## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

### CASE NO. 8:22-CV-1295

BRIAN MOREAU,

        Plaintiff,

vs.

FELD ENTERTAINMENT, INC.,
FELD MOTOR SPORTS, INC.,
JOHN A. BODNAR, M.D.,
JAMES KENNEDYE, M.D.,
ANTHONY DE HOYOS, and
AMY METIVA,

        Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff BRIAN MOREAU, a resident and citizen of France, sues Defendants FELD ENTERTAINMENT, INC., a Delaware Corporation, FELD MOTOR SPORTS, INC., a Delaware Corporation, JOHN A. BODNAR, M.D., a resident of California, JAMES KENNEDYE, M.D., a resident of Oklahoma, ANTHONY DE HOYOS, a resident of California, and AMY METIVA, a resident of Michigan, and alleges as follows:

### Nature of Case, Jurisdiction, and Venue

1.    This case arises out of the catastrophic and permanent injuries sustained by Plaintiff, a former professional motocross rider, during the "free practice" session

before the Monster Energy AMA Supercross Championship, an FIM World Championship ("**Supercross Championship**"), race at Raymond James Stadium in Tampa, Florida on February 15, 2020 ("**2020 Tampa Supercross**").  As a direct and proximate result of the Defendants' individual and collective negligence, gross negligence, and/or reckless disregard for the life, health, safety, and well-being of Plaintiff—who had just turned 18 years old two weeks before the race—Plaintiff is now a paraplegic.

2.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds the jurisdictional threshold, exclusive of interest and costs, and this dispute is between a citizen of France and citizens of different states of the United States of America.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to the Plaintiff's claims occurred within this judicial district.

**Plaintiff Brian Moreau**

4.      Plaintiff is a resident and citizen of France, who speaks French and English.  He was born in 2002 and is presently over the age of 18.

5.      In 2019, when he was 17 years old, Plaintiff moved to the United States to join the Troy Lee Designs Red Bull KTM Racing Team (n/k/a Troy Lee Designs Red Bull GASGAS Factory Racing Team) (the "**Racing Team**") and compete in the

250SX Class of the Supercross Championship.[1]  Before coming to the United States, Plaintiff had been a phenomenally successful motocross rider in Europe with an incredibly bright future in the sport.

### Feld Defendants

6.    At all relevant times, Defendants Feld Entertainment, Inc. and Feld Motor Sports, Inc. (collectively the "**Feld Defendants**") were for-profit corporations organized and existing in Delaware with their principal places of business in Palmetto, Florida; were conducting business extensively throughout Florida; were the promoters, organizers, and operators of the Supercross Championship; and were responsible for, among other things, directly or indirectly organizing, operating, controlling, staffing, and supervising the event and its premises in accordance with applicable law and the rules, regulations, requirements, standards, codes, procedures, and protocols of the American Motorcyclist Association and the Fédération Internationale de Motocyclisme, the domestic and global governing and sanctioning bodies of the Supercross Championship, respectively.

7.    At all relevant times, the Feld Defendants were responsible for and controlled the acts and omissions of their agents, employees, officers, directors, representatives, affiliates, and contractors, including but not limited to the Race Director, the Flag Marshall, the Flaggers, the Chief Medical Officer of the Supercross

---

[1] There are two racing divisions in the Supercross Championship: the 250SX Class and the 450SX Class. "The 250SX Class is populated primarily by younger riders on 250cc four-stroke motorcycles."  *See* https://www.supercrosslive.com/sx101 (last visited June 2, 2022).

Championship, the Medical Director of the Alpinestars Mobile Medical Unit, and the members of the Alpinestars Mobile Medical Unit.

**Tampa Sports Authority**

8.     At all relevant times, the Tampa Sports Authority ("**Authority**")[2] was a public agency and an Independent Special District under Florida law with its principal place of business in Tampa, Florida; and was the operator of the facilities known as "Raymond James Stadium," which is owned by Hillsborough County, Florida.

9.     In or around October 2019, the Authority entered into a License Agreement with the Feld Defendants to use Raymond James Stadium for the purpose of conducting the 2020 Tampa Supercross.  The Authority agreed, among other things, to provide the following services for the event: medical personnel, general operations personnel, and ambulance service for the event's participants.  The Authority also had the right and duty to supervise all operations of the Feld Defendants, including their agents, employees, officers, directors, representatives, affiliates, and contractors, in connection with the event.  This included the right and duty to preclude any act or use of equipment by the Feld Defendants, including their agents, employees, officers, directors, representatives, affiliates, and contractors, as needed to protect persons or property from exposure to unreasonable risks of harm, injury, or damage.

---

[2] Pursuant to § 768.28, Plaintiff has provided the Authority with written notice of his intent to sue under Florida law.  Plaintiff reserves the right to amend his complaint to assert claims against the Authority once his presuit claim is denied or the statutory waiting period lapses.

**The Domestic and Global Bodies**
**Sanctioning, Governing, and Regulating the Supercross Championship**

10.     At all relevant times, the American Motorcyclist Association ("**AMA**") was the domestic body that sanctioned, governed, and regulated the Supercross Championship series together with the Fédération Internationale de Motocyclisme.

11.     At all relevant times, the Fédération Internationale de Motocyclisme ("**FIM**") was the international body that sanctioned, governed, and regulated the Supercross Championship series together with the AMA.

12.     At all relevant times, the AMA and FIM each had established and implemented various rules, regulations, requirements, standards, codes, procedures, and protocols that Defendants were required to abide by and adhere to in connection with the Supercross Championship, including the 2020 Tampa Supercross.

**The Chief Medical Officer for the Supercross Championship**
**and the Medical Director of the Alpinestars Mobile Medical Unit**

13.     At all relevant times, Defendant John Bodnar, M.D. ("**Dr. Bodnar**") was a resident of California; was licensed to practice medicine in California but *not* in Florida; and was employed, appointed, selected, approved, authorized, and/or contracted by the Feld Defendants to serve as the Chief Medical Officer for the Supercross Championship and the Medical Director of the Alpinestars Mobile Medical Unit.

14.     At all relevant times, Dr. Bodnar was an agent and/or employee of the Feld Defendants and was acting within the scope of such employment and/or agency

relationship or, alternatively, was acting within his own individual or professional capacity as the Chief Medical Officer for the Supercross Championship and Medical Director of the Alpinestars Mobile Medical Unit.

15.    At all relevant times, Dr. Bodnar was responsible for not only his own acts and omissions, but also the acts and omissions of each member of the Alpinestars Mobile Medical Unit, as well as any other person or entity that had any duty or responsibility or provided any service falling under his purview as the Chief Medical Officer for the Supercross Championship and the Medical Director of the Alpinestars Mobile Medical Unit.

**Alpinestars Mobile Medical Unit**

16.    At all relevant times, the "Alpinestars Mobile Medical Unit" was a crew of individuals, including but not limited to physicians, registered nurses and nurse practitioners, certified athletic trainers, emergency medical technicians, and paramedics, who were responsible for providing on-track and trackside medical, rescue, and other services to riders during the Supercross Championship, including the 2020 Tampa Supercross.  Upon information and belief, none of the members of the Alpinestars Mobile Medical Unit were duly licensed, certified, or authorized by Florida to practice or perform their respective profession within the Sunshine State.

17.    At all relevant times, each member of the Alpinestars Mobile Medical Unit was the agent and/or employee of the Feld Defendants and/or Dr. Bodnar and was acting within the scope of such agency and/or employment relationship.

18.    At all relevant times, Defendant James Kennedye, M.D. ("**Dr. Kennedye**") was a resident of Oklahoma; was licensed to practice medicine in Oklahoma but *not* in Florida; and was employed, appointed, selected, approved, authorized, and/or contracted by Dr. Bodnar and/or the Feld Defendants to serve as a member of the Alpinestars Mobile Medical Unit during the Supercross Championship, including the 2020 Tampa Supercross.

19.    At all relevant times, Defendant Amy Metiva ("**Metiva**") was a resident of Michigan; was a certified athletic trainer licensed and/or certified in Michigan but *not* in Florida; and was employed, appointed, selected, approved, authorized, and contracted by Dr. Bodnar and/or the Feld Defendants to serve as a member of the Alpinestars Mobile Medical Unit during the Supercross Championship, including the 2020 Tampa Supercross.

20.    At all relevant times, Defendant Anthony De Hoyos ("**De Hoyos**") was a resident of California; was a certified athletic trainer licensed and/or certified in California but *not* in Florida; and was employed, appointed, selected, approved, authorized, and contracted by Dr. Bodnar and/or the Feld Defendants to serve as a member of the Alpinestars Mobile Medical Unit during the Supercross Championship, including the 2020 Tampa Supercross.

**The 2020 Tampa Supercross**

21.     The first race of the 2020 Supercross Championship series was held at Raymond James Stadium in Tampa, Florida on February 15, 2020.

22.     The 2020 Tampa Supercross was Plaintiff's debut for the Racing Team.

23.     In the early afternoon of February 15, 2020, and hours before the event officially started, the riders were allowed a "free practice" session on the racetrack, which was supervised by the Feld Defendants, including its agents, employees, officers, directors, representatives, affiliates, and contractors, such as the Race Director, the Flag Marshall, the Flaggers, and Dr. Bodnar, the Chief Medical Officer of the Supercross Championship and Medical Director of the Alpinestars Mobile Medical Unit, among others.

24.     Plaintiff participated in the practice session with other riders.

25.     During his first lap around the racetrack, Plaintiff crashed and fell off his motorcycle headfirst onto the middle of the racetrack and into the path of oncoming riders.

26.     A Flagger stationed at a nearby trackside location began waving a yellow flag as a supposed caution to oncoming riders.  However, at no point did any Defendant undertake any effort to "red flag" or stop the practice session—despite the serious nature of Plaintiff's crash, his headfirst impact with the ground, and the fact that he was lying on the ground in the middle of the racetrack.

27.    Shortly after the crash, two members of the Alpinestars Mobile Medical Unit, believed to be Metiva and De Hoyos, arrived on the scene to attend to Plaintiff, while a third person picked up Plaintiff's motorcycle, as shown below:



28.    Plaintiff immediately and repeatedly informed the two members of the Alpinestars Mobile Medical Unit that he was injured and was experiencing unusual sensations, including having trouble feeling his legs.

29.    Despite Plaintiff's obvious complaints of a potential spinal cord injury, the two members of the Alpinestars Mobile Medical Unit failed to undertake any effort to properly assess and respond to Plaintiff's reported injuries.  Indeed, at no point did they attempt to stabilize or immobilize his spine, place a cervical collar on Plaintiff, or ensure that his approximately 4-pound helmet was properly and carefully removed

under the circumstances, in accordance with the standard protocols for the type of acute trauma that Plaintiff had reported to them.

30.     Furthermore, even though Plaintiff was still lying on the ground in the middle of the racetrack and now had three other people in his immediate vicinity, at no point did any Defendant undertake any effort to "red flag" or stop the practice session to safeguard against the foreseeable risk of further harm and injury to Plaintiff.

31.     Instead, the two members of the Alpinestars Mobile Medical Unit proceeded to roughly lift Plaintiff up off the ground by his armpits and drag him off the racetrack like a ragdoll with his legs dangling from his torso, in a horrifying display of gross incompetence and reckless disregard for the life, health, and safety of Plaintiff, as shown below:





32.    Next, the two members of the Alpinestars Mobile Medical Unit, with the assistance of an unknown individual, proceeded to carry Plaintiff—by his armpits, torso, and dangling legs—over to the side of the racetrack and towards a nearby medical mule, as shown below:



33.     Around that time, a third member of the Alpinestars Mobile Medical Unit, believed to be Dr. Kennedye, arrived on scene to help Metiva and De Hoyos drop Plaintiff on the back of the medical mule, prop him upright, and yank off his helmet, as shown below:



34.    Plaintiff was then driven by the medical mule to an onsite ambulance accompanied by Metiva, as shown below:



35.    Upon arrival at the ambulance, the paramedics with Tampa Fire Rescue finally—and for the first time—recognized the serious nature of Plaintiff's reported injury and placed a cervical collar and rigid body splint on Plaintiff, before taking him to Tampa General Hospital.

36.    At all relevant times, the individual and/or collective acts and omissions of Defendants, including their agents, employees, officers, directors, representatives, affiliates, and contractors, breached the applicable standards of care, were grossly negligent, and were so reckless or wanting in care that they constituted a conscious

disregard or indifference to the life, safety, or rights of Plaintiff, and/or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff.

37.    At all relevant times, the individual and/or collective acts and omissions of Defendants, including their agents, employees, officers, directors, representatives, affiliates, and contractors, caused and/or contributed to Plaintiff's injuries, and/or resulted in the aggravation of his pre-existing condition, injury, and physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

38.    All conditions precedent to this suit have occurred or been performed.

## COUNT I
## Negligence of the Feld Defendants

39.    Plaintiff incorporates the allegations in paragraphs 1 through 38 as if fully set forth herein.

40.    At all relevant times, the Feld Defendants either directly or indirectly:

a.  organized, operated, staffed, supervised, and controlled the event and its premises;

b.  supervised and controlled their agents, employees, officers, directors, representatives, affiliates, and contractors for the event, including but not limited to the Race Director, the Flag Marshall, the Flaggers, the Chief Medical Officer, the Alpinestars Mobile Medical Unit and its Medical Director, and others whose responsibilities included protecting the riders from unreasonable risks of harm during the event;

c.  supervised and controlled the establishment, implementation, and enforcement of the rules, regulations, requirements, standards, codes, procedures, and protocols that their agents, employees, officers, directors, representatives, affiliates, and contractors adhered to or

should have adhered to in connection with the event, including but not limited to those related to the provision of on-track or trackside medical assistance to injured riders; and

d. determined the qualifications or lack of qualifications of each person that had any duty or responsibility with regard to the health or safety of the riders competing in the event.

41.    At all relevant times, the Feld Defendants owed Plaintiff a duty of reasonable care in organizing, operating, supervising, and controlling the event and its premises, including but not limited to establishing, implementing, and/or enforcing the rules, regulations, requirements, standards, codes, procedures, and protocols related to safeguarding the riders from unreasonable risks of harm beyond those inherent in the sport.

42.    At all relevant time, the Feld Defendants owed Plaintiff a duty to conduct the 2020 Tampa Supercross in accordance with the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, including but not limited to stopping or "red flagging" any practice session if there was danger to life or of further injury to a rider or persons attending to an injured rider if other riders continued to circulate, or if a rider was suspected of having a spinal cord or other serious injury.

43.    At all relevant times, the Feld Defendants had a duty to protect Plaintiff from unreasonable risks of harm beyond those inherent in the sport while he was participating in the 2020 Tampa Supercross.

44.    At all relevant times, the Feld Defendants breached their duties and increased the risks of harm to Plaintiff beyond those inherent in the sport by, among other things:

a. failing to abide by, implement, and enforce the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, including the FIM Medical Code, in conducting the event in general and in responding to a potential spinal cord or other serious injury specifically;

b. failing to render or ensure the rendering of appropriate emergency medical assistance to Plaintiff in light of his reports of a potential spinal cord injury by, among other things: (i) failing to properly assess Plaintiff's condition and injuries; (ii) failing to stabilize or immobilize Plaintiff's spine before moving him off the racetrack; (iii) failing to place a cervical collar on Plaintiff; (iv) picking Plaintiff up off the ground, dragging him over to the side of the racetrack, and then lifting him onto the back of the medical mule by his armpits, torso, and dangling legs; (v) propping Plaintiff upright on the back of the medical mule; and (iv) yanking Plaintiff's helmet off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported;

c. failing to adequately monitor and supervise the "free practice" session for circumstances, conditions, and/or crashes or injuries to riders that warranted stopping or "red flagging" the practice session;

d. failing to "red flag" or stop the practice session after Plaintiff crashed and fell headfirst onto the ground in the middle of the racetrack and repeatedly reported symptoms of a potential spinal cord injury, so as to allow sufficient time for the Alpinestars Mobile Medical Unit to properly assess and respond to Plaintiff's injuries;

e. failing to "red flag" or stop the practice session after Plaintiff crashed and fell headfirst onto the ground in the middle of the racetrack and was not clearly visible to oncoming riders;

f. failing to adequately hire, train, and supervise their agents, employees, officers, directors, representatives, affiliates, and contractors, including the Race Director, the Flag Marshall, the Flaggers, the Chief Medical Officer, the members of the Alpinestars Mobile Medical Unit and its Medical Director, and other individuals whose responsibilities included protecting the riders from unreasonable risks of harm and attending to their injuries during the event;

g. failing to provide qualified and adequate trackside personnel or professionals duly licensed or certified in Florida to render emergency medical services to riders injured on the racetrack; and

h. failing to establish, implement, and enforce reasonable safeguards to protect against the risk that the riders would receive less than adequate or substandard emergency medical services after being injured on the racetrack.

45.    At all relevant times, the Feld Defendants knew or should have known based upon prior experiences and incidents involving the provision of haphazard emergency medical services to other riders that any breach of their duties would likely subject the riders, including Plaintiff, to unreasonable and heightened risks of injury beyond those inherent in the sport.

46.    At all relevant times, the acts and omissions of the Feld Defendants were negligent, grossly negligent and/or were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff.

47.    As a direct and proximate result of the Feld Defendants' breaches, the "free practice" session was not stopped or "red flagged" after Plaintiff crashed and fell headfirst onto the ground in the middle of the racetrack, let alone after he reported symptoms of a potential spinal cord injury, thereby creating and/or increasing the foreseeable risk of further harm or injury to Plaintiff from oncoming riders and the provision of inadequate or substandard emergency medical services by the Alpinestars Mobile Medical Unit.

48.    As a direct and proximate result of the Feld Defendants' breaches, Plaintiff was subjected to inadequate and substandard emergency medical services while participating in the "free practice" session, despite immediately and repeatedly reporting obvious symptoms of a potential spine cord injury to the Alpinestars Mobile Medical Unit.

49.    As a direct and proximate result of the Feld Defendants' breaches, Plaintiff was injured, including but not limited to the aggravation of Plaintiff's pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

50.    As a direct and proximate result of the Feld Defendants' breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

51.     As a direct and proximate result of the Feld Defendants' breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the Feld Defendants for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT II
### Negligence against Dr. Bodnar

52.     Plaintiff incorporates the allegations in paragraphs 1 through 38 as if fully set forth herein.

53.     At all relevant times, Dr. Bodnar was the Chief Medical Officer for the Supercross Championship, including the 2020 Tampa Supercross, and the Medical Director of the Alpinestars Mobile Medical Unit.

54.     At all relevant times, Dr. Bodnar owed a duty of reasonable care to Plaintiff in hiring, retaining, training, and/or supervising the members of the Alpinestars Mobile Medical Unit to ensure, among other things, their compliance with prevailing emergency medicine standards and the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, including the FIM Medical Code.

55.     At all relevant times, Dr. Bodnar had a duty to monitor and supervise the racetrack during any race or practice session for any crash, incident, or potential serious injury of a rider that warranted stopping or "red flagging" the activity on the racetrack, so that the rider could receive appropriate emergency medical services.

56.     At all relevant times, Dr. Bodnar breached his duties and increased the risks of harm to Plaintiff beyond those inherent in the sport by, among other things:

   a.  failing to implement and enforce the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, including the FIM Medical Code, in supervising, controlling, and directing the Alpinestars Mobile Medical Unit in general and in responding to a potential spinal cord or other serious injury specifically;

   b.  failing to ensure the Alpinestars Mobile Medical Unit under his supervision, direction, and control rendered appropriate emergency medical assistance to Plaintiff;

   c.  failing to ensure the Alpinestars Mobile Medical Unit under his supervision, direction, and control properly assessed Plaintiff's condition and injuries before taking any action;

   d.  failing to ensure the Alpinestars Mobile Medical Unit under his supervision, direction, and control stabilized or immobilized Plaintiff's spine before moving him off the racetrack;

   e.  failing to ensure the Alpinestars Mobile Medical Unit under his supervision, direction, and control placed a cervical collar on Plaintiff;

   f.  failing to ensure the Alpinestars Mobile Medical Unit under his supervision, direction, and control did not carelessly and recklessly pick Plaintiff up off the ground, drag him over to the side of the racetrack, and then lift him onto the back of the medical mule by his armpits, torso, and dangling legs;

g.  failing to ensure the Alpinestars Mobile Medical Unit under his supervision, direction, and control did not carelessly and recklessly drop Plaintiff on the back of the medical mule and prop upright;

h.  failing to ensure the Alpinestars Mobile Medical Unit under his supervision, direction, and control did not simply yank Plaintiff's helmet off his head without any regard for standard protocols that applied to the type of acute trauma that Plaintiff had reported;

i.  failing to establish, implement, and/or enforce any procedures and protocols to ensure appropriate emergency medical services were provided by qualified and adequately trained personnel or professionals duly licensed or certified in Florida, in accordance with prevailing emergency medicine standards and the rules, regulations, requirements, standards, codes, and protocols of the AMA and the FIM, including the FIM Medical Code;

j.  failing to hire and/or retain qualified and adequate personnel or professionals duly licensed or certified in Florida to provide emergency medical services to riders injured on the racetrack, in accordance with prevailing emergency medicine standards and/or the rules, regulations, requirements, standards, codes, and protocols of the AMA and the FIM, including the FIM Medical Code;

k.  failing to adequately train and supervise the members of the Alpinestars Mobile Medical Unit to ensure they provided appropriate emergency medical services to riders injured on the racetrack, in accordance with the rules, regulations, requirements, standards, codes, and protocols of the AMA and the FIM, including the FIM Medical Code; and

l.  failing to adequately monitor, oversee, and/or supervise the practice session to ensure that it was stopped or "red flagged" after Plaintiff crashed and fell headfirst onto the ground in the middle of the racetrack or after he reported obvious symptoms of a potential spinal cord injury to the Alpinestars Mobile Medical Unit.

57.    At all relevant times, Dr. Bodnar knew or should have known based upon prior experiences and incidents involving the provision of haphazard emergency medical services to other riders that any breach of his duties would likely subject the riders, including Plaintiff, to unreasonable and heightened risks of injury beyond those inherent in the sport.

58.    At all relevant times, the acts and omissions of Dr. Bodnar were negligent, grossly negligent and/or were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff.

59.    As a direct and proximate result of Dr. Bodnar's breaches, the "free practice" session was not stopped or "red flagged" after Plaintiff crashed and fell headfirst onto the ground in the middle of the racetrack, let alone after he reported symptoms of a potential spinal cord injury, thereby creating and/or increasing the foreseeable risk of further harm or injury to Plaintiff from oncoming riders and the provision of inadequate or substandard emergency medical services by the Alpinestars Mobile Medical Unit.

60.    As a direct and proximate result of Dr. Bodnar's breaches, Plaintiff was subjected to inadequate and substandard emergency medical services while participating in the "free practice" session, despite immediately and repeatedly reporting obvious symptoms of a potential spine cord injury to the Alpinestars Mobile Medical Unit.

61.     As a direct and proximate result of Dr. Bodnar's breaches, Plaintiff was injured, including but not limited to the aggravation of Plaintiff's pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

62.     As a direct and proximate result of Dr. Bodnar's breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

63.     As a direct and proximate result of Dr. Bodnar's breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Dr. Bodnar for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT III
## Negligence against Metiva and De Hoyos

64.     Plaintiff incorporates the allegations in paragraphs 1 through 38 as if fully set forth herein.

65.     At all relevant times, Metiva and De Hoyos were members of the Alpinestars Mobile Medical Unit acting under the control of Dr. Bodnar and/or the Feld Defendants or, alternatively, acting within their own individual and/or professional capacity.

66.     At all relevant times, Metiva and De Hoyos owed Plaintiff a duty to use reasonable care under the circumstances, and/or the level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was acceptable and appropriate by similar and reasonably careful certified athletic trainers.[3]

67.     At all relevant times, Metiva and De Hoyos breached their ordinary and/or professional duties by, among other things:

      a.  failing to abide by the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, including the FIM Medical Code, with regards to responding to a potential serious injury to a rider

---

[3] Insofar as any allegation against Metiva or De Hoyos may be construed as an allegation of medical malpractice, Florida's medical malpractice statute provides no cover to them because certified athletic trainers are not "health care providers" within the meaning of § 766.202(4), Fla. Stat., and because the statute does not apply to professionals licensed or certified out-of-state. *See Dirga v. Butler*, 39 So. 3d 388, 391 (Fla. 1st DCA 2010) ("Given the unambiguous language of section 766.202(4), Florida Statutes, and Florida courts' strict construction of limitations on access to courts, we hold that out-of-state physicians are not health care providers entitled to presuit notice under chapter 766. Accordingly, we reverse the trial court's order dismissing the complaint against Dr. Butler, an Alabama physician, because he is not a health care provider as defined in chapter 766.").

on the racetrack, despite Plaintiff's complaints of a potential spinal cord injury;

b.  failing to properly assess Plaintiff's condition and injuries, despite his complaints of a potential spinal cord injury;

c.  failing to stabilize or immobilize Plaintiff's spine before moving him off the racetrack, despite his complaints of a potential spinal cord injury;

d.  failing to place a cervical collar on Plaintiff, despite his complaints of a potential spinal cord injury;

e.  picking Plaintiff up off the ground, dragging him over to the side of the racetrack, and then lifting him onto the back of the medical mule by his armpits, torso, and dangling legs, despite his complaints of a potential spinal cord injury;

f.  propping Plaintiff upright on the back of the medical mule, despite his complaints of a potential spinal cord injury; and

g.  yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

68.    At all relevant times, Metiva and De Hoyos knew or should have known based upon prior experiences and incidents involving the provision of haphazard emergency medical services to other riders that any breach of their duties would likely subject the riders, including Plaintiff, to unreasonable and heightened risks of injury beyond those inherent in the sport.

69.    At all relevant times, the acts and omissions Metiva and De Hoyos were negligent, grossly negligent and/or were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff,

or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff.

70.    As a direct and proximate result of Metiva and De Hoyos' breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

71.    As a direct and proximate result of Metiva and De Hoyos' breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

72.    As a direct and proximate result of Metiva and De Hoyos' breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Metiva and De Hoyos for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT IV
### Negligence against Dr. Kennedye

73.    Plaintiff incorporates the allegations in paragraphs 1 through 38 as if fully set forth herein.

74.    At all relevant times, Dr. Kennedye was a member of the Alpinestars Mobile Medical Unit acting under the control of Dr. Bodnar and/or the Feld Defendants or, alternatively, acting within his own individual and/or professional capacity.

75.    At all relevant times, Dr. Kennedye owed Plaintiff a duty to use reasonable care under the circumstances, and/or to use the level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was acceptable and appropriate by similar and reasonably careful doctors.[4]

76.    At all relevant times, Dr. Kennedye breached his ordinary and professional duties by, among other things:

> a. failing to abide by the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, including the FIM Medical Code, with regards to responding to a potential serious injury to a rider on the racetrack, despite Plaintiff's complaints of a potential spinal cord injury;

---

[4] Insofar as any allegation against Dr. Kennedye may be construed as an allegation of medical malpractice, Florida's medical malpractice statute provides no cover to him because he was not licensed to practice medicine in Florida and, therefore, was not a "health care provider" within the meaning of § 766.202(4), Fla. Stat. *See Dirga v. Butler*, 39 So. 3d 388, 391 (Fla. 1st DCA 2010) ("Given the unambiguous language of section 766.202(4), Florida Statutes, and Florida courts' strict construction of limitations on access to courts, we hold that out-of-state physicians are not health care providers entitled to presuit notice under chapter 766. Accordingly, we reverse the trial court's order dismissing the complaint against Dr. Butler, an Alabama physician, because he is not a health care provider as defined in chapter 766.").

    b.  failing to properly assess Plaintiff's condition and injuries, despite his complaints of a potential spinal cord injury;

    c.  failing to stabilize or immobilize Plaintiff's spine before moving him off the racetrack, despite his complaints of a potential spinal cord injury;

    d.  failing to place a cervical collar on Plaintiff, despite his complaints of a potential spinal cord injury;

    e.  propping Plaintiff upright on the back of the medical mule, despite his complaints of a potential spinal cord injury; and

    f.  yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

77.    At all relevant times, Dr. Kennedye knew or should have known based upon prior experiences and incidents involving the provision of haphazard emergency medical services to other riders that any breach of his duties would likely subject the riders, including Plaintiff, to unreasonable and heightened risks of injury beyond those inherent in the sport.

78.    At all relevant times, the acts and omissions Dr. Kennedye were negligent, grossly negligent and/or were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff.

79.    As a direct and proximate result of Dr. Kennedye's breaches, Plaintiff was injured, including but not limited to the aggravation of Plaintiff's pre-existing

condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

80.    As a direct and proximate result of Dr. Kennedye's breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

81.    As a direct and proximate result of Dr. Kennedye's breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Dr. Kennedye all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all his claims.

Respectfully submitted,

By: */s/ Mark A. Schweikert*
Mark A. Schweikert (FBN 70555)
mark@schweikertlaw.com
**SCHWEIKERT LAW PLLC**
1111 Brickell Avenue, Suite 1550

Miami, Florida 33131
Telephone: (305) 999-1906
*Lead Counsel for Plaintiff*

*and*

Maria A. Dominguez, Esq. (FBN 0510221)
maria.dominguez@dmralaw.com
Juan C. Ramos-Rosado, Esq. (FBN 1002562)
juan.ramos@dmralaw.com
Manuel A. Franco, Esq. (FBN 126443)
manuel.franco@dmralaw.com
**DMRA Law LLC**
1111 Brickell Avenue, Ste. 1550
Miami, FL 33131
Telephone: 305-548-8666

*and*

Jason B. Giller, Esq. (FBN 77441)
jason@gillerpa.com
**JASON B. GILLER, P.A.**
1111 Brickell Avenue, Suite 1550
Miami, Florida 33131
Telephone: (305) 999-1906