# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

## CASE NO. 8:22-CV-1295

BRIAN MOREAU,

       Plaintiff,

vs.

FELD ENTERTAINMENT, INC.,
FELD MOTOR SPORTS, INC.,
THE MEDIC RIG, LLC,
JOHN A. BODNAR, M.D.,
JAMES KENNEDYE, M.D.,
AMY METIVA, and
JOHN DOE,

       Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL[1]

Plaintiff BRIAN MOREAU, a resident and citizen of France, sues Defendants

FELD ENTERTAINMENT, INC., a Delaware Corporation, FELD MOTOR

SPORTS, INC., a Delaware Corporation, THE MEDIC RIG, LLC, a California

Limited Liability Company, JOHN A. BODNAR, M.D., a resident of California,

---

[1] Plaintiff respectfully amends his pleading "once as a matter of course" pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). Specifically, on July 6, 2022, Defendant John Bodnar, M.D. filed a motion to dismiss. (ECF No. 30). Pursuant to Local Rule 3.01(c), Plaintiff's response was due within 21 days, that is, by July 27, 2022. Instead of filing a response, Plaintiff has opted to amend his pleading under Rule 15(a)(1)(B).

JAMES KENNEDYE, M.D., a resident of Oklahoma, AMY METIVA, a resident of Michigan, and JOHN DOE,[2] and alleges as follows:

### Nature of Case, Jurisdiction, and Venue

1.    This case arises out of the catastrophic and permanent injuries sustained by Plaintiff, a former professional motocross rider, during the "free practice" session before the Monster Energy AMA Supercross Championship, an FIM World Championship ("**Supercross Championship**"), race at Raymond James Stadium in Tampa, Florida on February 15, 2020 ("**2020 Tampa Supercross**").  As a direct and proximate result of the Defendants' individual and collective negligence, gross negligence, and reckless disregard for the life, health, safety, and well-being of Plaintiff—who had just turned 18 years old two weeks before the race—Plaintiff has been rendered a paraplegic.

2.    This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds the jurisdictional threshold, exclusive of interest and costs, and this dispute is between a citizen of France and citizens of different states of the United States of America.

3.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to the Plaintiff's claims occurred within this judicial district.

---

[2] "John Doe" is a pseudonym for the gentleman wearing a red shirt, who is shown dragging Plaintiff off the racetrack on page 10.  Plaintiff's counsel asked counsel for the Feld Defendants to provide this gentleman's true identity before the parties exchange their initial disclosures but has not yet received the requested information.

**Plaintiff Brian Moreau**

4.     Plaintiff is a resident and citizen of France, who speaks French and English.  He was born in 2002 and is presently over the age of 18.

5.     In 2019, when he was 17 years old, Plaintiff moved to the United States to join the Troy Lee Designs Red Bull KTM Racing Team (n/k/a Troy Lee Designs Red Bull GASGAS Factory Racing Team) (the "**Racing Team**") and compete in the 250SX Class of the Supercross Championship.[3]

6.     Before coming to the United States, Plaintiff had been a phenomenally successful motocross rider in Europe with an incredibly bright future in the sport.

**Feld Defendants**

7.     At all relevant times, Defendants Feld Entertainment, Inc. and Feld Motor Sports, Inc. (collectively the "**Feld Defendants**") were for-profit corporations organized and existing in Delaware with their principal places of business in Palmetto, Florida; were conducting business extensively throughout Florida; were the promoters, organizers, and operators of the Supercross Championship; and were responsible for, among other things, directly or indirectly organizing, operating, controlling, staffing, and supervising the event and its premises in accordance with applicable law and the rules, regulations, policies, procedures, and codes of the American Motorcyclist Association and the Fédération Internationale de

---

[3] There are two racing divisions in the Supercross Championship: the 250SX Class and the 450SX Class. "The 250SX Class is populated primarily by younger riders on 250cc four-stroke motorcycles."  *See* https://www.supercrosslive.com/sx101 (last visited July 26, 2022).

Motocyclisme, the domestic and global governing and sanctioning bodies of the Supercross Championship, respectively.

**Tampa Sports Authority**

8.     At all relevant times, the Tampa Sports Authority[4] was a public agency and an Independent Special District under Florida law with its principal place of business in Tampa, Florida; and was the operator of the facilities known as "Raymond James Stadium," which is owned by Hillsborough County, Florida.

9.     In or around October 2019, the Tampa Sports Authority entered into a License Agreement with the Feld Defendants to use Raymond James Stadium for the purpose of conducting the 2020 Tampa Supercross.  The Tampa Sports Authority agreed, among other things, to provide the following services for the event: medical personnel, general operations personnel, and ambulance service for the event's participants.

10.    The Tampa Sports Authority also had the right and duty to supervise all operations of the Feld Defendants, including their agents, employees, officers, directors, representatives, affiliates, and contractors, in connection with the event. This included the right and duty to preclude any act or use of equipment by the Feld Defendants, including their agents, employees, officers, directors, representatives,

---

[4] Pursuant to § 768.28, Plaintiff has provided the Tampa Sports Authority with written notice of his intent to sue under Florida law.  Plaintiff reserves the right to amend his complaint to assert claims against it once his presuit claim is denied or the statutory waiting period lapses.

affiliates, and contractors, as needed to protect persons or property, including Plaintiff, from exposure to unreasonable risks of harm, injury, or damage.

### The Domestic and Global Bodies
### Sanctioning, Governing, and Regulating the Supercross Championship

11.    At all relevant times, the American Motorcyclist Association ("**AMA**") was the domestic body that sanctioned, governed, and regulated the Supercross Championship series together with the Fédération Internationale de Motocyclisme.

12.    At all relevant times, the Fédération Internationale de Motocyclisme ("**FIM**") was the international body that sanctioned, governed, and regulated the Supercross Championship series together with the AMA.

13.    At all relevant times, the AMA and FIM each had established and implemented rules, regulations, policies, procedures, and codes that Defendants and their agents, employees, officers, directors, representatives, affiliates, and contractors were required to abide by in connection with the Supercross Championship, including the 2020 Tampa Supercross.

### The Medic Rig doing business as the "Alpinestars Mobile Medical Unit"

14.    At all relevant times, Defendant The Medic Rig, LLC ("**The Medic Rig**") was a Limited Liability Company organized and existing in California with its principal place of business in Long Beach, California; was conducting substantial business within Florida in connection with the Supercross Championship, including the 2020 Tampa Supercross; and was responsible for providing on-track, off-track, and trackside medical, rescue, and other assistance and services to any rider injured during

5

the Supercross Championship in accordance with prevailing emergency medicine standards as well as the rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code.

15.     Upon information and belief, at all relevant times, The Medic Rig was doing business as the "**Alpinestars Mobile Medical Unit**" in part due to a sponsorship by Alpinestars, a manufacturer of clothing and protective gear for motorsports and action sports, including motocross racing.

16.     At all relevant times, the Alpinestars Mobile Medical Unit included a crew of individuals, including but not limited to physicians, registered nurses and nurse practitioners, certified athletic trainers, emergency medical technicians, paramedics, and others, who were responsible for providing on-track and trackside, medical, rescue, and other assistance and services to any riders injured during the Supercross Championship series, including the 2020 Tampa Supercross.

17.     At all relevant times, Defendant John Bodnar, M.D. ("**Dr. Bodnar**") was a resident of California; was licensed to practice medicine in California but not in Florida; and was the Chief Medical Officer for the Supercross Championship and the Medical Director of The Medic Rig (d/b/a Alpinestars Mobile Medical Unit).

18.     At all relevant times, Defendant James Kennedye, M.D. ("**Dr. Kennedye**") was a resident of Oklahoma; was licensed to practice medicine in Oklahoma but not in Florida; and was a crewmember of the Alpinestars Mobile Medical Unit during the Supercross Championship.

19.     At all relevant times, Defendant Amy Metiva ("**Metiva**") was a resident of Michigan; was a certified athletic trainer licensed and/or certified in Michigan but not in Florida; and was a crewmember of the Alpinestars Mobile Medical Unit during the Supercross Championship.

20.     At all relevant times, Defendant John Doe ("**John Doe**"), whose true identity is currently unknown, was a crewmember of the Alpinestars Mobile Medical Unit during the Supercross Championship.

### The 2020 Tampa Supercross

21.     The first race of the 2020 Supercross Championship series was held at Raymond James Stadium in Tampa, Florida on February 15, 2020.

22.     The 2020 Tampa Supercross was Plaintiff's debut for the Racing Team.

23.     In the early afternoon of February 15, 2020, and hours before the event officially started, the riders were allowed a "free practice" session on the racetrack, which was supervised by the Feld Defendants, including its agents, employees, officers, directors, representatives, affiliates, and contractors, such as the Race Director, the Flag Marshall, the Flaggers, and Dr. Bodnar, among others.

24.     Plaintiff participated in the practice session with other riders.

### "The show must go on."

25.     During his first lap around the racetrack, Plaintiff crashed and fell off his motorcycle headfirst onto the middle of the racetrack and into the path of oncoming riders.

26.     A flagger stationed at a nearby trackside location began waving a yellow flag as a supposed caution to oncoming riders.  However, at no point did any Defendant undertake any effort to "red flag" or stop the practice session—despite the serious nature of Plaintiff's crash, his headfirst impact with the ground, and the fact that he was lying on the ground in the middle of the racetrack.

27.     Shortly after the crash, two crewmembers of the Alpinestars Mobile Medical Unit, believed to be Metiva and John Doe, arrived on the scene to attend to Plaintiff, while a third person picked up Plaintiff's motorcycle, as shown below:



28.     Plaintiff immediately and repeatedly informed the two crewmembers that he was injured and was experiencing unusual sensations, including having trouble feeling his legs.

29.     Despite Plaintiff's obvious complaints of a potential spinal cord injury, the two crewmembers failed to undertake any effort to properly assess and attend to his reported injuries.  Indeed, at no point did they attempt to stabilize or immobilize his spine, place a cervical collar on Plaintiff, or ensure that his approximately 4-pound helmet was properly and carefully removed under the circumstances, in accordance with the standard protocols for the type of acute trauma that Plaintiff had reported.

30.     Furthermore, even though Plaintiff was still lying on the ground in the middle of the racetrack and now had three other people in his immediate vicinity, Defendants still failed to undertake any effort to stop or "red flag" the practice session to safeguard against the foreseeable risk of further harm and injury to Plaintiff.

31.     Instead, the two crewmembers of the Alpinestars Mobile Medical Unit proceeded to roughly lift Plaintiff up off the ground by his armpits and drag him off the racetrack like a ragdoll with his legs dangling from his torso, in a horrifying display of gross incompetence and reckless disregard for the life, health, and safety of Plaintiff, as shown below:





32.     Next, the two crewmembers of the Alpinestars Mobile Medical Unit, with the assistance of an unknown individual, proceeded to carry Plaintiff—by his armpits, torso, and dangling legs—over to the side of the racetrack and towards a nearby medical mule, as shown below:



33.     Around that time, a third crewmember of the Alpinestars Mobile Medical Unit, Dr. Kennedye, arrived on scene to help Metiva and John Doe drop Plaintiff on the back of the medical mule, prop him upright, and yank off his helmet, as shown below:



34.     Plaintiff was then driven by the medical mule to an onsite ambulance accompanied by Metiva, as shown below:



35. Upon arrival at the ambulance, the paramedics with Tampa Fire Rescue finally—and for the first time—recognized the serious nature of Plaintiff's reported injury and placed a cervical collar and rigid body splint on Plaintiff, before taking him to Tampa General Hospital.

36. All conditions precedent to this suit have occurred or been performed.

**COUNT I**
**Negligence against the Feld Defendants**

37. Plaintiff incorporates the allegations in paragraphs 1 through 36 as if fully set forth herein.

38. At all relevant times, Defendants Feld Entertainment, Inc. and Feld Motor Sports, Inc. (collectively the "**Feld Defendants**") were the promoters, organizers, and operators of the Supercross Championship.

39. At all relevant times, the Feld Defendants were responsible for organizing, operating, staffing, and controlling the 2020 Tampa Supercross in accordance with the rules, regulations, policies, procedures, and codes of the AMA and the FIM, the domestic and international sanctioning bodies for the event.

40. At all relevant times, the Feld Defendants had numerous employees, agents, and/or contractors that they selected, authorized, and appointed to oversee and manage the event in accordance with the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM. This included, but was not limited to, a Race Director, a Clerk of Course, a Flag Marshall, Flaggers

/ Corner Workers, a Chief Medical Officer, and the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit.

41.  At all relevant times, whenever motorcycles are on the racetrack, the Chief Medical Officer had a duty: to be stationed in an elevated "Race Control" booth to monitor the on-track activity; to be in close proximity to and liaise with the Clerk of the Course and Race Director; to be in direct communication with the medical team on the ground (the Alpinestars crewmembers); to provide immediate updates from trackside medical personnel to the Race Director and others regarding the condition of any injured rider to facilitate the most appropriate medical response to their condition; to participate with the Race Director and others in the immediate deployment of appropriate medical resources to injured riders; and to recommend to the Race Director, Clerk of Course, or other appropriate officials that a practice session or race be "red flagged" if, among other reasons, there is danger to a rider or officials attending to an injured rider if other riders continue to circulate the racetrack, or there is a suspected spinal or other serious injury that will require prolonged medical treatment.

42.  At all relevant times, the Race Director, Clerk of Course, and other relevant officials also had a duty "red flag" a practice session or race if there was danger to a rider or officials attending to an injured rider if other riders continue to circulate the racetrack, or there was a suspected spinal or other serious injury that would require prolonged medical treatment.

14

43.     At all relevant times, the Chief Medical Officer of the Supercross Championship, the Medical Director of the Alpinestars Mobile Medical Unit, and its crewmembers owed and undertook a duty to provide on-track and trackside medical, rescue, and other assistance to riders injured on the racetrack, in accordance with prevailing emergency medicine standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code.

44.     At all relevant times, the Race Director, the Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, the Chief Medical Officer, the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other relevant officials were the actual or apparent agents and/or employees of the Feld Defendants, and were acting within the scope of their agency and employment relationship with the Feld Defendants, and/or were performing services which he or she was employed to perform by the Feld Defendants in connection with the 2020 Tampa Supercross.

45.     At all relevant times, the Feld Defendants acknowledged that the Race Director, the Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, the Chief Medical Officer, the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other relevant officials would act on their behalf by, among other things: providing them with the credentials to access and work the event; providing them with various items to wear during the event to promote Monster Energy®—the Feld Defendants' official sponsor for the Supercross Championship;

and providing them with clothing branded in big yellow letters with the logo, "FELD ENTERTAINMENT":



46.    At all relevant times, the Race Director, the Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, the Chief Medical Officer (Dr. Bodnar), the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other relevant officials accepted the undertaking to act on behalf of the Feld Defendants by, among other things, using the provided credentials to access and work

the event on behalf of the Feld Defendants while wearing various items that bore the logos of Monster Energy® and/or "FELD ENTERTAINMENT."

47. At all relevant times, the Feld Defendants controlled the actions of the Race Director, the Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, the Chief Medical Officer (Dr. Bodnar), the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other relevant officials by, among other things, providing them with headsets, protective gear, and other essential equipment needed to perform their duties and responsibilities, as well as verbal and written instructions and directives on how to perform their duties and responsibilities, manage the on-track and off-track activities, and make the event as entertaining as possible for the spectators (so as to drive ticket sales for the remaining events of the 2020 season and, ultimately, pad the Feld Defendants' bottom line).

48. At all relevant times, the Feld Defendants represented to the riders, including Plaintiff and his sports agent, that the Race Director, Clerk of Course, Flaggers / Corner Workers, Chief Medical Officer, and other relevant officials would conduct the event in accordance with the rules, regulations, policies, procedures, and codes of the AMA and the FIM in an effort to not only ensure fair competition amongst the riders, but also to protect the riders from risks of harm beyond those inherent in the sport.

49. At all relevant times, Plaintiff relied upon these representations in participating in the event.

50.    At all relevant times, Plaintiff's reliance upon these representations was detrimental, because the Feld Defendants' agents and employees did not conduct the event in accordance with the rules, regulations, policies, procedures, and codes of the AMA and the FIM, for which Plaintiff has paid an irreversible and devastating price.

51.    At all relevant times, the Feld Defendants and their agents and employees breached their duties by, among other things:

    a. failing to abide by the rules, regulations, policies, procedures, and codes of the AMA and the FIM regarding when to stop or "red flag" a practice session in the interest of safety;

    b. failing to stop or "red flag" the practice session after Plaintiff crashed and fell headfirst onto the middle of the racetrack, given there was obvious danger to life or of further injury to Plaintiff or the Alpinestars crewmembers attending to him if other riders continued to circulate;

    c. failing to stop or "red flag" the practice session after Plaintiff crashed and fell headfirst onto the middle of the racetrack and reported obvious symptoms of a potential spinal cord injury that required prolonged medical intervention;

    d. failing to abide by prevailing emergency medicine standards and the rules, regulations, policies, procedures, and codes of the AMA and the FIM, in attending to Plaintiff's repeated reports of obvious symptoms of a potential spinal cord injury;

    e. failing to properly assess Plaintiff's condition and injuries before dragging him off the racetrack;

    f. failing to stabilize or immobilize Plaintiff's spine before dragging him off the racetrack;

    g. failing to place a cervical collar on Plaintiff;

      h.   dragging Plaintiff off the racetrack by his armpits and lifting him off the ground by his dangling legs;

      i.   dropping Plaintiff on the back of the medical mule and propping him upright; and

      j.   yanking or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

52.     At all relevant times, the Feld Defendants and their agents and employees knew or should have known based upon prior experiences that their failure to stop or "red flag" the practice session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of serious injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

53.     At all relevant times, the Feld Defendants and their agents and employees knew or should have known that their failure to comply with prevailing emergency medicine standards and the rules, regulations, requirements, policies, procedures, and codes of the AMA and the FIM in attending to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

54.     At all relevant times, the acts and omissions of the Feld Defendants and their agents and employees were not only egregiously unreasonable and substandard,

but were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, and demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because they essentially ignored all prevailing emergency medicine standards and the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, their own prior experiences, and general common sense—by simply dragging Plaintiff off the racetrack like a ragdoll, throwing him in the back of medical mule like a disposable crash test dummy, and yanking his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

55.     As a direct and proximate result of the foregoing breaches, Plaintiff was catastrophically injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

56.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

57.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the Feld Defendants for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

**COUNT II**
**Negligence against The Medic Rig**

58. Plaintiff incorporates the allegations in paragraphs 1 through 36 as if fully set forth herein.

59. At all relevant times, The Medic Rig, its Medical Director, Dr. Bodnar, and its crewmembers of the Alpinestars Mobile Medical Unit, including Dr. Kennedye, Metiva, and John Doe, owed and undertook a duty of care in providing on-track and trackside medical, rescue, and other assistance and services to any riders, including Plaintiff, that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code.

60. At all relevant times, each crewmember of the Alpinestars Mobile Medical Unit, including Dr. Bodnar, Dr. Kennedye, Metiva, and John Doe, was the agent and employee of The Medic Rig because the crewmembers' actions were controlled by The Medic Rig or were subject to its right of control.

61. At all relevant times, each crewmember of the Alpinestars Mobile Medical Unit, including Dr. Bodnar, Dr. Kennedye, Metiva, and John Doe, was

acting within the scope of their agency and employment relationship with The Medic Rig, and was performing services which he or she was employed to perform by The Medic Rig.

62.     At all relevant times, The Medic Rig acknowledged that the crewmembers of the Alpinestars Mobile Medical Unit would act on its behalf by, among other things, providing them with a red t-shirt that specifically designated them as part of the Alpinestars Mobile Medical Unit's "Medical Team." The crewmembers accepted the undertaking to act on behalf of The Medic Rig by, among other things, wearing the t-shirts while providing medical, rescue, and other assistance to the riders during the 2020 Tampa Supercross. Furthermore, The Medic Rig controlled the actions of the crewmembers by, among other things, using radio headsets by which they could communicate and receive directives and instructions from Dr. Bodnar, the Chief Medical Officer of the Supercross Championship and the Medical Director the Alpinestars crew, and others, while providing medical, rescue, and other assistance to riders injured during the event.

63.     At all relevant times, The Medic Rig represented to the riders, including Plaintiff and his sports agent, that its crewmembers would provide the best possible on-track and trackside medical, rescue, and other assistance to riders injured during the event. Upon information and belief, this representation (or its substantial equivalent) was made to the riders, including Plaintiff, by the Alpinestars crewmembers before the commencement of the "free practice" session during which Plaintiff was catastrophically injured.

64. At all relevant times, Plaintiff relied upon these representations in participating in the event.

65. At all relevant times, Plaintiff's reliance upon these representations was detrimental, because Plaintiff did not receive the best possible medical assistance from the crewmembers of the Alpinestars Mobile Medical Unit, who literally dragged him off the racetrack, threw him on the back of the medical mule like a disposable crash test dummy, and yanked off his helmet—despite his reports of obvious symptoms of a potential spinal cord injury.

66. At all relevant times, The Medic Rig and its agents and employees breached their duties by, among other things:

> k. failing to abide by applicable prevailing emergency medicine standards and the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, in responding and attending to Plaintiff's repeated reports of obvious symptoms of a potential spinal cord injury;
>
> l. failing to properly assess Plaintiff's condition and injuries before dragging him off the racetrack;
>
> m. failing to undertake any efforts (whether through radio communications or otherwise) to cause the practice session to be "red flagged" so that Plaintiff's condition and injuries could be properly assessed before moving him off the racetrack;
>
> n. failing to stabilize or immobilize Plaintiff's spine before dragging him off the racetrack;
>
> o. failing to place a cervical collar on Plaintiff;
>
> p. dragging Plaintiff off the racetrack by his armpits and lifting him off the ground by his dangling legs;

     q. dropping Plaintiff on the back of the medical mule and propping him upright; and

     r. yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

67.    At all relevant times, The Medic Rig and its agents and employees knew or should have known based upon prior incidents that their failure to try to stop or "red flag" the practice session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

68.    At all relevant times, The Medic Rig and its agents and employees knew or should have known that their failure to comply with prevailing emergency medicine standards and the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM in responding and attending to a rider injured on the racetrack would likely subject that rider to heightened risks of injury beyond those inherent in the sport.

69.    At all relevant times, the acts and omissions of The Medic Rig and its agents and employees were not only egregiously unreasonable and substandard, but were so reckless or wanting in care that they constituted a conscious disregard or

indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because they essentially ignored all prevailing emergency medicine standards and the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, their own prior experiences, and general common sense—by simply dragging Plaintiff off the racetrack like a ragdoll, throwing him in the back of medical mule like a disposable crash test dummy, and yanking his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

70. As a direct and proximate result of the foregoing breaches, Plaintiff was catastrophically injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

71. As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

72. As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against The Medic Rig for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT III
## Negligence against Dr. Bodnar

73.     Plaintiff incorporates the allegations in paragraphs 1 through 36 as if fully set forth herein.

74.     At all relevant times, Dr. Bodnar was the Chief Medical Officer for the Supercross Championship and the Medical Director of the Alpinestars Mobile Medical Unit.  In those capacities, Dr. Bodnar was responsible for, among other things, all aspects of any event that may have potential medical consequences, including supervising the Alpinestars crewmembers and ensuring that any medical, rescue, and other assistance that they provided to any injured riders comported with prevailing emergency medicine standards and the rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code.

75.     At all relevant times, whenever motorcycles are on the racetrack, Dr. Bodnar also had a duty: to be stationed in the "Race Control" booth; to be in close proximity to and liaise with the Clerk of the Course and Race Director, among others; to be in direct communication with the medical team on the ground (the Alpinestars crewmembers); to provide immediate updates from trackside medical personnel to the Race Director and others regarding the condition of any injured rider to facilitate the

most appropriate medical response to their condition; to participate with the Race Director and others in the immediate deployment of appropriate medical resources to injured riders; and to recommend to the Race Director, Clerk of Course, or other appropriate officials that a practice session or race be stopped or "red flagged" if, among other reasons, there is danger to a rider or officials attending to an injured rider if other riders continue to circulate the racetrack the racetrack, or there is a suspected spinal or other serious injury that will require prolonged medical treatment.

76. At all relevant times, Dr. Bodnar breached his duties by, among other things:

    a. failing to recommend that the practice session be stopped or "red flagged" despite the obvious danger to life or of further injury to Plaintiff or the Alpinestars crewmembers attending to him in the middle of the racetrack if other riders continued to circulate;

    b. failing to recommend that the practice session be stopped or "red flagged" despite Plaintiff's repeated reports of obvious symptoms of a potential spinal cord injury that required prolonged medical intervention; and

    c. failing to supervise the Alpinestars crewmembers to ensure that any assistance they provided to Plaintiff—after he crashed and fell headfirst onto the middle of the racetrack and reported obvious symptoms of a spinal cord injury—comported with prevailing emergency medical standards and the rules, regulations, policies, procedures, and codes of the AMA and the FIM, as opposed to simply dragging him off the racetrack like a ragdoll, throwing him on the back of the medical mule like a disposable crash test dummy, and yanking off his helmet.

77. At all relevant times, Dr. Bodnar knew or should have known based upon his prior experience that, if he failed to comply with his duty to recommend that a

practice session be stopped or "red flagged"—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—then Plaintiff would likely be subjected to heightened risks of serious injury beyond those inherent in the sport, such as the provision of inadequate, substandard, haphazard, reckless, and grossly negligent assistance from the Alpinestars crewmembers responding to the scene.

78. At all relevant times, Dr. Bodnar knew or should have known based upon his prior experience that any Alpinestars crewmember's provision of inadequate, substandard, haphazard, reckless, and grossly negligent assistance to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

79. At all relevant times, the acts and omissions of Dr. Bodnar were not only egregiously unreasonable and substandard, but also so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because Dr. Bodnar essentially ignored all the applicable rules, regulations, policies, procedures, and codes of the AMA and the FIM, all prevailing emergency medicine standards, and basic common sense in failing to recommend that the practice session be "red flagged" so that Plaintiff could receive the prolonged medical intervention his reported symptoms indisputably required; instead, Dr. Bodnar simply stood idly by and watched (like other horrified spectators)

as the Alpinestars crewmembers literally dragged Plaintiff off the racetrack like a ragdoll, threw him on the back of a medical mule like a disposable crash test dummy, and yanked his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

80.     As a direct and proximate result of the foregoing breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

81.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

82.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Dr. Bodnar for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT IV
### Negligence against Metiva

83.     Plaintiff incorporates the allegations in paragraphs 1 through 36 as if fully set forth herein.

84.     At all relevant times, Defendant Amy Metiva was an employee and agent of The Medic Rig and The Feld Defendants, was a crewmember of the Alpinestars Mobile Medical Unit, and was acting within the scope of such employment and agency relationship.

85.     At all relevant times, Metiva owed and undertook a duty of care in providing on-track and trackside, medical, rescue, and other assistance and services to any riders, including Plaintiff, that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code.

86.     At all relevant times, Metiva also owed Plaintiff a duty to use the level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was acceptable and appropriate by similar and reasonably careful certified athletic trainers.[5]

---

[5] Insofar as any allegation against Metiva may be construed as an allegation of medical malpractice, Florida's medical malpractice statute provides no cover to her because certified athletic trainers are not "health care providers" within the meaning of § 766.202(4), Fla. Stat., and because the statute does not apply to professionals licensed or certified out-of-state. *See Dirga v. Butler*, 39 So. 3d 388, 391 (Fla. 1st DCA 2010) ("Given the unambiguous language of section 766.202(4), Florida Statutes, and Florida courts' strict construction of limitations on access to courts, we hold that out-of-state physicians are not health care providers entitled to

87.  At all relevant times, Metiva breached her duties by, among other things:

    a.  failing to abide by applicable prevailing emergency medicine standards as well as the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM, in responding to Plaintiff's repeated reports of symptoms of a potential spinal cord injury;

    b.  failing to properly assess Plaintiff's condition and injuries before dragging him off the racetrack;

    c.  failing to undertake any efforts (whether through radio communications or otherwise) to cause the practice session to be "red flagged" so that Plaintiff's condition and injuries could be properly assessed before moving him off the racetrack;

    d.  failing to stabilize or immobilize Plaintiff's spine before dragging him off the racetrack;

    e.  failing to place a cervical collar on Plaintiff;

    f.  dragging Plaintiff off the racetrack by his armpits and lifting him off the ground by his dangling legs;

    g.  dropping Plaintiff on the back of the medical mule before propping him upright; and

    h.  yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

88.  At all relevant times, Metiva knew or should have known based upon

prior experience and incidents that her failure to try to stop or "red flag" the practice

---

presuit notice under chapter 766. Accordingly, we reverse the trial court's order dismissing the complaint against Dr. Butler, an Alabama physician, because he is not a health care provider as defined in chapter 766.").

session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

89.     At all relevant times, Metiva knew or should have known that her failure to comply with prevailing emergency medicine standards and the rules, regulations, policies, procedures, and codes of the AMA and the FIM in responding to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

90.     At all relevant times, the acts and omissions of Metiva were not only egregiously unreasonable and substandard, but also so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because Metiva essentially ignored all prevailing emergency medicine standards and the rules, regulations, policies, procedures, and codes of the AMA and the FIM, her own prior experience, and general common sense—by simply dragging Plaintiff off the racetrack like a ragdoll, throwing him on the back of medical mule like a disposable crash test dummy, and yanking his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

91.     As a direct and proximate result of the foregoing breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

92.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

93.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Metiva for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT V
## Negligence against John Doe

94.     Plaintiff incorporates the allegations in paragraphs 1 through 36 as if fully set forth herein.

95. At all relevant times, Defendant John Doe was an employee and agent of The Medic Rig and The Feld Defendants, was a crewmember of the Alpinestars Mobile Medical Unit, and was acting within the scope of such employment and agency relationship.

96. At all relevant times, John Doe owed and undertook a duty of care in providing on-track and trackside medical, rescue, and other assistance and services to any riders that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code.

97. At all relevant times, John Doe breached his duties by, among other things:

    a. failing to abide by applicable prevailing emergency medicine standards as well as the rules, regulations, requirements, policies, procedures, and codes of the AMA and the FIM, in responding to Plaintiff's repeated complaints of symptoms of a potential spinal cord injury;

    b. failing to properly assess Plaintiff's condition and injuries before dragging him off the racetrack;

    c. failing to undertake any efforts (whether through radio communications or otherwise) to cause the practice session to be "red flagged" so that Plaintiff's condition and injuries could be properly assessed before moving him off the racetrack;

    d. failing to stabilize or immobilize Plaintiff's spine before dragging him off the racetrack;

    e. failing to place a cervical collar on Plaintiff;

f. dragging Plaintiff off the racetrack by his armpits and lifting him off the ground by his dangling legs;

g. dropping Plaintiff on the back of the medical mule before propping him upright; and

h. yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

98.     At all relevant times, John Doe knew or should have known based upon prior experience and incidents that his failure to try to stop or "red flag" the practice session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

99.     At all relevant times, John Doe knew or should have known that his failure to comply with prevailing emergency medicine standards and the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM in responding to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

100.    At all relevant times, the acts and omissions of John Doe were not only egregiously unreasonable and substandard, but also so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of

Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because John Doe essentially ignored all prevailing emergency medicine standards and the rules, regulations, policies, procedures, and codes of the AMA and the FIM, his own prior experience, and general common sense—by simply dragging Plaintiff off the racetrack like a ragdoll, throwing him on the back of medical mule like a disposable crash test dummy, and yanking his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

101.    As a direct and proximate result of the foregoing breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

102.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

103.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against John Doe for all his damages, including but not limited to punitive damages, in an amount to be

determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT VI
### Negligence against Dr. Kennedye

104. Plaintiff incorporates the allegations in paragraphs 1 through 36 as if fully set forth herein.

105. At all relevant times, Dr. Kennedye was an employee and agent of The Medic Rig and The Feld Defendants, was a crewmember of the Alpinestars Mobile Medical Unit, and was acting within the scope of such employment and agency relationship.

106. At all relevant times, Dr. Kennedye owed and undertook a duty of care in providing on-track and trackside medical, rescue, and other assistance and services to any riders that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code.

107. At all relevant times, Dr. Kennedye also owed Plaintiff a duty to use reasonable care under the circumstances, and/or to use the level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was acceptable and appropriate by similar and reasonably careful doctors.[6]

---

[6] Insofar as any allegation against Dr. Kennedye may be construed as an allegation of medical malpractice, Florida's medical malpractice statute provides no cover to him because he was not licensed to practice medicine in Florida and, therefore, was not a "health care provider" within the meaning of § 766.202(4), Fla. Stat. *See Dirga v. Butler*, 39 So. 3d 388, 391 (Fla. 1st DCA 2010) ("Given the unambiguous language of section 766.202(4), Florida Statutes, and

108. At all relevant times, Dr. Kennedye breached his duties by, among other things:

    a. failing to abide by applicable prevailing emergency medicine standards as well as the rules, regulations, requirements, policies, procedures, and codes of the AMA and the FIM, in responding to Plaintiff's repeated complaints of symptoms of a potential spinal cord injury;

    b. failing to independently and properly assess Plaintiff's condition and injuries, despite his superior knowledge, experience, and qualifications in emergency medicine vis-à-vis Metiva and John Doe;

    a. failing to undertake any efforts (whether through radio communications or otherwise) to cause the practice session to be "red flagged" so that Plaintiff's condition and injuries could be properly attended to at any time after his crash;

    b. failing to stabilize or immobilize Plaintiff's spine at any time after his crash;

    c. failing to place a cervical collar on Plaintiff at any time after his crash;

    d. assisting Metiva and John Doe with lifting Plaintiff onto the back of the medical mule and propping him upright; and

    i. yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

109. At all relevant times, Dr. Kennedye knew or should have known based upon prior incidents that his failure to try to stop or "red flag" the practice session—

Florida courts' strict construction of limitations on access to courts, we hold that out-of-state physicians are not health care providers entitled to presuit notice under chapter 766. Accordingly, we reverse the trial court's order dismissing the complaint against Dr. Butler, an Alabama physician, because he is not a health care provider as defined in chapter 766.").

where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of serious injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

110.   At all relevant times, Dr. Kennedye knew or should have known that his failure to comply with prevailing emergency medicine standards and the rules, regulations, requirements, policies, procedures, and codes of the AMA and the FIM in attending to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

111.   At all relevant times, the acts and omissions of Dr. Kennedye were not only egregiously unreasonable and substandard, but were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because Dr. Kennedye essentially ignored all prevailing emergency medicine standards and the rules, regulations, policies, procedures, and codes of the AMA and the FIM, his own prior experience, and general common sense when he stood idly by as his fellow crewmembers dragged Plaintiff off the racetrack like a ragdoll—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

112.    As a direct and proximate result of the foregoing breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

113.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, life care planning, and lost income and lost earning potential.

114.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Dr. Kennedye for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all his claims.

Respectfully submitted,

By: */s/ Mark A. Schweikert*
Mark A. Schweikert (FBN 70555)
mark@schweikertlaw.com

**Schweikert Law PLLC**
1111 Brickell Avenue, Suite 1550
Miami, Florida 33131
Office: (305) 999-1906
Mobile: (305) 926-9452
*Lead Counsel for Plaintiff*

*and*

Maria A. Dominguez, Esq. (FBN 0510221)
maria.dominguez@dmralaw.com
Juan C. Ramos-Rosado, Esq. (FBN 1002562)
juan.ramos@dmralaw.com
Javier F. Micheo Marcial, Esq. (FBN 1009694)
Javier.micheo@dmralaw.com
Manuel A. Franco, Esq. (FBN 126443)
manuel.franco@dmralaw.com
**DMRA Law LLC**
1111 Brickell Avenue, Ste. 1550
Miami, FL 33131
Telephone: 305-548-8666

*and*

Jason B. Giller, Esq. (FBN 77441)
jason@gillerpa.com
Hilary A. Schein, Esq. (FBN 1019115)
hilary@gillerpa.com
**JASON B. GILLER, P.A.**
1111 Brickell Avenue, Suite 1550
Miami, Florida 33131
Telephone: (305) 999-1906

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which has served a copy upon any *pro se* party and counsel of record for any party who are authorized to receive this Court's notice of electronic filing.

By: */s/ Mark A. Schweikert*
Mark A. Schweikert (FBN 70555)
mark@schweikertlaw.com
**SCHWEIKERT LAW PLLC**
1111 Brickell Avenue, Suite 1550
Miami, Florida 33131
Office: (305) 999-1906
Mobile: (305) 926-9452
*Lead Counsel for Plaintiff*