## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

### CASE NO. 8:22-CV-1295-TPB-CPT

BRIAN MOREAU,

        Plaintiff,

vs.

FELD MOTOR SPORTS, INC.,
THE MEDIC RIG, LLC,
AMERICAN MOTORCYCLE ASSOCIATION
d/b/a AMERICAN MOTORCYCLIST
ASSOCIATION,
JOHN A. BODNAR, M.D.,
JAMES KENNEDYE, M.D.,
AMY METIVA, and
SCOTT COMBS,

        Defendants.

_____/

### THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff BRIAN MOREAU ("**Plaintiff**"), a resident and citizen of France, sues

Defendants FELD MOTOR SPORTS, INC. ("**FMS**"), a Delaware Corporation, THE

MEDIC RIG, LLC ("**The Medic Rig**"), a California Limited Liability Company,

AMERICAN MOTORCYCLE ASSOCIATION d/b/a AMERICAN

MOTORCYCLIST ASSOCIATION (the "**AMA**"), an Ohio Non-Profit Corporation,

JOHN A. BODNAR, M.D. ("**Dr. Bodnar**"), a resident of California, JAMES

KENNEDYE, M.D. ("**Dr. Kennedye**"), a resident of Oklahoma, AMY METIVA

("**Metiva**"), a resident of Michigan, and SCOTT COMBS ("**Combs**"), a resident of Florida, and alleges as follows:

### Nature of Case, Jurisdiction, and Venue

1.      This case arises out of the catastrophic and permanent injuries sustained by Plaintiff, a former professional motocross rider, during the "free practice" session before the "Monster Energy AMA Supercross, an FIM World Championship" ("**Supercross Championship**"), race at Raymond James Stadium in Tampa, Florida on February 15, 2020 ("**2020 Tampa Supercross**").  As a direct and proximate result of the Defendants' and their agents, employees, and/or contractors' individual and collective negligence, gross negligence, and reckless disregard for the life, health, safety, and well-being of Plaintiff—who had just turned 18 years old two weeks before the race—Plaintiff has been rendered a paraplegic.

2.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds the jurisdictional threshold, exclusive of interest and costs, and this dispute is between a citizen of France and citizens of different states of the United States of America.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to the Plaintiff's claims occurred within this judicial district.

**Plaintiff Brian Moreau**

4.  Plaintiff is a resident and citizen of France, who speaks French and English.  He was born in 2002 and is presently over the age of 18.

5.  In 2019, when he was 17 years old, Plaintiff moved to the United States to join the Troy Lee Designs Red Bull KTM Racing Team (n/k/a Troy Lee Designs Red Bull GASGAS Factory Racing Team) (the "**Racing Team**") and compete in the 250SX Class of the Supercross Championship.[1]

6.  Before coming to the United States, Plaintiff had been a phenomenally successful motocross rider in Europe with an incredibly bright future in the sport.

**Feld Motor Sports**

7.  At all relevant times, Defendant FMS was a for-profit corporations organized and existing in Delaware with its principal places of business in Palmetto, Florida; was conducting business extensively throughout Florida; was the promoter, owner, organizer, and operator of the Supercross Championship; and was responsible for, among other things, directly or indirectly, in whole or in part, organizing, operating, controlling, staffing, and supervising the event in accordance with applicable law and the rules, regulations, policies, procedures, and codes of the AMA and the Fédération Internationale de Motocyclisme ("**FIM**"), the domestic and global

---

[1] There are two racing divisions in the Supercross Championship: the 250SX Class and the 450SX Class. "The 250SX Class is populated primarily by younger riders on 250cc four-stroke motorcycles."  *See* https://www.supercrosslive.com/sx101 (last visited Feb. 20, 2024).

governing and sanctioning bodies of the Supercross Championship, respectively, and its own safety rules and regulations.

8.    In or around October 2019, FMS leased Raymond James Stadium from the Tampa Sports Authority for the 2020 Tampa Supercross.

**The Domestic and Global Bodies**
**Sanctioning, Governing, and Regulating the Supercross Championship**

9.    At all relevant times, Defendant AMA was a non-profit corporation organized and existing in Ohio with its principal place of business in Ohio; was conducting business extensively throughout Florida; and was the domestic body that sanctioned, governed, and regulated the Supercross Championship series together with the FIM, the international sanctioning body.

10.    In 2019, the AMA entered into the Second Amended and Restated Supercross Sanctioning Agreement Dated July 1, 2019 (the "**Sanctioning Agreement**") with FMS, which is hereby incorporated by reference.

11.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[2] None of the excerpts from the Sanctioning Agreement that are quoted herein plausibly qualify for sealing under Local Rule 1.11(d), given the public right of access in civil actions, *see* Local Rule 1.11(a).

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████    ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

12.    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

13.    ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████

14.　　At all relevant times, the AMA was wholly or partially responsible for, among other things, organizing, operating, controlling, staffing, and supervising the Supercross Championship, including the 2020 Tampa Supercross, in accordance with its own and the FIM's rules, regulations, policies, procedures, and codes, as well as the Sanctioning Agreement.

15.　　At all relevant times, the FIM was the international body that sanctioned, governed, and regulated the Supercross Championship together with the AMA.

16.　　At all relevant times, the AMA and FIM each had established and implemented rules, regulations, policies, procedures, and codes that Defendants and their agents, employees, officers, directors, representatives, affiliates, and contractors were required to abide by in connection with the Supercross Championship, including the 2020 Tampa Supercross.  This includes, but is not limited to, the AMA Supercross, an FIM World Championship 2020 Rulebook, the AMA Supercross Rulebook, the FIM Supercross Rulebook, and the FIM Medical Code 2019.

**The Medic Rig doing business as the "Alpinestars Mobile Medical Unit"**

17.　　At all relevant times, Defendant The Medic Rig was a Limited Liability Company organized and existing in California with its principal place of business in

Long Beach, California and doing business as the "**Alpinestars Mobile Medical Unit**"; was conducting substantial business within Florida in connection with the Supercross Championship, including the 2020 Tampa Supercross; and was responsible for providing on-track, off-track, and trackside medical, rescue, and other assistance and services to any rider injured during the Supercross Championship in accordance with prevailing emergency medicine standards as well as the rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code, and any safety rules and regulations put in place by FMS.

18.     In 2016, The Medic Rig entered into a Master Services Agreement with FMS, which applied to the 2020 Tampa Supercross, and is hereby incorporated by reference.

19.     █████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

20.     █████████████████████████████████████████

████████████████████████████████████████████████████

---

[3] None of the excerpts from the Master Services Agreement that are quoted herein plausibly qualify for sealing under Local Rule 1.11(d), given the public right of access in civil actions, *see* Local Rule 1.11(a).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

21.     At all relevant times, the Alpinestars Mobile Medical Unit included a crew of individuals, including but not limited to physicians, registered nurses and nurse practitioners, certified athletic trainers, emergency medical technicians, paramedics, and others, who were responsible for providing on-track and trackside medical, rescue, and other assistance and services to any riders injured during the Supercross Championship series, including the 2020 Tampa Supercross.

22.     At all relevant times, Defendant Dr. Bodnar was a resident of California; was licensed to practice medicine in California but not in Florida; and was the Chief Medical Officer for the Supercross Championship and the Medical Director of The Medic Rig (d/b/a Alpinestars Mobile Medical Unit).

23.     At all relevant times, Defendant Dr. Kennedye was a resident of Oklahoma; was licensed to practice medicine in Oklahoma but not in Florida; and was

a crewmember of the Alpinestars Mobile Medical Unit during the Supercross Championship.

24.    At all relevant times, Defendant Metiva was a resident of Michigan; was a certified athletic trainer licensed and/or certified in Michigan but not in Florida; and was a crewmember of the Alpinestars Mobile Medical Unit during the Supercross Championship.

25.    At all relevant times, Defendant Combs was a resident of Florida; was an Emergency Medical Technician and Paramedic licensed in Florida; and was a crewmember of the Alpinestars Mobile Medical Unit during the Supercross Championship.

<b>The 2020 Tampa Supercross</b>

26.    The 2020 Tampa Supercross was held at Raymond James Stadium in Tampa, Florida on February 15, 2020.

27.    The 2020 Tampa Supercross was Plaintiff's debut for the Racing Team.

28.    In the early afternoon of February 15, 2020, and hours before the event officially started, the riders were allowed a "free practice" session on the racetrack, which was wholly or partially supervised and controlled by the AMA and FMS, including their agents, employees, officers, directors, representatives, affiliates, and contractors, such as the Supercross Manager, Event Manager, Race Director, the Flag Marshall, the Flaggers, Dr. Bodnar, and other race staff and officials.

29.    Plaintiff participated in the practice session with other riders.

9

**"The show must go on."**

30.     During the practice session, Plaintiff crashed and fell off his motorcycle headfirst onto the middle of the racetrack and into the path of oncoming riders.

31.     A flagger stationed at a nearby trackside location began waving a yellow flag as a supposed caution to oncoming riders.   However, at no point did any Defendant undertake any effort to "red flag" or stop the practice session—despite the serious nature of Plaintiff's crash, his headfirst impact with the ground, and the fact that he was lying on the ground in the middle of the racetrack.

32.     Shortly after the crash, two crewmembers of the Alpinestars Mobile Medical Unit, believed to be Metiva and Combs, arrived on the scene to attend to Plaintiff, while a third person picked up Plaintiff's motorcycle, as shown below:



33.     Plaintiff immediately and repeatedly screamed at the crewmembers, in English, "don't touch me, I'm paralyzed," or similar words to that effect, because he was experiencing unusual sensations and having trouble moving his legs.

34.     Despite Plaintiff's obvious complaints of a potential spinal cord injury, the two crewmembers failed to undertake any effort to properly assess and attend to his reported injuries.  Indeed, they did not attempt to stabilize or immobilize his spine, place a cervical collar on Plaintiff, or ensure that his approximately 4-pound helmet was properly and carefully removed under the circumstances, in accordance with the standard protocols for the type of acute trauma that Plaintiff had reported.

35.     Furthermore, even though Plaintiff was still lying on the ground in the middle of the racetrack and now had three other people in his immediate vicinity, Defendants still failed to undertake any effort to stop or "red flag" the practice session to safeguard against the foreseeable risk of further harm and injury to Plaintiff.

36.     Instead, the two crewmembers of the Alpinestars Mobile Medical Unit proceeded to roughly lift Plaintiff up off the ground by his armpits and drag him off the racetrack like a ragdoll with his legs dangling from his torso, in a horrifying display of gross incompetence and reckless disregard for the life, health, and safety of Plaintiff, as shown below:





37.    Next, the two crewmembers of the Alpinestars Mobile Medical Unit, with the assistance of an unknown individual, proceeded to carry Plaintiff—by his

armpits, torso, and dangling legs—over to the side of the racetrack and towards a nearby medical mule, as shown below:



38.     Around that time, a third crewmember of the Alpinestars Mobile Medical Unit, Dr. Kennedye, arrived on scene to help Metiva and Combs drop Plaintiff on the back of the medical mule, prop him upright, and yank off his helmet, as shown below:



39. Plaintiff was then driven by the medical mule and outside of the stadium via a nearby tunnel, accompanied by Metiva, as shown below:



40.     At some point after the medical mule exited the stadium, unknown individuals (but believed to be members of the Alpinestars Mobile Medical Unit) finally—and for the first time—recognized the serious nature of Plaintiff's reported injury and placed him on a rigid body splint, but they did not place a cervical collar on his neck in accordance with the standard protocols for the type of acute trauma that Plaintiff had reported.

41.     Plaintiff was then taken to an onsite ambulance staffed by paramedics with Tampa Fire Rescue.  Upon arrival at the ambulance, and according to one of the paramedic's report on the incident:

> [P]atient was carried by Staff at the event to their medical cart and patient was seated on the back of the cart and transferred outside of organization's medical trailer. Patient was seated upright on the medical cart upon arrival. . . . Helmet was removed by staff prior to patient contact[]. Patient advises that he could not feel or move his legs upon assessment, rapid assessment revealed no obvious injures. C- collar placed on the patient by TFR, rigid body splint placed on the patient by medical doctor and staff (staff doctor or organization). . . .

42.     Plaintiff was then transported to the Emergency Department at Tampa General Hospital by the ambulance, where he underwent surgery for his spinal cord injury.

43.     As a direct and proximate result of Defendants' and their employees, agents, and contractors' acts and omissions, Plaintiff has been rendered a paraplegic.

44.     All conditions precedent to this suit have occurred or been performed.

## COUNT I
### Negligence against FMS
### (Vicarious Liability)

45.     Plaintiff incorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

46.     At all relevant times, Defendant FMS was the promoter, owner, organizer, and operator of the Supercross Championship.

47.     At all relevant times, FMS was responsible for organizing, operating, staffing, and controlling the 2020 Tampa Supercross in accordance with the rules, regulations, policies, procedures, and codes of the AMA and the FIM, as well as its own safety rules and regulations.

48.     At all relevant times, FMS had numerous employees, agents, and/or contractors that they selected, authorized, and appointed to oversee and manage the event in accordance with the rules, regulations, requirements, standards, codes, procedures, and protocols of the AMA and the FIM.  This included, but was not limited to, a Race Director, a Clerk of Course, a Flag Marshall, Flaggers / Corner Workers, a Chief Medical Officer, the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other race staff and officials.

49.     At all relevant times, whenever motorcycles are on the racetrack, race staff and officials, including the Chief Medical Officer and Race Director, had a duty: to be stationed in an elevated "Race Control" booth to monitor the on-track activity; to be in close proximity to and liaise with other race staff and officials, including the Clerk of the Course and Race Director; to be in direct communication with the medical

16

team on the ground (the Alpinestars crewmembers); to provide immediate updates from trackside medical personnel to the Race Director and other race staff and officials regarding the condition of any injured rider to facilitate the most appropriate medical response to their condition; to participate with the Race Director and other race staff and officials in the immediate deployment of appropriate medical resources to injured riders; and to recommend to the Race Director, Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, and other staff and officials that a practice session or race be "red flagged" if, among other reasons, there is danger to a rider or officials attending to an injured rider if other riders continue to circulate the racetrack, or there is a suspected spinal or other serious injury that will require prolonged medical treatment.

50.     At all relevant times, the Race Director, Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, and other staff and officials had a duty to "red flag" a practice session or race if there was danger to a rider or officials attending to an injured rider if other riders continue to circulate the racetrack, or there was a suspected spinal or other serious injury that would require prolonged medical treatment.

51.     At all relevant times, the Chief Medical Officer, the Medical Director of the Alpinestars Mobile Medical Unit, and its crewmembers owed and undertook a duty to provide on-track and trackside medical, rescue, and other assistance to riders injured on the racetrack, in accordance with prevailing emergency medicine standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA

and FIM, including the FIM Medical Code, and "all reasonable safety rules and regulations put in place by FMS." Master Services Agreement at p.10, § 5.

52.     At all relevant times, the Race Director, the Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, the Chief Medical Officer, the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other relevant staff and officials were the actual or apparent agents and/or employees of FMS, and were acting within the scope of their agency and employment relationship with FMS, and/or were performing services which he or she was employed to perform by FMS in connection with the 2020 Tampa Supercross.

53.     At all relevant times, FMS acknowledged that the Race Director, the Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, the Chief Medical Officer, the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other relevant staff and officials would act on their behalf by, among other things: providing them with the credentials to access and work the event; providing them with various items to wear during the event to promote Monster Energy®— FMS's official sponsor for the Supercross Championship; and providing them with clothing branded in big yellow letters with the logo of FMS's parent company, "FELD ENTERTAINMENT":



54.     At all relevant times, the Race Director, the Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, the Chief Medical Officer, the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other relevant staff and officials accepted the undertaking to act on behalf of FMS by, among other things, using the provided credentials to access and work the event on behalf of FMS while wearing various items that bore the logos of Monster Energy® and/or FMS's parent company, "FELD ENTERTAINMENT."

55.     At all relevant times, FMS controlled the actions of the Race Director, the Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, the Chief Medical Officer (Dr. Bodnar), the Medical Director and crewmembers of the Alpinestars Mobile Medical Unit, and other relevant staff and officials by, among other things, providing them with headsets, protective gear, and other essential equipment needed to perform their duties and responsibilities, as well as verbal and written instructions and directives on how to perform their duties and responsibilities, manage the on-track and off-track activities, and make the event as entertaining as possible for the spectators.

56.     At all relevant times, FMS represented to the riders, including Plaintiff, that the Race Director, Clerk of Course, Flaggers / Corner Workers, Chief Medical Officer, and other relevant staff and officials would conduct the event in accordance with the rules, regulations, policies, procedures, and codes of the AMA and the FIM in an effort to not only ensure fair competition amongst the riders, but also to protect the riders from risks of harm beyond those inherent in the sport.

57.     At all relevant times, Plaintiff relied upon these representations in participating in the event.

58.     At all relevant times, Plaintiff's reliance upon these representations was detrimental, because FMS's agents, employees, and/or contractors did not conduct the event in accordance with the rules, regulations, policies, procedures, and codes of the AMA and the FIM, or FMS's own safety rules and regulations, for which Plaintiff has paid an irreversible and devastating price.

59.     At all relevant times, FMS's agents, employees, and/or contractors breached their duties by, among other things:

    a.  failing to abide by the rules, regulations, policies, procedures, and codes of the AMA and the FIM, as well as FMS's own safety rules and regulations, regarding when to stop or "red flag" a practice session in the interest of safety;

    b.  failing to stop or "red flag" the practice session after Plaintiff crashed and fell headfirst onto the middle of the racetrack, given there was obvious danger to life or of further injury to Plaintiff or the Alpinestars crewmembers attending to him if other riders continued to circulate;

    c.  failing to stop or "red flag" the practice session after Plaintiff crashed and fell headfirst onto the middle of the racetrack and reported obvious symptoms of a potential spinal cord injury that required prolonged medical intervention;

    d.  failing to abide by prevailing emergency medicine standards and the rules, regulations, policies, procedures, and codes of the AMA and the FIM, as well as FMS's own safety rules and regulations, in attending to Plaintiff's repeated reports of obvious symptoms of a potential spinal cord injury;

    e.  failing to properly assess Plaintiff's condition and injuries before dragging him off the racetrack;

    f.  failing to stabilize or immobilize Plaintiff's spine before dragging him off the racetrack;

    g.  failing to place a cervical collar on Plaintiff;

    h.  dragging Plaintiff off the racetrack by his armpits and lifting him off the ground by his dangling legs;

    i.  dropping Plaintiff on the back of the medical mule and propping him upright; and

    j.  yanking or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that

applied to the type of acute trauma that Plaintiff had reported.

60.     At all relevant times, FMS's agents, employees, and/or contractors knew or should have known based upon prior experiences that their failure to stop or "red flag" the practice session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of serious injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

61.     At all relevant times, FMS's agents, employees, and/or contractors knew or should have known that their failure to comply with prevailing emergency medicine standards and the rules, regulations, requirements, policies, procedures, and codes of the AMA and the FIM, as well FMS's own safety rules and regulations, in attending to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

62.     At all relevant times, the acts and omissions of FMS's agents, employees, and/or contractors were not only egregiously unreasonable and substandard, but were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, and demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because they essentially ignored all prevailing emergency medicine standards and the applicable

rules, regulations, requirements, standards, codes, procedures, and protocols, their own prior experiences, and general common sense—by simply dragging Plaintiff off the racetrack like a ragdoll, throwing him in the back of medical mule like a disposable crash test dummy, and yanking his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

63.     As a direct and proximate result of the foregoing breaches, Plaintiff was catastrophically injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

64.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, and life care planning.

65.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against FMS for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT II
### Negligence against The Medic Rig
### (Vicarious Liability)

66.     Plaintiff incorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

67.     At all relevant times, The Medic Rig, its Medical Director, Dr. Bodnar, and its crewmembers of the Alpinestars Mobile Medical Unit, including Dr. Kennedye, Metiva, and Combs, owed and undertook a duty of care in providing on-track and trackside medical, rescue, and other assistance and services to any riders, including Plaintiff, that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code, and "all reasonable safety rules and regulations put in place by FMS." Master Services Agreement at p.10, §5.

68.     At all relevant times, each crewmember of the Alpinestars Mobile Medical Unit, including Dr. Bodnar, Dr. Kennedye, Metiva, and Combs, was an agent, employee, and/or contractor of The Medic Rig because the crewmembers' actions were controlled by The Medic Rig or were subject to its right of control.

69.     At all relevant times, each crewmember of the Alpinestars Mobile Medical Unit, including Dr. Bodnar, Dr. Kennedye, Metiva, and Combs, was acting within the scope of their agency, employment, or contractual relationship with The Medic Rig, and was performing services which he or she was engaged to perform by The Medic Rig.

70.     At all relevant times, The Medic Rig acknowledged that the crewmembers of the Alpinestars Mobile Medical Unit would act on its behalf by, among other things, providing them with a red t-shirt that specifically designated them as part of the Alpinestars Mobile Medical Unit's "Medical Team."  The crewmembers accepted the undertaking to act on behalf of The Medic Rig by, among other things, wearing the t-shirts while providing medical, rescue, and other assistance to the riders during the 2020 Tampa Supercross.  Furthermore, The Medic Rig controlled the actions of the crewmembers by, among other things, using radio headsets by which they could communicate and receive directives and instructions from Dr. Bodnar, the Chief Medical Officer and the Medical Director the Alpinestars crew, and others, while providing medical, rescue, and other assistance to riders injured during the event.

71.     At all relevant times, The Medic Rig represented to the riders, including Plaintiff and his sports agent, that its crewmembers would provide the best possible on-track and trackside medical, rescue, and other assistance to riders injured during the event.

72.     At all relevant times, Plaintiff relied upon these representations in participating in the event.

73.     At all relevant times, Plaintiff's reliance upon these representations was detrimental, because Plaintiff did not receive the best possible medical assistance from the crewmembers of the Alpinestars Mobile Medical Unit, who literally dragged him off the racetrack, threw him on the back of the medical mule like a disposable crash

test dummy, and yanked off his helmet—despite his reports of obvious symptoms of a potential spinal cord injury.

74. At all relevant times, The Medic Rig's agents, employees, and/or contractors breached their duties by, among other things:

    k. failing to abide by applicable prevailing emergency medicine standards and the applicable rules, regulations, requirements, standards, codes, procedures, and protocols, in responding and attending to Plaintiff's repeated reports of obvious symptoms of a potential spinal cord injury;

    l. failing to properly assess Plaintiff's condition and injuries before dragging him off the racetrack;

    m. failing to undertake any efforts (whether through radio communications or otherwise) to cause the practice session to be "red flagged" so that Plaintiff's condition and injuries could be properly assessed before moving him off the racetrack;

    n. failing to stabilize or immobilize Plaintiff's spine before dragging him off the racetrack;

    o. failing to place a cervical collar on Plaintiff;

    p. dragging Plaintiff off the racetrack by his armpits and lifting him off the ground by his dangling legs;

    q. dropping Plaintiff on the back of the medical mule and propping him upright; and

    r. yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

75. At all relevant times, The Medic Rig's agents, employees, and/or contractors knew or should have known based upon prior incidents that their failure

to try to stop or "red flag" the practice session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

76.     At all relevant times, The Medic Rig's agents, employees, and/or contractors knew or should have known that their failure to comply with prevailing emergency medicine standards and the applicable rules, regulations, requirements, standards, codes, procedures, and protocols in responding and attending to a rider injured on the racetrack would likely subject that rider to heightened risks of injury beyond those inherent in the sport.

77.     At all relevant times, the acts and omissions of The Medic Rig's agents, employees, and/or contractors were not only egregiously unreasonable and substandard, but were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because they essentially ignored all prevailing emergency medicine standards and the applicable rules, regulations, requirements, standards, codes, procedures, and protocols, their own prior experiences, and general common sense—by simply dragging Plaintiff off the racetrack like a ragdoll, throwing him in the back of medical

mule like a disposable crash test dummy, and yanking his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

78.    As a direct and proximate result of the foregoing breaches, Plaintiff was catastrophically injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

79.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, and life care planning.

80.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against The Medic Rig for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT III
## Negligence against The Medic Rig
## (Direct Liability)

81.     Plaintiff incorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

82.     At all relevant times, The Medic Rig owed and undertook a duty of care in providing on-track and trackside medical, rescue, and other assistance and services to any riders, including Plaintiff, that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code, and "all reasonable safety rules and regulations put in place by FMS." Master Services Agreement at p.10, §5.

83.     At all relevant times, The Medic Rig had a duty to hire qualified persons, with appropriate qualifications, experience, credentials, and licenses, to serve as the crewmembers of the Alpinestars Mobile Medical Unit, in accordance with the applicable rules, regulations, policies, procedures, and codes, as well as the Master Services Agreement.

84.     At all relevant times, The Medic Rig breached its duties by, among other things:

> a.  failing to hire qualified persons, with appropriate qualifications, experience, credentials, and licenses, to serve as the crewmembers of the Alpinestars Mobile Medical Unit, in accordance with the applicable rules, regulations, policies, procedures, and codes, as well as the Master Services Agreement;

b. failing to properly train and supervise the crewmembers of the Alpinestars Mobile Medical Unit to ensure that they abided by the applicable rules, regulations, policies, procedures, and codes in general, as well as the Master Services Agreement, and specifically with regard to when to stop or "red flag" a practice session in the interest of safety; and

c. failing to properly train and supervise the crewmembers of the Alpinestars Mobile Medical Unit to ensure that they abided by prevailing emergency medicine standards and the applicable rules, regulations, policies, procedures, and codes, as well as the Master Services Agreement, in responding and attending to Plaintiff's repeated reports of obvious symptoms of a potential spinal cord injury.

85.     At all relevant times, The Medic Rig knew or should have known based upon prior experiences that its failure to properly hire, train, and supervise the crewmembers of the Alpinestars Mobile Medical Unit would likely subject Plaintiff to heightened risks of serious injury beyond those inherent in the sport, such as the failure to "red flag" a race or practice when otherwise necessary to protect an injured rider, or the provision of inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

86.     At all relevant times, The Medic Rig knew or should have known that its failure to properly hire, train, and supervise the crewmembers of the Alpinestars Mobile Medical Unit to ensure they abided by prevailing emergency medicine standards and the applicable rules, regulations, requirements, policies, procedures, and codes, as well as the Master Services Agreement, in attending to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

87.     At all relevant times, the acts and omissions of the Medic Rig were not only egregiously unreasonable and substandard, but were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, and demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because the Medic Rig essentially ignored its duty to properly hire, train, and supervise the staff and officials to ensure they abided by prevailing emergency medicine standards and the applicable standards and the rules, regulations, requirements, standards, codes, procedures, and protocols, as well as the Master Services Agreement, and general common sense in attending to a rider injured on the racetrack.

88.     As a direct and proximate result of The Medic Rig's breaches, Plaintiff was catastrophically injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

89.     As a direct and proximate result of The Medic Rig's breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, and life care planning.

90.     As a direct and proximate result of The Medic Rig's breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical

impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against The Medic Rig for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

### COUNT IV
### Negligence against Dr. Bodnar
### (Direct Liability)

91.     Plaintiff incorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

92.     At all relevant times, Dr. Bodnar was the Chief Medical Officer for the Supercross Championship and the Medical Director of the Alpinestars Mobile Medical Unit.  In those capacities, Dr. Bodnar was responsible for, among other things, all aspects of any event that may have potential medical consequences, including supervising the Alpinestars crewmembers and ensuring that any medical, rescue, and other assistance that they provided to any injured riders comported with prevailing emergency medicine standards and the rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code, and "all reasonable safety rules and regulations put in place by FMS." Master Services Agreement at p.10, §5.

93.     At all relevant times, whenever motorcycles are on the racetrack, Dr. Bodnar also had a duty: to be stationed in the "Race Control" booth; to be in close

proximity to and liaise with the Clerk of the Course and Race Director, among others; to be in direct communication with the medical team on the ground (the Alpinestars crewmembers); to provide immediate updates from trackside medical personnel to the Race Director and others regarding the condition of any injured rider to facilitate the most appropriate medical response to their condition; to participate with the Race Director and others in the immediate deployment of appropriate medical resources to injured riders; and to recommend to the Race Director, Clerk of Course, the Flag Marshall, the Flaggers / Corner Workers, and/or other staff and officials that a practice session or race be stopped or "red flagged" if, among other reasons, there is danger to a rider or officials attending to an injured rider if other riders continue to circulate the racetrack the racetrack, or there is a suspected spinal or other serious injury that will require prolonged medical treatment.

94.     At all relevant times, Dr. Bodnar breached his duties by, among other things:

  a.  failing to recommend that the practice session be stopped or "red flagged" despite the obvious danger to life or of further injury to Plaintiff or the Alpinestars crewmembers attending to him in the middle of the racetrack if other riders continued to circulate;

  b.  failing to recommend that the practice session be stopped or "red flagged" despite Plaintiff's repeated reports of obvious symptoms of a potential spinal cord injury that required prolonged medical intervention; and

  c.  failing to supervise the Alpinestars crewmembers to ensure that any assistance they provided to Plaintiff—after he crashed and fell headfirst onto the middle of the racetrack and reported obvious symptoms of a spinal cord injury—

comported with prevailing emergency medical standards and the applicable rules, regulations, policies, procedures, and codes, as opposed to simply dragging him off the racetrack like a ragdoll, throwing him on the back of the medical mule like a disposable crash test dummy, and yanking off his helmet.

95.     At all relevant times, Dr. Bodnar knew or should have known based upon his prior experience that, if he failed to comply with his duty to recommend that a practice session be stopped or "red flagged"—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—then Plaintiff would likely be subjected to heightened risks of serious injury beyond those inherent in the sport, such as the provision of inadequate, substandard, haphazard, reckless, and grossly negligent assistance from the Alpinestars crewmembers responding to the scene.

96.     At all relevant times, Dr. Bodnar knew or should have known based upon his prior experience that any Alpinestars crewmember's provision of inadequate, substandard, haphazard, reckless, and grossly negligent assistance to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

97.     At all relevant times, the acts and omissions of Dr. Bodnar were not only egregiously unreasonable and substandard, but also so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the

life or health of Plaintiff, because Dr. Bodnar essentially ignored all the applicable rules, regulations, policies, procedures, and codes, all prevailing emergency medicine standards, and basic common sense in failing to recommend that the practice session be "red flagged" so that Plaintiff could receive the prolonged medical intervention his reported symptoms indisputably required; instead, Dr. Bodnar simply stood idly by and watched (like other horrified spectators) as the Alpinestars crewmembers literally dragged Plaintiff off the racetrack like a ragdoll, threw him on the back of a medical mule like a disposable crash test dummy, and yanked his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

98.     As a direct and proximate result of the foregoing breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

99.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, and life care planning.

100.     As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Dr. Bodnar for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT V
### Negligence against Metiva
### (Direct Liability)

101.   Plaintiff incorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

102.   At all relevant times, Defendant Amy Metiva was a crewmember of the Alpinestars Mobile Medical Unit.

103.   At all relevant times, Metiva owed and undertook a duty of care in providing on-track and trackside, medical, rescue, and other assistance and services to any riders, including Plaintiff, that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code, and "all reasonable safety rules and regulations put in place by FMS." Master Services Agreement at p.10, §5.

104.   At all relevant times, Metiva also owed Plaintiff a duty to use the level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was

acceptable and appropriate by similar and reasonably careful certified athletic trainers.[4]

105. At all relevant times, Metiva breached her duties by, among other things:

a. failing to abide by applicable prevailing emergency medicine standards as well as the applicable rules, regulations, requirements, standards, codes, procedures, and protocols, in responding to Plaintiff's repeated reports of symptoms of a potential spinal cord injury;

b. failing to properly assess Plaintiff's condition and injuries before dragging him off the racetrack;

c. failing to undertake any efforts (whether through radio communications or otherwise) to cause the practice session to be "red flagged" so that Plaintiff's condition and injuries could be properly assessed before moving him off the racetrack;

d. failing to stabilize or immobilize Plaintiff's spine before dragging him off the racetrack;

e. failing to place a cervical collar on Plaintiff;

f. dragging Plaintiff off the racetrack by his armpits and lifting him off the ground by his dangling legs;

g. dropping Plaintiff on the back of the medical mule before propping him upright; and

---

[4] Insofar as any allegation against Metiva may be construed as an allegation of medical malpractice, Florida's medical malpractice statute provides no cover to her because certified athletic trainers are not "health care providers" within the meaning of § 766.202(4), Fla. Stat., and because the statute does not apply to professionals licensed or certified out-of-state. *See Dirga v. Butler*, 39 So. 3d 388, 391 (Fla. 1st DCA 2010) ("Given the unambiguous language of section 766.202(4), Florida Statutes, and Florida courts' strict construction of limitations on access to courts, we hold that out-of-state physicians are not health care providers entitled to presuit notice under chapter 766. Accordingly, we reverse the trial court's order dismissing the complaint against Dr. Butler, an Alabama physician, because he is not a health care provider as defined in chapter 766.").

    h.  yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

106.   At all relevant times, Metiva knew or should have known based upon prior experience and incidents that her failure to try to stop or "red flag" the practice session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

107.   At all relevant times, Metiva knew or should have known that her failure to comply with prevailing emergency medicine standards and the applicable rules, regulations, policies, procedures, and codes in responding to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

108.   At all relevant times, the acts and omissions of Metiva were not only egregiously unreasonable and substandard, but also so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because Metiva essentially ignored all prevailing emergency medicine standards and the applicable rules, regulations, policies, procedures, and

codes, her own prior experience, and general common sense—by simply dragging Plaintiff off the racetrack like a ragdoll, throwing him on the back of medical mule like a disposable crash test dummy, and yanking his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

109.    As a direct and proximate result of the foregoing breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

110.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, and life care planning.

111.    As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Metiva for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT VI
## Negligence against Scott Combs
## (Direct Liability)

112.    Plaintiff incorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

113.    At all relevant times, Defendant Scott Combs was a crewmember of the Alpinestars Mobile Medical Unit.

114.    At all relevant times, Combs owed and undertook a duty of care in providing on-track and trackside medical, rescue, and other assistance and services to any riders that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code, and "all reasonable safety rules and regulations put in place by FMS." Master Services Agreement at p.10, §5.

115.    At all relevant times, Combs also owed Plaintiff a duty to use the level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was acceptable and appropriate by similar and reasonably careful emergency medical technicians and paramedics.

116.    At all relevant times, Combs breached his duties by, among other things:

   a.   failing to abide by applicable prevailing emergency medicine standards as well as the applicable rules, regulations, requirements, policies, procedures, and codes, in responding to Plaintiff's repeated complaints of symptoms of a potential spinal cord injury;

40

b. failing to properly assess Plaintiff's condition and injuries before dragging him off the racetrack;

c. failing to undertake any efforts (whether through radio communications or otherwise) to cause the practice session to be "red flagged" so that Plaintiff's condition and injuries could be properly assessed before moving him off the racetrack;

d. failing to stabilize or immobilize Plaintiff's spine before dragging him off the racetrack;

e. failing to place a cervical collar on Plaintiff;

f. dragging Plaintiff off the racetrack by his armpits and lifting him off the ground by his dangling legs;

g. dropping Plaintiff on the back of the medical mule before propping him upright; and

h. yanking and/or allowing Plaintiff's helmet to be yanked off his head without any regard for the standard protocols that applied to the type of acute trauma that Plaintiff had reported.

117. At all relevant times, Combs knew or should have known based upon prior experience and incidents that his failure to try to stop or "red flag" the practice session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

118.   At all relevant times, Combs knew or should have known that his failure to comply with prevailing emergency medicine standards and the applicable rules, regulations, requirements, standards, codes, procedures, and protocols in responding to a rider injured on the racetrack would likely subject that rider to heightened risks of serious injury beyond those inherent in the sport.

119.   At all relevant times, the acts and omissions of Combs were not only egregiously unreasonable and substandard, but also so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because Combs essentially ignored all prevailing emergency medicine standards and the applicable rules, regulations, policies, procedures, and codes, his own prior experience, and general common sense—by simply dragging Plaintiff off the racetrack like a ragdoll, throwing him on the back of medical mule like a disposable crash test dummy, and yanking his helmet off—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

120.   As a direct and proximate result of the foregoing breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

121.   As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to

damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, and life care planning.

122. As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Defendant Scott Combs for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT VII
### Negligence against Dr. Kennedye
### (Direct Liability)

123. Plaintiff incorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

124. At all relevant times, Dr. Kennedye was a crewmember of the Alpinestars Mobile Medical Unit.

125. At all relevant times, Dr. Kennedye owed and undertook a duty of care in providing on-track and trackside medical, rescue, and other assistance and services to any riders that were injured during the 2020 Tampa Supercross, in accordance with applicable prevailing standards as well as the applicable rules, regulations, policies, procedures, and codes of the AMA and FIM, including the FIM Medical Code, and

"all reasonable safety rules and regulations put in place by FMS." Master Services Agreement at p.10, §5.

126.   At all relevant times, Dr. Kennedye also owed Plaintiff a duty to use reasonable care under the circumstances, and/or to use the level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was acceptable and appropriate by similar and reasonably careful doctors.[5]

127.   At all relevant times, Dr. Kennedye breached his duties by, among other things:

     a.   failing to abide by applicable prevailing emergency medicine standards as well as the applicable rules, regulations, requirements, policies, procedures, and codes, in responding to Plaintiff's repeated complaints of symptoms of a potential spinal cord injury;

     b.   failing to independently and properly assess Plaintiff's condition and injuries, despite his superior knowledge, experience, and qualifications in emergency medicine vis-à-vis Metiva and Combs;

     a.   failing to undertake any efforts (whether through radio communications or otherwise) to cause the practice session to be "red flagged" so that Plaintiff's condition and injuries could be properly attended to at any time after his crash;

---

[5] Insofar as any allegation against Dr. Kennedye may be construed as an allegation of medical malpractice, Florida's medical malpractice statute provides no cover to him because he was not licensed to practice medicine in Florida and, therefore, was not a "health care provider" within the meaning of § 766.202(4), Fla. Stat. *See Dirga v. Butler*, 39 So. 3d 388, 391 (Fla. 1st DCA 2010) ("Given the unambiguous language of section 766.202(4), Florida Statutes, and Florida courts' strict construction of limitations on access to courts, we hold that out-of-state physicians are not health care providers entitled to presuit notice under chapter 766. Accordingly, we reverse the trial court's order dismissing the complaint against Dr. Butler, an Alabama physician, because he is not a health care provider as defined in chapter 766.").

   b. failing to stabilize or immobilize Plaintiff's spine at any time
      after his crash;

   c. failing to place a cervical collar on Plaintiff at any time after
      his crash;

   d. assisting Metiva and Combs with lifting Plaintiff onto the
      back of the medical mule and propping him upright; and

   i. yanking and/or allowing Plaintiff's helmet to be yanked off
      his head without any regard for the standard protocols that
      applied to the type of acute trauma that Plaintiff had
      reported.

   128.   At all relevant times, Dr. Kennedye knew or should have known based
upon prior incidents that his failure to try to stop or "red flag" the practice session—
where there was obvious danger to life or of further injury to Plaintiff if other riders
continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal
cord injury requiring prolonged medical intervention—would likely subject Plaintiff
to heightened risks of serious injury beyond those inherent in the sport, such as an
inadequate, substandard, haphazard, reckless, and grossly negligent on-track
assistance from the Alpinestars crewmembers.

   129.   At all relevant times, Dr. Kennedye knew or should have known that his
failure to comply with prevailing emergency medicine standards and the applicable
rules, regulations, requirements, policies, procedures, and codes in attending to a rider
injured on the racetrack would likely subject that rider to heightened risks of serious
injury beyond those inherent in the sport.

   130.   At all relevant times, the acts and omissions of Dr. Kennedye were not
only egregiously unreasonable and substandard, but were so reckless or wanting in

care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, or demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff, because Dr. Kennedye essentially ignored all prevailing emergency medicine standards and the applicable rules, regulations, policies, procedures, and codes, his own prior experience, and general common sense when he stood idly by as his fellow crewmembers dragged Plaintiff off the racetrack like a ragdoll—despite his repeated reports of obvious symptoms of a potential spinal cord injury.

131.   As a direct and proximate result of the foregoing breaches, Plaintiff was injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

132.   As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, and life care planning.

133.   As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment, mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against Defendant Dr. Kennedye for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

## COUNT VIII
### Negligence against the AMA
### (Vicarious Liability)

134. Plaintiff incorporates the allegations in paragraphs 1 through 44 as if fully set forth herein.

135. At all relevant times, the AMA had a duty to organize, operate, control, conduct, manage, officiate, staff, and supervise the 2020 Tampa Supercross and all on-track activities to protect the riders, including Plaintiff, from unreasonable risks of harm beyond those inherent in the sport.

136. At all relevant times, the AMA had a duty to organize, operate, control, conduct, manage, officiate, staff, and supervise the 2020 Tampa Supercross in accordance with its own and the FIM's rules, regulations, policies, procedures, and codes, including, but not limited to, the AMA Supercross, an FIM World Championship 2020 Rulebook, the AMA Supercross Rulebook, the FIM Supercross Rulebook, and the FIM Medical Code 2019, to protect the riders, including Plaintiff, from unreasonable risks of harm beyond those inherent in the sport.

137. At all relevant times, whenever motorcycles were on the racetrack, the AMA's employees, agents, and/or contractors, including race staff and officials, had a duty: to be stationed in an elevated "Race Control" booth to monitor the on-track

activity; to be in close proximity to and liaise with other race staff and officials, including the Chief Medical Officer; to be in direct communication with the medical team on the ground (the Alpinestars crewmembers); to provide immediate updates from trackside medical personnel to other staff and officials regarding the condition of any injured rider to facilitate the most appropriate medical response to their condition; to ensure the immediate deployment of appropriate medical resources to injured riders; and to recommend to other race staff and officials that a practice session or race be "red flagged" in the interest of rider safety if, among other reasons, there was danger to a rider or officials attending to an injured rider if other riders continued to circulate the racetrack, or there was a suspected spinal or other serious injury that would require prolonged medical treatment.

138. At all relevant times, the AMA's employees, agents, and/or contractors, including race staff and officials, had a duty to "red flag" a practice session or race to protect the riders, including Plaintiff, from unreasonable risks of harm beyond those inherent in the sport.

139. At all relevant times, the AMA's employees, agents, and/or contractors, including race staff and officials, had a duty to "red flag" a practice session or race if there was an unreasonable risk of danger or harm to a rider, including Plaintiff, or to other persons attending to an injured rider, if other riders continued to circulate the racetrack, or there was a suspected spinal or other serious injury that required prolonged medical intervention and treatment.

140.    At all relevant times, the AMA had numerous employees, agents, and/or contractors, including race staff and officials, that they engaged, selected, authorized, appointed, and/or employed, in whole or in part, to organize, operate, control, conduct, manage, officiate, staff, and supervise the 2020 Tampa Supercross and all on-track activities to protect the riders, including Plaintiff, from unreasonable risks of harm beyond those inherent in the sport.

141.    At all relevant times, the AMA had numerous employees, agents, and/or contractors, including race staff and officials, that they engaged, selected, authorized, appointed, and/or employed, in whole or in part, to organize, operate, control, conduct, manage, officiate, staff, and supervise the 2020 Tampa Supercross and all on-track activities in accordance with the its own and the FIM's rules, regulations, policies, procedures, and codes to protect the riders, including Plaintiff, from unreasonable risks of harm beyond those inherent in the sport.

142.    At all relevant times, the AMA's employees, agents, and/or contractors, including race staff and officials, were the actual or apparent agents and/or employees of the AMA, and were acting within the scope of their agency, employment, or contractual relationship with the AMA, and/or were performing services which he or she was engaged to perform by the AMA in connection with the 2020 Tampa Supercross.

143.    At all relevant times, the AMA acknowledged that its employees, agents, and/or contractors, including race staff and officials, would act on its behalf by, among

other things, engaging them, providing them with the credentials to access and work the event, and providing them with equipment and clothing to use during the event.

144. At all relevant times, the AMA's employees, agents, and/or contractors, including race staff and officials, accepted the undertaking to act on behalf of the AMA by, among other things, using the provided credentials to access and work the event on behalf of the AMA while wearing various items and using various equipment provided by the AMA to, among other things, maintain control over all race and floor operations for the safety of the riders.

145. At all relevant times, the AMA controlled the actions of its employees, agents, and/or contractors, including race staff and officials, by, among other things, providing them with headsets, protective gear, and other equipment needed to perform their duties and responsibilities, as well as verbal and written instructions and directives on how to perform their duties and responsibilities, manage the on-track and off-track activities, and make the event as safe as possible for the riders and not expose them to unreasonable risks of harm beyond those inherent in the sport.

146. At all relevant times, the AMA represented to the riders, including Plaintiff and his sports agent, that its employees, agents, and/or contractors, including race staff and officials, would conduct the event in accordance with the applicable rules, regulations, policies, procedures, and codes to not only ensure fair competition amongst the riders, but also to protect the riders from risks of harm beyond those inherent in the sport.

147.   At all relevant times, Plaintiff relied upon these representations in participating in the event.

148.   At all relevant times, Plaintiff's reliance upon these representations was detrimental, because the AMA's employees, agents, and/or contractors, including race staff and officials, did not conduct the event in accordance with the applicable rules, regulations, policies, procedures, and codes for the safety of the riders, much less common sense, for which Plaintiff has paid an irreversible and devastating price.

149.   At all relevant times, the AMA's employees, agents, and/or contractors, including race staff and officials, breached their duties by, among other things:

    a.   failing to abide by the applicable rules, regulations, policies, procedures, and codes regarding when to stop or "red flag" a practice session in the interest of safety;

    b.   failing to stop or "red flag" the practice session after Plaintiff crashed and fell headfirst onto the middle of the racetrack, given there was obvious danger to life or of further injury to Plaintiff or the Alpinestars crewmembers attending to him if other riders continued to circulate; and

    c.   failing to stop or "red flag" the practice session after Plaintiff crashed and fell headfirst onto the middle of the racetrack and reported obvious symptoms of a potential spinal cord injury that required prolonged medical intervention.

150.   At all relevant times, the AMA's employees, agents, and/or contractors, including race staff and officials, knew or should have known based upon prior experiences that their failure to stop or "red flag" the practice session—where there was obvious danger to life or of further injury to Plaintiff if other riders continued to circulate, and where Plaintiff had reported obvious symptoms of a spinal cord injury

requiring prolonged medical intervention—would likely subject Plaintiff to heightened risks of serious injury beyond those inherent in the sport, such as an inadequate, substandard, haphazard, reckless, and grossly negligent on-track assistance from the Alpinestars crewmembers.

151.  At all relevant times, the acts and omissions of the AMA's employees, agents, and/or contractors, including race staff and officials, were not only egregiously unreasonable and substandard, but were so reckless or wanting in care that they constituted a conscious disregard or indifference to the life, safety, or rights of Plaintiff, and demonstrated a reckless disregard for the consequences so as to affect the life or health of Plaintiff.

152.  As a direct and proximate result of the foregoing breaches, Plaintiff was catastrophically injured, including but not limited to the aggravation of his pre-existing condition, injury, and/or physical defect or impairment, which ultimately resulted in permanent disability and physical impairment.

153.  As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer economic damages, including but not limited to damages for past and future medical, pharmacological, psychological, and psychiatric care and treatment, and life care planning.

154.  As a direct and proximate result of the foregoing breaches, Plaintiff has suffered and will continue to suffer noneconomic damages, including but not limited to damages for past and future pain and suffering, disability and physical impairment,

mental anguish, emotional distress, inconvenience, and loss of capacity for the enjoyment of life.

WHEREFORE, Plaintiff demands judgment against the AMA for all his damages, including but not limited to punitive damages, in an amount to be determined at trial, plus pre-judgment and post-judgment interest and costs of this suit, and for such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all his claims.

Respectfully submitted,

By: */s/ Mark A. Schweikert*
Mark A. Schweikert (FBN 70555)
mark@schweikertlaw.com
**SCHWEIKERT LAW PLLC**
1111 Brickell Avenue, Suite 1550
Miami, Florida 33131
Office: (305) 999-1906
Mobile: (305) 926-9452
*Lead Counsel for Plaintiff*

*and*

Maria A. Dominguez, Esq. (FBN 0510221)
m.dominguez@dmrpr.com
Juan C. Ramos-Rosado, Esq. (FBN 1002562)
j.ramos@dmrpr.com
Javier F. Micheo Marcial, Esq. (FBN 1009694)
j.micheo@dmrpr.com
**DMR LAW LLC**
1430 South Dixie Hwy., Suite 313
Coral Gables, FL 33146
Telephone: 305-548-8666

*and*

Jason B. Giller, Esq. (FBN 77441)
jason@gillerpa.com
**JASON B. GILLER, P.A.**
1111 Brickell Avenue, Suite 1550
Miami, Florida 33131
Telephone: (305) 999-1906