# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**BRIAN MOREAU,**

       **Plaintiff**

**vs.**                                       **Case No. 8:22-cv-01295**

**FELD MOTOR SPORTS, INC., et al.,**

       **Defendant.**

_____

## FELD MOTOR SPORTS, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

Plaintiff's counsel again comes to the Court with allegations levying the most serious of professional misconduct accusations against FMS and its counsel. He now tosses around allegations—laced with intemperate rhetoric—that FMS has defrauded the Court, committed perjury, and concealed evidence. But he is profoundly mistaken. FMS has not "obstruct[ed] Plaintiff's pursuit of justice," engaged in "flagrant misconduct," "attack[ed] the truth-seeking process," or "abuse[d] our justice system." Mot. at 4. Plaintiff's counsel say-so is not accurate, nor is it a basis to impose the "ultimate sanctions." *Id.*

This Motion arises from a subpoena that Plaintiff issued to NBCUniversal ("NBCU") in September 2024 for the "complete broadcast of the practices and qualifiers at the 2020 Tampa Supercross." Ex. 1, NBCU Subpoena. This subpoena also sought the production of "raw audio and video recordings" and "raw audio recordings of communications" of Plaintiff's crash and his injuries. *Id.* Notably,

NBCU initially responded it had no archives and no footage because Plaintiff's "crash occurred around 12:25pm during the February 15, 2020 practice round. NBCU was not covering the round at that time. Its coverage began at 1pm, 35 minutes after the incident." Ex. 2, Parker Oct. 22 & Dec. 5 Emails. On December 12, 2024, Plaintiff's counsel Mark Schweikert surfaced, emailed FMS the footage from the NBCU production, and declared that "[w]e will be immediately seeking appropriate relief from the Court." *Id.*, Schweikert Dec. 12 Email.

Upon receipt of the NBCU production, FMS immediately conducted an in-depth investigation to understand what the footage was, how it originated, and whether FMS had a copy of it. This extraordinarily time-consuming process led FMS to learn that, despite repeatedly conducting searches of video footage related to Plaintiff's crash for years, the footage from the 2020 Tampa Event was not fully reviewed by an employee who was repeatedly asked for any such footage and had indicated that there was none.

FMS has since re-traced its search efforts to review *all* videos related to the 2020 Tampa Event, which entailed forensically collecting and sifting through a terabyte of data from this event. This effort resulted in the production of thirteen additional videos on Friday, January 31, 2025, and it is the balance of the footage of Plaintiff in the possession, custody or control of FMS. Only two of those video clips show Plaintiff's removal from the track: they are duplicates of footage in the NBCU production. They are also cumulative of other evidence produced at the outset of this case, such as the professionally taken, high-resolution pictures of

Plaintiff's rescue.[1]  FMS has no incentive to hide, conceal or otherwise bury any video evidence of the crash in this case—nor has it ever objected to the production of it.  The NBCU video is not "damning evidence," as Plaintiff calls it, for any Defendant; instead, this video further confirms and corroborates the other video and photographic evidence as well as what FMS's experts have already said from the outset: that Plaintiff was paralyzed upon impact.  His rescue from the track— whether one likes it or not—is irrelevant to Plaintiff's injuries.

At the same time, FMS agrees that the footage that Plaintiff received from NBCU should have been produced earlier in this case.  FMS was unaware that it had these videos and was mistaken in that belief, for which it apologizes.  But these videos were found in an archive that few FMS employees had access to and most of FMS, including its in-house lawyers and Mr. Prater, did not know even existed.  In short, the videos were not intentionally withheld, nor is their discovery emblematic of some so-called "pattern of obstruction" as Plaintiff now claims.

Plaintiff's counsel has an established pattern in this case.  He does little work and/or disappears from the case, only to return on the eve of some deadline and then files a motion blaming FMS for whatever he has failed to do.  These efforts have repeatedly been rejected, but they nonetheless require significant time and resources to defend.  This is ongoing harassment of FMS that needs to stop.

---

[1] The source of these photos is Stephan Legrand, a professional photographer, who was onsite at the time of Plaintiff's crash.  Plaintiff used several of Mr. Legrand's photos in his original Complaint filed on June 4, 2022.  ECF No. 1.  So FMS later subpoenaed him for the rest.  Plaintiff took Mr. Legrand's deposition on Wednesday, February 19, 2025.

Recklessly bandying about accusations of the most serious types of intentional fraud and seeking a default judgment is unprofessional and unjustified.

The NBCU production does not require Plaintiff to start over. He has months left in discovery, and so far, has hardly advanced his case. Since discovery commenced in **September 2022**, Plaintiff's counsel has taken the following depositions: two of the four paramedics onsite at the Event, the four individually named defendants, an FMS employee (in **December 2024**), and Mr. Legrand. He also cancelled the 30(b)(6) deposition of FMS scheduled for December 20, 2024 on December 10, two days **before** receiving the NBCU video (not as a result of it). Plaintiff intends to depose almost 20 more fact/party witnesses and nearly 10 experts before discovery closes on April 7. And as late as last week, Plaintiff was still adding names to his proposed deponent list. Plaintiff thus has ample time to question approximately 30 deponents about these videos, and in fact, has already addressed them in his expert rebuttal reports. The Court should deny the Motion.

## I.    Factual Background

### A.    FMS Never Concealed Videos or Defrauded the Court

Plaintiff has no evidence to demonstrate that FMS and its outside counsel concealed videos or defrauded the Court.

#### 1.    FMS Immediately and Repeatedly Searched for Videos

On February 15, 2020, FMS promoted a Supercross event held at Raymond James Stadium in Tampa, Florida, at which both 250SX and 450SX races occurred ("2020 Tampa Event"). The 2020 Tampa Event followed the same format and

schedule as with any other Supercross races.  Ex. 03 FMS_INC_00000851; Ex. 04, AMA_000949.  The first motorcycle riding of the day is "free practice," during which all riders in small groups spend 8-10 minutes on the track to become accustomed to it.  *Id.*  No official timing occurs for the practice sessions, and none of them were broadcast in 2020, either domestically or internationally.  *Id.* Afterward, the official, timed riding begins in the afternoon with a series of qualifying heats, which were broadcast in 2020 on a program known as "Race Day Live," both domestically and internationally with the only differences being the commercials.  *Id.*  The race day then ends with the "Night Show," which includes heat races for the 250SX and 450SX classes, as well as a last chance qualifier, before concluding with the main event, which is likewise broadcast.  *Id.*

At the 2020 Tampa Event, Plaintiff rode for the Troy Lee Designs racing team, and, as with all other riders, participated in the "free" practice session, which is early in the day and is the riders' first opportunity to ride the track on race day. On the second or third lap, he miscalculated a series of jumps, missed a landing, and flew off his motorcycle with speed, crashing headfirst into the face of another jump.  Plaintiff, himself, has accepted full responsibility for this unfortunate accident. Ex. 5, Moreau Tr. 202:18-204:25.  The degree of his injury was not then-known to FMS and began surfacing the next day on February 16.  On Monday, February 17, Mr. Prater requested that two other FMS employees, Mike Muye, FMS's then-Director of Operations for Supercross, and Doug Cabrera, the then-

Director of 2-wheel Television, to locate any footage of Plaintiff's crash, including his removal from the track ("Moreau Footage").  Ex. 6, Prater Decl., ¶¶ 4-6.

Following Mr. Prater's request, Mr. Muye ultimately obtained and preserved three videos from three different sources: (1) a recording from a nest camera that FMS had placed in Raymond James Stadium as part of the 2020 Tampa Supercross Event; (2) a recording from a camera that Troy Lee Designs had in the Stadium as part of the 2020 Tampa Supercross Event; and (3) a recording from the Tampa Sports Authority that is a compilation of the various videoboards and "jumbotron" displays running at the Stadium during the 2020 Tampa Event.  *See* Exs. 7 – 9 (screenshots of videos); Ex. 6, Prater Decl., ¶ 7.[2]  No additional footage was provided by Mr. Cabrera to Mr. Prater.  Ex. 6, Prater Decl., ¶ 8.

Multiple and repeated efforts to search for materials related to this litigation occurred since it began.  Ex. 6, Prater Decl.¶ 5-7, 17-23; Ex. 11 Joiner Decl., ¶¶ 8-11, 13-15.  After receiving notice of this lawsuit in June 2022, Mr. Prater participated in both electronic and hard copy file searches for any materials related to Plaintiff, including from Supercross operations, video filming, public relations, and safety departments.  Ex. 6, Prater Decl., ¶ 17.  This material was provided to FMS's legal department per instructions from its General Counsel, Lisa Zeiler Joiner.  Ex. 6, Prater Decl., ¶ 9; *see also* Ex. 11 Joiner Decl., ¶¶ 10-12; No additional footage was located.  Ex. 6, Prater Decl., ¶ 17.

---

[2]. The Night Show program was also produced to Plaintiff even though the broadcast footage contained no Moreau Footage.  Ex. 10, (screenshot of videos).

In March 2024, FMS received additional written discovery requests that Mr.
Prater and others helped counsel respond to. Ex. 6, Prater Decl., ¶ 18; Ex. 11 Joiner
Decl., ¶ 13. Mr. Prater personally conducted searches of his emails, laptop, and
phone, plus a Vimeo account where FMS maintains video recordings of the
broadcast programs. Ex. 6, Prater Decl., ¶¶ 18-19. No raw footage or additional
Moreau Footage was located. *Id.*; Ex. 11 Joiner Decl., ¶¶ 13.

In connection with Plaintiff's September 2024 motion to compel, as well as
another set of written discovery served by Plaintiff, FMS (including Mr. Prater)
again searched for any Moreau Footage. Ex. 6, Prater Decl., ¶ 20; Ex. 11, Joiner
Decl., ¶¶ 14-15. Mr. Prater again asked Messrs. Muye and Cabrera to search for
any Moreau Footage. Ex. 6, Prater Decl., ¶ 21. Messrs Muye and Cabrera did not
locate any additional Moreau Footage, and they confirmed for Mr. Prater that there
was no additional Moreau Footage. *Id.*, ¶ 22. Mr. Prater also asked Michele Lewis,
FMS's Senior Director of Video Monetization, who oversees the international
broadcast related to Supercross and maintains files of the Race Day Live programs,
for the 2020 Tampa Event. *Id.*, ¶ 23. The Race Day Live program for the 2020
Tampa Event does not contain any Moreau Footage. *Id.*, ¶¶ 11-12, 23. This
program was produced to Plaintiff on October 8, 2024. Ex. 12, Oct. 8, 2024 Email.

### 2. Plaintiff Again Improperly Accuses FMS's Counsel of Professional Misconduct in Producing Three Videos of His Crash in May 2024

FMS's counsel produced the three videos located by Mr. Muye in May 2024.
Plaintiff argues ***again*** that FMS's outside counsel intentionally misrepresented to

the Court that FMS's production was complete when it was not because, at that time, these three videos had not been produced. Mot. at 4-5. That statement was believed to be accurate at the time it was made, as repeatedly explained to the Court. *See* ECF No. 172 at 9. It also was clear that discovery was ongoing, and additional productions would be made. *Id.* But during the reproduction and reimaging of FMS's prior productions, undersigned counsel learned that these three videos had inadvertently not been produced. Undersigned counsel then promptly produced them to opposing counsel. *See* Ex. 13, May 20, 2024 Email.

Indeed, outside counsel has now explained this course-of-events to the Court twice—*first*, in FMS's Opposition to Plaintiff's "Time Sensitive" Motion for Sanctions, ECF No. 238; and *second*, at the motion hearing before Your Honor, Ex. 14, Oct. 4, 2024 Hr'g. Tr. at 14:24-15:-24. So, these three videos were not intentionally withheld from discovery, and any delay had nothing to do with FMS.

### 3. Plaintiff Misconstrues His June 2024 Motion to Compel

Plaintiff next claims that FMS avoided a Court Order on his first motion to compel by claiming that no other videos of the incident existed. Mot. at 5. But that was not the issue before the Court. Plaintiff filed a motion claiming that FMS waived its objections to certain document requests by responding "subject to and without waiving" objections (even though he has done the same thing throughout this case). FMS ultimately amended its discovery response to make clear that it had not intentionally "withheld any responsive, non-privileged materials on the basis of any prior objection to [a] Request," including as to "[a]ll video recordings

8

or photographs of or related to the Incident."  Ex. 15, FMS's Suppl. Responses.
That statement was unequivocally true at the time it was made and remains so
today because the recently produced, 13 videos were not withheld from Plaintiff
based on any objection.  They were instead not known to FMS's in-house legal
team, its outside counsel, or Mr. Prater until just very recently.  Ex. 11, Joiner Decl.,
¶¶ 16-18; Ex. 6, Prater Decl., ¶¶ 25-26, 30-31.

### 4.    FMS's Investigation Revealed Existence of an Archive Containing Raw Footage from the 2020 Tampa Event

On December 12, 2024, Plaintiff's counsel received footage from NBCU in
response to a third-party subpoena that he served in late September 2024.  Ex. 1,
NBCU Subpoena.  Plaintiff's counsel then forwarded that material to Defendants'
counsel and, before any conferral, advised that "[w]e will be immediately seeking
appropriate relief from the Court."  Ex. 2, M. Schweikert Dec. 12 Email.  Plaintiff
filed his Motion six weeks later on Friday, January 24, 2025, just two business days
before the in-person mediation on January 29, 2025 in Orlando.  FMS and its in-
house and outside counsel, by contrast, investigated the source of this new footage
at once, including NBC's claim that "Feld" was its source.  *Id.*, Bierbauer Email.

Through this investigation, FMS's in-house and outside legal counsel—along
with Mr. Prater—learned for the first time there is an archive of Supercross footage
that contains the programs (which were distributed in 2020 via NBCU within the
U.S. and via Videopass in foreign jurisdictions) along with some raw footage from
the 2020 Tampa Event.  Ex. 6, Prater Decl., ¶¶ 29-31; Ex. 11, Joiner Decl., ¶¶ 4, 16-

18.  Mr. Prater, FMS's in-house legal department, and outside counsel did not know of the existence of these archives or its contents, much less that it could contain Moreau Footage.  *Id.*  Indeed, neither Mr. Prater nor FMS's in-house legal department had access to this archive, or even knew about it until now.  *Id.*

Upon learning of the archive's existence, outside counsel immediately retained an outside ESI vendor, Consilio, to collect all footage on the archive related to the 2020 Tampa Event.  Ex. 16, M. Apostol Decl., ¶¶ 3-4.  This process began on Christmas Eve and included two collections: *first*, a non-forensic copy of the 2020 Tampa Event footage so that it could be reviewed as soon as possible; and *second*, an identical, forensic copy so that the metadata would stay intact.  *Id.*, ¶¶ 5-9.  Altogether, Consilio collected more than a terabyte of data—consisting of approximately 2,300 videos—for each copy made.  *Id.*, ¶¶ 9-10.

This process, not surprisingly, took time to complete.  *Id.*, ¶¶ 5-10.  Altogether, Consilio spent 29.3 manhours collecting and processing the non-forensic copy and made it available to FMS's outside counsel on January 7, January 8, and January 13, which then required processing by outside counsel's Litigation Technology Services Group for 11 manhours and over 20+ hours of machine time.  *Id.*, ¶¶ 8, 13.  A review of that material then began on January 7, with a counsel-level attorney, four associates, and a paralegal sifting through that material for, collectively, more than 100 hours (plus another 100+ hours spent related to that work).  *Id.*, ¶¶ 12, 14.  FMS's outside counsel completed its review

on January 30, and the next day, produced 13 videos to Plaintiff, including two clips of Plaintiff's removal from the track that were in the NBCU video. *Id.*, ¶ 15.

### 5. The Recently Discovered Footage Was Not Broadcast

As part of his Motion, Plaintiff doubles down on his claims about the anonymous, unverified YouTube users who commented on a [video](#) posted over two-years-ago about this case. *See* Ex. 17, Screenshot of Comments. This YouTube video has no footage whatsoever—only select snippets and still images from Plaintiff's original complaint. Plaintiff now uses these comments to suggest that FMS is still withholding "the original version of Race Day Live that streamed live," and "which may contain the footage referenced by the YouTube commenters." Mot. at 7-8, n.6. But Plaintiff is wrong, as his own exhibits confirm.

In 2020, Race Day Live was a live stream that could be viewed domestically via the NBC Sports Gold Pass and internationally via SupercrossLive.TV Super Pass (also known as Video Pass). *See* Pl.s' Mot., Ex. 1 at -722. The live broadcast of Race Day Live does not include free practice sessions but only qualifying sessions and typically begins at 1:00 p.m. ET. Ex. 18, FMS_INC_0000760 and Ex. 3, FMS_INC_0000851. Plaintiff claims that a reference in FMS's Technical Rider means that the "free practice" was filmed. Pl.'s Mot., Ex. 1 at -722 ("Race Day Live features hosts Jim Holley and Daniel Blair providing practice and qualifying coverage . . . ."). But he completely glosses over the relevant portion of FMS's Media Rights Agreement with NBC that he cites to the Court. Section 5(d) of that contract provides that "Race Day Live Programs do not include practices," but if

FMS elects to produce coverage of those practice, "it shall be included in the Race Day Live Programs and provided to NBCUniversal." Pl.'s Mot., Ex. 16 at -896. Plaintiff tells the Court none of this, representing only that "FMS's Media Rights Agreement with NBC required FMS to produce and deliver the Race Day Live programs." *Id.* at 7, n.6.

Nor does Plaintiff say a word about his own sister's deposition testimony, during which she confirmed that the "free practice" was not being streamed:

Q. So you didn't see the accident on TV; it wasn't broadcast on TV?

A. No.

Q. The pre-practice wasn't available to watch on TV?

A. Yes. They were only broadcasting the races. They weren't broadcasting the training sessions.

Ex. 19, I. Strubhart Dep. Tr. at 32:5-25. Plaintiff's ongoing narrative about some other purported broadcast of the 2020 Tampa Event not only lacks any evidentiary support, but also completely contradicts the evidence that does exist and which Plaintiff's counsel did not disclose to the court in his Motion.

### 6. The NBC Footage is Cumulative of Other Produced Evidence and Helpful to FMS's Defenses in this Case

Plaintiff professes that "FMS gambled on burying damning evidence and subverting justice, betting that it could run out the clock before its deceit was exposed." Mot. at 22. That claim is frivolous. The new footage is cumulative of high-resolution, professionally taken, and close-up shots of Plaintiff's removal from the track from approximately sixty photographs produced by Stephan

Legrand of LeBigUSA.com, a leading French website that covers Supercross. *See* Ex. 20, Dep. Ex. 15. Plaintiff's counsel chose to select photos from Mr. LeGrand and embed them into his original complaint prior to filing it. *See* ECF No. 1. Photos from Mr. LeGrand have since remained in every version of the Complaint. *See* ECF Nos. 1, 45, 101, 180.

Further, FMS has ***already produced*** three videos that depict Plaintiff's crash and/or removal from the track, and it has zero incentive to "bury" other videos. Two of FMS's testifying experts have reviewed the footage produced by NBCU (and reproduced by FMS), and they have both independently concluded that this footage either reinforces or further supports their expert opinions. *See* Ex. 21, Decl. of J. Fisher; Ex. 22, Decl. of J. Sampson. No rational party would "bury" this sort of exculpatory evidence that its own experts would rely upon.

### B. FMS Never Engaged in a "Pattern of Obstruction"

#### 1. FMS Is Not Responsible for Plaintiff's Delay in Adding the AMA as a Named Defendant

Plaintiff's Motion is the third time that he has accused FMS of willfully withholding the AMA Sanctioning Agreement—which has already been the subject of extensive briefing before the Court. *See* ECF Nos. 172, 238. In moving to add the AMA as a party the day before the statute of limitations expired, Plaintiff tossed around many of the same bogus allegations for his own delay that he repeats here, ECF No. 167, none of which Judge Barber entertained. *See* Ex. 23, March 19, 2024 Hr'g. Tr. As before, there is no merit to Plaintiff's contention that FMS was

responsible for Plaintiff's decision to delay joining the AMA as a party, or that the
production of the AMA Sanctioning Agreement revealed a "key fact" that the AMA
provided race officials to control the track and employ red flags as necessary.[3]

**Publicly Available Sources.**  The AMA's involvement in managing race
and floor operations and "red flagging" races is publicly available through a basic
Google search.  *See* 2020 AMA Supercross Rulebook.  The Rulebook includes a
description of its officials and their duties, including the Race Director who is
responsible for "discontinue[ing] race activity if conditions become unacceptable."
*Id.* at 62.  The AMA Rulebook also includes the Race Rules and Procedures that
the AMA officials follow and enforce, including for red flags.  *Id.* at 28.  The AMA's
connection to the 2020 Tampa Event was no secret.  Plaintiff signed an AMA
Waiver and Release to obtain his race credentials before participating in the 2020
Tampa Event.  *See* Ex. 24, Pl.'s AMA Release, AMA_001193.[4]

**Plaintiff's Pleadings and Discovery.**    Plaintiff's own document
production shows that his counsel received a link to the AMA Rulebook from a
third-party on June 8, 2022 (just four days after he filed his original Complaint).
Ex. 25, Moreau02318.  And in that Complaint, Plaintiff's counsel understood full

---

[3] The claims of Plaintiff's counsel related to that particular motion were nothing less than
shockingly false.  It is *not possible* to be a rider in the AMA Supercross series, which requires
membership licensing and credentials to be issued by the AMA *prior to racing*, and not know that
the AMA is somehow involved with sanctioning the race.  In addition, each rider's motorcycle is
required to have an AMA number plate on it.  All of this is public information available and known
to Plaintiff's counsel well before Plaintiff ever had his accident and his counsel filed suit.

[4] Plaintiff produced the AMA Rulebook and his AMA Waiver in a document production in June
2023—approximately eight months before he first accused FMS of withholding the "key fact" that
the AMA was responsible for providing race officials to control the track.

well the AMA's role.  *See* Ex. Compl., ¶ 10, ECF No. 1; *see also id.*, ¶ 12.  Indeed, the AMA Race Director's role is central to Plaintiff's July 27, 2022 Amended Complaint and his March 13, 2023 Second Amended Complaint.  *See* Am. Compl., ¶ 42, ECF No. 45 ("[The] Race Director, Clerk of Course, and other relevant officials also had a duty 'red flag' a practice session or race if there was danger to a rider or officials attending to an injured rider if other riders continue to circulate the racetrack, or there was a suspected spinal or other serious injury that would require prolonged medical treatment."); Sec. Am. Compl., ¶ 42, ECF 101 (same).

***Defendant's Document Production.***    Further, in March 2023, Defendant Dr. Bodnar produced documents clearly articulating the AMA's role in controlling race and floor operations and "red flagging."  This included documents explaining how the "***AMA Race Director has final decision for the Red Flag***."  Ex. 26, Bodnar00210 at -211; *see also* Ex. 27, Bodnar00223 (same).

***Defense Counsel's Disclosures.***    A few months later, in July 2023, FMS's counsel discussed the AMA's "red flagging" duties with Plaintiff's counsel and disclosed that the AMA Sanctioning Agreement would be forthcoming.  *See* Ex. 28, Decl. of C. Warren, ¶ 2, ECF No. 172-4; Ex. 29, Decl. of M. Bootier, ¶ 2, ECF No. 172-5.  Then, in October 2023, FMS's counsel again discussed the AMA's "red flagging" duties with Plaintiff's counsel.  Ex. 30, Decl. of D. Gordon, ¶¶ 1-3, ECF No. 172-6; Ex. 31, Decl. of D. Doyle, ¶¶ 1-3, ECF No. 172-7.  Plaintiff waited four months to seek leave to add the AMA as a defendant—just weeks before his expert disclosures were due and one day before the statute of limitations expired.  That

was a tactical decision made by Plaintiff's counsel, and he succeeded in getting the case stayed as a result such that his expert reports were not next due until October 1, 2024. *See* ECF No. 206. Plaintiff's mischaracterization of FMS's production of the AMA Sanctioning Agreement finds no support in the record and had nothing to do with his decision to add the AMA as a party at the last possible moment.

### 2.    FMS Did Not Dupe Plaintiff into Dropping Feld Entertainment as a Named Defendant

Plaintiff next claims that FMS "misled" him into dropping FMS's parent company, Feld Entertainment, Inc. ("FEI"), as a defendant when he moved to add the AMA as a party. FEI was never a proper defendant. FMS is only alleged to be vicariously liable for the acts of its purported agents, the AMA and The Medic Rig, LLC (plus the individually named defendants). The AMA sanctions Supercross races, including the 2020 Tampa Event, under a Sanctioning Agreement with FMS, not FEI. The Medic Rig likewise provides services at Supercross races under a Master Services Agreement with FMS, not FEI.[5] It should not be surprising, then, why FMS has consistently told Plaintiff FEI should not be a named party.

Plaintiff relies on cherry-picked testimony by FMS's Senior Director of Operations for Supercross, Mike Muye, who misspoke at his deposition. There, Mr. Muye testified "Feld Motorsports" when asked "who pays you for your work," and that FEI issues his W-2 form. Ex. 32, Muye Dep. Tr. at 20:7-21:2. He was then

---

[5] The Individual Defendants have no contractual relationship with FMS or FEI, and the releases that they signed were as between themselves and FMS.

asked a confusing, double question to which he answered, "I am an employee of Feld Entertainment, yes." *Id.* But Plaintiff omits much of this testimony, as well as Mr. Muye's later testimony in which he stated that "Feld Motorsports" has been his employer since 2016. *Id.* at 213:15-214:11. Nor does Plaintiff say anything about Mr. Muye's later testimony that FEI serves as FMS's payroll provider. *Id.* at 214:12-215:7. So once again, Plaintiff has misstated the record and failed to fully disclose relevant information that directly relates to his extreme allegations.[6]

### 3. FMS Has Not Obstructed Plaintiff's Ability to Depose Any Witnesses

Plaintiff next claims that FMS engaged in "classic misdirection" when its counsel informed him (on behalf of all defendants) that the "eye in the sky" position did not exist in 2020. Yet this is emblematic of Plaintiff's apparent preference to ask questions of counsel via email and then cry foul when a fact witness testifies differently. Mr. Muye is the first witness and only witness from FMS that Plaintiff deposed. At his December 12, 2024 deposition, Mr. Muye testified that FMS has an "eye in the sky" and he identified the person who he believed served in that role in 2020. Ex. 32, Muye Dep. Tr. at 75:14-15. Plaintiff's counsel then waited until February 6, 2025 to ask for the deposition of that individual. Plaintiff's claim that this August 2024 email exchange has "obstructed" his ability to depose any witness, let alone the "eye in the sky" strains credulity.

---

[6] Plaintiff accuses FMS of requesting an extension of Mr. Muye's errata sheet to substantively alter his testimony. But this is nonsense. FMS requested this because the transcript was fraught with typographical errors, which required significant time to review and correct. As the Court will see, all corrections related to transcription errors. *See* Ex. 33, M. Muye Errata Sheet.

Plaintiff also says that FMS "refused" to designate a Rule 30(b)6) designee to testify about its record-keeping systems, procedures, and practices. But this, too, is not accurate. FMS interposed objections to Plaintiff's 30(b)(6) Notice on November 27, 2024, including as to that topic, well in advance of its deposition that had been confirmed by Plaintiff's co-counsel for December 20, all before Plaintiff's lead counsel abruptly cancelled it on a December 10 conferral. *See* Ex. 34, Nov. 27-Dec. 9 Emails; Ex. 35, Dec. 10-12 Emails. Afterward, FMS offered to consider a request to stipulate to the authenticity of FMS documents because Plaintiff claimed that Topic 12 was meant to be a request for a records custodian to authenticate documents, rather than the improper "discovery on discovery" contemplated by the topic. *Id.*, Dec. 11-12 Emails. Plaintiff did not follow up.

### 4. Plaintiff Has Not Diligently Pursued Discovery

Against this record, Plaintiff accuses FMS of "prejudicing his ability to timely obtain critical evidence, depose key witness, and pursue claims against all responsible parties." *See* Mot. at 10. He is wrong. If anything, Plaintiff has sat around for years now, starting out by missing the first case management deadline, ECF No. 68, and then dragging his feet with his own discovery obligations.

Plaintiff has known who to depose from FMS since September 22, 2022 but he waited until December 12, 2024 to take his first FMS deposition. *See* Ex. 36, FMS's Initial Disclosures. Plaintiff has likewise known who to depose from The Medic Rig since September 2022 but again, waited until August 2024 to take the Individual Defendants' depositions. And he has known who to depose from the

AMA since June 2024 but has not yet deposed anyone from it (indeed, he cancelled the September 2024 deposition of John Gallagher, its Race Director at the 2020 Tampa Event, without explanation on August 27). *See* Ex. 37, Aug. 27 Email.

Since then, FMS's counsel has repeatedly attempted to schedule depositions. *See, e.g.*, Ex. 38, Sept. 17, Email; Ex. 39 Oct. 22 Email. In fact, FMS's counsel has been forced to repeatedly chase after Plaintiff's counsel, including his lead counsel who took leave from this case and then retracted agreements made in his absence by his co-counsel once he returned—while FMS has provided dates for its own witnesses, only to be ignored. *See* Ex. 40, Oct. 28, Nov 5, Nov. 11, Nov. 12, Nov 13, Nov 15, Nov. 19, Nov. 27 Emails. Plaintiff's practice of scheduling and then cancelling depositions has repeated itself once more this year, when Plaintiff again cancelled Mr. Prater's deposition scheduled for February 14—a day that he offered on January 30 and FMS accepted on January 31. Ex. 41, Jan. 31 Email. Any delay in scheduling depositions of fact witnesses, designees, and experts has nothing to do with the current dispute.[7]

Plaintiff has continued to weaponize the discovery process, including through this Motion. Just two weeks ago, Plaintiff made a Sunday afternoon production of nearly 200 files in response to FMS's Second Set of Document Requests—which were due by **November 23, 2024**. *See* Ex. 43, Schweikert Feb.

---

[7] Indeed, the scheduling of the majority of the depositions did not occur until the evening of February 13, 2025, the night before Judge Barber's deadline to advise the Court of any dispute— an Order that was prompted by another unilateral email to Judge Barber's Chambers by Plaintiff's counsel who then inaccurately represented to the Court that "there have been ongoing difficulties in coordinating and scheduling depositions ***between the parties***." Ex. 42 (emphasis added).

9 Email.  FMS repeatedly asked for this material for months, offering the
professional courtesy of not rushing to motions practice, only to be ambushed with
a document dump—including French-language files the day before two important
fact witness depositions, Marvin and Mathilde Musquin.  *See id.*, Emails of Feb 9
and Feb 12.  And when FMS's counsel held the deposition open in light of the
belated production, Plaintiff's counsel again blamed the NBCU video (which was
produced weeks after his deadline) and then attempted to interrogate FMS's
counsel on the record.  Ex. 44, Mathilde Dep. Tr. at 135:4-137:11.  Indeed, the
production documents themselves confirm the inaccuracy of Plaintiff's story:  an
errant comment left in one of the produced documents shows that Plaintiff's
counsel had at least some of this material since December 10, again two days before
the NBC production.  *See* Ex. 45, Screenshot of 40-page WhatsApp string.

## II.    Legal Standard

A court's inherent power to sanction "must be exercised with restraint and
discretion," and the "key to unlocking [it] is a finding of bad faith."  *Purchasing
Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) (citation
omitted).  This requires the movant to present "direct evidence of subjective bad
faith," or show conduct that "is so egregious that it could only be committed in bad
faith."  *Id.*  "Recklessness alone does not satisfy the inherent powers standard;
there must be more."  *Id.* at 1225.  Ultimately, "[t]he high standard of finding bad
faith cannot be met in the absence of fraud on the Court, proof of forum shopping,
unreasonable and vexatious multiplying of proceedings, pursuing a case barred by

the statute of limitations, or purposely vexatious behavior." *Tran v. Nomad Grp. LLC*, 2022 WL 22878428, at *2 (M.D. Fla. Sept. 19, 2022) (citations omitted).

## III.    Argument

### A.    FMS Has Not Engaged in Any Bad Faith Conduct

Plaintiff has no evidence of bad faith (because none exists), nor can he show any conduct that is so egregious that it could only be committed in bad faith (because none occurred).  "Bad faith" in this context may only be found in extreme scenarios, and none of them exist here.  As one court in this District has explained:

> First, bad faith may be found where the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled. Second, bad faith may be found where a party delays or disrupts the litigation, or hampers the enforcement of a court order.  Third, the Eleventh Circuit has stated that bad faith may be found where an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for the purpose of harassing an opponent.

*Mulet v. Mod. Pool Cage Painting*, *LLC*, 2025 WL 220459, at *1 (M.D. Fla. Jan. 6, 2025).  "A finding of fraud on the court, however, is reserved for only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated." *Id.* (citation omitted).  And for this showing, "[t]here must be clear and convincing evidence of an "unconscionable plan designed to improperly influence the court in its decision." *Id.* (citation omitted).  Nothing of that sort exists here.

### 1.    The Prater Declaration Was Not Perjurious

Plaintiff accuses Mr. Prater of committing perjury and its counsel of engaging in a scheme to suborn perjury based *solely* on Plaintiff's counsel's own

assumptions and innuendo—once again leaping to conclusions without evidence
or basis for doing so.  The facts of what has occurred here—which FMS and its
counsel have investigated at length since the NBC production—should control the
outcome here, not the vitriol directed towards Mr. Prater, FMS, and its counsel.

As the Eleventh Circuit has made clear, "[p]erjury is 'false testimony
concerning a material matter with the willful intent to provide false testimony,
rather than as a result of confusion, mistake, or faulty memory.'" *Stepanovich v.
Bradshaw*, 2017 WL 5249535, at *2 (M.D. Fla. Apr. 17, 2017), *aff'd* 728 F. App'x
891 (11th Cir. 2018) (quoting *United States v. Duperval*, 777 F.3d 1324, 1337 (11th
Cir. 2015)).  No such willfulness exists here, nor any other evidence of bad faith.

Mr. Prater did not commit perjury.  *See* Ex. 6, Prater Decl., ¶¶ 3, 10, 13-16,
24, 27, 35.  He never concealed, hid, or attempted to mislead anyone about the
evidence in this case.  *Id.*  His September Declaration was true and correct when
he made it and had been based on his own investigation, which began in 2020 and
continued throughout this case.  *Id.*.  So when Mr. Prater stated in his September
Declaration that "[t]here are no additional video or audio recordings that contain
footage of Mr. Moreau's crash," he believed this was accurate from his own
personal investigation, the instructions to search that he provided to two separate
FMS employees, and the fact that no additional Moreau Footage was ever located
and provided to him.  *Id.*, ¶ 24.  So, too, did Mr. Prater believe that his statement
regarding the filming of practice was truthful at the time it was made, again based
on his tenure and knowledge of FMS' filming practices at Supercross, plus the

content of FMS's Race Live Day and night show programs, and his discussions with two separate FMS employees. *Id.*, ¶ 27. Mr. Prater now knows (along with counsel) that those statements are not accurate based on the two clips of Mr. Moreau's rescue from the track that do exist. *Id.*, ¶¶ 28-35

Mr. Prater learned for the first time on December 13, 2024 that NBCU had produced a file that included two clips of Plaintiff being removed from the track after his crash at the 2020 Tampa Event. *Id.*, ¶ 25. Indeed, Mr. Prater was surprised by this footage, had never seen it, and did not know it existed. *Id.*, ¶ 26. Mr. Prater also lacked any awareness about the existence of an archive of Supercross footage that contains the programs and raw footage. *Id.*, ¶¶ 29-30. Mr. Prater has never had access to this archive, nor ever seen it. *Id.*, ¶ 31. No evidence exists that Mr. Prater had any willful intent to provide false testimony, nor that counsel purportedly suborned perjury as some sort of scheme as Plaintiff suggests.

### 2. A Late Production Does Not Warrant the "Ultimate Sanction"

Plaintiff's demand for the "ultimate sanction" of dismissal has no factual support, and the legal authority that he cites does not support such draconian relief. In *Access Innovators, LLC v. Usha Martin Ltd.*, for instance, the court dismissed an action when the plaintiff and its principal submitted an altered test report and made materially false statements in two affidavits as evidence that defendant's product was defective. 2010 WL 11508119, at *3 (N.D. Ga. Apr. 28, 2010). Similarly in *American Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, defendants

fabricated and filed declarations (which they deceived others into signing) to show their first use of trademarks, and then devised a scheme to keep a witness from being deposed. 2015 WL 12732433, at **23-26 (C.D. Cal. Dec. 14, 2015). And in *Frieson v. Delta Airlines, Inc.*, a plaintiff falsely testified in his deposition and then tampered with evidence by altering a 2010 letter to appear as if it were from 2009 to support an ADA claim. 2022 WL 376374, at *9 (N.D. Ga. Feb. 8, 2022). Plaintiff's other cited cases follow a similar pattern. *See, e.g.*, *Combs v. Rockwell Int'l Corp.*, 927 F.2d 486, 487 (9th Cir. 1991) (affirming dismissal when plaintiff's counsel made thirty-six changes to plaintiff's deposition, which were never reviewed by plaintiff, despite counsel's sworn statements to the contrary). Plaintiff omits these critical details. There is **no evidence** of intentional, deceitful conduct on the part of FMS. And there is **no evidence** that anyone tampered with evidence or witnesses. That is because FMS has not engaged in any such conduct, and notably absent from Plaintiff's Motion is any proof of it either.

### B.    Plaintiff's Requested Relief Lacks Factual or Legal Support

The record shows that FMS and its counsel have not engaged in any pattern of abuse or bad faith. Plaintiff's cherry-picked soundbites from case after case more clearly demonstrate that Plaintiff's requested relief should be denied.[8]

---

[8] *See ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 324-25 (1994) (holding that false testimony before an ALJ did not preclude the NLRB from ordering an employer to reinstate party with backpay); *Peer v. Lewis*, 606 F.3d 1306, 1314-15 (11th Cir. 2010) (allowing sanctions under the court's inherent authority when Rule 11's safe harbor provision otherwise disallowed them); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1301 (11th Cir. 2009) (affirming default judgment when defendant extensively surveilled opposing party's privileged communications); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 916 (9th Cir. 1987) (affirming

### 1.    FMS Has Not Doctored or Fabricated Evidence

Plaintiff repeatedly relies on case law regarding the doctoring or fabrication of evidence, and they are all readily distinguishable.  In *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, the court entered default judgment when defendants "doctored hundreds of critical discovery documents" in generating fake invoices to undermine the claims against them.  2020 WL 2308319, at *9 (N.D. Ala. May 8, 2020).  Similarly, in *Vargas v. Peltz*, the court dismissed an action when Plaintiff "committed numerous acts of perjury, fabrication of evidence, obstruction of justice, and obstruction of discovery" when she attempted to "enhance" her sexual harassment claims "through the introduction of fabricated women's panties and through fictionalized testimony concerning how she supposedly received [them]." 901 F. Supp. 1572, 1578 (S.D. Fla. 1995).  And in *Art Remedy, LLC v. Lana Moes Art, LLC*, the court entered default judgment when a defendant altered her blog posts, so it appeared that she created the allegedly infringing work before Plaintiff's work, and then produced the posts in discovery, submitted false interrogatory answers, and demanded dismissal of the action plus payment from Plaintiff for copyright violations.  2019 WL 13063496, at *4 (S.D. Fla. Sept. 26, 2019).

---

default judgment when party admitted to testifying falsely at his deposition and then recanting as part of an elaborate scheme to prevail at trial); *Cleveland Demolition Co. v. Azcon Scrap Corp., a Div. of Gold Fields Am. Indus.*, 827 F.2d 984, 986 (4th Cir. 1987) (deciding an action in equity under then-Rule 60(b) to set aside a judgment for fraud on the court); *People for the Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*, 2020 WL 13614406, at *2 (M.D. Fla. Feb. 26, 2020) (entering default judgment for violations of court ordered site inspection of tigers, who defendants moved in advance so that PETA could not view them or prove its case).

These cases are instructive: in each of them, the doctored or fabricated evidence went to the linchpin of the claims. Here, by contrast, the NBC Production hardly fits that bill. No dispute exists regarding what that video depicts—*i.e.*, how Plaintiff was removed from the track and placed into the medical mule by Defendants Metiva and Combs, along with local EMTs—because Plaintiff already has high-resolution photographs and additional videos showing just this. Further, no evidence exists (because, once more, there is none) that FMS doctored or fabricated any of the videos that it has produced, including the duplicative footage that it produced of Plaintiff's track removal in slow motion.

### 2. FMS Has Not Willfully Committed Discovery Violations

Plaintiff otherwise cites case law that portrays an actual pattern or practice of discovery abuse, not the fabricated chain-of-events that Plaintiff invents here. In *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, the Ninth Circuit upheld the dismissal of a claim where "considerable evidence" showed that a party knew that documents supporting a defense to her counterclaim had survived a fire (because she had seen them multiple times) yet repeatedly concealed and lied about their existence. 69 F.3d 337, 349-52 (9th Cir. 1995). Also, in *Qantum Communications Corp. v. Star Broad., Inc.*, the district court entered default judgment when "a substantial body of documentary and deposition testimony evidence" showed that a defendant lied under oath in his deposition, plus "deliberately failed to produce key documents" and concocted "a bad faith scheme to abuse of the bankruptcy system to avoid th[e] litigation." 473 F. Supp. 2d 1249,

1271-75 (S.D. Fla. 2007).  And in *Cowin v. Fam. Dollar Stores of Florida, LLC*, the
district court dismissed an action when a plaintiff lied about prior injuries and
extensive treatments in her discovery responses and at a deposition, despite
overwhelming, contrary evidence that made it implausible that she could have
forgotten.  2019 WL 13083138, at **1-2 (M.D. Fla. May 9, 2019).

Here, again, the record in this case does not align with these facts, despite
Plaintiff's repeated efforts to cobble together a similar story of lies and deceit.
Nothing about Plaintiff's decision to add the AMA as a party, drop FEI as a named
defendant, abandon depositions at the last minute, or delay the taking of
depositions translates into anything nefarious on FMS's part.  It was Plaintiff who
decided to amend his complaint for the third time when he was up against an
expert disclosure deadline.  It was also Plaintiff who decided to drop his claim
against FEI based on an indisputable record that FMS is the real party in interest.
And it was Plaintiff who dragged his feet for months and cancelled FMS's 30(b)(6)
Deposition even before receiving the NBCU production.  Plaintiff's story easily falls
apart when the actual record is considered.

### 3.    FMS Has Never Violated a Court Order in this Case

Finally, Plaintiff relies on case law that involved a well-documented history
of disobeying court orders, which simply do not apply here.  In *In re Sunshine Jr.
Stores, Inc.*, the Eleventh Circuit affirmed an entry of default against a bank for
bad faith conduct premised on the party's "repeated failure to respond to court
orders, its failure to appear before the court when ordered, and its refusal to

provide discovery pursuant [to its order]." 456 F.3d 1291, 1304-05 (11th Cir. 2006). Likewise, in *Musson v. Cook Jones*, a district court struck a defendant's answer for bad faith conduct when she "shunned multiple orders," "refused to attend her deposition on the date she previously proposed due to a conflict she created," and "in her attempt to explain away her contemptuous conduct, [then] ma[de] materially false statements" 2023 WL 7089941, at *1 (S.D. Ga. Oct. 26, 2023). And in *Malautea v. Suzuki Motor Company*, the Eleventh Circuit affirmed a default judgment when a party willfully violated three discovery orders, despite being repeatedly warned of potential sanctions, yet still "engaged in an unrelenting campaign to obfuscate the truth." 987 F.2d 1536, 1541-45 (11th Cir. 1993).

FMS has never violated a Court Order or any other directive to produce discoverable material, much less on multiple occasions as in the cases that Plaintiff now offers to the Court. Nor has the Court ever granted one of Plaintiff's many discovery motions, which he tends to conveniently file as deadlines near. And FMS is certainly not engaging in some conspiratorial cover-up to suppress cumulative evidence that supports FMS's defenses in this case.

### 4.    The "Ultimate Sanction" Is Unwarranted

Plaintiff's claim that he requires a default judgment because he "must start over" by revisiting depositions or revising expert reports rings hollow. His rebuttal reports were not due until February 18, and not a single expert deposition has occurred. And to be clear, Plaintiff's removal from the track is just that—an expert witness issue, not one that requires him to re-depose fact witnesses or "retool his

strategy," as he says.  All along, Plaintiff's theory has been that the race should have been "red flagged" by the AMA/the Medic Rig and his client should have been immobilized by the Medic Rig before being removed from the track.  These two videos change none of that, nor does Plaintiff even try to articulate how it does. The voids in Plaintiff's Motion speak far louder than its shrieking content.

As Plaintiff's own authority recognizes, the "dismissal of a party's complaint or answer, or striking its defenses, as a sanction is a heavy punishment, appropriate "only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." *Eagle Hosp. Physicians, LLC*, 561 F.3d at 1306.  In fact, "[t]he inherent powers doctrine is most often invoked where a party commits perjury or destroys or doctors evidence." *Santana v. Telemundo Network Grp. LLC*, 2022 WL 22873134, at *19 (M.D. Fla. Mar. 10, 2022), *adopted by* 2022 WL 22873104 (M.D. Fla. May 17, 2022).  Courts have thus declined to impose severe sanctions in the form of entering default judgment or striking defenses based on late discovery even where—unlike here—a party violated a Court Order.  *See, e.g.*, *People for the Ethical Treatment of Animals, Inc. v. Dade City's Wild Things, Inc.*, 2018 WL 4760780, at *1 (M.D. Fla. Jan. 19, 2018) (denying a motion for the ultimate sanctions and awarding fees alone when defendant served its discovery responses one month after a Court-imposed deadline).

## IV.    Conclusion

Plaintiff has not heeded this Court's prior warning.  He instead comes to this Court again without legal or record support.  This behavior needs to stop.  FMS

and its counsel have nothing to hide here, and an admittedly late production of cumulative evidence during discovery should not excuse Plaintiff from proving the merits of his case.  He bears the burden of proof in this case, and this case is approaching the point where Plaintiff will be called upon to do so because mere allegations will no longer suffice.  Evidence and the law, rather than accusations and rhetoric, will control the outcome.  Plaintiff's Motion seeking the "ultimate sanctions" should be denied.

DATED:  February 20, 2025     **BUCHANAN INGERSOLL & ROONEY PC**

By:  */s/David L. Gordon* _____
David L. Gordon (admitted pro hac vice)
700 Alexander Park Suite 300
Princeton, NJ 08540-6340
Tel: (609) 987-6854
Email: david.gordon@bipc.com

Gretchen L. Jankowski (admitted pro hac vice)
Matthew C. Pilsner (admitted pro hac vice)
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Tel.: (412) 562-1417/3921
Email: gretchen.jankowski@bipc.com
Email: matthew.pilsner@bipc.com

Richard G. Salazar
Florida Bar No: 899615
401 East Jackson St., Suite 2400
Tampa, FL 33602
Tel: (813) 222-8180
Email: richard.salazar@bipc.com

*Counsel for Defendant Feld Motor Sports, Inc.*