## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**BRIAN MOREAU,**

      **Plaintiff,**

**vs.**                                                **Case No. 8:22-cv-01295**

**FELD MOTOR SPORTS, INC., et al.,**

      **Defendants.**

_____/

## FELD MOTOR SPORTS, INC.'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT

Plaintiff Brian Moreau ("Moreau") was a French professional motorcross rider who debuted in Supercross at Raymond James Stadium in Tampa, Florida on February 15, 2020 ("2020 Tampa Event"). He had signed with and was riding as a member of the Troy Lee Design ("TLD") Red Bull KTM Racing Team. No one disputes that Moreau crashed his motorcycle early in the day during the free, untimed practice session of the 2020 Tampa Event due to his own error and that he became paralyzed afterward, which is both tragic and permanent.

In his Third Amended Complaint, Moreau brings only a single claim against FMS (Count I) for vicarious liability, alleging that its co-Defendants are FMS's agents, and thus, should be liable for their (non)actions. Moreau also brings only a vicarious liability claim against the AMA, claiming that it should have red flagged the race. The only direct liability claims in this case are against The Medic Rig

Defendants, who are alleged to have been negligent in their medical care by failing to immobilize Moreau following his crash and before removing him from the track.

This lawsuit should never have been brought against Feld Motor Sports, Inc. ("FMS"). Before he ever set foot in the stadium as a credentialed, professional motorcycle rider, Moreau unconditionally released, waived, and discharged FMS of all liability when he signed FMS's 2019-2020 Adult FMS All-Event Release, Waiver, and Indemnity Agreement ("FMS Release"). He likewise released, waived, and discharged others, including FMS's co-Defendants for all liability. Moreau understood the inherently dangerous nature of participating in the sport of Supercross, a risk that he knowingly and willfully undertook and acknowledged in signing the FMS Release. The FMS Release is enforceable and should end this case.

Equally important, Moreau has no factual or legal basis to hold FMS vicariously liable for the alleged conduct of its co-Defendants. FMS did not control The Medic Rig Defendants or the AMA, which were independent contractors, and there is no evidence to the contrary. Moreau cannot meet his required burden on the critical elements for his actual or apparent agency theories of vicarious liability.

Finally, Moreau's claim for punitive damages should never be submitted to a jury. Moreau cannot make his required showing—by clear and convincing evidence—that FMS (as an alleged principal) knowingly participated in, condoned, ratified, or consented to any intentional or grossly negligent conduct of the Medic Rig Defendants or of the AMA (as its alleged agents). That critical failure precludes an award of punitive damages against FMS as a matter of law.

## I.    STATEMENT OF UNDISPUTED FACTS

### A.    The Sport of Supercross

FMS is the owner, operator, organizer, and promotor for the sport of Supercross, including in 2020 for the Monster Energy AMA Supercross Series, an FIM World Championship.  Ex. 1, Third Am. Compl. ("TAC"), ¶¶ 7, 46; Ex. 2, FMS's Answer to TAC, ¶¶ 7, 46.  As the title indicates, this series was sanctioned by two distinct entities in 2020: (1) the AMA; and (2) the FIM.  Ex. 3, Gallagher Mar. Dep. Tr. at 42:14-43:2; Ex. 4, Prater Dep. Tr. at 199:21-25.

#### 1.    The AMA

The AMA sanctioned the 250SX class of racing in 2020 under a Sanctioning Agreement between FMS and the AMA.  *Id.*; Ex. 5, AMA Responses to RFAs at 9-12.  Among other things, the AMA provides the officials who officiate the events and oversee the race-related functions.  *See* Ex. 6, AMA Sanctioning Agreement (Excerpt) at −0607-0610.  The officials include the Race Director, who was John Gallagher in 2020.  Ex. 3, Gallagher Mar. Dep. Tr. at 40:4-17.  The AMA personnel were either independent contractors or employees of the AMA in 2020.  Ex. 5, AMA Responses to RFAs at 1-8.  FMS did not participate in the selection process for anyone that the AMA used to carry out its responsibilities for the 2020 Season or at the 2020 Tampa Event.  *Id.* at 13-40.  FMS also does not supervise or evaluate the services that the AMA performs, nor provide the AMA with any clothing, protective gear, or communication devices that any AMA crewmember used or wore in the performance of their services at any race in 2020.  *Id.* at 49-54.

3

### 2.    The Medic Rig

FMS contracts with Defendant The Medic Rig, LLC ("The Medic Rig") to provide on-site emergency medical services to riders' trackside in Supercross Events.  There, The Medic Rig operates as the Alpinestars Mobile Medical Unit under a Medical Unit Sponsorship Agreement ("Sponsorship Agreement").  *See* Ex. 7 (Excerpt).  A Master Services Agreement ("MSA") also exists between FMS and the Medic Rig, under which the Medic Rig supplies licensed medical professionals and related equipment at Supercross races.  Ex. 8, MSA (Excerpt) at –0576.

Defendant John A. Bodnar, M.D. ("Dr. Bodnar") acts as the Medical Director for The Medic Rig at AMA-sanctioned Supercross events.  Ex. 9, Bodnar Dep. Tr. at 8:22-24.  He is responsible for screening and selecting The Medic Rig crewmembers to serve as trackside medical professionals, either as paid seasonal crewmembers or on a volunteer per-race basis.  *Id.* at 19:15-25; Ex. 10, Carson Dep. Tr. at 75-76, 85.  At the 2020 Tampa Event, The Medic Rig's crew included Defendants Amy Metiva ("Metiva"), a certified athletic trainer, who had worked for The Medic Rig as a paid crewmember since 2018, as well as Defendant Scott Combs ("Combs"), a licensed EMT/paramedic who had volunteered to work with the Medic Rig for only this race.  *Id.*  Defendant James Kennedye, M.D. ("Dr. Kennedye") also served as one of the doctors who worked for the Medic Rig at the 2020 Tampa Event.  *Id.*; Ex. 11, Kennedye Dep. Tr. at 33:22-34:24.

FMS has no employment agreements with the Individual Defendants, did not hire or pay them, and was not responsible in any way for the medical services

that they provided during the 2020 Tampa Event or Supercross Season.  Ex. 9,
Bodnar Dep. Tr. at 276:21-280:17; *see also* Exs. 12–15, Individual Defendants'
Responses to FMS's RFAs.[1]  Indeed, FMS has no role whatsoever in The Medic
Rig's medical decisions or provision of care to injured riders.  Ex. 9, Bodnar Dep.
Tr. at 263:3-7, 273:4-25.  Ultimately, the decision as to whether The Medic Rig's
crewmembers remove a downed rider from the track or request a red flag lies
exclusively with them.  *Id.* at 272:15-273:2.  FMS also does not provide The Medic
Rig with any equipment used at Supercross events, *id.* at 269:5-14, 270:21-272:6,
or have any role in the selection, training, or oversight of its crew, who operate
under Dr. Bodnar's direction, *id.* at 263:9-267:17.  This was true at the 2020 Tampa
Event.  *Id.* at 274:1-276:20.  The only direction that FMS provided to The Medic
Rig on race day was where to park the trailer itself.  *Id.* at 270:10-19.

### B.    Flagging at Supercross Events

The AMA's 2020 Rulebook that governed the 2020 Tampa Event
("Rulebook") contains the race rules and procedures, including flags that may be
thrown to communicate with riders during an event.  *See* Ex. 16, Rulebook.  In the
Rulebook, a yellow flag "[i]ndicates serious hazard on or near the track."  *Id.* at –
0422.  A yellow flag does not stop the race, and passing is still allowed but riders
must proceed with extreme caution.  *See id.*  A red flag, by contrast, "indicates the
practice, qualifying or race has been stopped," and it requires that a rider reduce

---

[1] FMS will refer to Defendants Bodnar, Kennedye, Metiva and Combs as the "Individual
Defendants," and to The Medic Rig and the Individual Defendants as "The Medic Rig Defendants."

speed and proceed safely as directed by a race official. *See id.* The AMA possesses the sole responsibility to administer, apply, and enforce the Rulebook under its Sanctioning Agreement with FMS. *Id.* at −0606.

FMS does not (and cannot) request or throw a red flag at any Supercross race—which the Medic Rig may recommend to the Race Director and the AMA ultimately controls. Ex. 3, Gallagher Mar. Dep. Tr. at 93:17-23; Ex. 9, Bodnar Dep. Tr. at 267:20-268:17; Ex. 5, AMA Responses to RFAs at Nos. 41-44. Nor may FMS override the final and exclusive decision of the AMA regarding a red flag, and it does not provide the AMA with any type of instruction, training, or supervision related to red flag race stops. Ex. 4, Prater Dep. Tr. at 47:2-48:10; Ex. 5, AMA Responses to RFAs at Nos. 45-50. FMS's own flag crew does not even possess red flags; they are provided with only yellow flags. Ex. 4, Prater Dep. Tr. at 41:4-15.

## C.    The Pre-Race FMS Release

Moreau, a French citizen, was a professional motorcycle rider who began racing in Europe at eleven-years-old. Ex. 17, Moreau Jan. Dep. Tr. at 50:3:7. He later signed with the TLD Racing Team and came to the United States in late-2019 to ride in his first ever professional Supercross series. *Id.* at 160:22-161:17.

For the 2020 season, Moreau signed the FMS Release, and he did so before a notary January 2, 2020 (███████████████████████).[2] Ex. 18, FMS

---

[2] The notary that witnessed Moreau's signature was affiliated with Moreau's TLD Racing Team. *See* Ex. 19, Keefe Dep. Tr. at 82:21-83:10,

Release at −1592.[3]  Moreau executed the FMS Release in consideration for being allowed to (a) compete or participate in any way in any events produced and or promoted by FMS during 2020 or in any related activities, including motorcycle shows; and (b) enter, for any purpose, any restricted area requiring authorization, credentials, or permission to enter or where admission of the general public is restricted, including but not limited to, the competition and pit areas.  *Id.* at −1591.  Moreau also granted to FMS permission to use his image and likeness in connection with any Event, or for commercial activities.  *Id.*

In signing the FMS Release, Moreau acknowledged that he understood the inherently dangerous nature of participating in the sport of Supercross and that he assumed full responsibility for any risk of injury related to the Event.  *Id.*  He likewise released, waived, and discharged FMS its co-Defendants from all liability:

> I ACKNOWLEDGE and AGREE that, AS TO EACH SUCH EVENT, I . . . 3. RELEASE, WAIVE AND DISCHARGE [Feld Motor Sports, Inc.], its parent, affiliates and related companies, and their respective representatives, officers and employees and those in privity with them including, without limitation, any co-promoters, sponsors and their affiliated and related companies, participants, racing associations, sanctioning organizations or any subdivision or affiliate thereof, track operators, owners, builders and construction companies, officials, car owners, drivers, pit crews, rescue personnel, trauma doctors and other medical personnel, any persons in any Restricted Area, promoters, advertisers, owners and lessees of premises used to conduct the Event(s), inspectors, surveyors, underwriters, risk evaluators, consultants and others who provide recommendations, directions, or instructions including, but not limited to, driving schools or classes, and each of them, their directors, officers, agents and employees (collectively, "Releasees") FROM ALL LIABILITY TO ME and my personal representatives, assigns, heirs, and next of kin or wards FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMAND ON ACCOUNT OF DEATH OR INJURY TO PERSON

---

[3] *See also* Ex. 20, Second RFAs to Pl., ¶¶ 1-2.  Moreau never responded to FMS's November 2024 Second Set of RFAs, so they are deemed admitted by operation of law.  Fed. R. Civ. P. 36(a)(3).

OR PROPERTY, ARISING OUT OF OR RELATED TO ANY EVENT, WHETHER CAUSED IN WHOLE OR IN PART, BY THE SOLE OR CONCURRENT NEGLIGENCE OF THE RELEASEES OR OTHERWISE, including, without limitation, NEGLIGENT RESCUE OPERATIONS.

*Id.*  Moreau further agreed to indemnify the Releasees and hold them harmless from any claim brought by himself for any loss, liability, or damage arising out of the Event, whether caused by their negligence or otherwise.  *Id.*  Importantly, Moreau "warrant[ed] and represent[ed] that I am of the age of majority in the state, province, and/or country stated above" in signing the FMS Release.  *Id.* at −1592.

### D.    The Pre-Race AMA Release & AMA Contract

In addition to the FMS Release, Moreau also executed two agreements with the AMA: (1) the Minor's Release and Waiver of Liability and Indemnity with accompanying Assumption of Risk Acknowledgement ("AMA Release"); and (2) the AMA Racing Credential Terms and Conditions ("AMA Contract").  Ex 21, AMA Release at −4404-05; Ex. 22, AMA Contract at −4406.  As with the FMS Release, these documents permitted Moreau to obtain the Credential that was necessary to participate in AMA-sanctioned events, and without them, he could not participate in any race that Season.  *See* Ex. 19, Keefe Dep. Tr. at 62:25-63:4, 64:13-66:25, 67:18-69:4, 80:21-81:20.  The AMA Release, much like its FMS counterpart, provided that Moreau would assume full responsibility for and risk of bodily injury due to negligence of the Releasee and included a broad release and waiver, including as to promotors such as FMS.  Ex 21, AMA Release at −4404.  *Id.*[4]

---

[4] As for the AMA Contract, Moreau acknowledged "that my license is subject to the AMA 2020

### E.    Moreau's Crash at the 2020 Tampa Event

FMS promotes Supercross, including the 2020 Tampa Event, at which both 250SX and 450SX races occurred.  Ex. 4, Prater Dep. Tr. at 76:1-3.  Moreau admits he was qualified to ride in the 250SX class, and that he freely participated in his first ever professional Supercross race for his TLD Race Team at the 2020 Tampa Event.  Ex. 23, Moreau Oct. Dep. Tr. at 149:12-16, 163:13-25.

Moreau had to obtain his credential before he could participate in Supercross Events and enter the restricted areas at the Stadium, which he did prior to the 2020 Tampa Event after executing the FMS Release, AMA Release, and AMA Contract.  *See* Ex. 24, Credential; Ex. 19, Keefe Dep. Tr. at 67:18-68:20, 80:21-81:3; Ex. 4, Prater Dep. Tr. at 64:14-17, 224:7-16.   Moreau's credential stated: "**MOTORSPORTS ARE DANGEROUS**."  *See* Ex. 24, Credential.

On Friday, Moreau participated in a "press day" for the 2020 Tampa Event.  Ex. 19, Keefe Dep. Tr. at 116:8-24; Ex. 4, Prater Dep. Tr. at 227:13-19.   His Credential was required to gain access.  *Id*.  Moreau rode the track at that time for 15-20 minutes to become accustomed to it.  Ex. 17, Moreau Jan. Dep. Tr. at 331:11-19.  He also participated in an interview on press day, *id*. at 172:24-174:2, and likewise permitted himself to be filmed before the race itself, including for the promotion of the 2020 Tampa Event, per the terms of the FMS Release.[5]

---

Supercross Series Rulebook."  Ex. 22, AMA Contract at –4406.  The AMA's Rulebook for the 2020 Season, in turn, expressly provides that "EACH PARTICIPANT. . . MUST ASSUME THE RISK OF COMPETITION."  Ex. 16, Rulebook at –0396.

[5]  *See* Ex. 25, FMS_INC_0001136 at 0:04-0:05; Ex. 26, FMS_INC_0001139 at 0:01-0:15.

The next day, on Saturday, February 15, Moreau walked the track before the race to further learn the track. Ex. 23, Moreau Oct. Dep. Tr. at 149:2-18.[6] He again needed his Credential to enter the stadium and access the pits, where the teams and riders prepare for the race and keep their equipment. Ex. 19, Keefe Dep. Tr. at 66:6-25. Later, Moreau participated in the free, untimed practice session, which all riders engage in before the actual racing competition starts. Ex. 17, Moreau Jan. Dep. Tr. at 187:13-188:13. On the second or third lap, Moreau was riding through a "rhythm" section of the track, missed a landing, and flew off his motorcycle with speed, crashing headfirst into the face of another jump. *Id.* at 195:13-206:17. Moreau has admitted that his crash was caused because of his own error after miscalculating a series of jumps. *Id.*

## II.    LEGAL STANDARD

Summary judgment should be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). By its terms, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To survive a motion for summary judgment, the nonmoving party must show a genuine dispute of material fact by citing to material in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

---

[6] After the track walk, a riders' meeting occurred with the Race Director, who advised them to "[p]lease remember that Supercross and all motorsports are inherently dangerous activities." Ex. 27, Gallagher Apr. Dep. Tr. at 18:1-19:2; *see also* Ex. 28, AMA_002007 (Tampa Riders Meeting).

585-86 (1986).  But this "does not mean that [courts] are constrained to accept all the nonmovant's factual characterizations and legal arguments."  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir. 1994).  "If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted."  *Id.* at 459.

### III.    ARGUMENT

No reasonable jury could find that FMS is liable for the injuries that Moreau sustained when he crashed his motorcycle at the 2020 Tampa Event.  Moreau released, waived, and discharged FMS for all liability under the FMS Release, the AMA Release, and the Rulebook, which he ratified by freely participating in the 2020 Tampa Event after he turn 18-years-old.  He agreed to be bound by this in order to race, knowing the inherent risks of this sport.  He cannot simply ignore it now that the risk has materialized for him.  Nor does Moreau have any evidence to establish that FMS should somehow be vicariously liable for the alleged negligence of its co-Defendants.  Summary judgment should be entered in favor of FMS on Count I of the Complaint, and it should be dismissed from this case with prejudice.

### A.    Moreau Released FMS From Any Liability

The FMS Release controls the relationship between the riders and FMS, and accordingly, it should end this case.  Moreau freely executed it in consideration for FMS allowing him to compete in the 2020 Tampa Event, and in doing so, acknowledged the dangerous nature of the sport of Supercross and assumed full responsibility for any risk of bodily injury arising out of or related to the Event.  He

also released, waived, and discharged FMS and others, including sanctioning organizations (*i.e.*, the AMA) as well as rescue and medical personal (*i.e.*, Medic Rig Defendants) for all liability. And he agreed to indemnify, defend hold them harmless for claims brought by himself for any loss, liability, or damage arising out of the Event. This contract should be enforced.[7]

## 1.    Moreau Ratified the FMS Release

"[I]t is basic hornbook law that a minor can ratify an otherwise voidable contract upon reaching the age of majority through either an affirmative act, or failure to disaffirm the contract within the period of the statute of limitations." *Valldejuli v. Soc. Sec. Admin.*, 1994 WL 912253, at *2, n.4 (N.D. Fla. Dec. 20, 1994). Ratification "may be accomplished by exercising the option not to avoid the contract" or "by conduct which shows a clear intent to do so or such as will work a fraud on the opposing party if not treated as a ratification." *Lee v. Thompson*, 168 So. 848, 850 (Fla. 1936). And "where the infant, upon his arrival at majority, or at the time he seeks disaffirmance, still has the consideration received, or any part thereof, he must, upon his disaffirmance, return it, for the law will not allow him to repudiate his contract and at the same time retain its fruits as his own." *Putnal v. Walker*, 55 So. 844, 846 (Fla. 1911).

Moreau's conduct ratified the releases. He executed the FMS Release in consideration for being able to obtain the required Credential and participate in

---

[7] *See generally Thomas v. Sports Car Club of Am., Inc.*, 386 So. 2d 272, 274 & n.1. (Fla. Dist. Ct. App. 1980) (observing, in a wrongful death suit brought by a widow of a sports car race driver, that "numerous jurisdictions have upheld the validity of similar releases") (collecting cases).

the 2020 Supercross season. This constitutes an affirmative act manifesting his intent to assent to the FMS Release. He then, in fact, freely took the Credential and participated in the 2020 Tampa Event knowing that participating in the sport of Supercross is inherently dangerous—as he was so advised (again) at the riders' meeting and which is common knowledge within this industry.[8] Throughout, Moreau repeatedly used his Credential as an adult, competing for the TLD Racing Team at the 2020 Tampa Event and using that same Credential to take part in "press day," access the track, pits, and other Restricted Areas, and compete in the race itself, all over the course of two days. He also allowed his image and likeness to be used in promoting the Event, pursuant to the terms of the FMS Release, without any objection whatsoever. And at no point did Moreau ever disaffirm the FMS Release, let alone return his Credential as the consideration received.[9] Only now—after he had received the consideration that the parties agreed upon in exchange for the FMS Release—does Moreau seek to selectively invalidate its terms. He should be precluded as a matter of law from doing so.

---

[8] *See, e.g.*, Ex. 17, Moreau Jan. Dep. Tr. at 415:6-23 (acknowledging that he understood before the 2020 Tampa Event that riding in a Supercross event carried significant risks, including death, paralysis, and broken bones and that he willingly accepted those risk to participate in race); Ex. 19, Keefe Dep. Tr. at 50:4-11 (testifying as Moreau's former team manager for the TLD Racing Team regarding inherently dangerous nature of participating in the sport of Supercross); Ex. 29, Marvin Musquin Dep. Tr. at 42:2-43:5 (same as a former professional Supercross athlete).

[9] As a licensed, credentialed rider who participated in the 2020 Tampa Event with the TLD Race Team, Moreau also received secondary rider insurance provided through the AMA, as well as insurance disability payouts, including a €375,000.00 policy, which by all accounts he neither, disavowed nor returned as well. *See* Ex. 30, Pl.'s Sec. Suppl. to FMS's Interrogatories at No. 7.

## 2.    Moreau Cannot Rely on the Infancy Defense

Moreau's status as a minor—███████████████████████████when he signed the FMS Release—changes none of this.  Under Florida law, a minor cannot use the infancy defense to avoid a contract where, as here, the minor procured the contract by a fraudulent misrepresentation.  *See Off the Wall & Gameroom LLC v. Gabbai*, 301 So. 3d 281, 283–84 (Fla. Dist. Ct. App. 2020) (holding that a 13-year-old who was injured at a trampoline facility after forging an adult's signature to gain entry could not void the contract under the infancy defense because "the child intentionally misrepresented information on the release and waiver agreement"); *Mossler Acceptance Co. v. Perlman*, 47 So. 2d 296, 298 (Fla. 1950) (holding that a minor could not rescind a sales contract when he induced a dealer to sell him an automobile by misrepresenting his age because "the shield of infancy should not be turned into a sword with which to injure those dealing with them in good faith").

This defense requires a showing of "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Id.* at 284. "Moreover, a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him." *Id.*

FMS satisfies these elements here.  In signing the FMS Release, Moreau expressly (though falsely) "warrant[ed] and represent[ed] that I am of the age of

majority in the state, province, and/or country stated above." Ex. 18, FMS Release at −1592. He likewise executed the FMS Release so he could obtain his necessary race Credential and participate in the 2020 Supercross season, including at the 2020 Tampa Event. No evidence exists that FMS knew or should have obviously known that Moreau's representation was false (after all, he was 18 years old at the 2020 Tampa Event). In short, the infancy defense should be unavailable to Moreau because he intentionally misrepresented the information on the FMS Release to race in the 2020 Supercross Season.

### 3. The Feld Release Covers the AMA and The Medic Rig

Under Florida law "[a] waiver that identifies parties by capacity is sufficient to absolve those parties from liability as a matter of law." *Banfield v. Louis*, 589 So. 2d 441, 445 (Fla. Dist. Ct. App. 1991). In *Banfield*, for instance, the court dismissed a negligence suit against sponsors, organizers, and promoters of a triathlon by an injured participant, even though some of them were not specifically named in the waiver provision. *Id.* So, too, here: in signing the FMS Release, Moreau released, waived, and discharged "sanctioning organizations," (*i.e.*, the AMA), plus "rescue personnel, trauma doctors and other medical personnel, [and] any persons in any Restricted Area," (*i.e.*, Medic Rig Defendants). The FMS Release should be enforced to release and discharge all Defendants from liability.

### B.    Moreau Has No Claim For Vicarious Liability Against FMS

Under Florida law, vicarious liability may arise through theories of *respondeat superior*, actual agency, or apparent agency. *Domino's Pizza, LLC v.*

*Wiederhold*, 248 So. 3d 212, 221 (Fla. Dist. Ct. App. 2018).  Here, Moreau cannot support his claim of vicarious liability against FMS under any of those theories.

### 1. Moreau's *Respondeat Superior* Theory Fails Against FMS

Under Florida law, "[a]n employer may be vicariously liable to third parties under the principle of *respondeat superior* for damages and injuries caused by its employee's negligent acts which are committed within the scope and course of his employment.'" *Druker v. Walmart, Inc.*, 2023 WL 2439538, at *1 (11th Cir. Mar. 10, 2023).  Here, this theory cannot apply in this case: when asked in discovery to identify the FMS employees who had breached their alleged duties, Moreau stated that he is not aware of ***any*** employees of FMS that engaged in the negligent conduct alleged in the Third Amended Complaint.  Ex. 31, Pl's Ans. to FMS's 2nd Set of Interrogatories at Nos. 1–3.  No reasonable jury could find that his injuries were caused by any FMS employee acting within the scope of their employment.

### 2. Moreau's Actual and Apparent Agency Theory Fails Against FMS

Florida law also extends vicarious liability outside the employment context to an actual agency relationship or when apparent authority exists.  *See Cabrera v. Gov't Emps. Ins. Co.*, 452 F. Supp. 3d 1305, 1316–20 (S.D. Fla. 2014).  "The party asserting the existence of agency relationship has the burden of proving it."  *Id.* at 1316–17.  Although this often presents factual questions, Florida federal courts hold that where, as here, "a party bearing the burden of proving agency fails to produce evidence in support of its allegations or where the evidence presented is

so unequivocal that reasonable persons could reach but one conclusion, a court may determine the lack of agency as a matter of law." *Id.* at 1317 (collecting cases).

### a. The Medic Rig Defendants and the AMA Are Not FMS's Actual Agents

To establish an actual agency relationship, Florida law requires "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003)). Ultimately, the key element in the actual agency analysis "'is the control by the principal over the actions of the agent.'" *Hickman v. Barclay's Int'l Realty, Inc.*, 5 So. 3d 804, 806 (Fla. 4th Dist. Ct. App. 2009). And this inquiry turns on "the right of control, not actual control or descriptive labels employed by the parties[.]" *Id.* Here, the undisputed facts show that FMS does not have the right (or ability) to control the Medic Rig Defendants or the AMA as to their trackside care of Moreau or flagging responsibilities during the race.

### i. The Parties' Contracts Establish an Independent Contractor Relationship

To resolve right of control issues, Florida courts look to the parties' written contract(s). *See Del Pilar v. DHL Glob. Customer Sols. (USA), Inc.*, 993 So. 2d 142, 146 (Fla. 1st Dist. Ct. App. 2008). In most cases, "the terms of a contract between the parties is a pertinent index of the principal's right of control and should factor heavily into the inquiry, 'unless other provisions of the agreement, or the parties'

actual practice, demonstrate that it is not a valid indicator of status or belie the creation of the status agreed to by the parties.'" *Id.*

The unambiguous language in the MSA between FMS and the Medic Rig reflects the parties' intentions to be independent contractors of each other:

> It is specifically agreed that the relationship between Service Provider and FMS shall be that of FMS and independent contractor, and not that of an employer-employee. Therefore, the parties specifically agree that FMS shall have the right of control only to the extent of determining the results to be accomplished by Service Provider, but not as to the details and means by which those results shall be accomplished. Service Provider shall not be considered an employee for federal income tax purposes.[10]

Ex. 8 at −0581. As for the Individual Defendants, the only agreement that existed between them and FMS for their services at the 2020 Tampa Event was the FMS Release, and in that contract, nowhere does FMS retain any right to control them whatsoever. Moreau has only arguments—not evidence—to try and contradict these contracts to save his claim. These agreements have plain language reflecting the parties' intent at the time and thus are dispositive of FMS's inability to control the Medic Rig Defendants as independent contractors.

The unambiguous language in the AMA Sanctioning Agreement is equally clear regarding the parties' intent to be only independent contractors of the other:

> It is expressly understood and agreed that the parties are independent contractors and that this Agreement is not intended and shall not be construed to create a partnership, joint venture, principal agent relationship, or any other similar relationship between AMA and FMS. Unless specifically provided in this Agreement, neither party is authorized to contract or otherwise make commitments on behalf of the other party, or

---

[10] The Medical Unit Sponsorship likewise provides that the "parties are acting herein as independent contractors. Nothing herein contained will create or be construed as creating a partnership, joint venture or agency relationship between the parties . . . ." Ex. 7 at −0593.

> to otherwise act as an agent or representative of the other party for any reason or purpose.

Ex. 6 at −0624.  The AMA Sanctioning Agreement further provides for the parties' roles and responsibilities, and as for the AMA, its officials "will maintain ultimate control over all race and floor operations . . . . "  *Id.* at -0607.  In addition, the Sanctioning Agreement requires the AMA to "act as the sole authority on any matter related to racing competition at the Events included in the Series to administer and apply the AMA Supercross Rulebook," which, in turn, governs the use of yellow and red flags at races.  *Id.* at -0606.  Nowhere in the AMA Sanctioning Agreement does FMS have the right to control the AMA, including as to its race-day functions and personnel.  *Id.*  FMS instead is obligated to produce, promote, and operate the Supercross events, including by providing the AMA with certain agreed-upon benefits and onsite space, as well as arranging for emergency medical care at Events.  *Id.* at -0621.  The AMA Sanctioning Agreement therefore makes clear that the respective roles and responsibilities of FMS and the AMA are readily distinct at the Events, with each party responsible for controlling their own sectors.  No reasonable jury could find in favor of Moreau on this required element of control, and summary judgment should be granted in favor of FMS.

### ii.  *The Undisputed Facts Likewise Establish an Independent Contractor Relationship*

Florida courts also consider other elements, beyond the terms of a contract, to analyze whether a principal is vicariously liable for the agent's negligence.  *Del Pilar*, 993 So. 2d at 146.  The factors that tend to show such a relationship include:

> (1) the principal's right to control the agent's use of the principal's
> trademarks; (2) reservation to the principal of the unilateral right to
> prohibit the agent from working on behalf of competitors; (3) a requirement
> that the agent's employees must undergo training before they work on the
> principal's behalf; (4) a requirement that the agent perform services using
> only equipment selected pursuant to the principal's specifications; (5) a
> requirement that the agent, when working on behalf of the principal, use a
> vehicle with the principal's logo, placed according to parameters established
> by the principal; (6) a requirement that the agent adhere to customer-
> service procedures established by the principal; and (7) a requirement that
> the agent submit to inspections conducted at the principal's discretion

*Id.* (citations omitted). The "tell-tale signs of a principal-agent relationship" likewise includes "the ability of the principal to hire, fire, or supervise" the alleged agents. *Ocana v. Ford Motor Co.*, 992 So. 2d 319, 326 (Fla. Dist. Ct. App. 2008).

These factors are dispositive in FMS's favor. FMS has no right or ability to hire, fire, or supervise the employees or crewmembers of the AMA or the Medic Rig, including the Individual Defendants (indeed, FMS played no role in its personnel decisions as to any of them). *See* Exs. 5 & 12–15 (AMA, Bodnar, Combs, Kennedye, and Metiva's Responses to FMS's RFAs). Nor does FMS prohibit the Medic Rig or the Individual Defendants from working with any competitors. *Id.* FMS likewise does not train or inspect the AMA or the Medic Rig, or its employees and volunteers, leaving that responsibility to those entities. *Id.* And it does not select their equipment or establish the procedures that they must follow. *Id.* That FMS provided a "Feld Entertainment" mark to The Medic Rig to use on its clothing and mobile medical unit in 2020 to identify it as part of the Event cannot establish agency, much less control.

In the end, FMS is the promoter of the sport of Supercross, the AMA is the
sanctioning body, and the Medic Rig Defendants are the medical services
providers.  They are all readily distinct from one another, with no ability or right
to control the other.  The indicia of agency are simply not present in this case, and
the undisputed facts do not show otherwise.   Summary judgment should be
entered in favor of FMS on Plaintiff's actual agency theory in Count I.

### b.    The Medic Rig Defendants and the AMA Are Not FMS's Apparent Agents

Moreau also proceeds under the apparent authority theory of agency.  A
party "must prove three elements to establish an apparent agency: (1) a
representation by the purported principal; (2) a reliance on that representation by
a third party; and (3) a change in position by the third party in reliance on the
representation." *Mobil Oil Corp. v. Bransford*, 648 So.2d 119, 121 (Fla. 1995)).
Again, Moreau cannot meet his burden to establish the required elements.

In his Complaint, Moreau alleges that FMS represented to the riders,
including Moreau, that the "the Race Director, Clerk of Course, Flaggers / Corner
Workers, Chief Medical Officer, and other relevant staff and officials would
conduct the event in accordance with the rules, regulations, policies, procedures,
and codes of the AMA and the FIM in an effort . . . to protect the riders from risks
of harm beyond those inherent in the sport." Ex. 1, TAC, ¶ 56.  He then claims that
Moreau detrimentally relied upon these "representations" in participating in the
Event when FMS's "agency, employees, and/or contractors" did not conduct the
Event in accordance with those same "rules, regulations, policies, procedures, and

codes of the AMA and the FIM, or FMS's own safety rules and regulations," which, in turn, led to his injuries. *Id.*, ¶¶ 57-58.  Allegations in pleadings are granted the benefit of the doubt, but at this stage of the proceedings, real evidence is required. The problem with Moreau's theory now is that there is no evidence whatsoever of any such representation by anyone from FMS—written, orally, or otherwise.  Nor is there any evidence of actual reliance by Moreau, or any detriment to him, by such purported reliance arising from the unidentified representations.  His bare allegations are simply not enough to withstand a motion for summary judgment.

### 3.    Moreau's Vicarious Liability Theory Fails Against FMS Without Direct Claims of Negligence

Florida courts have held that, for claims of vicarious liability and *respondeat superior*, "there must be an underlying claim through which [Moreau] can hold one of the defendants liable." *Christrikes Custom Motorcycles, Inc. v. Teutul*, 2016 WL 3406391, at *4 (M.D. Fla. June 21, 2016).  As one Florida federal district court has explained, "[o]f paramount importance in finding vicarious liability is that the underlying alleged tortfeasor actually be found liable of tortious acts.  If the alleged tortfeasor is not liable, no liability can be imputed upwards."  *Fontanez v. Lamberti*, 2011 WL 4499016, at *15 (S.D. Fla. Sept. 27, 2011).  So "[w]ithout any underlying liability [by the agents], there can be no apportionment of that liability to [the principal]" because "any percent of zero is zero."  *Id.* at *16.

Here, FMS cannot be held vicariously liable for any alleged negligence by its co-Defendant because they are all covered of the FMS Release.  FMS likewise cannot be held liable for any alleged negligence of the AMA because Moreau has

failed to plead a direct liability claim against it.  Moreau is thus left without any claims of direct liability through which he could hold FMS vicariously liable for alleged acts or omissions of its purported agents (and there are none).

### C.     Moreau Cannot Recover Punitive Damages Against FMS

Even assuming the FMS Release is not enforced at this stage and the vicarious liability claim moves forward, summary judgment should be entered on Moreau's attempt to recover an award of punitive damages against FMS.

"Under Florida law, punitive damages are governed by § 768.72, Florida Statutes," which provides that "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." *Tiller v. Ford Motor Co.*, 2006 WL 166530, at *2 (M.D. Fla. Jan. 21, 2006). Importantly, "[t]rial courts regularly dismiss meritless claims for punitive damages by way of summary judgment" where, as here, a plaintiff fails to make that showing.  *Kurtz v. Young*, 2009 WL 10667471, at *1 (S.D. Fla. Aug. 25, 2009).

As the "Florida Supreme Court recognizes, punitive damages are reserved for truly 'culpable conduct," and the requisite level of negligence for those damages is "equivalent to the conduct involved in criminal manslaughter." *Cleveland Clinic Fla. Health Sys. Nonprofit Corp. v. Oriolo*, 357 So. 3d 703, 706 (Fla. 4th DCA 2023).  "Such conduct must be "so outrageous in character, and so extreme in degree that the facts of the case to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"

*Id.* And this is no doubt a high standard. *See Fla. Power & Light Co. v. Dominguez*, 295 So. 3d 1202, 1206 (Fla. Dist. Ct. App. 2019) (collecting cases reversing awards of punitive damages because a party had not shown a "willful and malicious action" that is "equivalent to criminal manslaughter"). Indeed, "[a]llegations of misfeasance or malfeasance, or breaches of a professional standard of care, cannot without more be converted into a claim for punitive damages simply by labelling them as 'grossly' negligent." *Cleveland Clinic*, 357 So. 3d at 706.

In the case of a principal, however, punitive damages may be imposed for the conduct of an agent only if such conduct meets that criterion ***and*** (a) the principal actively and knowingly participated in such conduct; (b) the officers, directors, or managers of the principal condoned, ratified, or consented to such conduct; or (c) the principal contributed to the loss, damages, or injury suffered by the claimant. Fla. Stat. § 768.72(3)(a)-(c). Yet "before one may infer that a principal ratified an unauthorized act of his agent, the evidence must demonstrate that the principal was fully informed—beyond having simple constructive knowledge—and that he approved of the act." *Cleveland Clinic*, 357 So. 3d at 707. It has also "been long-held that when a party seeks to hold a principal liable on ratification grounds, it must be shown that he ratified upon full knowledge of all material facts, or that he was willfully ignorant." *Id.* (collecting cases).

Moreau has no evidence—much less clear and convincing evidence—that FMS or any of its officers, directors, or managers had anything to do with the alleged conduct of the Medic Rig Defendants in removing Moreau from the track

or of the AMA in not red flagging the race.  FMS does not, after all, have any role whatsoever in those on-track functions at any Supercross race, including the 2020 Tampa Event (which is also precisely why FMS's co-Defendants are not its agents). No reasonable jury could find that punitive damages should be awarded against FMS under these facts, and summary judgment should be granted.

### IV.    CONCLUSION

For these reasons, the Court should grant summary judgment in favor of FMS and dismiss it with prejudice from this case.

Dated: April 17, 2025              Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

/s/ Richard G. Salazar
Gretchen L Jankowski (admitted *pro hac vice*)
Matthew C. Pilsner (admitted *pro hac vice*)
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Tel.: (412) 562-1417
Email: gretchen.jankowski@bipc.com
Email: matthew.pilsner@bipc.com

Richard G. Salazar
Florida Bar No: 899615
401 East Jackson St., Suite 2400
Tampa, FL 33602
Tel: (813) 222-8180
Email: richard.salazar@bipc.com

David L. Gordon (admitted *pro hac vice*)
700 Alexander Park Suite 300
Princeton, NJ 08540-6340
Tel: (609) 987-5767
Email: david.gordon@bipc.com

*Counsel for Defendant Feld Motor Sports, Inc.*