## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BRIAN MOREAU,

      Plaintiff,

v.                             CASE NO. 8:22-cv-01295-TPB-CPT

FELD MOTOR SPORTS, INC. *et al.*,

      Defendants.

_____/

### DEFENDANT AMA'S MOTION FOR SUMMARY JUDGMENT

    Pursuant to Rule 56, Fed. R. Civ. P., Defendant American Motorcycle Association d/b/a American Motorcyclist Association ("AMA") moves for summary judgment on Count VIII of the Third Amended Complaint ("TAC") in this action.

### INTRODUCTION

    This lawsuit arises from a catastrophic injury suffered by Plaintiff Brian Moreau's ("Plaintiff's") when he "fell headfirst" onto a dirt racetrack during a practice session at the February 15, 2020, Supercross event in Tampa, Florida ("Tampa Supercross"). Despite causing his own neck and back injury and resulting paralysis, Plaintiff now seeks to shift his responsibility for his injury to the Defendants.

    The Court should grant summary judgment in favor of AMA on Count VIII because Plaintiff assumed the risk and waived any claims relating to his crash. Plaintiff knew that he had to execute "paperwork" (as he called it) as a prerequisite to being allowed to participate in AMA Supercross events. Less than two months before turning 18, Plaintiff knowingly signed and submitted to AMA and Feld Motor Sports, Inc. ("FMS") such paperwork, consisting of agreements awarding to Plaintiff an AMA

license and racing credential that authorized, but did not require, him to participate in Supercross events. The agreements further expressly provided that, if he chose to engage and was subsequently injured, he assumed the risk of injury and agreed to waive all claims against AMA, FMS, and any emergency medical personnel for his injuries. Plaintiff could not engage in Supercross unless he signed the foregoing agreements.

Two months after executing the agreements, and two weeks after reaching 18 years of age, Plaintiff elected to take part in the Tampa Supercross event during which he suffered his catastrophic injury. By participating in the Tampa Supercross, Plaintiff ratified the agreements that he signed as a minor, because he had reached adulthood by the time of the event. And because the agreements expressly waived any right to sue for injuries sustained during a Supercross event, Plaintiff is now barred as a matter of law from seeking any recovery against AMA (or any of the other Defendants here).

AMA also seeks summary judgment against Plaintiff on the grounds that AMA cannot be held vicariously liable for the actions of co-Defendants John A. Bodnar, M.D. ("Bodnar"), James Kennedye, M.D. ("Kennedye"), Amy Metiva ("Metiva"), and Scott Combs ("Combs") (collectively, "Individual Defendants"), The Medic Rig, LLC ("Medic Rig"), or FMS. Because it is uncontested that no person associated with Medic Rig or FMS was ever an "employee" of AMA, vicarious liability cannot attach under a *respondeat superior* theory. Similarly, neither Medic Rig nor FMS can be deemed an actual agent of AMA because AMA did not maintain control over those entities, or persons associated with them. Plaintiff's theory of apparent agency also fails because Plaintiff cannot adduce evidence that AMA ever represented to anyone that FMS,

- 2 -

Medic Rig, or the Individual Defendants were authorized to act on AMA's behalf.

Finally, AMA seeks summary judgment on Plaintiff's punitive damages claim because Plaintiff cannot show by clear and convincing evidence that AMA knowingly participated in, condoned, ratified, or consented to any intentional or grossly negligent conduct of any AMA employee or agent, or Medic Rig, FMS, any of the Individual Defendants, or any of their employees or agents.

## UNDISPUTED MATERIAL FACTS

Supercross motorcycle racing competitions are conducted on dirt tracks constructed inside stadiums throughout the United States. AMA co-sanctioned the 2020 "Monster Energy AMA Supercross" season (the "2020 Supercross"), and FMS was the promoter of 2020 Supercross. **Ex. A**, p. 1.[1] On February 15, 2020, the Tampa Supercross was held at Raymond James Stadium in Tampa, Florida.

Plaintiff, a resident and citizen of France, had been a "phenomenally successful motocross" rider in Europe. TAC ¶ 6. Having obtained a temporary work visa in 2019, Plaintiff came to the United States to compete in "250SX class" of the 2020 Supercross. TAC ¶ 5. The U.S.-based Troy Lee Designs Red Bull KTM Racing Team (the "Team") signed Plaintiff in August 2019, when he was 17 years old, to compete as a rider in the Eastern Division of the 2020 Supercross, which would begin after Plaintiff turned 18 years old on ██████████. *Id.*; *see also* **Ex. B**. *See* **Ex. C.** Keefe 43:21-44:11. As a

---

[1] All exhibits to this Motion previously marked during depositions in this case will be the stamped copy. References to exhibits to this Motion shall be abbreviated as "**Ex.**" or "**Exs.**" Date of birth information will be redacted to comply with M.D. Fla. Admin. Procedures for Electronic Filing § (I)(1)-(3). Counsel will seek leave to submit an unredacted brief to the Court.

condition of obtaining an AMA racing license and racing credential, AMA and FMS required Plaintiff to sign and submit waivers, releases of liability, and assumptions of risk. Without that license and credential, Plaintiff could not even access the "non-spectator" areas at racing venues, much less participate in any Supercross race. Plaintiff's execution of these releases and waivers thus was an express precondition to his participation in the 2020 Supercross.

On November 22, 2020, before his first race at the Tampa 2020 Supercross, Plaintiff signed, and subsequently submitted to AMA, two agreements containing assumptions of risk and waivers of liability: (1) AMA "Minor's Assumption of Risk Acknowledgement" ("Assumption of Risk") **Ex. D**, and (2) AMA Racing Credential Terms and Conditions ("Credential Terms") **Ex. E**.[2] The Assumption of Risk expressly governed "all AMA events, activities and/or locations" for "all 2020 dates." *Id.* By signing the Assumption of Risk, Plaintiff expressly "assum[ed] all of the risks if I get hurt during" during Supercross events. He further acknowledged "risks and dangers associated" with Supercross "that could cause severe bodily injury, disability and death," which "may be caused by…the negligence of others" expressly defined to include "all acts of negligence… INCLUDING NEGLIGENT RESCUE OPERATIONS." **Ex. D** p. 2, ¶¶ 2, 3; p. 1, ¶ 5 (capitalization original). Moreover, "if any portion thereof is held invalid, [Plaintiff] agreed that the balance shall,

---

[2] *See* **Ex. C** 67:15-73:10; **Ex. H** 243:16-23; the Assumption of Risk is the second page of AMA's "Minor Release and Waiver of Liability and Indemnity Agreement," which was signed by Plaintiff's racing team manager, Tyler Keefe, who had identified himself as Plaintiff's "guardian." **Ex. C.**, 69:5-71:9.

notwithstanding, continue in full legal force and effect." *Id.* at p.1, ¶ 5. On the same day Plaintiff signed the Assumption of Risk, Plaintiff also executed the Credential Terms in express "consideration of being granted his 2020 AMA Racing Credential." **Ex. E**. In the Credential Terms, Plaintiff acknowledged, *inter alia*, that:

> by participating in an AMA sanctioned event, I am assuming the risk of property damage and serious injury up to and including death… *I waive any and all claims for personal property damage, injury, or death against AMA or any of their respective directors, officers, employees or agents. Id.* at ¶ 6 (emphasis added).

On January 2, 2020, Plaintiff signed a third agreement containing yet another broad release and waiver. Plaintiff's execution of this "2019-2020 Adult Feld Motor Sports All-Event Release, Waiver, and Indemnity Agreement" ("FMS Waiver") was also a precondition to Plaintiff's right to "participate in any way in any events" and in consideration of FMS allowing same. **Ex. F** p. 1.[3] The FMS Waiver included not only an assumption of risk, but also a "complete and unconditional release" of liability:

> FOR ANY AND ALL LOSS OR DAMAGE… ON ACCOUNT OF DEATH OR INJURY… ARISING OUT OF OR RELATED TO ANY EVENT, WHETHER CAUSED IN WHOLE OR IN PART, BY THE SOLE OR CONCURRENT NEGLIGENCE OF THE RELEASEES[4] OR OTHERWISE, including, without limitation, NEGLIGENT RESCUE OPERATIONS. *Id.* (capitalization original).

---

[3] *See* **Ex. G** FMS's Second RFAs to Pl., ¶¶ 1-2. These Requests are deemed admitted pursuant to Fed. R. Civ. P. 36(a)(3) because Plaintiff failed to respond to FMS's Second RFA's. Collectively, the Assumption of Risk, Credential Terms, and FMS Waiver are referred to her as the "Contracts."

[4] "Releasees" included FMS, "its…employees and those in privity with them including, without limitation, any…racing associations, *sanctioning organizations… rescue personnel*, trauma doctors and *other medical personnel*, any persons in any Restricted Area, promoters… and each of them, their directors, officers, agents and employees." *Id.* at ¶ 3 (emphasis added). AMA, Medic Rig, and the Individual Defendants are sufficiently identified as the "sanctioning organization," "rescue personnel," and "other medical personnel," respectively, in the FMS Waiver. Florida law provides (and permits summary adjudication) that a general release is effective to discharge tortfeasors not specifically named because the waiver identified these parties by their capacity. *Banfield v. Louis*, 589 So.2d 441 (Fla 4th DCA 1991).

On February 14, 2020, just over two weeks after he turned 18 and after having obtained from AMA and FMS his credential to race Supercross, Plaintiff participated in the pre-race media event at Raymond James Stadium ("Press Day"), where he was interviewed, photographed, and permitted to ride his motorcycle around the Supercross track. **Ex. H** Moreau Vol. 1, 172:24-177:22. The following day, Plaintiff utilized his credential to access the Tampa Supercross, where he was allowed to both walk and ride his motorcycle around the Supercross track. *Id.* at 184:4-187:17.

While on his second or third practice lap during the first "free practice" session of the Tampa Supercross, Plaintiff miscalculated, by his own admission, a series of jumps on the course and missed his landing. *Id.* at 197:13-207:10. His motorcycle's front wheel collided with the face of a jump and propelled him headfirst into the ground. *Id.* Within two to three seconds following Plaintiff's crash, five "flaggers" stationed nearby Plaintiff's crash site began waving yellow flags that signified to oncoming riders there was a "serious hazard" ahead and to proceed with "extreme caution." **Ex. I** Nos. 18-21. Two other trackside personnel came onto the track to direct ongoing riders around Plaintiff's crash site and to further shield Plaintiff. *Id.* Another trackside worker shielded Plaintiff by placing a large "tuffblock" in front of him. *Id.*

Medic Rig, the company hired by FMS to provide medical and emergency services to riders, quickly responded to Plaintiff while on-track. **Ex. I** Nos 2-4. Metiva, a Medic Rig crewmember and Certified Athletic Trainer, entered the track approximately 13 seconds following Plaintiff's crash and bent over to attend to him.

- 6 -

**Ex. J** Combs 124:4-125:20.[5] She was joined a few seconds later by Combs, a Medic Rig crewmember and licensed EMT/paramedic. *Id.* About 40 seconds after Plaintiff's crash, Metiva, assisted by Combs using a so-called "fireman's carry," lifted Plaintiff and moved him off the track to a nearby medical transport vehicle. **Ex. J** 100:20-24; **Ex. K** 133:17-23. Plaintiff was off of the track less than 60 seconds after his initial crash. **Ex. L** 211:14-23; 212:10-24. Plaintiff was then attended by Dr. Kennedye, a Medic Rig physician, together with other nearby Tampa Fire Rescue paramedics. **Ex. K** 134:13-20; 135:24-136:2. The medical personnel transported Plaintiff via the medical cart through the stadium tunnel to Medic Rig's mobile facility located just outside the stadium, where he was further evaluated and then transported to Tampa General Hospital. **Ex. M** Bodnar 214:15-215:1; **Ex. H** 238:5-15; 239:24-240:2.

Plaintiff alleges that AMA is vicariously liable and subject to punitive damages because its "employees, agents, and/or contractors, including race staff and officials, breached their duties" by, among other things, (1) failing to abide by applicable rules, regulations, policies, procedures, and codes regarding when to stop or "red flag" a practice session, (2) failing to stop or "red flag" the practice session "given there was obvious danger to life or of further injury to Plaintiff or the Medic Rig crewmembers attending to him," and (3) failing to stop or "red flag" the practice session "after

---

[5] A fact dispute that has no bearing on the present Motion, exists regarding an on-track oral discussion between Plaintiff and Metiva. Plaintiff asserts that he yelled to Metiva and Combs before he was moved from the track, "Don't touch me, I'm paralyzed." **Ex. H** 215:13-216:23. Metiva and Combs deny hearing Plaintiff state that he was paralyzed, and Metiva contends that Plaintiff communicated he had suffered only a leg injury. **Ex. K** Metiva 103:6-11; 111:1-13. It is undisputed that no one from AMA was in a position to hear any of this alleged exchange, as it was not communicated over the radio, and the AMA Race Director was 150 feet away at the start finish line. **Ex. L** Gallagher Vol. 1 221:2-10.

Plaintiff reported obvious symptoms of a potential spinal cord injury." TAC at ¶ 149.
Plaintiff claims that AMA knew or should have known that its failure to stop the
practice session "would likely subject Plaintiff to heightened risks of serious injury …
such as … grossly negligent on-track assistance from [Medic Rig]…." TAC at ¶ 150.

## MEMORANDUM OF LAW

Rule 56 provides that "[t]he court shall grant summary judgment if the movant
shows that there is no genuine dispute as to any material fact and the movant is entitled
to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### I.    After Turning 18 Years Old, Plaintiff Knowingly Ratified the Waiver, Release, and Assumption of Risk Contracts He Previously Signed as a Minor and Is Thus Now Barred from Suing AMA for His Injuries.

#### A. Plaintiff Could Ratify His Contracts After He Turned 18.

Contracts executed by a minor such as Plaintiff are voidable, not void. *Lee v.
Thompson*, 124 Fla. 494, 499 (Fla. 1936). "[C]ontracts of an infant" are "subject to the
possibility of disaffirmance," such that "when the infant attains his majority and ratifies
a contract made in infancy its infirmity is removed and it will be treated as valid from
inception and the optional right to disaffirm abandoned." *Id.* "This rule applies to both
executed and executory contracts." *Id.* A minor's voidable "executed contract…is
binding until it is avoided by some act indicating that the party refuses longer to be
bound by it." *Id.* A minor's voidable executory contract "is capable of being confirmed
or avoided, though it is invalid until it has been ratified." *Id.* "In the case of executed
contracts, ratification is more often implied from the conduct of the quondam infant
than from express declarations, but in the case of executory contracts ratification must

be positive and explicit." *Id.* at 500. As explained by the Florida Supreme Court in *Lee*:

> ratification may be accomplished by exercising the option not to avoid the contract. The quondam infant is required to do this in express terms, *or he may do so by some act freely and voluntarily done. He may also ratify by conduct which shows a clear intent to do so or such as will work a fraud on the opposing party if not treated as ratification*. *Id.* at 499 (emphasis added).

"[I]f the infant reaches majority and then retains and enjoys the use of property received under the contract, ratification will have occurred absent his express promise to perform." *Murray on Contracts* § 25 at pp. 4-5. As *Corbin on Contracts* explains:

> Retention and enjoyment of property received pursuant to contract for more than a reasonable time after attaining majority involves both kinds of conduct— that is, active use of the property coupled with a failure to disaffirm. Under such circumstances, a ratification will often be found to have occurred. Also*, receipt of performance from the other party after attaining majority will normally be considered to be a ratification.* 7 Corbin on Contracts 3d § 27.4 (emphasis added).[6]

### B. Plaintiff Knowingly Signed the Contracts, Knew That Nothing Prevented Him from Rejecting the Contracts, and Knew or Should Have Known of the Assumptions of Risk and Releases.

Plaintiff knew full well that motorcycle racing was dangerous. ("we all know the risk") and further knew he must "sign paperwork" to be permitted to race. **Ex. N** Moreau Vol. 3 151:4-17; 99:24-100:8. Plaintiff did not need his mother's permission to race Supercross as he lived alone, and she was "letting [him] do his sport." *Id.* at 134:16-135:6. It was Plaintiff's "dream" to race in the United States. *Id.* at 20:1-5; 164:3-5.

Plaintiff "believed" he had to get a credential and license to participate in Supercross. *Id.* at 140:24-141:6. His Team members provided him with the Contracts

---

[6] In his Opposition to AMA's Motion to Dismiss the TAC, Plaintiff claims that the Contracts were "executory," "not fully performed" and thus requires an even higher standard to show ratification. [Dkt 208 at 12]. Addressing executory contracts specifically, Corbin notes "It is apparent…that this 'rule' as to executory contracts is not applied when the infant's failure to disaffirm within a reasonable time after attaining majority works injustice on the other party." *Corbin on Contracts* § 27.4 at p.3.

to review and sign. *Id.* at 147:10-16. Plaintiff signed the Contracts because he "didn't care about paperwork…I just wanted to get on the bike and win races and then be good." *Id.* at 145:23-146:6. Plaintiff also knew that if he did not sign the Contracts, he could not race Supercross: "I know that I had to sign the paperwork for me to race…." *Id.* at 143:4-13; *see also* 145:7-16; 147:5-16. The Assumption of Risk and FMS Waiver confirmed Plaintiff had read and understood the documents. **Exs. D** and **F**.

Although Plaintiff *now* claims that he did not read the Contracts "because I don't like so much reading" [**Ex. N** 98:22 - 99:16-23], Florida law imputes knowledge of the Contracts' contents to him because "one who signs a contract is presumed to know its contents." *Sutton v. Crane*, 101 So.2d 823, 825 (Fla. 2d DCA 1958);[7] *see also Allied Van Lines, Inc. v. Bratton,* 351 So.2d 344, 348 (Fla. 1977) ("No party to a written contract in this state can defend against its enforcement on the sole ground that he signed it without reading."); *Pepple v. Rogers*, 104 Fla. 462, 469-70 (Fla. 1932).

It is noteworthy that Plaintiff did not *have* to sign the Contracts, and the Contracts did not even require him to *race*.[8] At any time up until he sought to race and

---

[7] *Sutton* explains that "this rule has been applied even to contracts of illiterate persons on the ground that if such persons are unable to read, they are negligent if they fail to have the contract read to them. If a person cannot read the instrument, it is as much his duty to procure some reliable person to read and explain to him, before he signs it, as it would be to read it before he signed it if he were able to do so, and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents." *Id.*

[8] The Contracts neither *require* Plaintiff to race, nor impose *any* duty absent some triggering event (e.g. submit to drug testing only if selected). Plaintiff's obligation to race Supercross arose *solely* from his racing contract with KTM Red Bull, a 23-page agreement that provided Plaintiff "shall" enter the "2020-2021 AMA 250 Supercross and Motorcross." **Ex. B** at p. 20. Signed twice by Plaintiff and his mother, the KTM agreement paid Plaintiff a base salary of $65,000, not including expenses and other incentives, and included another lengthy waiver and release. *Id.* at pp. 13-15, 21.

enjoy the privileges afforded him as a credential holder, he could have rejected the Contracts *without penalty*. But if Plaintiff wanted to race Supercross, it was an absolute precondition that Plaintiff sign and commit to be bound by the Contracts. **Ex. C** 67:15-68:20; **Ex. O** Prater 64:14-17; 225:16-226:1; **Ex. E** (executed "in consideration for being granted a 2020 AMA Racing Credential"); **Ex. F** (executed "in consideration for" FMS allowing Plaintiff to "participate in any way" in 2020 Supercross events and/or enter any "restricted area requiring…credentials").

In short, Plaintiff knew, or is charged with the knowledge, that he waived and released not only AMA, but all of the Defendants, in exchange for the privilege of participating in the 2020 Supercross. And those waivers and releases are supported by valid consideration—the *quid pro quo* for Plaintiff's acquisition of a credential authorizing him to race Supercross was his reciprocal agreement to release AMA from liability for any injuries he might sustain. Finally, Plaintiff knowingly and willingly signed his Contracts containing those releases and waivers because otherwise he would not be permitted to race in the 2020 Supercross. **Ex. N** 99:10-15 ("So you signed it so that you would be permitted to participate in the 2020 Supercross…?" "Yeah…").

### C. Plaintiff Ratified His Contracts by Accepting their Benefits and Receiving the Performance of AMA and FMS.

Plaintiff's choice to accept the benefits of the Contracts by participating in Press Day and the Tampa Supercross thereby ratified those Contracts. It would exact a fraud on AMA and FMS if Plaintiff, after having reaped the benefits of the Contracts by participating in Press Day and the Tampa Supercross as an adult, were now permitted

after-the-fact to disaffirm those same agreements. *Lee*, 124 Fla. at 499 (A quondam infant may also "ratify by conduct…such as will work a fraud on the opposing party if not treated as a ratification.").[9]

In circumstances similar to those here, the Colorado Supreme Court affirmed partial summary judgement in favor of defendant and held that a parachute-jumping contract signed by the plaintiff when he was 17 years old contained an enforceable exculpatory provision that barred plaintiff's claims for injuries sustained during parachute-jumping activities after he turned 18. In *Jones v. Dressel*, 623 P.2d 370 (Colo. 1981) (affirming *Jones v. Dressel*, 40 Colo. App. 459 (Colo. Ct. App. 1978)), the plaintiff contracted with defendant 6 weeks *before* plaintiff's 18th birthday, to ferry skydivers to defendant's parachute jumping site. 623 P.2d at 372. 10 months *after* his 18th birthday, the plaintiff suffered serious personal injuries when the defendant's plane carrying him to the jumping site crashed. *Id.* at 373. Although the plaintiff sought to void the contract because he had been a minor when he signed it, the court rejected his argument, noting that "[a]ffirmance is not merely a matter of intent. It may be determined by the actions

---

[9] Plaintiff received his 250SX racing license from AMA and a physical credential granting access to the 2020 Supercross events from AMA and FMS in consideration for executing the Contracts. **Ex. P**, Moreau AMA Rider Profile; **Ex. Q** Photograph of Plaintiff's credential [*see* **Ex. C** 62:13-65:19]; *see also* **Ex. R** Pelletier 98:22-99:22 (Q: …What is the AMA credential? A: We credential riders, mechanics, and officials. Q: Okay. And what does the AMA credential allow someone to do, once they have it? A: Gain access to the event. And then in the rider scenario, compete. Q: Is the AMA credential printed on a hard card? A: It is. Q: Is that hard card created by Feld? A: They print it for us, yes."). Using that credential, Plaintiff gained access to restricted areas, including the racetrack at Raymond James Stadium on February 14 and 15, 2020. By participating in Press Day where he was photographed, filmed, and interviewed by the press and was permitted to ride the track, Plaintiff accepted and enjoyed the benefits of the Contracts he executed as a minor, and thereby ratified those Contracts as an adult. By participating in the Tampa Supercross the following day, where he was admitted to restricted areas, permitted to ride his motorcycle on the racetrack, and photographed and filmed for broadcasting and promotional purposes, Plaintiff again evinced his intention to be bound by the Contracts.

- 12 -

of a minor who accepts the benefits of a contract after reaching the age of majority…." *Id*. at 374. The court held that, by using the defendant's facilities on the day of his accident, the plaintiff accepted the benefits of and thus ratified the contract such that the exculpatory provision barred his claim. *Id.* at 374.

As in *Jones*, Plaintiff accepted the benefits of the Contracts and thereby ratified them when he used his credential to gain access to Press Day and to participate in the Tampa Supercross. Because Plaintiff received and accepted the Contract's benefits after reaching adulthood, he thereby affirmed and ratified the Contracts.[10]

### D. The Exculpatory Provisions in the Contracts are Enforceable to Bar Plaintiff's Claims.

"[L]ong-standing precedent maintains that releases barring claims for negligence signed by individuals involved in motorsports should be honored." *Brotherton v. Victory Sports Inc.*, Civil No. 11-129-GFVT, 2013 WL 1311999, at *1 (E.D. Ky. Mar. 26, 2013) (Motorcycle races "are deemed both valuable and dangerous enough that race organizers have been permitted to contract out of a negligence standard of care"); *Dunn v. Paducah Int'l Raceway,* 599 F.Supp. 612, 613 (W.D. Ky. 1984) ("excepting racing and similar sporting competitions from the general rule against exculpatory agreements *promotes* the public's interest in observing and following sporting competitions…since

---

[10] Under Florida law, a former minor can disaffirm a contract entered into as a minor only "when there are no circumstances and no affirmative acts of his making it inequitable for him to remain inactive after attaining his majority." He is required to return any consideration received that is still in his possession at the time he seeks to disaffirm the contract, because "the law will not allow him to repudiate his contract and at the same time retain its fruits as his own." *Putnal v. Walker*, 61 Fla. 720, 723-725 (Fla. 1911). Plaintiff here accepted the benefits of the Contracts by virtue of his Supercross participation, and it would be inequitable to permit him now to disaffirm the Contracts.

without a release it is doubtful that anyone would be willing to sponsor such events.") (emphasis original) (citations omitted). An exculpatory clause is enforceable under Florida law to bar negligence claims even if it does not specifically reference "negligence" or "negligent acts," provided "the language unambiguously demonstrates a clear and understandable intention to be relieved from liability so that an ordinary and knowledgeable person will know what he or she is contracting away." *Sanislo v. Give Kids the World, Inc.*, 157 So.3d 256, 271 (Fla. 2015); *Cain v. Banka*, 932 So.2d 575, 579 (Fla. 5th DCA 2006). Moreover, courts have found that receiving negligent medical care in professional motor vehicle racing is a reasonably foreseeable risk of participation that can be waived by the participant, even where it is not expressly stated in the release. *Maness v. Santa Fe Park Enterprises, Inc.*, 298 Ill. App. 3d 1014 (Ill. App. Ct. 1998).

The assumptions of risk and the releases contained in the Contracts clearly serve to release and bar Plaintiff's claims against AMA and the other Defendants. Both the FMS Waiver and Assumption of Risk expressly identify and waive liability for the exact conduct that Plaintiff relies upon for his claims in this action, purportedly "negligent rescue operations." **Ex. D**, ¶ 5; **Ex. F**, ¶ 2(i). Moreover, the Contracts' releases and assumptions of risk are substantially similar to language in waivers that have been routinely deemed enforceable. *See, e.g., Brotherton* 2013 WL 1311999, at *1; *Donegan v. Beech Bend Raceway Park, Inc.*, 894 F.2d 205 (1990) (enforcing waiver which "affirmed that [plaintiff] would personally inspect the track before racing, and that he released the owners from all liability for injuries he might suffer there"); *Dunn,* 599 F.Supp. at 614.

Finally, in addition to the Contracts complying with Florida law generally as to

- 14 -

releases for negligence (as described above), Section 549.09(2), Florida Statutes, provides that "motorsport nonspectator liability releases" are enforceable if they take place in "closed-course motorsport" facilities and make, as a condition for admission to designated "nonspectator area[s]," the "signing of a liability release form." Section 549.09 requires that nonspectator areas be posted, fenced or walled, and designated as nonspectator areas. The Raymond James Stadium venue for Tampa Supercross met the definition of a "closed course motorsport facility" and complied with the statute's requirements set forth in Section 549.09(1)(b) and (d) for designating and restricting access to nonspectator areas. **Ex. O** 223:17-225:20; **Ex. S** Pelletier Decl. ¶¶ 9-14.[11] Both the Assumption of Risk and FMS Waiver complied with Section 549.09, and both specifically referenced access to restricted areas. Pursuant to Section 549.09(3)(b)2, the closed course motorsport facility also qualified as a "motorsports event" as defined by Section 549.10(1)(b) (a "motorsports event" is "a motorsports race and its ancillary activities that have been sanctioned by a sanctioning body.") As AMA was the sanctioning body for the 2020 Tampa Supercross, it clearly meets the definition of a "motorsports event." Section 549.09(1)(g) also applied to Plaintiff's Assumption of Risk and the FMS Waiver because Plaintiff was 18 years old on February 15, 2020, when he *participated* at the Supercross practice event. *See* § 549.09(3)(b)1 ("If a *minor is participating in a motorsports event*…the motorsport liability release must comply with the

---

[11] *See generally Hager v. Live Nation Motor Sports, Inc.*, 665 F. Supp. 2d 1290 (S.D. Fla. 2009) (holding monster truck rally on track purpose-built in baseball/football stadium and torn down afterward was "motorsports event" under §549.09 for purposes of enforcement of motorsports liability release).

- 15 -

requirements of this section….") (emphasis added).

In sum, Plaintiff executed waivers of liability in favor of AMA, as well as FMS, Medic Rig, and the Individual Defendants, in consideration of being issued a credential and being allowed to enter the non-spectator areas, take part in the Tampa Press Day, practice on the Supercross courses, and participate in Tampa Supercross overall. Utilizing the credential he obtained by signing the releases, Plaintiff *knowingly* accepted the Contracts' benefits and AMA's and FMS's contractual performance, twice participated in motorcycling events, and thereby ratified the Contracts. Because the Contracts contain clear and unambiguous exculpatory clauses that expressly waive and release his current claims against AMA, these claims are barred as a matter of law, requiring the entry of summary judgment in favor of AMA on Count VIII of the TAC.

## II.    **AMA Cannot Be Held Vicariously Liable as a Matter of Law for the Actions of Medic Rig or FMS.**

Plaintiff's allegations of purported agency between AMA and its various unspecified "employees, agents, and/or contractors" are hopelessly vague and confusing.[12] When AMA requested specificity as to whose conduct AMA is being held liable for, Plaintiff could identify only persons specifically associated with AMA (such as its Race Director, Event Manager, and Supercross Manager), and conspicuously failed to name anyone associated with Medic Rig. *See* **Ex. T** Pl's Resp. to AMA's First Interrogatories, No. 4. Plaintiff suggested that "[t]here may also have been a Track

---

[12] The one thing that *is* clear, is that regardless of the person or entity AMA is supposed to be "vicariously liable" for, such liability stems solely from failing to "stop or 'red flag'" the practice session during which Plaintiff was injured. No other *breach of duty* is alleged against AMA. *See* TAC, ¶ 149.

Safety Supervisor or 'eye in the sky' with similar authority," and offered to "supplement this response as additional information becomes available." *Id.* Suffice it to say that six months later and after completion of over 30 additional depositions and the subsequent close of discovery, no supplement has been forthcoming. The purpose of the present motion is now to close that door and establish as a matter of law that AMA cannot be held vicariously liable for the actions or omissions of any person associated with Medic Rig or FMS, or the Individual Defendants.[13]

Under Florida law, vicarious liability may arise via theories of *respondeat superior*, actual agency, or apparent agency. *Domino's Pizza, LLC v. Wiederhold*, 248 So. 3d 212, 221-22 (Fla. 5th DCA 2018). Here, the undisputed facts show that Plaintiff has no evidence to support his claim of vicarious liability against AMA pursuant to any of the foregoing theories. Plaintiff's vicarious liability claim also should fail as a matter of law because he has not even pleaded a direct liability claim against FMS.

## A. Plaintiff's *Respondeat Superior* and Actual Agency Theories Fail Against AMA.

Under Florida law, an employer may be vicariously liable to third parties under the principle of *respondeat superior* for injuries caused by its employee's negligent acts that are committed within the scope and course of his employment. *Druker v. Walmart, Inc.*, No. 22-11646, 2023 WL 2439538, at *1 (11th Cir. Mar. 10, 2023). Here, we can

---

[13] Although the agency inquiry often presents factual questions, federal courts recognize that where, as here, "a party bearing the burden of proving agency fails to produce evidence in support of its allegations or where the evidence presented is so unequivocal that reasonable persons could reach but one conclusion, a court may determine the lack of agency as a matter of law." *Cabrera v. Gov't Emps. Ins. Co.*, 452 F. Supp. 3d 1305, 1316–17 (S.D. Fla. 2014) (citation omitted).

quickly dispense with the *respondeat superior* theory against AMA because there is no evidence whatsoever that any person associated with or working for Medic Rig or FMS at the Tampa Supercross was an "employee" of AMA.[14]

Florida law also "extends vicarious liability outside the employment context [including] to the relationship between an agent and his principal." *Hall v. Sargeant*, 2020 WL 1536435, at *15 (S.D. Fla. Mar. 30, 2020). An agency relationship may be express or implied from apparent authority; the burden of proving the agency belongs to the party asserting it. *Marchisio v. Carrington Mortg. Servs.*, LLC, 919 F.3d 1288, 1311 (11th Cir. 2019) (quoting *Regions Bank v. Maroone Chevrolet, L.L.C.*, 118 So.3d 251, 255 (Fla. 3d DCA 2013)). To establish actual agency, Florida law requires "(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003).

Ultimately, the key issue in the actual agency analysis is whether the principal exercised *control* over the actions of the agent. *Vasquez v. Board of Regents*, 548 So. 2d 251, 254 (Fla. 2d DCA 1989). To resolve right of control issues, Florida courts "look first to the parties' written contract." *Gradia v. Baptist Hosp., Inc.*, 345 So. 3d 385, 387 (Fla. 1st DCA 2022). The terms of a contract between the parties are usually a pertinent

---

[14] Indeed, the evidence is precisely to the contrary. The Individual Defendants have all expressly admitted that they were never employed by AMA and never entered into any employment or subcontractor agreement with AMA. *See* **Comp. Ex. U** Individual Defendants' Resps to AMA's respective RFAs, Nos. 7. Similarly, it is uncontested that persons associated with FMS never were employed by AMA and never entered into any employment agreements with AMA. **Ex. S** ¶¶ 15-18. Accordingly, the *respondeat superior* theory as against AMA fails as a matter of law.

index of the principal's right of control and factor heavily into the inquiry. *Del Pilar v.
DHL Glob. Customer Sols. (USA), Inc.*, 993 So. 2d 142, 146 (Fla. 1st DCA 2008).

The problem here for Plaintiff is that there is no contract between AMA and
Medic Rig or any of the Individual Defendants. **Ex. I** No. 2; **Comp. Ex. U** Nos. 1-4;
**Ex. S** ¶¶ 15-16. For that reason, there cannot have existed a contract-based right of
control by AMA over Medic Rig or the Individual Defendants. And with respect to
FMS and AMA, although these two entities at least entered into a Sanctioning
Agreement, that agreement does not confer upon AMA any right of control over FMS.
Indeed, the Sanctioning Agreement expressly characterizes the relationship between
AMA and FMS as that of "independent contractors." *See* **Ex. A** p. 25 §III(C). Florida
courts generally follow the principle that the entity that hired an independent contractor
is not liable for the torts of the contractor or of the contractor's employees. *See Sterling
& Mgmt., Inc. v. Gitenis*, 117 So.3d 790, 794 (Fla. 4th DCA 2013) ("The rationale for the
general rule is that since the employer of an independent contractor has no power of
control over the manner in which the work is to be done by the contractor, it is to be
regarded as the contractor's own enterprise, and [the contractor] is the proper party…
charged with the responsibility of preventing the risk, and bearing and distributing it.").

Although courts can go beyond the terms of an independent contractor clause to
find indicia of agency, the "tell-tale signs of a principal-agent relationship" include "the
ability of the principal to hire, fire, or supervise" the alleged agents. *Ocana v. Ford Motor
Co.*, 992 So 2d 319, 326 (Fla. 3d DCA 2008). But here, Medic Rig and every Individual
Defendant have admitted that they were never supervised, directed, evaluated,

employed, selected, compensated, reimbursed, instructed, or trained by AMA. *See* **Ex. I** No. 13; **Comp. Ex. U** Nos. 7, 10-38; **Ex. M** 282:11-292:18; 293:8-295:21. Similarly, AMA had no right or ability to hire, fire, or supervise the employees or crewmembers of Medic Rig. **Ex. M** 284:2-287:5; 295:16-21; **Ex. S** ¶¶ 17-18. And AMA did not prohibit Medic Rig or the Individual Defendants from working for any other competitions. **Comp. Ex. U** Nos. 12. It is also uncontested that AMA did not train or inspect Medic Rig or their employees, leaving that responsibility to Medic Rig and its Chief Medical Officer. *Id.* at Nos. 17-18; 23-24; 31-32.[15] Medic Rig operated independently with no direction from AMA. **Ex. I** Nos. 8-10, 12-13.[16] Similarly, AMA did not in any way hire, evaluate, compensate, direct, supervise, manage, oversee, or otherwise control the actions of FMS or any of its personnel. **Ex. S** ¶¶ 19-21.

Finally, AMA also cannot be held vicariously liable for any alleged negligence by FMS because Plaintiff has not even asserted a direct liability claim against FMS. To sustain claims of vicarious liability and *respondeat superior*, "there must be an underlying

---

[15] AMA further did not select the equipment or establish the procedures that Medic and FMS must follow. *Id.* at Nos. 33-38. Although AMA and Medic Rig shared a radio channel for communicating with one another about on-track incidents requiring medical attention, each entity provided its own radio headsets. **Ex. M** 289:4-17. AMA also does not require FMS or the Medic Rig to use any logo or trademark of AMA. **Ex. S** ¶ 22. AMA did provide an AMA mark to FMS and Medic Rig to use on their clothing and mobile medical unit in 2020, but that alone cannot establish control sufficient to establish agency. *See Sine Enterprises, Inc. v. Jaguar Credit Corp.*, 139 F.3d 912, 1998 WL 88156, at *4 (10th Cir. 1998) ("[A] logo, in and of itself, is insufficient to establish the existence of an agency relationship").

[16] AMA also cannot be held vicariously liable for any alleged negligence by Medic Rig or Individual Defendants, because they are all third-party beneficiaries of the FMS Release. As discussed above, the FMS Release covers "rescue personnel, trauma doctors and other medical personnel, any persons in any Restricted Area." Plaintiff is thus left with no claims of direct liability against FMS or Medic Rig or their employees, agents, or contractors for which AMA could be held vicariously liable.

PD.49145550.1

claim through which the plaintiff can hold one of the defendants liable." *Christrikes Custom Motorcycles, Inc. v. Teutul*, 2016 WL 3406391, at *4 (M.D. Fla. June 21, 2016). To establish vicarious liability, the underlying alleged tortfeasor must actually be found liable of tortious acts. "If the alleged tortfeasor is not liable, no liability can be imputed upwards." *Fontanez v. Lamberti*, 2011 WL 4499016, at *15 (S.D. Fla. Sept. 27, 2011) ("Without any underlying liability [by the agents], there can be no apportionment of that liability to [the principal]" because "any percent of zero is zero."). Here, Plaintiff's claims against both FMS and AMA are only for "vicarious liability," not direct liability. Because, as a matter of law, a party cannot be vicariously liable for another party's vicarious liability, Plaintiff's claim against AMA fails for this additional reason.

**B. Plaintiff's Apparent Agency Theory Against AMA Also Fails.**

Plaintiff's apparent agency claim against AMA is similarly bereft of evidentiary support. To establish apparent agency here, Plaintiff must prove (1) a representation or action by AMA causing Plaintiff to believe that the Medic Rig, FMS, or the Individual Defendants had authority to act on benefit of AMA; (2) reliance on such representation by Plaintiff; and (3) a change in position by Plaintiff in reliance on the representation. *Mobil Oil Corp. v. Bransford*, 648 So.2d 119, 121 (Fla. 1995). The only alleged basis for Plaintiff's apparent agency theory here is that AMA "represented to the riders, including Plaintiff… that its employees, agents, and/or contractors, including race staff and officials, *would conduct the event in accordance with the applicable the rules…to protect the riders from risks of harm beyond those inherent in the sport*." TAC, ¶ 146 (emphasis added). Significantly, Plaintiff also has made virtually identical apparent agency claims against

FMS -- which highlights the implausibility of the claim as *both* AMA *and* FMS cannot serve as *both principal and agent* of one another simultaneously. TAC, ¶¶ 52, 56-57.

The obvious problem with the foregoing apparent agency claim is that it is missing an indispensable ingredient—representations by AMA that Medic Rig, FMS, and the Individual Defendants *were AMA's agents or were authorized to act on AMA's behalf*. To establish apparent agency, there must be allegations and proof that the principal made representations creating a reasonable appearance to a third party *of an apparent agency relationship between the principal and a purported agent*. *Sun Life Assur. Co. v. Imperial Holdings, Inc.* 2014 U.S. Dist. LEXIS 188601, *14 (S.D. Fla. June 26, 2014) (dismissing apparent agency claim where no facts alleged that purported principal made a representation that other persons were its agent); *St. Francis Holdings, LLC v. Pawnee Leasing Corp.*, 2020 WL 6287684 (M.D. Fla. Oct. 27, 2020) (dismissing apparent agency claim where plaintiffs failed to allege facts showing representations that would create reasonable appearance of apparent agency relationship with principal).

Here, there are no such allegations or evidence that AMA represented to Plaintiff that Medic Rig, FMS, or the Individual Defendants were AMA's agents. Even assuming *arguendo* that AMA represented its "agents, employees, and/or contractors" would conduct the Tampa Supercross in accordance with rules "to ensure fair competition" and "to protect riders from undue risks," this alone could not create a reasonable appearance to Plaintiff that the other defendants here were *agents* of AMA or *possessed the authority to act for or somehow bind AMA*. It is not enough for Plaintiff to

adduce evidence that AMA, FMS, Medic Rig, and Individual Defendants cooperated with one another in carrying out their respective roles, and collectively sought to ensure safety. Otherwise, every time two entities work together to accomplish a common goal, they would automatically be deemed agents of one another. *Vasquez*, 548 So. 2d at 254 (an affiliation between two entities by which they share responsibility for accomplishing activities does not create an agency relationship between them).[17] Rather, what is needed are "representations" that would reasonably lead one to believe these persons *were authorized to act for* AMA—and representations that everyone will simply work together to "ensure fair competition" and "to protect riders from harm" do not suffice.

### III.    Plaintiff Has No Claim for Punitive Damages Against AMA.

Trial courts oftentimes summarily adjudicate meritless claims for punitive damages, like this one against AMA. *Kurtz v. Young*, 2009 WL 10667471, at *1 (S.D. Fla. Aug. 25, 2009). The record evidence here is wholly insufficient for Plaintiff to support a punitive damages claim against AMA. Plaintiff must demonstrate by *clear and convincing evidence* not only that AMA's agents were personally guilty of intentional misconduct or gross negligence, but also that AMA as principal actively and knowingly participated in such conduct; condoned, ratified, or consented to such conduct; or engaged in conduct that constituted gross negligence, and that contributed to Plaintiff's

---

[17] This lack of evidentiary support is particularly problematic given that AMA's contract with FMS expressly contradicts the conferral of such authority via its "independent contractor" provision. **Ex. A** p. 25 §III(C). Also, the various disclaimers and waivers of liability signed by Plaintiff (discussed above) deal only with expectations of safety, and do not even purport to represent that Medic Rig, FMS, or the Individual Defendants were authorized to act on behalf of AMA. At base, Plaintiff apparent agency argument relies not on any representations by AMA that the other defendants were authorized to act for AMA, but rather relies merely on representations that all Defendants are responsible for safety.

PD.49145550.1

claimed loss, damages, or injury. *See* § 768.72(3)(a)-(c), *Florida Statutes*.

But Plaintiff cannot show here by clear and convincing evidence that AMA's agent or agents[18] engaged in intentional misconduct or gross negligence related to the *failure to red flag the event*. The evidence is that AMA's Race Director, who had the authority to display a red flag, was 150 feet away and did not personally witness Plaintiff's crash [**Ex. L** 177:14-178-12]; his attention was drawn to the area of Plaintiff's crash by five yellow flags flying there, [*Id.*]; he then observed Medic Rig personnel promptly attending to Plaintiff on the track [*Id.* 207:24-209:14]; a red flag is needed only if the incident site cannot be controlled [**Ex. L** 92:20-93:16]; the incident site here was controlled in "textbook" fashion as AMA and FMS staff all did their jobs "perfectly" [**Ex. R** 16:14-17:1; 228:1-13; 229:25-230:9; **Ex. V** Gallagher Vol. 2 62:16-63:5; 85:9-21]; the Race Director was not informed of Plaintiff's injury while he was still on the racetrack, and nothing otherwise suggested the need for a red flag. [**Ex. L** 221: 2-23].

Although AMA's Race Director had ultimate authority to call for a red flag, it is uncontested that the CMO possessed the authority to recommend a stoppage as the result of an injured rider, and equally uncontested that neither Medic Rig nor any of the Individual Defendants recommended or requested a red flag relating to Plaintiff's crash. **Ex. I** Nos. 15, 23; **Ex. V** 83:18-84:14; 84:20-85:21; **Ex. W** Kennedy 80:10-82:10; 134:3-135:5. It is also firmly established that if any attending medical personnel recommended a red flag, the Race Director would have immediately ordered one

---

[18] Plaintiff has identified only AMA officials as AMA's agents. **Ex. T** No. 4; **Ex. S** ¶ 23.

displayed as AMA has never in the history of Supercross refused to honor a request for race stoppage from medical personnel. **Ex. I** at No. 22; **Ex. V** 67:25-68:6.

It is simply inconceivable that a reasonable jury could find by clear and convincing evidence that the failure to throw a red flag here was grossly negligent. As the Florida Supreme Court recognizes, "punitive damages are reserved for truly 'culpable conduct.'" *Cleveland Clinic Fla. Health Sys. Nonprofit Corp. v. Oriolo*, 357 So.3d 703, 706 (Fla. 4th DCA 2023). Such conduct must be "so outrageous in character, and so extreme in degree that the facts of the case to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* There was nothing outrageous about not throwing a red flag when the incident site was already well controlled by five waving yellow flags (indicating a "serious hazard" ahead and to proceed with "extreme caution"); two workers literally were on track directing riders around the site and another was placing a shielding "tuffblock" in front of Plaintiff; and two other trained medical personnel were attending to Plaintiff and then began assisting him off the track within 40 seconds after his crash.

Dated:  April 17, 2025

*/s/ Michael S. Hooker*
Michael S. Hooker  |  FBN 0330655 (Lead Counsel)
A. Brian Albritton  |  FBN 777773
Caroline Catchpole Spradlin  |  FBN 1003631
**PHELPS DUNBAR LLP**
100 South Ashley Drive, Suite 2000
Tampa, FL  33602-5311
Phone:  813-472-7550; Fax:  813-472-7570
E-mail:  michael.hooker@phelps.com
brian.albritton@phelps.com
caroline.spradlin@phelps.com
**COUNSEL FOR AMERICAN MOTORCYCLE ASSOCIATION**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been served, by email, on April 17, 2025, on the following:

| | |
|---|---|
| Mark Adam Schweikert<br>Schweikert Law, PLLC<br>1111 Brickell Avenue, Suite 1550<br>Miami, Florida 33131<br>mark@schweikertlaw.com<br>schweikert.mark@gmail.com<br>**Lead Attorney for Plaintiff** | Manuel A. Franco<br>DMRA Law LLC<br>1111 Brickell Avenue, Suite 1550<br>Miami, Florida 33131<br>manuel.franco@dmralaw.com<br>**Attorney for Plaintiff** |
| Javier F. Micheo-Marcial, Esq.<br>Juan C. Ramos-Rosado, Esq.<br>Maria A. Dominguez, Esq.<br>DMR Law LLC<br>1430 South Dixie Hwy., Suite 314<br>Coral Gables, FL 33146<br>j.micheo@dmrpr.com<br>j.ramos@dmrpr.com<br>m.dominguez@dmrpr.com<br>a.suarez@dmrpr.com<br>jmicheo@gmail.com<br>elizabeth.santana@dmralaw.com<br>**Attorney for Plaintiff** | Jason Beau Giller<br>Jason B. Giller, P.A.<br>1111 Brickell Avenue, Suite 1550<br>Miami, Florida 33131<br>jason@gillerpa.com<br>file@gillerpa.com<br>**Attorney for Plaintiff** |
| Gretchen L. Jankowski<br>(Admitted pro hac vice)<br>Matthew C. Pilsner<br>(Admitted pro hac vice)<br>Union Trust Building<br>501 Grant Street, Suite 200<br>Pittsburgh, PA 15219<br>Tel.: (412) 562-1417/3921<br>gretchen.jankowski@bipc.com<br>matthew.pilsner@bipc.com<br>eservice@bipc.com<br>**Attorney for Feld Motor Sports, Inc.** | Richard G. Salazar<br>David Gordon<br>Buchanan Ingersoll & Rooney, PC<br>401 East Jackson Street, Suite 2400<br>Tampa, Florida 33602<br>david.gordon@bipc.com<br>caroline.warren@bipc.com<br>joshua.smith@bipc.com<br>joshua.calo@bipc.com<br>richard.salazar@bipc.com<br>faye.lafond@bipc.com<br>michael.bootier@bipc.com<br>**Attorney for Feld Motor Sports, Inc.** |

- 26 -

| | |
|---|---|
| David O. Doyle, Jr.<br>Kelly Ann Lenahan<br>Bethany W. Nduka<br>Toni P. Turocy<br>Julie A. Tyk<br>Pearson Doyle Mohre & Pastis, LLP<br>901 North Lake Destiny Road, Ste 305<br>Maitland, FL 32751<br>ddoyle@pdmplaw.com<br>klenahan@pdmplaw.com<br>lspeake@pdmplaw.com<br>bnduka@pdmplaw.com<br>tturocy@pdmplaw.com<br>kiddings@pdmplaw.com<br>jpreston@pdmplaw.com<br>**Attorney for The Medic Rig, LLC;<br>John A. Bodnar, M.D.; James<br>Kennedye, M.D.; Amy Metiva;<br>and Scott Combs** | |

*/s/ Michael S. Hooker*
**Counsel for American Motorcycle
Association d/b/a American
Motorcyclist Association**

- 27 -