# EXHIBIT K





UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

BRIAN MOREAU,

    Plaintiff,

vs.             Case No.  8:22-CV-01295-TPB-CPT

FELD MOTOR SPORTS, INC., et al,

    Defendants.

DEPOSITION OF

AMY KAYE METIVA

TAKEN ON

FRIDAY, AUGUST 9, 2024

9:13 A.M.

RAMADA WYNDHAM CONFERENCE CENTER

3325 DAVENPORT AVENUE

SAGINAW, MICHIGAN 48602

Page 6

1              DEPOSITION OF
2              AMY KAYE METIVA
3                 TAKEN ON
4          FRIDAY, AUGUST 9, 2024
5                  9:13 A.M.
6
7         THE VIDEOGRAPHER: We are on the record.
8  The time is 9:13. The date is August 9th, 2024.
9  This is the beginning of the deposition of Amy
10 Metiva. The case caption is Moreau versus Feld
11 Motor Sports.
12        Will counsel introduce yourself and state
13 whom you represent.
14        MR. SCHWEIKERT: Mark Schweikert for the
15 plaintiff, Brian Moreau.
16        MR. DOYLE: David Doyle on behalf of
17 defendants, Amy Metiva, Dr. John Bodnar, Dr. James
18 Kennedye, Scott Combs, and The Medic Rig.
19        MR. GORDON: David Gordon, Buchanan
20 Ingersoll and Rooney on behalf of the Feld
21 defendants.
22        MS. SPRADLIN: Caroline Spradlin on behalf
23 of the American Motorcyclist Association.
24        THE VIDEOGRAPHER: The court reporter will
25 now swear in the witness.

Page 7

1         THE REPORTER: Ms. Amy Metiva, can you
2  please raise your right hand?
3         Do you affirm under penalty of perjury
4  that the testimony you're about to give will be the
5  truth, the whole truth, and nothing but the truth?
6         THE DEPONENT: I will.
7         THE REPORTER: Thank you. Counsel, you may
8  proceed.
9         MR. SCHWEIKERT: Thank you.
10 AMY KAYE METIVA, having been first duly affirmed to
11 tell the truth, was examined and testified as
12 follows:
13 EXAMINATION
14 BY MR. SCHWEIKERT:
15    Q.   Good morning.
16    A.   Good morning.
17    Q.   Could you please state your full legal
18 name for the record?
19    A.   Amy Kaye Metiva.
20    Q.   What does the K stand for?
21    A.   K-A-Y-E is my middle name.
22    Q.   Oh, okay. Have you ever had your
23 deposition taken before?
24    A.   Never.
25    Q.   Have you ever been a party to a lawsuit?

Page 8

1     A.   No.
2     Q.   Did you do anything to prepare for today's
3  deposition?
4     A.   Yes. Just with my counsel.
5     Q.   Did you have any communications with
6  anyone other than your counsel?
7     A.   No, I did not.
8     Q.   Did you review any documents in preparing
9  for the deposition?
10    A.   With my counsel yesterday.
11    Q.   Do you have any email addresses?
12    A.   I do.
13    Q.   And what are those?
14    A.   The only one I have right now is Amy
15 Metiva at Yahoo dot com.
16    Q.   And how long have you had that email?
17    A.   Probably 15 years.
18    Q.   Do you have a cell phone?
19    A.   I do.
20    Q.   And what is that number?
21    A.   989-324-8784.
22    Q.   Do you have any other telephone numbers?
23    A.   No, I do not.
24    Q.   Do you know who Brian Moreau is?
25    A.   I do.

Page 9

1     Q.   And you understand we're here today to
2  talk about the events on February 15th, 2020, right?
3     A.   Correct.
4     Q.   Okay. Aside from that day, have you had
5  any communications with anyone since then about
6  Brian Moreau?
7     A.   No.
8     Q.   Never exchanged any text messages with
9  anyone about Brian?
10    A.   No.
11    Q.   Emails?
12    A.   No.
13    Q.   Could you describe to me, please, your
14 educational background?
15    A.   So I have a Bachelor's of Science degree
16 in exercise science with a concentration in athletic
17 training from Lake Superior State University, and
18 I'm board certified by the National Athletic
19 Trainers Association and licensed in the state of
20 Michigan as an athletic trainer.
21    Q.   Are you also currently licensed as an
22 emergency --
23    A.   No, I'm not.
24    Q.   -- medicine technician?
25    A.   I let that go.

Page 102

1   A.   Uh-huh.  That's right.
2   Q.   Okay.  And then approximately one minute
3  after he was off the track, he's on the mule and
4  it's being moved towards the tunnel?
5   A.   Correct.
6   Q.   You don't recall what you heard on the
7  radio, but do you have an idea of who would have
8  indicated that there was an incident in your
9  section?
10  A.   It would have been one of the flaggers
11 that were in front of the top flag there in the
12 black.
13  Q.   They were on the same radio channel?
14  A.   Yes.
15  Q.   Are those flaggers, to your knowledge,
16 associated with the medical team?
17  A.   No.
18  Q.   Do you know who they were associated with?
19  A.   No.  Not offhand.
20  Q.   When you first approached the side of the
21 racetrack, could you see Brian lying on the ground
22 in the middle of the track?
23  A.   He was crawling towards the -- sorry, yes.
24  Q.   What was he doing? What did you see?
25  A.   He was crawling towards his bike.

Page 103

1   Q.   Did it occur to you, while you were
2  standing on the side of the track waiting for it to
3  clear, that Brian could possibly be in danger lying
4  there in the middle of the crack?
5   A.   Yes.  But we also -- yes.  Yes.
6   Q.   Did you think about asking for the
7  racetrack to be stopped in that moment?
8   A.   No.
9   Q.   Why not?
10  A.   Because when I went over to ask him what
11 happened, he said he had a left leg injury.
12  Q.   I'm going to give you a packet of photos
13 previously marked as Composite Exhibit 15.  Have you
14 seen these pictures before?
15  A.   Yes.
16  Q.   When did you first see them?
17  A.   Yesterday.
18  Q.   Did you ever see anything online about
19 Brian's crash?
20  A.   No.
21  Q.   So the first picture shows you on the
22 scene, right?
23  A.   That's not me.
24  Q.   I'm sorry.
25  A.   That's not me.

Page 104

1   Q.   Well, do you see yourself in any of these
2  pictures?
3   A.   1177.
4   Q.   Okay.  If we go to the first picture on
5  1172, are you behind the individual who's picking up
6  the motorcycle?
7   A.   No.
8   Q.   You're not? Where are you at this point?
9   A.   I'm not sure, I might be -- I'm not sure.
10  Q.   That's not your arm there?
11  A.   No.
12  Q.   Who from the medical team responded to
13 Brian's crash?
14  A.   It looks like Scott did.
15  Q.   Did you as well?
16  A.   Yes.
17  Q.   But you're just not sure if you're in this
18 picture?
19  A.   No.
20  Q.   Okay.  Do you know this person picking up
21 the motorcycle?
22  A.   No.
23  Q.   Well, when you first reached Brian after
24 the track had cleared, what did you do?
25  A.   I asked him what hurts, and he said my

Page 105

1  leg.
2   Q.   He verbalized that?
3   A.   Yes.  In English.
4   Q.   And you could hear what he was saying?
5   A.   Yes.
6   Q.   Did you ask him which leg?
7   A.   He said -- he pointed to his left leg.
8   Q.   So he said my leg, and indicated his left
9  leg?
10  A.   Correct.
11  Q.   What did you do to assess his potential
12 injuries?
13  A.   I asked if he was okay to stand to get up
14 and move off of the track, and he nodded yes.
15  Q.   But did you first attempt to assess the
16 nature and extent of the leg injury?
17  A.   No.  Not on the track like that.
18  Q.   Why not?
19  A.   Because it's too fast -- the bikes are
20 coming too fast and you don't have a state -- you're
21 not in a safe environment for the athlete or
22 yourself to do an evaluation right on the track.
23  Q.   Did you ask for the racetrack to be
24 stopped so you could conduct a safe evaluation?
25  A.   No.

Page 110

1   A.  Yes.
2   Q.  Is that Scott Combs?
3   A.  I believe so, yes.
4   Q.  Do you know if he used a response code?
5   A.  I do not know.
6   Q.  Were you communicating with Mr. Combs at
7   any point while you were on the track?
8   A.  I do not recall.
9   Q.  Is this -- over the course of your career
10  as an athletic trainer, how many crashes have you
11  responded to where a rider ended up with a spinal
12  cord injury?
13  A.  None.
14  Q.  It's a relatively rare event, right?
15  A.  Right.
16  Q.  It's the only time it's happened, right?
17  A.  In my career, yes.
18  Q.  And you don't remember the specifics of
19  this unique circumstance?
20  A.  I don't know what we talked about.
21  Q.  If we go to Page 1175 in Exhibit 15, can
22  you see yourself in this photograph?
23  A.  I can.
24  Q.  What are you doing in this photograph?
25  A.  Asking the rider if he's okay.

Page 111

1   Q.  Did you hear him screaming?
2   A.  No.
3   Q.  Did you hear him saying don't touch me,
4   don't move me, anything like that?
5   A.  No.
6   Q.  Did you hear him saying I'm paralyzed?
7   A.  No.
8   Q.  But you were able to hear what he was
9   saying?
10  A.  Yes.
11  Q.  Even though you had, it looks like, your
12  headset over your ear?
13  A.  Correct.
14  Q.  As a certified athletic trainer, are you
15  trained to conduct a primary and then secondary
16  assessment?
17  A.  Yes.  But -- yes.
18  Q.  And what is a primary assessment?
19  A.  Head, neck, airway, circulation,
20  breathing.
21  Q.  Did you conduct a primary assessment on
22  Brian on the track?
23  A.  Yes.  He was talking to us and moving.
24  Q.  But you didn't see his legs moving, did
25  you?

Page 112

1   A.  No.  But his arms were moving.
2   Q.  According to you, he reported a left leg
3   injury, right?
4   A.  Correct.
5   Q.  But you didn't see his legs moving, right?
6   A.  Correct.
7   Q.  Did that alarm you?
8   A.  No.
9   Q.  Why not?
10  A.  Because it was a left leg injury.
11  Q.  And how are you trained to respond to --
12  well, strike that.
13      What was the extent of the left leg
14  injury?
15  A.  I wasn't sure.  I wanted to get him back
16  to the mule and out to the medical unit to assess it
17  more.
18  Q.  If you weren't sure of the extent of the
19  left leg injury, why did you proceed with the
20  rescue?
21  A.  Because the rider in our team was not safe
22  in the middle of the track and we needed to move
23  him, and we felt that he could move fine to go off
24  the track to get in the mule.
25      THE VIDEOGRAPHER:  Please stand by.  The

Page 113

1   time is 12:19 and we are going off the record.
2       (WHEREUPON, a recess was taken.)
3       THE VIDEOGRAPHER:  The time is 12:23 and
4   we're going back on the record.
5   BY MR. SCHWEIKERT:
6   Q.  When you said he was in danger, was that
7   because of the oncoming motorcycles?
8   A.  Correct.
9   Q.  At that point in time where you feel that
10  the scene is unsafe, did you do anything to try to
11  stop the racetrack?
12  A.  No.  Because --
13  Q.  Why not?
14  A.  -- it was a left leg injury and we knew we
15  could move him.
16  Q.  What specifically led you to believe that
17  you could move him safely off the track?
18  A.  We asked him if he could stand on his leg,
19  and he said he could, and he helped -- we moved him
20  off the track.
21  Q.  Who asked him if he could stand on his
22  leg?
23  A.  I did.
24  Q.  When did you ask him that?
25  A.  Probably when I got there.  I asked him

Page 130

1  to get him to the mule, so I did not see that.
2  BY MR. SCHWEIKERT:
3      Q.   The paramedic in the white shirt, he's
4  grabbing Brian's left leg, right?
5      A.   Correct.
6      Q.   Why would he grab his left leg if that was
7  the injured extremity?
8      A.   To help lift it up onto the mule.
9      Q.   It could have been a seriously injured
10 left leg, right?
11     A.   True.
12     Q.   You don't want to move a leg that's broken
13 like that, do you?
14          MR. DOYLE: Object to the form.
15          THE DEPONENT: No.  You do not want to move
16 a broken leg, but this was not a broken leg.
17 BY MR. SCHWEIKERT:
18     Q.   As we sit here today, do you know what
19 type of injury he experienced?
20     A.   I do now, yes.
21     Q.   And what is that?
22     A.   Wasn't it a C7-T1 injury?
23     Q.   Paralysis, right?
24     A.   Correct.
25     Q.   But you had already done your C-spine

Page 131

1  assessment of him prior to this point?
2          MR. DOYLE: Object to the form.
3          THE DEPONENT: I had looked and seen that
4  he had a left leg injury, and that's what he pointed
5  to, and at this point I didn't have any other
6  information to go by.
7  BY MR. SCHWEIKERT:
8      Q.   Did you try to obtain other information to
9  go by?
10     A.   Not when we were trying to put him in the
11 mule, no.
12     Q.   Did you ask this paramedic in the white
13 shirt to help move Brian?
14     A.   No.
15     Q.   He just came over on his own?
16     A.   Yes.  They do that.
17     Q.   I see you're wearing a fanny pack.
18     A.   Uh-huh.
19     Q.   What equipment do you have in there?
20     A.   I had gloves, SAM Splint, scissors,
21 anything for nosebleeds, and an inject.  I had an
22 inject in my pocket -- in my fanny pack.
23     Q.   What's a SAM Splint?
24     A.   SAM Splint is a splint that you put on for
25 a broken arm, leg, or an extremity.  It's about this

Page 132

1  long and flexible so you can mold it around the
2  injury.
3      Q.   At any point during this rescue, did you
4  consider putting the SAM Splint on Brian's left leg
5  injury?
6      A.   No.
7      Q.   Why not?
8      A.   Because it seemed like it was soft tissue
9  versus bone.
10     Q.   How did you arrive at that conclusion?
11     A.   Through my years of medical training.
12     Q.   What specifically, based on your years of
13 medical training, did you see, hear, or feel during
14 the rescue that led you to that conclusion?
15     A.   I felt it and it wasn't broke, so we went
16 ahead and moved him.
17     Q.   You did palpitate his leg?
18     A.   I did.
19     Q.   That was while he was laying on the
20 ground?
21     A.   Yes.
22     Q.   Did you ask him if he could feel your
23 fingers?
24     A.   Yes.
25     Q.   Did he respond?

Page 133

1      A.   No.
2      Q.   So you never received any confirmation
3  whether he could actually feel --
4      A.   Right.  This is in --
5      Q.   Hold on.  You never received any verbal
6  confirmation that he could actually feel you
7  palpitating his left leg; is that right?
8      A.   If I did, I don't remember what that was.
9  I don't recall that.
10     Q.   If a rider can't feel you when your
11 palpitating their extremity, is that a potential
12 sign or symptom of a central nervous system injury?
13     A.   Could be.
14     Q.   What else could it be?
15     A.   Could be the fact that they might have an
16 internal nerve issue.  Could be a lot of things.
17     Q.   And what would you do to make a
18 determination one way or the other?
19     A.   Get him to the mule, get him back to the
20 trailer to assess that situation in full so that we
21 could get the pants off and see where we were with
22 the legs and to see if he had any other injuries to
23 the legs.
24     Q.   You would do that before ruling out a
25 potential injury to the central nervous system?

Page 134

```
 1    A.   No.
 2         THE DEPONENT:  Can I have a break?
 3         MR. SCHWEIKERT:  Sure.
 4         MR. DOYLE:  Sure.
 5         THE DEPONENT:  Can I have a meeting with
 6  you?
 7         THE VIDEOGRAPHER:  The time is 12:50.  We
 8  are going off the record.
 9         (WHEREUPON, a recess was taken.)
10         THE VIDEOGRAPHER:  All right.  The time is
11  12:56 and we are back on the record.
12  BY MR. SCHWEIKERT:
13    Q.   Let's go to Picture Number 1202 of Exhibit
14  15.  Do you see the gentleman wearing an Alpinestars
15  shirt on the left side of the picture?
16    A.   I do.
17    Q.   Do you know who that is?
18    A.   Dr. Kennedye.
19    Q.   Is he -- he's a doctor, you said?  Yes.
20    A.   Yes, he is.
21    Q.   Okay.  Did he assume control over the
22  rescue as the medical supervisor at that point?
23    A.   Yes.
24    Q.   Did you communicate anything to Dr.
25  Kennedye?
```

Page 135

```
 1    A.   That it was a left leg injury and that we
 2  were putting him on the mule and taking him back to
 3  the trailer for assessment.
 4    Q.   Did Dr. Kennedy ask you any questions?
 5    A.   No.
 6    Q.   The -- do you know this gentleman --
 7    A.   I do not.
 8    Q.   -- in the blue shirt?
 9    A.   No.
10         THE REPORTER:  If you can just remember to
11  wait for the question to be fully asked.  Okay?
12  BY MR. SCHWEIKERT:
13    Q.   Do you know the gentleman in the blue
14  shirt?
15    A.   No.
16    Q.   Was he saying anything?
17    A.   I do not recall.
18    Q.   Was anybody saying anything at this moment
19  in time?
20    A.   I do not recall.
21    Q.   Dr. Kennedye appears to be leaning in to
22  get a closer look.  Was he saying anything?
23    A.   I do not recall.
24    Q.   At this point there's now, it looks like,
25  two additional gentlemen who are helping you and Mr.
```

Page 136

```
 1  Combs move Brian towards the mule, right?
 2    A.   Yes.
 3    Q.   Did it occur to you at that point in time
 4  that maybe the injury was more serious because Brian
 5  wasn't able to move his legs on his own?
 6    A.   No.
 7    Q.   Why not?
 8    A.   Because this is seconds.  These are
 9  seconds, so these are very quick.  So no.  I mean,
10  my job is to get him to the mule, get him strapped
11  in.
12    Q.   Was part of your job also ensuring that
13  Brian was stable before any movement of him
14  occurred?
15    A.   Yes.
16    Q.   Does it look like he is stable in these
17  pictures where additional gentlemen are assisting
18  you and Scott Combs in moving his legs?
19         MR. DOYLE:  Object to the form.  Go ahead.
20         THE DEPONENT:  It can be.
21  BY MR. SCHWEIKERT:
22    Q.   But what did you think at that moment in
23  time?
24    A.   That he still had a left leg injury and he
25  was struggling getting up onto the mule, so we had
```

Page 137

```
 1  to help him.
 2    Q.   If we go to Picture 1205.
 3    A.   Uh-huh.
 4    Q.   Looks like at this point Brian's sitting
 5  on the back of the mule, right?
 6    A.   Yes.
 7    Q.   And what are you doing?
 8    A.   I do not know.
 9    Q.   Are you bending down and looking at his
10  left leg?
11    A.   Looks like I am.
12    Q.   Do you remember what you were doing?
13    A.   I do not.
14         MR. GORDON:  Sorry, Mark, I missed that
15  number.  Which page are you looking at?
16         MR. SCHWEIKERT:  1205.
17  BY MR. SCHWEIKERT:
18    Q.   In the next page, 1206, do you know what
19  you were doing?
20    A.   No.
21    Q.   The next page, 1207, you're still bent
22  over, it appears.  Do you know what you're doing?
23    A.   I do not.
24    Q.   Is anybody saying anything at this point
25  in time?
```