# EXHIBIT R



UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

BRIAN MOREAU,

    Plaintiff,

vs.                    CASE NO. 8:22-CV-01295-TPB-CPT

FELD MOTOR SPORTS, INC., et al.,

    Defendants.

_____

VIDEOTAPED DEPOSITION OF

MICHAEL BRIAN PELLETIER

TAKEN ON

TUESDAY, APRIL 1, 2025

10:10 A.M.

AMERICAN MOTORCYCLIST ASSOCIATION

13515 YARMOUTH DRIVE

PICKERINGTON, OHIO 43147



1  move forward?
2          MR. GORDON:  I do.  Thanks.
3          THE REPORTER:  Ms. Nduka, do you agree to
4  move forward?
5          MS. NDUKA:  Yes.
6          THE REPORTER:  Mr. Pelletier, please raise
7  your right hand.  Do you affirm under penalty of
8  perjury that the testimony you're about to give will
9  -- you're about to give will be the truth, the whole
10 truth, and nothing but the truth?
11         THE DEPONENT:  I do.
12         THE REPORTER:  Thank you.
13         You may proceed.
14         MR. SCHWEIKERT:  Thank you. MICHAEL B.
15 PELLETIER, having been first duly affirmed to tell
16 the truth, was examined, and testified as follows:
17 EXAMINATION
18 BY MR. SCHWEIKERT:
19     Q.  **Good morning, sir.**
20     A.  Good morning.
21     Q.  **Could you please state your full legal**
22 **name for the record.**
23     A.  It is Michael Brian Pelletier.
24     Q.  **Okay.  And are you currently employed?**
25     A.  I am.

1  defendants?
2      A.   Not fully.
3      Q.   **Partially?**
4      A.   I'd say not really at all.
5      Q.   **So, you understand him to be alleging that**
6  **the AMA did some things wrong from a flagging and**
7  **operational standpoint, but you're not aware of what**
8  **his claims are with respect to the medical**
9  **defendants.**
10     A.   Correct.
11     Q.   **And that's despite reading the depositions**
12 **of Mr. Gallagher and Mr. Kennedy?**
13     A.   Yes.
14     Q.   **Okay.  Do you believe that Brian's claims**
15 **against the AMA are frivolous?**
16          MS. SPRADLIN:  Object to the form.
17          You can answer --
18          THE DEPONENT:  I can answer?
19          MS. SPRADLIN:  -- to the extent you know.
20          THE DEPONENT:  I believe it is.
21 BY MR. SCHWEIKERT:
22     Q.   **Okay.  Could you explain to me why.**
23     A.   Based off the control of the racetrack,
24 like I did -- I said before.  I believe the AMA
25 operated in a textbook form of how to control that

1  racetrack.
2       Q.   Is Brian still participating in the
3  supercross today?
4       A.   I do not believe he is.
5       Q.   Why not?
6       A.   I believe it's due to injury.
7       Q.   Do you know what injury?
8       A.   I can speculate that I've heard it's a
9  spinal cord injury, but I've not seen that
10 officially.
11      Q.   Okay.  And is it your understanding that
12 that injury was sustained during his participation
13 in the Tampa Supercross in 2020?
14      A.   I believe it was.
15      Q.   Okay.  And with the benefit of that
16 understanding, do you still believe, as you sit here
17 today, that the AMA's response was textbook?
18      A.   I absolutely do.
19           MS. SPRADLIN:  Objection to form.
20           THE DEPONENT:  I'm sorry.
21           MS. SPRADLIN:  No, that's okay.  You can
22 answer.
23           THE DEPONENT:  I absolutely do.
24           MR. GORDON:  And just for the record, just
25 so we have it on once that all objections to form

MICHAEL PELLETIER                April 01, 2025                           98
83433

```
 1       Q.    If we go to Page 17, this is Section 24
 2  under the heading for AMA Publicity and Exposure.
 3  And it reads, "The series logo will be placed
 4  prominently on the chest of the shirt of all Feld
 5  Motor Sports race staff uniforms for the
 6  championship."  Do you see that?
 7       A.    I do.
 8       Q.    Okay.  And do you know who the FMS race
 9  staff are that are being referred to here?
10       A.    I do not.
11       Q.    Let's go to Page 21, please.  There's, at
12  the bottom of the page, the section entitled
13  Credentials.  Do you see that?
14       A.    I do.
15       Q.    And it reads, "Feld Motor sports.  She'll
16  have the exclusive right to create, issue, revoke,
17  and otherwise control all credentials pertaining to
18  security and access at events."  Do you see that?
19       A.    I do.
20       Q.    And is that a true statement?
21       A.    I believe it is.
22       Q.    Is it your understanding that Feld had the
23  exclusive right to create, issue, revoke, and
24  otherwise control all credentials pertaining to
25  security and access at the Tampa Supercross.
```

```
 1      A.   I do.
 2      Q.   Now, I've learned that the AMA also has
 3 its own credential, fair?
 4      A.   Fair.
 5      Q.   All right.  What is the AMA credential?
 6      A.   We credential riders, mechanics, and
 7 officials.
 8      Q.   Okay.  And what does the AMA credential
 9 allow someone to do, once they have it?
10      A.   Gain access to the event.  And then in the
11 rider scenario, compete.
12      Q.   Is the AMA credential printed on a hard
13 card?
14      A.   It is.
15      Q.   Is that hard card created by Feld?
16      A.   They print it for us, yes.
17      Q.   And is that the credential that Feld had
18 the exclusive right to create, issue, revoke, and
19 otherwise control?
20      A.   They would, I would say, do a
21 collaborative effort with us, with the riders,
22 mechanics, and officials.
23      Q.   Did you have a hard card for the 2020
24 season?
25      A.   Yes, sir.
```

1    Q.   Knowing that, and with the benefit of
2  hindsight, do you still believe that the response by
3  the race director was appropriate under those
4  circumstances?
5              MS. SPRADLIN:  Object to the form.
6              THE DEPONENT:  Sitting here today, from an
7  operational standpoint, I do.
8  BY MR. SCHWEIKERT:
9     Q.   You wouldn't change anything, even if you
10 had the chance.
11             MS. SPRADLIN:  Object to the form.
12             THE DEPONENT:  Again, operationally from
13 our side, no.
14 BY MR. SCHWEIKERT:
15    Q.   And that's despite knowing that this young
16 rider had sustained a spinal cord injury?
17             MS. SPRADLIN:  Object to the form.
18             THE DEPONENT:  That's the medical
19 officials to do that.
20 BY MR. SCHWEIKERT:
21    Q.   But I -- I'm asking if you -- strike that.
22             If your race director had been aware in
23 real time that Brian had sustained a spinal cord
24 injury, such that he could not move his legs, would
25 you have wanted him to stop the activity on the

1  track?
2           MS. SPRADLIN:  Object to the form.
3           THE DEPONENT:  I would want --
4           MS. SPRADLIN:  You can answer.
5           THE DEPONENT:  -- I would want to hear
6  from Medical.
7  BY MR. SCHWEIKERT:
8       Q.   Even under those circumstances.
9           MS. SPRADLIN:  Object to the form.
10          THE DEPONENT:  The only way he would know
11 that is from Medical.  BY MR. SCHWEIKERT:
12      Q.   And if they said, we've got a rider here,
13 can't move his legs, would you want the race
14 director to stop the track?
15      A.   That would be from Medical.
16          MS. SPRADLIN:  Object to form.
17 BY MR. SCHWEIKERT:
18      Q.   You would still wait for a specific
19 request from Medical to stop the track.
20          MS. SPRADLIN:  Object to the form.
21          THE DEPONENT:  If they're answering that,
22 I would assume they would want to stop it.  That's
23 an assumption.
24 BY MR. SCHWEIKERT:
25      Q.   So, if we had a time machine and could go

```
 1  back and do it all over again, there's nothing that
 2  you, as the AMA supercross manager, responsible for
 3  maintaining control over the track would have wanted
 4  done differently, even knowing today how badly
 5  injured he was?
 6              MS. SPRADLIN:  Object to form.
 7              THE DEPONENT:  And I would say how do you
 8  explain that, with control of the racetrack, that
 9  situation is under control.
10  BY MR. SCHWEIKERT:
11       Q.   Do you know if the medics believed that
12  the environment was like a car being on fire?
13              MS. SPRADLIN:  Object to the form.
14              THE DEPONENT:  I do -- I do not know that.
15  BY MR. SCHWEIKERT:
16       Q.   Because you never talked to him, right?
17              MS. SPRADLIN:  Object to the form.
18              THE DEPONENT:  I talk to Medical.
19  BY MR. SCHWEIKERT:
20       Q.   Did you ever talk to them after this
21  incident about Brian?
22              MS. SPRADLIN:  Object to form.
23              THE DEPONENT:  I don't remember that.
24   BY MR. SCHWEIKERT:
25       Q.   Did anyone ever tell you that They felt
```