## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

### CASE NO. 8:22-CV-01295-TPB-CPT

BRIAN MOREAU,

        Plaintiff,

vs.

FELD MOTOR SPORTS, INC., *et al.*,

        Defendants.

_____/

### PLAINTIFF'S RESPONSE TO DEFENDANT AMERICAN MOTORCYCLIST ASSOCIATION'S MOTION FOR SUMMARY JUDGMENT [DE 294][1]

Brian Moreau was a rising motocross star from France. In 2019, at age 17, he moved to the United States to join a professional Supercross team, a lifelong dream. The Tampa event on February 15, 2020—just two weeks after his 18th birthday—was supposed to be his Supercross debut, but it turned into a nightmare. On his second lap during his first "free practice" session, after just 2 to 3 minutes on the track,[2] Moreau crashed and fell headfirst onto the middle of the track in the path of oncoming riders.

**A. Moreau Repeatedly Screamed "Don't Touch Me, I'm Paralyzed."** Within ten seconds, two of The Medic Rig's ("**TMR**") crewmembers, Amy Metiva (an experienced Supercross medic) and Scott Combs (a first-time volunteer with no motorsport experience),[3] entered the racetrack to attend to Moreau. Ex. 22, 217:14-16. He repeatedly screamed at them, "don't touch me, I'm paralyzed"—not once, but

---

[1] Attached as Exhibit 1 is a table identifying each specific exhibit cited herein.
[2] Ex. 22, 104:2-3, 196:3.
[3] Ex. 5, 58:2-14, 74:4-18

"five, six times." *Id.* 215:21-217:13. A journalist, Stephan Legrand, standing about 20 feet away, heard him screaming, "I can't feel my legs," and crying for help.[4] Ex. 14, 17:19-19:14, 99:21-100:3; Ex. 15 (Legrand's photos).[5] He had "never heard somebody screaming like Brian did." Ex. 14, 31:5-6. He considered intervening but it was Feld's event, so "it's their responsibility to do . . . what they have to do." *Id.* 23:2-24:3.

**B. The Medics Failed to Listen to or Immobilize Moreau.** Even though the medics did not see Moreau's legs moving, Metiva, who led the on-track rescue, did not consider the possibility of a spinal injury.[6] Instead, within 30 seconds, the medics picked Moreau up by his armpits and dragged him off the track toward a nearby medical mule, which had been driven to the scene by Dr. Kennedye.[7] They then sat him upright on the mule despite him repeatedly telling them, "I cannot get on that. I'm going to fall."[8] They said, "No, we'll hold you," and he said, "My life is over."[9]

**C. Race Officials Ignored Requests to Stop the Practice due to Legit Injury.** During the practice, AMA officials,[10] including Race Director John Gallagher, were

---

[4] When another rider visited Moreau in the hospital the next day, Moreau told him that he had been screaming at the medics not to touch to him while he was on the track. Ex. 10, 28:16-29:7.

[5] Legrand photographed the incident because he "thought something was not right" and he "was witnessing something that was like worth it." Ex. 14, 89:13-24.

[6] Ex. 4, 106:19-107:1; Ex. 5, 103:14-20, 178:14-15.

[7] Ex. 22, 215:21-217:13; **Ex. 38 (close-up slow-motion video of Moreau dragged off track).**

[8] Ex. 23, 359:2-14; **Ex. 39 (close-up slow-motion video of Moreau sat upright on mule).**

[9] Ex. 23, 360:8-10.

[10] The Race Director, Gallagher, reported to AMA Supercross Manager, Mike Pelletier, who was responsible for maintaining ultimate control over race operations and had a radio during the practice. Ex. 16, 108:18-109:1; Ex. 6, 79:22-81:6, 159:21-160:23, 163:23-164:12. Jeff Canfield was the AMA Event Manager or "spotter" located "upstairs" in a "show control booth" with the FMS Show Manager overlooking the track. Ex. 18, 79:19-22, 83:2-14, 85:1-4. Canfield was also on the radio during the practice and had the authority to cause a red flag. Ex. 18, 87:22-88:9; Ex. 16, 93:17-20.

on the AMA operations radio channel (Channel 1) with the medics.[11] Lieutenant Marcus Williams, Jr., a standby ambulance paramedic with Tampa Fire Rescue, had received a radio headset from TMR and was also on that channel.[12] Williams testified that the severity of the incident was immediately apparent on the radio.

Williams heard chatter that, "'Hey, somebody's down,' stopped [sic] the race," and "it was legit." Ex. 7, 87:23-25, 107:15-19. It was "more than just the typical, the guy fell down and get back up." *Id.* 108:18-20. There was immediately a sense that it was a "legit injury" and radio chatter about "stopping the race." *Id.* 108:7-110:2. Williams believed "there was some kind of flag system . . . or they would say something on the PA" but "it was just nothing." *Id.* 108:24-109:2. Dr. Kennedye also recalled chatter about stopping the track, because part of his job is to communicate "<u>with the people running the business, running the show</u>." Ex. 3, 255:5-257:5. But they "try not to stop the event" because of the fans.[13] *Id.* 101:16-102:2.

Gallagher claimed he did not hear anything on the radio, even though chatter is common after a crash, Ex. 16, 198:2-16, and a response code should have been called at least *twice*.[14] Yet, he did not ask a single question about the incident so he could

---

[11] Ex. 16, 171:2-25, 180:21-23; Ex. 2, 135:15-16, 165:24-25.

[12] Ex. 7, 12:11-25, 51:20-53:23; Ex. 2, 61:22-62:6 (paramedics were on radio with medics and officials).

[13] **The Medical Emergency Action Plan—created at FMS's request—was "<u>intended to . . . accelerate the resumption of normal operations at the event[,]</u>" and "<u>allow the ability to clear the area quickly</u>" after an on-track incident.** Ex. 17 at 1; Ex. 2, 114:16-116:13 ("Feld wanted to have some kind of emergency action plan"), 119:3-16, 120:12-121:13; Ex. 43 at 3 (August, 16, 2019, TMR email stating: "We have been *tasked by Feld* to prepare our Disaster and Emergency Protocol.").

[14] Ex. 2, 104:3-107:19, 173:17-20; Ex. 18, 155:13-23. Response codes (or "FIM communication codes") are part of the Medical Emergency Action Plan for how the medics, FMS, and AMA collaborate in responding to a rider injured on a racetrack. *See* Ex. 17 at 3. The response codes (i.e., Code 0, 1, 2, or 3) are derived from the FIM Medical Code and are used to indicate the location and

make an informed decision about whether to stop the practice. Ex. 16, 182:22-183:1. He claimed that no information needed to be conveyed to him to fulfill his role as Race Director. *Id.* 185:12-17. The only information he needed was whether the track was "clear," which it was "after they picked Brian up[.]" *Id.* 185:19-186:3.

**D. The Medics Failed to Immobilize Moreau for 10 to 15 Minutes.** Metiva and Combs rapidly extracted Moreau from the track—without first assessing the nature or extent of his purported generic "left leg injury"—because they felt unsafe with "bikes landing next to us."[15] After sitting Moreau upright on the mule, Dr. Kennedye drove Moreau and Metiva into the stadium tunnel toward the medic rig. While en route, Metiva claimed that Moreau told her for the first time that he could not feel his legs, and that she immediately told Dr. Kennedye, who radioed the Chief Medical Officer, Dr. Bodnar. Ex. 4, 156:16-20, 158:6-19, 159:22-5.

The manager of Moreau's team, Tyler Keefe, arrived at the medic rig 10 to 15 minutes after the crash and was shocked to find Moreau still "sitting in the back of the mule kind of slouched to the side" with "nothing on" to immobilize him.[16] Moreau

---

[15] Ex. 4, 105:13-20, 112:16-22, 174:18-175:3; Ex. 5, 103:25-104:5.

severity of the injury. Ex. 17 at 3; Ex. 2, 104:7-107:19, 137:5-139:3, 273:18-22; Ex. 3, 196:23-199:7; Ex. 16, 180:7-16; Ex. 18, 152:4-153:23. The FIM Medical Code, which applied to the event, even had specific protocols for stopping the track for suspected spinal injuries. Ex. 2, 16:13-16, 108:7-11, 135:23-136:10, 138:2-7. FMS admitted that "[w]e all work together to reduce and mitigate anything that could be harmful or dangerous to anybody on that racetrack." Ex. 12, 44:21-46:7.

[16] Ex. 8, 93:9-12, 100:10-104:10, 111:4-21, 180:20-182:20, 186:13-187:6. Keefe had been in the manager's tower on the interior of the racetrack when Moreau crashed. *Id.* 87:22-5. Keefe had to wait for the practice session to end before he could go to the medic rig, and then had trouble finding it, *id.* 91:18-92:23, which is why he did not arrive until 10 to 15 minutes later, *id.* 111:15-21, 182:17-23, 186:13-17. Mathilde Musquin—who was hosting Moreau in the USA with her husband, former Supercross champion Marvin Musquin—was already at the medic rig when the mule arrived. Ex. 41, 29:14-30:5. She too recalled Brian sitting on the mule, swaying, panicking, and trying to hold himself up. *Id.* 29:14-30:16, 55:18-56:9, 69:22-70:13, 77:5-9, 101:18-24, 104:3-105:5.

said, "TK, I'm fucked, I can't feel my legs." Ex. 8, 93:13-16. Keefe responded, "wait, what do you mean? Why are you sitting up?" *Id.* Dr. Bodnar then said, "we need to get him on a backboard." *Id.* 93:16-17, 103:12-13, 186:18-187:2. Only then—10 to 15 minutes after his crash—did the medics finally immobilize Moreau on a backboard. *Id.* 93:18-25. Williams then applied a cervical collar, Ex. 7, 34:10-25, before the ambulance transported Moreau to the hospital.

**E. The Paperwork Moreau Signed as a 17-Year-Old Minor.** Months before the event, on November 22, 2019, Moreau signed an *AMA Racing Credentials Terms and Conditions* [DE 294-5][17] and a *Minor Release and Waiver of Liability and Indemnity Agreement* and a *Minor's Assumption of Risk Acknowledgement* [DE 294-4] for all events in 2020.[18] Because these two documents were signed on the same day, they are construed as a single contract, *SFR Services, LLC v. Indian Harbor Ins. Co.*, 529 F. Supp. 3d 1285, 1297 (M.D. Fla. 2021), which is referred to as the "**AMA Minor Release**."

On January 2, 2020—while he was still a minor—Moreau also signed a *2019-2020 Adult FMS All-Event Release, Waiver and Indemnity Agreement* ("**FMS Adult Release**"). [DE 294-6]. All these documents are referred to collectively as the "**Releases**."

## LEGAL ARGUMENT

**I. The Releases are unenforceable and, even if they were enforceable, they cannot—as a matter of law—bar claims for recklessness or gross negligence against FMS and AMA, nor any claims whatsoever against TMR or the medics.**

---

[17] The AMA Credential Terms only waive claims against "AMA or any of their respective directors, officers, employees or agents," [DE 294-5 at ¶6], which does not include FMS, TMR, or the medics.
[18] Ex. 24, 143:14-145:16, 151:22-152:8, 156:18-157:1.

AMA contends that Moreau released all claims by signing the pre-injury Releases as a minor because he allegedly ratified them after turning 18 by briefly participating in preliminary activities before his debut Supercross event on February 15, 2020. This contention fails for several independent reasons. First, the Releases were void for violating Florida Statute 549.09—which AMA concedes governs motorsport liability releases—because they were not signed by his parent and were not limited to *ordinary negligence* as required. Second, even if they were merely voidable, material factual disputes exist as to whether Moreau manifested an intent to ratify them, with full knowledge of all the material facts, including their contents, legal consequences, and his right to reject them before the event.

Third, even if the Releases were ratified and enforceable, they cannot—as a matter of law—bar his claims for recklessness or gross negligence against AMA and FMS. Nor can they bar any of his claims against TMR and the medics, who fall outside the categories of parties covered by the statute. Finally, because express assumption of risk only waives risk inherent in a sport, whether the specific risks Moreau encountered— failing to stop the practice, dragging him off the track despite his screams, and delaying immobilization—were inherent or extrinsic to the sport is, at a minimum, a jury issue.

**A. The Releases were void under Florida Statute 549.09—which governs motorsport liability releases—because they were not signed by a parent, had tiny font, and overbroadly released recklessness and gross negligence.**

"The public policy of protecting children from waiver of their litigation rights . . . is a generally applicable contract principle[.]" *Glob. Travel Mktg., Inc. v. Shea*, 908 So.2d 392, 397 (Fla. 2005). Although contracts with minors are generally voidable, a contract

is void if it violates public policy or a valid statute. As courts have long recognized, "'an agreement that is violative of a provision of a constitution or a valid statute . . . is illegal and void.'" *Gables Ins. Recovery, Inc. v. Citizens Prop. Ins. Corp.*, 261 So.3d 613, 624 (Fla. 3d DCA 2018). Courts "have consistently applied this rule to invalidate contracts that violate the law." *Id.* (collecting cases).

Florida Statute 549.09, entitled "Motorsport nonspectator liability release," governs the validity and scope of pre-injury releases by participants in motorsport events like the Supercross. Section 549.09(2) provides:

> Any person who operates a closed-course motorsport facility may require, as a condition of admission to any nonspectator part of such facility, the signing of a liability release form. The persons or entities owning, leasing, or operating the facility or sponsoring or sanctioning the motorsport event shall not be liable to a nonspectator . . . for *negligence* which proximately causes injury . . . within a nonspectator area during the period of time covered by the release.

As the AMA concedes, this statute applies here because the Supercross was a sanctioned "motorsport event" under section 549.10(1)(b), held at a "closed-course motorsport facility" under section 549.09(1)(a). *See* [DE 294] at 14; *see Hager v. Live Nation Motor Sports, Inc.*, 665 F. Supp. 2d 1290, 1294 (S.D. Fla. 2009) (release signed by stunt driver performing at monster truck rally on track temporarily constructed inside football stadium was governed by 549.09).

**Crucially, the statute does *not* permit the release of recklessness or gross negligence.** Section 549.09(1)(e) defines "negligence" as "all forms of negligence, . . . but does *not* include gross negligence, recklessness, or willful and wanton conduct." Courts thus hold that motorsport releases cannot, as a matter of law, bar claims for

recklessness or gross negligence because "the Legislature has explicitly excluded gross negligence from the definition of negligence[.]" *MacGregor v. Daytona Int'l Speedway, LLC*, 263 So. 3d 151, 153 (Fla. 5th DCA 2018) (citing 549.09(1)(e)); *Hager*, 665 F. Supp. 2d at 1294 (same).

If a minor is participating in a motorsports event, the "release *must comply* with the requirements of this section[.]" 549.09(3)(b)(1). The release must: (1) be signed by the minor's "natural guardian," 549.09(1)(g); (2) be "printed in 8 point type or larger," 549.09(3)(a); and (3) exclude claims for recklessness and gross negligence, 549.09(1)(e). Here, the Releases failed to comply with these requirements. First, none were signed by a natural guardian.[19] *See* [DE 294-4, 294-5, 294-6]. Second, the AMA Minor Release was printed in tiny 7-point font. [DE 294-4 at 1, ¶¶1-5]; Ex. 42, Schweikert Decl. ¶¶2-6. Third, all the Releases purported to waive all claims whatsoever—including for recklessness and gross negligence.

In sum, because the Releases violated the governing statute, they were void and could not be ratified as a matter of law. *See Oubre v. Entergy Ops., Inc.*, 522 U.S. 422, 427-28 (1998) (release that failed to comply with requirements of ADEA was unenforceable to bar claim, as courts cannot "presume ratification of that which Congress forbids"); *cf. Dilallo By & Through Dilallo v. Riding Safely, Inc.*, 687 So.2d 353,

---

[19] Only the AMA Minor Release [DE 294-4] was co-signed by Moreau's team manager, Keefe, as his purported legal guardian. Ex. 8, 17:6-18:22, 67:23-69:25. But Keefe was never appointed his legal guardian by any court. *Id.* at 180:5-13. And Keefe was not authorized by Moreau's mother, Lydia Strubhart, to sign documents as his legal guardian. Ex. 9, 41:20-42:7, 79:17-80:3 ("My son is my son. . . . I would not have given that guardianship to somebody else.").

357 (Fla. 4th DCA 1997) ("[A] minor child injured because of a defendant's negligence is not bound by her contractual waiver of her right to file a lawsuit.").

### B. Even if the Releases were merely voidable, material factual disputes exist as to whether Moreau intended to ratify them with "full knowledge of all the material facts," including his right to reject them before the event.

"The two essentials to ratification of contracts made during infancy are (1) an intent to ratify, and (2) an act amounting to ratification with full knowledge of its consequences on the part of the former minor." 25 Fla. Jur. 2d Family Law § 501 (citing *Robertson v. Robertson*, 229 So.2d 642 (Fla. 3d DCA 1969) & *Lee v. Thompson*, 124 Fla. 494 (Fla. 1936)). Yet AMA recycles the same overbroad ratification-by-conduct theory this Court previously rejected in denying its motion to dismiss.

As this Court's Order explained, ratification requires "'conduct that indicates an intention, with full knowledge of the facts, to affirm a contract which the person did not enter into or which is otherwise void or voidable.'" [DE 228] at 5 (quoting *Gibson v. Lynn University, Inc.*, 504 F. Supp. 1335, 1343 (S.D. Fla. Nov. 29, 2020) and citing *Zurstrassen v. Stonier*, 786 So.2d 65, 71 (Fla. 4th DCA 2001)). This Court rejected the argument that Moreau's "mere participation in the event conclusively establishes that he acted 'with full knowledge of all the material facts,'" and that it "was 'an affirmative showing of his . . . express or implied intention to adopt . . . [a contractual release] entered into without authority.'" *Id.* (quoting *Zurstrassen*, 786 So.2d at 71). "Florida case law does not support such a broad application of the doctrine of ratification." *Id.*

As this Court explained, it was unclear "what information was conveyed to

[Moreau] at the time he signed the agreement or when he participated in the event, or what other actions, if any, [Moreau] took in relation to the event." *Id.* at 5-6. Critically, it was also unclear if he "knew he could reject the agreements at any point prior to the Supercross." *Id.* at 6. Without a developed factual record, the Court could not "ascertain whether [Moreau] affirmatively manifested an intent to approve the waiver of liability with 'full knowledge of all the material facts.'" *Id.*

These factual issues persist on summary judgment. When Moreau signed the Releases, he was a 17-year-old French motocross rider with limited English and minimal education. Ex. 21, ¶¶2-5. He stopped physically going to school at age 12 to focus on racing, quit all mandatory online schooling at age 16, and moved to the USA at age 17 to join a professional Supercross team. *Id.* ¶¶3-5. All he wanted to do was race, so he signed whatever paperwork was presented to him. *Id.* ¶5. But he did not read the Releases, and no one explained their contents to him before or after his injury. *Id.* He did not know that the Releases waived significant legal rights, purported to immunize Defendants for their own negligence, or required him to indemnify them.[20] *Id.* And he did not know that he could reject the Releases before the event. *Id.*

Viewing the evidence in Moreau's favor, a jury could find that he never manifested an intent to approve the Releases with "full knowledge of all the material facts," including his right to disaffirm. *See Steel Supplements, Inc. v. Blitz NV, LLC*, 2023 WL 145322, at *11 (M.D. Fla. Jan. 10, 2023) (intent to ratify with knowledge is jury issue).

---

[20] Moreau's sports agent in France, Gerard Valat, testified that releases, waivers, and indemnity provisions are not used in Europe. Ex. 11, at 73:5-17.

### 1. *Constructive knowledge of a contract's contents does not establish ratification even for adults—and cannot be imputed to minors without nullifying public policy.*

AMA argues that *constructive* knowledge of the Releases' contents and significant legal consequences should be imputed to Moreau because "'one who signs a contract is presumed to know its contents.'" [DE 294 at 10]. But this general rule only applies to adults with legal capacity to contract.[21] Even then, "the doctrine of constructive knowledge does not apply to bring about ratification.'" *Frankenmuth Mut. Ins. Co. v. Magaha*, 769 So. 2d 1012, 1022 (Fla. 2000) (citation omitted).

Florida law has long recognized that minors lack capacity to contract and may disaffirm contracts precisely because they may not understand the consequences of what they sign. *See Off the Wall & Gameroom LLC v. Gabbai*, 301 So. 3d 281, 284 (Fla. 4th DCA 2020) ("'The right of an infant to avoid his contract is one conferred by law for his protection against *his own improvidence* and the designs of others[.]'") (quoting *Putnal v. Walker*, 61 Fla. 720, 722 (Fla. 1911)). These protections apply with special force to pre-injury liability waivers. As the Florida Supreme Court has emphasized, "[t]he public policy of protecting children from waiver of their litigation rights . . . is a generally applicable contract principle[.]" *See Glob. Travel*, 908 So. 2d at 397.

Imputing constructive knowledge of a release to a minor who neither read it nor was aware of its contents would eviscerate these longstanding protections. Florida law requires *actual* full knowledge and affirmative intent to ratify a voidable contract.

---

[21] None of AMA's cited cases involved ratification by conduct, let alone by a minor. *See Sutton v. Crane*, 101 So. 2d 823 (Fla. 2d DCA 1958); *Allied Van Lines, Inc. v. Bratton*, 351 So. 2d 344 (Fla. 1977); *Pepple v. Rogers*, 104 Fla. 462 (Fla. 1932).

Constructive knowledge cannot satisfy that burden and, as a matter of law, cannot establish that a former minor intended to approve a release with "full knowledge of all the material facts," including its legal consequences and his right to disaffirm.

### 2. Moreau's limited participation in preliminary activities did not establish an intent to ratify the Releases with full knowledge of all the material facts.

AMA argues that Moreau ratified the Releases by using a credential (an identification card with his name and picture [DE 294-17]) to briefly participate in preliminary activities before the actual event.[22] But this Court has already rejected the notion that mere participation in the event can establish ratification, because "Florida case law does not support such a broad application of the doctrine of ratification." [DE 228 at 5]. As this Court recognized, ratification by conduct required a manifestation of an intent to approve the Releases with "full knowledge of all the material facts," including his right to reject them before the event. *Id.*

AMA's reliance on *Jones v. Dressel*, 623 P.2d 370 (Colo. 1981), is misplaced. First, *Jones* applied Colorado law, which allows ratification based solely on a minor's conduct alone, even without proof of actual intent or knowledge. Colorado law provides that "[a]ffirmance is not merely a matter of intent" and may "be determined by the actions of a minor who accepts the benefits of a contract after reaching the age of majority, or who is silent or acquiesces in the contract for a considerable length of

---

[22] FMS and AMA both claim that the same credential was the consideration for their respective releases. AMA says it was the consideration for its Minor Release in November 2019. [DE 294 at 5]. Yet, FMS says it was the consideration for its Adult Release in January 2020. [DE 292 at 12]. A single credential cannot constitute independent consideration for separate releases, executed months apart with different parties. The lack of valid consideration for the FMS Adult Release also renders it invalid.

time." *Id.* at 374. Florida law requires far more.

Second, the facts of *Jones* are materially different. There, the plaintiff had read the release before signing it as a minor, and even crossed out an alternative provision that would have allowed him to participate in parachute jumping without releasing negligence claims in exchange for a higher fee. *Id.* at 372 & nn.2, 8. He then used the defendant's facilities to *complete* several jumps *over an eleven-month period* before the accident. *Id.* at 372-73 & n.4. The court thus concluded he had ratified the release by continuing to use defendant's facilities on the day of his injury. *Id.* at 374.

Unlike *Jones*, Moreau did *not* read, modify, or understand the complex and significant waiver, release, and indemnity provisions of the Releases he signed as a minor. Ex. 21, ¶5. He was injured within minutes of beginning his first practice session at his debut Supercross event—just two weeks after turning 18. *Id.* ¶9. He never *completed* a single practice, qualifier, or race at any Supercross event. *Id. Jones* is both legally and factually distinguishable and irrelevant under Florida law. At a minimum, genuine disputes of material fact exist as to whether Moreau intended to approve the Releases with "full knowledge of all the material facts," including his right to disaffirm.

### 3. AMA's argument that disaffirmance would be inequitable is untenable.

AMA contends that Moreau ratified the Releases by accepting and retaining their "benefits," and that allowing him to disaffirm would exact a fraud on AMA and FMS and unjustly deprive them of their bargain. But the facts do not support this claim. Moreau crashed on his second lap during a warm-up practice at his debut event and

never participated in any qualifying session or race. Ex. 21, ¶9. Within two days, his team manager cancelled his entries in the 2020 season. Ex. 20. Moreau never used the credential again. Ex. 21, ¶10.

There is also zero evidence that Moreau intended to deceive or defraud anyone. AMA knew he was a minor when he signed the Releases, as his date of birth was expressly disclosed in the AMA Minor Release. *See* [DE 294-4] at 1. FMS likewise knew he was underage when he signed, as reflected in its internal email four days *before* the event stating: "Brian Moreau . . . Just turned Age 18 (1/29/02)[.]" Ex. 25 at 4.

AMA and FMS are sophisticated organizations that conduct professional racing events for elite athletes from around the world. The Supercross is the "Super Bowl" of motocross racing. Ex. 12, 15:16-17. In 2020, each event generated approximately $500,000 in profit. Ex. 13, 59:15-22. They had ample opportunity—and resources—to ensure that a valid release had been signed by Moreau's natural guardian before the event, or to obtain a new release from him after he turned 18. They did neither. Under these circumstances, the notion that AMA and FMS were deceived by a naïve French teenager or unjustly prejudiced to such a degree as to forfeit his legal right to disaffirm the Releases is factually and legally untenable.

### C. Even if the Releases were enforceable, they cannot—as a matter of law—bar Moreau's claims for *recklessness* or *gross negligence* against AMA and FMS, nor any claims whatsoever against TMR and the medics.

As explained above, section 549.09(1)(e) does not permit motorsport releases to waive a participant's claims for recklessness or gross negligence. *See MacGregor*, 263 So. 3d at 153 (motorsport release did not bar claim for gross negligence because "the

14

Legislature has explicitly excluded gross negligence from the definition of negligence")
(citing 549.09(1)(e)); *Hager*, 665 F. Supp. 2d at 1294 (same).

Crucially, the statute only permits liability releases of "[t]he persons or entities
owning, leasing, or operating the facility or sponsoring or sanctioning the motorsport
event," 549.09(2), like AMA and FMS.[23] "Under the statutory construction principle
of *inclusio unius est exclusion alterius* ('the inclusion of one is the exclusion of another'),"
*Moustakis v. City of Fort Lauderdale*, 338 Fed. Appx. 820, 821 (11th Cir. 2009), the
Legislature clearly intended to limit the scope of permissible releases to only those
specifically enumerated parties—thereby excluding TMR and the medics, who did not
operate the facility or sanction the event. Therefore, even if the Releases were
enforceable, they cannot, as a matter of law, bar Moreau's vicarious liability claims
for recklessness and gross negligence against FMS and AMA, nor any claims
whatsoever against TMR and the medics.[24]

### D. Even if the Releases were enforceable, material factual disputes exist as to whether the specific risks Moreau encountered were inherent or extrinsic to the sport of Supercross.

AMA contends that Moreau expressly assumed the risk of "negligent rescue
operations" by signing the Releases. Under Florida law, "express assumption of risk
waives only risks *inherent* in the sport itself." *Ashcroft v. Calder Race Course, Inc.*, 492 So.

---

[23] FMS leased and operated the stadium for the event. Ex. 31, 126:4-127:9. AMA sanctioned the event.
[24] Given the Releases are governed by 549.09, as AMA concedes, its reliance on Kentucky law is misplaced. *See* [DE 294] at 13-14 (citing *Brotherton v. Victory Sports Inc.*, 2013 WL 1311999 (E.D. Ky. Mar. 26, 2013); *Dunn v. Paducah Int'l Raceway*, 599 F. Supp. 612 (W.D. Ky. 1984); *Donegan v. Beech Bend Raceway Park, Inc.*, 894 F.2d 205 (1990)).

2d 1309, 1311 (Fla. 1986). The risks inherent in Supercross, which involves racing motorcycles at high speeds over obstacles, are crashing or colliding with other riders.[25] *See Rosencrans v. Dover Images, Ltd.*, 122 Cal. Rptr. 3d 22, 32 (Cal. Ct. App. 2011) (inherent risks of motocross are crashing and being "struck by other riders whose views are obscured by the blind corners, blind ramps, dust, and/or other riders").

In contrast, the risks of race officials failing to stop the track for an emergency during an untimed practice—and medics dragging a rider off the track without immobilization despite him screaming about paralysis—are *extrinsic* to the Supercross.[26] *See Del Santo v. Bristol Cnty. Stadium, Inc.*, 273 F.2d 605, 608 (1st Cir. 1960) (driver injured during race, when he flipped his car on the track and another driver crashed into his car, did not assume the risk that race would not be stopped in case of emergency); *Classen v. Izquierdo*, 520 N.Y.S.2d 999, 1002 (N.Y. Sup. Ct. 1987) (athletes do not "assume[] the risk of injury from negligent medical care rendered by physicians who have independently contracted to provide medical services to sports participants"); *Hass v. RhodyCo Productions*, 236 Cal. Rptr. 3d 682, 705 (Cal. Ct. App. 2018) (negligent emergency medical care during marathon is a risk extrinsic to sport).

---

[25] Moreau knew that the sport of Supercross was inherently dangerous and that he could crash and get hurt. Ex. 21, ¶17. But he did not know—let alone accept the risk—that the officials would not stop the practice or that the medics would drag him off the track despite him screaming and begging them not to touch or move him. *Id.* ¶¶17-20; Ex. 24, 185:22-186:18, 209:4-211:10.

[26] *See Sanislo v. Give Kids the World, Inc.*, 157 So. 3d 256, 270 (Fla. 2015) ("[A]lthough parties may be alerted to dangers *inherent* in dangerous activities, 'it does not follow that [parties are] aware of, much less intended to accept, any *enhanced* exposure to injury occasioned by the carelessness of the very persons on which [the parties] depend[ ] for [his or her] safety.'") (citation omitted); *Morrison v. MacNamara*, 407 A.2d 555, 567-68 (D.C. 1979) ("[T]he defense [of assumption of risk] has rarely been sustained in actions involving professional negligence. . . . Thus, save for exceptional circumstances, a patient cannot assume the risk of negligent treatment.").

As a former Supercross champion testified, the riders are risking their lives to entertain fans and expect the best possible medical care on the track, including a red flag for bad injuries.[27] Accordingly, even if the Releases were enforceable, this Court should conclude, as a matter of law, that the specific risks Moreau encountered—including failing to stop the practice, dragging him off the track despite his screams of paralysis, and delaying spinal immobilization for 10 to 15 minutes—were *not* an inherent risk of the Supercross. *See Ashcroft*, 492 So. 2d at 1311 (error to instruct jury on assumption of risk because riding a track with a negligently placed exit gap is not an inherent risk of horse racing). Alternatively, whether those specific risks were inherent or extrinsic to the Supercross presents a material factual dispute for the jury. *See McNichol v. S. Florida Trotting Ctr., Inc.*, 44 So.3d 253, 256 (Fla. 4th DCA 2010) (whether placement of two-foot mound blocking access from the track to the infield was inherent risk of horse racing was jury question).

## II. Moreau only seeks to hold AMA vicariously liable for *its own race officials*—not for the persons and entities that are the subject of Section II of its motion.

Moreau's vicarious liability claim against AMA is based *solely* on the conduct of its race officials—specifically, its Supercross Manager (Mike Pelletier), Race Director (John Gallagher), and Event Manager (Jeff Canfield), who were ultimately responsible for monitoring and controlling the racetrack during the practice. Moreau identified

---

[27] Ex. 10, 57:12-16, 63:18-66:11. FMS's executive, Prater, agreed that riders should receive the best possible medical care when injured on a track. Ex. 13, 18-22.

these officials in his interrogatory answers, as AMA acknowledges.[28] [DE 294 at 16].

However, AMA's motion omits any argument that it cannot be held liable for its own race officials. *See id.* at 16-23. Instead, AMA seeks summary judgment *solely* on whether it can be held vicariously liable for: (1) any person associated with FMS or TMR; (2) the FMS or TMR entities themselves; and (3) the "Individual Defendants" (aka the medics, Dr. Bodnar, Dr. Kennedye, Metiva, and Combs). *Id.* at 17.

Moreau stipulates that he is not pursuing vicarious liability claims against AMA for the conduct of these specific individuals or entities. Accordingly, the Court need not address the arguments raised in Section II of AMA's motion. Summary judgment on this issue should be denied.

## III. Material factual disputes preclude summary judgment on punitive damages.

Section 768.72(2)(b) defines gross negligence as conduct "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." As the Florida Supreme Court has explained:

> The character of negligence necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."

*Valladares v. Bank of Am. Corp.*, 197 So.3d 1, 11 (Fla. 2016). "[I]in close cases, the

---

[28] Pelletier was an employee. AMA may be held liable for his conduct under a theory of *respondeat superior* at trial. Gallagher and Canfield were contractors. AMA may be held liable for their conduct under actual or apparent agency theories, or the inherently dangerous activities doctrine.

question of whether conduct amounts to gross negligence is a question that should be left to the jury." *Hager*, 665 F. Supp. 2d at 1294 (applying Florida law).

Here, a jury could find that AMA officials were grossly negligent. When Moreau crashed, Race Director Gallagher, Supercross Manager Pelletier, and Event Manager Canfield were on the radio with trackside officials and the medics, including Lieutenant Williams, a local standby ambulance paramedic.[29] Williams testified there was immediately a sense on the radio of a "legit injury" and chatter about "stopping the race."[30] He recalled hearing, "'Hey, somebody's down,' stopped [sic] the race."[31] Dr. Kennedye also recalled radio chatter about stopping the track, because part of his job is to communicate "<u>with the people running the business, running the show[,]</u>" but they "try not to stop the event" because of the fans.[32] When the officials failed to stop the practice, the medics rapidly extracted Moreau without first assessing the nature or extent of his purported "left leg injury" because they felt unsafe with "bikes landing next to us."[33]

Although Gallagher claimed he heard nothing on the radio—not even a response code, which should have been called at least *twice*—he did not inquire with anyone whether a red flag was necessary, despite knowing serious injuries, including spinal

---

[29] Ex. 16, 171:2-25, 180:21-23, 197:10-12; Ex. 2, 61:22-62:6, 135:15-16, 165:24-25; Ex. 7, 12:11-25, 51:20-53:23; Ex. 6, 159:21-160:23, 163:23-164:12; Ex. 18, 87:22-88:9.
[30] Ex. 7, 108:7-110:2.
[31] Ex. 7, 87:23-25, 107:15-19.
[32] Ex. 3, 101:16-102:2, 255:5-257:5.
[33] Ex. 4, 105:13-20, 112:16-22; Ex. 5, 103:25-104:5.

trauma, are a risk of the dangerous sport.[34] He testified that the only information he needed was whether the track was "clear," which it was "after they picked Brian up[.]"[35] Even knowing that Moreau was lying on the ground with a catastrophic spinal cord injury, Gallagher still does not know if he would have done anything differently.[36]

A jury could find that Gallagher's disturbingly reckless failure to even investigate radio chatter about "stopping the race" for a "legit injury" constituted a conscious indifference to the life and safety of Moreau. *See Zavras v. Capeway Rovers Motorcycle Club, Inc.*, 687 N.E.2d 1263, 1267 (Mass. App. Ct. 1997) (whether flagger was grossly negligent by failing to wave yellow flag after rider crashed during race, resulting in another motorcycle striking his head, was an issue for the jury).

A jury could also find that AMA knowingly ratified, condoned, or consented to Gallagher's conduct under section 768.72(3)(b). AMA Supercross Manager and corporate representative, Mike Pelletier, admitted that AMA never investigated the incident, never assessed whether protocols were followed, and has done nothing to prevent similar future incidents.[37] To the contrary, Pelletier callously testified that AMA would not have done anything differently—even knowing Moreau had sustained a spinal cord injury on the track—regardless of him screaming that he was paralyzed.[38] Viewing the evidence in his favor, material factual disputes exist as to

---

[34] Ex. 2, 105:5-107:9, 173:17-20; Ex. 18, 155:13-23; Ex. 16, 121:14-17, 180:7-183:1, 208:17-20, 222:13-16.
[35] Ex. 16, 185:12-186:3.
[36] Ex. 16, 220:3-221:15.
[37] Ex. 6, 171:20-172:3, 232:9-235:7, 240:19-241:9.
[38] Ex. 6, 227:22-230:9, 240:4-240:14.

whether Gallagher was grossly negligent, and whether AMA knowingly ratified, condoned, or consented to his conduct.[39]

WHEREFORE, Plaintiff respectfully requests that this Court deny AMA's motion for summary judgment [DE 294].

By: */s/ Mark A. Schweikert*
Mark A. Schweikert (FBN 70555)
mark@schweikertlaw.com
**SCHWEIKERT LAW PLLC**
1111 Brickell Avenue, Suite 1550
Miami, Florida 33131
Office: (305) 999-1906
Mobile: (305) 926-9452
*Lead Counsel for Plaintiff*

*and*

Maria A. Dominguez, Esq. (FBN 0510221)
m.dominguez@dmrpr.com
Juan C. Ramos-Rosado, Esq. (FBN 1002562)
j.ramos@dmrpr.com
Javier F. Micheo Marcial, Esq. (FBN 1009694)
j.micheo@dmrpr.com
**DMR Law LLC**
1430 South Dixie Hwy., Suite 314
Coral Gables, FL 33146
Telephone: 305-548-8666

---

[39] AMA's claim that Moreau lacks "clear and convincing evidence" ignores the jury's prerogative to disbelieve defense witnesses' denials and credit independent witnesses. Neutral observers like Lieutenant Williams, Tyler Keefe, Mathilde Musquin, and Stephan Legrand provide compelling accounts of a chaotic and indifferent response and a failure to act. A jury could reasonably find that this testimony exposes not mere error, but reckless disregard followed by a coordinated effort to conceal it. Clear and convincing evidence doesn't require confession—only credible testimony and a jury willing to see the truth through the fog.

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2025, I electronically filed the foregoing document with the clerk of the court by using the CM/ECF system, which has served a copy upon any counsel of record for any party who is authorized to receive this Court's notice of electronic filing.

By:    */s/ Mark A. Schweikert*
Mark A.  Schweikert, Esq.