UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.: 8:22-CV-01295-TPB-CPT


BRIAN MOREAU,

    Plaintiff,

    -vs-

FELD MOTOR SPORTS, INC., et al.,

    Defendants.

_____/


401 E. Jackson, Suite 2400
Tampa, Florida 33602
-and-
Zoom

Friday, March 7, 2025
10:15 a.m. to 3:25 p.m.


DEPOSITION OF

TODD JENDRO



Taken before Jennifer Cope, Court Reporter, a

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Videotaped Deposition filed

in the above-styled cause.

```
 1                    APPEARANCES:

 2     On Behalf of the Plaintiff:

 3     SCHWEIKERT LAW PLLC

 4     1111 Brickell Avenue, Suite 1550

 5     Miami, Florida 33131-3123

 6     (305) 999-1906

 7     mark@schweikertlaw.com

 8     BY:  MARK A. SCHWEIKERT, ESQUIRE

 9

10     On Behalf of the Defendant:

11     BUCHANAN, INGERSOLL & ROONEY

12     501 Grant Street, Suite 200

13     Pittsburgh, PA 15219

14     (412) 562-3921

15     matthew.pilsner@bipc.com

16     BY:  MATTHEW C. PILSNER, ESQUIRE

17

18     PEARSON DOYLE MOHRE & PASTIS LLP

19     901 North Lake Destiny Road, Suite 305

20     Maitland, Florida 32751

21     (407) 647-0900

22     bnduka@pdmplaw.com

23     BY:  BETHANY W. NDUKA, ESQUIRE

24

25
```

```
 1      PHELPS DUNBAR LLP

 2      100 South Ashley Drive, Suite 2000

 3      Tampa, Florida 33602-5315

 4      (813) 222-7672

 5      Caroline.spradlin@phelps.com

 6      BY:  CAROLINE C. SPRADLIN, ESQUIRE

 7

 8

 9      Also Present:

10      Nathan Neil, VIDEOGRAPHER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         INDEX

 2   TESTIMONY OF TODD JENDRO              PAGE

 3   Direct Examination by Mr. Schweikert   5

 4   Cross-Examination by Mr. Pilsner      121

 5   Redirect Examination by Mr. Schweikert 122

 6   Certificate of Oath                   127

 7   Certificate of Reporter               128

 8

 9                 INDEX OF EXHIBITS

10             PLAINTIFF'S EXHIBITS MARKED

11   NUMBER          DESCRIPTION          PAGE

12   Exhibit 82     Doc from Vaught        22

13   Exhibit 83     USPTO printout         25

14   Exhibit 84     USPTO printout         26

15   Exhibit 85     Screenshot SX logo     35

16   Exhibit 86     Email from Prater      67

17   Exhibit 87     Email chain            82

18   Exhibit 88     Email to Vaught        85

19   Exhibit 89     Email from Doug        94

20   Exhibit 90     Email from Dirk       104

21   Exhibit 91     Email of agenda       108

22   Exhibit 92     Minutes notes         109

23        (Exhibits were retained by Court Reporter.)

24

25
```

```
 1   THEREUPON:

 2          VIDEOGRAPHER:  Good morning.  We are now on

 3     the record.  Today is March 7th, 2025 and the time

 4     is 10:15 a.m.  This is the videotaped deposition of

 5     Todd Jendro to be held in the United States

 6     District Court Middle District Florida Tampa

 7     Division.  Taking in the matter of Brian Moreau v.

 8     Feld Motor Sports, Inc., et al.  My name is Nathan

 9     Neil and I'm your videographer.

10          The court reporter is Jennifer Cope in

11     association of Cogent Legal Services.  Counsel will

12     be reflected on the stenographic record.  Madam

13     Court Reporter, please swear in the witness and you

14     may begin.

15          COURT REPORTER:  Mr. Jendro, if I could have

16     you raise your right hand for me please.

17                         TODD JENDRO,

18          having been first duly sworn and responding,

19      Yes,  was examined and testified as follows:

20          COURT REPORTER:  You can put your hand down

21     now.  Counsel, you can proceed.

22                      DIRECT EXAMINATION

23   BY MR. SCHWEIKERT:

24     Q.   Good morning, sir.  Could you please state

25   your full legal name for the record?
```

```
 1        A.    Sure.  Todd Jendro.

 2        Q.    Have you ever been a plaintiff or a defendant

 3   in a lawsuit?

 4        A.    I've done a deposition before.

 5        Q.    You've done one deposition before, not your

 6   first rodeo.  When was that approximately?

 7        A.    Probably four years ago.

 8              COURT REPORTER:  I'm sorry, could you speak a

 9        little bit louder.

10              MR. PILSNER:  Keep voice up.

11              THE WITNESS:  Maybe four years ago.

12   BY MR. SCHWEIKERT:

13        Q.    And do you recall what that case was about in

14   which you were deposed?

15        A.    That I believe was in regards to some legal

16   matters with the FIM.

17        Q.    As far as you're aware of the lawsuit, who

18   were the parties of that lawsuit as far as you know?

19        A.    I don't have that information.

20        Q.    Okay.  Do you have any better understanding of

21   what those legal matters were that were being litigated

22   with the FIM?

23        A.    It was just in regards to the name of the

24   championship.

25        Q.    Okay.
```

```
 1              MS. NDUKA:  I'm sorry to interrupt.  I don't know
 2         if it's just me.  I can't hear the witness at the
 3         end.  You're kind of trailing off a little bit.  If
 4         you could just keep your voice up that would be
 5         great.  I appreciate it.
 6              MR. PILSNER:  Just speak louder -- they can
 7         hear.
 8              THE WITNESS:  Okay.  Great.
 9    BY MR. SCHWEIKERT:
10         Q.   And just for the record, what is the FIM?
11         A.   FIM is the international sanctioning body.
12         Q.   Sanctioning body for what?
13         A.   For off-road motor sports.  And in our case,
14    at the time it was the sanctioning body for the 450
15    class World Championship.
16         Q.   What did you -- did you do anything to prepare
17    for your deposition today?
18         A.   Yes.
19         Q.   Okay.  I don't want to know anything that you
20    may have discussed with your lawyer, but generally did
21    -- what did you do to prepare?
22         A.   I looked at some documents and some videos.
23         Q.   Okay.  What were the videos?
24         A.   Videos of the incident.
25         Q.   Were they from a distant vantage point or were
```

```
 1   they more close up views?

 2       A.   Both.

 3       Q.   Okay.  Were any of those videos in slow

 4   motion?

 5       A.   I believe so.

 6       Q.   Okay.  And what documents did you review?

 7            MR. PILSNER:  Mark, if you want to ask him

 8       about a specific document, that's fine, but a

 9       question like that, I'm going to object as work

10       product and privilege and instruct him not to

11       answer.

12       Q.   What documents did you review?  I don't want

13   to know any specific information that the attorney may

14   have conveyed to you about a document, but just the

15   actual document.

16       A.   Just generalized emails.

17       Q.   Okay.

18            MR. PILSNER:  Mark, sorry to interrupt.  For

19       the record, can we agree that one objection counts

20       for all?

21            MR. SCHWEIKERT:  Sure.

22            MR. PILSNER:  Okay.  Thank you.

23   BY MR. SCHWEIKERT:

24       Q.   And what was the nature of those emails that

25   you reviewed?
```

```
1       A.    The nature of those emails were just some
2   correspondence that may have had my name on it and such.
3       Q.    Okay.  Did you review any deposition
4   transcripts?
5       A.    No.
6       Q.    Aside from your counsel, did you speak with
7   anyone else in preparing to testify today?
8       A.    (No verbal response.)
9       Q.    Was that a no?
10      A.    That's a no.  Sorry.
11      Q.    Okay.  And I'll give you just some general
12  guidelines.  I imagine your lawyers have gone over them
13  with you, but this is a formal court proceeding.  The
14  attorneys, we're officers of the court, and I would ask
15  that we conduct ourselves just as if we were in the
16  courtroom, even though the judge and jury's not present.
17      A.    Right.
18      Q.    We have a court reporter literally
19  transcribing every single word that's being spoken.  So
20  I would ask that you answer your questions verbally.  If
21  you want to say yes, please say yes.  If you want to say
22  no, please say no as opposed to uh-huh or uh-uh as we
23  sometimes do in normal conversations.  Does that make
24  sense?
25      A.    Makes sense.
```

1     Q.    Okay.  And also, just so the transcript is clean,

2  if you could give me a moment to complete my question

3  before you answer, and I will certainly do the same to

4  make sure we're not speaking over each other; is that

5  fair?

6     A.    Makes sense.

7     Q.    And your counsel told me you may need some

8  breaks and I'm happy to accommodate you if needed.  I

9  would just ask that we not break in the middle of a

10  question; is that fair?

11     A.    Understood.

12     Q.    Okay.  And as you may have seen, your lawyer

13  may object to my questions.  I would ask that you answer

14  the questions unless he specifically directs you not to

15  answer.  You understand?

16     A.    Understand.

17     Q.    Okay.  Where are you from, sir?

18     A.    Lakewood Ranch, Florida.

19     Q.    Is that in this area?

20     A.    It's by Sarasota.

21     Q.    Okay.  And what do you currently do for a

22  living?

23     A.    I am vice president of Monster Jam for Feld

24  Motor Sports.

25     Q.    Okay.  And how long have you been in that

```
 1   position?
 2        A.   I have been in this current position for just
 3   about five years.
 4        Q.   Do you recall approximately when you assumed
 5   that particular role?
 6        A.   In my timeline, in 2020, let's see, 2014,
 7   2016-ish, I transitioned from overseeing the two-wheel
 8   properties into also overseeing our four-wheel
 9   properties in about 2016.  And then that transition
10   through 2021, taking on Monster Jam franchise completely
11   and whole at that point in time.
12        Q.   Okay.  I think I've seen references to your
13   position as the vice president of motorsports.  Is that
14   your title as well?
15        A.   No.
16        Q.   Have you ever held that title?
17        A.   No.
18        Q.   Okay.  So if your LinkedIn profile says that
19   you are the vice president of motorsports, that's not
20   accurate?
21        A.   No.  Depending on when that was or what it is.
22   There was a point in time when I was vice president of
23   two operations, which encompassed Supercross,
24   Arenacross, and Freestyle Motorcross.  And then there
25   was a point in time where it encompassed the two-wheel
```

```
 1   stuff, which is Supercross and Monster Jam.

 2        Q.   Okay.  As of February, 2020, what was your

 3   position?

 4        A.   Vice president.  I oversaw the operations for

 5   Supercross and Monster Jam.

 6        Q.   And in that particular position, what were

 7   your general responsibilities?

 8        A.   So the responsibilities we're dividing the two

 9   first, which is Supercross, where there's 17 events.

10   Monster Jam has an excess of 400.  We've got five

11   domestic tours and one international tour.  So our goal

12   and our job responsibilities and role as the operations

13   team is to load into the stadiums, go over the AstroTurf

14   fields, conduct the racetrack with -- working with Dirt

15   Works, building out the pit party, working with all the

16   other departments.  And then pretty much same thing for

17   Monster Jam, but just on a different level and different

18   scale.

19        Q.   And what did you do in particular in assisting

20   those responsibilities?

21             MR. PILSNER:  Objection to form.  You can

22        answer.

23             THE WITNESS:  I oversee a bunch of talented

24        people who execute the live events, both Supercross

25        and Monster Jam.  So there's, you know, there was
```

```
 1          five domestic tours out on the road.  There is a lot

 2          of people out there executing those Monster Jam

 3          events just as there is Supercross from week to

 4          week.

 5   BY MR. SCHWEIKERT:

 6          Q.   Okay.  Do you recall as of February, 2020 who

 7   you were overseeing in connection with the Supercross

 8   events?

 9          A.   Yes.  The team under me?

10          Q.   Yes.

11          A.   Dave Prater and Mike Muye and Bill Heras.

12          Q.   Okay.  And who is Dave Prater?

13          A.   Dave Prater at the time was senior director of

14   operations for Supercross.

15          Q.   Okay.  And Mr. Muye?

16          A.   He would've been director of operations.

17          Q.   For Supercross?

18          A.   Mm-hmm (affirmative).

19          Q.   Is that a yes?

20          A.   Yes.

21          Q.   Okay.  And Bill Heras, who's that gentleman?

22          A.   Bill would be -- if I remember the title

23   right, he would've been the tour manager.

24          Q.   Okay.  And as far as you are aware, what were

25   the responsibilities of Mr. Heras in serving as the tour
```

```
 1    manager for Supercross?

 2        A.   Bill's primary responsibilities boots on the

 3    ground first and last out type of guy.  So he's there on

 4    the import of the dirt and the track construction phase

 5    with Dirt Works, and building out the pit party.

 6        Q.   Anything else?

 7        A.   There's probably a long list.  I don't

 8    remember.

 9        Q.   Did you attend the Supercross event in Tampa

10    in February of 2020?

11        A.   I did.

12        Q.   Okay.  And we'll certainly talk a little bit

13    more about that later.  I just wanted to know if you

14    happened to have been there.  Okay.  When did you first

15    begin working with Feld Motor Sports?

16        A.   Feld Motor Sports acquired a company I was

17    with in 2008.

18        Q.   And what company was that.

19        A.   Live Nation Motorsports.

20        Q.   Okay.  And what role were you in with Live

21    Nation at the time that it was acquired by Feld Motor

22    Sports?

23        A.   I probably was senior director of operations.

24        Q.   Okay.  And how long had you been working with

25    Live Nation?
```

```
 1        A.    There's a long timeline to unravel of that, but

 2   probably two years.

 3        Q.    Okay.  I'm not looking for a dissertation, but

 4   let's maybe talk a little bit about you and your career.

 5   It's my understanding you're a former rider; is that

 6   correct?

 7        A.    Yes.

 8        Q.    Professional rider?

 9        A.    I ride for fun right now.

10        Q.    Did you ever ride professionally?

11        A.    I have had a professional license.  And while

12   I've ridden some pro-am events, I've never made it to

13   the big time.

14        Q.    And by big time, you're referring to what?

15        A.    The Supercross and Motocross.

16        Q.    Is it fair to say that the Supercross is the

17   Super Bowl of Motocross?

18        A.    That's fair to say.

19        Q.    Okay.  And what were the pro-am events that

20   you're referring to?

21        A.    Like Motocross events.

22        Q.    What's the approximate time range of your

23   career as a rider?

24        A.    1982 to '89.  And then some more maybe in

25   1994.
```

 1        Q.    You had a little hiatus there, five years.

 2        A.    Injuries

 3        Q.    You ever had any serious injuries?

 4        A.    No.

 5        Q.    What is the worst injury that you've

 6   experienced while participating in a Motocross type of

 7   event?

 8        A.    Some broken bones.

 9        Q.    What bones?

10        A.    Hands, wrist, and a femur.

11        Q.    Okay.  That's the worst type of injury that

12   you've experienced?

13        A.    Yes.

14        Q.    Okay.  Were you affiliated with a particular

15   team during your career?

16        A.    No.

17        Q.    How was it done back then?

18        A.    Just what they call privateer riding and

19   racing on your own money.

20        Q.    Okay.  And after you last competed, I believe

21   in 1994, what did you do next with your career?

22        A.    I applied for a job at SRO Motorsports in

23   Lombard, Illinois.  They were partial producers of

24   Supercross and Monster Jam at the time.  And I got a job

25   as an event manager or what today is known as a tour

```
 1    manager, for Monster Jam.  And that was in 1995.

 2        Q.   Okay.  And what is Monster Jam for those that

 3    don't know?

 4        A.   Monster Jam franchise is the big monster

 5    trucks, Grave Digger, El Toro Loco, Megalodon, those

 6    trucks.  We produce those events all over the world.

 7    There's a very robust licensing program.

 8        Q.   Does Feld Motor Sports own the Monster Jam?

 9        A.   Yes.

10        Q.   Does Feld Motor Sports own the Supercross?

11        A.   Yes.

12        Q.   Does Feld Motor Sports promote and operate

13    Supercross events?

14        A.   Yes.

15        Q.   And was that true with respect to calendar

16    year of 2020?

17        A.   Yes.

18        Q.   What happened after you were working as an

19    event manager for the Monster Jam in terms of your

20    career progression?

21        A.   I had a passion for dirt bikes on Supercross.

22    And I shared that passion internally, and I got a job

23    working as the director of Supercross in 1997.

24        Q.   Was that with Live Nation or someone else?

25        A.   At that time, that would've been PACE
```

```
 1    Entertainment.
 2         Q.   Okay.  And what was the next step in your
 3    career?
 4         A.   Next step in my career would've been, we got
 5    acquired by SFX and Clear Channel throughout those next
 6    years.  And my role remained the same for a while,
 7    director of Supercross, and then eventually I became
 8    senior director of operations, and oversaw all of the
 9    two-wheel properties, what I referred to as Arenacross,
10    Freestyle Motocross, and Supercross earlier.  And then I
11    transitioned into vice president somewhere around that
12    2012 to '14 time period.
13         Q.   Okay.  And as far as you know, in terms of the
14    ownership of the Supercross, who did Live Nation acquire
15    it from?
16         A.   Live Nation acquired it from, again, going
17    back in my timeline, either Clear Channel or SFX at the
18    time, Live Nation.
19         Q.   Okay.  And then from Live Nation to Feld Motor
20    Sports?
21         A.   Feld Motor Sports, yes.
22         Q.   Okay.  And when you started with Feld Motor
23    Sports after the acquisition, remind me what your title
24    was?
25         A.   In '08?
```

```
 1        Q.    Yes.
 2        A.    Yeah, in 2008 I was -- I believe I was senior
 3   director of operations.
 4        Q.    And what were your responsibilities as a
 5   senior director of operations at that time?
 6        A.    Kind of the same duties as what I'm doing now,
 7   just on a different level.  Working with the ops team,
 8   working with the AMA, working with the medic unit
 9   people, working with Dirt Works, working with all the
10   teams it takes to produce and put on a live event.
11        Q.    And what do you mean by ops team?
12        A.    Feld operations team, which comprised of Dave
13   Prater, Mike Muye, Bill Heras, and back then a few other
14   additional people.  I probably couldn't even name or
15   remember.  Are responsible for executing all these
16   functions to bring those events together live in person
17   for the people that attend.
18        Q.    Do you recall who you were reporting to in
19   2020?
20        A.    In 2020, I was reporting to J. Vaught, who was
21   our senior vice president of touring operations.
22        Q.    Is he still with Feld Motor Sports?
23        A.    He is still with the company.
24        Q.    And who do you report to at present?
25        A.    Currently today?
```

```
 1        Q.    Yes.

 2        A.    Steve Yaros, our president.

 3        Q.    Steve Yaros is the president of Feld Motor

 4   Sports?

 5        A.    Steve Yaros is the president of Feld

 6   Entertainment.

 7        Q.    Okay.  Is Feld Motor Sports a subsidiary of

 8   Feld Entertainment Inc.?

 9        A.    If that's -- I think that's an accurate

10   representation of the parent company Feld Entertainment.

11        Q.    Yes?

12        A.    Yes.

13        Q.    Do you know if it's a wholly owned subsidiary

14   or if there's other shareholders?

15        A.    I do not know.

16        Q.    Do you consider yourself an employee of Feld

17   Motor Sports or Feld Entertainment Inc.?

18        A.    Feld Motor Sports.

19        Q.    And why is that?

20        A.    Because everything I do and produce and work

21   on is all motorsports related.  It has been from the

22   beginning of time.

23        Q.    Okay.  I've seen some emails and I know you

24   reviewed some, looks like your signature is Feld

25   Entertainment Inc.; is that fair?
```

```
 1        A.    I don't know what you're looking at, but --

 2        Q.    You don't know what your email signature says?

 3        A.    It probably has all of the properties on it,

 4   and it probably has -- my email says Feld Inc. on it,

 5   right?  Tjendro@feldinc.com.

 6        Q.    And why is it a Feld Inc. email?

 7        A.    I can't answer that.  I don't know.

 8        Q.    Do you get a W-2 from Feld Motor Sports?

 9        A.    I think it's Feld Entertainment.

10        Q.    Have you ever received a W-2 from Feld Motor

11   Sports?

12        A.    Again, I don't think I've ever looked, but I

13   think it's Feld Entertainment.

14        Q.    Okay.  Who do you believe are employees of

15   Feld Motor Sports?

16             MR. PILSNER:  Objection to form.  You can

17        answer.

18             THE WITNESS:  I am one of those.  Dave Prater

19        is one of those.  Mike Muye is one of those.  Bill

20        Heras is one of those.  And that's what I believe.

21   BY MR. SCHWEIKERT:

22        Q.    But when you file your federal taxes, you

23   report that you receive income from Feld Entertainment,

24   Inc., correct?

25        A.    Correct.
```

```
 1            MR. SCHWEIKERT:  Just give me one second.  Just
 2        while we're on the topic, I'll show you a document
 3        I will mark as Exhibit 82.
 4            (Thereupon, Plaintiff's Exhibit 82 was marked
 5    for identification.)
 6            COURT REPORTER:  You said 82?
 7            MR. SCHWEIKERT:  Eighty two (82).  Yes, ma'am.
 8        Bates labeled FMS Inc. 1027 through 1029.  There
 9        you go.
10            MR. PILSNER:  You have a copy for us, Mark?
11            MR. SCHWEIKERT:  Yes.
12            MR. PILSNER:  Thank you.
13    BY MR. SCHWEIKERT:
14        Q.   You're welcome.  Just take a moment if you
15    could review the document I've marked as Exhibit 82 and
16    let me know if you've seen it before.
17            MS. SPRADLIN:  Share that on the Teams meeting
18        so that Bethany and I are able to see it.
19            MR. SCHWEIKERT:  I mean, it'd be a lot easier
20        if you guys were here.  I wasn't quite prepared to
21        double share exhibits.  Can you find it based on
22        the Bates number?
23            MS. SPRADLIN:  Will you repeat the Bates for
24        me?
25            MR. SCHWEIKERT:  Yeah.  And look, I'll try to
```

1        find it, but it's making me do double duty here.  It's

2        1027 -- let me see if I can share it.  This one.

3            MS. SPRADLIN:  Thank you, Mark.

4    BY MR. SCHWEIKERT:

5        Q.   You're welcome.  All right.  Do you recognize

6    Exhibit 82, sir?

7        A.   Yes.

8        Q.   And what is it?

9        A.   It's a document from me to J. Vaught letting

10   him know how our meeting was going between the AMA and

11   the FIM.  Yes.

12       Q.   And if I could direct your attention to your

13   email signature on the second and third page.  Do you

14   see that under your name Todd Jendro it says, vice

15   president of operations motorsports?

16       A.   Mm-hmm (affirmative).

17       Q.   Is that a yes?

18       A.   Yes.

19       Q.   And it's your testimony that that is not, or

20   was not your title at the time of this email?

21       A.   If it's on paper and I sent it, it must be,

22   yes.

23       Q.   Okay.  So it's fair to say that as of 2020,

24   you were the vice president of operations motorsports?

25       A.   Right.  Which included two-wheel and four-

```
 1   wheel, yes.

 2        Q.   Understood.

 3        A.   And I thought I had mentioned that earlier.

 4        Q.   Understood.

 5        A.   Okay.

 6        Q.   And then below that it says Feld Entertainment

 7   Inc.; do you see that?

 8        A.   Yes.

 9        Q.   Is that a yes?

10        A.   Yes.

11        Q.   So is it fair to say that at the time of this

12   email you were the vice president of operations

13   motorsports for Feld Entertainment Inc?

14             MR. PILSNER:  Objection to form.

15             THE WITNESS:  No.

16   BY MR. SCHWEIKERT:

17        Q.   Why not?

18        A.   Because that is probably just a blank template

19   for use for lots of people to use on their emails.

20   That's all I know.

21        Q.   And if we go to the last page of the exhibit,

22   there are some logos there.  You take a look, please.

23        A.   Yes.

24        Q.   Do you see a Feld Entertainment logo?

25        A.   Yes.
```

```
 1        Q.   And that was part of your email signature at the
 2   time of this email?
 3        A.   Yes.
 4        Q.   Okay.  Do you see any logo for Feld Motor
 5   Sports?
 6        A.   I do not.
 7        Q.   You can set that aside.  We might talk about
 8   substance a little bit later, but just wanted to ask you
 9   about that.  Are you familiar with -- strike that.
10        Does Feld have any logos for the Supercross?
11             MR. PILSNER:  Objection to form.
12             THE WITNESS:  Can you restate that?
13   BY MR. SCHWEIKERT:
14        Q.   Sure.  Does Feld Motor Sports have any logos
15   for the Supercross?
16        A.   Feld Motor Sports itself have a logo, is that
17   what you're asking?
18        Q.   For Supercross.
19        A.   For Supercross.  There is one logo for Feld
20   Motor Sports.
21             MR. SCHWEIKERT:  Let me see.  I'm going to
22        hand you document I will mark as Exhibit 83.
23             (Thereupon, Plaintiff's Exhibit 83 was marked
24   for identification.)
25   BY MR. SCHWEIKERT:
```

```
 1        Q.   Before I do so, do you know if Feld Motor Sports

 2   has any trademarks related to the Supercross?

 3        A.   I do not know.

 4        Q.   Okay.  Who would know?

 5             MR. PILSNER:  Objection to form.

 6             THE WITNESS:  Steve Payne.  Who -- and I don't

 7        know his specific title.  He handles a lot of the

 8        trademark-related stuff within the company.

 9   BY MR. SCHWEIKERT:

10        Q.   All right.  I will hand you a document I've

11   marked as Exhibit 83.  Copy for Counsel.  And I will

12   represent, this is a printout from the USPTO office

13   regarding a trademark for SX, which you can see sort of

14   on the right-hand side of the page.  Do you see that?

15        A.   Yes.

16        Q.   Have you seen that SX logo before?

17        A.   Yes.

18        Q.   Do you know if that is a logo of Feld Motor

19   Sports?

20        A.   It is a logo of Feld Motor Sports.

21        Q.   Is it a trademark of Feld Motor Sports?

22        A.   I don't know that.

23             MR. SCHWEIKERT:  I'm going to hand you another

24        document.  I will mark as Exhibit 84.

25             (Thereupon, Plaintiff's Exhibit 84 was marked
```

```
 1    for identification.)

 2    BY MR. SCHWEIKERT:

 3        Q.   And I'll represent, this is another printout

 4    from the USPTO office.  Do you see --

 5            MR. PILSNER:  Can I get an extra copy?

 6        Q.   Sure.  Do you see the SX Supercross logo on

 7    the exhibit?

 8        A.   I do.

 9        Q.   Is that a logo of Feld Motor Sports?

10        A.   Yes.

11        Q.   Is it a trademark of Feld Motor Sports?

12        A.   I do not know.

13        Q.   Okay.  Were the logos depicted in Exhibits 83

14    and 84 used by Feld Motor Sports during the 2020

15    Supercross season?

16        A.   That I don't remember.

17        Q.   You're not aware of whether there were any SX

18    or Supercross logos anywhere within the stadium or on

19    the uniforms of people working the Tampa Supercross

20    event?

21            MR. PILSNER:  Objection to form.

22            THE WITNESS:  I probably attended more than

23        400 Supercross in my time, and I probably don't

24        remember if it was any of these on that particular

25        year or date.
```

 1    BY MR. SCHWEIKERT:

 2         Q.    Okay.

 3         A.    That's all.

 4         Q.    I'm happy to show you some pictures to refresh

 5    your recollection.  Just give me a moment.

 6         A.    No problem.

 7         Q.    Thank you for bearing with me.  Are you

 8    familiar with how credentialing was done for the

 9    Supercross events in 2020?

10         A.    No.

11         Q.    You're not aware of how the people on the ops

12    team or with the AMA were given access to the stadium

13    for the Tampa Supercross?

14         A.    What I can say is a generalized purpose.  Do I

15    know what a credential board is?  Yes.  Do I know the

16    specifics of where each one of those credentials go and

17    who makes them?  Is not part of my role or

18    responsibilities.  It's a little further down the chain.

19         Q.    I'm going to show you a document previously

20    marked as Exhibit 3, which I believe you identified

21    before I showed it to you as a credential board; is that

22    correct?

23         A.    That's accurate.

24         Q.    Okay.  And do you see in the upper left-hand

25    corner it says Tampa Supercross, Tampa, Florida,

```
 1   February 15th, 2020?

 2        A.   I do.

 3        Q.   Is it your understanding that this is a

 4   credential board for the Tampa Supercross in 2020?

 5        A.   It appears to be, yes.

 6        Q.   Okay.  And do you know who produces the

 7   credentials?

 8        A.   The operations team.

 9        Q.   Is that the Feld operations team?

10        A.   Feld operations team does the credentials and

11   the credential board, yes.

12        Q.   And a credential is needed -- strike that.

13        A credential was needed in order to access and work

14   the Supercross event, right?

15        A.   Yes.

16        Q.   Okay.  And do you see on the credential board,

17   for example, under industry credentials, there is the SX

18   logo we were talking about?

19        A.   I do see it.

20        Q.   Okay.  Is it your understanding that that SX

21   logo was on the industry credentials for the Tampa

22   Supercross?

23             MR. PILSNER:  Objection to form.

24             THE WITNESS:  It appears to be, yes.

25   BY MR. SCHWEIKERT:
```

```
 1      Q.   Okay.  And also on that same credential, you can
 2   see the Supercross logo at the top, correct?
 3      A.   Correct.
 4      Q.   Do you recall seeing those types of logos on
 5   the finish line or starting gate during the event?
 6           MR. PILSNER:  Objection to form.
 7           THE WITNESS:  Which logo are you referring to?
 8   BY MR. SCHWEIKERT:
 9      Q.   The Supercross logo.
10           MR. PILSNER:  Objection to form.
11           THE WITNESS:  This one?
12   BY MR. SCHWEIKERT:
13      Q.   Yes.
14      A.   Yes.  It is.
15      Q.   It was on the finish line and starting gate?
16      A.   In different areas, yes.
17      Q.   Do you know if the SX or Supercross logos were
18   also part of the broadcast of the main event on NBC on
19   February 15th, 2020?
20      A.   I don't know that.
21      Q.   Okay.  You don't know if that logo pops up
22   literally every 15 minutes or so during the broadcast?
23      A.   Yeah.  It may have.  I don't know specifically
24   in the timeline if it did then.
25      Q.   All right.  I can help you refresh your
```

```
 1   recollection.  We can do that a little later.  Okay.  Do

 2   you know if -- strike that.

 3      Did Feld have any employees working the Supercross

 4   event in Tampa aside from Dave Prater, Mike Muye, Bill

 5   Heras?

 6            MR. PILSNER:  Objection to form.

 7            THE WITNESS:  There would've been quite a few

 8      people working there under the Feld Motor Sports.

 9      But who they all were and -- I couldn't tell you.

10   BY MR. SCHWEIKERT:

11      Q.   Okay.  And when you say quite a few, what's

12   your best approximation of the number?

13      A.   That depends if you're talking about employees

14   of the company or if you're talking about independent

15   contractors or who --

16      Q.   Let's break it down.  Let's do employees

17   first.  Approximately how many?

18      A.   At any given time at a Supercross, there could

19   be at least 20 employees.  And then the rest of those 50

20   or 60 people on top of that could be independent

21   contractors or work for hire or whatever.

22      Q.   And the approximate 20 employees were with

23   Feld Motor Sports or Feld Entertainment?

24      A.   They would've been with Feld Motor Sports.

25      Q.   And at that time in February, 2020, what sort
```

 1    of roles were those additional folks serving in connection

 2    with the Supercross?

 3         A.    Well, the people that work underneath Dave

 4    Prater, Mike Muye, and Bill Heras is a -- I don't have

 5    all of their titles and their roles, but they -- they're

 6    operations team.  They hang banners, they erect the pit

 7    party areas, they work with our global partners to build

 8    out the pit party and the layouts and bring in all their

 9    rigs.  They work with the AMA, placement of the rigs

10    inside the pit party.  They work with a whole bunch of

11    different things operationally.

12         Q.    Did they hang banners with any of Feld Motor

13    Sports Supercross logos in the stadium?

14         A.    Just Supercross logos, not anything with Feld

15    Motor Sports or Feld Entertainment ever.

16         Q.    It's your testimony that you've never seen a

17    Feld Motor Sports logo in a stadium where a Supercross

18    event is being conducted?

19         A.    No.

20         Q.    I don't have a printout of this, but it is a

21    screenshot.  Maybe I can just show you the video.  Give

22    me one second.  And I'm going to show you -- I'll put it

23    up on the screen.  This is a video previously marked

24    Exhibit 55 Bates labeled FMS Inc. 710, footage from the

25    Glendale, Arizona Supercross event on January 25th,

```
 1    2020.  All right.  Push play.
 2              (Video was played.)
 3    BY MR. SCHWEIKERT:
 4         Q.   You see where my cursor is?
 5         A.   I see it.  I stand corrected, if that's
 6    accurate.
 7         Q.   Does this video depict a Feld Motor Sports
 8    logo within the stadium at this particular event?
 9         A.   That is accurate.
10         Q.   And then there's another example here of that
11    Feld Motor Sports Supercross logo, right?
12         A.   Correct, yes.
13         Q.   And you can actually see Feld Motor Sports
14    again over here on the right, correct?
15         A.   I can't see that really well, but I'm assuming
16    that's accurate.
17         Q.   Okay.  What would you call these gray-type
18    tarps?  Is there a name for them?
19         A.   Safety holds.
20         Q.   Safety holds.  Are these -- were these safety
21    holds used at every Supercross event during the 2020
22    season?
23         A.   We have safety holds at every event.
24         Q.   Are they different safety holds for the
25    events, or is it the same ones?
```

```
 1        A.    They're different.
 2        Q.    For each of the 17 events during the 2020
 3   Supercross season, you had different safety holds?
 4        A.    Yes, we have different safety holds.  We go
 5   through -- each track has unique characteristics that
 6   warrant adding or removing extra safety holds.
 7        Q.    Okay.
 8              (Video was played.)
 9   BY MR. SCHWEIKERT:
10        Q.    I'm now at the 19 second mark.  Do you see
11   supercrosslive.com on this -- on the video?
12        A.    I do.
13        Q.    Do you know what that is?
14        A.    Yes.  That is our website.
15        Q.    That's a Feld Motor Sports website?
16        A.    I believe.
17        Q.    Okay.  And on this particular screen, you can
18   see the Supercross logo at least in three different
19   places, four, five, six, right?
20        A.    That's accurate.
21        Q.    Okay.  Have you ever watched a televised
22   Supercross event?
23        A.    I have.
24        Q.    Let me show you a screenshot I took from a
25   video Bates labeled FMS Inc. 790, which I believe is
```

```
 1    footage of Tampa Supercross Main Event.

 2              MR. PILSNER:  Are you marking this, Mark?

 3              MR. SCHWEIKERT:  I can, yeah.  So that would

 4       be 85.  Let me just save that for myself before I

 5       lose track.

 6              (Thereupon, Plaintiff's Exhibit 85 was marked

 7    for identification.)

 8    BY MR. SCHWEIKERT:

 9       Q.   All right.  Do you see this screenshot on your

10    screen?

11       A.   I do.

12       Q.   It's got the SX logo and the Supercross logo,

13    right?

14       A.   That's accurate.

15       Q.   Okay.

16              MR. PILSNER:  Mark, for the record, what

17       minute mark or second mark from the video did you

18       send this from?

19              MR. SCHWEIKERT:  You know what?  I can try to

20       show you the video.  I think it's at 2:50.  That

21       video's not downloaded, so I'll have to come back

22       to that.  But I believe it's at the two minute 52nd

23       mark on FMS Inc. 790, which was Part 1 of the Tampa

24       Supercross.

25              MR. PILSNER:  Thank you.
```

```
 1   BY MR. SCHWEIKERT:

 2       Q.   Do you know if any of Feld Motor Sports' logos

 3   were imposed on any uniforms worn by the medical team

 4   working the event?

 5            MR. PILSNER:  Objection to form.

 6            THE WITNESS:  There may have, I do I remember

 7       what year or when?  I don't.

 8   BY MR. SCHWEIKERT:

 9       Q.   I will show you a document previously marked

10   as Exhibit 29.  You can probably put this one on the

11   screen as well.  And I will represent to you this is

12   pictures of a uniform produced by defendant Amy Metiva

13   in this case.  Do you see that Exhibit 29 on the screen,

14   sir?

15       A.   I do.

16       Q.   Okay.  And do you see the Feld Entertainment

17   logo on the right sleeve of the jacket on Page 1?

18       A.   I do.

19       Q.   If we go to the second page of the exhibit,

20   let's skip past it.  We go to the third page.  There is

21   a collared shirt that's produced -- strike that.

22       On the third page, it's a picture of a collar shirt

23   produced by Ms. Metiva.  Do you see that?

24       A.   Oh, the back page.

25       Q.   I'm sorry?
```

```
1        A.    Third page.

2        Q.    Yes.

3        A.    Yes, I see it.

4        Q.    And do you see the Feld Entertainment logo on

5   the sleeve of that shirt?

6        A.    I do.

7        Q.    And if we go to the last page, it's the back

8   of the shirt, you see where it says medical team?

9        A.    Yes.

10       Q.    And if you go above that on the back of the

11  collar, there is an SX logo.  You see that?

12       A.    I do, yes.

13       Q.    Do you have any understanding as to why --

14  strike that.

15       Do you know who Amy Metiva is?

16       A.    I do.  I don't know her exact role.

17       Q.    Are you aware that she was one of the medics

18  that responded to Brian Moreau's crash?

19       A.    I did not know that until discovery.

20       Q.    I'm sorry?

21       A.    I did not know that until I looked at the

22  videos.

23            MR. PILSNER:  I will just caution the witness

24      not to disclose anything that we may have told him.

25       Q.    Okay.  And I don't want to know that.  I guess
```

1    I'm confused.  Did you have a understanding of who she was

2    before you may have got information through counsel?

3         A.   I didn't know who, because I wasn't there at

4    the time who attended to Brian during his accident.

5         Q.   But you were at the Tampa Supercross in 2020,

6    right?

7         A.   I was, but not until later in the day.

8         Q.   Okay.  What time did you arrive?

9         A.   I probably arrived after 3:30.

10        Q.   Do you have any understanding as to why a

11   uniform worn by one of the medics during the Tampa

12   Supercross had a Feld Entertainment logo on its sleeve

13   and the Feld Motor Sports SX logo on the back of the

14   collar?

15        A.   I can only say that the Feld Entertainment is

16   the parent company of ours.  Is sometimes utilized

17   inaccurately and sometimes is given or grabbed.  I don't

18   know if the medic team produced these on their own and

19   assumed that, or if we actually sent them that at work.

20   I have no idea.

21        Q.   What do you mean sometimes used inaccurately?

22        A.   Well, because Feld Entertainment is the parent

23   company of Feld Motor Sports.  So people that don't

24   understand the difference could have been confused of

25   which logo probably should have been on that day, on

 1    that shirt.

 2        Q.   Okay.  And you personally aren't aware of

 3    whether Feld Motor Sports or Feld Entertainment Inc.

 4    actually provided the logo to the medical team for their

 5    uniforms?

 6        A.   I wouldn't know.

 7        Q.   Okay.  Do you know if the -- strike that.

 8        Are you aware of whether the AMA had officials that

 9    were working the Tampa Supercross in 2020?

10        A.   That's the end of your question?

11        Q.   Yeah.  Just are you generally aware -- I'm

12    trying not to put words in your mouth.  I imagine, you

13    know, a lot of things, but for purposes of a legal

14    proceeding, I need to establish a basis.

15        A.   Okay.  I thought there was more to your

16    question.  I'm sorry.  Can you repeat that then?

17        Q.   Sure.  Do you know if the AMA had any

18    officials that were working the Supercross event in

19    Tampa in 2020?

20        A.   Yes.

21        Q.   Okay.  Do you know if those officials wore

22    uniforms that bore any of Feld Motor Sports logos on

23    them?

24        A.   I don't recall.  And I don't know.  But I'm

25    assuming you're going to show me.

```
 1        Q.   I can.
 2        A.   I don't get into this level of detail.  I'm
 3   sorry.
 4        Q.   Lucky you, man.  Yeah.  I'll show you one just
 5   briefly.  All right.  This is a document previously
 6   marked as Exhibit 77 Bates labeled AMA 1704.  This is a
 7   picture of a uniform by the A MA that was produced in
 8   this lawsuit by the AMA.  Have you ever seen a uniform
 9   like this?
10        A.   I have seen a shirt like that.
11        Q.   When do you recall seeing it?
12        A.   I have seen that on some of the AMA officials.
13        Q.   Do you recall seeing that during the 2020
14   season?
15        A.   I don't recall.
16        Q.   Do you see how on the left breast area of the
17   shirt there is the Supercross logo?
18        A.   There is, yes.
19        Q.   Okay.  Do you have any reason to believe that
20   this uniform depicted in this exhibit was not worn by
21   AMA officials during the Tampa Supercross?
22             MR. PILSNER:  Objection to form.
23             THE WITNESS:  I would not know.
24             MS. SPRADLIN:  It's just a bit tough as Ms.
25        Nduka pointed out earlier to hear you on some of
```

```
 1        that.  If you'll just keep your volume up and sorry
 2        for interrupting.
 3              THE WITNESS:  Will do.
 4              MS. SPRADLIN:  Thank you.
 5              MR. SCHWEIKERT:  I would propose a little
 6        break.  We got a little sidetracked.  And I could
 7        use the restroom.  You okay with that?
 8              THE WITNESS:  Yeah, I could.  Yes.  Agreed.
 9              MR. SCHWEIKERT:  Can we take ten minutes?
10              MR. PILSNER:  Sure.
11              MR. SCHWEIKERT:  Just so I can get a little
12        more organized.
13              MR. PILSNER:  Need longer than that?
14              VIDEOGRAPHER:  We are going off the video
15        record.  The time is 11:14 a.m.
16              (Off the record.)
17              (On the record.)
18              VIDEOGRAPHER:  We are now back on the record.
19        The time is 11:34 a.m.
20   BY MR. SCHWEIKERT:
21        Q.   Okay.  Do you know what Road to Recovery is?
22        A.   I do.
23        Q.   And what is that?
24        A.   It's a 501(c)(3) non-for-profit organization
25        to help injured riders.
```

1      Q.   Do you currently serve on its board of directors?

2      A.   I do not.

3      Q.   Did you previously?

4      A.   I did.

5      Q.   When approximately were you on the board?

6      A.   I don't know the years of length, but probably

7   more than 15 years.

8      Q.   Wow.  When did you stop serving?

9      A.   When I transitioned fully over to Monster Jam

10   in 2021.

11      Q.   Okay.  But you were on the board of directors

12   for Road to Recovery during the 2020 Supercross season?

13      A.   Correct.

14      Q.   They still have you on the website.

15      A.   Yeah.

16      Q.   Don't worry.  It's very flattering photos.

17   All right.  And what does Road to Recovery do or what

18   did it do during the 2020 Supercross season?

19      A.   I don't know if I can recall all the details

20   of the 2020 season or 2018 seasons or any of the

21   seasons, but the role of Road to Recovery is to generate

22   funds and work towards providing injured riders with

23   equipment or resources or money to help offset some of

24   their costs for their injuries.

25      Q.   Is it fair to say that there are a lot of

1   injuries that occur to riders participating in Supercross

2   events?

3        A.   Supercross is inherently dangerous.  There are

4   a lot of fall downs that happen.  Luckily there are not

5   a lot of catastrophic injuries.

6        Q.   And why is Supercross inherently dangerous?

7        A.   With any motorsports and where dirt bikes are

8   jumping on dirt and mounds and there's a lot of riders

9   next to them, there could be accidents.

10       Q.   Is it dangerous to any person that is on the

11  floor of the stadium during a Supercross event?

12       A.   Yes.

13       Q.   Would you agree then that it is inherently

14  dangerous for a medical professional to provide care to

15  an injured rider on an active racetrack?

16            MR. PILSNER:  Objection to form.

17            THE WITNESS:  I'm not a medical expert.  I

18       don't go on the track and do that.

19  BY MR. SCHWEIKERT:

20       Q.   Was it dangerous for someone to have to run

21  onto an active racetrack?

22       A.   I would say yes, it could be.

23       Q.   And why could it be?

24       A.   Because there are oncoming motorcycles, and if

25  the area isn't controlled, somebody could get hit.

```
 1        Q.    And seriously injured, right?

 2        A.    Potentially.

 3        Q.    So given the inherent dangers of Supercross,

 4   what does Feld do, if anything, to manage the risk of

 5   injuries to riders?

 6              MR. PILSNER:  Objection to form

 7              THE WITNESS:  Each year we work with the AMA

 8         and with Dirt Works to provide feedback and

 9         information throughout the season or the course of

10         years of what racetracks work, which racetracks

11         might not work, which ones provide lots of parity

12         in racing.  And all that stuff is analyzed and we

13         look back.

14   BY MR. SCHWEIKERT:

15        Q.   Do you believe that during the 2020 Supercross

16   season, Feld had any responsibility for the safety of

17   the riders?

18              MR. PILSNER:  Objection To form.

19              THE WITNESS:  Can you restate that?

20   BY MR. SCHWEIKERT:

21        Q.   Do you believe that during the 2020 Supercross

22   season, Feld had responsibility for the safety of the

23   riders?

24              MR. PILSNER:  Same objection.

25              THE WITNESS:  I'm not sure how to answer that
```

```
 1          question, but the roles are divided where there is
 2          what Feld does as race operation conducting the
 3          live event, there is the AMA who are the
 4          officiating part of it.  They run the event, right?
 5          And then there is Dirt Works who builds the
 6          racetrack.  We all work together to minimize risks
 7          and anything inherent to people on the floor or
 8          riders on the thing is not our goal to have injured
 9          riders.  They're the stars of the show.  So --
10   BY MR. SCHWEIKERT:
11          Q.   So it is a -- strike that.
12          It was a goal of Feld Motor Sports during the 2020
13   Supercross season to protect riders from injuries,
14   right?
15          A.   One of them.
16          Q.   So it was also Feld's responsibility to
17   implement measures to protect against the risk of
18   injuries to riders during that season, right?
19              MR. PILSNER:  Objection to form.
20              THE WITNESS:  When it comes to riders and
21          specifically the AMA is that their role as their
22          advocate is working with the riders on that
23          information and doing that -- keeping them safe.
24   BY MR. SCHWEIKERT:
25          Q.   Okay.  So is it your testimony then that Feld
```

```
 1    did not have any responsibility to implement measures

 2    during the 2020 Supercross season to protect riders?

 3            MR. PILSNER:  Objection to form.

 4            THE WITNESS:  I'm not sure I track that

 5        question, but we all work together to reduce and

 6        mitigate anything that could be harmful or

 7        dangerous to anybody on that racetrack.  Yes.

 8    BY MR. SCHWEIKERT:

 9        Q.    Does Feld have a risk and safety department?

10        A.    Yes.

11        Q.    Did it have one during the 2020 supercross

12    season?

13        A.    Yes.

14        Q.    Did the risk and safety department serve any

15    function in connection with the Supercross at that time?

16        A.    The on-site Supercross safety person who I

17    don't believe -- I believe at the time was -- I don't

18    know his name, works with all of the departments on-

19    site, including The Medic Rig including the AMA,

20    including Dirt Works, including our own personnel,

21    employees and partners or sponsors, on-site to -- and

22    that's a multitude of things.  From forklift safety down

23    to ingress, egress areas, safety holds, everything.

24        Q.    Do you have any idea of who that person may

25    have been at the Tampa Supercross?
```

```
 1        A.   I believe his name was Phil, but I don't know for
 2   sure.
 3        Q.   Does Phil Penn ring a bell?
 4        A.   Yes.
 5        Q.   And you refer to him as the on-site safety
 6   person; is that correct?
 7        A.   For Supercross.
 8        Q.   And as far as you are aware, what were his
 9   responsibilities with respect to keeping the riders safe
10   while the racetrack was active?
11        A.   That's not my area of responsibility, but the
12   ultimate goal again is to make sure everybody is
13   complying within safety, whether it's forklifts and
14   whether it's ingress or egress or whether it's the --
15   where people can and can't go.  And he also works with
16   the flaggers.
17        Q.   I've heard reference to a track safety
18   supervisor.  Are you familiar with that title?
19        A.   No.
20        Q.   I've heard reference to a Feld safety
21   coordinator.  Is that who you're referring to?
22        A.   I'm not quite sure the exact title or role it
23   was.
24        Q.   Have you ever heard of an eye in the sky?
25        A.   I have heard of that term.
```

```
 1        Q.    And what does that term mean to you?
 2        A.    That term is an area that is in an operational
 3   booth at the top of the stadium where a member of Feld
 4   and the AMA and a few other people are there to
 5   communicate, work together within their own environment.
 6   So --
 7        Q.    And was that --
 8        A.    -- in order to conduct a live event, everybody
 9   is communicating together.
10        Q.    And was that true with respect to the Tampa
11   Supercross in 2020?
12        A.    I was not there to go in the room to know if
13   there was -- if that existed.
14        Q.    So you have no idea whether there was any sort
15   of safety coordination going on during the Tampa
16   Supercross; is that your testimony?
17        A.    I would say that it is consistent from week to
18   week that the team of people that are put in place, that
19   that would be there, yes.
20        Q.    And do you have a more specific recollection
21   of the team of people that would've been involved in
22   performing that function during the Tampa Supercross in
23   2020?
24        A.    I don't.
25        Q.    Does Feld have a risk management officer for
```

```
 1   the Supercross?

 2        A.    That, no.  The risk person is -- was Phil for

 3   Supercross.

 4        Q.    Okay.  Do you know if anyone at Feld Motor

 5   Sports was involved in preparing medical protocols that

 6   were in effect during the February, 2020 Supercross in

 7   Tampa?

 8        A.    Absolutely not.

 9        Q.    Why not?

10        A.    Because that's not our area of expertise.

11        Q.    But it is Feld Motor Sports' event, correct?

12        A.    We contract an expert to provide services.

13        Q.    Okay.  And are you saying that Feld Motor

14   Sports does nothing to make sure that those individuals

15   who are contracts with provide services up to a standard

16   that is acceptable to Feld?

17             MR. PILSNER:  Objection to form.

18             THE WITNESS:  Well, I don't get into that

19        level, but I would imagine yes, there is the

20        expertise that is done by the medic unit and what

21        they provide is what their recommendation is as

22        experts given what we're asking them to do.

23   BY MR. SCHWEIKERT:

24        Q.    And what are you asking them to do?

25        A.    We're asking them -- the riders are paramount
```

```
 1   importance to the race teams, to Feld Motor Sports to
 2   partners.  That providing superior care to them and
 3   paying for that and getting the best surgeons and people
 4   that you can in a mobile medic unit position and paying
 5   for that is super important to the company.  Versus
 6   hiring them and having EMTs locally, which is
 7   unacceptable.  This is -- they provide a fantastic job.
 8   They've done a great job for many years and they're the
 9   experts.  I can't pretend to be an expert.
10        Q.   Did Feld do anything to ensure that the
11   medical team that was working at Tampa Supercross in
12   2020 met the standard that you just described?
13             MR. PILSNER:  Objection to form.
14             THE WITNESS:  Again, that's something I get
15        involved in.
16   BY MR. SCHWEIKERT:
17        Q.   Who would be involved in that from Feld side,
18   if anyone?  Just Phil,
19        A.   If anybody has correspondence with the medic
20   unit would be the operations team.
21        Q.   And the operations team consisted of Mr.
22   Prater and Mr. Muye, Mr. Heras, and yourself?
23        A.   Very rarely me.
24        Q.   Anyone else outside of those individuals that
25   may have collaborated with the medical team?
```

 1       A.    No, not to my knowledge.

 2       Q.    Okay.  Do you know if Phil Penn works for Feld

 3  Motor Sports?

 4       A.    I do not.

 5       Q.    Do you go to like an office every day in

 6  performing your job?

 7       A.    I do.

 8       Q.    And is that at the Feld Entertainment

 9  headquarters in Palmetto?

10       A.    Yes.

11       Q.    Does Phil Penn work there as far as you know?

12       A.    No.

13       Q.    And you don't know if he's an employee of

14  Feld; is that right?

15       A.    I do not.

16       Q.    Do you know if Feld Motor Sports or Feld

17  Entertainment ever asked Dr. Bodnar or his team at The

18  Medic Rig to prepare written protocols that apply to the

19  2020 Supercross season?

20            MR. PILSNER:  Objection to form.

21            THE WITNESS:  That I do not know or recall.

22  BY MR. SCHWEIKERT:

23       Q.    Who would know?

24       A.    I'm assuming again, the operations team.

25       Q.    Do you know a gentleman by the name of Rico

 1    Hawks (phonetic)?

 2         A.    Yes.

 3         Q.    Who is he?

 4         A.    Former employee.

 5         Q.    Was he employed during the 2020 Supercross

 6    season?

 7         A.    I don't recall which years.

 8         Q.    I know it's been a long time.  I understand

 9    that.  Okay.  Do you recall generally what function he

10    served when he was with Feld?

11         A.    Yes.  He had a role where he oversaw a lot of

12    the risk and safety for all of our motorsports events.

13    So he wasn't specifically assigned to one touring unit,

14    but multiple events that he would go and perform

15    evaluations, and walk around and make sure that

16    everybody was, you know, doing their role and keeping

17    things safe.

18         Q.    So Feld Motor Sports did oversee risk and

19    safety at the Tampa Supercross, correct?

20              MR. PILSNER:  Objection to form.

21              THE WITNESS:  Ultimately, yes.

22    BY MR. SCHWEIKERT:

23         Q.    But it's your testimony that despite

24    overseeing risk and safety at the Event Feld did nothing

25    to ensure that sufficient protocols were established by

```
 1    the medical team that it contracted to provide care to

 2    riders?

 3         A.   That's outside of my scope.

 4         Q.   Why is it outside of your scope?

 5         A.   Can you repeat the question then?

 6              MR. SCHWEIKERT:  Madam Court Reporter, can you

 7         help me with that?  Can you read it back?

 8              COURT REPORTER:  Yeah.  Give me one quick

 9         second.

10              (Thereupon, the reporter read the record as

11    requested.)

12    BY MR. SCHWEIKERT:

13         Q.   Okay.  Well, we can agree, I think as you

14    said, that Feld was ultimately responsible for risk and

15    safety at the event, right?  Yes?

16         A.   Yes.

17         Q.   That includes keeping the rider safe, right?

18              MR. PILSNER:  Objection to form.

19              THE WITNESS:  A partial function of that, yes.

20    BY MR. SCHWEIKERT:

21         Q.    Is it your testimony, which may be in the

22    public record that Feld is not interested in protecting

23    rider safety?

24              MR. PILSNER:  Objection to form.

25              THE WITNESS:  No, we are interested in
```

```
 1        protecting them, but we are not the piece that does
 2        that.  We work with the other entities that do do
 3        that, which is the AMA.  They are the ones that
 4        control the racetrack.
 5   BY MR. SCHWEIKERT:
 6        Q.    So you're essentially saying that Feld
 7   delegates these functions and then has a hands-off
 8   approach and does nothing to ensure that those functions
 9   are actually performed in an adequate manner?
10             MR. PILSNER:  Objection to form.
11             THE WITNESS:  I would say no.  The -- what if
12        you look back at those notes at the season ending,
13        it does indicate that we do do that season, mid-
14        season, and end of season reviews of things that
15        happened throughout the course of the season to
16        ensure things are good, to make sure that each one
17        of those areas are being met, whether it's rider
18        safety or whether it's motorcycle issues or
19        whatever.  We work with those particular partners.
20   BY MR. SCHWEIKERT:
21        Q.    Are you aware that The Medic Rig developed a
22   medical emergency action plan, which states in part that
23   it's intended to accelerate the resumption of normal
24   operations at the events?
25        A.    What do you mean by that?
```

 1        Q.    Are you aware of that?

 2        A.    I have read that.

 3        Q.    When did you read that?

 4        A.    In the -- the Alpinestar Medic Unit thing, did

 5    their piece of paper that was in the documents.

 6        Q.    In connection with preparing for the

 7    deposition, you reviewed that?

 8              MR. PILSNER:  Can I just caution the witness

 9         not to disclose anything that he may have learned

10         from counsel.

11        Q.    Had you seen that written protocol before you

12    reviewed it in connection with preparing?

13        A.    I see a lot of things, so I'm not sure exactly

14    which thing you're completely referring to, but I

15    vaguely may remember something like that.

16        Q.    Do you know why The Medic Rig's written

17    protocol would have some emphasis on accelerating the

18    resumption of the events in providing medical care to

19    injured riders?

20        A.    I do not.

21        Q.    Is that not something that Feld Motor Sports

22    asked it to do?

23              MR. PILSNER:  Objection to form.

24              THE WITNESS:  I do not know.

25    BY MR. SCHWEIKERT:

```
 1        Q.   Who would know?

 2             MR. PILSNER:  Objection to form.

 3             THE WITNESS:  I don't know.

 4   BY MR. SCHWEIKERT:

 5        Q.   So Feld is ultimately responsible for risk and

 6   safety, yet it had no involvement in actually the

 7   preparation of the protocols that governed how injured

 8   riders were taken care of during its events; is that

 9   your testimony?

10             MR. PILSNER:  Objection to form.

11             THE WITNESS:  What I'm saying is that I

12        haven't been completely part of all of those

13        conversations, so whatever you're referring to

14        might not have included me.  That's all.

15   BY MR. SCHWEIKERT:

16        Q.   Who as far as you know, would've been part of

17   those conversations?

18        A.   The operations team.

19        Q.   Anyone else?

20        A.   No.

21        Q.   Did you talk to Dave Prater in connection with

22   this deposition?

23        A.   No.

24        Q.   Why not?

25        A.   Why would I?
```

 1     Q.   Why not?

 2     A.   Because you can't.

 3     Q.   Does he know that you're being deposed today?

 4     A.   I believe he does.

 5     Q.   Why do you believe that?

 6     A.   Because we -- our offices are near each other.

 7     Q.   Did you tell him you were being deposed today?

 8     A.   Heading downtown for a deposition.

 9     Q.   Did he say anything?

10     A.   No.  He did not.

11     Q.   Didn't even wish you well?

12     A.   No.

13     Q.   You said earlier I believe that catastrophic

14  injuries are relatively rare at Supercross events,

15  right?

16     A.   Yes.

17     Q.   And you're aware that my client, Brian Moreau

18  is paralyzed as a result of his participation in the

19  Tampa event, right?

20     A.   Yes.

21     Q.   Is that a catastrophic injury to you?

22     A.   Yes.

23     Q.   Has Feld ever been involved in any other

24  litigation regarding catastrophic injuries to riders

25  during Supercross events?

```
 1                    MR. PILSNER:  Objection to form.

 2                    THE WITNESS:  Not to my knowledge.  I don't

 3        have that info.

 4    BY MR. SCHWEIKERT:

 5        Q.    Okay.  So you would agree then that this is a

 6    relatively significant event for Feld Motor Sports being

 7    sued by a rider who was paralyzed at one of its events,

 8    right?

 9                    MR. PILSNER:  Objection to form.

10                    THE WITNESS:  Yes.

11    BY MR. SCHWEIKERT:

12        Q.    And you haven't had any discussions with Mr.

13    Prater outside the presence of counsel about this case

14    or Brian Moreau?

15        A.    Correct.

16        Q.    Why not?

17        A.    Why would I?

18        Q.    Do you not care about Brian Moreau?

19                    MR. PILSNER:  Objection to form.

20                    THE WITNESS:  No, I don't believe you can talk

21        about that stuff.

22    BY MR. SCHWEIKERT:

23        Q.    Why do you believe that?

24        A.    Because is that not the truth?

25        Q.    Is it true for you?
```

```
 1        A.   It is.

 2        Q.   Have you ever met Brian?

 3        A.   No.

 4        Q.   When did you first become aware of him?

 5   Literally that day after you learned about his accident?

 6        A.   Yes.

 7        Q.   Go ahead.

 8        A.   Learned about Brian himself as a person or the

 9   accident?

10        Q.   I mean, we obviously know he got hurt, and

11   that's one of the reasons we're here, but did you know

12   about him before his injury?

13        A.   I knew Brian was making his professional

14   debut, yes.

15        Q.   And how did you know that?

16        A.   Because my team told me.

17        Q.   The operations team?

18        A.   Yeah.

19        Q.   Okay.  Let's talk a little bit more about

20   February 15th, 2020, the day of the incident.  I

21   understand you arrived at around 3:30 at the stadium,

22   right?

23        A.   Yes.

24        Q.   Was that just your typical routine or had you

25   been tied up doing something else earlier in the day?
```

```
 1        A.   That's not my typical because there is no
 2   typical, it's just that's the time I needed to arrive.
 3   It was the hometown event, so I was driving from my home
 4   there.  And there was no -- I was already in the city,
 5   and I was already at the hotel and I come over, I was
 6   just coming from my home.  I think I was bringing my
 7   family.
 8        Q.   Do you know what time the gates opened
 9   approximately on that day?
10        A.   Hard to recall, but I believe noon.
11        Q.   And why did you not go earlier in the day?
12   Not part of what you were expected to do or --
13        A.    I don't attend every event because I'm at a
14   lot of Monster Jams.  And this being the hometown event,
15   and I've been to a ton of Supercrosses that I did not
16   need to be there.  I didn't have any meetings scheduled
17   early in advance, so I was taking my family to a
18   hometown event to see their Supercross.
19        Q.   And when did you first become aware that Brian
20   had been injured?
21        A.   Probably shortly after I arrived by four
22   o'clock-ish.
23        Q.   Do you recall how you became aware of his
24   injury?
25        A.   Dave Prater told me.
```

1    Q.    What did he tell you?

2    A.    He just said that Brian crashed.  Didn't know

3    the extent of the injuries.  And that was really about

4    it.  I don't think anyone had any information at that

5    moment in time.

6    Q.    He didn't tell you any specifics about the

7    fact that Brian was removed from the track without any

8    spinal precautions taken?

9    A.    No.

10   MR. PILSNER:  Objection to form.

11   Q.    He didn't tell you that the practice had not

12   been red flagged following Brian's crash?

13   A.    No.

14   Q.    Why not?

15   MR. PILSNER:  Objection, form.

16   THE WITNESS:  Because there are a lot of

17   crashes that do happen and people do get injured or

18   they don't, some of them are transported and some

19   of them aren't.  In this case, it was unknown the

20   extent of his injuries.  And he was being

21   transported, so that I did know.

22   BY MR. SCHWEIKERT:

23   Q.    You didn't know at that time that it was a

24   very serious injury that he had suffered?

25   A.    Absolutely not.

```
 1        Q.    When did you first become aware that he had in

 2   fact suffered a catastrophic injury?

 3        A.    probably a day or two later.

 4        Q.    Can you explain that to me, please?

 5        A.    I got information on Monday or Tuesday.  I

 6   can't recall which day, that it may be a little bit more

 7   significant.

 8        Q.    What do you mean by that?

 9        A.    There could be some other related issues to

10   his crash that are unknown that could be serious.

11   Again, don't know all the facts.

12        Q.    What related issues were unknown.

13        A.    I'm saying the extent of his injury, that it

14   sounded serious.

15        Q.    So you were not informed -- strike that.

16        You were not aware on Saturday, February 15th at

17   any time after he crashed, that the injury he suffered

18   was in fact serious?

19        A.    Absolutely not.

20        Q.    I didn't hear you say the word.

21        A.    She agreed with me.

22        Q.    Sorry.  Technology sometimes good to a fault.

23   Okay.  Well, did you or anyone on your team do anything

24   to keep track of Brian after he was taken to the

25   hospital in an ambulance?
```

 1      A.   That function is dealt with The Medic Rig.  And

 2   if there is any follow up from that stuff, and they

 3   usually get with the family and deal with all those

 4   things on their own, that is not a function of Feld.

 5      Q.   Why not?

 6      A.   Because it's not.

 7      Q.   But Feld is ultimately responsible for risk

 8   and safety at the event, right?

 9      A.   Right.

10      Q.   Yet when a rider who actually just turned 18

11   gets seriously injured, Feld has no interest in even

12   communicating with the family of the injured rider about

13   his status?

14           MR. PILSNER:  Objection to form.

15           THE WITNESS:  No, that's not accurate.  I'm

16      saying -- what I was saying is that the

17      communication and the information flow of the

18      extent of those things is not something that we're

19      privy to that we get part of.  Sometimes we do

20      reach out to the families, sometimes we do have

21      talk with the actual rider's wife.  Sometimes we --

22      yes.

23           But the communication flow of that information

24      does not come directly to Feld.  That information

25      is not released to hospitals to Feld.  That's not

```
 1        accurate.
 2   BY MR. SCHWEIKERT:
 3        Q.    Did -- do you know if anybody did anything to
 4   inquire about how Brian was doing after he was taken to
 5   the hospital?
 6        A.    I don't know that.
 7        Q.    I've heard that there were rumblings around
 8   the pit from riders and other participants about the way
 9   in which Brian's incident was handled.  Is that
10   something you're aware of?
11        A.    No.
12        Q.    Have you ever heard any complaints from anyone
13   about the manner in which Brian's crash and injuries
14   were handled by the officials and medical team?
15        A.    I am not.
16        Q.    Did you hang out in the pits at all after --
17   strike that.
18        Did you hang out in the pits at all on the day of
19   the event?
20        A.    No.  I was -- came into the event -- went up
21   into the suite, met with some partners, and enjoyed the
22   event.
23        Q.    What suite?
24        A.    I don't remember which suite number.
25        Q.    Was it like a spectator suite or was it one of
```

1    the TV booths or show booths?

2         A.    Tampa Bay Buccaneer Suite.

3         Q.    Fancy.  Nice.  Okay.  And do you recall who

4    you were with in that suite?

5         A.    I don't recall.  I'm in this suite every week.

6         Q.    And I'm just trying to understand, you were

7    there sort of hosting people in the suite, you weren't

8    really there to like serve as a operator of the event,

9    right?

10        A.    I have no function at the event.

11        Q.    Okay.  Do you recall any discussion with

12   anyone in the suite about what had happened to Brian

13   earlier in that day?

14        A.    No.

15        Q.    Do you recall who was in the suite?

16        A.    My family, maybe a few friends, maybe some

17   coworkers.  I don't -- I can't recall five years ago.

18        Q.    Anyone from Feld?

19        A.    I believe so, but I couldn't recall who.

20        Q.    Was a hometown event, as you described it,

21   right?  Anyone from the Feld family attend?

22        A.    They don't always attend, so I can't recall

23   back five years ago if they were at that specific event

24   that time.  But the likelihood of some Feld employees

25   being there was probable.

```
 1        Q.   And which Feld employees may have been there?

 2        A.   I don't know.

 3        Q.   You don't know So after the main event

 4   concluded, did you immediately leave the stadium or did

 5   you go down to the paddock area and hang out with

 6   people?

 7        A.   I immediately left the stadium.

 8        Q.   Did you go back to the stadium the next day on

 9   Sunday for the futures event?

10        A.   No.

11        Q.   And shortly thereafter is when you first

12   became aware that Brian had had a catastrophic injury;

13   is that right?

14        A.   You're saying which day?

15        Q.   After Sunday?

16        A.   Yes.

17        Q.   Okay.  Just to make sure we're on the same

18   page, I understand you went to the stadium on Saturday.

19   You saw Dave Prater, he told you Brian was injured, but

20   you didn't know the extent of it, and then it wasn't

21   until a couple days later that you learned it was

22   actually a very serious injury; is that fair?

23        A.   Without the extent of completely knowing the

24   injury, yes.

25             MR. SCHWEIKERT:  Okay.  I would propose maybe
```

```
 1        taking a lunch break at this point, if you guys are

 2        okay with that.

 3              THE WITNESS:  Yeah.

 4              MR. SCHWEIKERT:  This might be a good stopping

 5        point.

 6              VIDEOGRAPHER:  We are going off the record.

 7        The time is 12:12 p.m.

 8              (Off the record.)

 9              (On the record.)

10              VIDEOGRAPHER:  We are now back on the record.

11        The time is 1:11 p.m.

12              MR. SCHWEIKERT:  Before we took a break for

13        lunch, we were talking about your -- when you

14        became aware of the catastrophic nature of Brian's

15        injury.  I'm going to show you a document, I'm

16        going to mark as Exhibit 86 labeled FMS Inc. 1030.

17              (Thereupon, Plaintiff's Exhibit 86 was marked

18   for identification.)

19   BY MR. SCHWEIKERT:

20        Q.   Here you guys go.

21        A.   Thank you.

22        Q.   Take a minute, look at it.  Let me know if you

23   recognize it, Mr. Jendro.

24        A.   I do recognize it.

25        Q.   And what is Exhibit 86?
```

```
 1        A.   It is an email from Dave Prater to me about

 2   Brian.

 3        Q.   All right.  It's an email sent February 17th,

 4   2020, two days after his accident, right?

 5        A.   I don't know if that -- what day the 17th was.

 6   Let's see if it -- what day is that?  Tuesday after --

 7        Q.   Monday, I believe.  Saturday, February 15th

 8   was the event.

 9        A.   16, 17, Monday.  Yeah.

10        Q.   Okay.

11        A.   Yeah.

12        Q.   So Exhibit 86 is an email sent on the Monday

13   after the event from Mr. Prater to you, right?

14        A.   Correct.

15        Q.   And the subject is injured rider; is that

16   right?

17        A.   Yes.

18        Q.   And then in the body, Mr. Prater writes Brian

19   Moreau number 104 250 class first free practice.  Do you

20   see that?

21        A.   Yes.

22        Q.   Do you have an understanding as to why Mr.

23   Prater sent you this email?

24        A.   Yes.  So this email is just because I was

25   wanting to know the first name, the spelling of the last
```

1  name, who he is.  So I was curious.

2       Q.   Why did you want to know that?

3       A.   Because it was an injured driver.  This is

4  that correspondence to me about who he was and his

5  number and what had happened.

6       Q.   And what did you do with this information, if

7  anything?

8       A.   This is -- I think that -- I don't think I got

9  anything with this information other than that this is

10 corresponding with me, telling me these three things.

11      Q.   So it's your belief that you had asked Mr.

12 Prater to send you more specific information about Mr.

13 Moreau and that he sent you this email in response?

14      A.   Yep.

15      Q.   Is that a yes?

16      A.   Yes, that's a yes.

17      Q.   And what was your interest in obtaining more

18 specific information about Brian?

19      A.   He was just giving me his name and his number

20 and which class he rode and which practice because

21 again, I don't have all this information.  I wanted to

22 know.

23      Q.   Did you reply to this email?

24      A.   I don't remember if I did.

25      Q.   Do you recall if you were aware that Brian had

1   been catastrophically injured at the time that you received

2   this email?

3        A.   I don't remember.

4        Q.   It doesn't have any information about the

5   incident or Brian's specific injuries, does it?

6        A.   No.

7        Q.   You -- did you ask for that information as

8   well?

9        A.   No.  This is just him sending me information

10  about his name, his number, which class he was and which

11  practice.

12       Q.   And why would you need that information?

13       A.   I wanted to know.

14       Q.   For what purpose?

15       A.   For my own knowledge.

16       Q.   But he wasn't able to tell you that when you

17  had previously asked him, who was the injured rider?

18       A.   Maybe when we were at the event and talking,

19  but this is more sending me an email with the

20  information.  I don't know how to spell Moreau.  Any of

21  the other stuff that was on there for him, which class

22  he rode, and which practice he was in.  That was

23  information I was asking about.

24       Q.   Was it information that was useful you -- in

25  performing your job responsibilities at that time?

       1        A.    It was.

       2        Q.    How so?

       3        A.    Because ultimately, I care about the well-

       4   being of riders or people and he was injured.  I don't

       5   know the extent of what happened.  So asking who exactly

       6   he was, what the number he was, which class he did, and

       7   which free practice.  And it says first free practice.

       8        Q.    Did you pass this information on to anyone

       9   else?

      10        A.    I don't recall.  I don't know.  It was five

      11   years ago.

      12        Q.    Are you aware of whether any investigation

      13   about the incident was done by anyone after it happened?

      14        A.    No.

      15        Q.    Did Feld conduct any sort of investigation?

      16              MR. PILSNER:  Objection to form.

      17              THE WITNESS:  No.

      18   BY MR. SCHWEIKERT:

      19        Q.    Did Feld Motor Sports investigate the

      20   circumstances of the incident involving Brian at the

      21   Tampa Supercross?

      22        A.    No, not to my knowledge.

      23        Q.    Why not?

      24        A.    Because.

      25        Q.    Wouldn't it be in Feld Motor Sports' interest

```
 1   to prevent future occurrences of catastrophic injuries at

 2   subsequent Supercross events, right?

 3              MR. PILSNER:  Objection to form.

 4              THE WITNESS:  Can you restate the question?

 5   BY MR. SCHWEIKERT:

 6        Q.    I believe you told me earlier this morning

 7   that this was the first catastrophic injury at a

 8   Supercross events during your time with Feld Motor

 9   Sports, right?

10        A.    Probably one of.

11        Q.    You recall others?

12        A.    There may have been over the time.

13        Q.    Any specifically?

14        A.    Not that come to my brain right now.

15        Q.    And I would -- do the folks at Feld Motor

16   Sports have an interest in preventing the occurrence of

17   similar sort of catastrophic injuries?

18              MR. PILSNER:  Objection to form.

19              THE WITNESS:  Yes, absolutely.

20   BY MR. SCHWEIKERT:

21        Q.    Why is that?

22        A.    Like I told you before we work with AMA and

23   Dirt Works, and all the people that need to be part of

24   those conversations on the track and different things,

25   as you pointed out in one of your other recent emails,
```

1    we do work together to minimize those things.  So, yes.

2         Q.   Was anything done specifically in response to

3    catastrophic injuries to Brian Moreau?

4         A.   Not to my knowledge.

5         Q.   Do you think it would've been prudent at that

6    time to take some steps to minimize the potential of

7    similar catastrophic injuries occurring in the future?

8              MR. PILSNER:  Objection to form.

9              THE WITNESS:  Again, I think we all work

10        together to figure out what can be done to minimize

11         those risks.  Yes.

12   BY MR. SCHWEIKERT:

13        Q.   And who's we all that work together?

14        A.   When it comes to track design, we talk with

15   the AMA and we talk with our Dirt Works contractor on

16   track design.  When it comes to officiating, we talk

17   with the AMA in regards to that.  So we talk with the

18   people that are necessary for whatever we're talking

19   about.

20        Q.   And what about when it comes to medical

21   response to an injured rider?  Who do you talk to?

22        A.   Medic Rig.

23        Q.   And who in particular would you have talked to

24   at The Medic Rig?

25              MR. PILSNER:  Objection to form.

```
 1              THE WITNESS:  I do not have the conversations,
 2         but the operations team would be having
 3         conversations.
 4    BY MR. SCHWEIKERT:
 5         Q.   Are you aware of any discussion between the
 6    groups of individuals you mentioned about Brian Moreau's
 7    incident at the Tampa Supercross?
 8         A.   Not to my knowledge.
 9         Q.   Is it your testimony that Feld Motor Sports
10    did nothing to investigate the circumstances surrounding
11    the occurrence of Brian Moreau's catastrophic injuries
12    at the Tampa Supercross?
13         A.   I don't remember at this point in time.
14         Q.   And nothing you did in preparing to testify
15    refreshed your recollection?
16         A.   No.
17         Q.   You understood that today's deposition was
18    about what happened to Brian, right?
19         A.   Yes.
20         Q.   Did you do everything you could to refresh
21    your recollection to testify as accurately and
22    truthfully as possible today?
23         A.   Yes.
24         Q.   And despite those efforts, you have no
25    recollection of whether anything was done by Feld after
```

```
 1    Brian's incident to mitigate the risk of similar incidents

 2    occurring in the future; is that right?

 3         A.   That would probably be outside the scope of

 4    what I get involved in at that point in time.  So I

 5    would not be the right person to be having that

 6    conversation with.

 7         Q.   Who would be the right person?

 8         A.   The operations team.

 9         Q.   Anyone in particular?

10         A.   Dave Prater.

11         Q.   Did you ever review -- strike that.

12         I understand you reviewed some footage recently in

13    preparing to testify, correct?

14         A.   Correct.

15         Q.   Okay.  Aside from that, had you ever seen any

16    video footage of the incident involving Brian?

17         A.   No.

18         Q.   Why not?

19         A.   Because I'm not been privy to.

20         Q.   Are you aware that the practice sessions at

21    the Tampa Supercross were filmed by Feld Motor Sports?

22              MR. PILSNER:  Objection to form.

23              THE WITNESS:  I was not aware.

24    BY MR. SCHWEIKERT:

25         Q.   Why not?
```

```
 1        A.    We do not film free practice.

 2        Q.    But the footage that you reviewed in preparing

 3   to testify did in fact contain footage of the free

 4   practice and Brian's incident, right?

 5        A.    Yes.

 6        Q.    And it's my understanding that was footage

 7   filmed by Feld Motor Sports.

 8        A.    It was footage, I believe that was filmed by

 9   the stadium.  The use of the cameras for jumbotron.

10        Q.    All right.  Let me just make sure we're

11   talking apples to apples here.  I will show you a video

12   I previously marked as Exhibit 62, Bates labeled FMS

13   Inc. 1148.  And I'll put it up on the screen.  Just give

14   me a second.  Okay.  There it goes.  All right.  This is

15   Exhibit 62.  I'm going to push play.

16             (Video was played.)

17   BY MR. SCHWEIKERT:

18        Q.    You know, the footage is not great on the

19   screen, but I'm happy to share my screen with you this

20   way.

21        A.    I can see pretty good.

22        Q.    Is this one of the videos that you reviewed in

23   preparing to testify?

24        A.    Yes.

25        Q.    And what do you understand to be the source of
```

```
 1    this video?

 2         A.   I don't know where that came from unless

 3    there's a marker on that you have; I have no idea where

 4    it actually came from.

 5         Q.   Do you have any reaction in viewing this

 6    footage of Brian being removed from the track as someone

 7    who used to compete in Motocross races?

 8              MR. PILSNER:  Objection to form.

 9              THE WITNESS:  I would say that one, I'm not a

10        medical expert so I would only be speculating on

11        how he would be attended to, but what I can tell

12        you is that early on in that video, the way that

13        everybody worked together to make that lane safe

14        for the down rider, Brian was done really well in

15        my opinion.

16    BY MR. SCHWEIKERT:

17         Q.   But you understand as you sit here today, that

18    he had suffered a spinal cord injury during this

19    incident, right?

20              MR. PILSNER:  Objection to form.

21              THE WITNESS:  That's what I'm told.

22    BY MR. SCHWEIKERT:

23         Q.   Okay.  Do you believe that it was appropriate

24    to remove Mr. Moreau in the manner depicted in this

25    video given he had suffered his spinal cord injury?
```

```
 1              MR. PILSNER:  Objection to form.
 2              THE WITNESS:  Again, I'm not a medical expert,
 3         so I'm not one to judge how the experts take people
 4         off the track.
 5    BY MR. SCHWEIKERT:
 6         Q.   If that had been you back in your prime, you
 7    hurt yourself, you reported symptoms of a spinal cord
 8    injury, would you have appreciated if the medical team
 9    had simply removed you in that manner without taking any
10    precautions to immobilize your spine?
11              THE WITNESS:  Objection to form.
12              THE WITNESS:  I don't know how to answer that
13         one because I've not been put in that spot.  So --
14    BY MR. SCHWEIKERT:
15         Q.   You don't know how, or you don't want to
16    answer?
17              MR. PILSNER:  Objection to form.
18              THE WITNESS:  Restate your question please.
19    BY MR. SCHWEIKERT:
20         Q.   If that had been you, and you had reported
21    symptoms of a spinal cord injury to the medics that
22    responded to your crash, would you have appreciated
23    being removed from the track without having your spine
24    immobilized?
25              MR. PILSNER:  Objection to form.
```

```
 1              MS. NDUKA:  Objection to form.
 2              THE WITNESS:  I guess if that were me in that
 3         situation, and I was coherent, and I could talk and
 4         speak properly to articulate what I thought was
 5         going on, probably.
 6    BY MR. SCHWEIKERT:
 7         Q.   You probably would not appreciate being
 8    handled in that manner?
 9              MR. PILSNER:  Objection to form.
10              MS. NDUKA:  Form.
11              THE WITNESS:  I would appreciate them handling
12         me the way that they think I needed to be handled
13         in this situation.  Yeah.  There are a lot of
14         things that could happen on that racetrack, and one
15         of those could be a million different scenarios.  I
16         wasn't there.  I didn't see it.  I don't know.
17    BY MR. SCHWEIKERT:
18         Q.   Okay.  I'm going to show you another video.
19    This has been previously marked Exhibit 64, Bates
20    labeled FMS Inc. 1147.  I will turn my screen so you can
21    see it.  This appears to be another camera angle of the
22    incident, right?
23         A.   It appears.
24         Q.   Have you seen this video before?
25         A.   This particular video, yes.
```

```
 1        Q.    Was this one that you reviewed in preparing to
 2   testify?
 3        A.    Yes.
 4        Q.    Did you review it prior to preparing to
 5   testify?
 6        A.    No.
 7        Q.    Okay.  Does it make you cringe watching that
 8   video knowing that Brian had a spinal cord injury at the
 9   time?
10             MR. PILSNER:  Objection to form.
11             THE WITNESS:  It would make me cringe knowing
12       any rider who had an injury, I feel -- I feel for.
13   BY MR. SCHWEIKERT:
14        Q.    But you're aware that moving somebody with a
15   potential spinal cord injury can be detrimental, right?
16             MR. PILSNER:  Objection to form.
17             THE WITNESS:  Could be.
18             MS. NDUKA:  Objection, form.  Lacks basis,
19       predicate.
20   BY MR. SCHWEIKERT:
21        Q.    I mean, you don't need to be a medical doctor
22   to know that somebody who has suffered a potential
23   spinal cord injury should not be moved without proper
24   precautions, right?
25             MR. PILSNER:  Objection to form.
```

```
 1              THE WITNESS:  I would assume.
 2  BY MR. SCHWEIKERT:
 3      Q.   I mean, I've seen other incidents involving
 4  riders at Supercross events where a backboard was used
 5  and a cervical collar used to immobilize a rider before
 6  moving them off the track, right?
 7      A.   Yes.
 8      Q.   Do you know why that wasn't done in this case?
 9              MR. PILSNER:  Objection to form.
10              THE WITNESS:  I don't know.
11  BY MR. SCHWEIKERT:
12      Q.   Do you know of anyone who ever did any
13  investigation to try to figure out why that did not
14  happen in this case?
15      A.   I do not.
16      Q.   Is preventing a rider from being removed from
17  the track without spinal precautions something that Feld
18  Motor Sports has an interest in doing?
19              MR. PILSNER:  Objection to form.
20              THE WITNESS:  No.  As I stated before, rider's
21     safety is very important and paramount.  Keeping
22      the stars healthy in the game is important.
23  BY MR. SCHWEIKERT:
24      Q.   So it's your testimony that Feld does not have
25  an interest in ensuring that riders with a spinal cord
```

```
 1    injury are removed from the track with proper precautions

 2    taken?

 3              MR. PILSNER:  Objection to form.  Misstates

 4         his testimony.

 5              THE WITNESS:  No, it is important.  But again,

 6         we're not the medical experts.  We have to rely on

 7         those that are to use their decisions and how they

 8         are in that moment and in that time with the rider.

 9              MR. SCHWEIKERT:  Okay.  I want to show you

10         another document in a second.  I will mark as

11         Exhibit 78.  Excuse me, I'm going to show you a

12         document.  I am marking as Exhibit 87.  Bates

13         labeled FMS Inc. 1063 to 1064.

14              (Thereupon, Plaintiff's Exhibit 87 was marked

15    for identification.)

16    BY MR. SCHWEIKERT:

17         Q.   Take a minute, review it, let me know if you

18    have seen it before.

19         A.   Oh, the back is part of the --

20         Q.   Yes.  It's a double-sided, trying to save some

21    paper.

22         A.   Okay.  So what was your question?

23         Q.   Do you recognize the document I have marked as

24    Exhibit 87?

25         A.   I can't recall, but my name is on it so it
```

```
 1    must have gotten to me.  Yes.
 2         Q.   Would you agree that Exhibit 87 is an email
 3    chain from February of 2020, which includes one email
 4    from Mr. Prater to you, Steve Yaros and Sean Brennen on
 5    February 19th, around 10:53 a.m.?
 6         A.   Yes.
 7         Q.   And Mr. Prater is forwarding to you and those
 8    other gentlemen an email from Stefan LeGrande, which
 9    contains a message from Brian's dad; is that correct?
10         A.   That's correct.
11         Q.   Do you know why you were sent this email?
12         A.   Again, keeping people in the loop.
13         Q.   Loop about what?
14         A.   Information.
15         Q.   What information?
16         A.   Email from Brian's dad.  It was sent to the
17    people below, and Dave resent it to myself and Steve and
18    Sean Brennen.
19         Q.   Did you ever have any discussion with Mr.
20    Brennen, Mr. Yaros or Mr. Prater about Brian around the
21    time of this email?
22         A.   Not that I can recall back, I don't know.
23         Q.   All right.  So you were receiving an update of
24    information about Brian from his father, but you don't
25    recall having any discussions with those gentlemen about
```

```
 1   Brian; is that fair?
 2        A.   That's correct.
 3        Q.   Why not?
 4        A.   It could be a million reasons.  It could have
 5   been another country.  I don't know.
 6        Q.   But it's also one of the only catastrophic
 7   injuries that you're aware of during your career in
 8   Supercross, right?
 9             MR. PILSNER:  Objection to form.
10             THE WITNESS:  One of them.  And there is --
11        obviously there's some people talking about it.
12        There are people that are probably working together
13        on this stuff.  Doesn't mean that I have to be in
14        all those meetings.
15   BY MR. SCHWEIKERT:
16        Q.   Were there meetings?
17        A.   Not that I'm aware of.  I used that term
18   loosely.
19        Q.   Do you think it would've been prudent to have
20   meetings about this catastrophic injury for purposes of
21   advancing rider safety in the Supercross sport?
22             MR. PILSNER:  Objection to form.
23             THE WITNESS:  Again, going back to what I
24        talked about, I think whether it's Brian's or any
25        rider, all of that stuff is digested.  And at some
```

```
 1        point I talked about as far as track construction with
 2        Dirt Works or the way things are handled on the
 3        racetrack from an official standpoint all the time.
 4        I just may not be part of all those conversations.
 5   BY MR. SCHWEIKERT:
 6        Q.   Are you aware of any conversation about how
 7   the race officials handled the incident?
 8        A.   No.
 9             MR. SCHWEIKERT:  I'm going to show you another
10        document I will mark as Exhibit 88, Bates labeled
11        FMS Inc. 1025.  It's just a one pager.
12             (Thereupon, Plaintiff's Exhibit 88 was marked
13   for identification.)
14   BY MR. SCHWEIKERT:
15        Q.   Just take a minute, review Exhibit 88 and let
16   me know if you've seen it before.
17        A.   I have seen it before.
18        Q.   And what is Exhibit 88?
19        A.   It was that email that was sent to me in the
20   previous email you showed me.  And I'm sending it as an
21   update to the person I reported to J. Vaught.
22        Q.   What was his name?
23        A.   J. Vaught.  Jonathan Vaught.
24        Q.   He goes by Jay?  Like J-A-Y?
25        A.   Just J.
```

```
 1        Q.    The letter J?

 2        A.    Yeah.

 3        Q.    Sesame Street, brought to you by J.  Got you.

 4   All right.  And what position was Mr. Vaught in at the

 5   time of this email, if you recall?

 6        A.    Senior vice president of touring.

 7        Q.    And why were you forwarding him the message

 8   from Brian's dad?

 9        A.    Just like any company, keeping people updated

10   on things that are happening and what's going on.

11        Q.    Was there any other purpose for you forwarding

12   this email?

13        A.    No.  As I said, update of the rider that was

14   injured in Tampa.  Keeping people in the loop.

15        Q.    Okay.  But you did tell me this morning that

16   at no point did you or anyone at Feld as far as you're

17   aware, reach out to Brian's family about his injury,

18   right?

19        A.    Not to my knowledge.  I don't recall

20        Q.    Why not?

21        A.    I don't know if somebody had, or maybe that

22   somebody had, I don't know that.

23        Q.    Do you know if Mr. Vaught ever responded to

24   this email?

25        A.    I don't remember.
```

```
 1        Q.   Do you recall if he asked you for this update or
 2   if you were just sending it on your own?
 3        A.   I was just sending it on my own.
 4        Q.   And why did you feel compelled to share this
 5   update with Mr. Vaught?
 6        A.   Because we had a rider that got injured.
 7   Wanted to share an update.
 8        Q.   But it's fair to say that a number of riders
 9   were injured at the Tampa Supercross, just to a much
10   lesser extent, right?
11        A.   I don't remember which riders that were
12   injured at that event.
13        Q.   Well, do you typically send emails internally
14   about every rider that suffers an injury at every
15   Supercross event?
16        A.   If a rider that gets transported, there's
17   likely some type of email correspondence to keep people
18   in the loop, yes.
19        Q.   And by transported you mean to the hospital?
20   Yes?
21        A.   Yes.
22        Q.   Why is it that internal emails are circulated
23   regarding riders whose injuries require transport to the
24   hospital?
25        A.   Because they're the stars of our sport.  Just
```

1  like in Monster Jam, if one of our drivers gets in an

2  accident on the track, we make sure that everybody

3  understands and knows from a PR perspective and media

4  inquiries, a whole bunch of things.

5      Q.   So you believe it's newsworthy to keep the

6  fans updated about any injuries to the stars of the

7  Supercross?

8           MR. PILSNER:  Objection to form.

9           THE WITNESS:  No.  It's keeping everybody

10      inside the company updated, right?  So that if

11      people do reach out from Media or from other

12      outlets or from television or from whatever that

13      people are -- have an idea of what happened, what's

14      going on.  Just keeping people in the loop.

15      Communication.

16  BY MR. SCHWEIKERT:

17      Q.   Do you know if any insurance carrier was

18  notified around this time of the occurrence of Brian's

19  injuries at the Tampa Supercross?

20      A.   I do not know.

21      Q.   As far as you're aware, who would've been

22  responsible for putting an insurance carrier on notice

23  of a potential claim at that time?

24           MR. PILSNER:  Objection to form.  I also

25      caution the witness not to disclose anything he may

```
 1        have learned from legal counsel.

 2             THE WITNESS:  That I don't know internally or

 3        can remember.

 4   BY MR. SCHWEIKERT:

 5        Q.   Is that a function of the risk and safety

 6   department?

 7        A.   Could be.

 8        Q.   Do you know if Feld had any sort of policy,

 9   whether written or unwritten, around the time of Brian's

10   incident about notifying its insurers about the

11   occurrence of injuries that required transport to a

12   hospital?

13        A.   I don't remember back then what or if anything

14   transpired.

15        Q.   What about since then, are you aware of any

16   such policy?

17        A.   Specific to what?

18        Q.   Putting a carrier on notice that a rider had

19   been transported to hospital after suffering an injury

20   during a Supercross event.

21        A.   If that does occur, the insurance area of the

22   business would notify a carrier.

23        Q.   What is the insurance area of the business?

24        A.   The department that handles all of our

25   insurance for the live events.
```

```
 1        Q.   And what's the name of that department?

 2        A.   That would be the insurance side.

 3        Q.   Do you know the name of any individuals that

 4   work within that department?

 5        A.   From that -- from back in 2000, no.

 6        Q.   What about as of today?

 7        A.   A woman named Polly.

 8        Q.   What's her last name?

 9        A.   I don't have it on top of my head.

10        Q.   Anybody else?

11        A.   No.

12        Q.   So as far as you're aware, at least as of the

13   present day, there is a separate department responsible

14   for communicating with insurers?

15        A.   They set up all of the insurance, the general

16   liability and everything else for all of our live events

17   that we carry out worldwide.

18        Q.   Is it a subdivision of the risk and safety

19   department or its own separate department?

20        A.   It would be its own separate department, I

21   believe.

22        Q.   Okay.  And are you aware of Feld Motor Sports

23   ever notifying any carrier of an injury to anyone

24   participating in any motorsport event at any time?

25             MR. PILSNER:  Objection to form.
```

```
 1              THE WITNESS:  Yes.

 2   BY MR. SCHWEIKERT:

 3       Q.   Tell me about that.

 4       A.   If, again, somebody -- if there is a crash

 5   that is significant, sometimes those carriers are put on

 6   notice that there could be a claim or could something

 7   happen.  Yeah.

 8       Q.   Because if they are not put on notice, there's

 9   potential that a claim for coverage could be denied in

10   the future.  right?

11              MR. PILSNER:  Objection to form.

12              THE WITNESS:  Not my area of expertise.

13   BY MR. SCHWEIKERT:

14       Q.   Okay.  And you have no knowledge of whether

15   any carrier was put on notice of Brian's catastrophic

16   injuries around the time that it occurred in February of

17   2020; is that right?

18       A.   Not that I remember.

19       Q.   Would it have been prudent to have done so

20   based on your experience?

21              MR. PILSNER:  Objection to form.

22              THE WITNESS:  I'm not saying that it has or

23       hasn't, I just don't know.

24   BY MR. SCHWEIKERT:

25       Q.   Would it have been prudent?
```

```
 1        A.   Yes.

 2             MR. PILSNER:  Objection to form.

 3        Q.   I want to show you documents previously marked

 4   as an exhibit, which I will put on the screen.  All

 5   right.  This is a email previously marked as Exhibit 19,

 6   Bates labeled -- I don't see a Bates label.

 7        Let me show it to you.  You see the document on the

 8   screen?

 9        A.   Yeah, but I'm having a hard time reading it.

10   There we go.

11        Q.   Tell you what, I might have it.

12             MR. PILSNER:  There you go.

13        Q.   Thank you.  I handed you a copy of a document

14   previously marked as Exhibit 19.  I'll represent, I

15   don't see your name on it, but just take a minute,

16   review it, and I have some questions for you.

17        A.   Okay.

18        Q.   Do you see that Exhibit 19 contains an email

19   from Olivier de Vaulx on February 17th, 2020?

20        A.   Yes.

21        Q.   Do you know who that gentleman is?

22        A.   He's a media person, I think.

23        Q.   And do you see he is inquiring about Brian's

24   accident?

25        A.   I do see that.
```

1      Q.   And one of the questions is why no red flag?  Was

2   it seen as unnecessary on the moment?  And why?  Do you

3   see that?

4      A.   I do see that.

5      Q.   Do you know why there was no red flag thrown

6   at any time after Brian crashed during the Tampa event?

7      A.   I do not.  I wasn't there.  I can't really

8   speculate why.

9      Q.   And you have no knowledge about any discussion

10  or evaluation of how the officials responded to his

11  crash?

12     A.   I have had none of those discussions that I

13  can recall with any of those in regards to that

14  question.

15     Q.   Okay.  Have you ever spoken about Brian Moreau

16  with Sean Brennen?

17     A.   I don't recall if I did or didn't.

18     Q.   Do you know Sean Brennen?

19     A.   I do.

20     Q.   Who is he?

21     A.   Sean Brennen is the Supercross PR manager.

22     Q.   Does he work in the physical office with you?

23     A.   He does work in the office.

24     Q.   Is he aware, as far as you know, that you're

25  being deposed today?

 1        A.    No.

 2        Q.    Did you ever mention -- strike that.

 3        And you never had any discussions with him about

 4   Brian Moreau?

 5        A.    No, not that I can recall.

 6        Q.    Do you know if Feld Motor Sports ever provided

 7   the media with any sort of information about Brian's

 8   injuries at the Tampa event?

 9        A.    I would say I don't know and can't remember if

10   there was or wasn't at this point.

11             MR. SCHWEIKERT:  I'm going to show you

12        document I will mark as Exhibit 89, Bates labeled

13        FMS Inc. 27.

14             (Thereupon, Plaintiff's Exhibit 89 was marked

15   for identification.)

16   BY MR. SCHWEIKERT:

17        Q.    Take a minute, review it.  Let me know if

18   you've seen it before.

19             MR. PILSNER:  Mark, you said 89?

20             MR. SCHWEIKERT:  Yes.  Is that right?

21             THE WITNESS:  He doesn't have a marker on his.

22             MR. PILSNER:  No, no.  I just lost track of

23        the numbering.

24             THE WITNESS:  Oh, okay.

25             MR. PILSNER:  Thanks.

```
 1   BY MR. SCHWEIKERT:

 2        Q.   Take a minute.  Review Exhibit 89, and let me

 3   know if you've seen it before.

 4             MS. SPRADLIN:  Mark, what was that Bates

 5        number?  Sorry.

 6             MR. SCHWEIKERT:  FMS Inc. 27.

 7             MS. SPRADLIN:  Thank you.

 8             THE WITNESS:  Okay.

 9   BY MR. SCHWEIKERT:

10        Q.   Do you recognize Exhibit 89, sir?

11        A.   I do.

12        Q.   And what is it?

13        A.   It's an email from Doug to us, meaning Dave

14   Prater and Mike Muye, and myself, in regards whether he

15   should put a quote on the broadcast and Race Day Live.

16        Q.   Who is Doug Cabrera?

17        A.   Doug Cabrera oversees TV operations.

18        Q.   Do you know if he works for Feld Motor Sports

19   or Feld Entertainment Inc.?

20        A.   Feld Motor Sports.

21        Q.   And that's your testimony, even though his

22   email signature says Feld Entertainment Inc., in bold?

23        A.   Yes, just as it does with mine.  It could be a

24   shell.  It's what's given to us from corporate for

25   branding.
```

 1      Q.    Okay.  And what responsibilities would Mr.

 2   Cabrera have had in connection with the Tampa thing as

 3   far as you're aware?

 4      A.    I have limited with Doug because that's not my

 5   area.  But Doug's interaction is working with the

 6   television broadcast team and the Race Day Live.

 7      Q.    And what do you mean working with them?

 8      A.    He organizes all of the TV truck stuff, all of

 9   the powering, all the staffing needs.  All of that

10   stuff.

11      Q.    The camera set up.

12      A.    From week to week, he works with the TV truck.

13      Q.    That includes the camera set up?

14      A.    For the broadcast, yes.  The in-house

15   jumbotron cameras are different.

16      Q.    But the videos that we looked at maybe 45

17   minutes ago, you don't know one way or the other,

18   whether those were from pre-existing cameras in the

19   stadium or from other cameras.  Do you?

20      A.    It is hard to tell which ones those were, but

21   those look to be the jumbotron cameras at the live event

22   from the building.

23      Q.    And who had control over what was displayed on

24   the jumbotron during the Tampa event?

25      A.    That would be put up by the show director.

```
 1    And I don't have that person's name.

 2         Q.   Is that a Feld person?

 3         A.   Yes.

 4         Q.   And that person would've been in a show booth

 5    inside the stadium?

 6         A.   That person would be set up in a operational

 7    booth or within the jumbotron operations area of the

 8    stadium.

 9         Q.   And as far as you're aware, at the time of the

10    event, did that person have discretion to decide what

11    was displayed on the jumbotron or is somebody directing

12    that person what to put up on the jumbotron?

13         A.   That I do not know.

14         Q.   Is it Jim Moehle?

15         A.   I would be speculating if it were him.  That

16    would be an answer or a question for operations.

17              COURT REPORTER:  Can you spell his name?

18         Q.   M-O-E-H-L-E.  Let's go back to Exhibit 89.

19    You see the original email from Mr. Cabrera on February

20    21st, at 6:10, asking for the quote to be resent about

21    Brian to be used on the broadcast?

22         A.   I see it.

23         Q.   Okay.  And Mr. Prater responds, and you're

24    copied on his response saying in part, don't say

25    anything on the broadcast.  Do you see that?
```

```
 1        A.    I do see that.
 2        Q.    Do you know why Mr. Prater was not interested
 3   in saying anything about Brian on the broadcast?
 4              MR. PILSNER:  Objection to form.
 5              THE WITNESS:  I do not know.
 6   BY MR. SCHWEIKERT:
 7        Q.    Do you think that fans of the Supercross might
 8   have an interest in knowing about the status of a rider
 9   that was injured at a Supercross event?
10              MR. PILSNER:  Objection to form.
11              THE WITNESS:  Yes.  And there's a time and
12        place to do that with privacy, with what's going
13        on.  Do you have enough information?  What's
14        already been sent out?  All those things are
15        probably key piece to whether what gets put out for
16        you.
17   BY MR. SCHWEIKERT:
18        Q.    Do you know if at any point on the February
19   21st or any day thereafter Feld provided any sort of
20   information to Supercross fans about Brian and his
21   injuries?
22        A.    I don't know.
23        Q.    But you do agree that that would be something
24   of interest to a Supercross fan?  Your position is that
25   there's a time and place for that sort of information to
```

```
 1   be disseminated, right?

 2        A.   Yes.

 3        Q.   Okay.  But you don't know if any information

 4   was ever disseminated, right?

 5        A.   I do not know.

 6        Q.   Are you aware of any of the social media posts

 7   about Brian and his accident?

 8        A.   No.

 9        Q.   Did you ever respond to Mr. Cabrera or Mr.

10   Prater on this topic depicted in Exhibit 89?

11        A.   I couldn't tell you.  I would say I don't

12   recall.  I don't know, 2020.

13        Q.   And do you see in Mr. Prater's response to Mr.

14   Cabrera, he also says in part, I sent that quote so you

15   could share it with your team, not for the broadcast.

16        A.   I see that.

17        Q.   Do you have any understanding as to why Mr.

18   Prater was sharing a quote with the operations team and

19   Mr. Cabrera but did not want it shared on the broadcast?

20        A.   I don't know.  I would be speculating.  Again,

21   there's a time and place for sharing information, so I'm

22   not quite sure.

23        Q.   Was Feld Motor Sports doing some damage

24   control?

25             MR. PILSNER:  Objection to form.
```

```
 1              THE WITNESS:  No, not my opinion.
 2   BY MR. SCHWEIKERT:
 3        Q.   No?
 4        A.   Not my opinion.
 5        Q.   But I think you told me earlier you were aware
 6   that there was some rumblings amongst the riders about
 7   how Brian's incident had been handled over the course of
 8   that weekend, right?
 9        A.   No, that's what you told me.
10        Q.   You're not aware of that?
11        A.   You -- no, I'm not aware of that.
12        Q.   Okay.  Did nobody ever informed you -- strike
13   that.
14        You never became aware that there were rumblings
15   amongst the riders about how Brian had been removed from
16   the track given he had a spinal cord injury?
17              MR. PILSNER:  Objection to form.  Asked and
18        answered about ten times now.
19              THE WITNESS:  No.
20   BY MR. SCHWEIKERT:
21        Q.   Do you know of anybody that's aware of that?
22        A.   I don't know.
23        Q.   During the 2020 Supercross season, did you
24   interact with the riders or their teams at all?
25        A.   In 2020, I very rarely ever interact with race
```

```
 1   teams.

 2        Q.   Why?

 3        A.   Because that's not my role.

 4        Q.   Whose role is it or was it?

 5        A.   Operations.

 6        Q.   Okay.  Do you know who Tyler Keefe is?

 7        A.   I know of him.

 8        Q.   What do you know about him?

 9        A.   That he worked on The Medic Rig.

10        Q.   I will represent to you that at the time of

11   the event, Mr. Keefe was manager of Brian's racing team.

12   Are you aware of that?

13        A.   No.

14        Q.   Okay.

15             MR. PILSNER:  Mark, whenever's a good stopping

16        point for you --

17             MR. SCHWEIKERT:  Yeah.

18             MR. PILSNER:  -- we'll take a --

19             MR. SCHWEIKERT:  Sure.

20             MR. PILSNER:  -- quick restroom break.

21             MR. SCHWEIKERT:  Do it now.  Off the record,

22        please.

23             VIDEOGRAPHER:  We are going off the record.

24        The time is 2:06 p.m.

25             (Off the record.)
```

```
 1                    (On the record.)

 2                    VIDEOGRAPHER:  We are now back on the record.

 3          The time is 2:20 p.m.

 4     BY MR. SCHWEIKERT:

 5          Q.   Do you know if the FIM co-sanctioned the

 6     Supercross during the 2020 season?

 7          A.   Yes.

 8          Q.   Do you know if the FIM still co-sanctions the

 9     Supercross at present?

10          A.   No.

11          Q.   No, you don't know or no it doesn't?

12          A.   No it does not.

13          Q.   Okay.  Do you know why?

14          A.   The agreement expired.

15          Q.   Was there no interest in renewing that

16     agreement?

17          A.   I believe there was some back and forth on --

18     couldn't come to terms, and everybody moved on.

19          Q.   And that litigation that we talked about way

20     back at the beginning in which you were previously

21     deposed, was that before the expiration of the agreement

22     or after?

23          A.   That would be probably after.

24          Q.   Sometime within the last four years or so?

25          A.   Or less.
```

```
 1        Q.   Do you know who is the plaintiff in that
 2   litigation?
 3        A.   I do not.
 4        Q.   Do you know if the FIM sued Feld Motor Sports
 5   or Feld Motor Sports sued the FIM?
 6        A.   I don't know that information.
 7        Q.   What was the general subject matter of the
 8   deposition that you gave in that litigation?
 9        A.   It was in regard to the usage of World
10   Championship.
11        Q.   And do you know why you were deposed about
12   that particular topic?
13        A.   Probably because of my title.  Probably
14   because I had the most intimate knowledge at the time.
15        Q.   Do you have --
16             MS. SPRADLIN:  I apologize, Mr. Jendro, if you
17        could just make sure to keep your volume up.  I
18        know we've had a few breaks and you're a little
19        farther from the mic than Mr. Schweikert is, so
20        it's just a bit hard to hear you through this
21        program.
22        Q.   Do you know if any other entities are part of
23   that litigation?
24        A.   I do not know.
25        Q.   Do you know if the AMA is a party to that
```

1    litigation?

2         A.    Not to my knowledge.

3         Q.    And when approximately do you think that

4    deposition occurred?

5         A.    I don't recall.  But I'm assuming at the end

6    of '21.

7         Q.    Do you know if that litigation is ongoing or

8    completed?

9         A.    I don't know.

10        Q.    Do you recall participating in a recap of the

11   2020 Supercross season with the AMA and some folks from

12   the FIM?

13        A.    I usually do.  I don't know if I was that

14   year.  If you have anything to show me.

15             MR. SCHWEIKERT:  You know, I do.  I will show

16        you document I'll mark as Exhibit 90, Bates labeled

17        FMS Inc. 1035.  And I have appended the attachment,

18        which is Bates labeled 1036 to 1037.

19             (Thereupon, Plaintiff's Exhibit 90 was marked

20   for identification.)

21             THE WITNESS:  Thank you.

22   BY MR. SCHWEIKERT:

23        Q.    Take a minute.  Review Exhibit 90.  Let me

24   know if you've seen it before.

25        A.    Okay.  Yes, I've seen this.

1      Q.   And what is Exhibit 90?

2      A.   It's an email from Dirk De Neve from the FIM

3  to some of the operations team from Feld Motor Sports

4  and AMA.

5      Q.   And it's an email sent on June 24th, 2020 with

6  the subject matter of 2020 Supercross debriefing

7  meeting, correct?

8      A.   That is correct.

9      Q.   And attached to the email is a draft agenda

10  for that meeting, right?

11      A.   Yes, I see that.

12      Q.   Okay.  Who is Dirk De Neve?

13      A.   Dirk De Neve is the Motocross commissioner for

14  the FIM.

15      Q.   Do you know if he's still the commissioner at

16  present?

17      A.   I do not.  I'm removed.

18      Q.   And his email is sent to Mr. Prater.  Mr.

19  Muye, Mr. John Gallagher, Mr. Robert Dingman, Mr. Mike

20  Pelletier, and yourself, copying Antonio Alia, right?

21      A.   Looks like it, yes.

22      Q.   Okay.  Who is Robert Dingman?

23      A.   Rob Dingman is the president of the AMA.

24      Q.   At present, he's the president?

25      A.   I believe so.

1    Q.    Let me say that again.  It was a little bit of

2  tongue twister.  As of the present day, Mr. Robert

3  Dingman is the president of the AMA?

4    A.    That's my understanding.

5    Q.    Is it also your understanding he was the

6  president back in 2020?

7    A.    Yes.

8    Q.    And who is John Gallagher?

9    A.    John Gallagher was the FIM representative and

10  race director.

11    Q.    Do you know Mr. Gallagher?

12    A.    Yes, I do.

13    Q.    Do you know if he's still the race director

14  today?

15    A.    He's not.

16    Q.    Do you know why not?

17    A.    When the FIM agreement expired, that decision

18  was left up to the AMA.

19    Q.    Do you know why the AMA made the decision not

20  to continue with Mr. Gallagher as the race director?

21    A.    I do not.

22    Q.    Have you ever spoken to Mr. Gallagher about

23  the incident involving Brian at the Tampa event?

24    A.    No.

25    Q.    Do you keep in touch with him at all?

```
 1        A.    I do not.

 2        Q.    Next gentleman, Michael Pelletier, do you know

 3   who that is?

 4        A.    I do.

 5        Q.    Who's he?

 6        A.    I don't know his title, but he is the -- he

 7   oversees the Supercross operations for the AMA.

 8        Q.    Have you ever communicated with Mr. Pelletier

 9   about Brian Moreau's incident?

10        A.    Not to my knowledge.

11        Q.    Are you still in touch with him today?

12        A.    I am not.  I am removed from Supercross.

13        Q.    That's right.  Was that a promotion for you?

14        A.    It was a promotion for me that started in

15   2017, taking on the four-wheel division.  And then

16   transitioning out over through COVID through '21 and now

17   full-time into '22.

18        Q.    Okay.  And you lost the two-wheel division

19   approximately when?

20        A.    At the end -- through '21.

21        Q.    Do you miss it?

22        A.    I get -- I --

23        Q.    You still get the perks, I imagine.  The suite

24   access, right?

25        A.    Yes.
```

```
 1        Q.    All right.   In the copy of this email, there's
 2   Antonio Alia.   Do you know who that is?
 3        A.    I briefly met him.   He is a -- he was a
 4   representative from the FIM.
 5        Q.    Do you know what his role was for the FIM in
 6   connection with the Supercross?
 7        A.    I don't recall.
 8             MR. SCHWEIKERT:   Okay.   And we'll talk about
 9        the agenda, but I have the actual one.   Going to
10        show you a document I am marking as Exhibit 91,
11        Bates labeled FMS Inc. 1031 with the agenda
12        attached.   So Bates label ending 1034.
13             (Thereupon, Plaintiff's Exhibit 91 was marked
14   for identification.)
15             THE WITNESS:   Thank you.
16   BY MR. SCHWEIKERT:
17        Q.    Take a minute to review it and let me know if
18   you've seen it before.
19        A.    It looks like the same email.
20        Q.    It looks like you forwarded -- strike that.
21        It looks like Mr. Prater sent you the draft agenda.
22   You see that?
23        A.    Yes.
24        Q.    Do you know why he did so?
25        A.    Probably, well, depending on when this meeting
```

1    was, June 30th, he was sending me the agenda for the

2    meeting that I was going to attend with him.

3        Q.   Okay.  Do you know or recall if anyone at Feld

4    Motor Sports had any comments on the draft agenda?

5        A.   Again, I can't recall.

6            MR. SCHWEIKERT:  I'm going to show you another

7        document.  I'll mark as Exhibit 92, Bates labeled

8        FMS Inc. 10 through -- Bates labeled FMS Inc. 1038

9        with the attachment through 1044.

10            (Thereupon, Plaintiff's Exhibit 92 was marked

11    for identification.)

12    BY MR. SCHWEIKERT:

13        Q.   Just take a moment, review the document.  Let

14    me know if you've seen it before.

15        A.   Okay.

16        Q.   Do you recognize Exhibit 92?

17        A.   I believe so.

18        Q.   What is it?

19        A.   This is the minute meeting notes from that FIM

20    meeting on June 30th.

21        Q.   Of 2020?

22        A.   Of 2020.

23        Q.   And that was a Supercross debriefing meeting?

24        A.   Yes, correct.

25        Q.   All right.  And you participated in that

```
 1   meeting?
 2        A.   I believe I did.
 3        Q.   If we go to page Bates labeled FMS Inc. 1040
 4   at the top of the page, there's a list of gentlemen in
 5   attendance.  Do you see that?
 6        A.   Yeah.
 7        Q.   And it appears Antonio, Alia, Dirk de Neve,
 8   Michael Pelletier, John Gallagher, yourself, Todd
 9   Jendro, Dave Prater, and Mike Muye were in attendance.
10        A.   Yes.
11        Q.   Is that your recollection as well?
12        A.   Yes.
13        Q.   Okay.  And if we go to the next page, Bates
14   labeled FMS Inc. 1041.  There is a Section 2.6 entitled
15   Friday race direction meeting/evaluation.  Do you see
16   that?
17        A.   I do see it.
18        Q.   Do you recall if Friday race direction
19   meetings were held during the 2020 Supercross season?
20        A.   Let me read this very quick.  It appears to
21   be, yes.
22        Q.   Is it your understanding that there was a race
23   direction meeting on the Friday before the Tampa
24   Supercross event in February of 2020?
25        A.   Yes.  That's my understanding, but a question
```

1    more geared towards operations.

2          Q.   Okay.  Do you have any understanding as to why

3    Feld would participate in that race direction meeting?

4          A.   I think given the scope of what I'm reading,

5    again, it's a communication tool so everybody can

6    communicate and make sure things are running and

7    functioning proper from an operational standpoint

8    between AMA, Feld, Medic Rig, and Dirt Works.

9          Q.   And --

10         A.   I will add FIM too.  Sorry.

11         Q.   Okay.  But you personally did not participate

12   in any race direction meeting before the Tampa

13   Supercross?

14         A.   I personally have not.

15         Q.   And if we go to the next page, FMS Inc. 1042,

16   there is Section 2.1 entitled use of GoPro cameras.  Do

17   you see that?

18         A.   Mm-hmm (affirmative).

19         Q.   Is that a yes?

20         A.   Yes, I see it.

21         Q.   And under that heading it reads, "After the

22   Brian Moreau incident, his team decided not to use any

23   helmet cameras anymore.  AMA was now discussing to

24   prohibit any helmet device (GoPro-LitPro) in the amateur

25   ranks." Do you see that?

 1    A.   I do see that.

 2    Q.   What is your recollection of that discussion

 3 regarding Brian Moreau?

 4    A.   I honestly can't remember what that -- I'm

 5 reading it, but I don't recall or remember what -- if

 6 there was any action or not.  So --

 7    Q.   Well, according to the minutes of the meeting,

 8 there was a discussion about the use of GoPro cameras on

 9 helmets, right?

10    A.   Yeah.  I see that.

11    Q.   Was there any discussion about the manner in

12 which the medical team had removed him from the track?

13    A.   Not that I recall.

14    Q.   Why was there a focus on GoPro cameras?

15    A.   I don't remember.

16    Q.   Okay.  Was there any discussion about the --

17 strike that.

18    Was there any discussion about the lack of a red

19 flag being thrown following Mr. Moreau's crash?

20    A.   Not to my knowledge.

21    Q.   Have you ever had any discussions with anyone

22 from the FIM about the way Mr. Moreau's incident was

23 handled by the race officials and medical team?

24    A.   Not that I can recall from me.

25    Q.   Are you aware of anyone having that sort of

```
 1   discussion?

 2        A.   There may have been, but it wasn't with -- I

 3   have no idea

 4        Q.   Who might have been the person that would have

 5   that type of discussion with the FIM?

 6        A.   Operations.

 7        Q.   Anyone in particular?

 8        A.   I don't know whether that was Dave Prater or

 9   Mike Muye.  I'd be speculating.

10        Q.   You're aware that Brian was catastrophically

11   injured at the Tampa Supercross, right?

12        A.   Yes.

13        Q.   Who do you believe is responsible for his

14   injuries?

15             MR. PILSNER:  Objection to form.

16             THE WITNESS:  I can't answer that.  I would

17        say ultimately himself.

18   BY MR. SCHWEIKERT:

19        Q.   Are you aware that that is in fact Feld's

20   position in this litigation that the only person to

21   blame is Brian Moreau?

22             MR. PILSNER:  Objection to form.

23             THE WITNESS:  Brian Moreau suffered in a crash

24        that was brought upon by himself, is my

25        understanding.
```

```
 1   BY MR. SCHWEIKERT:

 2       Q.   And you don't believe that anybody did

 3   anything that contributed to his injuries after he had

 4   crashed?

 5            MR. PILSNER:  Objection to form.

 6            THE WITNESS:  I would be speculating because

 7       I'm not a medical expert.  I'm not.

 8   BY MR. SCHWEIKERT:

 9       Q.   Well, if a medical expert was to give the

10   opinion that spinal protocols were not adhered to in

11   responding to Brian's crash, would you disagree with

12   that?

13            MR. PILSNER:  Objection to form.  Calls for

14       expert testimony?

15            THE WITNESS:  Again, I don't know.

16   BY MR. SCHWEIKERT:

17       Q.   You would defer to a medical professional; is

18   that fair?

19            MR. PILSNER:  Objection to form.

20            THE WITNESS:  Medical expert would have to

21       determine that.  I couldn't.

22   BY MR. SCHWEIKERT:

23       Q.   And what about the failure of a -- strike

24   that.

25            What about the lack of a red flag, as you sit here
```

```
 1    today, do you believe that the practice should have been

 2    stopped after he had crashed?

 3              MR. PILSNER:  Objection to form.

 4              MS. SPRADLIN:  Join.

 5              THE WITNESS:  Based on the video that I have

 6         watched from you, my opinion is that it was handled

 7         properly.  The flags came out well in advance.  The

 8         runners came and put out the blocks.  There was

 9         people motioning riders to a different area.  He

10         wasn't unconscious, appeared.  I think that they

11         did everything they could possible, they did right.

12         And that's just an opinion.

13    BY MR. SCHWEIKERT:

14         Q.   Who's they that did everything possible?

15         A.   All the people in the track in that video, in

16    that lane.

17         Q.   So you're saying it wasn't possible then for

18    them to have thrown a red flag to stop the race track

19    activity; is that what you're saying?

20              MR. PILSNER:  Objection, form.  Misstates his

21         testimony.

22              THE WITNESS:  It's always possible.  The AMA

23         decided that it was safe manner, and the medic team

24         responded.  The flags were out.  It was a

25         controlled lane.
```

```
 1   BY MR. SCHWEIKERT:

 2        Q.   Would you agree that if the practice had been

 3   stopped, it would've provided a greater opportunity to

 4   assess Brian's injuries and hopefully reach the

 5   conclusion that he needed to have spinal precautions

 6   taken before being moved off the track?

 7             MR. PILSNER:  Objection to form.

 8             THE WITNESS:  Again --

 9             MS. SPRADLIN:  Join.

10             THE WITNESS:  -- I would be speculating.  So I

11      don't know that question.

12   BY MR. SCHWEIKERT:

13        Q.   I'm just asking for your opinion.

14             MR. PILSNER:  Objection to form.  He's a fact

15      witness.

16             THE WITNESS:  I don't know.

17   BY MR. SCHWEIKERT:

18        Q.   So you have no opinion about whether the

19   response to Mr. Moreau's crash was consistent with the

20   expectations of elite athletes participating in the

21   Super Bowl of Motocross events?

22             MR. PILSNER:  Same objection.

23             THE WITNESS:  Again, the way he was responded

24      to and handled was done by the medic team, and that

25      they're the experts that we rely upon.  The AMA
```

```
 1        handled the situation in which the manner was

 2        controlled in the environment.  That's all I can

 3        tell you.  I'm not the expert.

 4   BY MR. SCHWEIKERT:

 5        Q.   Have you ever seen a NFL game where a player

 6   goes down with a potential neck injury?

 7        A.   I may have.

 8        Q.   Have you ever seen an instance where the NFL

 9   game is stopped and a medical cart is brought out and

10   the player is immobilized on a backboard before being

11   carted off the field?

12        A.   I have seen that.

13             MS. NDUKA:  Object to form.  Improper --

14        improper analogy, metaphor.

15        Q.   Why do Supercross riders not receive the same

16   sort of care during their sport?

17             MR. PILSNER:  Objection to form.

18             THE WITNESS:  They do.  And that's why there's

19        a gigantic medical unit on-site for their care.

20        And they attend to down riders every single

21        weekend.  And they're put in different situations

22        every weekend.  They do their best and they do a

23        great job at it.

24   BY MR. SCHWEIKERT:

25        Q.   People can do their best and still make
```

```
 1   mistakes, right?
 2              MR. PILSNER:  Objection to form.
 3              THE WITNESS:  Sure, I guess.
 4   BY MR. SCHWEIKERT:
 5      Q.   But you believe despite your experience as a
 6   former rider and working in the Supercross for almost
 7   several decades, that the entire situation was handled
 8   appropriately; is that fair?
 9      A.   That's fair.
10      Q.   And that is the message you want to send to
11   all of the Supercross riders and the Supercross
12   community; is that correct?
13              MR. PILSNER:  Objection to form.
14              THE WITNESS:  I think -- again, defer to the
15      medical experts, and the officials on how they
16      handled the situation.  I think they did a good
17      job.
18   BY MR. SCHWEIKERT:
19      Q.   And you think they did a good job despite
20   knowing today that Brian had in fact suffered a serious
21   spinal cord injury?
22              MR. PILSNER:  Objection to form.
23      Q.   Am I understanding you correctly?
24              MR. PILSNER:  Same objection
25              THE WITNESS:  That he could have done on his
```

```
 1         own?

 2    BY MR. SCHWEIKERT:

 3         Q.   That despite knowing that he had suffered a

 4    spinal cord injury, you still believe sitting here today

 5    that the response by the officials and the medical team

 6    was appropriate?

 7         A.   I do.

 8         Q.   So if a rider suffers a spinal cord injury at

 9    any Supercross event, they should expect to be removed

10    from the track without immobilization, and that would be

11    appropriate from Feld's perspective?

12              MR. PILSNER:  Objection to form.

13              THE WITNESS:  You know, that's not what I'm

14         saying.  I'm saying that I defer to the medical

15         experts on how they treat and handle the rider

16         that's down.  I'm not that guy that makes that

17         decision.  They have a long history of doing great

18         stuff.  They do a good job.

19              MR. SCHWEIKERT:  All right.  Let's take a

20         little break.  I think I'm close.

21              THE WITNESS:  Okay.

22              MR. SCHWEIKERT:  Come back at 3:00 just to

23         give me a little more time.

24              MR. PILSNER:  Sure.  No problem.

25              VIDEOGRAPHER:  We are going off the record.
```

```
 1        The time is 2:47 p.m.

 2               (Off the record.)

 3               (On the record.)

 4               VIDEOGRAPHER:  We are now back on the record.

 5        The time is 3:09 p.m.

 6   BY MR. SCHWEIKERT:

 7        Q.    Just a couple more questions.  Do you know who

 8   Tim Phend is?  Spelled, P-H-E-N-D.

 9        A.    Yes.

10        Q.    Who's that?

11        A.    Tim Phend works in operations.

12        Q.    Was he part of the operations team in February

13   of 2020?

14        A.    I don't know what capacity he was in, but he -

15   - I believe he was there.

16        Q.    What is the best of your understanding was his

17   function?

18        A.    He worked in some television operations

19   capacity.

20        Q.    Okay.  I only ask because I have a document

21   identifying him as the director of Supercross, but I

22   don't see him on your other sort of operational team

23   emails.  Is he not really part of the ops or --

24        A.    I can't remember back to 2020, which capacity

25   he was in, and whether he was an employee at the time or
```

```
 1    an independent contractor.

 2             MR. SCHWEIKERT:  Okay.  I might have follow up

 3        if the attorney asks you some questions, but I

 4        think at this time I will tender the witness.

 5             MS. NDUKA:  No questions.  Thank you.

 6             MS. SPRADLIN:  I don't have any questions for

 7        the witness.  Thank you.

 8                         CROSS-EXAMINATION

 9    BY MR. PILSNER:

10        Q.   I have a couple.  Good afternoon, Mr. Jendro.

11    Earlier today you testified that Feld has ultimate

12    responsibility for the risk and safety of the event.  Do

13    you recall that testimony?

14        A.   Yes.

15        Q.   Okay.  What did you mean by the event when you

16    testified earlier today?

17        A.   What I meant is that the Supercross is much

18    more than the racetrack.  It is what happens out in the

19    pit party.  It's what happens backstage.  It's what

20    happens in the backstage areas.  It's what happens where

21    the fans are.

22        Q.   Okay.  And does Feld Motor Sports

23    responsibility for risk and safety differ depending on

24    whether the track is hot or not?

25        A.   Yes.
```

```
1        Q.    Okay.  How so?

2        A.    When the AMA takes control of the racetrack.

3        Q.    Okay.  What do you mean by that?

4        A.    What I mean by that is that we support the AMA

5   with additional flaggers and blocks and runners on the

6   racetrack.

7        Q.    And that support happens once that shift

8   occurs?

9        A.    Yes.

10        Q.    Okay.  And when the track is hot, does Feld

11   have any role or responsibility related to The Medic

12   Rig's function on the track itself?

13        A.    No.

14        Q.    And why is that?

15        A.    Because that's not our authority.

16              MR. PILSNER:  Okay.  I don't have any further

17       questions.

18                    REDIRECT EXAMINATION

19   BY MR. SCHWEIKERT:

20        Q.    Just a brief follow up.  But there is a on-

21   site safety person who I believe you identified as Phil

22   Penn that is involved in overseeing the racetrack when

23   it's hot, correct?

24        A.    I do not know that.

25        Q.    You're not aware of whether the on-site safety
```

```
 1   person is in communications with other crew on the floor
 2   assisting and coordinating response to an incident?
 3            MR. PILSNER:  Objection to form.
 4            THE WITNESS:  Yes.  That would be my
 5       recollection, but I don't know the actual cadence
 6       of what and who and how they communicate all the
 7       time.
 8            MR. SCHWEIKERT:  Okay.  That's it.  I have
 9       nothing else.
10            MR. PILSNER:  No further questions.
11            MR. SCHWEIKERT:  You're going to read?
12            MR. PILSNER:  Yeah, we're going to read and
13       sign.
14            COURT REPORTER:  Okay.
15            MR. SCHWEIKERT:  Thank you very much, sir.  I
16       know it's not pleasant to be in the hot seat, but I
17       appreciate your time.
18            VIDEOGRAPHER:  Let me read us off.
19            MR. SCHWEIKERT:  Yeah, of course.
20            VIDEOGRAPHER:  This concludes the videotaped
21       deposition of Todd Jendro.  We are going off the
22       record.  The time is 3:13 p.m.
23            COURT REPORTER:  Are you keeping your
24       exhibits, or am I taking them?
25            MR. SCHWEIKERT:  I can give them to you.  Do
```

```
 1      you want them?
 2           COURT REPORTER:  My honest answer, no, but --
 3      are you ordering?  Let's just put it that way.
 4           MR. SCHWEIKERT:  I'll have my office send you
 5      an email.
 6           COURT REPORTER:  Okay.  So at this moment no.
 7      But possibility is yes.
 8           MR. SCHWEIKERT:  Possibly, correct.
 9           COURT REPORTER:  Possibly, okay.
10           MR. PILSNER:  But I'll put it in writing
11      exactly what we're looking for.
12           COURT REPORTER:  If it is ordered, who would
13      like a copy?
14           MR. PILSNER:  We're going to order a copy
15      irrespective of what Mr. Schweikert does.
16           COURT REPORTER:  So you would like one today?
17           MR. PILSNER:  I don't need the transcript
18      today, but we are going to order.
19           COURT REPORTER:  No, yeah.  Today you're
20      ordering?
21           MR. PILSNER:  Correct.
22           COURT REPORTER:  Okay.  Do you want that
23      standard order?
24           MR. PILSNER:  What is the turnaround for
25      standard order?
```

```
 1                COURT REPORTER:  Something close to ten business
 2         days.
 3                MR. PILSNER:  Check the calendar.  Is it
 4         possible to get a copy by the end of next week?
 5                COURT REPORTER:  Like next Friday?
 6                MR. PILSNER:  Yes.
 7                COURT REPORTER:  That would be considered a
 8         rush.
 9                MR. PILSNER:  That's fine.
10                COURT REPORTER:  Is that okay?  Okay.  Would
11         anybody else like a copy?
12                MS. NDUKA:  I'll take a copy.
13                COURT REPORTER:  Okay.
14                MS. NDUKA:  But I don't need to order one
15         right now, but I may follow up with you.  Thanks.
16                COURT REPORTER:  Okay.  Perfect.  Thank you.
17                VIDEOGRAPHER:  And Mr. Pilsner, does that
18         include a order for the video or just the
19         transcript?
20                MR. PILSNER:  No, we're going to order the
21         video as well, but I don't need it on a rush basis.
22                VIDEOGRAPHER:  Okay.
23                MS. NDUKA:  Mine is just the transcript.
24                COURT REPORTER:  Okay.
25                MR. SCHWEIKERT:  Exhibits, what's your
```

```
 1          preference?
 2               COURT REPORTER:  If it's being ordered, then
 3          I'll go ahead and take them, that way they can be
 4          attached to the transcript.
 5               MR. SCHWEIKERT:  Okay.
 6               (Thereupon, the deposition was concluded at
 7      3:25 p.m.)
 8               (Reading and signing of the deposition
 9      transcript was reserved.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OATH

 2      STATE OF FLORIDA

 3      COUNTY OF HILLSBOROUGH

 4

 5           I, Jennifer Cope, Court Reporter, Notary

 6      Public, State of Florida, certify that Todd Jendro,

 7      personally appeared before me on the 7th day of

 8      March 2025, and was duly sworn.

 9           Signed this 10th day of March 2025.

10

11

12

13      _____

14      Jennifer Cope, Court Reporter

15      Notary Public, State of Florida

16      Commission No.: HH 189226

17      Commission Expires: 02/19/26

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2      STATE OF FLORIDA

 3      COUNTY OF HILLSBOROUGH

 4

 5           I, Jennifer Cope, Court Reporter, certify that

 6      I was authorized to and did report the Deposition

 7      of Todd Jendro; that a review of the transcript was

 8      reserved; and that the transcript is a true and

 9      correct record of my notes.

10           I further certify that I am not a relative,

11      employee, attorney, or counsel of any of the

12      parties, nor am I a relative or employee of any of

13      the parties' attorneys or counsel connected with

14      the action, nor am I financially interested in the

15      action.

16           Dated this 10th day of March 2025.

17

18                         Jennifer Cope

19      _____

20      Jennifer Cope, Court Reporter

21

22

23

24

25
```

                    WITNESS NOTIFICATION LETTER

1

2    March 10, 2025
     Todd Jendro

3

4         In Re:  BRIAN MOREAU vs FELD MOTOR SPORTS, INC., et al.

5

6         Deposition taken on March 7, 2025.

7

8              The transcript of the above proceeding is now

9    available for your review.

10             Please call to schedule an appointment between

11   the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday.

12             Please complete your review within 30 days.

13

14             Sincerely,

15

16

17             Jennifer Cope

18

19             Jennifer Cope

20             Cogent Legal Services

21             6586 Hypoluxo Road, Suite 212

22             Lake Worth, Florida 33467

23             561-356-0831

24

25

```
 1                       ERRATA SHEET

 2              DO NOT WRITE ON THE TRANSCRIPT

 3               ENTER CHANGES ON THIS PAGE

 4        IN RE:  BRIAN MOREAU vs FELD MOTOR SPORTS, INC., et
       al.
 5
                         Todd Jendro
 6
                        March 7, 2025
 7
       Page  Line          Change                  Reason
 8
       _____
 9
       _____
10
       _____
11
       _____
12
       _____
13
       _____
14
       _____
15
       _____
16
       _____
17
       _____
18
           Under penalties of perjury, I declare that I have read
19
       the foregoing document and that the facts stated in it are
20
       true.
21
                    _____
22
                    Todd Jendro                     Date
23

24

25
```

# E R R A T A   S H E E T

BRIAN MOREAU v. FELD MOTOR SPORTS, INC., et  al.
Case No. 8:22-CV-01295-TPB-CPT Deposition
Transcript of TODD JENDRO

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 6 | 15 | Change "believe was" to "believe it was" |
| 11 | 11 | Change "and" to "as a" |
| 12 | 8 | Change "we're" to "were" |
| 12 | 14 | Change "conduct" to "construct" |
| 12 | 15 | Change "Works" to "Wurx" |
| 14 | 2 | Change "responsibilities boots" to "responsibilities were boots" |
| 14 | 5 | Change "Works" to "Wurx" |
| 19 | 15 | Change "remember. Are" to "remember. They are" |
| 25 | 16 | Change "Feld Motor" to "Does Feld Motor" |
| 28 | 17 | Change "Is" to "That is" |
| 31 | 8 | Change "under the" to "for" |
| 32 | 5 | Change "they're" to "they're the" |
| 36 | 6 | Change "I do" to "do" |
| 38 | 4 | Change "time who" to "time to know who" |
| 38 | 16 | Change "Is" to "It's" |
| 38 | 19 | Change "at work" to "artwork" |
| 41 | 24 | Change "non-for-profit" to "not-for-profit" |
| 44 | 8 | Change "Works" to "Wurx" |
| 45 | 5 | Change "Works" to "Wurx" |
| 45 | 8 | Change "the thing is" to "the thing. It is" |
| 45 | 21 | Change "AMA is that" to "AMA, it is" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 46 | 19 | Change "Rig including" to "Rig, including" |
| 46 | 20 | Change "Works" to "Wurx" |
| 46 | 22 | Change "things. From" to "things: from" |
| 49 | 15 | Change "who are" to "who it" |
| 50 | 1 | Change "Sports to" to "Sports, to" |
| 50 | 14 | Change "that's something" to "that's not something" |
| 50 | 20 | Change "unit would" to "unit it would" |
| 54 | 11 | Change "what if" to "if" |
| 60 | 5 | Change "I come over" to "and I came over" |
| 64 | 15 | Change "am not" to "have not" |
| 72 | 23 | Change "Works" to "Wurx" |
| 73 | 15 | Change "Works" to "Wurx" |
| 73 | 22 | Change "Medic" to "The Medic" |
| 77 | 14 | Change "Brian" to "it" |
| 81 | 20 | Change "rider's" to "riders'" |
| 85 | 2 | Change "Works" to "Wurx" |
| 96 | 4 | Change "have" to "have interaction" |
| 100 | 4 | Change "not my" to "not in my" |
| 105 | 18 | Change "Mr. Prater." To "Mr. Prater," |
| 111 | 8 | Change "Works" to "Wurx" |
| 113 | 23 | Change "suffered in a" to "suffered a" |
| 115 | 23 | Change "safe manner" to "safe" |
| 118 | 25 | Change "done on" to "done this on" |

I DO HEREBY CERTIFY that I have read the transcript of my
deposition and I swear it is true and correct to the best of
my knowledge, subject to the above-referenced corrections.

_____

TODD JENDRO

2

# A D D I T I O N A L   E R R A T A   S H E E T

BRIAN MOREAU v. FELD MOTOR SPORTS, INC., et al.
Case No. 8:22-CV-01295-TPB-CPT Deposition
Transcript of TODD JENDRO

COUNSEL OF RECORD NOTES THE FOLLOWING ADDITIONAL ERRATA
CHANGES:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 4 | 10 | Delete "Plaintiff's" |
| 4 | 12 | Change "Doc from" to "Email to" |
| 4 | 17 | Change "chain" to "from Yaros" |
| 4 | 19 | Change "Doug" to "Cabrera" |
| 4 | 20 | Change "Dirk" to "De Neve" |
| 4 | 21 | Change "of agenda" to "from Prater" |
| 19 | 9 | Change "Works" to "Wurx" |
| 22 | 4 | Delete "Plaintiff's" |
| 25 | 23 | Delete "Plaintiff's" |
| 26 | 25 | Delete "Plaintiff's" |
| 28 | 17 | Change "Is" to "That" |
| 35 | 6 | Delete "Plaintiff's" |
| 35 | 18 | Change "send" to "snip" |
| 40 | 7 | Change "A MA" to "AMA" |
| 52 | 1 | Change "Hawks (phonetic)" to "Hawkes" |
| 52 | 24 | Change "the Event" to "the event" |
| 66 | 3 | Change "don't know So" to "don't know. So" |
| 67 | 17 | Delete "Plaintiff's" |
| 82 | 14 | Delete "Plaintiff's" |
| 83 | 8 | Change "Stefan LeGrande" to "Stephan Legrand" |
| 85 | 12 | Delete "Plaintiff's" |

| PAGE | LINE | CORRECTION |
|------|------|-----------|
| 94 | 14 | Delete "Plaintiff's" |
| 104 | 19 | Delete "Plaintiff's" |
| 108 | 13 | Delete "Plaintiff's" |
| 109 | 10 | Delete "Plaintiff's" |
| 121 | 22 | Change "Sports" to "Sports'" |

4