UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.: 8:22-CV-01295-TPB-CPT


BRIAN MOREAU,

    Plaintiff,

    -vs-

FELD MOTOR SPORTS, INC., et al.,

    Defendants.
_____/


Buchanan Ingersoll & Rooney, P.C.
401 East Jackson, Suite 2400
Tampa, Florida 33602

Tuesday, March 25, 2025
9:11 a.m. to 5:45 p.m.


VIDEOTAPED DEPOSITION OF


DAVID L. PRATER


      Taken before Jennifer Cope, Court Reporter, a

Notary Public for the State of Florida at Large,

pursuant to Notice of Videotaped Deposition filed in the

above-styled cause.

```
 1                      APPEARANCES:

 2     On Behalf of the Plaintiff:

 3     SCHWEIKERT LAW, PLLC

 4     1111 Brickell Avenue, Suite 1550

 5     Miami, Florida 33131

 6     (305) 999-1906

 7     mark@schweikertlaw.com

 8     BY:  MARK A. SCHWEIKERT, ESQUIRE

 9

10     On Behalf of the Defendant, Feld Motor Sports:

11     BUCHANAN, INGERSOLL & ROONEY

12     401 East Jackson, Suite 2400

13     Tampa, Florida 33602

14     (813) 222-8180

15     gretchen.jankowski@bipc.com

16     BY:  GRETCHEN L. JANKOWSKI, ESQUIRE

17

18     FELD ENTERTAINMENT, INC.

19     805 3rd Street E

20     Palmetto, Florida 34221

21     (941) 201-9696

22     lexykehlla@gmail.com

23     BY:  ALEXIA KHELLA, ESQUIRE

24

25
```

```
 1                    APPEARANCES (Cont'd.):

 2     On Behalf of the Defendants, The Medic Rig, et al.:

 3     PEARSON DOYLE MOHRE & PASTIS, LLP

 4     901 North Lake Destiny Road, Suite 305

 5     Maitland, Florida 32751

 6     (407) 647-0090

 7     ddoyle@pdmplaw.com

 8     BY:  DAVID O. DOYLE, JR., ESQUIRE

 9

10     On Behalf of the Defendant, American Motorcycle

11     Association:

12     PHELPS DUNBAR, LLP

13     100 South Ashley Drive, Suite 2000

14     Tampa, Florida 33602

15     (813) 222-7672

16     caroline.spradlin@phelps.com

17     BY:  CAROLINE CATCHPOLE SPRADLIN, ESQUIRE

18

19     Also Present:

20     Rick Spector - Videographer

21

22

23

24

25
```

```
 1                         INDEX

 2   TESTIMONY OF DAVID L. PRATER           PAGE

 3   Direct Examination by Mr. Schweikert    7

 4   Cross-Examination by Ms. Spradlin      223

 5   Certificate of Oath                    232

 6   Certificate of Reporter                233

 7

 8                  INDEX OF EXHIBITS

 9              PLAINTIFF'S EXHIBITS MARKED

10   NUMBER          DESCRIPTION           PAGE

11   Exhibit 143     Responses             9

12   Exhibit 144     Amended Notice        10

13   Exhibit 145     Safety Hold Diagram   95

14   Exhibit 146     Venue                 99

15   Exhibit 147     Picture               109

16   Exhibit 148     Picture               110

17   Exhibit 149     Picture               111

18   Exhibit 150     Picture               111

19   Exhibit 151     Picture               113

20   Exhibit 152     PA Book               127

21   Exhibit 153     Credential Board      132

22   Exhibit 154     Camera Map            134

23   Exhibit 155     Documents             151

24   Exhibit 156     Email                 172

25   Exhibit 157     Email                 175
```

```
 1                   INDEX OF EXHIBITS (Cont'd.)

 2                  PLAINTIFF'S EXHIBITS MARKED

 3        NUMBER            DESCRIPTION            PAGE

 4        Exhibit 158      Screenshot            178

 5        Exhibit 159      Email                 186

 6        Exhibit 160      Screenshot            196

 7        Exhibit 161      Email                 210

 8        Exhibit 162      Report                217

 9           (Exhibits were retained by Mr. Schweikert.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   THEREUPON:

 2            THE VIDEOGRAPHER:  Good morning.  We are now

 3       on the record for the video deposition of Dave

 4       Prater taken in the matter of Brian Moreau, as

 5       Plaintiff, versus Feld Motor Sports, Inc., et al.,

 6       as Defendants.

 7            Today is Tuesday, March 25th, 2025 and the

 8       time is 9:11 in the morning.  This deposition is

 9       being conducted at Buchanan Ingersoll & Rooney,

10       P.C., 401 East Jackson Street, Suite 2400, Tampa,

11       Florida.

12            The court reporter is Jennifer Cope and the

13       videographer is Rick Spector.

14            Will counsel please introduce themselves,

15       afterwards the court reporter will swear in the

16       witness.

17            MR. SCHWEIKERT:  Good morning.  Mark

18       Schweikert on behalf of Brian Moreau.

19            MS. JANKOWSKI:  Gretchen Jankowski, Buchanan

20       Ingersoll & Rooney on behalf of Feld Motor Sports.

21       And with me here today is Lexy Khella, in-house

22       attorney for Feld Motor Sports.

23            MS. SPRADLIN:  Caroline Spradlin for the

24       American Motorcycle Association.

25            MR. DOYLE:  David Doyle on behalf of
```

```
 1        Defendants The Medic Rig, LLC, Dr. Bodnar,

 2        Dr. Kennedye, Amy Mativa, and Scott Combs.

 3                       DAVID L. PRATER,

 4        having been first duly sworn and responding,

 5        "I do," was examined and testified as follows:

 6              THE REPORTER:  You can put your hand down now.

 7              Counsel, you may proceed.

 8                     DIRECT EXAMINATION

 9   BY MR. SCHWEIKERT:

10        Q.   Good morning, sir.

11        A.   Good morning.

12        Q.   Could you please state your full legal name

13   for the record.

14        A.   David Lloyd Prater.

15        Q.   And where are you currently employed?

16        A.   Feld Motor Sports.

17        Q.   Have you ever had your deposition taken

18   before?

19        A.   Yes.

20        Q.   What was that in connection with?

21        A.   In connection with a -- in a Monster Jam event

22   in 2000, I believe, and another time when I was a

23   teenager in an automobile accident.

24        Q.   What was the Monster Jam event case about if

25   you can recall?
```

 1        A.    A portion of a spotlight had fallen and struck a

 2   spectator and injured the spectator.

 3        Q.    And do you know why you were deposed?

 4        A.    I was the event manager at the time.

 5        Q.    All right.  Just so we're sort of on the same

 6   page, this is a formal court proceeding.  The attorneys

 7   president -- excuse me, attorneys present, we are all

 8   officers of the court.  And I would just ask that we

 9   conduct ourselves as if we were in the courtroom, even

10   though the judge and jury is not present.  Okay?

11        A.    Okay.

12        Q.    We have a court reporter here.  She's

13   literally transcribing every single word that's being

14   spoken.  So if you could please take your time, speak

15   slowly, try not to interrupt me, and I will extend you

16   the same courtesy.  Does that seem fair?

17        A.    Yes.

18        Q.    All right.  The court reporter also cannot

19   transcribe non-verbal responses.  Sometimes in normal

20   conversation we might nod, shake our head, "uh-huh,"

21   "huh-uh."  But if you're intending to say "yes" or "no,"

22   I would ask that you please say that.  Is that fair?

23        A.    Yes.

24        Q.    Okay.  And if you need a break at any time,

25   I'm happy to accommodate you.  Just I would ask that we

```
 1   not break while a question is pending.  Is that okay?
 2        A.   Okay.
 3        Q.   And I know the lawyers might have some
 4   objections to my questions, so maybe take a moment, see
 5   if they object before answering, all right?
 6        A.   Okay.
 7             MR. SCHWEIKERT:  And while we're on that, I'm
 8        happy to stipulate that one "objection to form"
 9        applies to all Defendants.
10             MR. DOYLE:  Thank you.
11             MS. JANKOWSKI:  Thank you.  So stipulated.
12             MR. SCHWEIKERT:  All right.  I'm going to hand
13        you a document I will mark as Exhibit 143.
14             Copies for counsel.
15             (Thereupon, Plaintiff's Exhibit 143 was marked
16        for identification.)
17   BY MR. SCHWEIKERT:
18        Q.   Just take a minute and let me know if it's
19   something you've seen before.
20        A.   Yes.
21        Q.   And do you know what it is?
22        A.   It's the responses to Plaintiff's notice.
23        Q.   Are you appearing today on behalf of Feld
24   Motor Sports as a corporate representative?
25             MS. JANKOWSKI:  Objection to form.  And as
```

```
 1        we've made clear in our email correspondence to you,
 2        Mr. Prater is appearing in his individual capacity.
 3        And with respect to Exhibit 143 it was withdrawn.
 4             MR. SCHWEIKERT:  I apologize.
 5             All right.  I'm going to hand you a document I
 6        will mark as Exhibit 144.
 7             (Thereupon, Plaintiff's Exhibit 144 was marked
 8        for identification.)
 9   BY MR. SCHWEIKERT:
10        Q.   Take a minute, review it.  Let me know if
11   you've seen it before.
12        A.   I believe so, yes.
13        Q.   Do you see that Exhibit 144 is Plaintiff's
14   second amended notice of Rule 30(b)(6), the videotaped
15   deposition of Defendant Feld Motor Sports?
16        A.   I do.
17        Q.   Are you appearing today as a representative of
18   Feld Motor Sports with respect to any of the topics in
19   this notice?
20             MS. JANKOWSKI:  I'm going to object to that.
21        As you know, we objected to this notice for all the
22        reasons set forth in David Gordon's May 18th, 2025,
23        email.  So he is not appearing today in connection
24        with your second amended notice of Rule 30(b)(6)
25        videotaped deposition, Exhibit 144.
```

 1          With that said, he's here to answer any and all

 2      questions that you have whether it's related to the

 3      notice or not.

 4  BY MR. SCHWEIKERT:

 5      Q.   Were you previously prepared to testify about

 6  some of the topics identified in Exhibit 143?

 7          MS. JANKOWSKI:  Objection to form.

 8          THE WITNESS:  I had begun preparing.

 9  BY MR. SCHWEIKERT:

10      Q.   If you could just do your best to answer the

11  questions as fully and as accurately as possible, I'd

12  appreciate that.  Understood?

13      A.   Okay.

14      Q.   With respect to today's deposition and without

15  telling me anything that you may have discussed with

16  your lawyer, did you do anything to prepare?

17      A.   Just prepared looking through various

18  documents that were produced upon discovery.

19      Q.   Do you recall any documents that you looked

20  at?

21      A.   There were quite a few.

22      Q.   How many?

23      A.   It's hard to say.  Approximately 50.

24      Q.   Did you review any deposition transcripts?

25      A.   One.

```
 1        Q.    Which one was that?

 2        A.    Lisa Joiner's.

 3        Q.    But you did not review any other deposition

 4   transcripts from this case?

 5        A.    No.

 6        Q.    Did you review any emails or text messages?

 7        A.    Yes.

 8        Q.    Did you happen to review any contracts?

 9        A.    Yes.

10        Q.    Which ones?

11        A.    The Medic Rig contract with Feld Motor Sports

12   and the AMA contract with Feld Motor Sports.

13        Q.    And are you referring to the sanctioning

14   agreement?

15        A.    Sanctioning agreement, yes.

16        Q.    And while we're on it, I understand there's

17   Feld Entertainment, Inc. and Feld Motor Sports, Inc.  Is

18   that your understanding?

19        A.    Yes.

20        Q.    Can we just have an agreement that if we refer

21   to "Feld," we're talking about Feld Motor Sports, Inc.?

22        A.    Yes.

23        Q.    Okay.  And if you need to clarify, just let me

24   know you're referring to Feld Entertainment versus Feld

25   Motor Sports, Inc., but otherwise if we're talking about
```

```
 1    Feld, I'm going to assume it's Feld Motor Sports.  Is that

 2    fair?

 3         A.    Fair.

 4         Q.    Okay.  Did you speak with anyone other than

 5    your counsel in preparing to testify?

 6         A.    When I was originally doing the 30(b)(6) I

 7    spoke with John Tillman and Jim Perry.

 8         Q.    And who's John Tillman?

 9         A.    John Tillman is our head flagger.

10         Q.    Was he the head flagger at the Tampa

11    Supercross in 2020?

12         A.    As far as I remember, yes.

13         Q.    And who is Jim Perry?

14         A.    Jim Perry is now our safety manager.

15         Q.    Do you know if he had any role in connection

16    with the Tampa Supercross in 2020?

17         A.    The only role that I believe Jim had was he

18    was employed by Yamaha, which is an OEM race team that

19    competes at Supercross.

20         Q.    And OEM is original equipment manufacturer?

21         A.    Yes.

22         Q.    And I know some of these terminologies or

23    questions you're very familiar with, but for laypeople

24    we might not quite understand the lingo, so I apologize

25    if I ask you to explain things that seem intuitive to
```

1   you from time to time.  Okay?

2       A.   Understand.

3       Q.   Why did you speak with Jim Perry?

4       A.   I spoke with Jim Perry just to make sure that

5   I was correct in my belief of what we instruct the track

6   runners to do.

7       Q.   And what did he tell you?

8       A.   He told me that the track runners are

9   instructed that when a rider goes down, if that rider

10  doesn't get up quickly or is being attended to by the

11  medical staff, that they are to direct traffic away from

12  the rider.  And if they have a motorcycle that they can

13  put in between the rider and oncoming traffic to do

14  that, and/or place a Tuff Block there, as well.

15      Q.   And was that your understanding going into the

16  conversation?

17      A.   Yes.

18      Q.   Anything else that he told you?

19      A.   That was all.

20      Q.   And why did you speak with John Tillman?

21      A.   Again, to refresh my memory and make sure that

22  I was understanding what we directed our caution

23  flaggers to do.

24      Q.   And what did he tell you?

25      A.   He told me that when there's an accident or

 1    incident, something on the track, that he directs our

 2    caution flaggers to wave their flag and signal the

 3    riders that there is something up ahead to warn them of

 4    a potential obstacle in the way.

 5        Q.    Okay.  Anybody else you spoke to?

 6        A.    No.

 7        Q.    Have you spoken to Todd Jendro about this

 8    case?

 9        A.    I have not.

10        Q.    What about anybody with the AMA?

11        A.    No.

12        Q.    Anyone with The Medic Rig?

13        A.    No.

14        Q.    Why not?

15        A.    I didn't think it was appropriate.

16        Q.    Why not?

17        A.    With the ongoing litigation.

18        Q.    And what did you understand the ongoing

19    litigation to be about?

20        A.    That the Plaintiff is suing the list of

21    Defendants for what he believes is inadequate medical

22    care.

23        Q.    And who's the Plaintiff?

24        A.    Brian Moreau.

25        Q.    Did you know of Brian before this lawsuit?

```
 1        A.    Yes.

 2        Q.    Did you know of him before his accident at the

 3   Tampa event?

 4        A.    Only weeks before.

 5        Q.    What do you mean by that?

 6        A.    I was aware that he was a French rider coming

 7   over to compete in AMA Supercross through PR and

 8   probably his team mentioning it.

 9        Q.    And do you believe Brian's claims are

10   frivolous?

11              MS. JANKOWSKI:  Objection to form.

12              THE WITNESS:  Define "frivolous."

13   BY MR. SCHWEIKERT:

14        Q.    How would you define it?

15        A.    Unwarranted.

16        Q.    Do you believe Brian's claims in this lawsuit

17   are unwarranted?

18        A.    I do.

19        Q.    And why is that?

20        A.    I believe Brian was at fault for crashing his

21   motorcycle.

22        Q.    Do you understand that his claims concern what

23   happened after his crash with respect to the way the

24   track was officiated and the way the medical team

25   responded to his crash?
```

 1       A.    I do.

 2       Q.    And do you understand that aspect of his

 3   claims to be -- strike that.

 4       Do you believe that aspect of his claims to be

 5   unwarranted, as well?

 6             MR. DOYLE:  Object to form.

 7             MS. JANKOWSKI:  Objection to form.

 8             MS. SPRADLIN:  Join.

 9             THE WITNESS:  I do.

10   BY MR. SCHWEIKERT:

11       Q.    Why is that?

12       A.    Well, I believe that the caution flaggers and

13   the track runners did everything correctly.  I am not an

14   expert or a medical professional, and neither am I an

15   AMA official; so I can't say -- I can't answer for those

16   two organizations.

17       Q.    You've been -- how long have you been working

18   with the Supercross?

19       A.    Twenty-three (23) years.

20       Q.    Do you ride dirt bikes yourself?

21       A.    I used to.

22       Q.    For what time period, approximately?

23       A.    From 4 years old to 26.

24       Q.    Did you ever compete in any Motocross racing?

25       A.    I did amateur Motocross.

 1    Q.   But never professionally?

 2    A.   No.

 3    Q.   Did you ever have any injuries that required

 4  you to go to a hospital?

 5    A.   No.  I was lucky other than one.  I did have a

 6  broken collarbone.

 7    Q.   Was that during an amateur Motocross event?

 8    A.   It was during practice.

 9    Q.   Practice before a particular event or just

10  practicing on the weekend and --

11    A.   No, just practicing during the week.

12         MS. JANKOWSKI:  You need to let him finish.

13         THE WITNESS:  I'm sorry.

14  BY MR. SCHWEIKERT:

15    Q.   I'm asking a lot of questions.  I'm sure

16  you'll anticipate at where I'm going, but to make

17  Jennifer's life easier, just take your time, please.

18    Did you go to college?

19    A.   I did.

20    Q.   Where did you go?

21    A.   Florida State University.

22    Q.   Go Gators.  What year did you graduate?

23    A.   1998.

24    Q.   All right.  And what did you study?

25    A.   Sport Administration.

```
 1        Q.    Did you have an interest when you were an
 2   undergrad in working in Motocross at that time?
 3        A.    Not particularly.  I just wanted to work in
 4   sports.  My interest wasn't really piqued until closer
 5   to the end of my career -- my scholastic career.  I
 6   started grad school and really that's when the interest
 7   started to pique.
 8        Q.    What piqued your interest?
 9        A.    Just a conversation with a friend of mine.
10        Q.    What about that conversation piqued your
11   interest?
12        A.    I just had no clue what professional sport I
13   wanted to work in and the friend asked me, you know,
14   what would I do if anything was an option.  And I
15   remembered my love of the sport of Motocross and
16   Supercross, and that's when I was -- I decided to go
17   after a career in Supercross and Motocross.
18        Q.    And for those of us unfamiliar, can you
19   explain the difference between Motocross versus
20   Supercross, please?
21        A.    Uh-huh (affirmative).  Motocross is typically
22   in a rural area.  It's rolling hills, natural terrain.
23   Very seldom, but there are, you know, a few times where
24   a Motocross track will have a manmade obstacle on it
25   where they actually push up dirt and create jumps, but
```

```
 1   it's more often than not just the natural terrain that they
 2   race over.
 3       Supercross is held inside a stadium or a venue.
 4   The dirt is imported into the venue.  The track is
 5   wholly built by man and machines and then raced on.  And
 6   then after that the dirt is taken back out and stored.
 7       Q.   Is it fair to say that Supercross is the Super
 8   Bowl of professional Motocross racing?
 9       A.   I wouldn't say it's the Super Bowl, but I
10   would say it's the premier discipline in Supercross/
11   Motocross racing.
12       Q.   You mentioned grad school.  Did you start
13   going to grad school?
14       A.   I started going to grad school.
15       Q.   Where did you start going to grad school?
16       A.   Florida State University
17       Q.   And what were you setting out to study?
18       A.   Sport Administration.
19       Q.   Okay.  Did you complete that degree?
20       A.   I did not.
21       Q.   Why not?
22       A.   It became clear to me within the courses and
23   my classes that I was one of the only ones without real-
24   world experience in the sport -- in the field.  And so I
25   decided to go out, try to start my career, and then
```

1    afterwards I would go back.

2        Q.    Were you successful?

3        A.    I was -- I would say I was successful.  I mean

4    I got the job with Feld Motor Sports and, you know, that

5    ultimately led to Supercross.  And so due to time

6    available, as well as, you know, ending up in the job

7    that I wanted, I just didn't go back to finish the

8    degree.

9        Q.    And when you say you got the job with Feld

10   Motor Sports, what do you mean?

11       A.    Well, I applied for a job with Supercross, but

12   there wasn't anything -- there was no openings for

13   Supercross, so I got a job with Monster Jam and I worked

14   Monster Jam for a year and a half prior to transitioning

15   to Supercross.

16       Q.    And when did you start working in Monster Jam?

17       A.    2000.

18       Q.    And then approximately 2001-2002 you

19   transitioned to Supercross?

20       A.    Yeah, I believe it was 2001.  August 2001.

21       Q.    Was Feld -- did Feld own Supercross back then?

22       A.    No.

23       Q.    So when you transitioned to Supercross at that

24   time, who did you go to work for?

25       A.    I believe it was SFX Motorsports at the time.

```
 1     Q.   And since starting with SFX Motorsports, have you

 2   continued to work with the Supercross from that point up

 3   until the present day?

 4     A.   Yes.  When I -- so from, again, 2001,

 5   approximately August, through the present day I

 6   continued to work for Supercross.

 7     Q.   Do you know approximately when Feld took over

 8   the Supercross?

 9     A.   I believe it was late 2008, so the first full

10   year would have been 2009, I believe.

11     Q.   Okay.  And this isn't a memory test, but I'm

12   just trying to get an understanding of your experience.

13   Do you recall the various roles you may have held over

14   the course of your career, working with the Supercross

15   starting back in the beginning?

16     A.   Yes.  I was the event manager when I started,

17   what we call tour manager today.

18     Q.   And how long were in that role?

19     A.   Probably approximately five to six years.

20     Q.   And what did you do as an event manager?

21     A.   I set up -- I would call the venues, work with

22   the event manager from various venues making sure, you

23   know, that they knew what our needs were when we

24   arrived, making sure that everything was ordered

25   operationally from port-a-johns for the pits to trophies
```

 1    for the races.

 2        Q.    And after serving as an event manager, what

 3    was the next position you took on?

 4        A.    Direction of operations.

 5        Q.    Do you recall approximately when that was?

 6        A.    I believe it was around 2007.  2006, 2007.

 7        Q.    Shortly before Feld took over?

 8        A.    Yes.

 9        Q.    And what did a director of operations do at

10    that time?

11        A.    Managed the operational budget for the event.

12    Managed the event manager.  Liaison with the various

13    staff, operation staff.

14        Q.    And when Feld took over, did you stay in that

15    role as director of operations?

16        A.    I did.

17        Q.    Did the responsibilities that you had change

18    or did they stay consistent with what you had already

19    been doing?

20        A.    They stayed consistent.

21        Q.    And how long were you the director of

22    operations?

23        A.    I believe approximately another six or seven

24    years.

25        Q.    Do you know when you stopped being the

 1  director of operations?

 2      A.   I don't recall the exact date or timeframe,

 3  but I would say 2012, '13, '14.  In there.

 4      Q.   And what was the next position you took on?

 5      A.   The senior director of operations.

 6      Q.   And what did you do as the senior director of

 7  operations?

 8      A.   Helped manage the director of operations.

 9  Again, oversaw budgets with the director of operations.

10  Helped liaison between television broadcast crew and the

11  operations department.

12      Q.   And how long were you the senior director of

13  operations?

14      A.   From, again, 2012, '13, '14 through the end of

15  2021.

16      Q.   So you were the senior director of operations

17  at the time of the Tampa Supercross in 2020?

18      A.   Yes.

19      Q.   And who did you report to at that time?

20      A.   Todd Jendro.

21      Q.   Do you know who he reported to at that time?

22      A.   I believe he reported to J. Vaught.

23      Q.   And who's J. Vaught?

24      A.   J. Vaught was the SVP of operations.

25      Q.   Senior vice president of operations?

1    A.   Senior vice president.

2    Q.   And do you know who Mr. J. Vaught reported to?

3    A.   I don't know.  I believe he reported to Mike

4  Shannon, who was the president.

5    Q.   The president of Supercross or the president

6  of Feld Motor Sports?

7    A.   Feld Motor Sports.

8    Q.   And how do you spell Vaught?

9    A.   V-a-u-g-h-t.

10   Q.   And Jay is J-a-y?

11   A.   Just the initial J.

12   Q.   Okay.  Thank you.

13   Are you currently the senior director of operations

14 with Supercross?

15   A.   No, I'm currently the vice president of

16 Supercross.

17   Q.   And when did you become the vice president?

18   A.   The very end of 2021, I believe.

19   Q.   Was that a promotion?

20   A.   Yes.

21   Q.   And how did your role and responsibilities

22 change?

23   A.   The role changed in that I liaison with all

24 departments outside of just operations and television

25 broadcast now, all departments under Feld Motor Sports.

1    Q.   And what departments are those related to the

2    Supercross?

3    A.   Finance, marketing, digital marketing, paid

4    digital media, social media, public relations, FCP,

5    which is Feld Consumer Products, our merchandise,

6    creative services.  I may be missing one or two, but

7    that's the gist of it.

8    Q.   Is there an operations department?

9    A.   There's an operations department.

10   Q.   Is there a safety department?

11   A.   There is a safety department.

12   Q.   Is there a risk management department?

13   A.   There's a risk department, yes.

14   Q.   At the time of the Tampa Supercross, was there

15   anyone that was reporting to you?

16   A.   Yes.  Mike Muye was reporting to me.

17   Q.   Anyone else?

18   A.   No.  There was a dotted line, if you will, so

19   I -- they didn't report directly to me, but the -- and I

20   don't know his title, but vice president of broadcast,

21   Michael Prince, I believe he reported to Todd Jendro.

22   Q.   And do you recall what role Mike Muye was in

23   at the time of the Tampa Supercross?

24   A.   I believe director of operations.

25   Q.   Your old job?

```
 1        A.    My old job, yes.

 2        Q.    Did you speak with Mr. Muye in preparing to

 3   testify today?

 4        A.    Not in preparing to testify, no.

 5        Q.    Have you spoken with him about Brian Moreau in

 6   any other capacity since the lawsuit has been filed?

 7        A.    No.

 8        Q.    Are you aware that he had his deposition

 9   taken?

10        A.    I am.

11        Q.    Did you review it?

12        A.    No.

13        Q.    Did you ask him about it?

14        A.    No.

15        Q.    Why not?

16        A.    Again, I didn't feel it was appropriate given

17   the litigation.

18        Q.    The operations department, safety department,

19   and risk management department, were they in existence

20   at the time of the Tampa Supercross?

21        A.    They were.

22        Q.    What did the operations department do at that

23   time?

24        A.    They oversaw the operations of the Supercross

25   event as a whole outside of competition.
```

1    Q.   What does that mean?

2    A.   It means they were responsible for operations

3  for the event as a whole.  So setting up the pit area,

4  putting up that fence, hanging the banners around the

5  stadium, putting up the various structures, podium,

6  finish line, start gate overhead, that type of thing.

7    Q.   Did they have any role in facilitating the

8  construction of the racetrack itself?

9    A.   Not in facilitating the construction, no.

10    Q.   Didn't have any role with respect to the

11  racetrack?

12    A.   Other than putting Tuff Blocks on the

13  racetrack, no.

14    Q.   How did -- well, at that time how was the

15  track for the Tampa Supercross designed and constructed?

16    A.   It was designed by Dirt Wurx.

17    Q.   And who's Dirt Wurx?

18    A.   Dirt Wurx is our contractor that we hired to

19  design and build Supercross tracks.

20    Q.   And did Dirt Wurx design the track on its own

21  or did Feld have some input?

22    A.   Dirt Wurx designs the track.  Mike Muye and,

23  at the time, myself would look at the track just to make

24  sure we felt like it worked operationally with the

25  venue, but there's very little input from our side, if

1     any, on the track design.

2         Q.   Well, if there were potential safety concerns

3     that you had about how a particular track was designed,

4     would you address those with Dirt Wurx?

5         A.   Yes.

6         Q.   Did Feld ultimately have approval of the final

7     design of the track that was constructed at the Tampa

8     Supercross?

9         A.   No.

10        Q.   So even if the track was unsafe, Dirt Wurx

11    could just go ahead and build it however they wanted and

12    Feld had no authority over it?

13            MS. JANKOWSKI:  Objection to form.

14            THE WITNESS:  No.  If the track was unsafe,

15        the AMA, along with Feld Motor Sports, would have

16        gotten with Dirt Wurx and explained what we felt

17        was unsafe about it, and Dirt Wurx would have made

18        the revision.

19    BY MR. SCHWEIKERT:

20        Q.   I noticed -- strike that.

21        Do you know if there was any concrete that was left

22    exposed on the exterior of the racetrack at the Tampa

23    Supercross?

24        A.   Well, define "exposed" and the -- meaning the

25    walls of Raymond James Stadium, I believe, are concrete.

1    Q.    Was there an area where the dirt ended and there

2    was some concrete before it got to the wall?

3    A.    No.

4    Q.    Are you sure about that?

5    A.    I'm sure.  It's plywood.  So Raymond James

6    Stadium is grass or turf and so there's plywood put down

7    between the track and the wall.

8    Q.    So you believe there was plywood and then

9    grass put down on top of it?

10    A.    No.  We put down -- so a regular football

11    field, obviously grass.  In order to protect that grass,

12    operations would go in and put plastic and then plywood,

13    and then in some cases a substance we call product,

14    which is basically thin plastic plywood that goes over

15    the grass.

16    So that was the surface from -- as I remember, that

17    was the surface from the racetrack to the wall.

18    Q.    Are there other stadiums where there have been

19    instances where concrete is left exposed?

20    A.    Yes.

21    Q.    Do you believe that Supercross is a dangerous

22    sport?

23    A.    Supercross is a dangerous sport.

24    Q.    There's a risk that riders can crash their

25    motorcycles, right?

1    A.   Yes.

2    Q.   There's a risk that they can crash and go off

3  the dirt track, right?

4    A.   Yes.

5    Q.   Do you know why in some instances there's

6  concrete that's left exposed next to the track?

7    A.   That's the way Supercross tracks are

8  constructed.  And if there is no grass to protect, then

9  we leave the outside concrete.

10    Q.   Is it a budgeting issue?

11    A.   No.

12    Q.   Would it be expensive to put some additional

13  soil down to cover the concrete areas?

14    A.   It would cost something to do that, yes.

15    Q.   Have you seen instances where riders have

16  fallen off their motorcycles and landed on the bare

17  concrete?

18    A.   Yes.

19    Q.   Did you ever consider addressing that issue by

20  doing something to cover the concrete in those

21  circumstances?

22    A.   No.

23    Q.   Why not?

24    A.   We didn't feel it was necessary.  If you land

25  on concrete or you land on flat dirt, it's -- in my

1    opinion it's the same impact.

2        Q.   Do you ride street bikes?

3        A.   I did ride street bikes, yes.

4        Q.   Me, too.  I've also ridden dirt bikes.  Isn't

5    it fair to say that falling off a dirt bike and landing

6    on dirt or grass is a little bit of a softer landing

7    than falling off a street bike and landing on bare

8    concrete?

9            MS. JANKOWSKI:  Objection to form.

10           THE WITNESS:  It depends on the consistency of

11       the dirt and how hard the dirt is.  Dirt varies

12       everywhere.

13   BY MR. SCHWEIKERT:

14       Q.   Is dirt the only way to cover concrete that is

15   exposed next to a racetrack?

16       A.   You could cover it with a lot of things.

17       Q.   Like what?

18       A.   That's a broad question.  We don't cover it.

19   We don't think it's necessary to cover it.

20       Q.   Have you ever had any concerns expressed by

21   any rider or team about leaving their concrete exposed

22   around the exterior of a track?

23       A.   Over the years there may have been one or two

24   that have expressed that concern.

25       Q.   Who are the one or two?

```
 1        A.    I can't remember exactly.  I believe the rider

 2   was Grant Langston years ago, early 2000s.

 3        Q.    And the other, if you remember?

 4        A.    I don't remember.

 5        Q.    And when you say we didn't think it was

 6   necessary, who are you referring to?

 7        A.    Feld Motor Sports.

 8        Q.    Are you familiar with Austin Forkner's crash

 9   in Arlington in 2024?

10        A.    I am.

11        Q.    Do you recall that he fell off his bike and

12   landed on the concrete next to the track on his back?

13        A.    I am.  I do recall that.

14        Q.    Did that concern you at all?

15              MS. JANKOWSKI:  Objection to form.

16              THE WITNESS:  It always concerns me when an

17        athlete crashes.

18   BY MR. SCHWEIKERT:

19        Q.    What about the fact that he landed on bare

20   concrete?

21              MS. JANKOWSKI:  Same objection.  Go ahead.

22              THE WITNESS:  It always concerns me when a

23        rider crashes and lands on anything solid.

24   BY MR. SCHWEIKERT:

25        Q.    Was there any consideration after that
```

 1  incident about doing something to eliminate having bare

 2  concrete exposed next to the racing surface?

 3      A.   We talked about it and I believe we -- well,

 4  we came to the conclusion, again, that it was

 5  unnecessary to cover the concrete with dirt.  Austin

 6  actually, in an interview I heard, mentioned the fact

 7  that he believes it would have been worse had we covered

 8  it with dirt and he would have landed on there.

 9      Q.   What about some sort of padding, that could be

10  a way to soften the landing if somebody happens to go

11  off the track, right?

12      A.   It could be.

13      Q.   Do you know if Mr. Forkner experienced any

14  sort of injury to his vertebrae as a result of that

15  crash?

16      A.   I don't recall.

17      Q.   Do you recall seeing him walking off the track

18  with a cervical collar around his neck and tears

19  streaming down his face?

20      A.   I do.

21      Q.   And you still don't believe that covering the

22  concrete is something that's necessary to prevent riders

23  from fracturing vertebrae in their back if they go off

24  the track and hit the concrete?

25          MS. JANKOWSKI:  Objection to form.

```
 1              THE WITNESS:  I don't believe it's necessary, no.
 2   BY MR. SCHWEIKERT:
 3       Q.   With respect to the Tampa 2020 Supercross,
 4   what did the safety department do?
 5       A.   The safety department for Feld Motor Sports
 6   only deals with the operations on the Supercross side.
 7   So they're there to monitor whether we're using -- the
 8   operations crew is using the proper PPE, personal
 9   protection equipment, fall equipment, stuff like that,
10   during the construction and the deconstruction of the
11   racetrack.
12       Q.   So Feld's safety department is only concerned
13   with the safety of the operations crew?
14       A.   Correct.
15       Q.   Feld's safety department is not concerned with
16   rider safety during Supercross events?
17       A.   We have the AMA and The Mobile Medical Rig as
18   experts to oversee the safety of the riders.
19       Q.   And when you say "the operations crew," who
20   are you referring to?
21       A.   The crew that is responsible for setting up
22   and tearing down, constructing and deconstructing the
23   Supercross event on a week-to-week basis.
24       Q.   Does the operations crew include the track
25   runners and the flaggers?
```

```
 1        A.    Not the flaggers, but some members of the
 2   operations crew are track runners.
 3        Q.    And you mentioned personal protective
 4   equipment; what did you mean by that?
 5        A.    Steel-toed boots, high vis outerwear, hard
 6   hats when you're setting something up, you know, above
 7   your head, that type of thing.  Constructional --
 8   construction equipment.
 9        Q.    Is there any sort of personal protective
10   equipment that Feld wants the track runners to wear
11   during Supercross events?
12        A.    Yes.
13        Q.    And what's that?
14        A.    They wear helmets and gloves.
15        Q.    And why do they wear helmets?
16        A.    Supercross is inherently dangerous, and
17   they're out on the racetrack.
18        Q.    Is it fair to say that anybody that's on the
19   floor while the racetrack is active is in danger?
20              MS. JANKOWSKI:  Object to form.
21        A.    I wouldn't say that.  I would say anyone who
22   is in close proximity or on the racetrack on Feld Motor
23   Sports staff has a helmet on.
24        Q.    To protect against the risk of a head injury,
25   right?
```

```
 1        A.    Yes.
 2        Q.    Because Supercross racing presents a risk of a
 3   head injury, right?
 4        A.    It can.
 5        Q.    A motorcycle could hit somebody in the head,
 6   right?
 7        A.    Yes.
 8        Q.    A motorcycle can go off the track and hit a
 9   journalist that's standing nearby taking photographs,
10   right?
11        A.    They could, yes.
12        Q.    Didn't that happen last month in February?
13        A.    I don't recall if it was last month, but, yes,
14   it did happen recently.
15        Q.    A journalist was hit by a motorcycle and his
16   legs were broken, right?
17        A.    I don't know the extent of his injury.  I
18   believe it was one leg.
19        Q.    So I'm clear, it's your testimony that Feld
20   delegates all issues related to rider safety to the AMA
21   and The Medic Rig?
22             MS. JANKOWSKI:  Objection to form.  Go ahead.
23             THE WITNESS:  Yes.
24   BY MR. SCHWEIKERT:
25        Q.    Feld owns the Supercross, right?
```

1    A.   Feld owns the Supercross events, yes.

2    Q.   Why would Feld take such a hands-off approach

3 to rider safety given it owns these events where elite

4 athletes are participating in a very dangerous sport?

5         MS. JANKOWSKI:  Objection.  Form.

6         THE WITNESS:  The AMA and The Medic Rig staff

7    are the competition experts.

8 BY MR. SCHWEIKERT:

9    Q.   Are they the safety experts?

10        MR. DOYLE:  Object to form.

11        MS. JANKOWSKI:  Join.

12        THE WITNESS:  As it pertains to the

13    competition, yes.

14 BY MR. SCHWEIKERT:

15   Q.   What about the risk management department,

16 what role did it serve during the 2020 season?

17   A.   It's insurance for the events.  I'm not sure

18 what other role they would have performed.

19   Q.   Did Feld have a risk management officer at the

20 Tampa Supercross event in 2020?

21   A.   Not that I'm aware of.

22   Q.   Are you aware of whether the AMA typically

23 requires the organizer of an AMA sanctioned event to

24 have a dedicated risk management officer?

25   A.   I am not aware of that, no.

```
 1      Q.   You mentioned Jim Perry currently serving as
 2  Feld's safety manger; is that right?
 3      A.   Correct.
 4      Q.   Do you know if there was a safety manager at
 5  the Tampa event in 2020?
 6      A.   Yes.  And let me define safety manager under
 7  the operations department.
 8      Q.   I was going to get there.  Do you recall who
 9  was the safety manager at the Tampa Supercross?
10      A.   Yes, Phil Penn.
11           THE REPORTER:  Did you say Penn?
12           THE WITNESS:  Penn, P-e-n-n.
13  BY MR. SCHWEIKERT:
14      Q.   And is his role sometimes referred to as track
15  safety supervisor?
16      A.   I can imagine it would be.  I don't
17  necessarily refer to it as that.
18      Q.   Is that role sometimes referred to as the,
19  quote, "eye in the sky," end quote?
20      A.   I've heard people refer to it as that, yes.
21      Q.   And one of the reasons for that reference is
22  because the person's position is high up in the stadium
23  looking down on the floor where the track is, right?
24      A.   Right.
25      Q.   They have a good vantage point of everything
```

1    that's going on, right?

2        A.   Right.

3        Q.   And are they there to assist in keeping the

4    track safe?

5            MS. JANKOWSKI:  Objection to form.  You can

6        answer.

7            THE WITNESS:  They are there to assist Feld

8        Motor Sports track runners and Feld Motor Sports

9        caution flaggers.

10   BY MR. SCHWEIKERT:

11       Q.   Well, it's my understanding the track runners

12   at that time would assist in creating a safe area for

13   the medical team to provide services to a rider injured

14   on the track; is that fair?

15           MS. JANKOWSKI:  Objection to form.

16           THE WITNESS:  That's fair.

17   BY MR. SCHWEIKERT:

18       Q.   And we talked about picking up a bike and

19   placing as a protective barrier, right?

20       A.   Right.

21       Q.   So is it fair to say that the track runners

22   are part of the overall team that is responding to an

23   accident where a rider may be injured?

24       A.   Yes, that's fair.

25       Q.   And that's also true with respect to the

```
 1    flaggers who wave yellow flags to alert oncoming traffic
 2    that there's a hazard on the track, right?
 3        A.   Yes, the caution flaggers.
 4        Q.   And I understand that Feld has some flaggers
 5    and the AMA has flaggers; is that your understanding?
 6        A.   Yes.
 7        Q.   Do you know why at the time of the Tampa event
 8    there were two different groups of flaggers?
 9        A.   Feld's caution flaggers are simply to warn
10    riders of obstacles that they're approaching.  So
11    they're only -- they only have yellow flags.  That's
12    their sole purpose is to warn riders of potential
13    obstacles in the track.
14        Flaggers for the AMA are officials and have a
15    multitude of flags.
16        Q.   But why would there be two different groups of
17    flaggers as opposed to just one group?
18        A.   I think --
19            MS. JANKOWSKI:  Objection to form.  Go ahead.
20            THE WITNESS:  I think with the amount of
21        flaggers, both caution, as well as AMA flaggers, on
22        the floor, it is more efficient to have our caution
23        flaggers -- Feld Motor Sports caution flaggers
24        overseen by one individual and then the AMA
25        flaggers and officials overseen by the AMA.
```

BY MR. SCHWEIKERT:

    Q.   You believe it's more efficient to have two
different people supervising two different groups of
flaggers as opposed to one person supervising the entire
flagging crew?

         MS. JANKOWSKI:  Object to form.

         THE WITNESS:  I do.

BY MR. SCHWEIKERT:

    Q.   Why?

    A.   Again, because of the amount of flaggers and
because Feld Motor Sports caution flaggers have a
singular purpose and that is to alert athletes of an
obstacle in the racetrack ahead.

    Q.   Well, that's the purpose that the AMA flaggers
serve, too, right?

         MS. JANKOWSKI:  Object to form.

         MS. SPRADLIN:  Same objection.

         THE WITNESS:  It is.  They can, yes.

BY MR. SCHWEIKERT:

    Q.   Well, what is your understanding of the
purpose of the AMA flaggers?

    A.   Again, multiple purposes, but they're
officials.  They do have a caution flag, a yellow flag.
They have multiple flags that they can use to signal to
riders depending on what the message is.

1    Q.   And when you refer to them as "officials," does

2    that mean they have some officiating role?

3    A.   They do.

4    Q.   And you're telling me the Feld flaggers have

5    no role in the officiating aspect?

6    A.   Correct, they have no role in the officiating.

7    Q.   Do you know what different flags the AMA

8    flaggers had during the Tampa event?

9    A.   I know what different flags they have at a

10   typical Supercross event, yes, which would be the same

11   that they had at the Tampa event.

12   Q.   And do you know how many officials at the

13   Tampa Supercross had red flags?

14   A.   I don't know.  I believe three would have had

15   red flags.

16   Q.   And why do you believe that?

17   A.   Because that's typical for a Supercross event.

18   Q.   And how many flaggers, approximately,

19   including the AMA's flaggers and Feld's flaggers, were

20   at the Tampa Supercross event during the practices?

21        MS. JANKOWSKI:  Objection.  Form.

22        THE WITNESS:  I would -- it would be difficult

23     for me to say exactly.  There are approximately 25

24     caution flaggers -- Feld Motor Sports caution

25     flaggers that we use at a typical event, and I

```
 1          would estimate there's 10 to 12 AMA officials with
 2          flags.
 3    BY MR. SCHWEIKERT:
 4          Q.    Do you know why only approximately three of
 5    AMA officials would have red flags?
 6                MS. SPRADLIN:  Objection to form.
 7                THE WITNESS:  I don't know why.
 8    BY MR. SCHWEIKERT:
 9          Q.    Did you attend the Tampa Supercross in 2020?
10          A.    I did.
11          Q.    Did you ever speak to Phil Penn about Brian
12    Moreau?
13          A.    I did not.
14          Q.    Why not?
15          A.    I spoke to Mike Muye about Brian Moreau.
16          Q.    Do you know if Phil Penn was positioned up in
17    the stadium looking down on the track during the
18    practice in which Brian crashed?
19          A.    I don't personally know, but I assume he was
20    since that was his position and free practice had
21    started.
22          Q.    And you never sought out any information from
23    Mr. Phil Penn about what he saw?
24                MS. JANKOWSKI:  Objection to form.
25                THE WITNESS:  I did not.
```

BY MR. SCHWEIKERT:

    Q.    Do you know if anybody did?

    A.    I do not know.

    Q.    And you don't know, even though you did do
some preparation late last year, I think in connection
with appearing as corporate representative at that time,
right?

            MS. JANKOWSKI:  Objection to form.

            THE WITNESS:  Correct.  I know that I asked
        Mike Muye to gather all the information that he
        could on the accident and whether he asked Phil or
        not I am not sure.

BY MR. SCHWEIKERT:

    Q.    Does Phil Penn work for Feld?

    A.    Not any longer.

    Q.    Do you know why not?

    A.    I believe he was retiring and -- retiring from
his job and just didn't want to travel 17 weekends a
year.

            MR. SCHWEIKERT:  That is a lot.

            We've been going a little bit.  I could use a
        break if that's all right with everybody.

            MS. JANKOWSKI:  Yes.

            MR. SCHWEIKERT:  Off the record, please.

            THE VIDEOGRAPHER:  It's 10:14.  We're going

 1          off the record.

 2                  (Off the record.)

 3                  (On the record.)

 4          THE VIDEOGRAPHER:  It's 10:33.  We're back on

 5      the record.

 6  BY MR. SCHWEIKERT:

 7      Q.    I want to talk to you a little bit about some

 8  of the contracts I believe you had the chance to review.

 9  This is a document that was previously marked as Exhibit

10  131 at a Zoom deposition.  Just for clarity's sake, I'm

11  going to put a sticker on it with the Exhibit Number of

12  131 on there.

13      It's the sanctioning agreement.  If you guys need

14  copies.

15      Just take a minute, review Exhibit 131 and let me

16  know if you've seen it before.

17      A.    I have seen it before, yes.

18      Q.    And is this a sanctioning agreement between

19  the AMA and Feld Motor Sports that was in effect at the

20  time of the Tampa Supercross in 2020?

21      A.    Yes, it is.

22      Q.    If we could go to Page 7 there's a Section E.

23  My apologies.  Go to the next page, 8.  There's a

24  Section 4 entitled Race Management Personnel.  Do you

25  see that?

1     A.    Yes.

2     Q.    And within that section there's a reference to

3  an AMA Supercross manager who will maintain ultimate

4  control over all race and floor operations.  Do you see

5  that?

6     A.    Yes.

7     Q.    What is your understanding of what that means

8  from a practical perspective during an event like the

9  Tampa one?

10    A.    The AMA Supercross manager is the lead

11 official that is overseeing all other AMA personnel.

12    Q.    Do you know who that was?

13    A.    I believe that was Mike Pelletier.

14    Q.    And what is your understanding of the

15 reference to maintaining ultimate control over all race

16 and floor operations?

17    A.    The race manager -- again, what it says there

18 -- has ultimate control over the racetrack and

19 everything that happens on the racetrack.

20    Q.    Would that include stopping the activity on

21 the racetrack if needed?

22          MS. JANKOWSKI:  Object to form.

23    A.    It would include that.

24    Q.    And the subsection below that refers to the

25 AMA Supercross manager providing managerial assistance

 1    of all track marshals and safety personnel, do you see

 2    that?

 3        A.    I do.

 4        Q.    And what is your understanding of what that

 5    means?

 6        A.    He can assist in the management of all track

 7    marshals and safety personnel.

 8        Q.    And do you know what a track marshal is?

 9        A.    I'm not sure what the AMA definition of track

10    marshal is.

11        Q.    What is your general understanding given your

12    decades of experience with the Supercross?

13        A.    A track marshal to me is what we at Feld Motor

14    Sports define as a track runner.

15        Q.    So it's your understanding that the AMA

16    Supercross manager provides some managerial assistance

17    of Feld's track runners?

18              MS. JANKOWSKI:  Object to form.

19              THE WITNESS:  If it's necessary he could

20        provide assistance.

21    BY MR. SCHWEIKERT:

22        Q.    Has it ever been necessary?

23        A.    Not that I can recall.

24        Q.    And if it was necessary, do you know how he

25    would provide assistance?

 1          MS. SPRADLIN:  Objection.  Form.

 2          THE WITNESS:  I'm not sure other than just

 3      some suggestions as to what to do.

 4  BY MR. SCHWEIKERT:

 5      Q.   Do you know if the track runners during the

 6  practices at the Tampa Supercross were in communication

 7  with the AMA Supercross manager?

 8      A.   They were not.

 9      Q.   Do you know what I mean by being "in

10  communication with"?

11      A.   I don't.  Define "communication."

12      Q.   I understand there's different radio channels

13  that are used to communicate amongst different staff.

14  Do you know if the Feld track runners had the ability to

15  communicate via a radio with the AMA Supercross manager?

16      A.   The Feld track runners did not have the

17  ability to communicate via radio with the AMA Supercross

18  manager.

19      Q.   Did they have the ability to communicate via

20  radio with anyone?

21      A.   They had the ability to communicate with

22  safety -- the track safety manager, Phil Penn, as well

23  as each other.

24      Q.   Do you happened to know what channel that they

25  were using at that time?

1    A.    I do not know what channel they were using.

2    Q.    Do you know if their radio equipment had the

3  capacity to change from one channel to a different

4  channel?

5    A.    It did, yes.

6    Q.    Do you know if they -- in your experience,

7  would there be any reason for a track runner to change

8  channels to communicate with someone other than the

9  safety manager or each other?

10    A.    Not during the event, no.

11    Q.    Is there a time outside of the event that

12  you're thinking of?

13    A.    Before and after the event those track runners

14  act as operations staff, so they would be on the

15  operations channel for load in and construction and then

16  load out and deconstruction of the racetrack.

17    Q.    And when you're saying during the event, are

18  you referring to while the racetrack is active with

19  motorcycles?

20    A.    Yes.

21    Q.    So as far as you're aware, once the racetrack

22  becomes active, those track runners are on a channel

23  with the safety manager and each other, but nobody else;

24  is that correct?

25    A.    Correct.

1    Q.   Do you know -- going back to the contract -- what

2    is meant by the reference that the AMA Supercross

3    manager would provide managerial assistance to safety

4    personnel?

5    A.   I take that as our caution flaggers, as well

6    as the AMA officials on track.

7    Q.   Do you know one way or another or is that just

8    your personal interpretation?

9    A.   That's my personal interpretation.

10   Q.   And during the Tampa Supercross, during the

11   practices, where were you located?

12   A.   I was throughout the venue.  So anywhere on

13   the premises.  I was in the pits.  I was underneath in

14   the service corridor.  Our event office.  I traverse

15   throughout the venue during events.

16   Q.   Are you equipped with a radio or headset?

17   A.   No.

18   Q.   And we'll get into that a little bit more

19   detail later.

20       Going back to the contract on Page 8, Subsection

21   4(b) there's a reference to an AMA race director.  Do

22   you see that?

23   A.   Yes.

24   Q.   Do you know who the AMA race director was at

25   the Tampa Supercross?

```
1        A.   I believe it was John Gallagher.

2        Q.   Is he still the race director for the

3   Supercross today?

4        A.   He is not.

5        Q.   Why not?

6        A.   He acted as the FIM race director, as well as

7   the AMA race director.  And when we did not renew our

8   contract with the FIM, the AMA didn't feel it necessary

9   to renew -- I don't know if they had a contract with him

10  or not, but they didn't feel it necessary to continue

11  with John Gallagher as the race director.

12       Q.   Do you know why?

13       A.   I do not.

14       Q.   He had been serving in that role for quite

15  some time at that point, right?

16       A.   Yes.

17       Q.   He held a lot of experience in directing

18  Supercross races, right?

19       A.   He did.

20       Q.   Did you or Feld have any say in John Gallagher

21  not being asked to continue serving as the race

22  director?

23       A.   No.

24       Q.   Did you have any conversations with anyone

25  about why they were going in a different direction?
```

 1     A.    No.   Mike Pelletier let me know they were going

 2   in a different direction.   I don't know that I asked

 3   why.   I think Mike felt it was a redundant position, I

 4   believe, but that was just my personal opinion.

 5     Q.    And why do you believe -- you thought it was a

 6   redundant position?

 7     A.    Because Mike Pelletier was capable of acting

 8   as the race director.

 9     Q.    And Mr. Pelletier took over serving as the

10   race director after Mr. Gallagher was no longer in that

11   role?

12     A.    I'm not sure if Pelletier acts as a race

13   director today or not.   He is the Supercross manager.

14     Q.    What was the last Supercross event you

15   personally attended?

16     A.    Indianapolis Supercross this year, so a few

17   weeks ago.

18     Q.    Do you know who was the race director for that

19   race?

20     A.    I assume it was Mike Pelletier, but I'm not

21   sure.   Again, I'm not sure he can play both roles.   He

22   is the lead official.

23     Q.    At present?

24     A.    Yes.

25     Q.    And it's your understanding that at present

1  there is still a separate AMA Supercross manager and an AMA

2  race director?

3      A.   That's my understanding, yes.

4      Q.   Do you know who the AMA Supercross manager is

5  at present?

6      A.   Mike Pelletier is the AMA Supercross manager.

7  I am not sure who the AMA race director is at present.

8      Q.   Did you have ever have any conversations with

9  Mr. John Gallagher about Brian Moreau or his accident?

10     A.   I did not.

11     Q.   Why not?

12     A.   I didn't feel it necessary.  I don't -- I

13  didn't feel it necessary.

14     Q.   Why did you not feel it was necessary?

15     A.   I just didn't think that John could give me

16  any information that I wasn't already aware of.

17     Q.   What do you mean by that?

18     A.   John acting as the race director, I know his

19  responsibilities and so I assumed he did everything

20  correctly.

21     Q.   You assumed, but you didn't speak with him to

22  determine for yourself if everything had been done

23  correctly?

24     A.   I did not speak with John Gallagher, no.

25     Q.   If we go back to the sanctioning agreement,

 1    Exhibit 131, Page 8, Subsection 4(c), there's a reference

 2    to an AMA event manager.  Do you see that?

 3        A.   Yes.

 4        Q.   Is that different than the Feld event manager

 5    you were telling me about earlier?

 6        A.   It is.

 7        Q.   How do you distinguish between the Feld event

 8    manager and the AMA event manager with respect to the

 9    2020 Supercross Season?

10        A.   Feld Motor Sports event manager handles the

11    operations of the event as a whole outside of the

12    competition and the racetrack.  The AMA event manager

13    handles event management, but pertaining to the

14    competition, the racetrack, the athletes, race teams,

15    and so on.

16        Q.   Do you know who the AMA event manager was for

17    the Tampa Supercross?

18        A.   I'm not a hundred percent sure, but I believe

19    it was Jeff Canfield.

20        Q.   Do you know Mr. Canfield?

21        A.   I do.

22        Q.   Did you ever speak to him about Brian or his

23    accident?

24        A.   I did not.

25        Q.   Why not?

 1      A.   I didn't feel it necessary.

 2      Q.   Why not?

 3      A.   The AMA are the experts when it comes to

 4   competition and I didn't feel it necessary to speak to

 5   him.  I had spoken to Mike Muye and Mike Pelletier.

 6      Q.   And John Hinz, right?

 7      A.   John Hinz called me about it, yes.

 8      Q.   We'll talk a little bit about that later.

 9   The next position referenced in the sanctioning

10   agreement is an AMA operations manager.  Do you see

11   that?

12      A.   I do.

13      Q.   Do you know who that person was at the Tampa

14   Supercross?

15      A.   I don't know who that person was at the Tampa

16   Supercross.

17      Q.   What is your understanding of the role the AMA

18   operations manager plays versus Feld's operation team?

19      A.   My understanding, again, Feld's operations

20   manager deals with the event outside of the racetrack

21   and the competition.  The AMA's operation manager is in

22   charge of what we would call technical inspection.  It's

23   making sure that the motorcycles are technically sound

24   and that everything is -- you know, all equipment,

25   motorcycles, helmets, and so on are within the AMA

1    regulations.

2        Q.    I'm going to go to -- if I can find it -- one

3    moment, please -- Page 17.  Towards the bottom of the

4    page there's a Section 24 entitled Race Staff Uniforms.

5    Do you see that?

6        A.    Yes.

7        Q.    And that section reads, quote, "The series

8    logo will be placed prominently on the chest of the

9    shirt of all FMS race staff uniforms for the

10   championship," end quote.  Do you see that?

11       A.    I do.

12       Q.    And what is meant by "FMS race staff"?

13       A.    Feld Motor Sports race staff, which would be

14   track runners and operational staff.

15       Q.    Anyone else?

16       A.    Potentially the caution flaggers.  I'm not

17   sure if that series logo was on the chest, but I would

18   -- I believe it is and I believe it was in 2020.

19       Q.    While we are on the topic, I'm going to show

20   you a document previously marked as Exhibit 120 at

21   Mr. Gallagher's deposition.  Do you know what Exhibit

22   120 is?

23       A.    It is either our track runners' shirts or our

24   caution flaggers' shirts, I believe.

25       Q.    And do you see the Supercross Futures logo on

```
 1   the left and right-hand sleeve?

 2        A.   I do.

 3        Q.   Is that a Feld logo?

 4        A.   That is a Feld logo, yes.

 5        Q.   And what about the Supercross logo on the

 6   front and back, is that a Feld logo?

 7        A.   That is a conglomeration of logos.

 8        Q.   But it includes a Feld logo, particularly the

 9   Supercross, right?

10        A.   Yes, the Supercross word mark logo is a Feld

11   Motor Sports logo.

12        Q.   And on the back of the shirt just above the

13   Monster Energy logo there is an SX logo.  Do you see

14   that?

15        A.   Yes.

16        Q.   Is that a Feld logo?

17        A.   That is a Feld Motor Sports logo.  It's the

18   Supercross -- I believe we refer to it as the plain

19   logo.

20        Q.   SX is shorthand for Supercross, right?

21        A.   Correct.

22        Q.   Okay.  You can set that aside.

23        Does Feld -- well, strike that.

24        Did Feld profit from the Tampa Supercross in 2020?

25             MS. JANKOWSKI:  Objection to form.
```

```
 1              THE WITNESS:  I don't recall the exact financials
 2         of that event, but I would assume we profited from
 3         the Tampa Supercross in 2020.
 4    BY MR. SCHWEIKERT:
 5         Q.   Did Feld generate revenue from putting on the
 6    Tampa Supercross in 2020?
 7         A.   Yes.
 8         Q.   And what are all the sources of revenue that
 9    you're aware of?
10         A.   Revenue sources are ticket sales, media
11    rights, sponsorship, merchandise.
12         Q.   Anything else?
13         A.   Not that I can think of off the top of my
14    head.
15         Q.   What is your best approximation of the average
16    profit, if any, that Feld generated from a Supercross
17    event in 2020 before COVID shut things down?
18              MS. JANKOWSKI:  Objection to form.
19              THE WITNESS:  That is hard to say.  Again, my
20         best recollection, and this may be way off, but I
21         would say is somewhere around a half a million
22         dollars per event.
23    BY MR. SCHWEIKERT:
24         Q.   Does anyone share in that profit other than
25    Feld?
```

```
 1              MS. JANKOWSKI:  Objection.  Form.
 2              THE WITNESS:  Not directly, no.
 3   BY MR. SCHWEIKERT:
 4       Q.    What about indirectly?
 5       A.    Well, we do pay contractors and vendors out of
 6   that revenue.
 7       Q.    Anyone else?
 8       A.    Not that I can think of.
 9       Q.    Once you've subtracted all of your expenses
10   from revenue, taken out any taxes, you're left with a
11   net profit, right?
12       A.    Correct.
13       Q.    And is it your understanding that around that
14   time Feld was generating approximately $500,000 in net
15   profit from a Supercross event?
16       A.    I wouldn't say that's my understanding.
17   That's my best guestimate.
18       Q.    I will take your guestimate.
19       All right.  And what I was trying to understand is
20   does anybody else, other than Feld, share in that bottom
21   line profit?
22       Does some of it go to the AMA or someone else,
23   anything like that?
24              MR. SCHWEIKERT:  Object to the form.
25              MS. JANKOWSKI:  Objection to form.
```

 1          THE WITNESS:  Not that I'm aware of, no.

 2  BY MR. SCHWEIKERT:

 3      Q.    Do you know how the AMA is compensated for the

 4  services that it provided during Supercross events in

 5  2020?

 6      A.    Yes.  They invoice Feld Motor Sports and we

 7  pay that invoice.

 8      Q.    Do you recall approximately how much AMA was

 9  compensated per event in 2020?

10      A.    Again, guestimate, but I believe it was around

11  85- to $90,000 per event.

12      Q.    And what -- and would that consist of a fee

13  for sanctioning and officiating the event, as well as a

14  fee for rights?

15          MS. JANKOWSKI:  Objection.  Form.

16          THE WITNESS:  Yes.

17  BY MR. SCHWEIKERT:

18      Q.    And if we go to Page 18 there's a section

19  entitled Compensation.  Do you see that?

20      A.    I do.

21          MS. JANKOWSKI:  For the record, you're back on

22      Exhibit 131?

23          MR. SCHWEIKERT:  Yes.

24  BY MR. SCHWEIKERT:

25      Q.    The first section is entitled Fixed

 1   Services/Sanction Fee.  Do you see that?

 2       A.   I do.

 3       Q.   And there's a Subsection A which reads in part

 4   that the amount of the per event fee for the fixed

 5   services will be approximately $40,000.  Do you see

 6   that?

 7       A.   I see that.

 8       Q.   Okay.  And then Subsection 2 is entitled

 9   Variable Service/Officiating Fee.  Do you see that?

10       A.   I do.

11       Q.   And if we go to the next page, Subsection A

12   references a per event variable fee of approximately

13   $23,400, right?

14       A.   Right.

15       Q.   And then the third section is Rights Fee.  Do

16   you see that?

17       A.   I do.

18       Q.   And under Subsection A, the per event rights

19   fee was approximately $24,800, right?

20       A.   Right.

21       Q.   And if we add those three fees up, it comes

22   out to roughly $94,000, which is generally consistent

23   with what you told me at first, right?

24       A.   Right.

25       Q.   Okay.  On Page 19 there's a reference to back

```
 1   gate.  Can you help me understand how that works?
 2        A.   Yes.  So back gate are any individuals,
 3   competitors or race team individuals.  So any credential
 4   fees, any entry fees, anyone associated with the race
 5   team.  Athletes, mechanics, and so on.  Any fees that
 6   are taken in from those individuals or those companies,
 7   race teams would go to the AMA.
 8        Q.   Does Feld collect any revenue at the back
 9   gate?
10        A.   The only revenue that we collect is if a rider
11   or team personnel bring a guest to simply spectate, then
12   we would collect that revenue.
13        Q.   If I could direct your attention to Page 21 of
14   the sanctioning agreements, at the bottom theirs is a
15   Section 3 entitled Credentials.  Do you see that?
16        A.   I do.
17        Q.   And I reads, quote, "FMS shall have the
18   exclusive right to create, issue, revoke, and otherwise
19   control all credentials pertaining to security and
20   access at events."  Do you see that?
21        A.   I do.
22        Q.   And is that a true statement with respect to
23   the Tampa Supercross?
24        A.   It is.
25        Q.   And what does that mean, practically?
```

1    A.    It means that we physically create the physical

2  hard card credential.  It's split into two different

3  groups.  So there are Feld Sports Motor Sports and the

4  credentials that we issue to television staff,

5  operations crew, sponsors, and so on, everyone outside

6  of competition.

7    And then the AMA would issue the athletes, race

8  teams, OEM personnel, any individual that is on the

9  competition side.  The AMA would take all of that

10  information in.  They would send us a list and then we

11  would physically print the credentials.  And once those

12  are printed, give them back to the AMA to distribute to

13  those individuals.

14    Q.    And those individuals would need a credential

15  to access and participate in the 2020 Tampa Supercross,

16  right?

17    A.    Correct.

18    Q.    If we go to the next page, 22, at the top

19  there's a Subsection 4 entitled Emergency Medical

20  Support.

21    A.    Uh-huh.

22    Q.    Do you see that?

23    A.    I do.

24    Q.    And I'm going to read the first sentence into

25  the record.  Quote, "FMS agrees to arrange for an

 1  emergency medical care at the events at no cost to AMA,"

 2  end quote.  Do you see that?

 3      A.   I do.

 4      Q.   And is that true with respect to the 2020

 5  Supercross season?

 6      A.   It is.

 7      Q.   That's something Feld agreed to do?

 8      A.   It is.

 9      Q.   And how did it arrange for emergency medical

10  care at the events during the 2020 season?

11      A.   We contracted for the season to have the

12  mobile medical rig there at all 2020 Supercross events.

13  And then for the local paramedics, EMTs that are

14  required, we either contract that directly or in some

15  cases go through the venue.

16      Q.   And when you say "go through the venue," are

17  you referring to the licensing agreement that Feld uses

18  to lease the stadiums to put on these events?

19      A.   Correct.

20      Q.   And do you know if Feld had a license

21  agreement with Tampa Sports Authority to use Raymond

22  James Stadium in Tampa for a Supercross event in 2020?

23      A.   We did.

24      Q.   And do you know if that agreement covered the

25  provision of the local ambulance paramedics that you

 1    were referring to?

 2        A.   I believe it did, yes.

 3        Q.   This subsection refers to Feld providing --

 4    strike that.

 5        It refers to Feld arranging for emergency medical

 6    care at the event at no cost to AMA.  Do you see that?

 7        A.   I do.

 8        Q.   Do you know why the agreement specifies that

 9    the AMA would not incur any cost in connection with

10    emergency medical care at the events?

11        A.   The agreement specifies what both parties are

12    responsible for.  So it's just specifying in this

13    instance that the AMA is not responsible for the cost of

14    medical care.

15        Q.   Had there been a time where the AMA was

16    responsible for the cost of medical care?

17        A.   Not since I began my career.

18        Q.   Do you know if the Supercross events during

19    the 2020 season where wholly owned by Feld Motor Sports?

20             MS. JANKOWSKI:  Objection to form.

21             THE WITNESS:  The Supercross events during the

22        2020 season were wholly owned by Motor Sports with

23        the exception of Daytona Supercross, which is the

24        -- I believe the company that owns that is

25        International Speedway Corp.

BY MR. SCHWEIKERT:

    Q.    Can you just help me understand generally why
that one event is carved out?

    A.    I can.  It's a long story, but I'll make --
I'll try to make it short.  When Supercross began in
1974 -- AMA Supercross began in 1974 -- there were
multiple promoters.  And then as it progressed through
the years, again, additional promoters were included.

    So at some time I believe in the late '90s what was
then Pace Motorsports went to the other promoters and
asked to purchase their AMA Supercross events.  All of
the other promoters agreed and sold their Supercross
events to what was then Pace Motorsports.

    International Speedway Corp. for Daytona did not,
so International Speedway Corp. maintained the Daytona
Supercross.  Pace Motorsports then was purchased by SFX,
became SFX Motorsports and so on.  Ultimately is what
Feld purchased in 2008.

    Q.    Was there a Daytona event this year in 2025?

    A.    There was.

    Q.    I'm just trying to understand.  Did Feld have
any role in connection with that Daytona event?

    A.    We do.  Now we have -- we own media rights to
that event and we own the sponsorship rights to that
event.

```
 1        Q.    But the other entity is organizing and operating
 2   the event?
 3        A.    Correct.
 4        Q.    There is an Exhibit A to the sanction
 5   agreement titled Plain Logo.  Do you see that?
 6        A.    I do.
 7        Q.    And are the various logos depicted in Exhibit
 8   A Feld Motor Sports logos?
 9        A.    They are.
10        Q.    I want to talk now a little bit about the
11   contract with Medic Rig.  Do you know what I mean when I
12   refer to The Medic Rig?
13        A.    I believe so.
14        Q.    There's an entity, The Medic Rig, LLC, are you
15   familiar with that?
16        A.    Yes.
17        Q.    Okay.  And there's also like a literal semi-
18   truck that's like an emergency department on wheels,
19   right?
20        A.    Correct.
21        Q.    I heard that sometimes called the medic rig or
22   -- so it can get a little confusing, but --
23        A.    True.
24        Q.    I just want to make sure we're on the same
25   page.  All right.  This will be a document previously
```

 1   marked as Exhibit 11.

 2        Actually, I gave you the wrong one.  You can set

 3   that aside for now.

 4             MS. JANKOWSKI:  Do you want this back?

 5             MR. SCHWEIKERT:  You can keep it.  I'll get to

 6        that.

 7             MS. JANKOWSKI:  You're going to need this

 8        eventually?  Okay.  That's fine.  Let me pass it

 9        on.

10             MR. SCHWEIKERT:  My apologies.

11             MS. JANKOWSKI:  No problem.

12   BY MR. SCHWEIKERT:

13        Q.   I'm going to show you a document previously

14   marked as Exhibit 7.  For clarity's sake, I'm going to

15   put another exhibit sticker on it.  It's Bates labeled

16   FMS, Inc. 576 through 586 entitled Master Services

17   Agreement.

18        Just take a moment, review it, let me know if

19   you've seen it before.

20             MS. JANKOWSKI:  And for the record, you're

21        putting another exhibit sticker, but it's staying

22        Exhibit 7?

23             MR. SCHWEIKERT:  It was marked as Exhibit 7 at

24        Dr. Bodnar's depo, yes.

25             MS. JANKOWSKI:  Okay.  Just making sure.

BY MR. SCHWEIKERT:

Q.   Do you recognize Exhibit 7, sir?

A.   I do.

Q.   And what is it?

A.   It is the contract between Feld Motor Sports
and The Medic Rig to provide medical services to
Supercross events.

Q.   And do you know if this contract was in effect
during the 2020 season?

A.   I'm looking for the term.

Q.   I believe --

A.   I --

Q.   Go ahead.

A.   I believe it was, but I would need to see the
scope of work, I guess, to see if it was in effect, but
I believe it was.  I don't see the date of termination.

Q.   Take a look at the page Bates labeled FMS,
Inc. 584.  It's Exhibit A to the agreement entitled
Statement of Work.

A.   Okay.

Q.   Do you see that?

A.   Uh-huh (affirmative).

Q.   Section 1 says, "The term of this statement of
work shall be from the effective date of the master
service's agreement through the Monser Energy Cup event

 1    held in October of 2021."  Do you see that?

 2         A.   Yes.

 3         Q.   So your understanding that this master

 4    services agreement was in effect during the Tampa

 5    Supercross in 2020?

 6         A.   Yes.

 7         Q.   Okay.  And if we look at the page Bates

 8    labeled FMS, Inc. 583, the signatures page, do you see

 9    that?

10         A.   I do.

11         Q.   Is that your signature on behalf of Feld Motor

12    Sports?

13         A.   It is.

14         Q.   And what is your understanding of what The

15    Medic Rig was agreeing to do under this contract?

16         A.   The Medic Rig was agreeing to provide medical

17    services to the Supercross events in the term which

18    appears to be 2016 through 2021.

19         Q.   And do you know why Feld Motor Sports

20    contracted The Medic Rig?

21         A.   We had a longstanding relationship with The

22    Medic Rig and we're extremely comfortable with their

23    services.

24         Q.   How longstanding?

25         A.   Over 20 years they were -- I don't know if it

```
 1   was The Medic Rig at the time, the company, but the
 2   individuals involved were in place prior to my
 3   employment and have been in place throughout.
 4       Q.   Is one of those individuals Tom Carson?
 5       A.   Yes.
 6       Q.   Is another one of those individuals Dr. John
 7   Bodnar?
 8       A.   Yes.
 9       Q.   Fair to say you've known them for 20 years or
10   more?
11       A.   Yes.
12       Q.   Did you speak -- strike that.
13       All right.  Let's go back to the agreement itself,
14   just a couple of provisions I wanted to talk to you
15   about.  If we go to Page 2 of the contract, there is a
16   Section 4.2 titled FMS Responsibilities and access.  Do
17   you see that?
18       A.   Yes.
19       Q.   And it reads, quote, "On a commercially
20   reasonable basis, FMS will provide or arrange for access
21   to the locations where service provider is to deliver
22   all contracted professional services or deliverables,"
23   end quote.  Do you see that?
24       A.   I do.
25       Q.   What does that mean from a practical
```

 1   perspective?

 2        A.    That we would allow The Medic Rig to be onsite

 3   at Supercross events and allow the access through a

 4   credential for their personnel.

 5        Q.    For their medical team?

 6        A.    Their medical team, yes.

 7        Q.    Okay.  If we go to Exhibit A, the statement of

 8   work, to Page 10 of the contract, there's a Section 5

 9   entitled Miscellaneous.  Do you see that?

10        A.    I do.

11        Q.    And the first sentence reads, quote, "Service

12   providers personnel and third-party vendors must abide

13   by all reasonable safety rules and regulations put in

14   place by Feld Motor Sports," end quote.  Do you see

15   that?

16        A.    I do.

17        Q.    Did Feld Motor Sports put in place any safety

18   rules and regulations that The Medic Rig was required to

19   abide by during the Tampa Supercross?

20        A.    The only thing that would come to mind are

21   credential access.  So the medical staff and Med Rig

22   would need to abide by their credentials and where those

23   credentials allowed them.

24        Q.    And how would that be a safety rule or

25   regulation?

 1      A.   Because there are many areas where individuals

 2   not credentialed for a certain access point wouldn't be

 3   permitted simply due to safety.

 4      Q.   Any other safety rules and regulations put in

 5   place by Feld Motor Sports for The Medic Rig to abide by

 6   during the Tampa event?

 7      A.   Not that I can think of, no.

 8      Q.   Why not?

 9           MS. SPRADLIN:  Objection.  Form.

10           THE WITNESS:  They're the medical experts.

11      Most if not all of their team members have all-

12      access credentials, which would allow them to be

13      anywhere if it's an all-access.

14   BY MR. SCHWEIKERT:

15      Q.   Feld didn't have any interest in how those

16   medical services would be provided during a Supercross

17   event?

18           MS. JANKOWSKI:  Objection to form.

19           THE WITNESS:  We have a longstanding

20      relationship with The Medic Rig.  They're the

21      medical experts and so we defer to the medical

22      experts.

23           MR. SCHWEIKERT:  I think I got a five-minute

24      warning here.  We can go off the record and change

25      the tape.

```
 1          THE VIDEOGRAPHER:  This concludes the media file

 2      number one of the deposition of Dave Prater.  It is

 3      11:24.  We're going off the record.

 4          (Off the record.)

 5          (On the record.)

 6          THE VIDEOGRAPHER:  This will begin video file

 7      number two of the deposition of Dave Prater.  It is

 8      11:35.  We're back on the record.

 9  BY MR. SCHWEIKERT:

10      Q.   All right.  I'm going to show you a document

11  previously marked as Exhibit 2.  It's the AMA rule book.

12  Are you familiar with the rule book?

13      A.   Yes.

14      Q.   I don't have a lot of questions for you, just

15  a couple.  If I could direct your attention to Page 62

16  of the rule book, and let me know when you're there.

17      A.   I'm there.

18      Q.   On Page 62 there's a heading titled Event

19  Management.  Do you see that?

20      A.   I do.

21      Q.   And it reads, in part, "The event management

22  is composed of three officials, AMA delegate, race

23  director, representative of the championship promoter."

24  Do you see that?

25      A.   I do.
```

```
 1        Q.    Feld Motor Sports was the championship promoter

 2   for the 2020 Supercross?

 3        A.    Yes.

 4        Q.    The Supercross at that time was sometimes

 5   referred to as the championship?

 6        A.    Yes.

 7        Q.    Do you know who was the representative of the

 8   championship promoter at the Tampa Supercross of 2020?

 9        A.    I believe it was Mike Muye.

10        Q.    Were you involved in any way in the management

11   of the event as it's described in this rule book?

12        A.    Mike Muey reported to me.  But as far as it's

13   described in this rule book, I personally was not

14   involved in it, in the management of the event as it was

15   described in the rule book.

16        Q.    Under that section for event management,

17   Subsection E reads in part, "The authority and duties of

18   event -- strike that.

19        "The authority and duties of event management

20   include, but are not limited to, one, to ensure the

21   smooth and efficient running of the event."  Do you see

22   that?

23        A.    I do.

24        Q.    What does that mean?

25        A.    It means that the duties of the event
```

1   management are there to ensure the smooth and efficient

2   running of the event in all aspects, so off the top of

3   my head two scenarios that I can think of are if there

4   is ever weather, inclement weather coming in, that group

5   gets together and decides if we need to modify the race

6   day schedule, practice or qualifying, or the event

7   schedule, et al.  So that would be one scenario.

8        Another would be something as simple as moving the

9   motorcycles from the pits to the racetrack or the

10  stadium floor.  You know, what tunnel was used to

11  accommodate that.  And if anyone believes that there's a

12  better way, then that group would get together and

13  discuss that and decide on what tunnel to use.

14       Q.   Is the smooth and efficient running of the

15  event something that was important to Feld?

16       A.   It's always important to everyone involved.

17       Q.   Why?

18       A.   For the same reasons it's important for

19  anything.  Any event you want to be smooth, you want to

20  be efficient as possible for everyone involved.  The

21  fans, the racers, the race teams, everyone.

22       Q.   Television?

23       A.   Television.

24       Q.   Are you aware of any consequences that would

25  happen if any event did not occur according to the pre-

1  planned schedule?

2          MS. SPRADLIN:  Objection to form.

3          MS. JANKOWSKI:  Form.  Join.

4          THE WITNESS:  Define "consequences."

5  BY MR. SCHWEIKERT:

6      Q.   The 2020 Tampa Supercross was broadcast on

7  NBC, right?

8      A.   Correct.

9      Q.   Was there a particular time that the event was

10 scheduled to be broadcast?

11     A.   There was, yes.

12     Q.   And is there an interest on behalf of

13 everybody involved in putting on the event to make sure

14 that the broadcast occurs in accordance with that

15 schedule?

16     A.   We like to -- yes.  The broadcast in

17 accordance with the planned schedule.  Yes.

18     Q.   Do you know if there's any sort of financial

19 penalty that Feld would incur if an event did not begin

20 in accordance with the schedule for the broadcast?

21     A.   There's no financial penalty.

22     Q.   If we go back to this rule book, the next

23 subsection describing the authority and duties of event

24 management reads:  "To make recommendations to race

25 direction to improve the smooth and efficient running of

```
 1    the event."
 2         What is your understanding of that particular
 3    subsection?
 4         A.   Again, it's the same as Subsection 1.  So if
 5    weather was approaching, then the event management team
 6    would get together and then make their recommendations
 7    to the race direction team on abbreviating the schedule,
 8    changing start times, eliminating one qualifying
 9    session, whatever it may be.
10         Q.   Do you know if there was any changes that
11    needed to be made to the schedule for the Tampa
12    Supercross in 2020?
13         A.   Not that I recall, no.
14         Q.   I'll set that aside.  Thank you.
15         Do you know if Feld ever tasked anyone at The Medic
16    Rig with preparing protocols for Supercross events?
17         A.   I am aware through this litigation that
18    someone from The Medic Rig says that someone from Feld
19    Motor Sports tasked them with -- and I believe the terms
20    was "emergency medical plan" or "disaster plan."
21         Q.   Did that happen?
22         A.   I'm not sure.  It didn't come from the
23    operations department as far as I know.
24         Q.   Did you speak with Mike Muye at all in
25    preparing to testify?
```

1      A.   Not in preparing to testify, no.

2      Q.   Did you speak with him about anything he may

3  have said during his deposition?

4      A.   I did not.

5      Q.   Are you aware of whether Feld's risk

6  management department was working on safety protocols in

7  advance of the 2020 Supercross Season?

8           MS. JANKOWSKI:  Objection to form.

9           THE WITNESS:  I believe Feld's risk and safety

10          -- or risk department was working on safety

11          protocols prior the 2020 season and continues to

12          work on those.  And in this case -- again, I don't

13          know have firsthand knowledge if you ask, but it

14          sounds like someone from the risk department

15          requested a mass casualty event disaster plan from

16          The Medic Rig.

17  BY MR. SCHWEIKERT:

18      Q.   So you were not involved in any communications

19  in the fall or winter of 2019 about preparing track

20  emergency protocols for Supercross events?

21      A.   Not track emergency protocols, excuse me, that

22  I recall.  I do recall some discussion about the

23  disaster plan, which, again, goes to mass casualty

24  events, active shooters, that type of thing, some

25  discussion.

```
 1        Q.   Tell me what you remember.
 2        A.   I remember receiving the disaster action plan
 3   and -- as it pertains to, again, if something were to
 4   happen at a Supercross event holistically, meaning,
 5   again, active shooter in the Fan Fest or pit area or in
 6   the stadium what some of those protocols would be and
 7   what, if any, involvement The Medic Rig could assist in.
 8        Q.   And who did you have those discussions with?
 9        A.   Risk department, which was a gentleman named
10   Rico Hawks and Mike Muye.
11        Q.   Why was -- strike that.
12        Why were mass casualty events of a concern to Feld,
13   but not protocols that were used on the racetrack during
14   events?
15             MS. JANKOWSKI:  Objection.  Form.
16             THE WITNESS:  They're both concerns; however,
17        The Medic Rig and the medical personnel that The
18        Medic Rig has are experts on the racetrack as far
19        as emergency situations go there.  A mass casualty
20        event was obviously outside of what we would
21        typically have The Medic Rig there for.  But,
22        again, it's a concern for everyone.  I believe
23        everyone in every company today as it pertains to
24        live events especially -- so we're continuously
25        looking at ways to ensure that we are ready for
```

 1       that type of situation, as ready as we can be.

 2  BY MR. SCHWEIKERT:

 3       Q.   Do you know if The Medic Rig had a written

 4  protocol for providing emergency medical services to

 5  riders injured on the racetrack during the Tampa

 6  Supercross?

 7       A.   I did not know prior to this litigation, but I

 8  have seen their documents since this litigation started.

 9       Q.   And I believe I handed that to you earlier.

10  That was Number 11.  Do you happen to have that handy?

11       A.   Yes.

12       Q.   If you could please take a look at the

13  document previously marked Exhibit 11, is this the

14  written protocol that you believe was in effect during

15  the Tampa event?

16            MS. JANKOWSKI:  Objection.  Form.

17            THE WITNESS:  Again, as far as I know, yes.

18       And without seeing the other disaster mass casualty

19       event plan, I'm not sure that is this or this is

20       pertaining to just activities on the racetrack.

21  BY MR. SCHWEIKERT:

22       Q.   Did you review the disaster action plan in

23  preparing to testify?

24       A.   I --

25            MS. JANKOWSKI:  Objection.  Form.

 1              THE WITNESS:  I read --

 2              MS. JANKOWSKI:  You can answer.

 3              THE WITNESS:  I read it.

 4   BY MR. SCHWEIKERT:

 5      Q.    And did you review Exhibit 11 entitled Medical

 6   Emergency Action Plan in preparing to testify?

 7      A.    I read --

 8              MS. JANKOWSKI:  Objection to form.

 9              THE WITNESS:  I read it, yes.

10   BY MR. SCHWEIKERT:

11      Q.    And if we take a look at the first paragraph

12   of the medical emergency action plan, the second

13   sentence, it reads:  "Our action plan is

14   multidimensional and intended to reduce confusion

15   regarding authority and responsibility, prevent

16   fatalities, reduce injuries, protect the racing

17   community, and accelerate the resumption of normal

18   operations at the event," end quote.

19      Did I read that correctly?

20      A.    Yes.

21      Q.    Were you aware before you saw this for the

22   first time that The Medic Rig had a medical emergency

23   action plan that in part was intended to accelerate the

24   resumption of normal operations at the event?

25              MS. JANKOWSKI:  Objection.  Form.

```
 1              THE WITNESS:  As I stated, I wasn't aware that
 2       this existed prior to this litigation.
 3   BY MR. SCHWEIKERT:
 4       Q.   Do you -- did you -- strike that.
 5       When you did become aware of that, did you have any
 6   concerns that the written medical emergency action plan
 7   was intended, in part, to accelerate the resumption of
 8   normal operations at the event?
 9              MR. DOYLE:  Object to form.
10              MS. JANKOWSKI:  Objection to form.
11              THE WITNESS:  I did not.
12   BY MR. SCHWEIKERT:
13       Q.   No concerns?
14              MR. DOYLE:  Form.
15              MS. JANKOWSKI:  Objection to form.
16              THE WITNESS:  No concerns.
17   BY MR. SCHWEIKERT:
18       Q.   Why not?
19              MR. DOYLE:  Form.
20              MS. JANKOWSKI:  Same objection.
21              THE WITNESS:  Again, because The Medic Rig and
22       the medical professionals that are employed by The
23       Medic Rig understand that safety and the health of
24       the rider is paramount and that they will do what
25       is necessary to attend to that rider and at that
```

```
 1        time, once the rider is clear of the track, we'll get
 2        back to the normal events.
 3   BY MR. SCHWEIKERT:
 4        Q.    And who are you referring to when you say they
 5   understand that the health and safety of the rider is
 6   paramount?
 7        A.    The entire The Medic Rig staff.
 8        Q.    Do you know which individuals in particular
 9   were involved in providing care to Brian Moreau during
10   the Tampa event?
11        A.    I do.  During the course of this litigation I
12   was made aware.
13        Q.    And who's that?
14        A.    Amy Metiva, Scott Combs, and Dr. Kennedye.
15        Q.    And is it your understanding that those three
16   individuals believed that the health and safety of the
17   rider during the Tampa Supercross was paramount?
18              MS. SPRADLIN:  Object to form.
19              MS. JANKOWSKI:  Objection to form.
20              THE WITNESS:  That's my understanding, yes.
21   BY MR. SCHWEIKERT:
22        Q.    And what is the basis of that understanding?
23        A.    Years of experience with The Medic Rig.
24        Q.    Did you ever have any conversations to that
25   effect with Dr. Kennedye?
```

```
 1        A.    I did not.

 2        Q.    Are you aware of whether any of those

 3   individuals believed there were competing interests

 4   between providing care and the entertaining aspects of

 5   the event?

 6              MR. DOYLE:  Objection.  Form.

 7              MS. JANKOWSKI:  Objection to form.

 8              THE WITNESS:  I'm not aware of that, no.

 9   BY MR. SCHWEIKERT:

10        Q.    And you didn't review Dr. Kennedye's

11   deposition at all at any time before today?

12        A.    I did not.

13        Q.    Did you mention Scott Combs as one of the

14   individuals that you're aware of who provided care to

15   Brian?

16        A.    I did.

17        Q.    And who's he?

18        A.    He is a member of The Medic Rig staff.

19        Q.    Is he currently still a member?

20        A.    I don't -- I do not know.

21        Q.    Do you know how long he had been a member of

22   The Medic Rig staff before the Tampa Supercross?

23        A.    I do not know.

24        Q.    How do you know of Mr. Combs believed that the

25   health and safety of the rider was paramount in
```

```
 1    providing care during the 2020 Tampa Supercross?

 2           MR. DOYLE:  Object to form.

 3           MS. JANKOWSKI:  Same objection.

 4           THE WITNESS:  I believe that all Medic Rig

 5      staff believed that.

 6    BY MR. SCHWEIKERT:

 7      Q.    Did you or anyone affiliated with Feld do

 8    anything to ensure that they had that belief before they

 9    were allowed to provide medical care during the 2020

10    Tampa Supercross?

11      A.    We did not.  Again, goes to two decades-plus

12    experience with The Medic Rig staff.

13      Q.    But you don't know if Scott Combs had two

14    decades of experience as a medic, right?

15           MR. DOYLE:  Object to form.

16           MS. JANKOWSKI:  Same objection.

17           THE WITNESS:  I do not know that.

18    BY MR. SCHWEIKERT:

19      Q.    Do you know how many Supercross events Amy

20    Mativa had previously worked?

21      A.    No.

22      Q.    What about Dr. Kennedye?

23      A.    I don't know.

24      Q.    If we go back to the medical emergency action

25    plan, Exhibit 11, Page 3, there's a heading entitled
```

 1   Medical Crew and Rider Security.  Do you see that?

 2       A.    Yes.

 3       Q.    Could you please read that section into the

 4   record for me?

 5       A.    "Medical Crew and Rider Security.  Designated

 6   Feld crew members are assigned to the track to manage

 7   track equipment, including Tuff Blocks, track markers,

 8   and signage.  They are also assigned to provide a safe

 9   area for the medical staff to work on an injured rider.

10   Communication is maintained and monitored through radio

11   with track safety supervisor who has an overview of the

12   entire track."

13       Q.    Is it fair to say that that particular section

14   is referring to Feld crew members and Feld safety

15   manager?

16       A.    It is.

17       Q.    And you do not believe that Feld had any

18   involvement in developing or reviewing this medical

19   emergency action plan that explicitly references Feld

20   crew members and Feld's safety manager?

21       A.    As far as I know, no.  This, again, would be

22   20-plus years of experience.  And The Medic Rig staffs'

23   knowledge of what our truck runners and our track safety

24   supervisor in this -- where it's referred to here, what

25   they do in the case of a down rider.

1    Q.    Has Feld had a track safety supervisor or safety
2  manager at every Supercross event since Feld took over
3  the Supercross?

4    A.    Yes.

5    Q.    And the reference to Feld crew members, is
6  that to the track runners and flaggers -- Feld flaggers?

7    A.    I would say that is in reference to the Feld
8  Motor Sports track runners.

9    Q.    Do you know who provided training, if any, to
10 the Feld track runners that worked the Supercross event
11 in 2020?

12   A.    It would have been Phil Penn, the safety
13 manager, and potentially someone on Mike Muye's staff,
14 maybe Tim Phend, maybe the pit manager.

15   Q.    Is that P-h-e-n-d.

16   A.    P-h-e-n-d, yes.

17   Q.    Tim Phend.

18   I'm going to show you a document previously marked
19 as Exhibit 50.  I believe it was a Zoom deposition, so
20 just to clarify, I'm going to put a sticker on it today.
21 It's Bates labeled -- maybe it's not.  There you go.

22   And just for the record, my version is Bates
23 labeled FMS, Inc. 544 to 545, but it appears the one I
24 gave Mr. Prater did not print the Bates label.

25        MS. JANKOWSKI:  I was going to say --

1       MR. SCHWEIKERT:   There were some issues with the

2   margin I think.

3       MS. JANKOWSKI:   Yeah.   Yeah.

4       MR. SCHWEIKERT:   But I will represent that is

5   what I printed.

6       MS. JANKOWSKI:   Well, I know that at least the

7   first page of Exhibit 50 was FMS, Inc. 544, so the

8   second page is probably 545.

9       MR. SCHWEIKERT:   Thank you.

10      MS. JANKOWSKI:   Yes.

11  BY MR. SCHWEIKERT:

12      Q.   Do you recognize Exhibit 50, sir?

13      A.   I do.

14      Q.   Okay.   And what is it?

15      A.   It is a list of the flaggers and what we then

16  referred in 2020 referred to as volunteers for the Tampa

17  event.

18      Q.   At the top of the document, there's a

19  reference to Feld Entertainment.   Do you see that?

20      A.   I do.

21      Q.   Do you have any understanding as to why Feld

22  Entertainment would be referenced on the safety and

23  training document for flaggers and volunteers?

24      A.   I don't.

25      Q.   Did Feld Entertainment play any role in

1    connection with the Tampa Supercross?

2        A.    Feld Motor Sports is the company that ran and

3    operated the Tampa Supercross.  Feld Entertainment is

4    the parent company.

5        Q.    And why do you recognize this document?

6        A.    I've seen it in the past.  Just, again, it is

7    something that the flaggers and volunteers would sign in

8    with at a Supercross event.

9        Q.    Do you know who provided the safety and

10   training for the flaggers and volunteers at the Tampa

11   Supercross?

12       A.    I believe it was John Tillman.

13       Q.    And do you know if the training that

14   Mr. Tillman has provided covered the role -- strike

15   that.

16       All right.  Take a look at the bullet points

17   underneath the heading for flaggers, the third bullet

18   point.  Do you see that?

19       A.    Incident/action protection?

20       Q.    Yes.

21       A.    Yes

22       Q.    I'll read it into the record.

23   "Incident/Accident Protection -- Wave flag as warning to

24   oncoming riders.  Do not attempt assistance or aide to

25   downed riders.  This will be handled by Feld Motor

 1    Sports employees and medical teams," end quote.

 2         Do you see that?

 3         A.    I do.

 4         Q.    And what does that mean?

 5         A.    That means that -- so a caution flagger, which

 6    are the folks that -- the flaggers are referenced here

 7    are only to warn riders of obstacles in their way.  So

 8    it's purely for a warning.  When he referenced Feld

 9    Motor Sports employees, he's talking about the track

10    runners.  And those are the folks that would run out to

11    remove the motorcycle and/or place the motorcycle in

12    between the downed athlete and oncoming traffic and/or

13    place a Tuff Block in between the motorcycle and

14    oncoming traffic -- or the downed rider in oncoming

15    traffic.

16         Q.    And the reference to medical teams?

17         A.    Yes.  The medical teams, which would be The

18    Medic Rig staff, as well as local paramedics, EMTs.

19         Q.    Did Feld have the same crew of flaggers at

20    each Supercross event during the 2020 season?

21         A.    No, not entirely.  Not the same crew at each

22    event.

23         Q.    Depended on the geographic location?

24         A.    Yes

25         Q.    Was there any sort of designated crew that

 1  would travel to every event?

 2      A.   Only John Tillman, our head flagger.

 3      Q.   But as far as you're aware, Feld had employed

 4  track runners in the various different states where

 5  Supercross events were held?

 6      A.   No.  Track runners are a different story.

 7  Track runners are employed throughout the season, so

 8  they travel with us.  So the same track runners are used

 9  throughout the season.  Caution flaggers are the

10  exception.

11      Q.   Do you know why this document refers to

12  volunteers?

13      A.   Yeah, I'd say it's a holdover term from years

14  ago that we just -- I don't know -- someone prior to me

15  created.  It's a -- we have what's called -- we call

16  mechanics barriers and they are foam blocks that are

17  brought out into the start area, typically, after the

18  Supercross race has started.

19      And it's in areas where the motorcycles don't race

20  through again.  But those mechanics barriers are brought

21  out to delineate a line between where the mechanics can

22  stand and signal the riders and where the racetrack is.

23  So volunteers were those individuals that were assigned

24  to dragging those mechanics barriers out in place after

25  each start of a Supercross event or race.

 1     Q.   And there came a time when Feld decided not to

 2    use volunteers in that role any longer?

 3     A.   Well, there came a time, I believe, prior to

 4    my employment where we didn't use volunteers at all.

 5    So, again, that's a holdover term volunteers.  We

 6    currently refer to them as barrier pullers.

 7     Q.   And that's just in the starting gate area?

 8     A.   Just in the starting gate area, yes.

 9     Q.   And then the track runners are sort of around

10    the racetrack to put Tuff Blocks out when needed?

11     A.   Correct.

12     Q.   Okay.  If we look towards the bottom of the

13    document, there's a reference to understanding assigned

14    duties as a member of the operations and safety

15    maintenance for the Supercross events down in Tampa.  Do

16    you see that?

17     A.   No.  Where is it?

18        MS. JANKOWSKI:  Right above -- second to the

19        last line.  I have --

20        THE WITNESS:  Oh, yes.  Okay.  I see it.

21    BY MR. SCHWEIKERT:

22     Q.   So these individuals were signing -- strike

23    that.

24     These individuals were signing this document to

25    confirm that they attended and understood their duties

 1  as a member of the operations and safety maintenance for

 2  the Tampa Supercross, right?

 3       A.    Correct.

 4       Q.    And what is meant by safety maintenance?

 5       A.    I would define that as warning and protection.

 6  The -- well, let me take that back.

 7       I would define that as warning, because this is

 8  purely for flaggers.  So flaggers are there to warn

 9  athletes as they approach a downed athlete or a

10  situation where a Tuff Block gets kicked into the track.

11  Any kind of obstacle that they may encounter, the

12  flaggers are there to warn those riders.

13       Q.    And that's a safety function, right?

14       A.    It is, yes.

15       Q.    You don't want riders racing around a track

16  with a hazard that maybe they can't see in front of

17  them, right?

18       A.    Correct.

19       Q.    Give me a second.

20       I'm going to show you -- it's a new document which

21  I'll mark as Exhibit 145.  Take a minute, review it, and

22  let me know if you've seen it before.

23       A.    I've seen it before.

24            (Thereupon, Plaintiff's Exhibit 145 was marked

25       for identification.)

BY MR. SCHWEIKERT:

    Q.    And what is this document?

    A.    This is a safety hold diagram.  It depicts
what our safety holds were for the 2020 Tampa Supercross
event?

    Q.    And what is a safety hold?

    A.    A safety hold is an area of the stands that we
do not allow fans to set within and we cover it with
plastic.

    Q.    And why are there sections in the stands that
Feld does not allow spectators to sit in?

    A.    We just -- we want to ensure that the fans are
safe and Supercross racing is on dirt and when the tire
accelerates on dirt, sometime what we refer to roost or
dirt comes off the back of the tire and can be thrown.
So that's, in the case of Supercross, the primary
reason.

    And then in the off chance that it happened, but a
motorcycle because of the fact that Supercross tracks
have jumps and bumps, motorcycles go into the air.  So
it's just an extra safety barrier between the fans and
the motorcycles, as well.

    Q.    Are you aware in your experience of a
Motocross -- strike that.

    Are you aware in your experience of a motorcycle

 1   ever going into the stands?

 2       A.   I am.  Two times.  Only on practice days,

 3   never on an event day.

 4       Q.   When were those times?

 5       A.   I don't recall the exact year, but it was, I'd

 6   say, early 2000s, Indianapolis, the old RCA dome.

 7   During practice a motorcycle lost control and went into

 8   the stands.

 9       Q.   And the other time you think you know?

10       A.   At an amateur Supercross event in Pontiac,

11   Michigan.  Again, early 2000s, but an amateur competitor

12   lost control and again the motorcycle went into the

13   stands.

14       Q.   And were safety hold in place at that time or

15   were safety holds developed later as a result of those

16   types of incident?

17       A.   Safety holds were in place at those times.

18   Now the Friday situation in Indianapolis, obviously no

19   one was in the stands.  It was a Friday press day, but,

20   yes, we were -- we had safety holds up at the time.

21           MS. JANKOWSKI:  Is there a Bates number on

22       that document?

23           MR. SCHWEIKERT:  For whatever reason when I

24       was printing them, it wasn't getting the margin,

25       but I can get it for you.

 1          MS. JANKOWSKI:  Yeah.  Well, I presume this is a

 2     document produced by FMS, correct?

 3          MR. SCHWEIKERT:  Yes.

 4          MS. JANKOWSKI:  Because I just know it doesn't

 5     have a Bates number.

 6          MR. SCHWEIKERT:  Give me a second.  I can find

 7     it.

 8          MS. JANKOWSKI:  All right.

 9          MR. SCHWEIKERT:  Some of your later

10     production, for whatever reason, the Bates Number

11     was so low on the document it was outside the

12     margin of my printer.

13          MS. JANKOWSKI:  We can do that on a break.

14     You don't need to do it right now.  I just want to

15     get it on the record at some point so we know what

16     we've marked.

17          MR. SCHWEIKERT:  Yeah.

18  BY MR. SCHWEIKERT:

19     Q.   Okay.  What other safety measures, aside from

20  these safety holds, did Feld put in place for the 2020

21  Supercross event?

22          MS. JANKOWSKI:  Objection to form.

23          THE WITNESS:  I would say primarily it's

24     credential access and assigning in credential

25     levels to different access areas.

 1    BY MR. SCHWEIKERT:

 2        Q.    Anything else?

 3        A.    Again, we've gone over the caution flaggers,

 4    as well as the track runners there to assist on the

 5    racetrack and safety holds.

 6        Q.    And the safety manager, as well, right?

 7        A.    Safety manager.

 8        Q.    Anything else that you can think of?

 9        A.    Outside of the competition, I mean we --

10    again, we have the safety department that is there to

11    ensure that everyone is following correct protocols and

12    wearing the correct PPE and so on.  But as far as the

13    event, I would say that's -- that's it that I can

14    recall.

15        Q.    One moment.  I'm going to show you a document

16    that we'll mark as Exhibit 146, Bates labeled FMS, Inc.

17    679 through 688.  Thank you.

18        Take a moment, review it, and let me know if you've

19    seen it before.

20        A.    Yes, I've seen it before.

21            (Thereupon, Plaintiff's Exhibit 146 was marked

22        for identification.)

23    BY MR. SCHWEIKERT:

24        Q.    And what is this?

25        A.    This is a venue racetrack, the specific

 1  guidelines for the Supercross race teams in 2020.

 2      Q.   And were these guidelines in effect during the

 3  Tampa Supercross in 2020?

 4      A.   Yes, they were.

 5      Q.   Do you see in the first written paragraph

 6  there's a reference to Feld Entertainment?

 7      A.   I do.

 8      Q.   Do you know why this document is referring to

 9  Feld Entertainment?

10      A.   I do not, other than Feld Entertainment is the

11  parent company of Feld Motor Sports.

12      Q.   And if we read the last sentence in that first

13  paragraph, it reads, quote, "All approvals and consents

14  the Feld Entertainment in this document may be granted

15  or withheld in its sole and absolute discretion."

16      Do you see that?

17      A.   I do.

18      Q.   And is it your understanding that the

19  reference there to Feld Entertainment is also to Feld

20  Motor Sports?

21          MS. JANKOWSKI:  Objection.  Form.

22          THE WITNESS:  I would say it's to Feld Motor

23      Sports.

24  BY MR. SCHWEIKERT:

25      Q.   Okay.  The approvals and consents referenced

1   in this document were granted or withheld in the sole and

2   absolute discretion of Feld Motor Sports?

3       A.   They could be, yes.

4       Q.   And if we look at the heading one on track

5   conduct -- do you see that?

6       A.   I do.

7       Q.   It says, "Access to the racetrack is a

8   privilege."  Do I read that correctly?

9       A.   You do.

10      Q.   And Feld had the sole and absolute discretion

11  to grant access to the racetrack at the Supercross

12  event?

13      A.   Again, it's -- we had the ability to issue

14  credentials along with the AMA.  But at the end of the

15  day, if it came to that, it would be Feld Motor Sports

16  decision.

17      Q.   And did the second bullet point under that

18  heading -- reads, quote, "Stay in approved areas at all

19  times.  Never cross track lanes when riders are on

20  track," end quote.  Do you see that?

21      A.   I do.

22      Q.   And why is that something that is spelled out

23  in this document?

24      A.   Because when riders are on the racetrack the

25  only folks that should be -- ever be on the racetrack

```
 1    are our track runners, AMA officials, or The Medic Rig

 2    staff.

 3         Q.    Are journalists not allowed to be on the

 4    track?

 5         A.    They are not allowed to be on the racetrack

 6    when riders are on the track.

 7         Q.    And is that true with respect to the 2020

 8    season?

 9         A.    Yes.  And I'm defining "racetrack" by the

10    actual racetrack lanes in between the Tuff Blocks.

11         Q.    Okay.  How would you define just the floor of

12    the stadium where the racetrack is constructed, "the

13    floor"?

14         A.    The floor.

15         Q.    Okay.  So the only ones allowed on the

16    racetrack are the folks you identified, but other people

17    are allowed on the floor so long as they have proper

18    credentials?

19         A.    Correct.

20         Q.    And is it fair to say that one of the reasons

21    this document stresses never crossing track lanes when

22    riders are on the track is because of the danger of

23    getting hit by a rider and getting hurt?

24         A.    It's fair to say that, yes.

25         Q.    We go to second page Bates labeled FMS, Inc.
```

 1  680 there's Section 4, Press Day.  Do you see that?

 2      A.   I do.

 3      Q.   Was there a press day before the Tampa

 4  Supercross in 2020?

 5      A.   Yes.

 6      Q.   Did you go?

 7      A.   I don't believe I was there.

 8      Q.   Do you know if Feld had arranged for any

 9  medical personnel to be present while any riders were on

10  the track during press day?

11      A.   Yes, we do.

12      Q.   And who, as far as you're aware, was present

13  in that capacity on press day?

14      A.   As far as I'm aware, it was the local

15  paramedics and ambulance staff.

16      Q.   And those would be folks with Tampa Fire

17  Rescue?

18      A.   I don't recall the company that were present

19  at the Tampa Supercross event in 2020.

20      Q.   Do you know if, in general, the local

21  ambulance crew had any training with respect to

22  providing care to a Supercross rider injured on a

23  racetrack?

24      A.   I do not know if they had any training

25  specific to a Supercross rider on a racetrack.  They're

```
 1    paramedics and/or EMTs.
 2        Q.    But during the actual event itself, Feld has
 3    the medics from The Medic Rig that are there to provide
 4    care to the riders, right?
 5        A.    Correct.
 6        Q.    Do you know why The Medic Rig crew was not
 7    used during press day, as well?
 8        A.    It just wasn't something that was
 9    traditionally used and they typically didn't arrive --
10    or most of the staff didn't arrive until Fridays.
11        Q.    Is it done differently now?
12        A.    Not that I'm aware, no.
13        Q.    And if we look at Subsection 3 under Press
14    Day, there's a Section D that reads, quote, "Everyone
15    permitted on the track must stay in the area designated
16    by Feld Entertainment," end quote.  Do you see that?
17        A.    I do.
18        Q.    And was that true with respect to the 2020 --
19    strike that.
20        Was that true with respect to the press day held in
21    advance of the 2020 Tampa Supercross?
22        A.    It was true that everyone permitted on the
23    track must stay in the area designated by Feld Motor
24    Sports, yes.
25        Q.    And Feld would designate the areas where
```

 1  people were permitted to be?

 2      A.   Yes.

 3      Q.   Is that true, also, with respect to the race

 4  day on Saturday?

 5      A.   Yes.

 6      Q.   And Subsection J reads, quote, "Riders can

 7  only ride parts of the track designated by Feld

 8  Entertainment," end quote.  Do you see that?

 9      A.   I do.

10      Q.   And is that true with respect to the press

11  day?

12      A.   That is true.  Riders can only ride parts of

13  the track designated by Feld Motor Sports on press day.

14      Q.   If Feld typically relies on the AMA for the

15  safety of the riders when they're on the track in

16  conjunction with The Medic Rig, why would Feld be

17  designating the parts of the track that the riders could

18  ride during press day?

19      A.   Press day is simply an exhibition for media

20  and local media to take photographs to promote the

21  event.  So it's twofold.  Typically we only allow the

22  race teams to ride a small portion of the track in order

23  to get those photos.

24      And other than the first event of the year and the

25  last event of the year, we have agreed with the AMA not

 1    to allow press day riders to ride the entirety of the

 2    racetrack simply because it presents a -- it could

 3    present an unfair advantage to those riders who ride

 4    press day and the ones who don't.

 5        Q.   If we go to Page FMS, Inc. 687 there's a list

 6    of Feld Entertainment contracts on the bottom.  Do you

 7    see that?

 8        A.   I do.

 9        Q.   And we talked a little bit about Mike Muye.

10    You mentioned Tim Phend, right?

11        A.   Uh-huh (affirmative).

12        Q.   Is that a yes?

13        A.   Yes.

14        Q.   Okay.  And then director of operations,

15    Supercross Futures, there's someone named Bill Heras,

16    H-e-r-a-s.  Do you see that?

17        A.   Yes.

18        Q.   What did -- strike that.

19        What is Supercross Futures?

20        A.   Supercross Futures is an amateur program for

21    super- -- in 2020 it was a bit different than it is

22    today, so in 2020 it was an amateur day for local

23    athletes, but really any amateur athlete who wanted to

24    compete and learn to compete on a Supercross track.

25        So those events were held on Sundays following a

few select Supercross events. I believe it was five to

six events in the past. And Bill was director of

operations for that Supercross Futures amateur program.

Q. Do you know if the AMA was involved in the

Supercross Futures?

A. They were.

Q. They provided officiating for that?

A. Yes.

Q. And do you see the reference below that to

Supercross paddock manager?

A. I do.

Q. What is the paddock?

A. The paddock is the pit area where all the race

teams pit in between practice, qualifying race sessions.

Sometimes you'll hear it referred to as Fan Fest because

the paddock is within what we call Fan Fest, which is

also an area where sponsors will do exhibitions,

activations, and the like.

Q. Is that -- strike that.

The Medic Rig trailer, is that -- strike that.

Was The Medic Rig trailer located within the

paddock area at the Tampa Supercross?

A. I don't recall exactly where The Medic Rig was

located at the Tampa Supercross. Depending on the

various paddock locations and size and shape, it may or

1    may not be within the paddock.  We typically like it to be

2    in the area in between what we would call the paddock

3    and the venue, so kind of in that -- it's not a public

4    -- I guess I would say it's not a public area that we

5    put the mobile medic rig in.

6        Q.    But Feld will designate the location of The

7    Medic Rig trailer for the events?

8        A.    We will in conjunction with The Medic Rig

9    staff.  You know, if they had something else in mind or

10    think something else would be preferrable, they'll bring

11    it to us and we'll do everything we can to make that

12    happen.

13        Q.    There's a reference to a gentleman, Chris

14    Zimmerman, as the Supercross event manager.  Do you see

15    that?

16        A.    Yes.

17        Q.    And I believe you explained to me earlier the

18    difference between AMA event manager versus Feld's event

19    manager, right?

20        A.    Correct.

21        Q.    And Mr. Zimmerman was Feld's event manager?

22        A.    He was.

23        Q.    Is he still working with Feld?

24        A.    No.

25        Q.    Do you know why not?

```
 1        A.   Again, he left -- I believe, again, it was due
 2   to just not wanting to travel 17 weeks a year.
 3             MR. SCHWEIKERT:  I would propose a little
 4        break for lunch before I change topics and power
 5        through the afternoon.
 6             MS. JANKOWSKI:  Okay.
 7             MR. SCHWEIKERT:  Off the record, please.
 8             THE VIDEOGRAPHER:  It's 12:36.  We're going
 9        off the record.
10             (Off the record.)
11             (On the record.)
12             THE VIDEOGRAPHER:  It's 1:25.  We are back on
13        the record.
14   BY MR. SCHWEIKERT:
15        Q.   I want to show you some pictures.  First one I
16   will mark as Exhibit 147 Bates labeled FMS, Inc. 786.
17        Do you know what is depicted in Exhibit 146, sir?
18        A.   I do.
19        Q.   47?
20        A.   I do.
21             (Thereupon, Plaintiff's Exhibit 147 was marked
22        for identification.)
23   BY MR. SCHWEIKERT:
24        Q.   And what is that?
25        A.   That is the starting gate for a Supercross
```

 1  event.

 2      Q.   Does Exhibit 147 fairly and accurately depict

 3  what the starting gate looked like at the Tampa

 4  Supercross in 2020?

 5      A.   I believe so, yes.

 6      Q.   I'm going to show you another picture.  This

 7  will be Exhibit 148.  Take a minute -- take a minute,

 8  review it, and let me know if you know what it is.

 9      A.   Yes.

10          (Thereupon, Plaintiff's Exhibit 148 was marked

11      for identification.)

12  BY MR. SCHWEIKERT:

13      Q.   Is Exhibit 148 a photograph of the back of the

14  starting gate at the Tampa Supercross in 2020?

15      A.   It is a picture of the starting gate and it

16  appears to be Raymond James Stadium in Tampa.  I cannot

17  definitively tell you if this is in 2020 just with this

18  photograph.

19      Q.   Okay.  And what about it makes it appear to

20  you that's Raymond James Stadium?

21      A.   I'm fairly familiar with the construction of

22  the stadium and the video boards and how it's -- the

23  overall look, the palm trees in the far end in the

24  picture.

25      Q.   Okay.  I'll give you another one.  This will

```
 1   be Exhibit 149, Bates labeled FMS, Inc. 783.  Do you know

 2   what is depicted in photograph marked as Exhibit 149?

 3        A.   Yes.

 4             (Thereupon, Plaintiff's Exhibit 149 was marked

 5        for identification.)

 6   BY MR. SCHWEIKERT:

 7        Q.   What is it?

 8        A.   It is the finish line for a Supercross event

 9   in Tampa Raymond James Stadium.

10        Q.   Does it fairly and accurately depict what the

11   finish line looked like on the day of the Tampa

12   Supercross in 2020?

13        A.   Again, without -- I couldn't definitively tell

14   you this is from 2020, but fairly and accurately it

15   depicts what the finish line structure and typical

16   finish line jumps look like at all Supercross events.

17        Q.   I'll show you another one I'll mark as Exhibit

18   150.  Bates labeled FMS, Inc. 736.  Do you recognize

19   what is depicted in the photograph marked as Exhibit

20   150.

21        A.   Yes.

22             (Thereupon, Plaintiff's Exhibit 150 was marked

23        for identification.)

24   BY MR. SCHWEIKERT:

25        Q.   And what is it?
```

 1    A.   It is an activation -- I guess you could call it

 2  an activation element of the show, which is in between

 3  races where we are highlighting a family from St. Jude.

 4  St. Jude is a partner of AMA Supercross.

 5    Q.   And behind the family do you see a stage

 6  that's set up?

 7    A.   Yes.  We refer to that as the podium.

 8    Q.   Okay.  And does Exhibit 150 fairly and

 9  accurately depict what the podium at the 2020 Tampa

10  Supercross looked like?

11    A.   Again, I can't say if it's 2020, but, yes, I

12  would say that that is what it looked like during the

13  year of 2020 and that's what it looked like at Tampa.

14    Q.   And is the podium set up before the practices

15  start or only after the main event has concluded?

16    A.   The podium is set up before the practices

17  start.

18    Q.   Okay.  You can set that on aside.  I'm going

19  to show you a document.  I think it was previously

20  marked, so let me just find that real quick.

21    I'm going to show you a document.  It was

22  previously marked as Exhibit 48, but then marked up by

23  Dr. Kennedye, so I'm going to show you a clean copy of

24  the document, which I'll mark as Exhibit 151.  Bates

25  labeled FMS, Inc. 778.

```
 1        Do you recognize what is depicted in the picture

 2   marked as Exhibit 151?

 3        A.   Yes.

 4             (Thereupon, Plaintiff's Exhibit 151 was marked

 5        for identification.)

 6   BY MR. SCHWEIKERT:

 7        Q.   And what is it?

 8        A.   It is a Supercross track inside Raymond James

 9   Stadium and I believe it is the 2020 Supercross track.

10        Q.   And does this photograph fairly and accurately

11   depict what the stadium looked like on that day at the

12   time that the picture was taken?

13        A.   At the time that the picture was taken, yes.

14   Yes.

15        Q.   It looks like there's some bulldozers and

16   other construction equipment on the track, right?

17        A.   Yes.

18        Q.   Does all of that occur before the riders first

19   get on the track for the practices, or are there

20   instances where in between practices or qualifier

21   sometimes the bulldozer goes out and moves things

22   around?

23        A.   Yes.  In between -- sometimes in between

24   practices and qualifiers the equipment -- the heavy

25   equipment is brought out onto the floor to touch-up
```

1    different areas to get rid of ruts and so on that have

2    developed during the course of practice, qualifying, or

3    races.

4        Q.   All right.  And if you look towards -- strike

5    that.

6        Do you see the 300 level in the stadium where the

7    suites are?

8        A.   I do.

9        Q.   And is that depicted in the center left upper

10   portion of the photograph where you see the windows?

11       A.   Can you point to that?

12       In here, yes.

13       Q.   Yeah.  And if you wouldn't mind, just -- I'm

14   going to ask you a couple of things.  We had talked a

15   little bit earlier about the eye in the sky?

16       A.   Yes.

17       Q.   And it was my understanding he was located in

18   that -- on that suite level; do you know?

19       A.   He would have been located close to that suite

20   level.  It would have been the press box level.

21       Q.   Can you see the press box level on this

22   photograph?

23       A.   I can see the level.  From what I recall;

24   however, the press box level is on the side that the

25   photograph was taken from.

1    Q.   Okay.  Do you recall if the press box was

2    situated around where the 50-yard line would be?

3    A.   The press box itself is situated between the

4    end zone and we'll call it the 30- to 40-yard line.  And

5    then what we refer to as operational booths start at the

6    end of the press box and continue, I want to say, to the

7    adjacent 30 -- 40- to 30-yard line.

8    Q.   And one of those booths is where the eye in

9    the sky official was, correct?

10    A.   Correct.

11    Q.   I've heard it -- is it referred to as a race

12    control or race command booth?

13    A.   I'm not sure what it's referred to today, but,

14    yes, race control booth sounds right.

15    Q.   And you referred to some operational booths.

16    What other booths would have been utilized during the

17    Tampa Supercross?

18    A.   There's a booth for timing and scoring, the

19    timing and scoring crew.  There is a private booth that

20    some Feld operations staff would from time to time use

21    if they needed an area just to observe from.  There are

22    the broadcast booths where the broadcast commentators

23    are located.

24    Sometimes there are television cameras and/or

25    stadium cameras, depending on the facility, located in

 1    those operations booths.
 2        Q.    The timing and the scoring booth, that would
 3    be up at the suite level or located on the track itself?
 4        A.    The timing and scoring booth where the timing
 5    and scoring officials were would have been, again, on
 6    the press box level, not the suite level.  And may --
 7    again, Tampa -- because every stadium is different --
 8    press box level may have -- once you get past the
 9    operational booths and go out into the hallway, there
10    may be some suites on that same level that are further
11    down toward the end zone, but the operational booths
12    are, again, synonymous with the press box level and
13    that's where you would enter the press box in order to
14    get to the operation booths in Tampa.
15        Q.    Do you currently live in Tampa?
16        A.    I currently live in Bradenton.
17        Q.    As far as you know, was anyone stationed in
18    the race control booth with the eye in the sky during
19    the practices at the Tampa Supercross?
20            MS. JANKOWSKI:  Object to form.
21            THE WITNESS:  I do not know if there was
22        someone officially stationed there during the
23        entirety of the practice.  I know Harv Whipple was
24        in with Phil Penn at least during a portion of the
25        practices and qualifying.

BY MR. SCHWEIKERT:

Q.   Would that portion include when Brian crashed?

A.   I don't know.

Q.   How do you know that he was there for a portion of the time?

A.   Because I remember he was there.  Again, he was working with Supercross Futures.  He had arrived a day early, and so he informed myself or Mike Muye at some point that he was going to be in with Phil and just be another set of eyes on the racetrack.

Q.   Do you have a specific recollection of that?

A.   I have a specific recollection of seeing him in that booth at some point during the day.  And I have a recollection of someone informing me that that's where he was going to be in and out of.  Again, wasn't in there in an official capacity, just was there to assist since he was there a day earlier.

Q.   And at that time do you know who Harv Whipple was working for?

A.   He was working for the AMA and not on that Saturday.  He was working the event, Supercross Futures, for the AMA.  On that Saturday, again, he didn't have an official capacity that I'm aware of.

Q.   Anyone else that may have been in that race control booth at the time that Brian crashed during the

 1    practice?

 2         A.    Not that I'm aware of.

 3         Q.    You mentioned a broadcast booth; do you recall

 4    that?

 5         A.    Yes.

 6         Q.    I've heard reference to a show control booth.

 7    Do you know what that is?

 8         A.    Yes.

 9         Q.    Are those two different things or the same?

10         A.    They're two different things.

11         Q.    Can you explain the differences?

12         A.    Yeah.  The broadcast booth is where the

13    television talent calls the event from -- excuse me, the

14    show control booth is where our show manager would have

15    directed the videos that go on the video boards and

16    directed the live event talent in between races to do

17    interviews with riders, to do that activation piece on

18    St. Jude that we talked about in Exhibit 150, that type

19    of thing.

20         Q.    And who was the show manager on that day?

21         A.    I don't recall specifically.  I believe it was

22    Jim Moehle.

23         Q.    Could you spell that last name, please?

24         A.    I believe it's M-o-h-l-e [sic].

25         Q.    And do you know if Mr. Moehle was in that

1    booth during the practice when Brian crashed?

2         A.   I don't know.

3         Q.   Do you know of anyone that was in that booth

4    when Brian crashed?

5         A.   I don't.

6         Q.   Just as a normal course of business during

7    that particular season, who would have been assigned or

8    stationed in that both during activity on the racetrack?

9         A.   Jim Moehle.

10        Q.   Do you know if anyone else would have been

11   there with him?

12        A.   Kat Kaczmarzyk could have been in there in and

13   out, but she wasn't necessarily assigned to that booth

14   throughout the day.

15             MR. SCHWEIKERT:  Just to make our court

16        reporter's life easier, I believe that's K-a-c-z --

17             THE REPORTER:  K-a-c-z- --

18             MR. SCHWEIKERT:  -- m-a-r-z-y-k.  I think Kat

19        is with a -- K-a-t.

20             THE REPORTER:  Okay.

21             THE WITNESS:  Yes.

22             MR. SCHWEIKERT:  Okay.  Thank you.

23   BY MR. SCHWEIKERT:

24        Q.   Anyone else?

25        A.   Not that I'm aware of.

1    Q.   Do you know if the AMA had any official that was

2    in any booth while the racetrack was active during the

3    practices in which Brian crashed?

4    A.   I do not know, outside of the timing and

5    scoring officials.

6    Q.   And who were the timing and scoring officials,

7    if you know?

8    A.   The only one I know was the head timing and

9    scoring official, which was Conrad Young.  Again, I

10   don't know that he was in that booth because he didn't

11   make it to all the events, but timing and scoring

12   officials were in the timing and scoring booth when

13   motorcycles were in the racetrack.

14   Q.   For purposes of keeping time of the riders'

15   laps?

16   A.   Correct.

17   Q.   And that would include even during the untimed

18   practices?

19   A.   Typically that transponder system, the timing

20   and scoring system, is running even when it's not being

21   scored officially.

22   Q.   Okay.  So the riders can at least get a sense

23   of how they're doing during that pre-practice.

24   A.   I'm not sure if the AMA shares that with the

25   riders and race teams or not, if they share those pre-

1    practice times.

2         Q.   Okay.  You referenced recognizing video boards

3    in the picture of Raymond James Stadium that's Exhibit

4    151.

5         A.   Yes.

6         Q.   What were you referring to?

7         A.   There are six video boards; three in each end

8    zone.  And I'm sure there are other stadiums in the

9    country, if not the world, that have that same layout,

10   but it is somewhat unique to Raymond James where they

11   have the large one in the middle of each end zone and

12   the two smaller ones kind of tucked into the corners.

13        Q.   Okay.  Would you understand if I referred to

14   the large one in the middle as the jumbotron?

15        A.   Yes.

16        Q.   But when you're talking about video boards,

17   you're talking about both the jumbotron and then the

18   video board on the left and the one on the right as well

19   as the ones in the opposite end zone?

20        A.   Correct.

21        Q.   Okay.  And in terms of what was -- strike

22   that.

23        Do you know who would be controlling and what was

24   being displayed on those video boards during the

25   practices?

1    A.   Yes.  So Jim Moehle was our show manager.  In

2    2020 the stadium would have had a director for those

3    video boards, as well as cameras for those video boards.

4         Q.   And what role would the stadium's director be

5    serving?

6         A.   The stadium's director would communicate

7    directly with the camera operators from the stadium and

8    relay any information our show manager, assuming it was

9    Jim Moehle, gave him.

10        Q.   Is it fair to understand that within that show

11   control booth there would have been the feeds from the

12   various cameras that were available to Mr. Moehle and

13   this stadium director?

14             MS. JANKOWSKI:  Objection.  Form.

15             MS. SPRADLIN:  Join.

16             THE WITNESS:  Yes, it fair to say that.

17   BY MR. SCHWEIKERT:

18        Q.   And then they could identify which particular

19   feed they wanted to put up on the jumbotron, for

20   example?

21        A.   Yes.

22        Q.   Anybody else that would have been in that show

23   control booth other than who you've told me?

24        A.   Not that I'm aware.  Again, in certain

25   circumstances the person from the stadium who operates

 1   the video boards or the ribbon boards, we call them, those

 2   advertising boards around -- really what you -- what you

 3   identified as the suite level --

 4       Q.   Yeah.

 5       A.      -- those thin LED boards that typically put up

 6   sponsor logos and such, I'm not sure if in 2020 or if

 7   Tampa -- that operator sits there, but that is, you

 8   know, the typical staffing location for that.

 9       Q.   In terms of selecting what is depicted on

10   those ribbons or the video boards, is that coming from a

11   Feld person?

12       A.   Those ribbon boards, yes.  So we have a

13   document that is produced that has a rolling --

14   typically it's just a rolling sponsor logo loop.  So

15   sponsor one goes up for a certain number of times, then

16   sponsor two, and so on.

17       And then when certain things go out, like

18   qualifying practice one or heat race one, that's

19   depicted on there.  So that operator knows, all right,

20   this is heat race one of the 250s.

21       Q.   And are you familiar with how the public

22   address system was handled during the Tampa Supercross?

23       A.   Define "public address system."

24       Q.   Were there occasions where there were

25   announcements over the load speaker within the stadium

1    to the members of the public who were there to watch the

2    event?

3        A.   Yes, there were.

4        Q.   And that's -- how would you define that if not

5    public -- okay.  You're talking like a public safety

6    announcement, is that the confusion?

7        A.   Yeah.  The confusion is many times a stadium

8    will create an audio loop that plays continuously at the

9    outside gates leading into the stadium and so on.  So

10   that's one form of public address system.

11       Feld Motor Sports has its own Supercross announcers

12   that are announcing the event inside the stadium.  So if

13   that's what you're referring to, yes.

14       Q.   And where were those announcers stationed, if

15   you know?

16       A.   I don't know particular to 2020 Tampa

17   Supercross.  The standard protocol was to have one

18   announcer up higher and two down on the floor.

19       Q.   Up higher than the press box at the press box

20   level?

21       A.   Either it could -- just elevated from the

22   floor.  So it could have been either in the press box or

23   any other area that's got an elevated sight line to the

24   floor.

25       Q.   And is the show manager directing the show

 1    during the practices in terms of what's being displayed

 2    and any sort of announcements being made over the PA?

 3            MS. JANKOWSKI:  Objection to form.

 4            THE WITNESS:  In the general sense, yes, but

 5        he's not necessarily specifically addressing what's

 6        shown on camera at all times.  So, I mean, during a

 7        practice or qualifying session, excuse me, there

 8        are multiple bikes on the track and so typically

 9        that stadium manager is just switching cameras

10        showing different competitors on the track.

11            If the show manager wants a certain competitor

12        shown on the video screen, then he will request

13        that from the stadium director.

14    BY MR. SCHWEIKERT:

15        Q.   And what about the announcements that are made

16    -- for example, I -- would there be an announcement of

17    the riders beginning a particular qualifying session?

18        A.   At certain times, yes.  It wouldn't

19    necessarily be at the beginning of the session where

20    it's formalized and the announcer says, "This is 250

21    Group B about ready to qualify."  It would be just an

22    identification at some point during that qualifying

23    session, more often than not, that this is 250 B or 450

24    A qualifying session.

25        Q.   And is that -- in that sort of example, is the

     1   announcer receiving a direction from somebody to make that

     2   announcement or are they independently providing

     3   information on their own?

     4       A.   It could be both.  I would say more often than

     5   not in that circumstance the announcer is giving that

     6   information on their own simply because they're

     7   experienced and know what the running order is and know

     8   what's out on the racetrack at that time.  But if need

     9   be, the show director could say, hey, this is qualifying

    10   Group B, 250 and announce that.

    11       Q.   Okay.  Do you know who any of the announcers

    12   for this PA system were during the Tampa Supercross?

    13       A.   I believe it was Ashley Renard; that's her

    14   married name.  I'm not sure she was married at the time.

    15   Ashley Phillips was her maiden name.  Steve Scott who

    16   goes by the nickname of Lurch.  And, again, to my

    17   recollection, Dan Hubbard.  Those were our traditional

    18   Supercross announcers, I believe, in 2020.

    19       I don't know that Steve Scott made all 17 -- or 16

    20   rounds that we produce, but I believe he was in Tampa.

    21       Q.   And those announcers were affiliated with

    22   Feld?

    23       A.   Yes.

    24       Q.   While I have you, I'll just ask -- this will

    25   be document I will mark as Exhibit 152.  Bates labeled

 1    FMS, Inc. 739 through 743.  Let me know if it's something

 2    that you're familiar with or recognize, please.

 3        A.   I recognize it, yes.

 4             (Thereupon, Plaintiff's Exhibit 152 was marked

 5        for identification.)

 6    BY MR. SCHWEIKERT:

 7        Q.   And what -- did I say 153?

 8             MS. SPRADLIN:  You said 152.

 9             MS. JANKOWSKI:  152.

10             MR. SCHWEIKERT:  Thank you.  All right.

11    BY MR. SCHWEIKERT:

12        Q.   What is document I've marked as Exhibit 152?

13        A.   We refer to it as the PA book or different

14    things that we want to educate the announcers on

15    throughout the show.

16        Q.   And almost half way down on the first page --

17    actually Row Number 17 says Feld Motor Sports.  Do you

18    see that?

19        A.   Yes.

20        Q.   And then below that in Row 17 it says "Logo

21    on, logo loop."  Do you see that?

22        A.   Yes.

23        Q.   What does that mean?

24        A.   That probably means that we are either putting

25    the Feld Motor Sports logo on the ribbon boards, those

1   narrow strip LED boards around the stadium and/or on one,

2   if not all, of the video boards in the stadium.

3       Q.   And what is your understanding of Feld Motor

4   Sports logo when you refer to it?

5       A.   What is my understanding of the logo?

6       Q.   Yeah.  Are you talking about the name Feld

7   Motor Sports or a different logo?

8       A.   It's a specific logo, slash, wordmark that

9   says Feld Motor Sports, yes.

10      Q.   Okay.  And we talked earlier about some of the

11  other logos for the Supercross.  Do you remember that?

12      A.   I do remember that.

13      Q.   Are those -- were those displayed throughout

14  the stadium, as well, during the Tampa Supercross?

15      A.   The Monster Energy AMA Supercross logo and FMI

16  World Championship logo was displayed during the 2020

17  Tampa Supercross.  I am not sure if the plain logo was

18  displayed or not.  I believe it was, because we've used

19  it -- we have traditionally used it on the face of the

20  podium, but I can't remember if it was in 2020 or not.

21      Q.   Can you take a look at the picture that's 147?

22      A.   Okay.

23      Q.   Do you see on the banner behind the starting

24  gate there's the SX logo?

25           MS. JANKOWSKI:  I'm sorry, where?

```
 1            THE WITNESS:  Yes.

 2            MS. JANKOWSKI:  Thank you.

 3            MR. SCHWEIKERT:  Yes.

 4            THE WITNESS:  Yes.

 5            MR. SCHWEIKERT:  Is that a "yes"?

 6            THE WITNESS:  Yes.  So that would be the plain

 7      logo behind the starting gate.

 8  BY MR. SCHWEIKERT:

 9      Q.   And you had talked earlier about how the ops

10  crew would set up banners for the event; do you remember

11  that?

12      A.   Yes.

13      Q.   Are these the types of banners that the ops

14  crew would set up?

15      A.   They are.

16      Q.   And would the ops crew also be setting up the

17  ones that are covering the seats?

18      A.   They would, yes.

19      Q.   If we go back to the -- what did you call

20  Exhibit 152?

21      A.   PA script.

22      Q.   Is that the PA script?  On the second page,

23  Row 45, do you see that?

24      A.   Yes.

25      Q.   It reads, quote, "Medical unit team should be
```

1  referred to as Alpinestars medial team," end quote.

2      A.   Yes, I see that.

3      Q.   Should that say "Alpinestars medical team"?

4      A.   Yes.  It should either say "medical team" or

5  "medic team."

6      Q.   Okay.  And that was how Feld wanted the

7  medical team to be referred to during the Tampa

8  Supercross?

9      A.   Yes.

10     Q.   I'm going to show you a document previously

11 marked as Exhibit 3, Bates labeled FMS, Inc. 706 to 707.

12         MS. JANKOWSKI:  And because we double marked a

13     few at the beginning, was that marked during

14     Bodnar?

15         MR. SCHWEIKERT:  Yes, Bodnar.

16 BY MR. SCHWEIKERT:

17     Q.   Do you know what Exhibit 3 is?

18     A.   Yes.

19     Q.   What is it?

20     A.   It is a credential board.

21     Q.   And what is a credential board?

22     A.   It is a board depicting the various

23 credentials at a Supercross event and what access those

24 various credentials have.

25     Q.   And are these credentials being depicted the

```
 1   ones that Feld would permit to be used to enter the

 2   stadium?

 3        A.   Some of these credentials are the ones that

 4   Feld and the AMA used to permit access to the stadium.

 5        Q.   And which ones are those?

 6        A.   The majority.  Probably use to --

 7        Q.   Do you want to exclude the ones --

 8        A.   Yeah, it's probably to exclude the ones --

 9        Q.   I'll tell you what, if you give me that, I

10   will mark it as Exhibit 153 and then you can just cross

11   out the ones that you believe need to be crossed out.

12        A.   We're crossing out the ones that do not allow

13   access into the stadium, correct?

14        Q.   Yes.

15        A.   And, again, the definition of "in stadium" is

16   inside the walls, including the grandstands.  So

17   anything outside the walls, including the pits and the

18   paddock, would in this definition be outside of the

19   stadium?

20        Q.   Yes.

21        A.   Okay.  I don't know where you want me to cross

22   it out, but the ones at Fan Fest only pit access, that

23   would not get you into the stadium alone.  16, the Fan

24   Fest access sticker alone would not get you into the

25   stadium.  Fan Fest filming on the next page alone will
```

```
 1    not get you into the stadium.
 2         Q.   The orange --
 3         A.   The orange, yes.
 4         Q.   The orange bib or is it just a wristband?
 5         A.   It would be the -- I believe the way this is
 6    depicting it; it would be the bib with Fan Fest filming
 7    in those areas marked with a white line on the bib.  So
 8    the front would have -- the upper left chest would say
 9    Fan Fest filming and across the top back would say Fan
10    Fest filming.  That would not get you into the stadium
11    alone.
12         Actually, on this back side -- let me make sure
13    before I comment, but -- none of these credentials on
14    the back side would get you into the stadium alone,
15    meaning if you had that black press core bib or vest,
16    you would still need a credential to access the stadium.
17         Q.   And by "backside," you're talking about Page
18    Bates labeled FMS, Inc. 707?
19         A.   Correct.
20         So do you want me to cross these out?
21         Q.   Sure.  I understood your testimony, as well,
22    but since we're crossing out, might as well continue.
23         A.   All right.
24              (Thereupon, Plaintiff's Exhibit 153 was marked
25         for identification.)
```

```
 1   BY MR. SCHWEIKERT:
 2       Q.   Did you, yourself, happen to have a credential
 3   that you used to get inside the stadium?
 4            MS. JANKOWSKI:  Hold on.  Are you still --
 5            THE WITNESS:  I'm still crossing out, but --
 6            MS. JANKOWSKI:  Hang on, Mark.
 7            MR. SCHWEIKERT:  I gave you too much homework.
 8            THE WITNESS:  Yep.  Again, all these that I'm
 9       marking would not get you into the stadium alone.
10       They would need to be accompanied by another
11       credential on this board.
12   BY MR. SCHWEIKERT:
13       Q.   And in turn -- my next question, did you
14   happen to have one of these credentials yourself for the
15   Tampa Supercross?
16       A.   I did.
17       Q.   And what would yours have looked like?
18       A.   It most likely would have been the center --
19   top left center portion that is yellow, black, and red
20   that says, "All Access Motorsports can escort."  Again,
21   it's been five years, I don't remember exactly, but that
22   is what I would typically have at a Supercross event.
23       Q.   Do you recall if you had one credential like
24   that for the entire season or would you get one for each
25   individual event?
```

1    A.   I would have one credential for the entire

2  season.

3    Q.   Okay.  I'm going to show you a document I will

4  mark as Exhibit 154.  Do you happen to recognize Exhibit

5  154?

6    A.   I do.

7         (Thereupon, Plaintiff's Exhibit 154 was marked

8    for identification.)

9  BY MR. SCHWEIKERT:

10    Q.   And what is it?

11    A.   It is a camera map.

12    Q.   Is it a map of the approximate locations of

13  cameras in Raymond James Stadium during the Tampa

14  Supercross?

15    A.   It is a map of where the approximate locations

16  of the cameras were planned at the Raymond James

17  Supercross.

18    Q.   Are you suggesting that cameras were not set

19  up as planned?

20    A.   I do not recall, but there are occasions where

21  once we're onsite cameras will not work in those

22  locations, so they're adjusted.

23    Q.   And you had mentioned earlier the stadium

24  having some cameras, do you recall that?

25    A.   I do recall mentioning that the stadium or the

```
 1   Tampa Sports Authority had some cameras.  Yes.
 2       Q.   Is there anything on this map that would allow
 3   you to determine which were cameras of the Tampa Sports
 4   Authority?
 5       A.   Not that I'm aware of, no.
 6       Q.   And is it fair to say there were additional
 7   cameras beyond what was provided by Tampa Sports
 8   Authority?
 9           MS. JANKOWSKI:  Object to form.
10           THE WITNESS:  There were additional cameras
11       onsite, yes, it's fair to say.
12   BY MR. SCHWEIKERT:
13       Q.   I'll re-ask it.  Were there any other cameras
14   at the stadium in addition to what was provided by Tampa
15   Sports Authority?
16           MS. JANKOWSKI:  Object to form.
17           THE WITNESS:  Yes, there were other cameras in
18       addition.
19   BY MR. SCHWEIKERT:
20       Q.   Do you know who was responsible for those
21   other cameras?
22       A.   A company we contracted called Kavis
23   Productions.
24       Q.   You held a contract with Kavis?
25       A.   Yes.
```

```
 1        Q.    Is that K-a-v-i-s?

 2        A.    Yes.

 3        Q.    Were there any other cameras that anyone else

 4   was responsible for beyond Kavis Productions and Tampa

 5   Sports Authority?

 6        A.    There were.  Typically OEM race teams, as well

 7   as a few high-level privateer race teams will have

 8   cameras where they film their athletes while they're on

 9   the track.  And then there were one, if not two, cameras

10   that were manned by Feld Motor Sports employees.

11   They're small mobile cameras that wouldn't be depicted

12   here on this map.

13        They're mobile throughout the even taking video of

14   everything inclusive of the event like we've talked

15   about, Fan Fest, paddock, racetrack, whatever it may be.

16        Q.    Practices?

17        A.    In some cases, yes, practices.

18        Q.    Do you know if the AMA had any cameras set up?

19        A.    I'm not aware of any cameras that the AMA had

20   set up.

21        Q.    Do you know if during the practices the AMA

22   had access to any video feeds from any of the cameras

23   that were operating during the practices?

24        A.    By access they were able to view the jumbotron

25   and had access to the same -- you know, small monitor
```

1    that would be the same video content that is displayed on

2    the jumbotron.

3        Q.   Who do you mean had access to that?

4        A.   AMA officials would typically -- whether it's

5    the timing and scoring official or someone at an

6    elevated position in one of those booths would have a

7    monitor.  Again, it's the same video footage that's on

8    the jumbotron.

9        Q.   So whatever is being shown on the jumbotron

10   would be displayed on that individual's monitor?

11       A.   Correct.

12       Q.   When the racetrack is active, do you know if

13   there's anyone that has access to all of the different

14   feeds from the cameras that were filming the activity on

15   the racetrack?

16            MS. JANKOWSKI:  Object to form.

17            THE WITNESS:  The ones that we've discussed,

18        so the show manager up top who is in show control.

19        The stadium director who would have all of those

20        monitors and cameras.  And then at some point

21        during the day Kavis Production trucks would have

22        access to whatever cameras are running at the time.

23   BY MR. SCHWEIKERT:

24       Q.   Was anybody monitoring the video feeds that

25   were available for safety reasons while the racetrack

1    was active?

2            MS. JANKOWSKI:  Objection to form.

3            THE WITNESS:  Not that I'm aware of.  No one

4       was monitoring video camera feeds for safety

5       reasons.

6    BY MR. SCHWEIKERT:

7       Q.    Does that make sense to you?

8            MS. JANKOWSKI:  Objection to form.

9            MR. DOYLE:  Join.

10           MS. SPRADLIN:  Also join.

11           THE WITNESS:  Yes, it makes sense to me.

12   BY MR. SCHWEIKERT:

13      Q.    Why?

14      A.    Because the nature of the sport of Supercross,

15   the entire -- the entirety of the racetrack is easily

16   visible from elevated positions where the safety

17   manager, timing and scoring, and others are positioned.

18      Q.    But the safety manger, as far as you're aware,

19   did not have the ability to communicate with the AMA

20   race director, did he?

21           MS. JANKOWSKI:  Object to form.

22           THE WITNESS:  As far as I'm aware, no.

23   BY MR. SCHWEIKERT:

24      Q.    Did the safety manager have the ability, as

25   far as you're aware, to communicate with anyone on the

 1    medical team?

 2         A.    No.

 3         Q.    So if the safety manager saw something that

 4    created a hazard on the track, he had no way to inform

 5    any of the AMA officials or any of the medics on the

 6    medical team?

 7         A.    The AMA -- he would not need to.  The AMA has

 8    at least one person who can see the entirety of the

 9    racetrack, as well.  If for some reason there was no

10    response from the AMA for the medic team, and that has

11    never happened to my knowledge, then there may be a

12    reason for that to happen, but both the safety manager

13    from our side and the AMA have clear vision of the

14    entirety of the racetrack.

15         Q.    And who are you referring to at the AMA that

16    would have had this vision of the track?

17         A.    In 2020 I believe it was Jeff Canfield.

18         Q.    Do you know where he was located during the

19    practices at the Tampa Supercross?

20         A.    I don't know where he was located, but it

21    would have been on that same level, the operational

22    booth level.

23         Q.    Is it possible he was in the show control

24    booth with Jim Moehle?

25         A.    It's possible.

```
 1              MS. JANKOWSKI:  Objection.  Form.
 2              THE WITNESS:  It's possible.
 3    BY MR. SCHWEIKERT:
 4        Q.    And is it your understanding that Mr. Canfield
 5    was in a location where he had the ability to monitor
 6    more than one feed from a camera while the racetrack was
 7    active?
 8              MS. SPRADLIN:  Object to form.
 9              MS. JANKOWSKI:  Objection to form.
10              THE WITNESS:  That is not my understanding,
11        no.
12    BY MR. SCHWEIKERT:
13        Q.    Are you familiar with any other professional
14    racing sports?
15        A.    Define "familiar."
16        Q.    Are you a fan of Formula 1?
17        A.    I'm -- I wouldn't say I'm a fan of Formula 1.
18    I know a little bit about Formula 1.
19        Q.    Are you -- do you know if during Formula 1
20    races there is a location where the track is being
21    monitored through a number of cameras placed around the
22    track?
23        A.    I believe there is, yes, from what I
24    understand.
25        Q.    And is it your understanding one of those
```

 1   reasons is to monitor the track for any crashes or hazards

 2   that may occur during a race?

 3        MS. JANKOWSKI:  Object to the form.

 4        THE WITNESS:  That is my understanding.

 5   BY MR. SCHWEIKERT:

 6        Q.   But you don't believe that sort of monitoring

 7   is necessary during a Supercross event because of the

 8   compact nature of the stadium; is that right?

 9        A.   That's right.  I don't believe it's -- it's

10   two completely different forms of racing.  One or even a

11   group of officials located in a booth can see an

12   entirety of an F1 track, so it's a necessity to have

13   cameras placed outside of that monitoring the racetrack,

14   because the entirety, if not the majority, of the

15   racetrack isn't visible from most of those operational

16   booths.

17        Q.   And during the Tampa Supercross, the entire

18   track while Brian was on it during the practices, as far

19   as you know, was visible to, at a minimum, the Feld

20   safety manager and the AMA event manager; is that right?

21        A.   As far as I know, yes.

22        MR. SCHWEIKERT:  Let's take a break so we can

23        -- off the record, please.

24        THE VIDEOGRAPHER:  This will conclude Media

25        File Number 2 of the deposition of Dave Prater.  It

```
 1        is 2:23.  We're going off the record.
 2               (Off the record.)
 3               (On the record.)
 4               THE VIDEOGRAPHER:  This will begin Media File
 5        Number 3 to the deposition of Dave Prater.  It is
 6        2:37.  We're back on the record.
 7   BY MR. SCHWEIKERT:
 8        Q.    In references to like a Feld management and a
 9   show office, does that mean something to you?
10        A.    No, not necessarily.  I mean we have a show
11   office or event office at each stadium that we utilize
12   for Feld Motor Sports staff to office out of.
13        Q.    Okay.  There's a reference, if you want to
14   follow along, in Exhibit 11, the medical emergency
15   action plan, Page 3.  There's a heading for
16   Communication.
17        A.    It's 3?
18        Q.    Yes, sir.
19        A.    Okay.
20        Q.    Do you see the heading Communication?
21        A.    Yes.
22        Q.    And the second sentence reads:  "Additional
23   communication on track, in person, or as directed by
24   radio contact with the Feld management and show office
25   is maintained throughout the event."  Do you see that?
```

1    A.   I do.

2    Q.   Do you have any understanding of what the Feld

3  Management and show office is?

4         MS. JANKOWSKI:  Objection.  Form.

5         THE WITNESS:  Again, I would say the show

6      office or the event office is where Feld Motor

7      Sports staff use to office out of.  I am not aware

8      of any direct radio contact between the show office

9      and the Alpinestars Medical Unit.

10 BY MR. SCHWEIKERT:

11   Q.   What about between the show office and the AMA

12 officials?

13        MS. SPRADLIN:  Object to form.

14        THE WITNESS:  I'm not aware of that either.

15 BY MR. SCHWEIKERT:

16   Q.   How is the management team for Feld kept

17 apprised of any developments throughout the day from the

18 AMA if needed?

19        MS. JANKOWSKI:  Objection to form.

20        THE WITNESS:  Typically, if needed, the AMA

21      would call probably Mike Muye on his cell phone.

22 BY MR. SCHWEIKERT:

23   Q.   Would that -- is that your understanding of

24 how those communications would have occurred at the

25 Tampa Supercross in 2020?

1    A.    Yes.  Either that or if Mike or someone from the

2    Feld Motor Sports staff was in close proximity to Jeff

3    Canfield or an AMA official and that was relayed through

4    that official to either Mike or one of the Feld Motor

5    Sports staff.

6        Q.    It's my understanding the safety manager, the

7    track runners, and the Feld flaggers had radio

8    communications amongst themselves, right?

9        A.    The safety -- the Feld Motor Sports safety

10   manager, the track runners, and the Feld Motor Sports

11   caution flaggers, yes, had communication amongst

12   themselves.

13       Q.    Aside from those folks, and with respect to

14   Tampa Supercross, was anybody else with Feld in radio

15   contact with anybody else?

16       A.    Was anyone else with Feld within radio contact

17   with anyone else?  Define "anyone else."

18       Q.    Yeah, I don't pretend to ask great question.

19       I'm just trying to understand if anyone other than

20   those folks had a walkie-talkie or a headset, anything

21   like that?

22       A.    Yes, other people had walkie-talkies or

23   headsets.

24       Q.    For what purpose?

25       A.    Multiple purposes.  Operations purposes,

1    paddock purposes, fan movement purposes, such as

2    congestion at the gates or so on.  So multiple operation

3    -- operational purposes.

4         Q.   And would those people with radios for

5    operations purposes have the ability to flip to a

6    channel to communicate with an AMA official, for

7    example?

8         A.   As far as I recall, there was only one or two

9    radios that Feld Motor Sports staff had that could

10   communicate via radio to the AMA.  And that would have

11   been Mike Muye, senior director -- or director of

12   operations, and Tim Phend, who was -- I'm not sure his

13   title at the time, but event manager, I believe.

14        Q.   All right.  Let's talk about the day in

15   question, February 15th, 2020.  Do you recall

16   approximately what time you arrived at the stadium?

17        A.   I do not.  I do not recall what time I arrived

18   at the stadium.  I would imagine it was around 8:00 a.m.

19   That's when I typically arrive.  When I go to a

20   Supercross event, that's my typical race day arrival

21   time.

22        Q.   Do you recall anything specifically that you

23   did between 8:00 a.m. and to when the practices started

24   around noon?

25        A.   Yes.  I arrived.  I checked in with Mike Muye,

 1   checked in with Doug Cabrera on the broadcast side, just

 2   in general to see how things were going.  I don't

 3   remember anything out of the ordinary.  And then at some

 4   point between 8:00 a.m. and when the practices started,

 5   Kenneth Feld arrived, the owner of Feld Motor Sports,

 6   with -- arrived with our -- it was, at the time, our new

 7   CFO.  I believe his name was Aaron Holt, if I'm not

 8   mistaken.

 9      And he was new to the company, so Kenneth asked me

10   to give him a tour.  So I took Kenneth and Aaron on a

11   tour of the entire event and the different moving parts.

12      Q.   And do you recall anything else you did after

13   that and before the practices began?

14      A.   Nothing specific, no.

15      Q.   Do you recall where you were when the

16   practices began around noon?

17      A.   I don't know where I was.  I was somewhere

18   along that tour with Kenneth and Aaron.

19      Q.   Were you giving them any -- what were you

20   giving them a tour of, if you remember?

21      A.   Just everything that a Supercross event was

22   from what we do when we move on typically Tuesday

23   morning, how that week goes, and then took them to the

24   television compound with the television trucks.  Took

25   them inside one of the trucks and introduced them to

1    Doug Cabrera and I believe I typically would introduce

2    them to Chris Bond, who was our producer.

3        Walked them through the service level.  Spoke to

4    them about, you know, how many operations, vehicles, how

5    many tractor trailers we have.  Walked them through the

6    Fan Fest and the paddock.  Explained to him just the

7    nature of the sport, how the race teams are organized,

8    how the paddock is set up.

9        Took them to the merchandise area.  Showed them

10   various merchandise and the merchandise trailer units

11   that we use.  That type of thing.

12       Q.    When you refer to Doug Cabrera, what was he

13   involved in producing on that day?

14       A.    He was involved with producing the television

15   broadcast.

16       Q.    Just the TV broadcast?

17       A.    The television broadcast.  I would say the

18   Race Day Live, which is our qualifying show, that

19   broadcast, as well.  I kind of use the two

20   interchangeable.  They're both on television now that

21   television is a computer or any kind of screen.  So,

22   yes, it was Race Day Live, which is our qualifying show,

23   which is the timed practice sessions, and then the --

24   what we refer to as the night show, which is actual race

25   -- the qualifying heats and the main events.

1    Q.  Do you recall watching any of the practices?

2    A.  I don't recall watching any specific practice.

3  I did at some point watch some of the qualifying

4  practice with Kenneth and Aaron and explained to them,

5  you know, what was going on on the racetrack during that

6  time.

7    Q.  When did you first become aware that Brian had

8  been injured?

9    A.  I first became aware that Brian had been

10  injured sometime during the day on Saturday after my

11  tour had concluded with Kenneth and Aaron in the -- I

12  was in the paddock area.

13    Q.  How did you become aware?

14    A.  I was in the paddock area.  I was with Todd

15  Jendro and a gentleman named Eric Peronnard, who's a

16  longtime acquaintance, approached Todd and I, because

17  he's known us for a long time, just to say hello.  We

18  had some small talk and -- so at some point during that

19  conversation, and I don't know the exact wording of it,

20  but Eric said -- Eric is French, so Eric had mentioned

21  Brian Moreau and it's a -- he's disappointed to see

22  Brian, you know, get hurt.

23    Q.  What was that guy's name?

24    A.  Eric Peronnard.  And I believe you spell it

25  P-e-r-o-n-n-a-r-d.

1    Q.   Eric with a C or a K?

2    A.   C.

3    Q.   Okay.  Do you recall any more about that

4  conversation?

5    A.   That was it.  It was very general and he

6  didn't -- he didn't elaborate as to the nature of the

7  injury.  I'm not sure -- I'm not sure he knew.  He just

8  said that it's disappointing that, you know, Brian's

9  first race had been hurt.

10    Q.   Do you recall if he made you aware that Brian

11  had left the stadium in an ambulance?

12    A.   Not that I recall.

13    Q.   Did you ask?

14    A.   I didn't ask.

15    Q.   Did you have any communications with anyone

16  else on that day about Brian or his accident?

17    A.   Not that I recall, no.

18    Q.   You didn't talk to anyone from his racing

19  team?

20    A.   No.

21    Q.   Now did there come a time where you did become

22  aware that Brian had been transported from the stadium

23  to the hospital in an ambulance?

24    A.   I believe the first time I became aware of

25  Brian's injury, and not necessarily his injury, but that

1   it was a serious injury, was sometime late Sunday, I

2   believe.  And it was either through a social post or an

3   internet post.

4       Q.   Have you had the opportunity to review any

5   videos of the incident involving Brian?

6       A.   I have, yes.

7       Q.   Have you viewed the video from the jumbotron

8   feed?

9       A.   I have, yes.

10      Q.   Have you seen the slow-motion views of the

11  incident?

12      A.   I've seen the slow-motion views of after the

13  incident.

14      Q.   Okay.  And I'm going to ask you some questions

15  as we move along.  And if you'd like me to refresh your

16  recollection, I'm happy to play those videos for you.

17  But in the interest of like keeping things moving, I

18  wasn't going to sit here and replay them for you.  But

19  if you'd like me to any point, just let me know.

20      A.   Okay.

21      Q.   I'm going to show you a document I will mark

22  Exhibit 155.  Was Bates labeled FMS, Inc. 1126 through

23  28.  Unfortunately the Bates number was outside my print

24  margin, so it didn't show up there.

25      Take a moment, review the document I've marked as

```
 1    Exhibit 155, and let me know if you know what it is.
 2             MS. JANKOWSKI:  Just while we have a moment,
 3        Mark, the ones that you'll mark as the official
 4        exhibit, do they have the Bates on them?
 5             MR. SCHWEIKERT:  They didn't print for
 6        whatever reason.
 7             MS. JANKOWSKI:  It's fine.  I'm just curious.
 8             (Thereupon, Plaintiff's Exhibit 155 was marked
 9        for identification.)
10    BY MR. SCHWEIKERT:
11        Q.   Do you recognize Exhibit 155?
12        A.   I recognize the email and I recognize the
13    social post.  I don't know that they necessarily go
14    together.  I don't know that they don't, but I don't
15    know that they go together.
16        Q.   Well, do you -- let's start with the social
17    media post.
18        A.   Uh-huh.
19        Q.   It appears to be from a Michael, underscore,
20    Lindsay.  Do you see that?
21        A.   Yes.
22        Q.   And there's photographs of his posts?
23        A.   Yes.
24        Q.   Is this the social media post that you believe
25    made you first aware of Brian's -- the seriousness of
```

1   Brian's injuries?

2       A.   I can't say.  I believe there was a social

3   media post that was in some way a statement from his

4   father that made me aware of the injury, but I could be

5   mistaken.

6       Q.   Do you recall ever seeing this post by

7   Michael?

8       A.   I recall seeing this post.  I don't know that

9   I actually saw it in its native environment, assuming

10  it's Instagram, but I have seen this post.

11      Q.   Did you take screenshots of Michael Lindsay's

12  social media post and email it to Steve Yaros on

13  February 17th?

14      A.   I don't recall.  I may have.  That's what I'm

15  saying, I don't -- I don't recall emailing this

16  screenshot, but I may have.

17      Q.   Who is Steve Yaros?

18      A.   Steve Yaros was the senior vice president of

19  PR in 2020.

20      Q.   Do you see how in the bottom of the first page

21  there's an email from you, Dave Prater, on February

22  17th, 2020 to Steve Yaros?

23      A.   Yes.

24      Q.   And the subject is Brian Moreau, Number 104,

25  Injury?

 1     A.   Yes.

 2     Q.   Do you have any recollection of sending that

 3  email to Mr. Yaros?

 4     A.   I don't remember sending an email to Mr. Yaros

 5  just updating him on Brian Moreau's injury, in general.

 6  I don't recall taking a screenshot of that social post.

 7  Again, it's not to say that I didn't, I just don't

 8  recall specifically as it pertains to this email.

 9     Q.   Why at that time would you have informed

10  Mr. Steve Yaros of Brian Moreau's injury?

11     A.   I informed Mr. Yaros of Brian Moreau's injury

12  because, like I said, I had been made aware that it

13  seemed to be serious sometime Sunday.  So I wanted to

14  alert our staff, specifically PR staff that Brian had

15  been injured and that it was potentially serious.

16     Q.   Did you ever communicate with Michael Lindsay

17  about Brian Moreau's injury?

18     A.   Not that I recall, no.

19     Q.   Why not?

20     A.   I didn't feel it necessary.

21     Q.   He does appear to have been posting about

22  Brian's injuries, right?

23     A.   He does, yes.

24     Q.   And he references no red flag thrown and you

25  heard from people in the incident how Brian was pulled

1   from the track with a spinal cord injury; do you see that?

2        A.   That's what he references, yes.

3        Q.   And that's not something that you had an

4   interest in discussing with him?

5             MS. JANKOWSKI:  Objection.  From.

6             THE WITNESS:  I don't typically discuss

7        injuries with anyone outside of Feld Motor Sports

8        and I know Michael Lindsay, I'm not sure if this

9        Michael Lindsay is the one I know.  But, again,

10       it's not typical practice for me to reach out to

11       someone after seeing a social media post.

12   BY MR. SCHWEIKERT:

13       Q.   Who is the Michael Lindsay that you know?

14       A.   There's a Michael Lindsay who works for Vital

15   MX, which is an independent endemic.

16       Q.   A what publication?

17       A.   Endemic, so a publication that follows the

18   sport of Supercross and Motocross.

19       Q.   Do you see in Mr. Lindsay's post where he

20   writes:  "Considering it was just pre-practice, I wish

21   there was a red thrown so the safety crew had the time

22   to move him under safer conditions"?

23       A.   I see that, yes.

24       Q.   Do you agree that considering it was just pre-

25   practice a red flag should have been thrown so the

1  safety crew had the time to move Brian under safer

2  conditions?

3          MR. DOYLE:  Object to form.

4          MS. JANKOWSKI:  Object to form.

5          MS. SPRADLIN:  Same objection.

6          THE WITNESS:  I don't have an opinion on

7      whether a red flag should have been thrown.  I'm

8      not an expert in red flags.

9  BY MR. SCHWEIKERT:

10     Q.  But you are a human being, right?

11     A.  I am a human being.

12     Q.  You're someone who has raced, at least in an

13 amateur level, Motocross before, right?

14     A.  I am.

15     Q.  And you've worked more than a hundred

16 Supercross events over your career?

17     A.  I would say that's accurate.

18     Q.  And despite that experience, you don't have

19 even a personal opinion about whether a red flag should

20 have been thrown so the medical team had the time to

21 move Brian under safer conditions?

22         MR. DOYLE:  Objection.  Form.

23         MS. SPRADLIN:  Objection.  Form.

24         MS. JANKOWSKI:  Objection to form.

25         THE WITNESS:  Again, I -- I've never thrown a

 1      red flag.  It's not my responsibility to throw red

 2      flags.  Our caution flaggers, as well as our track

 3      runners, performed exactly how they were supposed

 4      to.  They alerted the riders -- the oncoming riders

 5      of the fact that Brian and the med staff were on

 6      the track.

 7           Our track runners picked up his bike, held it

 8      in front of Brian and the medical crew, and then

 9      also put a Tuff Block at the peak of the jump prior

10      to where Brian and the med crew were.

11  BY MR. SCHWEIKERT:

12      Q.   But you don't have an opinion one way or the

13  other as to whether you believe despite all your

14  experience and the fact that it was a pre-practice that

15  a red flag should have been thrown?

16           MS. SPRADLIN:  Object to the form.

17           MS. JANKOWSKI:  Same objection.

18           MR. DOYLE:  Join.

19           THE WITNESS:  I don't have an opinion.  I

20      wasn't -- I didn't witness the accident.  I wasn't

21      near the accident, so, no, I don't have an opinion.

22  BY MR. SCHWEIKERT:

23      Q.   But you have seen videos of Brian being

24  removed from the track after his crash, right?

25      A.   I have.

```
 1       Q.   Have you seen pictures, as well?

 2       A.   I have, yes.

 3       Q.   And was there anything that you saw in those

 4   pictures or in the videos that affected your opinion one

 5   way or the other?

 6            MS. SPRADLIN:  Object to form.

 7            MR. DOYLE:  Join.

 8            THE WITNESS:  No.  Again, I'm not a medical

 9       expert, so I rely on the medical team for that.

10   BY MR. SCHWEIKERT:

11       Q.   Just quickly, there's a couple more names on

12   this 155.  Sabrina Lowe, do you know who that is?

13       A.   Yes.  I don't know her exact title in 2020,

14   but she was in the PR department.

15       Q.   And Sam Gomez?

16       A.   Yes.  Again, I don't know his exact title in

17   2020, but he was in the digital department.

18       Q.   Did you believe this was a public relations

19   concern at the time?

20            MS. SPRADLIN:  Object to form.

21            THE WITNESS:  I didn't believe that it was

22       necessarily public relations' concern, but I knew

23       that there would potentially be press reaching out,

24       so I wanted to make them aware.

25   BY MR. SCHWEIKERT:
```

1    Q.   I'm going to show you a document previously

2   marked as Exhibit 86 during Todd Jendro's deposition.  I

3   don't have the marked copy, so I will put a new sticker

4   on it, but it's the same document Bates labeled FMS,

5   Inc. 1030.

6    Do you recognize Exhibit 86?

7    A.   Yes.

8    Q.   And what is it?

9    A.   It is an email from myself to Todd Jendro

10   titled Injured Rider.  And then the content of the email

11   is the name of the rider, Brian Moreau, his racing

12   number, the class he was competing in, and when the

13   injury happened the first free practice.

14    Q.   And this is an email you sent to Mr. Jendro on

15   February 17th, 2020, around 3:29 p.m.?

16    A.   Yes.

17    Q.   Regarding Brian Moreau, Number 104, right?

18    A.   Correct.

19    Q.   Why were you -- why did you send this email?

20    A.   I sent this email to communicate with Todd

21   that Brian had been injured and what, at the time, I

22   would assumed would be a serious injury, and so I'm just

23   letting him know.

24    Q.   Why at the time did you assume that it would

25   be a serious injury?

```
 1      A.   From -- again, if my memory serves, when I saw
 2   the post, which I believe was the letter or statement
 3   from his father, it seemed fairly serious.
 4      Q.   Did you -- this statement from Brian's father
 5   that you're referring to, was it on a website or
 6   something that you believe was in an email that was sent
 7   to you?
 8      A.   I don't recall.  I have -- I believe it was a
 9   website, but I believe it may have been an email from
10   that website that I would periodically get during the
11   season, like a subscription service.
12      Q.   And why would Todd Jendro need to be informed?
13      A.   I reported to Todd Jendro.  Todd Jendro was
14   the vice president of operations and so I just thought
15   he should be aware.
16      Q.   But if, as you told me earlier, Feld differs
17   to The Medic Rig and the AMA on rider safety issues, why
18   would Mr. Jendro be concerned?
19           MS. SPRADLIN:  Objection to form.
20           MS. JANKOWSKI:  Objection to form.
21           THE WITNESS:  We do defer to The Medic Rig and
22      the AMA as far as rider safety is concerned,
23      however, we are involved with Supercross and we're
24      concerned with everyone's safety.  Obviously the
25      rider's safety, but everyone's safety that has
```

1     something to do with the event.

2   BY MR. SCHWEIKERT:

3       Q.   But you didn't contact Michael Lindsay to ask

4   him about what he may have been aware of with respect to

5   Brian's accident?

6           MS. SPRADLIN:   Objection to form.

7           MS. JANKOWSKI:   Objection to form.

8           THE WITNESS:   I did not.

9   BY MR. SCHWEIKERT:

10      Q.   Did you try to seek out information about what

11  had happened?

12      A.   I asked Mike Muye and Doug Cabrera for any

13  videos that we may have and/or any documentation or

14  information about it.

15      Q.   But why wouldn't you ask -- well, did you ask

16  anyone from the AMA or the medical team for information

17  about it?

18      A.   Not that I recall, no.

19      Q.   Why not?

20      A.   Because I didn't necessarily communicate

21  directly with the AMA or the medic team.   Mike Muye,

22  that was his role in 2020.

23      Q.   And he reported to you at that time?

24      A.   Yes.

25      Q.   Okay.   I'm going to show you the document

 1   marked during Mr. Muye's Zoom deposition, Exhibit 52,

 2   Bates labeled FMS, Inc. 699.  I'm going to put a sticker

 3   on it so the record is clear.

 4        Do you know what Exhibit 52 is?

 5        A.   Yes.

 6        Q.   And what is it?

 7        A.   I believe that's a text from myself to Mike

 8   Muye asking for any pictures or video of the crash and

 9   the removal.  And then I also asked if someone was with

10   him at the hospital.

11        Q.   So if we look at Exhibit 155, you sent your

12   email to Mr. Yaros on February 17th, around 10:45 a.m.

13   Do you see that?

14        A.   Yes.

15        Q.   And then according to Exhibit 52,

16   approximately four minutes later, you texted Mr. Muye to

17   try to get any pics or video of the crash and taking him

18   off, right?

19        A.   It appears that way, yes.

20        Q.   And why were you interested in getting any

21   pics or video of the crash and taking Brian off?

22        A.   Just standard protocol.  If we have a serious

23   accident, we would try to find any pictures or video of

24   that incident.

25        Q.   Why?

```
1        A.    To better investigate what happened.

2        Q.    For what purpose?

3        A.    To better or knowledge of what happened.

4        Q.    And why would you want to better your

5   knowledge of what happened?

6        A.    Just to be aware of exactly what the incident

7   was?

8        Q.    Did you want to know for purposes of seeing if

9   anything you did needed to be improved going forward?

10       A.    If there was something, yes, that was, you

11  know, obvious that something could have been improved,

12  yes, we would have used whatever video, pics,

13  information that we had to try to help improve that.

14       Q.    And based on the videos and pictures that you

15  have seen as of today in 2025, is there anything obvious

16  to you that could have been improved?

17            MR. DOYLE:  Object to the form.

18            MS. JANKOWSKI:  Join.

19            THE WITNESS:  There's nothing obvious to me

20       that could have been improved.

21  BY MR. SCHWEIKERT:

22       Q.    Everything was done exactly the way you

23  believe it should have been handled?

24            MS. JANKOWSKI:  Object to form.

25            THE WITNESS:  Everything that I'm aware of was
```

1    done in a way that it should have been handled.

2    Again, I'm not a medical expert.  I'm not an

3    official AMA expert.  But as far as what I've seen

4    in those videos, from the way Feld Motor Sports

5    track runners and caution flaggers handled the

6    situation, and all the way through, I believe it

7    was done as best it could be.

8  BY MR. SCHWEIKERT:

9    Q.   And that includes how the AMA controlled the

10 track after he crashed?

11         MS. SPRADLIN:  Object to the form.

12         THE WITNESS:  As far as I know, yes.

13 BY MR. SCHWEIKERT:

14    Q.   The AMA, they were responsible for controlling

15 the track during the practices, right?

16    A.   They were.

17    Q.   Did -- with respect to your text to Muye, did

18 he ever send you any pictures or video of the crash and

19 taking Brian off the track?

20    A.   He did send me video.  I'm not sure what this

21 video that he texted me is, specifically, but ultimately

22 he had sent three videos of the incident to me.

23    Q.   And what videos were those?

24    A.   Those were one video from what was up high --

25 so we -- at each event during load-in, we had an

1   operational camera that we placed.  It's a Nest camera,

2   the brand Nest.  And it would film from load-in to load-

3   out.  And the main objective, not the sole objective of

4   that camera, was just to be able to monitor progress

5   throughout the week, because I wasn't there every day,

6   Mike wasn't there every day.

7       So there's a -- that was up running during free

8   practice and the event.  That captured it -- captured

9   Brian's crash from afar.  There was another high camera

10  from Brian's race team from, I believe, factory filming

11  -- what we call factory filming where Brian's race team

12  was videoing him during practice.  That was acquired by

13  Mike.

14      And then he also acquired a video from Tampa Sports

15  Authority of what was on the jumbotron at the time.

16      Q.   Did you receive -- I mean you mentioned you

17  asked Doug Cabrera, as well, correct?

18      A.   I did, yes.

19      Q.   Did you get anything from him?

20      A.   I did not get anything from Doug.

21      Q.   Did -- where did you expect Mr. Cabrera to

22  have looked in response to your request?

23      A.   I expected him to have looked in the files

24  that we have from the television trucks.

25      Q.   Did you expect him to have inquired with Kavis

 1    Productions as to whether they had any footage?

 2        A.   I did, yes.

 3        Q.   Do you know if he did that?

 4        A.   I would assume he did, because that would have

 5    been one of the primary people that would have had

 6    access to that footage.

 7        Q.   You've seen the slow-motion videos of Brian

 8    being removed, correct?

 9        A.   I have, yes.

10        Q.   What is your understanding of where those

11    videos came from?

12        A.   Those videos initially came from NBC.  That's

13    my understanding of it.

14        Q.   Did there come a time where you learned about

15    archives that Feld maintained of some Supercross

16    footage?

17        A.   Yes.  After we obtained those from NBC, I was

18    then made aware after we went back and did some further

19    searching that we had some archives of Supercross

20    footage that included those -- I believe it's two

21    videos.

22        Q.   Do you have the non-slow-motion versions?

23        A.   I don't remember seeing the non-slow-motion

24    versions.

25        Q.   Was it your understanding that those videos

 1    were filmed in slow motion?

 2         A.    I would assume those videos are filmed were

 3    filmed in slow motion if that's the only copies we have.

 4         Q.    And you were not aware until this litigation

 5    that there was such an archive of raw footage; is that

 6    correct?

 7         A.    Correct.  I was unaware that there was such an

 8    archive of this footage well into this litigation, until

 9    recently.

10         Q.    But you said you had previously tried to

11    compile videos whenever somebody got hurt so you could

12    figure out what happened, right?

13         A.    I did say that.

14         Q.    Had you ever received raw footage of any other

15    prior incident involving injuries to riders?

16         A.    Not that I can recall.  I can't think of

17    another injury serious like this where we requested

18    footage.  I'm trying to -- or I was the one requesting

19    the footage.  I can't recall another injury outside of

20    maybe James Marshal in San Diego, and I don't know -- I

21    don't know what year, but that wasn't me.  I wasn't

22    making the request at the time.

23         Q.    And why were you making the request this time

24    with respect to footage of Brian?

25              MS. JANKOWSKI:  Objection.  Form.

```
 1              THE WITNESS:  It was part of -- I felt like it
 2         was part of my responsibilities to gather as much
 3         info as I could.
 4     BY MR. SCHWEIKERT:
 5         Q.   Why did you feel that was part of your
 6     responsibility?
 7         A.   I was senior director of operations for Feld
 8     Motor Sports Supercross.
 9         Q.   And why did being senior director of
10     operations for Supercross make you feel that you had
11     some responsibility for collecting footage of Brian's
12     crash?
13         A.   I felt like I was the most senior person
14     specific to Supercross for Feld Motor Sports.  I had a
15     responsibility to the Feld Motor Sports executive team,
16     as well as the AMA and everyone involved to find that
17     footage, or at least request that footage being as we
18     were -- Feld Motor Sports contracted Kavis Productions
19     and Tampa Sports Authority to film the event.
20         Q.   And you're -- and the only footage that you
21     received around the time that the incident occurred are
22     the three videos you previously described?
23         A.   Correct.
24         Q.   Were you aware at that time that the cameras
25     filming the practices were recording the footage?
```

```
 1            MS. JANKOWSKI:  Objection.  From.
 2            THE WITNESS:  I was not.  I did not -- I was
 3       not made aware that any cameras other than Tampa
 4       Sports Authority were filming free practice.  I was
 5       not made aware of it, actually, until NBC produced
 6       the footage of the two slow-motion shots.
 7  BY MR. SCHWEIKERT:
 8       Q.   At that time in 2020, were you aware as to who
 9  was producing the race programs, like Race Day Live and
10  the night show?
11       A.   Yes, the producer, you mean.  The individual?
12       Q.   The entity behind those productions.
13       A.   Yes, Kavis Productions.
14       Q.   On behalf of Feld, right?
15       A.   On behalf of Feld Motor Sports, yes.
16       Q.   With Doug Cabrera serving as the director for
17  those productions?
18       A.   Director liaison between Feld Motor Sports and
19  Kavis Productions.
20       Q.   Who had editorial control over the
21  productions?
22       A.   Ultimately Feld Motor Sports.
23       Q.   And do you know if Feld had the -- strike
24  that.
25       Do you know if Feld retained ownership over the raw
```

1    footage that was filmed by Kavis regardless of whether it

2    was used in a production or not?

3        A.    Again, define "ownership."

4        Q.    Feld was ultimately able to locate two slow-

5    motion videos of the incident in its archives, correct?

6        A.    Correct.

7        Q.    The footage in Feld's archives, is it owned by

8    Feld?

9        A.    I believe so, yes.

10       Q.    And would that include those slow-motion

11   videos?

12       A.    I believe so, yes.

13       Q.    Are you aware that the names of those video

14   files includes the number 104?

15       A.    Other than seeing them after I was made aware

16   that we did have those in the archive and I -- to this

17   day, I wouldn't remember that those video files include

18   104.  But if I was made aware, it was when I watched

19   those after being made aware we had it in the archive.

20       Q.    Do you know if the archived footage is

21   organized in any way?

22       A.    I know there is -- it is organized.  I can't

23   say in which way and how it is organized.

24       Q.    Well, your email to Jendro specifically

25   referenced Brian's number 104, right?

 1    A.   Uh-huh (affirmative).

 2    Q.   Is that a yes?

 3    A.   Yes, that's a yes.

 4    Q.   Is that because at least for some purposes

 5  Feld uses the rider's numbers to keep track of them?

 6         MS. JANKOWSKI:  Objection to form.

 7         THE WITNESS:  No, not necessarily.  That's

 8    just typical practice with most racing properties

 9    that I know of is rider name followed by number.

10  BY MR. SCHWEIKERT:

11    Q.   It's one way to keep track of riders by using

12  their official racing number, right?

13    A.   It's an easy way to identify riders if you

14  don't -- I mean it's the same with ath- -- any athlete

15  that wears a helmet, it's difficult to identify them

16  outside of their number.

17    Q.   Do you know who saved the videos, slow motion

18  ones, to Feld archive?

19    A.   I don't.

20    Q.   Do you know when they were added to Feld

21  archive?

22    A.   I don't.

23    Q.   Do you have any idea why the names of those

24  files included the number 104, which is the same racing

25  number that Brian used for Supercross?

```
 1        A.    I can only speculate that they were a way to
 2   identify that number 104 was down or was videoed during
 3   -- you know, that video was video footage of number 104.
 4        Q.    Do you -- I had asked you earlier, but you
 5   know who John Hinz is, correct?
 6        A.    I do.
 7        Q.    Who is he?
 8        A.    He's the president of KTM North America.
 9        Q.    Do you recall if Mr. Hinz reached out to you
10   around the time of Brian's accident?
11        A.    He did.  I believe he sent me an email
12   requesting a meeting.
13        Q.    Did you have a meeting with him?
14        A.    I did.
15        Q.    What do you remember about that meeting?
16        A.    I believe he requested a meeting via email to
17   discuss Brian's injury and his -- I don't know how he
18   worded it -- removal from track.  He requested that -- I
19   believe it was myself, Mike Pelletier from the AMA, and
20   Dr. Bodnar from The Medic Rig attend.
21        And so I asked Mike Muye to send out a meeting
22   notice to Mike Pelletier and Dr. Bodnar and ask them if
23   they were okay to meet with John Hinz.
24        Q.    And did you all meet?
25        A.    We did.  We met.
```

1    Q.   With John Hinz?

2    A.   We did.

3    Q.   Did you ever speak with John Hinz on your own?

4    A.   Not that I recall.

5    Q.   I'm going to show you a document I will mark

6    as Exhibit 156.  Take a minute, review it, and let me

7    know if you've seen it before.

8    A.   Yes, I've seen it before.

9         (Thereupon, Plaintiff's Exhibit 156 was marked

10   for identification.)

11   BY MR. SCHWEIKERT:

12   Q.   And what is Exhibit 156?

13   A.   It is two photographs, three if you count Page

14   2, of Brian being -- excuse me, being removed from the

15   racetrack.

16   Q.   Is this an email from John Hinz to you on

17   February 18th, 2020 regarding Brian's on-track

18   treatment?

19   A.   I cannot see that subject line, but -- I can't

20   see it.

21   Q.   Well, is it an email from John Hinz to you on

22   February 18th, 2020?

23   A.   I cannot see the names or the date clearly.

24   Q.   Do you recall getting an email from John Hinz

25   with these pictures?

```
 1        A.    I don't recall it specifically, but that's not
 2   to say that he didn't send me an email with these
 3   pictures.
 4            MS. SPRADLIN:  And did you use the Bates on
 5        these?
 6            MR. SCHWEIKERT:  They were in the margin and
 7        did not permit.
 8            MS. SPRADLIN:  No, I know.  I was just
 9        wondering if you have them.
10            MR. SCHWEIKERT:  I don't.
11            MS. SPRADLIN:  I can read it, for what it's
12        worth, but it's very, very small.
13            MS. JANKOWSKI:  My copy is little clearer.
14        Take a look at that.  See if you can read it.
15            THE WITNESS:  It's crazy.  You need longer
16        arms as you get older.  It's hard for me to see.  I
17        mean it's close.  I can't swear that that's John
18        Hinz or my name or the date, but it's close.
19            MR. SCHWEIKERT:  I might be able to clear it
20        up for you.
21            MS. JANKOWSKI:  Is there another -- this is
22        another non-Bates numbered copy?
23            MR. SCHWEIKERT:  The Bates were way in the
24        margin and outside the printer.
25            MS. JANKOWSKI:  I can see it.  Again, I just
```

```
 1        want to know what the Bates number is?

 2             THE WITNESS:  Evidently I need them.  I could

 3        zoom in, maybe, if that works.

 4             MR. SCHWEIKERT:  The Bates number is FMS, Inc.

 5        12 to 13.

 6   BY MR. SCHWEIKERT:

 7        Q.   I will show you a zoomed in digital copy if

 8   you can read that?

 9        A.   Yes.  Is that -- scroll down to see the

10   pictures.  Okay.  Yep, I read it.  Yes.

11        Q.   Just so the record is clear, is Exhibit 156 an

12   email from John Hinz to you on February 18th, 2020

13   regarding Brian's on-track treatment?

14        A.   It is an email to John Hinz -- or from John

15   Hinz to me with three pictures of Brian being removed

16   from the racetrack and the third is being -- he's on the

17   mobile medic cart or mule.

18        Q.   He's being lifted towards the mule in the

19   third picture, right?

20        A.   I'm referring to this picture, so he's on the

21   picture in the top.

22        Q.   Okay.  I'm with you.

23        And this will be 157, exhibit, FMS, Inc. 1047 and

24   1048.

25             MS. JANKOWSKI:  I'm sorry, could you say that
```

```
 1      again?
 2            MR. SCHWEIKERT:  1047 to 1048, Exhibit 157.
 3            MS. JANKOWSKI:  And, I'm sorry, did you find
 4      the Bates on 156?
 5            MR. SCHWEIKERT:  Yes, 12.
 6            MS. SPRADLIN:  12 to 13.
 7            MR. SCHWEIKERT:  12 to 13.
 8            (Thereupon, Plaintiff's Exhibit 157 was marked
 9      for identification.)
10 BY MR. SCHWEIKERT:
11      Q.    Do you recognize Exhibit 157?
12      A.    I do, yes.
13      Q.    And do you see John Hinz emailed you on
14 February 17th, 2020, at 10:32 p.m., an email, subject
15 Brian Moreau's Accident and Medical Treatment at the
16 Track?
17      A.    Yes.
18      Q.    And then he wrote in the body of the email
19 "Hello, Dave, I would like to discuss this tomorrow
20 morning.  I will give you a call early around 7:00 a.m.
21 Pacific to discuss.  Best regards, Hinz."
22      Do you see that?
23      A.    I do, yeah.
24      Q.    And then you responded to him, "Okay."
25      A.    Yes.
```

1    Q.   And this was him requesting the conversation

2    that you ultimately had with him, Dr. Bodnar, and Mike

3    Pelletier?

4    A.   Correct.

5    Q.   And what did Mr. Hinz want to discuss

6    specifically?

7    A.   He wanted to ask Dr. Bodnar if he agreed with

8    the way that Brian was removed from the racetrack?

9    Q.   Did he ask those questions?

10   A.   Yes.

11   Q.   And what do you recall being said by anyone?

12   A.   I -- to the best of my knowledge I recall

13   Dr. Bodnar saying that he stood by his medical staff and

14   that they followed the correct procedures at the time.

15   Q.   Do you recall anything more about that

16   conversation?

17   A.   No, I don't.  I recall it was fairly short and

18   that was really the gist of it.

19   Q.   Did anybody else add anything to the

20   conversation?

21   A.   Not anything that I can recall, no.

22   Q.   Did Mr. Hinz indicate that he believed the

23   medical treatment at the track was not appropriate?

24   A.   I don't recall John ever saying that he

25   believed the medical treatment at the track was not

```
 1   appropriate.  Again, all I recall was John asking

 2   Dr. Bodnar if he felt that the response was appropriate.

 3        Q.    Did Dr. Bodnar explain why he stood by the

 4   response?

 5        A.    I don't recall any specifics of Dr. Bodnar

 6   explaining why he stood by their response.  No.

 7        Q.    Was there any discussion about what may have

 8   been said by anyone on the racetrack after Brian

 9   crashed?

10        A.    Not that I specifically recall.  I believe the

11   only other thing that was in reference to anything that

12   was said was I do believe Dr. Bodnar said to everyone on

13   the call that Brian complained of a leg injury.

14        Q.    Are you aware, as you sit here today, that

15   Brian has testified that he was complaining of an

16   inability to move his legs while on the track?

17        A.    As I sit here today, I believe I've been made

18   aware in the process of this litigation that Brian had

19   mentioned something about that, but only in the process

20   of this litigation.

21        Q.    Are you aware that Mr. Stephan LeGrand has

22   testified that he heard Brian screaming words to the

23   effect that he was paralyzed and couldn't move his legs?

24             MS. JANKOWSKI:  Object to the form.

25             MS. SPRADLIN:  Same objection.
```

```
 1              THE WITNESS:  I'm not aware of that, no.

 2   BY MR. SCHWEIKERT:

 3       Q.   At any point before this litigation were you

 4   ever made aware of any allegation that Brian had said

 5   something other than his left leg hurt?

 6       A.   Not that I recall, no.  And I don't -- other

 7   than hearing you just say it now; I don't specifically

 8   remember Brian or Dr. Bodnar or anyone mentioning it was

 9   a specific leg that hurt.

10       Q.   You just remember Dr. Bodnar saying Brian had

11   complained of a leg injury?

12       A.   I believe that was it, yes.

13       Q.   Do you remember Dr. Bodnar explaining what

14   type of leg injury his medical team believed Brian had

15   before they decided to move him off the track?

16       A.   I don't recall.  I don't believe he said

17   anything specific.

18       Q.   I'll show you a document we'll mark as Exhibit

19   158, Bates labeled FMS, Inc. 693.  Do you recognize

20   Exhibit 158?

21       A.    I do.

22            (Thereupon, Plaintiff's Exhibit 158 was marked

23       for identification.)

24   BY MR. SCHWEIKERT:

25       Q.   Is this a screenshot of a message chain from
```

 1   your phone with John Hinz?

 2        A.   It believe so, yes.

 3        Q.   And did you send him a message on February

 4   18th, 2020 ,at 11:42, stating that you talked to Dr.

 5   Bodnar and Mike Pelletier and Mike Muye and Dr. Bodnar

 6   could speak to Mr. Hinz about the procedures getting

 7   Brian off the track?

 8        A.   Yes, I did.

 9        Q.   So you had -- did you have a conversation with

10   Dr. Bodnar and Mike Pelletier and Mike Muye before

11   speaking with John Hinz?

12        A.   Yes.  I believe -- so I asked Mike Muye to set

13   up the call.  It was myself -- as I remember it, myself,

14   Mike Muye, Mike Pelletier, and Dr. Bodnar on the call.

15   And I just explained to Dr. Bodnar that John Hinz had

16   requested to speak to him and I included this group and

17   that -- was he okay with that.  And he said yes.

18        Q.   I'll show you a document previously marked as

19   Exhibit 23 at Dr. Bodnar's deposition, Bates labeled

20   FMS, Inc. 654.  I'm just trying to thread the needle a

21   little bit.

22        A.   Uh-huh.

23        Q.   Is this an email from Mike to you, Dr. Bodnar,

24   Tom Carson, and Mike Pelletier on February 28th

25   regarding the Tampa Supercross meeting?

```
 1              MS. SPRADLIN:  Objection.  From.
 2              THE WITNESS:  This is -- appears to be the
 3         email regarding the initial meeting that we just
 4         spoke about between myself, Mike Muye, Mike
 5         Pelletier, and Dr. Bodnar.  I don't remember Tom
 6         Carson being on that call, but it's not to say he
 7         wasn't.
 8    BY MR. SCHWEIKERT:
 9         Q.   Was is typical around that time to have
10    meetings of this nature following a Supercross event?
11         A.   No.
12         Q.   And you had arranged -- strike that.
13         This meeting reflected in Exhibit 23 was set up in
14    advance of having a second conversation or meeting with
15    John Hinz?
16         A.   Correct.
17         Q.   Do you recall if Mr.- -- strike that.
18         During the original meeting you had without
19    Mr. Hinz, was there any discussion about why a red flag
20    was not thrown after Brian crashed?
21         A.   I don't recall any discussion about why a red
22    flag was not thrown after Brian's crash.
23         Q.   The focus was on Brian's removal from the
24    track by the medical team?
25         A.   Yes, because that's what John Hinz had asked
```

```
 1   about.
 2        Q.   Did you take any notes or anything after this
 3   meeting?
 4        A.   Not that I recall, no.
 5        Q.   Did Dr. Bodnar inform you that he was
 6   anticipating the possibility of litigation as a result
 7   of what had happened with Brian?
 8        A.   Not that I recall, no.
 9             MR. SCHWEIKER:  Let's take a little break.
10        Off the record, por favor?
11             THE VIDEOGRAPHER:  This will conclude Media
12        File Number 3 of the deposition of Dave Prater.  It
13        is 3:51.  We're going off the record.
14             (Off the record.)
15             (On the record.)
16             THE VIDEOGRAPHER:  This will begin Media File
17        Number 4 of the deposition of Dave Prater.  It's
18        4:08.  We are back on the record.
19   BY MR. SCHWEIKERT:
20        Q.   Okay.  Do you know who Roger De Coster is?
21        A.   I do.  Roger De Coster, yes.
22        Q.   Who's he?
23        A.   He is -- I don't know his current title, but
24   he is, we'll call it, over racing department for KTM
25   Group.
```

```
 1        Q.    Have you ever had any conversations with him
 2   about Brian or the incident?
 3        A.    I don't necessarily remember any conversations
 4   specific to Brian or this incident.  No.
 5        Q.    In any of your conversations with Mr. Hinz,
 6   was there ever any inquiry about whether there was any
 7   pressure to get Brian off the track to keep things on
 8   schedule?
 9        A.    Not that I recall, no.
10        Q.    Are you aware of any instance where there's
11   been pressure to clear the track to keep things on
12   schedule?
13        A.    No, not when it pertains to injured riders.
14        Q.    Did you have any conversations -- well, strike
15   that.
16        Do you know who Tyler Keefe is?
17        A.    Yes, I know who Tyler Keefe is.
18        Q.    Who is he?
19        A.    He was, at the time in 2020, the Troy Lee
20   Designs KTM race team manager.
21        Q.    Was that the team that Brian was on?
22        A.    It was, yes.
23        Q.    Did you ever talk to Tyler about the incident?
24        A.    I don't remember physically talking to Tyler
25   about it.  I did text Tyler, I believe, or he texted me
```

1    about it.  I don't -- currently I can't recall the context

2    of that text.

3         Q.    Did you ever -- strike that.

4         Do you know if -- strike that.

5         Did you ever reach out to Brian or his family about

6    his accident?

7         A.    I personally did not reach out to Brian or his

8    family about the accident.  No.

9         Q.    Why not?

10        A.    I didn't feel it was my place to reach out to

11   Brian or the family about the incident.

12        Q.    Do you know if anybody related with Feld

13   contacted Brian or his family about what had happened?

14        A.    I don't recall 100 percent.  I do believe that

15   Mr. Rico Hawks attempted to reach Brian's family in our

16   risk department, but I don't believe he ever did.

17        Q.    And what's the basis of that belief?

18        A.    I seem to recall Mr. Hawks informing that.

19        Q.    When did he inform you of that?

20        A.    Sometime after the incident.  I'd call it a

21   week or so.

22        Q.    Do you know why Mr. Hawks attempted to make

23   contact?

24        A.    Just to check in with the family.  In a

25   serious injury like this, just to see how they were

 1    doing.

 2        Q.    Do you remember in 2019 there was like an

 3    accident with the lime in the track that caused some

 4    damage to riders' bikes and irritated their skin?

 5        A.    I do remember that, yes.

 6        Q.    Do you know if in response to that incident

 7    Feld reached out to each of the riders to assess the

 8    extent the impact of that on their welfare?

 9            MS. JANKOWSKI:  Objection to form.  Go ahead.

10            THE WITNESS:  Yes, we did.  We did reach out

11        to individual riders and race teams to, again,

12        investigate and see what had happened to their

13        motorcycles and the irritation that you asked

14        about.

15    BY MR. SCHWEIKERT:

16        Q.    Were you involved in those attempts to reach

17    out to those riders?

18        A.    I was, yes.

19        Q.    If you had previously attempted to contact

20    riders who had some issues effecting their welfare

21    during a Supercross event, why did you not believe it

22    was your place to try to reach out to Brian or his

23    family?

24            MS. JANKOWSKI:  Objection to form.

25            THE WITNESS:  It was a different situation.

1     These riders were claiming to have been irritated by a

2     drying agent that Feld Motor Sports allowed Dirt

3     Wurx to apply to the racing surface.  And so --

4     and, to be honest, we didn't -- we had no idea that

5     this had happened until, again, we started hearing

6     about it socially.  So we wanted to inquire with

7     the riders and see exactly what had happened and

8     what their irritation and motorcycle issues were.

9  BY MR. SCHWEIKERT:

10     Q.   But you didn't have that same interest in

11  contacting Brian or his family with respect to his

12  incident?

13     A.   I did not personally, no.

14     Q.   Do you consider the Supercross community to be

15  one big family?

16          MS. JANKOWSKI:  Objection.  Form.

17          THE WITNESS:  "Family" has many definitions,

18     but I consider it to be profession- -- fairly

19     professionally close-knit group professionally.

20  BY MR. SCHWEIKERT:

21     Q.   Do you consider Brian to still be part of that

22  close-knit group?

23     A.   I hadn't thought about it, but asking it that

24  way, yes, I would consider him still to be a part of the

25  Supercross community.

```
 1        Q.   And you personally never tried to touch base
 2   with him at any point after his accident, did you?
 3        A.   I did not.
 4        Q.   Do you know who Olivier Duval is?
 5        A.   I don't.
 6        Q.   I'm going to show you a document I will mark
 7   as Exhibit 159, Bates labeled FMS, Inc. 1061 to 1062.
 8   Take a minute, review it, let me know if you've seen it
 9   before.
10        A.   Yes, I've seen it in the context of this
11   litigation and discovery.
12             (Thereupon, Plaintiff's Exhibit 159 was marked
13        for identification.)
14   BY MR. SCHWEIKERT:
15        Q.   Is the email at the top from Sean Brennen on
16   February 17th, 2020, to a number of people, including
17   yourself?
18        A.   Yes.
19        Q.   And do you see Mr. Brennen is forwarding an
20   email with the subject French Media's Questions
21   Regarding Brian Moreau?
22        A.   Yes.
23        Q.   And if you look down to the email below, it's
24   from a gentleman, Olivier Duval.  Do you see that?
25        A.   I do.
```

 1     Q.   And within the body of his email he's got some
 2  bullet points.  Do you see that?
 3     A.   I see the bullet points, yes.
 4     Q.   And the first bullet point is:  "Red flag.
 5  Why no red flag?  Was it seen as unnecessary on a moment
 6  and why?"  Do you see that?
 7     A.   I see that, yes.
 8     Q.   And his next bullet point is:  "Evacuation
 9  from the track.  Looks like Brian was quickly put on his
10  feet, which will raise questions, but I'm sure there's a
11  perfectly reasonable answer to that decision."
12     Do you see that?
13     A.   I see that.
14     Q.   And Mr. Duval's email was forwarded to you and
15  some other folks by Sean Brennen, right?
16     A.   Correct.
17     Q.   And Sean writes, quote, "Please see below from
18  one of our primary French outlets, Moto Verte Magazine.
19  Olivier sent this to Alpinestars, as well, so we need to
20  coordinate statements," end quote.
21     Do you see that?
22     A.   I see that, yes.
23     Q.   Do you have any understanding of why there was
24  a need to coordinate statements at that time?
25     A.   I'm not sure why there was a need.

1    Q.    Well, did you ever respond to this email and

2  tell Mr. Brennen "I don't think there's a need to

3  coordinate statements"?

4    A.    I don't remember responding to this email and

5  telling Sean that.  No.

6    Q.    And you don't agree with his statement about a

7  need to coordinate statements in response to the

8  inquiries from the media?

9    A.    I'm not a PR expert, but I would not

10  personally agree there was a need to coordinate

11  statements with Alpinestars.

12    Q.    And why is that?

13    A.    We had our statement about the accident and,

14  again, I'm -- I'm not sure if Sean is referring to

15  Alpinestars the company or the, quote, sponsor, or

16  Alpinestars Mobile Medical Unit.  I assume this is the

17  company Alpinestars that sponsors the medic unit.

18    Q.    Do you see that Mr. Duval, his original email,

19  was to Doc Bodar, Tom Carson, and Sean Brennen?

20    A.    Yes, I see that.

21    Q.    With that context, do you agree that

22  Mr. Brennen's reference to Alpinestars was to the

23  medical team and his perceived need to coordinate

24  statements?

25          MS. JANKOWSKI:  Objection to form.

```
 1              MR. DOYLE:  Form.
 2              THE WITNESS:  It's hard to say.  Again,
 3         Alpinestars is a company that produced protective
 4         gear.  And so I can't say whether Sean was
 5         referring to that company or The Medic Rig.
 6    BY MR. SCHWEIKERT:
 7         Q.   Do you know if Alpinestars, the brand, was
 8    ever contacted about Brian's accident?
 9         A.   I don't know if they were ever contacted about
10    it.
11         Q.   Did you ever speak with anyone from
12    Alpinestars, the brand, about Brian's accident?
13         A.   I spoke to Gabriele Mazzarolo, I believe is
14    his name.  He's the owner of Alpinestars.  And he just
15    inquired at one of the following Supercross events as to
16    whether Feld Motor Sports was satisfied with Alpinestars
17    medic rig and their actions surrounding Brian Moreau.
18    And I told him The Medic Rig staff are the experts and
19    that we had spoken to Dr. Bodnar on that.
20         I didn't tell him specifically that we had spoken
21    to him in regards to that John Hinz call, but that we
22    had spoken to Dr. Bodnar and that Dr. Bodnar had stood
23    by the actions of the medic crew.
24         Q.   Anything else you recall about communicating
25    with that gentleman?
```

1    A.   No, I don't recall anything else.  It was a

2    quick two-minute conversation in the paddock area.

3    Q.   I'm going to show you a document previously

4    marked as Exhibit 87.  It's labeled FMS, Inc. 1063 to

5    1064.  I believe it was marked during a Zoom deposition,

6    so I'm going to put a sticker on it today.  Take a

7    minute, review it, and let me know if you've ever seen

8    it before.

9    A.   I don't remember the specific -- seeing this

10   specific email before, but obviously it was sent to me,

11   so I probably saw it at some point that week.

12   Q.   And the top email is from Steve Yaros to you

13   on February 19th, 2020 regarding a message from Brian

14   Moreau's dad, right?

15   A.   Correct.

16   Q.   And Mr. Yaros is thanking you for forwarding

17   an email from Brian's dad, right?

18   A.   It was -- I don't believe it was an email from

19   Brian's dad.  I believe it was a statement that Brian's

20   dad had made to a website or some media outlet.

21   Q.   And if we go to the bottom of the first page,

22   there's an email from Stephan LeGrand dated February

23   18th, 2020 to various individuals.  And in the body of

24   Mr. LeGrand's email there is a new message from Brian's

25   dad, according to Mr. LeGrand, right?

```
 1        A.    Yes.
 2        Q.    Is this the message you were telling me about
 3   earlier that you believe made you aware of the
 4   seriousness of Brian's injuries?
 5        A.    Not this specific email message.  I don't
 6   remember the specific wording or social post that I saw
 7   on late Sunday night after Brian's accident, but I do
 8   believe, as I recall, that there was some message from
 9   Brian's family, Brian's dad that alerted me on Sunday
10   night.
11        This appears to be something that came out later,
12   like Tuesday or Wednesday.  It was sent when?  Tuesday,
13   is that February 18th?  Yeah, Tuesday.
14        Q.    So what you were telling me about earlier, you
15   believe is a different notification that you received?
16        A.    I believe so.  I mean it could have been -- it
17   was not -- what I'm saying is I was not informed of the
18   seriousness of Brian's injuries by this email
19   specifically.
20        I'm not sure if Brian's dad had posted something
21   earlier or if some other media outlet had posted a
22   message about Brian, but this specific email was not how
23   I was informed of Brian's -- of the seriousness of
24   Brian's injury.
25        Q.    All right.  I'm going to show you a document
```

1    previously marked Exhibit 89 during a Zoom deposition, so

2    I will put a sticker on it today to help keep the record

3    clear.  It's Bates labeled FMS, Inc. 27.  Just take a

4    minute, review Exhibit 89 and let me know if you've seen

5    it before, please.

6          A.   Yes, I've seen it before.

7          Q.   And what is Exhibit 89?

8          A.   It is Doug Cabrera requesting that I resend

9    him a statement that Feld Motor Sports had crafted

10   regarding Brian's crash and injury.  It was a holding

11   statement.  It wasn't something to be, you know, sent

12   out without being -- without a request being made for

13   it.  And so I told him that we are not making a

14   statement and he replied and said, okay, I just wanted

15   to triple check.

16         Q.   Without telling me anything you may have

17   discussed with an attorney, but was that a statement

18   that was prepared with the assistance of Feld's counsel

19   Lisa Joiner?

20              MS. JANKOWSKI:  Objection.  Form.  And I'm

21     going to instruct him not to answer that.

22              I think you can ask it in a different way.

23   BY MR. SCHWEIKERT:

24         Q.   Did you -- who prepared the statement

25   regarding Brian's accident that you're referencing?

 1    A.   As far as I'm aware, our PR department prepared

 2   the statement regarding Brian's accident.

 3    Q.   Okay.  And if we go back to your email chain,

 4   there is a message from you to Mr. Cabrera and a couple

 5   of other gentlemen which says, in part, "Don't say

 6   anything the broadcast.  I sent that quote so you could

 7   share it with your team, not for the broadcast."  Right?

 8    A.   Yes.

 9    Q.   Why did you not want Mr. Cabrera to say

10   anything on the broadcast?

11    A.   First and foremost, I didn't feel like it was

12   our position to say anything on the broadcast.  Brian

13   was a contractor of the team, KTM, and they had made a

14   statement, as well as his family.  And, like I said, as

15   far as I know, our risk department had reached out and

16   had not made contact with his family.

17    Q.   Do you know if they made multiple attempts to

18   contact Brian's family?

19    A.   I do not know.

20    Q.   Do you know how they -- strike that.

21    Do you know how Mr. Rico Hawks attempted to contact

22   Brian or his family?

23    A.   I don't know.

24    Q.   If -- I'll withdraw that.

25    Did you have any concern around this time about --

1    strike that.

2        Why did you not want to update fans of the

3    Supercross about Brian Moreau's accident on the

4    broadcast?

5            MS. JANKOWSKI:  Objection.  Form.

6            THE WITNESS:  Again, Brian was contracted with

7        KTM.  That was his race team.  And his parents --

8        both his race team and his parents had made a

9        statement.  I felt like our fans were educated on

10       Brian's situation and that it was not necessary for

11       us to do a statement on the broadcast.

12   BY MR. SCHWEIKERT:

13       Q.   Was that typical at the time for the broadcast

14   not to provide information about riders who may have

15   been seriously injured in prior events to keep fans

16   informed?

17       A.   Yes, it is -- it's typical that we don't

18   elaborate on rider injuries.

19       Q.   Not even -- was it typical not even to provide

20   just a general update about how an injured rider was

21   doing following an accident during a Supercross event?

22       A.   Not a typical practice, no.

23       Q.   Did you ever -- strike that.

24       Do you know if you reached out to Mr. Muye to ask

25   him if anyone had inquired about Brian's accident during

1   the subsequent Arlington Supercross event?

2       A.   I don't remember asking Mike Muye about that.

3   It's not to say that I didn't, but I don't remember

4   asking him about it.

5       Q.   I will show you a document I will mark as

6   Exhibit 164, Bates labeled FMS, Inc. 689.  Take a

7   minute, review it, please, let me know if you have seen

8   it before.

9            MS. JANKOWSKI:  What are you marking it as?

10           MR. SCHWEIKERT:  What did I say?

11           MS. JANKOWSKI:  164.  I think we're on 160,

12       unless I'm missing stuff.

13           MS. SPRADLIN:  We should be on 160.

14           MR. SCHWEIKERT:  I'm sorry, may have that

15       back.

16           MS. JANKOWSKI:  I'm like, did we --

17           MR. SCHWEIKERT:  It's getting to that time of

18       the day.

19           MS. JANKOWSKI:  That's all right.  I just want

20       to be sure I'm not --

21           THE REPORTER:  Okay.  So you said it's FMS --

22           MR. SCHWEIKERT:  I'll say it again.

23   BY MR. SCHWEIKERT:

24       Q.   All right.  I'm going to show you a document I

25   will mark as Exhibit 160, Bates labeled FMS, Inc. 698.

```
 1   Just take a minute, review it, let me know if you have
 2   seen it before.
 3        A.   Yes, now I recall.  I have seen it.
 4             (Thereupon, Plaintiff's Exhibit 160 was marked
 5        for identification.)
 6   BY MR. SCHWEIKERT:
 7        Q.   Is Exhibit 160 a screenshot of text messages
 8   between you and Mike Muye?
 9        A.   It appears to be, yes.
10        Q.   It's a screenshot from your phone?
11        A.   I would assume so.
12        Q.   And why is that?
13        A.   Because Mike Muye, MM, is at the top.  And I
14   believe that on iPhones when you take a screen- -- when
15   you text it, the person you're texting is at the top,
16   not your name and number -- or name and initials.
17        Q.   Did you text Mike Muye on February 24th, 2020
18   to ask whether anyone inquired about Brian Moreau in
19   Arlington?
20        A.   I believe so, yes, given this screenshot.
21        Q.   And he responded "no," right?
22        A.   Correct.
23        Q.   Why were you inquiring about if anyone asked
24   about Brian at the Arlington event?
25        A.   I was just -- that was our next -- I believe
```

1    that was our next Supercross event, so I just wanted to

2    know if anyone had asked about him.

3        Q.   Why?

4        A.   Because it was -- we had -- that entire week

5    we had done investigations, like I said, asking for

6    video footage and so on to try to gather and there had

7    been -- like John Hinz had reached out and asked about

8    it on that Monday, so, again, it was just -- I was

9    inquiring if anyone had asked at the event.

10       Q.   And why was that something you wanted to know?

11            MS. JANKOWSKI:  Objection to form.

12            THE WITNESS:  Again, curious if anyone had

13       brought it up at the event.  We had spoken to John

14       Hinz that week and that next event, Arlington, was

15       the first time that Mike was going to be with the

16       Supercross community again, so just wondered if

17       anyone had asked him about it.

18   BY MR. SCHWEIKERT:

19       Q.   Was there any concern in your mind at that

20   time about whether what had happened to Brian presented

21   any sort of reputational risk to the Supercross?

22       A.   No, not in my mind.  No.

23       Q.   You just wanted to know if anybody had asked

24   about a rider that had been removed from the racetrack

25   at the prior Supercross event with a spinal cord injury?

1    A.   I just wanted to know if anyone had inquired

2  about Brian at the next Supercross event that we -- that

3  Mike was there in person with the other individuals in

4  the Supercross community.

5    Q.   And if somebody had inquired, were you

6  intending to do anything?

7         MS. JANKOWSKI:  Objection to form.

8         THE WITNESS:  That's a broad question.  I

9    don't know.  There could have been thousands of

10   inquiries, thousands of types of inquiries, I would

11   say.

12  BY MR. SCHWEIKERT:

13   Q.   Did anyone ask you to keep tabs on whether

14  people were asking about Brian at subsequent events?

15        MS. JANKOWSKI:  Objection to form.

16        THE WITNESS:  Not that I remember, no.

17  BY MR. SCHWEIKERT:

18   Q.   This was your own interest in asking Muye if

19  people had asked about Brian?

20   A.   Yes.

21   Q.   Do you see in the Exhibit 160 there's a screen

22  shot of an Instagram post from Supercross Live?

23   A.   I do, yes.

24   Q.   What is Supercross Live, do you know?

25   A.   Supercross Live is Feld Motor Sports social

 1    handles, so we use it for various social platforms,

 2    Facebook, Instagram, TikTok, whatever.

 3        Q.    Is the website Supercrosslive.com a Feld Motor

 4    Sports website?

 5        A.    Yes.

 6        Q.    All right.  This is a document previously

 7    marked as Exhibit 92 during a Zoom deposition, so I'm

 8    putting a sticker on it.  Bates labeled FMS, Inc. 1038

 9    to 1044.  Take a minute, review it, and let me know if

10    you've seen it before.

11        A.    Yes, I've seen it before.

12        Q.    Is this an email dated July 8th, 2020

13    regarding the 2020 Supercross meeting report?

14        A.    Yes.

15        Q.    And it's an email from a gentleman at the FIM

16    to a number of folks, including you, Dave Prater?

17        A.    Yes.

18        Q.    And attached is a meeting report.  Do you see

19    that?

20        A.    Yes.

21        Q.    I don't think I asked you already, but what is

22    the FIM?

23        A.    The FIM is the international sanctioning body

24    for motorcycle racing.  And in 2020 they were the

25    sanctioning body for the 450 class.

 1      Q.   And did you participate in a post-season meeting

 2   with the FIM and some other individuals on June 30th of

 3   2020?

 4      A.   I did.

 5      Q.   If we go to the attachment Bates labeled FMS,

 6   Inc. 1041, Section 2.6 entitled Friday Race Direction

 7   Meeting/Evaluation, do you see that?

 8      A.   Yes.

 9      Q.   And below it reads, quote, "Everybody agreed

10   at the Friday afternoon race direction meeting was

11   beneficial for the event.  The meeting joined

12   representatives Feld, AMA, Dirt Wurx, and the

13   Alpinestars Mobile Medical Unit to share information and

14   raise their concerns, if any.  People came in prepared.

15   And if there were any things to fix, there was still

16   ample time to do so," end quote.

17      Do you see that?

18      A.   Yes.

19      Q.   Do you have a recollection of conducting

20   Friday race direction meetings during the 2020

21   Supercross season?

22      A.   I did not conduct Friday race direction

23   meetings during the 2020 season.

24      Q.   Do you know if somebody from Feld participated

25   in such meetings with the AMA, Dirt Wurx, and the

```
 1   Alpinestars Mobile Medical Unit?
 2        A.   Yes.
 3        Q.   Do you have an understanding as to what the
 4   purpose was of having that Friday meeting?
 5        A.   The purpose of the Friday race direction
 6   meeting was for all the groups to come together and
 7   discuss where they were as far as race preparedness for
 8   Saturday.  It went over everything from Feld being ready
 9   with the podium setup, it was ready to go, to, you know,
10   speaking with the AMA and Dirt Wurx about any potential
11   inclement weather threats and so on.
12        Q.   Is it fair to say that putting on Supercross
13   events in the 2020 season was a collaborative effort
14   between Feld, AMA, the Alpinestars Mobile Medical Unit,
15   and others?
16             MR. DOYLE:  Object to form.
17             MS. JANKOWSKI:  Same objection.
18             MS. SPRADLIN:  Join.
19             THE WITNESS:  Yes, it's fair to say.
20   BY MR. SCHWEIKERT:
21        Q.   Would you agree that those collaborating in
22   that effort were joined in sharing responsibility to
23   ensure that things went according to plan and the events
24   were conducted as safely as possible?
25             MR. DOYLE:  Form.
```

```
 1            MS. JANKOWSKI:  Join.

 2            THE WITNESS:  Yes.

 3   BY MR. SCHWEIKERT:

 4       Q.   I want to take a look at Agenda Item 2.11

 5   title Use of GoPro Cameras.  Do you see that?

 6       A.   I do.

 7       Q.   And it reads in part, quote, "After the Brian

 8   Moreau incident, his team decided not to use any helmet

 9   cameras anymore," end quote.  Do you see that?

10       A.   I do.

11       Q.   Do you recall having a discussion about the

12   Brian Moreau incident at this meeting referenced in this

13   agenda?

14       A.   I recall this item being brought up.  I don't

15   know that there was too much discussion around it.  But

16   -- and I don't know who brought up the subject.  It was

17   typically the FIM that created these -- this agenda.  So

18   I would assume it's the FIM, but basically that was it,

19   that KTM had decided to not use helmet cameras after

20   Tampa 2020.

21       Q.   Do you have any understanding of why that

22   decision was made?

23       A.   I don't have any direct understanding other

24   than I believe that KTM thought that the helmet camera

25   attached to the helmet in some way attributed to Brian's
```

```
 1    injuries.
 2         Q.    Do you have any opinion on that?
 3         A.    I have no opinion.  I'm not a helmet expert.
 4    I'm not a medical expert.
 5         Q.    Are Supercross riders today still allowed to
 6    wear GoPros on their helmets during events?
 7         A.    No, today they are not allowed to wear GoPros
 8    on their helmets.
 9         Q.    Do you know when that change went into effect?
10         A.    I don't recall the specific year, no.
11         Q.    Is part of the reason or that change what
12    happened to Brian Moreau during the Tampa Supercross?
13         A.    Not that I'm aware of, no.
14         Q.    Are you aware of any changes being made at all
15    following what happened to Brian during the Tampa event.
16         A.    I not aware --
17               MS. JANKOWSKI:  Objection to form.  Go ahead.
18               THE WITNESS:  I'm not aware, no.
19               MS. JANKOWSKI:  I don't know if when you
20         marked Exhibit 92 in the deposition, whatever
21         deposition it was, whether or not that exhibit had
22         highlighting.  This one clearly does and I am
23         pretty confident it wasn't produced with
24         highlighting by FMS.  So I just want the record to
25         be clear on that.
```

 1          MR. SCHWEIKERT:  The one I marked for him --

 2          MS. JANKOWSKI:  Yeah.

 3          MR. SCHWEIKERT:  -- or the one I gave you?

 4          MS. JANKOWSKI:  The one you gave me has

 5     highlighting on it.  And I don't -- does yours --

 6          THE WITNESS:  Yes.

 7          MS. JANKOWSKI:  His has highlighting.  I think

 8     everybody's has highlighting.  It's not colored

 9     highlights, but clearly we did not produce this

10     document with highlighting on it, so I just want

11     the record to be clear on that.

12          MR. SCHWEIKERT:  Understood.

13   BY MR. SCHWEIKERT:

14     Q.   Do you believe -- strike that.

15     As far as you're aware, does Feld have any interest

16   in preventing injuries similar to the ones Brian

17   sustained during the Tampa event at future Supercross

18   events?

19     A.   We obviously want Supercross racing to be as

20   safe as possible.  We'd love to have zero injuries

21   moving forward.  So I'm not sure if that answers your

22   question, but, yes, we're obviously concerned about the

23   riders' safety.

24     Q.   Are you aware of anything being done

25   specifically to try to prevent similar injuries

1  following Brian's accident at the Tampa Supercross?

2         MS. JANKOWSKI:  Objection to form.

3         THE WITNESS:  Not specifically following

4    Brian's accident at the Tampa Supercross.

5  BY MR. SCHWEIKERT:

6      Q.   Why not?

7      A.   Again, I'm not a medical expert.  Upon -- in

8  speaking to Dr. Bodnar, he stands by the actions of the

9  medical team, so there was no need to continue the

10 discussion.

11     Q.   Has Feld ever had any discussions with the

12 mobile -- strike that.

13     Has Feld ever had any discussions with The Medic

14 Rig or any of its staff about protocols used during any

15 Feld events?

16     A.   No discussions about what protocols they use.

17 I can't think of any, no.

18     Q.   Do you believe that Supercross riders should

19 receive the best possible medical care if they need it

20 when injured on a racetrack during a Supercross event?

21         MR. DOYLE:  Object to form.

22         THE WITNESS:  Yes, of course.

23 BY MR. SCHWEIKERT:

24     Q.   Do you believe Brian got the best possible

25 care following his crash at the Tampa event?

1          MR. DOYLE:  Object to form.

2          THE WITNESS:  Again, I'm not a medical expert,

3     so I rely on the medical experts and Dr. Bodnar

4     stands by the actions of the medic group.

5   BY MR. SCHWEIKERT:

6     Q.   And you stand by Dr. Bodnar and his opinion,

7   is that what you're saying?

8     A.   I do.  I have had over two decades worth of

9   experience with Dr. Bodnar and many on the medical crew

10  and they've been nothing but exemplary.

11    Q.   And that would include an exemplary

12  performance in responding to Brian's accident at the

13  Tampa Supercross?

14         MR. DOYLE:  Object to form.

15         MS. JANKOWSKI:  Same objection.

16         THE WITNESS:  Again, I'm not a medical expert

17    and I trust Dr. Bodnar and the medic crew as the

18    medical professionals.

19  BY MR. SCHWEIKERT:

20    Q.   I know you're not a doctor, but you were the

21  senior director of operations at the Tampa Supercross,

22  right?

23    A.   I was, yes.

24    Q.   Weren't you interested in trying to ensure

25  that the event was conducted as safely as possible for

1  everyone involved, including the riders?

2          MS. JANKOWSKI:  Objection.  Form.

3          MR. DOYLE:  Join.

4          THE WITNESS:  I was, yes.

5  BY MR. SCHWEIKERT:

6      Q.   That's why Feld hired The Medic Rig to provide

7  medical professionals for the event, right?

8      A.   Correct.

9      Q.   And there's nothing that The Medic Rig could

10 do that would change our opinion about whether they are

11 the appropriate team for providing care at Supercross

12 events?

13         MR. DOYLE:  Objection.  Form.

14         MS. JANKOWSKI:  Objection.  Form.

15         THE WITNESS:  That question is extremely

16    broad, but I have never seen anything that would

17    change my opinion about the level of care that The

18    Medic Rig provides at Supercross events.

19 BY MR. SCHWEIKERT:

20     Q.   And that would include the videos of Brian's

21 incident such as the slow-motion removal of him from the

22 track?

23         MR. DOYLE:  Object to form.

24         THE WITNESS:  That would include the videos of

25    Brian's removal from the track.

BY MR. SCHWEIKERT:

Q.   Those videos appear to depict standard
practices for responding to an injured professional
Supercross rider at an event?

MR. DOYLE:  Objection.  Form.

MS. JANKOWSKI:  Objection.  Form.  Go ahead.

THE WITNESS:  Again, I defer to the medical
professionals and Dr. Bodnar stands by the actions
of the medical team.

BY MR. SCHWEIKERT:

Q.   Would there ever come a point where you would
not defer to Dr. Bodnar or his medical team in
determining whether a particular response to an incident
was appropriate?

MR. DOYLE:  Objection.  Form.

MS. JANKOWSKI:  Objection.  Form.

THE WITNESS:  Again, there are thousands of
scenarios which I can't foresee, so I can't answer
that question.

BY MR. SCHWEIKERT:

Q.   Would you agree that if the medical team did
not abide by a standard of care in responding to an
emergency situation on a racetrack, that would be a
concern?

MR. DOYLE:  Objection to form.

```
 1              MS. JANKOWSKI:  Objection.  Form.
 2              MS. SPRADLIN:  Join.
 3              THE WITNESS:  If they did not respond to the
 4         standard of -- is that how you -- repeat the
 5         question.
 6    BY MR. SCHWEIKERT:
 7         Q.   I understand you're not a doctor, correct?
 8         A.   Correct.
 9         Q.   But do you understand that there are protocols
10    for responding to medical emergencies?
11              MR. DOYLE:  Object to form.
12              MS. JANKOWSKI:  Objection to form.
13              THE WITNESS:  I do understand there are
14         protocols in responding to medical emergencies.
15    BY MR. SCHWEIKERT:
16         Q.   And if a medical professional did not abide by
17    an applicable protocol in responding to an injured rider
18    on a racetrack during a Supercross event, do you agree
19    that would be a concern?
20              MR. DOYLE:  Object to form.
21              MS. JANKOWSKI:  Same objection.
22              MR. SCHWEIKERT:  Join.
23              THE WITNESS:  I don't -- I'm not a medical
24         expert and I don't know what those protocols are,
25         so I have to rely on Dr. Bodnar and The Medic Rig
```

```
 1       staff.
 2   BY MR. SCHWEIKERT:
 3       Q.   Let me show you a document I'll mark as 161,
 4   Bates labeled FMS, Inc. 692.  Take a minute, review it,
 5   and let me know if you have seen it before.
 6       A.   Yeah, I don't know if I've seen this specific
 7   email before.  I'm assuming I had since it seems to be a
 8   meeting invite that I was included on.
 9            (Thereupon, Plaintiff's Exhibit 161 was marked
10       for identification.)
11   BY MR. SCHWEIKERT:
12       Q.   Is it a meeting invite organized by Mr. Muye
13   and inviting you, William Harris, Mike Pelletier, Tom
14   Carson, Dr. John Bodnar with a subject of
15   Feld/AMA/Astars Event Protocols Review Discussion?
16       A.   It is.
17       Q.   And this was an invitation for a meeting in
18   March of 2021?
19       A.   Yes, it appears to be.
20       Q.   Do you know why Mr. Muye was organizing a
21   meeting with some of the medical teams folks to discuss
22   event protocols?
23       A.   I don't recall, no.
24       Q.   Have you had discussions with the medical team
25   about any of the protocols that they used during any
```

 1  event organized by Feld?

 2      A.   The only discussion that I can recall was

 3  asking about our concussion -- or the Supercross

 4  concussion protocol, which was -- I believe it's called

 5  the impact.  And I'm not sure if this meeting was about

 6  that.  And -- potentially.  But I did inquire with

 7  Dr. Bodnar and the AMA, because I just wanted to

 8  understand what the procedures were as far as impact

 9  testing and concussion protocol and how -- what that

10  procedure was from the time a concussion was documented

11  and what steps had to be taken in order for the athlete

12  to get back to competition, because I was uneducated, so

13  I just wanted to know.

14      Q.   And what did you learn?

15      A.   I'd have to -- I honestly don't recall at the

16  moment about the details, but baseline or 30,000-foot

17  view, all the athletes are required to do an impact

18  test.  And then I believe that was -- again, I don't

19  know the technical terms, but that would give them a

20  baseline of cognitive skills, I believe.

21      And then if a rider hit the ground and it was

22  deemed that they were indeed concussed, they were put

23  into a program where they had to check in with a doctor

24  and do a certain number of steps to get back to being

25  allowed to compete.

1    Q.   As far as you're aware, is there any written

2    concussion protocol?

3    A.   I believe there is.

4    Q.   Is that something that the medical team

5    submitted to Feld?

6    A.   I don't believe it was submitted to Feld.

7    Again, in the context of me wanting to be better

8    educated, I'm sure that that would have been one of the

9    steps, is they would have sent me the actual protocol,

10   but I don't recall, you know, the detail of it.

11   Q.   Did you ever have an interest in being better

12   educated about how the medical team responded to an

13   injured rider on a racetrack during the 2020 Supercross

14   Season.

15   A.   Again, I'm not a medical expert, so I trust

16   The Medic Rig to do that.

17   Q.   So your answer is, no, you didn't have such an

18   interest; is that right?

19         MR. DOYLE:  Form.

20         MS. JANKOWSKI:  Objection to form.

21   Argumentative.  That's not what he said.  You can

22   answer.

23         THE WITNESS:  I never inquired about that, no.

24   BY MR. SCHWEIKERT:

25   Q.   You know who Stephan LeGrand is, correct?

1      A.   I do, yes.

2      Q.   Have you ever had any conversations with

3   Mr. LeGrand about this lawsuit?

4      A.   Not in-depth conversations about this lawsuit.

5   I believe he told me he was contacted by an attorney or

6   an attorney's office at some point.  He did not name

7   names.  I don't know that he even knew, but he told me

8   he was contacted.

9      Q.   When did he tell you that?

10      A.   I do not recall.

11      Q.   Did you ask him why he was being contacted by

12   an attorney?

13      A.   I don't believe so.

14      Q.   Were you interested in knowing?

15      A.   No.

16      Q.   Why not?

17      A.   I just assumed if he was being contacted by an

18   attorney that -- about the Brian Moreau incident it was

19   -- that there was going to be litigation filed.

20      Q.   And you didn't want to know whether

21   Mr. LeGrand -- strike that.

22      Are you aware that Mr. LeGrand photographed Brian's

23   removal from the track?

24      A.   Yes.

25      Q.   Okay.  Did you ever ask him if he had heard or

1    seen anything with respect to that incident?

2        A.    I don't believe I ever asked him if he heard

3    or had seen anything with respect to the incident.  I

4    believe that he did inform me that he had taken several

5    photos and that he was going to -- he had or he was

6    going to share them with the attorney that had contacted

7    him.

8        Q.    So Feld was doing some investigation following

9    the incident to collect videos, right?

10           MS. JANKOWSKI:  Objection.  Form.

11           THE WITNESS:  Yes.

12   BY MR. SCHWEIKERT:

13       Q.    You had even asked Mr. Muye to collect any

14   pictures of the incident, right?

15       A.    Yes.

16       Q.    But you didn't ask the photographer who took

17   photographs of the incident what he may have witnesses

18   at any time?

19       A.    No, not that I remember.

20       Q.    If he had told you that he had heard Brian

21   screaming or crying for help while he was being removed,

22   do you think you would have remember that?

23           MS. JANKOWSKI:  Objection to form.

24           MS. SPRADLIN:  Form.

25           THE WITNESS:  I would have remembered that.

BY MR. SCHWEIKERT:

1  BY MR. SCHWEIKERT:

2      Q.   This will be 162.  I can get the Bates after

3  -- oh, strike that.

4      I'm sorry, sir, can you hand that back to me?

5      I'm going to show you a document previously marked

6  as Exhibit 68, Bates labeled FMS, Inc. 956.  Take a

7  minute, review it, and let me know if you have seen it?

8      A.   Does this need a sticker on it or no?

9      Q.   I can put one on there.  I would be 68.  Sure.

10         MS. JANKOWSKI:  What are we putting on it?

11         MR. SCHWEIKERT:  For the record, this was

12     marked as Exhibit 68 during Stephan LeGrand's Zoom

13     deposition.  So I'm going to put a sticker on it

14     while we're all here.

15 BY MR. SCHWEIKERT:

16     Q.   There you go, sir.  Do you recognize Exhibit

17 68?

18     A.   I do.

19     Q.   Is this a screenshot of text messages between

20 you and Stephan LeGrand?

21     A.   I believe so.

22     Q.   And did Mr. LeGrand send you a picture of an

23 email he received from Mark Schweikert?

24     A.   Yes.

25     Q.   And did Mr. LeGrand send you a picture of that

 1    email on July 28th, 2021?

 2         A.   It appears that way, yes.

 3         Q.   And in the email Mr. Schweikert writes, in

 4    part, "I am one of the attorneys representing Brian

 5    Moreau.  I'd like to schedule a time to speak with you

 6    at your convenience."

 7         Do you see that?

 8         A.   Yes, I do.

 9         Q.   Did you ever respond to this message from

10    Mr. LeGrand?

11         A.   I don't believe so, no.

12         Q.   Why not?

13         A.   I alerted our in-house counsel of this text

14    message.

15         Q.   Who's that?

16         A.   Ms. Lisa Joiner.

17         Q.   And when did you alert Ms. Joiner of the

18    message from Mr. LeGrand which contained a picture from

19    one of Brian Moreau's attorneys?

20         A.   I don't recall.  I would assume it was

21    directly following this.

22         Q.   Did you call Stephan to ask him about the

23    email that he had sent you a picture of?

24         A.   I don't recall calling Stephan about it, no.

25         Q.   Do you know if anyone related with Feld

```
 1    contacted Mr. LeGrand following him informing you that an

 2    attorney for Brian Moreau had reached out to him?

 3        A.    I don't know if anyone did.

 4        Q.    But you never did?

 5        A.    Not that I recall, no.

 6        Q.    Have you had further text messages with

 7    Mr. LeGrand since July 28th, 2021?

 8        A.    Not that I recall, no.

 9            MR. SCHWEIKERT:  Break.  Can we go off the

10        record for a little break?

11            THE VIDEOGRAPHER:  It's 5:08.  We're going off

12        the record.

13            (Off the record.)

14            (On the record.)

15            THE VIDEOGRAPHER:  It's 5:26.  We're back on

16        the record.

17    BY MR. SCHWEIKERT:

18        Q.    I'm going to show you a document that we'll

19    mark as Exhibit 162.  It's labeled FMS, Inc. 712.

20        Do you know what Exhibit 162 is, sir?

21        A.    I do.

22            (Thereupon, Plaintiff's Exhibit 162 was marked

23        for identification.)

24    BY MR. SCHWEIKERT:

25        Q.    Is it a fall-down report from the Glendale,
```

 1   Arizona event time of January 25th, 2020?

 2       A.   It appears to be, yes.

 3       Q.   And what is a fall-down report?

 4       A.   It is a record of all the times where a rider

 5   falls down as it states.  So falls down, crashes, that

 6   type of thing.

 7       Q.   Does it also indicate if the rider was

 8   transported by ambulance to a hospital?

 9       A.   It does.

10       Q.   And does this fall-down report for the

11   Glendale, Arizona event indicate that there were three

12   ambulance transfers?

13       A.   It appears to, yes.

14       Q.   Do you -- is that typical to have an ambulance

15   transport during a Supercross event?

16       A.   I wouldn't say it's typical, but it's not

17   uncommon.

18       Q.   Okay.  It's not uncommon because the sport is

19   very dangerous, right?

20       A.   Supercross is a dangerous sport.

21       Q.   All right.  I'm going to show you -- you can

22   set that side.

23       This was previously marked as Exhibit 22 at

24   Dr. Bodnar's deposition.  I don't have the one with the

25   sticker, so I'm just going to put another 22 on it.

1    It's the 2020 technical rider Bates label FMS, Inc. 714 to

2    735.

3         There you go.  Do you know what Exhibit 22 is?

4         A.    Yes.  It is a technical rider or Monster

5    Energy AMA Supercross from 2020.

6         Q.    For the Tampa event on February 15th, 2020?

7         A.    Yes, it appears to be.

8         Q.    And what is a technical rider?

9         A.    It is event information that Feld Motor Sports

10   provides the venue with everything that we are going to

11   require and all the relevant schedules and maps so that

12   the venue is as well informed as they can be prior to us

13   arriving.

14        Q.    And if I could direct you to the last page

15   Bates labeled FMS, Inc. 735.  Are you there?

16        A.    I'm there.

17        Q.    And at the top it's entitled Supercross

18   Futures Paramedic Requirements.  Do you see that?

19        A.    I do.

20        Q.    Do you know who prepared the Supercross

21   Futures paramedic requirements?

22        A.    I do not.

23        Q.    Did Feld create these paramedic requirements

24   for the Supercross Futures?

25        A.    I can't say for certain.

```
 1       Q.   Who, based on your experience, might have been
 2   involved in preparing the Supercross Futures paramedic
 3   requirements?
 4            MS. JANKOWSKI:  Objection to form.
 5            THE WITNESS:  Based on my experience it would
 6       have probably been Feld Motor Sports along with the
 7       AMA.
 8   BY MR. SCHWEIKERT:
 9       Q.   Okay.  And if you look at Item Number 7 it
10   reads, in part, quote, "If it is necessary for the
11   medical team to go onto the racetrack, the race will be
12   stopped," end quote.  Do you see that?
13       A.   I do.
14       Q.   And was that applicable to the Supercross
15   Futures event in Tampa during that weekend?
16       A.   It was, yes.
17       Q.   And Number 8 reads, quote, "In the event of a
18   head or neck injury, the stance all Supercross Futures
19   staff members will take is to leave the helmet intact
20   while assisting the paramedics with the protocol they
21   follow," end quote.  Do you see that?
22       A.   I do see that.
23       Q.   And was that a requirement applicable to the
24   Supercross Futures event that weekend in February of
25   2020?
```

1    A.    I believe so, yes.

2    Q.    And the next one, 9, reads, quote, "In the

3    event of a back injury or injury requiring a backboard,

4    the Supercross Futures' staff members will assist the

5    medical team with placement of the backboard, the

6    transportation of the patient to the medics assigned

7    area or ALS unit upon the recommendation of the medical

8    team," end quote.

9        Do you see that?

10   A.    I do.

11   Q.    And was that applicable?

12   A.    I believe so, yes.

13   Q.    So there are protocols that based on your

14   experience you believe would have been prepared by Feld

15   and/or the AMA for providing care during the Supercross

16   Futures events, right?

17        MS. JANKOWSKI:  Object to form.

18        THE WITNESS:  Correct.

19   BY MR. SCHWEIKERT:

20   Q.    But Feld had not involvement whatsoever in

21   preparing any medical protocols that applied to the

22   professional racing events that weekend, right?

23   A.    Correct.

24   Q.    Do you know who the Supercross Futures' staff

25   members were?

 1    A.    I do not know all of them.  I know the director

 2  of operations was Bill Heras.  Outside of that, I don't

 3  believe I can name anyone.

 4    Q.    Is it your understanding that the Supercross

 5  Futures' staff members were affiliated with Feld?

 6    A.    Supercross Futures' staff members were Feld

 7  Motor Sports employees, yes.

 8    Q.    Okay.  And according to this written protocol,

 9  there were times where the Supercross Futures' staff

10  members assisted the paramedics with the protocols they

11  followed, right?

12    A.    Yes, but "assist" is a broad term.

13    Q.    Do you know if any of those Supercross

14  Futures' staff members were medically trained?

15    A.    I do not.

16    Q.    And Supercross Futures, does that typically

17  involve younger teenage aged riders?

18    A.    For a portion of Supercross Futures, yes.

19    Q.    Riders that may have a future in competing

20  professionally in the Supercross, right?

21    A.    There are a few that may, yes.

22    Q.    Do you know why these protocols would apply to

23  the Supercross Futures, but not the professional

24  Supercross event?

25         MS. JANKOWSKI:  Object to the form.

```
1       A.   We did have the mobile medic unit at Supercross

2   Futures events, so, again, I assume these protocols are

3   just to inform the paramedics of the potential risk and

4   injuries during a Supercross Futures event.

5          MR. SCHWEIKERT:  Well, I think subject to my

6       right to follow up, if there's additional

7       questions, I will tender Mr. Prater.

8          MS. JANKOWSKI:  Okay.  Anyone want to ask some

9       questions?

10          MR. DOYLE:  I have no questions.

11          MS. SPRADLIN:  I have just a couple for you,

12      Mr. Prater.

13                  CROSS-EXAMINATION

14  BY MS. SPRADLIN:

15      Q.   And I introduced myself earlier.  I'm Carline

16  Spradlin.  I'm here on behalf of the AMA.

17      At Supercross events, including during the 2020

18  season, is there a restricted area that spectators are

19  not allowed to enter?

20      A.   There is.  There are -- so the paddock is

21  restricted typically from the hours prior to 12:00 noon

22  and after 6:00 p.m.  And then anything interior, meaning

23  the service corridor, the tunnels, the stadium floor

24  would be prohibited by general spectators.

25      Q.   And that would include the racetrack?
```

```
 1        A.    That would include the racetrack.

 2        Q.    And how -- does Feld have any responsibility

 3   for ensuring that spectators are not allowed to access

 4   those areas?

 5        A.    Feld does have responsibility to ensure

 6   spectators do not access those areas.

 7        Q.    And how does Feld ensure that spectators are

 8   not able to access those areas?

 9        A.    Well, we create credential boards.  We create

10   the credentials that we spoke about earlier.  We have a

11   security company that we contract, Ingress Security.

12   There are four individuals that travel with us.  And

13   then we also contract either through the venue or

14   through the local security company local security

15   personnel to man those access points where restricted

16   areas can be accessed.

17        Q.    And in -- is there signage that designates

18   what is a non-spectator or restricted access area at the

19   Supercross events, including at Tampa 2020?

20        A.    There is, yes.

21        Q.    And does that signage read "non-spectator

22   area" or some similar verbiage?

23        A.    Something similar.  It would -- as I recall,

24   read "credential access only" or "credential access."

25        Q.    And are those signs that designate non-
```

1    spectator areas displayed at any entrances that people

2    could access to the non-spectator areas?

3        A.    Yes, they should be displayed at all entrances

4    where there are entrances to non-spectator access -- in

5    areas.

6        Q.    And at the stadiums where Supercross is

7    typically held, there are -- we discussed earlier today

8    that there's the tarping that's laid over the first

9    areas of the seating to prevent people from accessing

10   the floor from those directions.  So when we speak about

11   access points to, for instance, the stadium floor, that

12   would be the tunnels coming into the stadium floor; is

13   that correct?

14       A.    Correct.

15           MR. DOYLE:  Form.

16       Q.    And in order to be able to access you said

17   there are other credential boards, so any individuals

18   that would be -- have access to the non-spectator areas

19   would need to have the credentials; is that correct?

20       A.    Correct.

21       Q.    And in order to obtain a credential,

22   individuals have to sign certain documentation; is that

23   correct?

24       A.    Yes.  In 2020 individuals would have to sign

25   an AMA release or waiver, as well as a Feld Motor Sports

```
 1   release or waiver.
 2        Q.   And we spoke earlier about press day that
 3   occurs the day before a Supercross event.  Do you
 4   remember that?
 5        A.   I do.
 6        Q.   And I believe you testified that you did not
 7   attend the Tampa press day on February 14th, 2020?
 8        A.   Correct, I do not believe I attended press
 9   day.
10        Q.   Do you ever attend press day events?
11        A.   I do from time to time, but not often.
12        Q.   You're generally familiar with what occurs
13   during a press day; is that correct?
14        A.   Yes.
15        Q.   And in the documentation that you just
16   mentioned that individuals have to sign to obtain their
17   credential, are you aware that there are certain grants
18   by those individuals of promotional or production
19   rights?
20        A.   Yes.
21        Q.   And at press day is the purpose of press day
22   to allow media to take photographs and videos of --
23   among other things, of competitors to promote Supercross
24   events?
25        A.   Yes.
```

 1     Q.   And do you know if media took such photos and

 2  videos of riders during the Tampa 2020 press day?

 3     A.   They did, yes.

 4     Q.   Do you know if those were used to promote

 5  Supercross events?

 6     A.   I don't know of any specific ones that were

 7  used for specific promotions, but I have to imagine that

 8  they were.

 9     Q.   And is Feld responsible for selecting what

10  riders are invited to participate in any given press day

11  event?

12     A.   Yes.

13     Q.   Are you aware that Brian Moreau was invited to

14  participate in the Tampa 2020 press day?

15     A.   I was aware, yes.

16     Q.   And in terms of participating in press day,

17  the riders who are invited have to have a credential to

18  be allowed to participate in press day; is that correct?

19     A.   Correct.

20          MR. DOYLE:  Form.

21     Q.   Just one moment.  I'm going to go over my

22  notes.  I think that may be all I have for you.

23          You mentioned the security individuals that Feld

24  contracts with.  Those individuals are stationed at any

25  potential entrances to the non-spectator area to prevent

 1   unrestricted -- or, I'm sorry, unauthorized access; is

 2   that correct?

 3           MR. DOYLE:  Form.

 4      A.   Yes.  Throughout the day.  So there actually

 5   -- there's a few reasons that we contract with Ingress,

 6   but primarily at the tunnel entrances to the stadium we

 7   staff an Ingress person who is familiar with the

 8   Supercross community as a whole, individuals that travel

 9   along the circuit.

10      So there are individuals from Ingress that work

11   with us week in and week out at those tunnel entrances.

12   They also go around throughout the day and continue to

13   educated the local security on what access, what

14   credentials are allowed through that gate and, you know,

15   what the flow of the day will be.

16      So with shift changes and other things the local

17   guards can be continuously educated.

18      Q.   And then I just have one small thing to clear

19   up on some of the questioning that Mr. Schweikert asked

20   you earlier.  You were discussing access to video feeds.

21   Do you recall that?

22      A.   I do recall that, yes.

23      Q.   So during the Tampa 2020 Supercross, as far as

24   you were aware, did anyone from Feld have access to the

25   team cameras that were set up that we discussed?

```
 1        A.   No, they did not.

 2        Q.   And did anyone from Feld have access to the

 3   Tampa Sports Authority, I think you said there was a

 4   Nest camera that was set up; is that correct?

 5        A.   The Tampa -- so there's two different things.

 6   So Feld had access to the Nest camera -- operational

 7   Nest camera that Feld Motor Sports set up.  And Feld had

 8   access through the show control room to the cameras that

 9   Tampa Sports Authority was operating.

10             MS. SPRADLIN:  Okay.  I believe that is all

11        that I have for you.  Thank you very much.  I

12        appreciate your time today.

13             THE WITNESS:  Thank you.

14             MS. JANKOWSKI:  No, I have no questions.

15             MR. SCHWEIKERT:  I don't, either.  Thank you.

16        I know that depositions aren't pleasant, but I

17        appreciate your time and cooperation.

18             THE WITNESS:  Thank you.  I appreciate it.

19             THE VIDEOGRAPHER:  This will conclude the

20        deposition of Dave Prater.  It is 5:45.  We're

21        going off the record.

22             THE REPORTER:  Are you going to be ordering?

23             MS. JANKOWSKI:  I am.  I would like it

24        expedited.

25             THE REPORTER:  Okay.  How quickly would you
```

```
 1     like it?
 2          MS. JANKOWSKI:  I would like it, if possible,
 3     by -- I don't know what your timeframes are, but
 4     Friday would be great.
 5          THE REPORTER:  Okay.
 6          THE VIDEOGRAPHER:  Does anyone want the video
 7     besides Mr. Schweikert?
 8          MS. JANKOWSKI:  I do.
 9          MR. SCHWEIKERT:  I don't need it at this time.
10          THE VIDEOGRAPHER:  Oh, you don't need it.
11          MS. JANKOWSKI:  Yeah, I want the video.
12          THE VIDEOGRAPHER:  Pardon?
13          MS. JANKOWSKI:  I want it.
14          THE VIDEOGRAPHER:  Do you want plain video or
15     do you want text video sync?
16          MS. JANKOWSKI:  This is why I don't like to
17     order anything.  I'll have my -- let me just get
18     your card.  I'm going to have my paralegal --
19     because whatever I say is going to wrong.
20          THE REPORTER:  Do you want a copy?
21          MR. DOYLE:  I will have someone get in touch.
22          THE REPORTER:  Do either of you want a copy?
23          MR. SCHWEIKERT:  Not at this time.
24          MS. SPRADLIN:  I don't need a copy at this
25     time.  Thank you.
```

1          MR. DOYLE:  Electronic copy.  Full size mini

2      with a word index, please.

3          (Thereupon, the examination was concluded at

4   5:45 p.m.)

5          (Reading and signing of the deposition

6   transcript was waived.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


    I, Jennifer Cope, Court Reporter, Notary

Public, State of Florida, certify that David L.

Prater, personally appeared before me on the 25th

day of March 2025, and was duly sworn.

    Signed this 4th day of April 2025.




_Jennifer Cope_

_____

Jennifer Cope, Court Reporter

Notary Public, State of Florida

Commission No.: HH 189226

Commission Expires: 2/19/2026

```
 1                  CERTIFICATE OF REPORTER

 2     STATE OF FLORIDA

 3     COUNTY OF HILLSBOROUGH

 4

 5          I, Jennier Cope, Court Reporter, certify that

 6     I was authorized to and did report the Deposition

 7     of David L. Prater; and that the transcript is a

 8     true and correct record of my notes.

 9          I further certify that I am not a relative,

10     employee, attorney, or counsel of any of the

11     parties, nor am I a relative or employee of any of

12     the parties' attorneys or counsel connected with

13     the action, nor am I financially interested in the

14     action.

15          Dated this 4th day of April 2025.

16

17                    Jennifer Cope

18     _____

19     Jennifer Cope, Court Reporter

20

21

22

23

24

25
```

E R R A T A   S H E E T

BRIAN MOREAU v. FELD MOTOR SPORTS, INC., et al.
Case No. 8:22-CV-01295-TPB-CPT Deposition
Transcript of DAVID L. PRATER

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 7 | 21 | Change "in a Monster" to "a Monster" |
| 11 | 18 | Change "upon" to "in" |
| 23 | 4 | Change "Direction" to "Director" |
| 23 | 13 | Change "operation" to "operations" |
| 47 | 10 | Change "manager" to "Manager" |
| 52 | 6-11 | Change "race director" to "Race Director" in multiple instances |
| 53 | 8 | Change "race director" to "Race Director" |
| 53 | 12-13 | Change "race director" to "Race Director" |
| 53 | 13 | Change "manager" to "Manager" |
| 54 | 6 | Change "manager" to "Manager" |
| 54 | 7 | Change "race director" to "Race Director" |
| 54 | 18 | Change "race director" to "Race Director" |
| 57 | 17 | Change "series logo" to "Series Logo" |
| 63 | 2 | Change "back gate" to "Back Gate" |
| 64 | 3 | Change "Feld Sports Motor Sports" to "Feld Motor Sports" |
| 65 | 12 | Change "mobile medical rig" to "Mobile Medical Rig" |
| 66 | 22 | Change "Motor Sports" to "Feld Motor Sports" |
| 67 | 14 | Change "for" to "or" |
| 76 | 12 | Change "Meuy" to "Muye" |
| 81 | 10 | Change "Hawks" to "Hawkes" |

1

| PAGE | LINE | CORRECTION |
|---|---|---|
| 81 | 22 | Change "everyone. I" to "everyone I" |
| 88 | 5 | Change "and" to "&" |
| 88 | 7 | Change "track equipment," to "track equipment" |
| 88 | 11 | Change "track safety supervisor" to "Track Safety Supervisor" |
| 88 | 23 | Change "truck" to "track" |
| 90 | 16 | Change "in 2020 referred to" to "to in 2020" |
| 96 | 14 | Change "sometime" to "sometimes" |
| 98 | 24 | Change "assigning in" to "assigning" |
| 99 | 25 | Change "venue racetrack" to "Venue Guidelines" |
| 101 | 9 | Change "You do." to "You did." |
| 101 | 15 | Change "Feld Motor Sports" to "Feld Motor Sports'" |
| 107 | 2-3 | Change "director of operations" to "Director of Operations" |
| 128 | 15 | Change "FMI" to FIM |
| 128 | 17 | Change "plain logo" to "Plain Logo" |
| 129 | 6-7 | Change "plain logo" to "Plain Logo" |
| 130 | 4-5 | Change ""medical team" or "medic team."" to ""Medical Team" or "Medic Team."" |
| 131 | 8 | Change "probably to exclude" to "probably easier to exclude" |
| 136 | 13 | Change "even" to "event" |
| 141 | 11 | Change "can" to "can't" |
| 143 | 5-6 | Change "show office" to "Show Office" |
| 145 | 11 | Change "senior director" to "Senior Director" |
| 145 | 11-12 | Change "director of operations" to "Director of Operations" |
| 145 | 13 | Change "event manager" to "Event Manager" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 146 | 22 | Change "on" to "in" |
| 149 | 9 | Change "had been hurt." to "he had been hurt." |
| 154 | 15 | Change "independent endemic" to "independent endemic publication" |
| 162 | 3 | Change "or" to "our" |
| 167 | 7 | Change "senior director of operations" to "Senior Director of Operations" |
| 179 | 2 | Change "It" to "I" |
| 183 | 15 | Change "Hawks" to "Hawkes" |
| 183 | 18 | Change "Hawks" to "Hawkes" |
| 183 | 18 | Change "informing that." to ""informing me of that." |
| 185 | 18 | Change "fairly" to "a fairly" |
| 185 | 19 | Change "professionally close-knit group professionally." to "close-knit group professionally." |
| 188 | 15 | Change "sponsor, or" to "sponsor of" |
| 193 | 6 | Change "anything the broadcast." to "anything on the broadcast." |
| 198 | 25 | Change "Sports" to "Sports'" |
| 200 | 22-23 | Change "race direction meetings" to "Race Direction Meetings" |
| 201 | 5-6 | Change "race direction meeting" to "Race Direction Meeting" |
| 219 | 4 | Change "technical rider or" to "Technical Rider for" |
| 222 | 1-2 | Change "director of operations" to "Director of Operations" |
| 223 | 1 | Change "We did have" to "We did not have" |
| 228 | 13 | Change "educated" to "educate" |

I DO HEREBY CERTIFY that I have read the
transcript of my deposition and I swear it is true
and correct to the best of my knowledge, subject
to the above-referenced corrections.

DAVID L. PRATER

A D D I T I O N A L    E R R A T A    S H E E T

BRIAN MOREAU v. FELD MOTOR SPORTS, INC., et al.
Case No. 8:22-CV-01295-TPB-CPT Deposition
Transcript of DAVID L. PRATER

COUNSEL OF RECORD NOTES THE FOLLOWING ADDITIONAL ERRATA
CHANGES:

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 47 | 3-4 | Quoted section from document should read as follows:<br><br>"An AMA Supercross Manager(s) who will maintain ultimate control over all race and floor operations, []" |
| 47 | 25 | Change "manager" to "Manager" |
| 47 | 25 | Insert beginning quotes before the word "managerial" |
| 48 | 1 | Insert ending quotes after the word "personnel." |
| 48 | 16 | Change "manager" to "Manager" |
| 49 | 15 | Change "manager" to "Manager" |
| 51 | 3 | Change "manager" to "Manager" |
| 51 | 21 | Change "race director" to "Race Director" |
| 51 | 24 | Change "race director" to "Race Director" |
| 52 | 2 | Change "race director" to "Race Director" |
| 53 | 10 | Change "race director" to "Race Director" |
| 53 | 18 | Change "race director" to "Race Director" |
| 54 | 1 | Change "manager" to "Manager" |
| 54 | 2 | Change "race director" to "Race Director" |
| 54 | 4 | Change "manager" to "Manager" |
| 55 | 2 | Change "event manager" to "Event Manager" |
| 55 | 4 | Change "event manager" to "Event Manager" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 55 | 7-8 | Change "event manager" to "Event Manager" in multiple instances |
| 57 | 7 | Change "series logo" to "Series Logo" |
| 57 | 10 | Change "championship" to "Championship" |
| 62 | 4-5 | Quoted section from document should read as follows:<br><br>"the amount of the per Event fee for the Fixed Service will be" |
| 62 | 12 | Change "event variable fee" to "Event Variable Fee" |
| 62 | 18-19 | Change "event variable fee" to "Event Variable Fee" |
| 62 | 25 | Change "back" to "Back" |
| 63 | 1 | Change "gate" to "Gate" |
| 63 | 8-9 | Change "back gate" to "Back Gate" |
| 63 | 14 | Change "theirs" to "there" |
| 63 | 17 | Change "I" to "it" |
| 63 | 20 | Change "events" to "Events" |
| 64 | 25 | Delete the word "an" |
| 65 | 1 | Change "events" to "Events" |
| 69 | 16 | Change "FMS, Inc." to "FMS_INC_" |
| 70 | 17-18 | Change "FMS, Inc." to "FMS_INC_" |
| 70-71 | 23-1 | Quoted section from document should read as follows:<br><br>"The term of this SOW shall be from the Effective Date of the Master Services Agreement through the Monster Energy Cup event held in October 2021." |
| 71 | 3-4 | Change "master services agreement" to "Master Services Agreement" |
| 71 | 8 | Change "FMS, Inc." to "FMS_INC_" |

6

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 72 | 16 | Change "access" to "Access" |
| 72 | 21 | Change "service provider" to "Service Provider" |
| 72 | 22 | Change "professional services or deliverables" to "Professional Services or Deliverables" |
| 73 | 11-14 | Quoted section from document should read as follows:<br><br>"Service Provider's personnel and Third Party Vendors must abide by all reasonable safety rules and regulations put in place by FMS." |
| 75 | 21-23 | Quoted section from document should read as follows:<br><br>"The event management is composed of three officials:<br>1. AMA Delegate<br>2. Race Director<br>3. Representative of the Champion Promoter" |
| 76 | 1 | Change "championship promoter" to "Championship Promoter" |
| 76 | 8 | Change "championship promoter" to "Championship Promoter" |
| 76 | 17 | Change "E" to "e" |
| 76 | 19-21 | Quoted section from document should read as follows:<br><br>"The authority and duties of Event Management include but are not limited to:<br>1. To ensure the smooth and efficient running of the event. |
| 78-79 | 23-1 | Quoted section from document should read as follows:<br><br>"The authority and duties of Event Management include but are not limited to:<br><br>2. To make recommendations to Race Direction to improve the smoother and efficient running of the event." |
| 83 | 14 | Change "multidimensional" to "multi-dimensional" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 83 | 15 | Capitalize the words "authority" and "responsibility" |
| 87 | 20 | Change "Mativa" to "Metvia" |
| 89 | 23 | Change "FMS, Inc." to "FMS_INC_" |
| 90 | 7 | Change "FMS, Inc." to "FMS_INC_" |
| 91 | 24 | Change "Do not" to "DO NOT" |
| 91 | 24 | Change "aide" to "aid" |
| 99 | 16 | Change "FMS, Inc." to "FMS_INC_" |
| 100 | 14 | Change "the" to "of" |
| 101 | 4-5 | Change "on track conduct" to "On Track Conduct" |
| 10 | 8 | Change "Do I" to "Did I" |
| 101 | 19 | Change "Never" to "NEVER" |
| 102 | 25 | Change "FMS, Inc." to "FMS_INC_" |
| 104 | 14 | Change "D" to "d" |
| 105 | 6 | Change "J" to "j" |
| 106 | 5 | Change "FMS, Inc." to "FMS_INC_" |
| 106 | 6 | Change "contracts" to "contacts" |
| 106 | 14 | Change "director of operations" to "Director of Operations" |
| 107 | 10 | Change "paddock manager" to "Paddock Manager" |
| 108 | 14 18-19 21 | Change "event manager" to "Event Manager" |
| 109 | 16 | Change "FMS, Inc." to "FMS_INC_" |
| 109 | 19 | Change "47?" to "147?" |
| 111 | 1 18 | Change "FMS, Inc." to "FMS_INC_" |

8

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 112 | 25 | Change "FMS, Inc." to "FMS_INC_" |
| 124 | 19 | Change "the press box at" to "the press box? At" |
| 127 | 1 | Change "FMS, Inc." to "FMS_INC_" |
| 129-130 | 25-1 | Quoted section from document should read as follows:<br><br>"Medical Unit team should be referred to as "Alpinestars Medical Team."" |
| 130 | 3 | Change "medical team" to "Medical Team" |
| 132 | 18 | Change "FMS, Inc." to "FMS_INC_" |
| 142 | 22-25 | Quoted section from document should read as follows:<br><br>"Additional communication; on track, in person, or as directed by radio contact with the Feld Management and Show Office, is maintained throughout the event." |
| 143 | 3 | Change "show office" to "Show Office" |
| 150 | 22 | Change "FMS, Inc." to "FMS_INC_" |
| 153 | 24 | Change "you" to "he" |
| 153 | 25 | Change "in" to "near" |
| 154 | 20 | Change "pre-practice" to "free practice" |
| 154 | 24 | Change "pre-" to "free" |
| 156 | 14 | Change "pre-practice" to "free practice" |
| 158 | 4-5 | Change "FMS, Inc." to "FMS_INC_" |
| 159 | 16 | Change "differs" to "defers" |
| 161 | 2 | Change "FMS, Inc." to "FMS_INC_" |
| 167 | 9-10 | Change "senior director of operations" to "Senior Director of Operations" |
| 173 | 7 | Change "permit" to "print" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 174 | 4<br><br>23 | Change "FMS, Inc." to "FMS_INC_" |
| 175 | 20 | Change "early around 7:00 a.m." to "early, around 7 a.m." |
| 175 | 24 | Change "Okay." to "Ok." |
| 178 | 19 | Change "FMS, Inc." to "FMS_INC_" |
| 179 | 20 | Change "FMS, Inc." to "FMS_INC_" |
| 180 | 9 | Change "is" to "it" |
| 183 | 22 | Change "Hawks" to "Hawkes" |
| 184 | 8 | Change "extent the impact" to "extent of the impact" |
| 186 | 4 | Change "Duval" to "de Vaulx" |
| 186 | 7 | Change "FMS, Inc." to "FMS_INC_" |
| 186 | 24 | Change "Duval" to "de Vaulx" |
| 187 | 4-6 | Quoted section from document should read as follows:<br><br>Red flag: why no red flag? Was it see as unnecessary on the moment and why?" |
| 187 | 14 | Change "Duval's" to "de Vaulx's" |
| 187 | 17-20 | Quoted section from document should read as follows:<br><br>"Please see below from one of our primary French outlets-MotoVerte magazine.  Olivier sent this to Alpinestars as well so we need to coordinate statements." |
| 188 | 18 | Change "Duval" to "de Vaulx" |
| 190 | 4 | Change "FMS, Inc." to "FMS_INC_" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 193 | 5-7 | Quoted section from document should read as follows:<br><br>"Don't say anything on the broadcast. [] [] I sent that quote so you could share it with your team, not for the broadcast." |
| 193 | 21 | Change "Hawks" to "Hawkes" |
| 195 | 6<br><br>25 | Change "FMS, Inc." to "FMS_INC_" |
| 196 | 21 | Change "no" to "No" |
| 199 | 8 | Change "FMS, Inc." to "FMS_INC_" |
| 200 | 5-6 | Change "FMS, Inc." to "FMS_INC_" |
| 200 | 9-16 | Quoted section from document should read as follows:<br><br>"Everybody agreed at the Friday afternoon Race Direction meeting was beneficial for the event. The meeting joined representatives Feld, AMA Dirt Wurx, and the Alpinestars Mobile Medical Unit to share information and raise their concerns., if any.  People came in prepared. And if there were any things to fix there was still ample time to do so." |
| 200 | 20 | Change "race direction meetings" to "Race Direction Meetings" |
| 202 | 5 | Change to match quoted material "GoPro" to "Go-Pro" |
| 203 | 11 | Change "or" to "for" |
| 206 | 21 | Change "senior director of operations" to "Senior Director of Operations" |
| 207 | 10 | Change "our" to "your" |
| 210 | 13 | Change "Harris" to "Heras" |
| 210 | 15 | Change "Astars" to "A-Stars" |
| 210 | 15 | Change "Review Discussion" to "Review/Discussion" |

| PAGE | LINE | CORRECTION |
|------|------|------------|
| 214 | 17 | Change "witnesses" to "witnessed" |
| 214 | 22 | Change "remember" to "remembered" |
| 215 | 6 | Change "FMS, Inc." to "FMS_INC_" |
| 215 | 9 | Change "I would be" to "It would be" |
| 217 | 19 | Change "FMS, Inc." to "FMS_INC_" |
| 218 | 22 | Change "side" to "aside" |
| 219 | 1<br><br>15 | Change "FMS, Inc." to "FMS_INC_" |
| 219 | 8 | Change "technical rider" to "Technical Rider" |
| 219 | 21<br><br>23 | Change "paramedic requirements" to "Paramedic Requirements" |
| 220 | 2-3 | Change "paramedic requirements" to "Paramedic Requirements" |
| 220 | 18 | Delete "," |
| 221 | 2-8 | Quoted section from document should read as follows:<br><br>"In the event of a back injury or injury requiring a backboard the Supercross Futures staff members will assist the medical team with placement of the backboard the transportation of the patient to the medics assigned area or ALS unit upon the recommendation of the medical team." |
| 221 | 20 | Change "not" to "no" |