UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


CASE NO.: 8:22-CV-01295-TPB-CPT


BRIAN MOREAU,
     Plaintiff,

vs.

FELD MOTOR SPORTS, INC., ET AL.,
     Defendant.
_____/


DEPOSITION OF JOHN GALLAGHER


DATE TAKEN:    APRIL 3, 2025
TIME:          3:08 P.M.
PLACE:         VIA VIDEOCONFERENCE

APPEARANCES:


On behalf of the Plaintiff:

SCHWEIKERT LAW PLLC
BY:  MARK A. SCHWEIKERT, ESQUIRE
1111 Brickell Avenue
Suite 1550
Miami, Florida 33131
305-999-1906
mark@schweikertlaw.com


On behalf of the Defendant AMERICAN MOTORCYCLE
ASSOCIATION:

PHELPS DUNBAR, LLP
BY:  CAROLINE SPRADLIN, ESQUIRE
100 South Ashley Drive
Suite 2000
Tampa, Florida 33602
813-222-7672
caroline.spradlin@phelps.com


On behalf of the Defendant FELD MOTOR SPORTS, INC.:

BUCHANAN, INGERSOLL & ROONEY, P.C.
BY:  DAVID L. GORDON, ESQUIRE
700 Alexander Park
Suite 300
Princeton, New Jersey 08540
609-987-6800
david.gordon@bipc.com

AND

FELD ENTERTAINMENT, INC.
BY:  ALEXIA KHELLA, ESQUIRE
800 Feld Way
Palmetto, Florida 34221
941-432-4015
lexykhella@gmail.com

APPEARANCES (CONT.):


On behalf of the Defendants, THE MEDIC RIG, LLC,
JOHN A. BODNAR, M.D., JAMES KENNEDYE, M.D.,
AMY METIVA AND SCOTT COMBS:

PEARSON, DOYLE, MOHRE & PASTIS, LLP
BY:  BETHANY NDUKA, ESQUIRE
901 North Lake Destiny Road
Suite 305
Maitland, Florida 32751
407-647-0900
bnduka@pdmplaw.com

INDEX OF EXAMINATION


WITNESS: JOHN GALLAGHER

                                                    PAGE NO.



DIRECT EXAMINATION
By Mr. Schweikert, Esq.                              06

CROSS-EXAMINATION
By Mr. Gordon, Esq.                                  72



                    INDEX TO EXHIBITS


EXHIBIT NO.   DESCRIPTION                    PAGE NO.

196           Screenshot of Virtual MX Website    06

```
 1                DEPOSITION OF JOHN GALLAGHER

 2                      APRIL 3, 2025

 3                  *  *  *  *  *  *  *  *  *

 4          THE REPORTER:  Good afternoon.  My name is George

 5   Garcia, I'm the court reporter for today's depo.  The time

 6   is 3:08 p.m., the date is April 3rd, 2025.

 7              If the witness can state his name on the record

 8   and spell it for us, please.

 9          THE WITNESS:  John Gallagher.  J-O-H-N, G-A-L-L-A-

10   G-H-E-R.

11          THE REPORTER:  Thank you.  Do you have a photo ID

12   that you could show me?

13          John Michael Gallagher.  Thank you so much.

14              If you could please raise your right hand, Mr.

15   Gallagher.

16                      JOHN GALLAGHER,

17       having first been duly sworn, testified as follows:

18          THE REPORTER:  Thank you.  You can put your hand

19   down.

20              Attorneys, please state your appearances.

21          MR. SCHWEIKERT:  Good afternoon, Mark Schweikert

22   for Brian Moreau.

23          MS. SPRADLIN:  Caroline Spradlin for Defendant,

24   American Motorcycle Association.

25          MR. GORDON:  David Gordon and Lexy Khella on
```

```
 1   behalf of Feld Motor Sports.

 2           MS. NDUKA:  Bethany Nduka on behalf of

 3   Defendants, The Medic Rig, Dr. John Bodnar, Dr. James

 4   Kennedye, Amy Metiva, and Scott Combs.

 5           THE REPORTER:  Thank you guys.

 6           Go ahead, Mark.

 7           MR. SCHWEIKERT:  All right.  Thank you.

 8                       DIRECT EXAMINATION

 9   BY MR. SCHWEIKERT:

10       Q.   Good afternoon, Mr. Gallagher.  How are you?

11       A.   I'm doing well.

12           MR. SCHWEIKERT:  Good.  I want to show you a

13   document I will mark as Exhibit 196.

14           (Exhibit 196 was marked for identification.)

15           MR. SCHWEIKERT:  Just give me a moment.

16           MS. SPRADLIN:  And, Mark, as we have been doing

17   in the Zoom depositions, would you be able to post the

18   exhibits in the chat for us?

19           MR. SCHWEIKERT:  Yes.

20           MS. SPRADLIN:  Thank you.

21           MR. SCHWEIKERT:  And I'm also happy to stipulate

22   one objection is good for all Defendants.

23           MS. SPRADLIN:  Thank you very much.  Takes care

24   of that.

25   BY MR. SCHWEIKERT:
```

7

1      Q.   Okay.  I'm putting the document I've marked as

2   Exhibit 196 in the chat, and also share it with you on the

3   screen.

4           Do you see a document I've marked as Exhibit 196

5   on the screen?

6      A.   Yes.

7      Q.   Okay.  And I'll represent this is a screenshot of

8   the Vital MX website.  I really just wanted to know if the

9   picture in this exhibit is a picture of you?

10     A.   Yes.

11     Q.   Okay.  And the last time we were together, we

12  talked a little bit about your uniform, and you'd mentioned

13  you might be wearing a hat.  Is the picture here that we

14  see in Exhibit 196 similar to how you would've been dressed

15  at the Tampa Supercross?

16     A.   Yes.

17     Q.   The black polo, AMA uniform with the AMA logo,

18  and the Supercross Series logo on it; is that right?

19     A.   I -- I have that uniform, but I don't know what

20  we were wearing five years ago.

21     Q.   Okay.

22     A.   I -- I think so, but I'm not -- I'm not sure if

23  that was the uniform or if there was one previous to that

24  one.

25     Q.   And we had talked last time a little bit about

1  hard cards.  Would what we see here hanging on a lanyard

2  around your neck, be an example of a hard card that you

3  would use to enter stadiums to serve as the race director

4  for Supercross races?

5       A.   That's my credential, yes.

6       Q.   All right.  Let me stop sharing my screen.

7            I want to talk a little bit about the different

8  types of flags.  And I'll show you -- well, before I show

9  you anything.  I understand there's yellow flags, and red

10 flags, and some other colors that we touched upon last

11 time.

12           Are you aware of a white flag with a red cross?

13      A.   Yes.

14      Q.   Okay.  What is the purpose of that particular

15 flag?

16      A.   The white flag with the red cross is displayed to

17 signify to the riders that there's two things that they

18 need to make sure that they do.  One is, they can't jump

19 over obstacles.  And that there's an extreme danger up

20 ahead, and they have to be prepared to stop.  And they also

21 cannot pass.

22      Q.   And I'm going to show you a document previously

23 marked as Exhibit 2, which is the AMA Rule Book.  And I am

24 on Page 28, and there's a heading for White Flag with Red

25 Cross or Red Flashing Light.  Do you see that?

1    A.   Yes.  Can you zoom in please?

2    Q.   Yeah.

3    A.   Okay.

4    Q.   Now I lost my page.  Hold on, when I zoomed in,

5  it jumped, give me a second.  I've got to go back to 422.

6         MS. SPRADLIN:  And for clarity of the record,

7  this was Exhibit 2 marked during Dr. Bodnar's deposition,

8  because we have multiple marked in the low number exhibits

9  in this case.

10  BY MR. SCHWEIKERT:

11    Q.   All right, I am showing you Exhibit 2, the AMA

12  Rule Book, Page 28.  Do you see Section E, White Flag with

13  Red Cross or Red Flashing Light?

14    A.   Yes.

15    Q.   Okay.  How does the red flashing light pertain to

16  the white flag with red cross?

17    A.   The -- the red flashing lights are typically on

18  one or two triples that are on the racetrack.

19    Q.   And is the white flag with a red cross used in

20  tandem with the red flashing light?

21    A.   Yes.

22    Q.   Okay.  And who has the authority to throw a white

23  flag with a red cross?

24    A.   Any of the AMA officials that are carrying that

25  flag.

1       Q.   Do you recall approximately how many officials

2    would've been carrying that flag during the Tampa

3    Supercross in 2020?

4       A.   I -- I don't know.

5       Q.   I think we talked about -- at the last

6    deposition, that there were two red flags at -- on the

7    track at the Tampa Supercross.  Do you recall that?

8       A.   Yes.

9       Q.   Do you think there were more than two white flags

10   with red cross?

11      A.   Yes.

12      Q.   Okay.  What's your best approximation of how many

13   white flags with red cross there would've been?

14      A.   There's definitely one on each triple.  There's

15   one at the finish line, and then there's one for any of --

16   AMA official that the -- the clerk for the floor felt

17   necessary.

18      Q.   And if we go down to Subsection 7, it reads,

19   "When used on a triple jump, the area of concern is at a

20   minimum the whole obstacle.  I.E., if a rider is down on

21   the face of the triple or after the first or second jump,

22   you must not jump any section of the triple."

23           Do you see that?

24      A.   Yes.

25      Q.   Okay.  So in cases where a rider crashes off of a

1  triple jump and lands on the face of the third jump, a

2  white flag with a red cross should be thrown?

3           MR. GORDON:  Objection.  Form.

4           MS. SPRADLIN:  Object to form.

5           THE WITNESS:  Yes.

6  BY MR. SCHWEIKERT:

7      Q.   And the red flashing light should be activated as

8  well?

9           MS. SPRADLIN:  Object to the form.

10          THE WITNESS:  That's correct.

11 BY MR. SCHWEIKERT:

12     Q.   And who could activate the flashing light?

13     A.   The AMA official that's at the conclusion of the

14 triple jumps.

15     Q.   Okay.

16     A.   I'm sorry, the -- the official that's at the

17 beginning of the triple jumps will illuminate it.

18     Q.   So before the rider hits that first jump, he

19 should see a red flashing light to indicate to him, there's

20 a hazard ahead, don't jump.

21          Is that --

22     A.   There are -- there's two red -- red lights on

23 either side of the track, and a lead in red light leading

24 into that.  And all three come on at the same time.

25     Q.   Now, would you as a race director be involved in

1    the activation of those lights or the deactivation of them?

2        A.    Neither.

3        Q.    Okay.  That's something that's done independently

4    by the AMA official at that location?

5        A.    He works in coordination with a -- another

6    official that can see the landing area of the obstacle

7    we're talking about.

8        Q.    And is that other official an AMA official?

9        A.    Yes.

10        Q.    Okay.  I'm going to show you a document

11    previously marked as Exhibit 177, Bates labeled AMA2011.

12    Can you see Exhibit 177 on your screen, sir?

13        A.    Yes.

14        Q.    And do you know what this is?

15        A.    Yeah, it's a -- it's a track map for Tampa.

16        Q.    Okay.  And do you know who would have created

17    this map or added the handwriting to it?

18        A.    The -- yes, I would.

19        Q.    And who's that?

20        A.    The gentleman that's indicated as TK in the

21    middle of the start straight.

22        Q.    TK, Tim Kennedy?

23        A.    Yes.

24        Q.    And he was the chief flagging Steward at the

25    Tampa Supercross?

 1      A.   Yes.

 2      Q.   Okay.  Can you tell me based on this map the

 3  approximate location of where Brian crashed?

 4      A.   Section 5.

 5      Q.   Okay.  Where in Section 5?

 6      A.   I believe that he crashed on the obstacle after

 7  the numeral 5, for the -- closer to 6.

 8      Q.   About where my cursor is?

 9      A.   Yes, just before that cursor.

10      Q.   Okay.  Are there any triple jumps in Section 5?

11      A.   No.

12      Q.   Were there any triple jumps at the Tampa

13  Supercross as far as you're aware?

14      A.   Yes.

15      Q.   Can you see them on this map?

16      A.   Yes.

17      Q.   Okay.  And where are the triple jumps?

18      A.   Section 7, and after -- after Section 3.

19      Q.   Is there any, sort of, marking on the map that

20  indicates what a -- where a triple jump is?

21      A.   Well, for one, the little black dots on the face

22  of the biggest jump in those two sections are the

23  indication of where the red lights are at.

24      Q.   Okay, that helps.  And these black dots here

25  would indicate where the red lights would be located?

```
 1        A.   Well, not specifically on the peak of the jump.

 2    It's where -- wherever they can safely put them so they

 3    don't get hit by riders.

 4        Q.   Okay.

 5        A.   Relatively close to those dots.

 6        Q.   Okay.  So there was one triple jump here in

 7    Section 7, and then the other one would've been down here

 8    in Section 3?

 9        A.   Yes.

10        Q.   Okay.  What would you -- how would you

11    characterize this section of the track?  Is it a rhythm

12    section or --

13        A.   Yes.

14             MS. SPRADLIN:  And for the record, you're

15    indicating Section 5.

16             MR. SCHWEIKERT:  Yes.

17    BY MR. SCHWEIKERT:

18        Q.   How do riders typically go through a rhythm

19    section based on your experience?

20        A.   The idea is to jump two obstacles from the

21    takeoff of one into the landing of the second.  And they

22    can do it in any order that is the quickest for them to get

23    through the section.

24        Q.   Okay.  So for example -- can you see my cursor?

25        A.   Yes.
```

1    Q.   All right.  The rider would come around this

2  corner and take off this first jump, and then try to land

3  here after the second?

4    A.   Not -- not necessarily, no.

5    Q.   Okay.  What do you mean then?

6    A.   They may -- it's called sucking up an obstacle.

7  It's -- they may not necessarily jump the first obstacle to

8  the second.  They may roll the first obstacle, because it's

9  out of a corner, and then do the two jumps after that

10  obstacle.

11    Q.   Okay.  I'm going to stop sharing that with you.

12        I'm going to show you another document previously

13  marked as Exhibit 191.  It's Bates labeled AMA 20072010.

14  And it's four pages.  I'm happy to scroll through it just

15  so you know what we're looking at.

16        Do you see the first page on your screen?

17    A.   Yes.

18    Q.   And the heading is Tampa Riders meeting?

19    A.   Yes.

20    Q.   Okay.  And then do you see the second page?

21    A.   Yes.

22    Q.   Third page?

23    A.   Yes.

24    Q.   And the last page?

25    A.   Yes.

1    Q.    Do you know what Exhibit 191 is?

2    A.    Yes.

3    Q.    And what is it?

4    A.    That's the notes for my -- for the Riders meeting

5    that I presented to the -- to the field.

6    Q.    And what do you mean by that?

7    A.    At 11:00 in the morning -- I believe it's 11:00,

8    I'd have to look at the schedule, after the track walk, the

9    Riders there, personnel that are with them, and anybody

10   that's on the floor of the stadium, gathers near the stage,

11   and there's a Riders meeting provided for information that

12   is pertinent to that event.

13   Q.    And your notes for the Tampa Riders meeting; was

14   that sort of like a script for you in speaking to the

15   Riders, or was that something that was posted somewhere for

16   people to read?

17   A.    Strictly a script.

18   Q.    Okay.  And do you see a reference to "safety

19   changes," with a number of exclamation points after it?

20   A.    Yes.

21        MS. SPRADLIN:  Mark, would you mind zooming in

22   just a little bit?  It's kind of hard to see on the Zoom.

23        Thank you.

24   BY MR. SCHWEIKERT:

25   Q.    And why would that be part of your notes?  What

1  would you have addressed to the Riders about safety

2  changing?

3          MS. SPRADLIN:  Object to the form.

4          THE WITNESS:  So we have three classes: the 450,

5  which is a -- a national class, and we have an East and

6  West 250 class.  And this round was the first race of the

7  250 East series.  So in my Riders meeting notes,

8  occasionally I'll mark, for my own necessity, something

9  that I need to stress.

10  BY MR. SCHWEIKERT:

11      Q.   And did you need to stress safety changes for the

12  Tampa Supercross?

13      A.   It's not necessarily the term "safety changes"

14  that I wanted to stress.  It was a mark on my Riders

15  meeting notes to make sure that I said the whole entire

16  sentence, not just the safety changes portion.  I wanted to

17  go over the sentence after that.  So Riders knew who I was,

18  and knew what they -- who they need to go to to talk to.

19      Q.   Can you give me an example of what you might have

20  said on that particular item?

21      A.   I would've said that.

22      Q.   Safety changes, see me with your suggestions, I'm

23  your go-to person for all your concerns regarding the

24  obstacles?

25      A.   Yes.

1      Q.    Okay.  So by safety changes, what does -- what

2  does that mean?

3      A.    Riders have -- have walked the racetrack along

4  with their teams, and if they see something on the

5  racetrack that is something that we need to address, or the

6  track maintenance personnel needs to address; then they

7  come to me, and then I go out with the rider and look up

8  exactly what he's talking about.  And then I go to the

9  track maintenance people, or the track builder to address

10  the issue.

11      Q.    Okay.  And towards the top, you write, "Please

12  remember that Supercross and all motorsports are inherently

13  dangerous activities."

14          Do you see that?

15      A.    Yes.

16      Q.    And is that something you address during the

17  Riders meeting at the Tampa Supercross?

18      A.    Yes.

19      Q.    And why is that?

20      A.    Because the statement is true.

21      Q.    And in your role as race director, are you

22  partially trying to mitigate those dangers as best as you

23  can by controlling the track through flags, and

24  communicating with officials?

25          MR. GORDON:  Objection to form.

1              MS. SPRADLIN:  Object to the form.

2              THE WITNESS:  Yes.

3   BY MR. SCHWEIKERT:

4       Q.   Your role as race director is not to make

5   Supercross even more dangerous, is it?

6              MR. GORDON:  Objection --

7              MS. SPRADLIN:  Object to the form.

8              THE WITNESS:  Of course not.

9   BY MR. SCHWEIKERT:

10      Q.   How would you describe your role as a race

11  director for an inherently dangerous activity like the

12  Supercross?

13             MS. SPRADLIN:  Object to the form.

14             THE WITNESS:  We attempt -- we -- all of us on

15  the floor attempt to provide the safest stage, so to speak,

16  for the riders to do what it is that they need to do.

17  BY MR. SCHWEIKERT:

18      Q.   And what do you, as the race director, have

19  available to you to try to create that stage for the

20  riders?

21      A.   Besides the flags and the personnel that are

22  trained to do what they need to do to create a safe

23  situation; we can also alter the racetrack if necessary, or

24  we can pad areas with padding that's -- that will solve a

25  problem with a rider hitting something on the floor of the

1    stadium.

2        Q.    I apologize if I asked you this before, but in

3    all of your years working the Supercross, did you ever

4    serve as a flagger?

5        A.    Yes.

6        Q.    Okay.  Did you ever serve as the chief flagging

7    steward?

8        A.    Yes.

9        Q.    All right.  I'm going to show you a document

10    previously marked as Exhibit 73, Bates labeled AMA

11    20052006.  Can you see the first page of that exhibit on

12    your screen, sir?

13        A.    I can't read it.  You'll have to zoom in.

14        Q.    Is that better?

15        A.    Okay.  Yes.

16        Q.    Okay.  You see at the top it says AMA Flagging?

17        A.    Yes.

18        Q.    And below that it reads, "The key to flagging is

19    situational awareness"?

20        A.    Yes.

21        Q.    Do you agree with that statement, that the key to

22    flagging is situational awareness?

23        A.    Yes.

24        Q.    What does that mean?

25        A.    From the perspective of an individual flagger,

1  that they maintain a complete understanding of what's going

2  on around them.

3      Q.   And what is the purpose of maintaining a complete

4  understanding of what is going on around them?

5      A.   Well, for one, it's for the safety of the

6  flagman.

7      Q.   Is there anything beyond the one?

8      A.   The flagger has an area.  And the area will have

9  parts of that area that are hotspots that he needs to keep

10 an eye on.  But we relegate the areas for each flagger to a

11 very small part of the racetrack.  So the individual

12 flagger doesn't have to concern himself with anything other

13 than his area.

14     Q.   And what do you mean by hotspots?

15     A.   Well, typically riders will either slide out in a

16 corner, or they'll make a mistake on a jump.  Well,

17 typically the takeoff of the jump isn't as nearly a concern

18 as the landings, where they're going to land at.

19     Q.   Is the landing area of a jump, if I understand --

20 oh, strike that.

21          Are you saying that the landing area of a jump is

22 more dangerous than the takeoff area?

23          MS. SPRADLIN:  Object to the form.

24          THE WITNESS:  I don't necessarily think that one

25 or the other is more dangerous.  I'm saying that -- like,

```
 1   I'll give you an example on the triples: We put the red

 2   lights on either side of a triple without concern for

 3   riders hitting the lights, because typically riders don't

 4   make a mistake on the takeoff; they make a mistake on

 5   judging the landing.

 6   BY MR. SCHWEIKERT:

 7       Q.   And if they make a mistake on judging the

 8   landing, it's possible they could crash their motorcycle

 9   and hurt themselves, right?

10            MR. GORDON:  Objection.  Form.

11            MS. SPRADLIN:  Object to the form.

12            THE WITNESS:  Correct.

13   BY MR. SCHWEIKERT:

14       Q.   And that's unfortunately what happened with

15   Brian; he made a mistake and did not land his motorcycle

16   correctly, and crashed, and hurt himself, right?

17            MR. GORDON:  Objection.  Form.

18            THE WITNESS:  Yes.

19   BY MR. SCHWEIKERT:

20       Q.   Okay.  Just a couple other questions on a

21   document.

22            Have you seen this document before?

23       A.   Yes.

24       Q.   Did you see it as part of working with the

25   Supercross?
```

1      A.    No.

2      Q.    Okay.  When did you see it before?

3      A.    I -- I think it was presented in the last -- last

4   month -- month or two.

5      Q.    Okay.  Do you know what this is -- aside from

6   anything you may have been told by your lawyer; do you

7   independently know what this document is?

8      A.    Yes.

9      Q.    And what is it?

10     A.    It's a -- it's a help for Tim Kennedy to describe

11  to his flaggers what he expects of them.  In other words,

12  to give them a written documentation of how things work on

13  the floor.

14     Q.    Do you know if the Feld flaggers receive any sort

15  of written documentation about how things worked on the

16  floor?

17          MS. SPRADLIN:  Object to the form.

18          THE WITNESS:  No, I don't know whether they get

19  written documentation or not.

20  BY MR. SCHWEIKERT:

21     Q.    Do you know if the Feld flaggers would get a copy

22  of this document?

23          MS. SPRADLIN:  Object to the form.

24          THE WITNESS:  Probably not.

25  BY MR. SCHWEIKERT:

1      Q.   Okay.  In the second -- strike that.

2           Were you involved in creating this document or a

3  prior iteration of it?

4      A.   No.

5      Q.   Okay.  In the second point, it says make sure you

6  have a pen and notebook on you, so you can write things

7  down as the race director may call you and ask what you

8  saw.

9           Do you see that?

10     A.   Yes.

11     Q.   Okay.  What is meant by the race director may

12  call a flagger and ask the flagger what they saw?

13     A.   Okay, once again, this is not yellow flaggers.

14  These are AMA officials.  And I have direct radio

15  communication to AMA officials.  I would call them to say,

16  ask if a rider cut the course in front of them, or what

17  they saw with a collision.  And I may not do it instantly

18  after it happens, because I want -- I want those officials

19  to do their job properly.  So when they get a chance, they

20  can jot down numbers of riders that were involved in

21  incidents in front of them.  And then I can ask them later

22  what happened.

23     Q.   What was the distinction you drew between

24  flaggers and officials?

25     A.   The officials are actually hired by AMA, and they

1    serve a purpose that's different than the purpose that the

2    yellow flaggers that Feld hires do.

3        Q.   Okay.  But the AMA officials also have flags, and

4    are stationed around the track, right?

5        A.   Correct.

6            MS. SPRADLIN:  Object to the form.

7    BY MR. SCHWEIKERT:

8        Q.   Okay.  I want to go down to Number 9.

9            Can you see that on your screen?

10       A.   Yes.

11       Q.   It reads: "If a rider crashes, don't forget to

12   call out the code for doc.

13           Do you see that?

14       A.   Yes.

15       Q.   And is that something the AMA officials are

16   supposed to do when they see a crash?

17           MS. SPRADLIN:  Object to the form.

18           THE WITNESS:  If -- if medical isn't present,

19   that's to call medical.

20   BY MR. SCHWEIKERT:

21       Q.   Well, is that a true statement, based on your

22   experience, that if a rider crashes, don't forget to call

23   out the code for doc?

24       A.   And if -- if Doc is needing that call, yes.  If

25   there's a doc present, there'd be -- it'd be redundant.

1      Q.   And going back to the document, it reads further:

2    "Code 0, it's okay; Code 1, getting up slowly; Code 2,

3    rider staying down, but moving; Code 3, something is bad

4    and get the doc there now."

5          Do you see that?

6      A.   Yes.

7      Q.   Is that your understanding of the codes that were

8    used during the Tampa Supercross when there was a crash?

9      A.   It's a simplified -- it's -- it's a simplified

10   way of saying what those codes officially mean, yes.

11     Q.   Is there a more complex understanding of those

12   codes?

13         MS. SPRADLIN:  Object to the form.

14         THE WITNESS:  The -- the explanation provided

15   serves the purpose that the codes -- serves the purpose of

16   explaining the codes.

17   BY MR. SCHWEIKERT:

18     Q.   And would an example of -- would an example of an

19   appropriate use of code 0 be if a rider toppled over and

20   then just quickly gets back up and on their bike and goes?

21     A.   That's correct.

22     Q.   And then code 1 refers to a rider getting up

23   slowly after crashing; is that right?

24     A.   Yes, that's what it says.

25     Q.   Okay.  And then a Code 2 is used when the rider

1   is staying down, but moving; is that correct?

2       A.   Yes.

3       Q.   And by "staying down," does that mean staying

4   down on the ground?

5       A.   Yes.

6       Q.   And what is meant by, "but moving"?

7       A.   My understanding of it is that he's not

8   unconscious.

9       Q.   Okay.  And the last one is Code 3, something is

10  bad and get the doctor there now; is that correct?

11      A.   Yes.

12      Q.   What is meant by something is bad?

13          MS. SPRADLIN:  Object to the form.

14          THE WITNESS:  In -- in an official's term, that

15  the rider isn't moving, or something is bad enough to

16  require a doctor as opposed to the other medical staff.

17  BY MR. SCHWEIKERT:

18      Q.   And you believe an unconscious rider would be a

19  Code 2, correct?

20          MS. SPRADLIN:  Object to the form,

21  mischaracterizes testimony.

22          THE WITNESS:  No, I wouldn't.

23  BY MR. SCHWEIKERT:

24      Q.   Okay.

25      A.   An unconscious rider would be Code 3.

1      Q.   Okay.

2      A.   Because an unconscious rider wouldn't be moving.

3      Q.   Understood.  And with respect to the Code 2, what

4   type of movement would an official be looking for?

5          MS. SPRADLIN:  Object to the form.

6          THE WITNESS:  I think it kind of says it in the -

7   - in the code.  It's the rider's down, but moving.

8   BY MR. SCHWEIKERT:

9      Q.   Does that mean moving in an attempt to get up off

10  the ground?

11         MS. SPRADLIN:  Object to the form.

12         THE WITNESS:  That could be one of many things

13  that an official would see as the rider's moving.  He could

14  just roll over, he could -- there's a lot.  Moving.

15  BY MR. SCHWEIKERT:

16     Q.   Okay.  In your mind, would any of these codes

17  indicate an immediate need for a red flag?

18         MS. SPRADLIN:  Object to form.

19         THE WITNESS:  Code 3 -- Code 3.

20  BY MR. SCHWEIKERT:

21     Q.   And what about a Code 2?

22     A.   I'd need more information.

23     Q.   And what would you do to get more information if

24  you heard a Code 2 come in over the radio?

25         MS. SPRADLIN:  Object to the form.

```
 1            THE WITNESS:  I probably wouldn't have to do

 2   anything.  I think that the medical staff would then

 3   provide information on what they want to have happen.

 4   BY MR. SCHWEIKERT:

 5       Q.   And if you weren't getting any information, would

 6   you do anything to try to acquire more information?

 7            MS. SPRADLIN:  Object to the form.

 8            THE WITNESS:  I'd give -- I'd give the medical

 9   staff enough time to triage the situation.

10   BY MR. SCHWEIKERT:

11       Q.   What does that mean?

12       A.   That they can take the -- take the effort to look

13   at the rider and determine how they want race direction to

14   proceed.

15       Q.   So you would wait for -- if a Code 2 was called

16   and a medical team member responded to it, you would wait

17   for more information from that medical personnel before

18   making a decision about whether anything needed to be done

19   by yourself as the race director?

20            MS. SPRADLIN:  Object to the form.

21            THE WITNESS:  I'd provide -- I'd provide them

22   with a radio airway -- airway to allow them to explain or

23   to request whatever it is that they need.

24   BY MR. SCHWEIKERT:

25       Q.   And if the radio is silent, would you assume that
```

```
 1   everything is okay, or would you do anything to assure

 2   yourself that they didn't need anything from you?

 3            MS. SPRADLIN:  Object to form.

 4            THE WITNESS:  In the short -- in the short term,

 5   I would allow them due diligence to allow them to ascertain

 6   what it is that they need.

 7   BY MR. SCHWEIKERT:

 8       Q.   And in the long term?

 9       A.   At some point, I would eventually stop the

10   practice myself if I haven't heard from them.  But there's

11   three different radios, four different radios that were

12   able to talk to me there.  And -- and there's two people

13   standing in our tower, both that had radios on that would

14   accept that information.

15       Q.   When you say, at some point you would stop the

16   race --

17       A.   The practice.

18       Q.   When you say at some point, you would stop the

19   track on your own, what is that point for you?

20            MS. SPRADLIN:  Object to the form.

21            THE WITNESS:  I definitely need to see at least a

22   lap to allow them to do what their job is.  That's under --

23   that's assuming that the area is controlled.

24   BY MR. SCHWEIKERT:

25       Q.   And what do you mean by an area being controlled?
```

1      A.   That all the personnel that are on the floor that

2 are in charge of controlling an area are doing their jobs

3 properly.  That -- so that's what was happening here.

4      Q.   And the reason we didn't see any white flag with

5 the red cross is because those are at the triple jumps, and

6 there was not a triple jump where Brian crashed; is that

7 correct?

8           MR. GORDON:  Objection to form.

9           MS. SPRADLIN:  Form.

10           THE WITNESS:  There -- there are other white

11 flags with red crosses out, but -- I mean, on the floor.

12 But they were not being displayed in that area.

13 BY MR. SCHWEIKERT:

14      Q.   Do you know why not?

15           MS. SPRADLIN:  Object to the form.

16           THE WITNESS:  The area was controlled with

17 personnel.

18 BY MR. SCHWEIKERT:

19      Q.   Let's go back to this flagging document, Exhibit

20 73.

21           Do you see Section 12?  It says, "When a rider

22 goes down and is in danger or tuff block gets knocked into

23 race line, I will start waving the cross flag or yellow,

24 depending on the situation, and start moving up to an

25 obstacle that you have pre-planned out where you know I

1    can't slow the riders down and stop them from

2    jumping/hitting the obstacle."

3          Do you see that?

4    A.    Yes.

5    Q.    Okay.  Is it your understanding that the official

6    who sees a rider goes down has the ability to independently

7    determine whether they want to wave a yellow flag or a

8    white flag with a red cross or do something else entirely?

9          MS. SPRADLIN:  Object to the form.

10         THE WITNESS:  I -- I don't understand your

11   question.

12   BY MR. SCHWEIKERT:

13   Q.    If somebody -- when a rider goes down, like, is

14   somebody asking an official to wave a particular flag or is

15   that official using their own judgment?

16   A.    The official's using their --

17         MS. SPRADLIN:  Form.

18         THE WITNESS:  -- their own judgment.

19   BY MR. SCHWEIKERT:

20   Q.    And what does it mean when a rider goes down and

21   is in danger?

22         MS. SPRADLIN:  Object to the form.

23         THE WITNESS:  For instance, the landing of a

24   triple is a perfect place where a rider could go down and

25   be in danger, because the riders that are after him that

```
 1   are coming up the track couldn't see him.

 2   BY MR. SCHWEIKERT:

 3       Q.   What about a rider who is laying on the ground in

 4   the middle of a rhythm section of the track?  Would that be

 5   a dangerous place to be?

 6           MS. SPRADLIN:  Object to form.

 7           THE WITNESS:  If it's not controlled.

 8   BY MR. SCHWEIKERT:

 9       Q.   If it is not controlled, it would be dangerous,

10   correct?

11       A.   Yes.

12           MS. SPRADLIN:  Object to form.

13   BY MR. SCHWEIKERT:

14       Q.   And one reason it would be dangerous is there

15   would be a risk that somebody could hit that rider that is

16   laying on the ground with their motorcycle, right?

17           MS. SPRADLIN:  Object to form.

18           THE WITNESS:  Yes.  Or -- or the other personnel

19   that are on the track.

20   BY MR. SCHWEIKERT:

21       Q.   That's why you try to control those situations

22   and direct traffic away from a rider on the ground, is so

23   they don't get hit, correct?

24           MR. GORDON:  Objection to form.

25           THE WITNESS:  All of which was -- which was
```

1    happening in that area.

2    BY MR. SCHWEIKERT:

3        Q.   I want to go to Section 14 of Exhibit 73.  Do you

4    see where it says, "If in doubt, protect doc and the

5    rider?"

6        A.   Correct.

7        Q.   Do you agree with that statement?

8        A.   Yes.

9        Q.   Is it fair to say that if there's any doubt about

10   how to control a particular incident on the track, then the

11   priority must be protecting the doctor or medical personnel

12   and the rider?

13           MS. SPRADLIN:  Object to form.

14           THE WITNESS:  That's -- that's correct.

15   BY MR. SCHWEIKERT:

16       Q.   When -- can you give me an example of when there

17   would be doubt?

18           MS. SPRADLIN:  Object to the form.

19           THE WITNESS:  No.

20   BY MR. SCHWEIKERT:

21       Q.   So okay.  The next section, 15, it reads in part,

22   "Even though Feld and you are doing our job trying to slow

23   and move them away from the danger."

24           Do you see that?

25       A.   Yes.

1    Q.   So when a rider goes down on the track, Feld and

2  the AMA officials are working together to try to slow

3  oncoming riders and move them away from the downed rider;

4  is that correct?

5    A.   Yes.

6    Q.   And they're trying to slow the oncoming riders

7  down and direct them away from the downed rider to protect

8  them from getting hit, right?

9    A.   Yes.

10       MS. SPRADLIN:  Object to form.

11  BY MR. SCHWEIKERT:

12    Q.   Are you familiar with any written protocols about

13  how to respond to an injured rider on a racetrack?

14       MS. SPRADLIN:  Object to the form.

15       THE WITNESS:  You're asking with regard to

16  medical staff?

17  BY MR. SCHWEIKERT:

18    Q.   During the 2020 Supercross season, were you --

19  strike that.

20       During the 2020 Supercross season, were there any

21  written protocols that you're aware of about the process or

22  procedures for responding to an injured rider on a

23  racetrack?

24    A.   No.

25       MS. SPRADLIN:  Object to the form.

```
 1  BY MR. SCHWEIKERT:

 2       Q.   No, you're not aware?

 3       A.   No.

 4       Q.   I'm going to show you a document previously

 5  marked as Exhibit 11.  It is Bates labeled Bodner 210

 6  through 216 and entitled Medical Emergency Action Plan.

 7            Do you see the first page of this Medical

 8  Emergency Action Plan on your screen?

 9       A.   Yes.

10       Q.   Have you ever seen this Medical Emergency Action

11  Plan before?

12       A.   Just recently.

13       Q.   With your lawyer?

14       A.   Yes.

15       Q.   Okay.  Had you seen it at any point before that?

16       A.   Not that I recall.

17       Q.   Okay.  When you reviewed this, did you see

18  references to AMA officials and the race director?

19       A.   Can you expand it, please?

20       Q.   Yeah.  Make it bigger?

21       A.   Yes.

22       Q.   More?

23       A.   I can read that.  So that's better.  Does it

24  mention the race director further down the page?

25       Q.   Yes, it does.  Well, when you reviewed it, did
```

1  you -- with your counsel, did you read it in its entirety?

2          MS. SPRADLIN:  Object to the form.

3          THE WITNESS:  I -- I believe so, but I would like

4  to read it now so --

5          MS. SPRADLIN:  And, John, I'm just going to --

6  John, I'm just going to stop you right there.

7          I'm going to object to any questioning that

8  starts to try to get into the specifics of what

9  specifically we looked at and discussed and reviewed while

10  prepping my witness.  I'm going to object to that in terms

11  of attorney-client privilege.  To the extent that he looked

12  at the document?  Yes.  But trying to dig into specifically

13  what we focused on, I believe, is improper.

14          MR. SCHWEIKERT:  I just wanted to know -- look,

15  if you want, we can take a break, and I will send it to Mr.

16  Gallagher, and he can review it.  That's all I wanted to

17  know.

18  BY MR. SCHWEIKERT:

19     Q.   Do you want a chance to review this, sir, before

20  I ask you questions about it?

21     A.   Yes.

22          MR. SCHWEIKERT:  All right.  Let's go off the

23  record.

24          (A recess was taken.)

25          THE REPORTER:  All right.  We're back on the

1    record.  The time is 4:05 p.m.

2            Go ahead, Mr. Gordon.

3            MR. GORDON:  Thanks.  Now, I did go back and

4    check the timing of the first deposition, just so you know,

5    and we were pretty accurate in that we did go about five

6    hours and 15 minutes on the record.  So we did make an

7    agreement before we got started today that there would be

8    one hour and 45 minutes left of testimony for Mr.

9    Gallagher.

10            Mr.  Schweikert has agreed to reserve some time

11    for Defense Counsel to ask some questions.  And the first

12    session went 3:09 to 3:58 p.m., or about 49 minutes.  So

13    based on my calculations, there are about 56 minutes left,

14    so.

15            MR. SCHWEIKERT:  I did not necessarily agree to

16    reserve time, but I did agree to conclude my examination

17    within seven hours, which I think I can.  And certainly, to

18    the extent you need a little bit more time, I trust Ms.

19    Spradlin, who is working with you pursuant to a joint

20    defense agreement, would give you some time to do your

21    examination.  But I am going to keep moving.  I personally

22    have no intention of going beyond seven hours.

23    BY MR. SCHWEIKERT:

24        Q.  Are you ready yet, sir?

25        A.  Yes.

1      Q.   Okay.  Did you review the Medical Emergency

2   Action Plan I marked as Exhibit 11?

3      A.   Yes.

4      Q.   Did you see in there some language about the plan

5   being intended to accelerate the resumption of normal

6   operations at the event?

7      A.   I didn't notice that sentence, no.

8      Q.   Okay.  Let me find it for you.

9           Am I sharing?  All right.  I'm going to share

10   with you Exhibit 11.

11           Do you see the Medical Emergency Action Plan on

12   your screen?

13      A.   Yes.

14      Q.   Okay.  And you see where it says, "Our action

15   plan is multidimensional and intended to reduce confusion

16   regarding authority and responsibility, prevent fatalities,

17   reduce injuries, protect the racing community, and

18   accelerate the resumption of normal operations at the

19   event"?

20      A.   Yes.

21      Q.   Do you have any understanding, given all your

22   experience with the Supercross, as to why the Medical

23   Emergency Action Plan would, at least in part, be intended

24   to accelerate the resumption of normal operations at the

25   event?

```
1                MS. SPRADLIN:  Form.

2                THE WITNESS:  I -- I didn't write this, and I

3   don't know what that -- what was meant by that.

4   BY MR. SCHWEIKERT:

5        Q.   Did you, as a race director, ever feel the need

6   to accelerate the resumption of normal operations at the

7   event when there was an incident on the track?

8                MS. SPRADLIN:  Object to form.

9                THE WITNESS:  Certainly not during practice,

10  ever.

11  BY MR. SCHWEIKERT:

12       Q.   But during races or qualifying?

13               MS. SPRADLIN:  Object to form.

14               THE WITNESS:  I've never had a -- anybody

15  involved in Supercross debtor a decision I've made or

16  questioned it afterwards with regard to time.

17  BY MR. SCHWEIKERT:

18       Q.   Is it -- would -- well, would you agree that,

19  when a rider goes down, you would like that incident to --

20  strike that.

21               If there is a crash on the racetrack and nobody

22  is hurt, would you prefer for the track to be cleared as

23  quickly as possible?

24               MS. SPRADLIN:  Object to the form.

25               THE WITNESS:  With regard to the person who is on
```

```
 1   the racetrack's safety, absolutely.

 2   BY MR. SCHWEIKERT:

 3        Q.   You wouldn't want to have motorcycles just laying

 4   in the middle of an active track, right?

 5             MS. SPRADLIN:  Object to form.

 6             THE WITNESS:  There -- there is procedures to

 7   make sure that doesn't happen.

 8   BY MR. SCHWEIKERT:

 9        Q.   Okay.  I'm going to go back to this plan.

10             Do you see, in the Medical Emergency Action Plan,

11   it refers to the medical team's expertise in on-track

12   situations and preparation?

13        A.   Okay.

14        Q.   Do you believe that the medical team working the

15   Tampa Supercross were experts in on-track situations and

16   preparation?

17             MS. SPRADLIN:  Object to the form.

18             THE WITNESS:  I -- I can only rely on the CMO's

19   determination of the -- of their employees and staff.

20   BY MR. SCHWEIKERT:

21        Q.   So you, as the race director for that event --

22   you don't have an opinion, one way or the other, whether

23   the medical team providing care to riders injured on the

24   track were experts in on-track situations and preparation?

25             MS. SPRADLIN:  Form.
```

```
 1              THE WITNESS:  I have to trust the CMO.

 2   BY MR. SCHWEIKERT:

 3        Q.   And by CMO, you're referring to the Chief Medical

 4   Officer, Dr. John Bodnar?

 5        A.   Yes.

 6        Q.   Okay.  Do you see the heading for Trackside

 7   Inter-Dependence?

 8        A.   Yes.

 9        Q.   And it reads, "A red flag can be called by the

10   AMA race director, the AMMU chief medical officer or other

11   track marshals, and AMA officials in communication with the

12   race director."

13              Do you see that?

14        A.   Yes.

15        Q.   Is that a true statement with respect to the

16   Tampa Supercross?

17        A.   Yes.

18        Q.   Okay.  The AMA's race director has the final

19   decision for the red flag, true?

20        A.   Yes.

21        Q.   Then it reads, "Consideration is given for

22   injured riders who are unable to be removed from the track,

23   either by themselves or by track staff, due to severity of

24   injury, location on the track, as well as danger to other

25   riders on the track."
```

```
1              Do you see that?

2        A.   Yes.

3        Q.   Are those things that you considered in

4   connection with making a decision about whether to throw a

5   red flag during a Supercross event?

6              MS. SPRADLIN:  Object to form.

7              THE WITNESS:  They're all -- they're all points

8   to -- to consider, yes.

9   BY MR. SCHWEIKERT:

10       Q.   Are there any other points that you would

11  typically consider in making that final decision about

12  whether to throw a red flag?

13             MS. SPRADLIN:  Form.

14             THE WITNESS:  No.

15  BY MR. SCHWEIKERT:

16       Q.   Okay.  It also reads, "If it is felt that there

17  is danger to track officials, medical staff, track workers,

18  team staff, or spectators, a red flag will be called."

19             Do you see that?

20       A.   Yes.

21       Q.   And do you agree with that?

22       A.   Yes.

23       Q.   That if there is danger to track officials,

24  medical staff, or track workers, a red flag should be

25  called, right?
```

```
1              MS. SPRADLIN:  Object to the form.

2              THE WITNESS:  Yes.

3    BY MR. SCHWEIKERT:

4        Q.   And during a Supercross event, are you

5    independently assessing whether there is danger to track

6    officials or medical staff when they are responding to an

7    incident?

8              MS. SPRADLIN:  Form.

9              THE WITNESS:  That's -- that's one aspect of --

10   of the way things work, my -- my personal assertation.  But

11   there is also other people who are on the floor that also

12   can -- that can see it, the issue, and make a determination

13   for a consultation with me.

14   BY MR. SCHWEIKERT:

15       Q.   The next section, Medical Crew and Rider Security

16   -- do you see that?

17       A.   Yes.

18       Q.   Okay.  And it says, "Designated Feld crew members

19   are assigned to the track to manage track equipment,

20   including Tuff Blocks, track markers, and signage.  They're

21   also assigned to provide a safe area for the medical team

22   to work on an injured rider."

23            Do you see that?

24       A.   Yes.

25       Q.   Is that true with respect to the Tampa
```

1    Supercross?

2         A.    Yes.

3         Q.    Part of the Feld crew members' responsibilities

4    were to provide a safe area for the medical staff to work

5    on injured rider like Brian?

6         A.    As they did in the videos, yes.

7         Q.    Okay.

8         A.    It's part of controlling the area.

9         Q.    But you did not have a direct means of radio

10   contact with those designated Feld crew members, did you?

11             MS. SPRADLIN:  Form.

12             THE WITNESS:  Yeah.  Yes.  I could change

13   channels and talk to them as well.

14   BY MR. SCHWEIKERT:

15        Q.    You could talk to the actual crew members or to

16   the track safety supervisor?

17        A.    Well, the channel I would go to for the Track

18   Safety Supervisor is the channel that they're on.

19        Q.    Okay.  And then do you see a reference to FIM

20   communication codes?

21        A.    Yes.

22        Q.    That, your understanding, those are the codes

23   that we were talking about earlier: Code 0, Code 1, Code 2,

24   Code 3?

25        A.    Yes.

1      Q.    Could you give me an example of what you might

2  hear on the radio when somebody calls a code for a

3  particular section of the track?

4      A.    They'd get three bits of information.

5      Q.    And what are those three bits of information?

6      A.    The area on the racetrack, which is those numbers

7  you saw on the race -- racetrack map, the -- the number of

8  the rider, and the code.

9      Q.    So for example, Code 2, Section 5, Rider 104?

10      A.    Correct.

11      Q.    And when that sort of call comes in, what

12  typically happens next?

13          MS. SPRADLIN:  Object to the form.

14          THE WITNESS:  Medical will respond.

15  BY MR. SCHWEIKERT:

16      Q.    Are you talking about respond over the radio?  Or

17  physically respond to that location or section of the

18  track?

19      A.    Medical will go to that section of the track.

20      Q.    Do they typically indicate on the radio medical

21  is on its way, anything like that?

22      A.    That could happen, yes.  Not every time.  But,

23  yes, usually that happens.

24      Q.    Is there anything done to confirm that a call for

25  a medical team response has actually been received and is

1    being acted on by the medical team?

2        A.   Besides the observer that stated it, there are

3    the other medical staff and -- and our AMA staff can see

4    that medical's on the way.

5        Q.   And you see the -- we were just talking about how

6    the Chief Medical Officer can request a red flag, right?

7        A.   Yes.

8        Q.   Is it your understanding that a red flag will

9    create an opportunity for the medical team to have more

10   time to respond to an injured rider?

11           MS. NDUKA:  Form.

12           THE WITNESS:  I think that the amount of time is

13   not part of this equation.  I think that they have the time

14   on the -- on the field to look at the -- to look at the

15   patient.  And if they want the practice to be stopped, then

16   we can provide as much time as is necessary.

17   BY MR. SCHWEIKERT:

18       Q.   And why, in your experience, would the Chief

19   Medical Officer want a practice or a race to be stopped

20   with a red flag?

21           MS. SPRADLIN:  Form.

22           THE WITNESS:  That they're either going to be

23   there for a while, or they're bringing additional equipment

24   onto the field and possibly completely covering the

25   racetrack.

```
 1  BY MR. SCHWEIKERT:

 2      Q.   And -- it's -- so a red flag is used in some

 3  circumstances to give the medical team an opportunity to

 4  respond in a way that they believe is in the best interest

 5  of that particular injured rider?

 6            MR. GORDON:  Objection.

 7            MS. SPRADLIN:  Form.

 8            THE WITNESS:  I -- I -- I'm -- I'm

 9  misunderstanding your question.

10  BY MR. SCHWEIKERT:

11      Q.   I'm just -- I'm just trying to understand, and

12  I'd like you to explain to the members of the jury, what is

13  the purpose of a medical request for a red flag?

14            MS. NDUKA:  Form.

15            THE WITNESS:  They're -- they're either going to

16  take a lot of time with this patient, and they need to do

17  it right where you're sitting, or they're going to bring

18  out additional equipment that's going to cover the

19  racetrack.  Or they don't feel safe in the area that

20  they're in with the amount of control that's being

21  provided.

22  BY MR. SCHWEIKERT:

23      Q.   I want to show you a video.  It's previously

24  marked Exhibit 58, and I will share it with you.

25            Do you see a video on your screen, sir?
```

```
 1        A.    I see a still picture on the screen.

 2        Q.    Okay.  I will represent this is a Nest camera

 3   video of Brian's accident.  I think we talked about it a

 4   little bit before last time, and I'm not going to rehash

 5   everything, but I did want to cover some other questions

 6   with you.  If you can keep your eye in this area.  I

 7   believe Brian's going to come and try to do a triple jump

 8   and then he will crash.  I'm going to push play around the

 9   4:51 mark.

10        My video is not playing.  Let me close that and

11   try it again.  One second.

12        MR. GORDON:  Mark, are you at Caroline's mother's

13   house?

14        MS. SPRADLIN:  God, I hope not.

15        MR. SCHWEIKERT:  You had troubles with the

16   Internet from that place?

17        MS. SPRADLIN:  I put -- before we began, just let

18   everyone know that if I vanish, I did not leave willingly.

19   I had had some Internet troubles this morning.  So I guess,

20   for the record, if I vanish from the Zoom, I would greatly

21   appreciate you not continuing to depose my witness without

22   me.

23        MR. SCHWEIKERT:  We actually just heard it in

24   your voice.  Yeah.  There was some buffering there, but

25   understood.
```

```
 1              MS. SPRADLIN:  Oh, good.

 2   BY MR. SCHWEIKERT:

 3       Q.   Let me try again.  I'm going to share Exhibit 58

 4   with you.

 5              Do you see that on your screen, sir?

 6       A.   Yes.

 7       Q.   I'm going to try to zoom in a little bit.  And

 8   I'll begin around the 4:49 mark.

 9              (Video played for the record.)

10   BY MR. SCHWEIKERT:

11       Q.   Did you see Brian just crash?

12       A.   Yes.

13       Q.   Okay.  And he's currently in the middle of the

14   track, right?

15       A.   Yes.

16              MS. SPRADLIN:  Form.

17              THE WITNESS:  He -- he's slightly to the side of

18   the track.

19              MR. SCHWEIKERT:  Okay.

20              THE WITNESS:  He's to the outside.

21   BY MR. SCHWEIKERT:

22       Q.   All right.  I'm going to push play, and I want

23   you to see if you can help me count the number of

24   motorcycles that go by before Brian is removed from the

25   track.
```

```
 1              (Video played for the record.)

 2    BY MR. SCHWEIKERT:

 3        Q.   That's one and two, right?  You see that?

 4        A.   Yes.

 5        Q.   Okay. 3, 4, 5; you see that?

 6        A.   Yes.

 7        Q.   Six; do you see that?

 8        A.   Yes.

 9        Q.   Okay.  And then after the sixth motorcycle, did

10    you see the medical personnel move into the track?

11        A.   As well as the Tuff Block that got moved out in

12    front of him.

13        Q.   Right.  Okay.  That's the seventh and eighth

14    motorcycle, right?

15        A.   Yes.

16        Q.   And now, here comes the ninth; do you see that?

17        A.   Yes.

18        Q.   At this point with the yellow flag waving, should

19    the riders be proceeding with extreme caution?

20        A.   It looks like they are.

21        Q.   Would jumping and landing in close proximity to

22    where a rider is being attended to by the medical team be

23    considered proceeding with extreme caution?

24             MS. SPRADLIN:  Form.

25             THE WITNESS:  Yes.
```

```
 1   BY MR. SCHWEIKERT:

 2        Q.   It would?

 3        A.   Sure.

 4        Q.   Okay.

 5        A.   None of them are attempting what, certainly,

 6   Brian attempted.

 7        Q.   I'm going to push play at the 5:14 mark.

 8             MR. GORDON:  Mark, was Brian hit by another

 9   rider?  Because I was not aware of that.

10             MR. SCHWEIKERT:  Did you -- is someone trying to

11   testify?

12             MR. GORDON:  Sorry.

13   BY MR. SCHWEIKERT:

14        Q.   All right.  I'm going to go back.  I'm going to

15   begin playing at the 5:14 mark.  You're going to see a

16   rider come and jump and appear to land in the area where

17   Brian is being attended to.

18             (Video played for the record.)

19   BY MR. SCHWEIKERT:

20        Q.   Do you see that?

21        A.   Yes.

22        Q.   You see that rider?  He jumped and landed in

23   close proximity to where the medics are attending to rider,

24   correct?

25             MS. SPRADLIN:  Form.
```

53

```
 1          THE WITNESS:  It's some pretty vague statements
 2   you're making: close proximity and jumped in the area of.
 3   I mean, generally, that's safe.  It's the -- the rider's in
 4   complete control of his bike and doing exactly what the
 5   flags are asking him to do.
 6   BY MR. SCHWEIKERT:
 7       Q.   So it's safe, then, for a rider to launch himself
 8   off a jump and land on the ground within six feet of where
 9   an injured rider is being attended to by medics; is that
10   what you're saying?
11          MS. SPRADLIN:  Form.
12          THE WITNESS:  Yes.
13   BY MR. SCHWEIKERT:
14       Q.   So that is not a situation, then, where you would
15   feel that there was danger to the medical staff or the
16   injured rider; is that right?
17          MS. SPRADLIN:  Form.
18          THE WITNESS:  I do not feel there was danger.
19   BY MR. SCHWEIKERT:
20       Q.   What if that particular rider had gone off the
21   jump at a slightly different angle?  He could have landed
22   in a trajectory that would have resulted in him hitting the
23   medics and Brian, right?
24          MS. SPRADLIN:  Form.
25          THE WITNESS:  Well, we -- we could what if all
```

1    day long, but that rider isn't at race speed.

2    BY MR. SCHWEIKERT:

3        Q.  He did jump a couple of the rhythm bumps, right?

4           MS. SPRADLIN:  Form.

5           THE WITNESS:  Not at the full extent of what race

6    speed is, no.

7           MR. SCHWEIKERT:  So I'm going back --

8           THE WITNESS:  That guy rolled it.  That -- that

9    first guy rolled all the obstacles.

10   BY MR. SCHWEIKERT:

11       Q.  And we're paused at the 5:10 mark.  That rider

12   rolled the obstacles, meaning his wheels remained in

13   contact with the ground, correct?

14       A.  Generally, yes.

15       Q.  And that's --

16       A.  He's didn't jump ramp to ramp.

17       Q.  And that's a good example of a rider being

18   extremely cautious when he's seeing yellow flags being

19   waved, right?

20          MS. SPRADLIN:  Form.

21          THE WITNESS:  But it's not the -- it's not the

22   limit of what we certainly would be concerned about.

23   BY MR. SCHWEIKERT:

24       Q.  All right.  So where is that limit, then, for

25   you, sir, where you would be concerned about riders

1  continuing to go through an area of the track where there's

2  medics and an injured rider on the ground?

3          MS. SPRADLIN:  Form.

4          THE WITNESS:  Okay.  All the riders are going to

5  the right of the incident.  If a rider chose to go to the

6  left of the incident, that would be a big concern.

7  BY MR. SCHWEIKERT:

8      Q.   Anything else?

9      A.   It would have to be on a case by case basis on

10  what a -- a rider would do to create a dangerous situation.

11  But I -- I've stated this over and over and over.  This is

12  a controlled area, and the riders are doing what we're

13  asking them to do.

14      Q.   Do you know if the medical personnel that we're

15  on the track felt that they were safe while they were

16  attending to Brian?

17      A.   I do --

18          MS. SPRADLIN:  Form.

19          THE WITNESS:  -- not know.

20  BY MR. SCHWEIKERT:

21      Q.   I'm going to push play at 5:10.

22          (Video played for the record.)

23          THE WITNESS:  That rider rolled.

24  BY MR. SCHWEIKERT:

25      Q.   And here comes -- I'm pausing at 5:16.  You can

1    see him taking off at this jump right here, right?

2        A.   Yes.

3        Q.   And he's going to clear the next jump and land at

4    the base of that jump, which is also the area where Brian

5    is currently on the ground with two medics attending to

6    him, right?

7            MS. SPRADLIN:  Why don't you let him see it

8    before you ask him what's going to happen?

9            MR. SCHWEIKERT:  I'm sorry.  The lawyers can stop

10   testifying.  I'm trying to get this done.  I'm here to talk

11   to Mr. Gallagher.  If you want to instruct him not to

12   answer because it's privileged, you can.  If you want to

13   state a form objection, you can.

14           MS. SPRADLIN:  Mark, I'm not instructing him not

15   to answer.

16           MR. SCHWEIKERT:  Anything else --

17           MS. SPRADLIN:  You're asking him what's going --

18           MR. SCHWEIKERT:  Anything else is inappropriate.

19           MS. SPRADLIN:  -- to happen in the video before

20   you show it to him.

21           MR. SCHWEIKERT:  Anything else is inappropriate.

22   Do --

23           MS. SPRADLIN:  Mr. Gallagher, go ahead and

24   testify about what's about to happen in the video, if you

25   can.

```
 1              MR. SCHWEIKERT:  All right.  I am going to move

 2  to strike all of that commentary and speaking objection.

 3  BY MR. SCHWEIKERT:

 4      Q.   Do you remember my question, sir?

 5      A.   I don't remember the question.

 6      Q.   All right.  I will back it up to 5:15, and I will

 7  pause it at 5:16.

 8              You see this rider here; he's about to take off

 9  from this jump, correct?

10      A.   I -- I guess.  That's the way -- the -- the

11  direction he is headed.

12      Q.   Right.  And I want you to describe for me, where

13  you see him land?  And I will push play.

14              (Video played for the record.)

15  BY MR. SCHWEIKERT:

16      Q.   And I paused at 5 minutes, 18 seconds.  Did you

17  see him just land that jump?

18      A.   Yes.

19      Q.   And where did he land?

20      A.   To the right of the incident on the -- on the

21  field.

22      Q.   How close?

23      A.   I couldn't tell.  I'm looking at a minuscule,

24  little, tiny video from a long way away.  I can't tell

25  exactly how close.
```

```
1       Q.   And you do not believe that that particular rider

2  was not proceeding with extreme caution, do you?

3            MS. SPRADLIN:  Form.

4            THE WITNESS:  He looks like he's in complete

5  control.

6  BY MR. SCHWEIKERT:

7       Q.   You can see that he's -- it appears to you he's

8  in complete control, but you can't tell me how close he

9  appears to have landed to the medics and Brian on the

10  ground, right?

11            MS. SPRADLIN:  Form.

12            THE WITNESS:  You got to understand: the video

13  you're providing is actually farther away than I actually

14  really was.

15  BY MR. SCHWEIKERT:

16       Q.   Do you recall witnessing that particular rider

17  jumping in that manner live on that day?

18            MS. SPRADLIN:  Form.

19            THE WITNESS:  I recall that all of the riders

20  were adhering to the yellow flags.

21            MR. SCHWEIKERT:  So all --

22            THE WITNESS:  They're doing -- they're under

23  control and doing what we're asking them to do with the

24  yellow flag.

25  BY MR. SCHWEIKERT:
```

59

1      Q.   Do you think that a white flag with a red cross

2   would've been appropriate under these circumstances?

3           MS. SPRADLIN:  Form.

4           THE WITNESS:  No, not necessarily.

5   BY MR. SCHWEIKERT:

6      Q.   Even though the rider is on the ground in the

7   middle of the track slightly to the right side, as you

8   indicated?

9      A.   The left side of the track.

10     Q.   You don't believe this would be an instance where

11  a white flag with a red cross could be used?

12          MS. SPRADLIN:  Form.

13          THE WITNESS:  I -- I mean, it could be used, but

14  the reality is, is that the -- the racetrack in that

15  section was controlled by yellows, and it was not a -- none

16  of those are blind jumps.

17          The riders can see the incident, can see where

18  they cannot land, and every one of them looks very, very

19  safe to me.

20  BY MR. SCHWEIKERT:

21     Q.   Every one of those motorcycles going by appear to

22  be acting safely to you?

23     A.   Correct?

24          MS. SPRADLIN:  Form.

25  BY MR. SCHWEIKERT:

1    Q.  What would you need to see for you to feel that a

2  rider was not acting safely in going by the incident?

3            MS. SPRADLIN:  Form.

4            THE WITNESS:  I'll go back to my example.  If a

5  rider went down the left side of the racetrack, then that

6  clearly would not be doing what the officials, all the way

7  to the corner, are trying to get that rider to do, and

8  that's: go to the right of the incident and do so in a safe

9  manner.

10  BY MR. SCHWEIKERT:

11    Q.  Were the officials also trying to get the riders

12  to slow down?

13            MS. SPRADLIN:  Form.

14            THE WITNESS:  I couldn't tell you.  I'm not sure.

15  BY MR. SCHWEIKERT:

16    Q.  All right.  I will show you a video, previously

17  marked 62.  Let me share it with you real quick.

18            I'm showing you a video previously marked Exhibit

19  62.  I currently have it paused at the 8-second mark.

20            Do you see that?

21    A.  Yes.

22    Q.  Okay.  And I'll represent this is some slow-

23  motion footage of a portion of the incident.  And I'm going

24  to push play.

25            (Video played for the record.)

```
 1   BY MR. SCHWEIKERT:

 2        Q.   Do you see these individuals directing traffic?

 3        A.   Correct.

 4        Q.   Okay.  Is anybody asking them to slow down?

 5             MS. SPRADLIN:  Form.

 6             THE WITNESS:  They are, with the yellow flag.

 7   BY MR. SCHWEIKERT:

 8        Q.   So the yellow flag is directing the riders to

 9   slow down?

10        A.   Correct.

11        Q.   Okay.  But they were still allowed to jump?

12        A.   Yes.

13             MS. SPRADLIN:  Form.  Asked and answered multiple

14   times.

15   BY MR. SCHWEIKERT:

16        Q.   So other than the riders going by on the right-

17   hand side, are there any other examples that you can give

18   me as to when they would've been acting in an unsafe

19   manner?

20             MS. SPRADLIN:  Form.

21             THE WITNESS:  Going through the section at full

22   race speed.

23   BY MR. SCHWEIKERT:

24        Q.   And how fast do you know they were -- how do you

25   know how fast they were going?
```

1      A.   By the trajectory from the jump to the landings.

2   For instance, if they rhythm the rhythm section.  And none

3   of them are rhythming the rhythm section.  Not one single

4   rider went through there the way they would go through at

5   race speed.

6      Q.   And if you had the chance to do this all over

7   again, even knowing today how serious of an injury Brian

8   had sustained while he was on that track, you wouldn't

9   change a thing.

10          Is that what you're telling me?

11          MS. SPRADLIN:  Form.

12          THE WITNESS:  I don't think, in the moment, I had

13  that 2020 hindsight that you're illustrating.  So I think

14  that's an unfair question.

15  BY MR. SCHWEIKERT:

16     Q.   You wouldn't change a thing, even if you had the

17  chance and with the benefit of hindsight, right?

18          MR. GORDON:  Objection.

19          MS. SPRADLIN:  Form.

20          THE WITNESS:  I think everybody did their job

21  perfectly.

22  BY MR. SCHWEIKERT:

23     Q.   Everybody did their job perfectly, even though

24  you were never informed that the rider was not moving his

25  legs.

```
 1              Is that what you're saying?

 2              MS. SPRADLIN:  Form.

 3              THE WITNESS:  All -- all of the MA staff were

 4   doing exactly what we asked them to do.  I would take this

 5   video and use it as a training tool.

 6   BY MR. SCHWEIKERT:

 7      Q.   Are you aware that Brian has testified that he

 8   was screaming, don't touch me; I'm paralyzed -- something

 9   like that -- while the medics were about to lift him off

10   the ground?

11      A.   How -- how would I know that -- what Brian

12   testified to?  I don't know -- understand how you would ask

13   that.  I don't -- I don't know how I would know that

14   question.

15      Q.   So no, you -- you're not aware of that?

16      A.   No.

17      Q.   If you had been informed, as the race director,

18   that a rider was screaming words to that effect, what would

19   you have done in response, if anything?

20              MS. SPRADLIN:  Form.

21              THE WITNESS:  I'd need to know when he -- when he

22   started screaming.  I mean, there -- I'd need more

23   information.

24   BY MR. SCHWEIKERT:

25      Q.   You would need more information beyond a rider on
```

1    the ground, on the racetrack, screaming, don't touch me;

2    I'm paralyzed, before you could make a decision about

3    whether to stop the track during a free practice session?

4        A.    I -- I would have --

5              MS. SPRADLIN:  Form.

6              THE WITNESS:  -- to have medical tell me that

7    that's what he's doing, because I certainly couldn't hear

8    him from where I was standing.

9    BY MR. SCHWEIKERT:

10       Q.    Well, even if an AMA official reported those

11   circumstances to you, you still wouldn't act until a

12   medical person told you that?

13       A.    No --

14             MS. SPRADLIN:  Object to the form.

15   Mischaracterizes his testimony.

16             MR. SCHWEIKERT:  I'm sorry?

17             THE WITNESS:  Are you asking me sorry, or --

18             MS. SPRADLIN:  You can answer, John.  You can

19   answer.

20             THE WITNESS:  I -- I would definitely believe my

21   officials, yes.  I would believe them.  I would not need

22   medical to tell me.  But there was no discussion on the

23   radio to explain the rider's injuries or how he was acting.

24   BY MR. SCHWEIKERT:

25       Q.    And you didn't ask for more information over the

```
 1   radio, did you?

 2           MS. SPRADLIN:  Object to the form.  Asked and

 3   answered repeatedly, both yesterday and today.

 4           MR. SCHWEIKERT:  Cut it out.

 5           MS. SPRADLIN:  I -- Mark, you need to -- you can

 6   ask him questions --

 7           MR. SCHWEIKERT:  Those are speaking objections.

 8           MS. SPRADLIN:  -- but don't keep asking him the

 9   same questions over and over.

10           MR. SCHWEIKERT:  Those are speaking objections.

11   You can say form, and Judge will rule on it when we get

12   there, but to try to interrupt my flow -- I'm trying to get

13   this done, and you --

14           MS. SPRADLIN:  Then move on and not -- stop

15   asking him the same questions over and over again.

16           MR. SCHWEIKERT:  Are you finished?

17           MS. SPRADLIN:  Go ahead.

18   BY MR. SCHWEIKERT:

19       Q.  Do you remember my question, sir?

20       A.  No.

21           MR. SCHWEIKERT:  Jorge, could you read it back,

22   please?

23           THE REPORTER:  There was interruption, so you'll

24   need to reread it again.

25           Form.  Form.  Form.
```

```
 1              MR. SCHWEIKERT:  I don't remember.

 2    BY MR. SCHWEIKERT:

 3       Q.   You didn't hear anything on the radio after Brian

 4    crashed, and you didn't ask for more information after he

 5    crashed, right?

 6              MS. SPRADLIN:  Form.

 7              THE WITNESS:  In the next -- in the next minute,

 8    after he crashed, I did not ask for any information.  I

 9    wanted to leave the radio open so they could talk.

10    BY MR. SCHWEIKERT:

11       Q.   And even when you heard nobody talking, you still

12    didn't feel compelled to ask what was going on, did you?

13              MS. SPRADLIN:  Form.

14              THE WITNESS:  No, I didn't feel compelled.

15              MR. SCHWEIKERT:  Let's take a five-minute break,

16    please.

17              (A recess was taken.)

18              THE REPORTER:  Back on the record.  It is 4:51.

19              Go ahead.

20    BY MR. SCHWEIKERT:

21       Q.   You were the race director at the Glendale,

22    Arizona, event in January of 2020, correct?

23       A.   Yes.

24       Q.   And I think the last time we spoke a little bit

25    about an incident with Chris Blose.  Do you recall that?
```

1        A.   I thought we talked about Alex Ray?

2        Q.   We did.  And that was, I think, a crash at the

3    Tampa Supercross during the qualifiers.  Neither here nor

4    there.  I'm going to show you a video from the Glendale,

5    Arizona, event, previously marked Exhibit 55.

6            I will share my screen.

7            Can you see a paused video on your screen?

8        A.   Yes.

9        Q.   And I currently have it at the 2:51 mark.  Let me

10   back it up a hair.

11           All right.  I'm going to start it from the 2:46

12   mark.

13           (Video recording played.)

14           COMMENTATOR:  First main event.  He's, like,

15   really aggressive here early on.  Oh, the red flag is out.

16   Red flag -- this one will come to a stop so the Alpinestars

17   medical team can probably -- properly attend to Justin

18   Bogle.

19           (Video recording stopped.)

20   BY MR. SCHWEIKERT:

21       Q.   Did you hear the commentator state that the red

22   flag is out so the Alpinestars medical team can properly

23   attend to Justin Bogle?

24       A.   Yes.

25       Q.   Is waving a red flag in response to a medical

1  request one way to allow the medical team to properly do

2  their job?

3          MS. SPRADLIN:  Form.

4          MR. GORDON:  Form.

5          THE WITNESS:  If they requested a red flag, then

6  we would provide a red flag to stop the race.

7  BY MR. SCHWEIKERT:

8      Q.  I'm going to show you that video again.  It's at

9  the 3:04 mark, and I'm going to push play.

10         (Video recording played.)

11         COMMENTATOR:  Justin is sitting up.  He's taking

12 his helmet off.  That's Doc Bodnar just rolling in.

13         (Video recording stopped.)

14 BY MR. SCHWEIKERT:

15     Q.  And do you see in this video that Dr. Bodnar was

16 able to drive the medical mule onto the track and right

17 next to where Justin Bogle is sitting on the ground?

18     A.  Yes.

19     Q.  And that's possible because there's been a red

20 flag at this point, right?

21         MS. SPRADLIN:  Form.

22         THE WITNESS:  Correct.

23 BY MR. SCHWEIKERT:

24     Q.  Okay.  I'm going to push play.

25         (Video recording played.)

```
 1              COMMENTATOR:  A familiar face and a comforting

 2    face when the riders see Doc Bodnar and the Alpinestars

 3    medical team there to assist them.

 4              (Video recording stopped.)

 5    BY MR. SCHWEIKERT:

 6        Q.   And I'm going to pause at the 3:29 mark.

 7              Do you see that there's no motorcycles going by

 8    where Dr. Bodnar and some other medics are attending to

 9    Justin Bogle?

10        A.   Yes.

11        Q.   And is that because a red flag has been waived?

12              MS. SPRADLIN:  Form.

13              THE WITNESS:  According to the video and the

14    announcer, yes.

15    BY MR. SCHWEIKERT:

16        Q.   Because when a red flag is waived, it

17    discontinues the activity on the track and the rider are

18    supposed to proceed as directed back to the starting gate,

19    right?

20        A.   Yes.

21              MR. GORDON:  Form.

22              MS. SPRADLIN:  Form.

23    BY MR. SCHWEIKERT:

24        Q.   And if there's a red flag due to a medical

25    request, the riders will be directed away from that
```

```
 1   incident, right?

 2       A.   If it's possible.  Sometimes that's not even

 3   possible.

 4       Q.   What do you mean by that?

 5       A.   Because of the -- the routing of the racetrack,

 6   there's nowhere else to send them besides by the incident.

 7       Q.   Okay.  But in Brian's case, if there had been a

 8   red flag, the riders could have been directed off to the

 9   side and away from where he was on the ground, right?

10           MS. SPRADLIN:  Form.

11           THE WITNESS:  Eventually, yes.

12   BY MR. SCHWEIKERT:

13       Q.   Okay.  And just for a little more context, here's

14   -- I'm going to show you the replay of the crash involving

15   Justin Bogle.  And this is at the 5:03 mark.

16           (Video recording played.)

17           COMMENTATOR:  Up and away, but let's show you

18   what happened here.  And then the start right there, you

19   can see he just kind of high sided, gliding with -- let's

20   see here, Zach Osborne.  I think he got a little help from

21   Adam Cianciarulo --

22           (Video recording stopped.)

23   BY MR. SCHWEIKERT:

24       Q.   Did you see the crash that resulted in the red

25   flag?
```

```
 1        A.   Was the rider that went all the way to the

 2   concrete the rider that we're talking about or was there

 3   another rider in the middle?

 4        Q.   I believe the rider going to the concrete was Mr.

 5   Bogle.  We can back up and take a look.

 6        A.   Because that rider looks like he's wearing

 7   something different.

 8        Q.   He's wearing black and blue.

 9        A.   With a KTM.

10        Q.   Okay.  Let's see.

11        A.   And that's a Husqvarna.  That's not even the

12   rider that we're talking -- oh, that's Dean Wilson.

13        Q.   Is this Justin Bogle?  19?

14        A.   It appears so.  Yes.

15        Q.   Okay.

16             (Video recording played.)

17             COMMENTATOR:  And then the start right there, you

18   can see he just kind of high sided, gliding with -- let's

19   see here --

20             (Video recording stopped.)

21   BY MR. SCHWEIKERT:

22        Q.   Okay.  So it appears this would be Justin Bogle -

23   -

24        A.   Yes.

25        Q.   -- crashing and hitting the ground, correct?
```

```
 1        A.   I think so.

 2        Q.   Do you have any recollection as to why this

 3   particular crash was red flagged?

 4        A.    No.  I'd have to investigate what -- what

 5   racetrack this is and find out which direction they go.

 6   They may come back by this section right away.  I -- I

 7   don't know.

 8        Q.   Okay.

 9             (Video recording played.)

10             COMMENTATOR:  -- Zach Osborne --

11             (Video recording stopped.)

12   BY MR. SCHWEIKERT:

13        Q.   I'm going to -- I'm paused at the 5-minute --

14   5:15 mark.  Looks like Mr. Bogle is towards the side of the

15   track, right?

16        A.   Yes.

17        Q.   He's not in the middle of a rhythm section, is

18   he?

19        A.   No.

20             MR. SCHWEIKERT:  I will reserve my right to

21   follow up, but otherwise, I am done with my examination.

22             Thank you, Mr. Gallagher.

23             THE WITNESS:  You're welcome.

24                      CROSS-EXAMINATION

25   BY MR. GORDON:
```

73

1      Q.   Mr. Gallagher, my name is David Gordon.   I

2  introduced myself back when we started your deposition

3  three weeks ago, but I'll introduce myself again.   I

4  represent Feld Motor Sports in this matter.

5      A.   Yes.

6      Q.   I just have a few follow-up questions for you.

7  As I just said, my client is Feld Motor Sports, Inc.   Feld

8  Entertainment is not a defendant in this matter.   There

9  have been some references, at least with regard to expense

10  reimbursement I'm going to ask you earlier, you -- where

11  you had referred to Feld Entertainment versus Feld Motor

12  Sports.

13          Let me just ask you this: Do you have an

14  understanding personally of the differences from a

15  corporate structure standpoint of Feld Motor Sports, Inc.,

16  and Feld Entertainment?

17          MR. SCHWEIKERT:   Form.

18          THE WITNESS:   I knew of the two names, but I

19  don't know why or how the accounting works or whatever.   I

20  -- I'm -- I don't understand how that works.

21  BY MR. GORDON:

22      Q.   Okay.  So you -- so you know that there is a name

23  Feld Entertainment and there is a name Feld Motor Sports?

24      A.   Yes.

25      Q.   But in terms of, like -- do you know which entity

```
 1   is actually the legal promoter of Supercross?

 2                MR. SCHWEIKERT:  Form.

 3                THE WITNESS:  I -- I think it's Feld Motor

 4   Sports.

 5   BY MR. GORDON:

 6        Q.   Okay.  All right.  All right.  But beyond that,

 7   in terms of corporate structure between Feld Motor Sports

 8   and Feld Entertainment, is it fair to say you don't have a

 9   detailed understanding of that?

10        A.   I mean, just in the two names --

11        Q.   Yeah.

12        A.   -- one is motor racing, monster trucks, and so

13   on, and the other is all the rest: Ice Capades and -- and

14   that kind of thing, I assume.

15        Q.   Okay.

16        A.   Just from the two names, and that's it.

17        Q.   So from your assumption, all of the Supercross

18   stuff that we're talking about here today and Feld's role

19   of promoter, that would be as Feld Motor Sports?

20                MR. SCHWEIKERT:  Form.

21                THE WITNESS:  I -- I believe that's the way I

22   understand it, yes.

23   BY MR. GORDON:

24        Q.   Okay.  I want to ask you some questions going

25   back to the beginning of your deposition of how you're paid
```

1  and who you were paid from.  Now, from what I understand,

2  and please correct me if I am wrong, but I'm going to try

3  to summarize it a little bit because it was three weeks

4  ago, and I want to try to keep this moving.

5          You were the race director on February 15th,

6  2020, in Tampa wearing two different hats: One was the race

7  director for the 450 class and one was the race director

8  for the 250 class; is that fair?

9      A.   That's right.  Uh-huh.

10     Q.   And the 250 class is sanctioned by AMA, and you

11 were in fact paid by AMA to be the race director for the

12 250 class in Tampa?

13          MR. SCHWEIKERT:  Form.

14          THE WITNESS:  Yes.

15 BY MR. GORDON:

16     Q.   Okay.  And Brian Moreau was going to compete that

17 day in the 250 class and at the time he had his unfortunate

18 crash in practice, he was in fact at a practice section for

19 the 250 class?

20     A.   That's correct.

21     Q.   Okay.  So you -- your role having any relevance

22 to this lawsuit and Brian Moreau was as the race director

23 for the 250 class for which you were compensated by the

24 AMA?

25     A.   That's correct.

1      Q.   Okay.  In terms of the 450 class, this is at

2   least how I understood your explanation.  Let me summarize

3   it and tell me if you think I'm -- I don't have it right.

4           That -- that technically, you were the race

5   director for the FIM, which sanctioned the 450 class.

6   However, you actually got your -- I'm just going to use the

7   words Feld -- that's okay with you -- instead of going into

8   Feld Motor Sports, but Feld, generically.  You were -- you

9   were compensated for your role in the 450 class as race

10  director by Feld, but you understood that they were taking

11  that money out of the money that they owed FIM for the

12  sanctioning agreement.  So technically, you were being paid

13  by the FIM, even though the money was coming from Feld.

14          Am I explaining that correctly?

15          MR. SCHWEIKERT:  Form.

16          THE WITNESS:  I am only assuming that.  I don't

17  know how the accounting is done.

18  BY MR. GORDON:

19      Q.   Okay.  But at least -- am I -- am I -- am I

20  fairly summarizing your testimony?

21          MR. SCHWEIKERT:  Form.

22          THE WITNESS:  Yes.

23  BY MR. GORDON:

24      Q.   Okay.  And again, that was only for the 450

25  class.  Any work you were doing as terms of race director

1  for the 250 class was for the AMA and you were compensated

2  directly from the AMA?

3      A.   That's correct.

4      Q.   Okay.  And you talked about -- and Mr. Schweikert

5  showed you a picture of your uniform at the time, right?

6  It was clearly an A -- an AMA uniform?

7      A.   Yes.

8      Q.   And that -- and that's what you would wear when

9  you were at these races, including Tampa in 2020?

10     A.   I had an AMA uniform on -- on the top and an FIM

11 hat on.

12     Q.   Got it.  And you didn't have any -- you did not

13 have a Feld uniform, nor did you wear any of the Feld

14 uniforms that were used by Feld employees at these events?

15          MR. SCHWEIKERT:  Form.

16          THE WITNESS:  That's correct.

17 BY MR. GORDON:

18     Q.   Okay.  All right.  And in terms of your expenses,

19 you talked about your compensation where you got a flat

20 amount plus you were reimbursed travel expenses?  Hotel,

21 rental car --

22     A.   Yes.

23     Q.   -- food, et cetera, and so forth, correct?

24     A.   Correct.

25     Q.   And you gave that to somebody named Pam Murphy

1  who was associated with Feld, and she would take care of

2  getting you reimbursed for your travel expenses?

3      A.   Correct.

4      Q.   Now, is it fair to say you also don't know

5  whether the reimbursement of your travel expenses was also

6  deducted by the amount that Feld owed the FIM for their

7  sanctioning agreement?

8      A.   That's a relationship between Feld and the FIM.

9  I don't know.

10      Q.   So you don't know one way or another whether your

11  expenses were in fact deducted from the Feld relationship

12  with the FIM for their sanctioning agreement?

13          MR. SCHWEIKERT:  Form.

14          THE WITNESS:  I assume that, but I don't know.

15  BY MR. GORDON:

16      Q.   Okay.  So -- well, I'm not sure if we've used it

17  in your deposition, but we've used the term the racetrack

18  being active, which means motorcycles on the track, right?

19      A.   Yeah.

20      Q.   Okay.  And the racetrack is active for practice

21  for qualifying for final heats.  Anytime there are -- there

22  are motorcycles on the track, we call it active, correct?

23      A.   Or hot.  Yes.

24      Q.   Or hot.  Okay.

25          So when the track is either active or hot, are

```
 1   all of your AMA staff and officials in place?

 2            MR. SCHWEIKERT:  Form.

 3            THE WITNESS:  Yes.

 4   BY MR. GORDON:

 5       Q.   Okay.  And all the Feld folks who are -- whether

 6   they have responsibilities for flagging or being runners,

 7   et cetera, and so forth, are they in place?

 8            MR. SCHWEIKERT:  Form.

 9            THE WITNESS:  I -- I don't check to see if

10   they're in place, but I do check to see if there's any

11   activity on the racetrack before we make it hot.

12   BY MR. GORDON:

13       Q.   Okay.  Okay.  And so who do you communicate with

14   before the track is made hot?

15       A.   I'll talk to Dr. Bodnar to make sure his people

16   are in place through radio or sometimes I'm standing next

17   to him.  I mean, that happens, too.  I call up to Jeff

18   Canfield and then I talk to the safety person for Feld, the

19   one that directs all the Feld employees.

20       Q.   Okay.  So you're -- so you're talking to somebody

21   from Feld, someone from the Medic Rig, and, obviously, your

22   folks from the AMA and you're in communication with them,

23   making sure that you have the green light, for lack of a

24   punnet, to make the track hot?

25       A.   Yes.
```

```
 1              MR. SCHWEIKERT:  Form.

 2   BY MR. GORDON:

 3       Q.   Okay.  And that in fact was done before Brian

 4   went onto the track for free practice on February 15th,

 5   2020 in Tampa?

 6              MR. SCHWEIKERT:  Form.

 7              THE WITNESS:  I believe so, yes.

 8   BY MR. GORDON:

 9       Q.   Okay.  And in looking at the videos, et cetera,

10   and so forth, in terms of what happened, does it -- does it

11   appear to you that all of the people that were supposed to

12   be in place were in fact in place when Brian had his

13   unfortunate accident?

14              MR. SCHWEIKERT:  Form.

15              THE WITNESS:  Yes.

16   BY MR. GORDON:

17       Q.   Okay.  Dr. Bodnar and his team, we've referred to

18   them as the Medic Rig, we've also referred to them as

19   Alpinestars Medical Mobile Unit.

20              But do you understand them to be one and the

21   same?

22       A.   Yes.

23       Q.   Okay.  And at this event, and at most events,

24   they are the entity responsible to provide the direct

25   medical attention for riders when they're injured on the
```

```
 1  track?

 2          MR. SCHWEIKERT:  Form.

 3          THE WITNESS:  Yep.

 4  BY MR. GORDON:

 5      Q.   Were they need any type of medical attention on

 6  the track?

 7          MR. SCHWEIKERT:  Form.

 8          THE WITNESS:  Correct.

 9  BY MR. GORDON:

10      Q.   Okay.  And do you have any medical training?

11      A.   No.

12      Q.   Okay.  So you, as race director, are you relying

13  on The Medic Rig and their staff to make medical decisions?

14          MR. SCHWEIKERT:  Form.

15          THE WITNESS:  Absolutely.

16  BY MR. GORDON:

17      Q.   Okay.  Are you or any representative of Feld, you

18  know, supervising or controlling the work that is done by

19  The Medic Rig people on the field at these races?

20          MR. SCHWEIKERT:  Form.

21          THE WITNESS:  Not -- not during the activity or

22  even before or after the activity.  We don't control them,

23  no.

24  BY MR. GORDON:

25      Q.   Okay.  Is The Medic Rig responsible for, you
```

```
 1   know, hiring their own their own staff and people?

 2            MR. SCHWEIKERT:  Form.

 3   BY MR. GORDON:

 4       Q.   To your knowledge?

 5       A.   I couldn't tell you how they hire or fire people,

 6   I don't know.

 7       Q.   Okay.  But you and the AMA are not involved in

 8   that?

 9       A.   No.

10            MR. SCHWEIKERT:  Form.

11   BY MR. GORDON:

12       Q.   Okay.  And you and the AMA are not involved in

13   providing them with their medical equipment?

14            MR. SCHWEIKERT:  Form.

15            THE WITNESS:  No.

16   BY MR. GORDON:

17       Q.   And once they render attention, or once a rider

18   is down and they're rendering attention to them, you know,

19   it -- are they the ones who are making the medical

20   decisions with regard to the rider?

21            MR. SCHWEIKERT:  Form.

22            THE WITNESS:  Yes.

23   BY MR. GORDON:

24       Q.   And in your role as the 250 race director, you

25   were -- you were -- you were hired by the AMA, correct?
```

```
 1        A.    Yes.

 2        Q.    Compensated by the AMA?

 3        A.    Yes.

 4              MR. SCHWEIKERT:  Form.

 5   BY MR. GORDON:

 6        Q.    And then when you were asked not to come back at

 7   some point, that was from the AMA, correct?

 8              MR. SCHWEIKERT:  Form.

 9              THE WITNESS:  Yes.

10   BY MR. GORDON:

11        Q.    And when you were at these races as the rest --

12   race director, are you making your own independent

13   decisions based on your training, and experience in

14   Supercross?

15        A.    Yes.

16              MR. SCHWEIKERT:  Form.

17   BY MR. GORDON:

18        Q.    And are you expecting Doc Bodnar and his medical

19   crew to make their own decisions based on medical needs of

20   riders based on their training and experience?

21              MR. SCHWEIKERT:  Form.

22              THE WITNESS:  Yes.

23   BY MR. GORDON:

24        Q.    Looking at the videos of Brian's crash and the

25   aftermath of the crash on February 15th, 2020 in Tampa, do
```

```
 1  you believe that the medical crew was provided a safe area

 2  in order for them to assess Brian and do whatever they

 3  needed to do?

 4            MR. SCHWEIKERT:  Form.

 5            THE WITNESS:  I -- I believe that it was a safe

 6  area, and if it wasn't a safe area, or they didn't feel it

 7  was, there was a solution in that.

 8  BY MR. GORDON:

 9       Q.   Which is what?

10       A.   Get on the radio and ask for a red flag to

11  provide them with additional needs if they felt necessary.

12       Q.   Okay.  And nobody got on the radio that day to

13  ask for a red flag, correct?

14       A.   No.

15       Q.   And based on where you were you able to visualize

16  the track?  I mean --

17       A.   Yes.

18       Q.   -- were you able to visualize I knew you were

19  able to visualize the track, strike that.

20            Were you able to -- were able to visualize the

21  area where the accident occurred?

22       A.   Yes.

23            MR. SCHWEIKERT:  Form.

24  BY MR. GORDON:

25       Q.   And I know we went through a -- Mr. Schweikert
```

 1  went through a bunch of questions with you, you didn't

 2  visualize the accident itself, but once there were yellow

 3  flags, your attention was called to the -- that area, and

 4  you were you were watching the scene, correct?

 5       A.   Yes.  Uh-huh.

 6       Q.   And if you believed on your own that a red flag

 7  was necessary, you could have called it, correct?

 8       A.   Sure.

 9       Q.   Okay.  And based on your observation of the fact

10  that Brian was conscious, and the medical folks, the scene

11  was secured, and the medical folks, were there rendering

12  attention to Brian, based on your observation and

13  experience, you also did not believe that a red flag needed

14  to be called at that time?

15            MR. SCHWEIKERT:  Form.

16            THE WITNESS:  No.

17  BY MR. GORDON:

18       Q.   No you did not -- no, you did not believe a red

19  flag needed to be called?

20            MR. SCHWEIKERT:  Form.

21            THE WITNESS:  Correct.

22  BY MR. GORDON:

23       Q.   Yes, okay.  And it's -- in terms of time

24  pressure, have you ever in your many years of being a race

25  director at the AMA, not called a red flag because you were

```
1    feeling some sort of time pressure?

2              MR. SCHWEIKERT:  Form.

3              THE WITNESS:  Even if I was threatened to be let

4    go because of it, I wouldn't make that decision.  I would

5    always go on the -- on the side of what I think is right.

6    BY MR. GORDON:

7        Q.   And if you believe the red flag was necessary,

8    you would call it?

9        A.   Correct.

10             MR. GORDON:  Okay.  Thanks.  I don't have any

11   further questions at this time.

12             Bethany?

13             MS. NDUKA:  No questions.

14             MS. SPRADLIN:  All right.  The witness will read.

15             THE REPORTER:  All right.  Anybody want a copy?

16   Caroline, you want to order?

17             David?

18             Bethany?

19             MS. SPRADLIN:  I would -- I would like to be sent

20   the transcript to read, I do not want to order a copy of

21   the transcript at this time.

22             THE REPORTER:  Okay.  Anybody want to order?

23   Going once --

24             MR. GORDON:  I do -- I do.  I do want to order.

25             THE REPORTER:  Dave -- David.  All right.  David.
```

```
 1              David, hold on, let me write here, you want to
 2    order.  Do you want standard?  Please say yes.
 3              MR. GORDON:  Standard is fine.
 4              THE REPORTER:  All right.
 5              Caroline, you want a copy?
 6              MS. SPRADLIN:  I would like to read -- the
 7    witness would like to Read and Sign.  I do not want to
 8    order a copy at this time.
 9              THE REPORTER:  All right, so I'll send it -- all
10    right I'll send it to you.
11              Okay.  Bethany?
12              MS. NDUKA:  I don't need a copy right now,
13    thanks.
14              THE REPORTER:  All right.  Thank you, guys.
15    We're concluding at 5:16, and we've been on the record, Mr.
16    Gordon one hour, 53 minutes and, say, .06 seconds.
17              (Deposition concluded at 5:16 p.m.)
18
19
20
21
22
23
24
25
```

CERTIFICATE OF OATH


STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


    I, JORGE GARCIA, Reporter, Notary Public, State of
Florida, certify that JOHN GALLAGHER personally appeared
before me on the 3rd day of April, 2025, and was duly
sworn.

    SIGNED this 10th day of April, 2025, at Hillsborough
County, Florida.




*Jorge Garcia*

_____

JORGE GARCIA

Court Reporter

Notary Public, State of Florida

Commission: HH 358644

Expires: 03/27/2027

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH


    I, JORGE GARCIA, do hereby certify that I was authorized to and did report the deposition of JOHN GALLAGHER; that a review of the transcript was not requested; and that the foregoing transcript is a true and correct record of the electronic notes.

    I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

    DATED this 10th day of April, 2025, at Hillsborough County, Florida.


*Jorge Garcia*

—————————————————————————

JORGE GARCIA

Court Reporter

Notary Public, State of Florida

Commission: HH 358644

Expires: 03/27/2027