1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


CASE NO. 8:22-CV-01295-TPB-CPT


BRIAN MOREAU,
Plaintiff


vs.
FELD MOTOR SPORTS, INC. ET AL,


Defendants.
_____/



DEPOSITION OF TOM CARSON


MARCH 20, 2025
10:00 AM



VIA ZOOM VIDEO CONFERENCE

<u>APPEARANCES</u>

**JUAN CARLOS RAMOS**
DMR Law LLC
1430 S Dixie Hwy Ste 314
Coral Gables, FL 33146-3174
Office: 305-548-8666
Fax: 786-513-7998
j.ramos@dmrpr.com

**DAVID GORDON**
(609) 987-6854
Buchanan Ingersoll & Rooney, Pc
700 Alexander Park
Suite 300
Princeton, NJ 08540

**MARK SCHWEIKERT**
Schweikert Law PLLC
1111 Brickell Ave Ste 1550
Miami, FL 33131-3123
Office: 305-999-1906
Cell: 305-926-9452
mark@schweikertlaw.com

**ALEXIA KHELLA**
Feld Motor Sports, Inc.
800 Feld Way
Palmetto, FL 34221
(941) 432-4015

**DAVID DOYLE**
Pearson Doyle Mohre & Pastis, LLP
901 N Lake Destiny Rd Ste 305
Maitland, FL 32751
Office: 407-647-0090
Cell: 407-414-7172
Fax: 407-647-0092
ddoyle@pdmplaw.com

<u>APPEARANCES</u>

**CAROLINE SPRADLIN**
Phelps Dunbar LLP
100 S Ashley Dr Ste 2000
Tampa, FL 33602-5315
Office: 813-222-7672
Cell: 803-617-8539
Fax: 813-472-7570
caroline.spradlin@phelps.com

4

<u>INDEX OF EXAMINATION</u>

WITNESS: TOM CARSON

                                        PAGE NO.


DIRECT EXAMINATION
By MR.  MARK SCHWEIKRT                    10


CROSS EXAMINATION
By MR.  DAVID GORDON                      270


CROSS EXAMINATION
By MS.  CAROLINE SPRADLIN                 274

INDEX TO EXHIBITS                         5,6,7

CERTIFICATE OF REPORTER                   278

WITNESS READ FORM                         279

5

## INDEX TO EXHIBITS

EXHIBIT          DESCRIPTION          PAGE NO.

135.        Amended Notice of Rule
        30(b)(6), Videotape Deposition
            of The Medic Rig              14

42.     Pictures of Dr. Kennedy's Hard
    Card for the 2020 Supercross Season   55

3.          Credential Board             56

75.         Picture of Tim Kennedy's
        Hard Card for the 2020
            Supercross Season            58

7.       Bates labeled FMS Inc.
            576 through 586              59

A.          Statement of Work           63

128.        Bates Labeled FMS Inc.
        574 through 575 Entitled
    First Amendment to Statement of Work  70

129.        Bates Labeled FMS Inc.
            587 through 596             118

136.        Bates Labeled FMS, Inc.
            771 through 772.004         130

29.       Pictures of Amy Metiva's
            Medical Team               134

137.     Biography from the Alpine Stars
        Mobile Medical Unit website    135

9.  Bates Labeled Bodnar 223 through 227   142

<u>INDEX TO EXHIBITS</u>

EXHIBIT          DESCRIPTION          PAGE NO.

138.          Excerpt from Dr. Bodnar's
              August 5, 2024 Deposition,
              Pages 114 to 117          148

11.            Bates labeled Bodnar
                210 through 216          151

6.          Subcontract Services Agreement
            Between the Medic Rig, LLC
              and Dr. John Bodnar          160

39.          Subcontract Services Agreement
            Between the Medic Rig, LLC and
              Dr. James R. Kennedy          162

25.          Subcontract Services Agreement
          Between Witness Company, The Medic Rig,
              LLC, and Amy Metiva          165

31.          Alpine Stars Mobile Medical
                Unit volunteer agreement          166

139.          Company's Bank Transactions          170

140.          Bates labeled The Medic
                Rig 5 through 6          175

17.            Medic Rig 1 through 4          208

23.          Bates labeled FMS Inc. 654          210

19.    Email From Sean Brennan to Olivier
        Deval, Dr. Bodnar, and you, Tom Carson,
              on February 17, 2020          219

141.          Email From the Journalist
                Olivier Deval          226

7

## INDEX TO EXHIBITS

EXHIBIT              DESCRIPTION              PAGE NO.

59.              Jumbotron Video              231

62.              FMS Inc. 1148              233

16.              Bates labeled KTM 145              245

142. Copy of the Verified Interrogatories  251

DEPOSITION OF TOM CARSON

MARCH 20, 2025

**COURT REPORTER:** Good morning. My name is Jorge Garcia, the court reporter for today's depo. The time is 10:15 a.m. The date is March 20, 2025. If the witness could state his name on the record for us, please. That's you, Mr. Carson.

**MR. DOYLE:** Hey Tom, can you hear him okay?

**MR. CARSON:** Let me turn that up.

**MR. DOYLE:** Yeah, I think it's here.

**MR. CARSON:** Right.

**MR. DOYLE:** There you go. Got it. So, he asked you to state your name for the record.

**MR. CARSON:** Oh, Thomas R. Carson.

**COURT REPORTER:** Mr. Carson, if you could please raise your right hand. Do you swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the

truth?

**MR. CARSON:** I do.

**COURT REPORTER:** Perfect. Can you get a little closer to the mic, please? If you can remove the... Thank you. Do you have a photo ID that you could show me?

**MR. CARSON:** Yes.

**COURT REPORTER:** Thank you. Can you bring it a little closer, closer, closer, closer? Thank you. I see it. Attorneys, please state your appearances.

**MR. SCHWEIKERT:** Good morning. Mark Schweikert and Juan Carlos Ramos on behalf of plaintiff, Brian Moreau.

**MR. DOYLE:** David Doyle on behalf of defendants, The Medic Rig, Dr. Bodnar, Dr. Kennedy, Amy Metiva, and Scott Combs.

**MR. GORDON:** David Gordon for Feld Motorsports. Lexi Khella is also on as a representative of Feld Motorsports.

**MS. SPRADLIN:** Caroline Spradlin on behalf of American Motorcyclist Association, DBA American Motorcycle Association.

**COURT REPORTER:** I think that's everyone. Go ahead, Mark.

**MR. SCHWEIKERT:** Thank you.

**DIRECT EXAMINATION BY MR. SCHWEIKERT:**

**Q.** Good morning, sir. Could you please state your name for the record?

**A.** Thomas R. Carson.

**Q.** Okay. Are you the owner of The Medic Rig, LLC?

**A.** Yes.

**Q.** Okay. Does anybody else have an ownership interest in The Medic Rig, LLC?

**A.** No.

**Q.** Okay. Are you the Chief of Staff for The Medic Rig?

**A.** Yes.

**Q.** Okay. Have you ever been deposed before?

**A.** No.

**Q.** This is a formal court proceeding. Your lawyer, the other lawyers present, we're all officers of the court and we should conduct ourselves just as if the judge and jury were present. Does that make sense?

**A.** Yes.

**Q.** Okay. I'm going to be asking you a number of questions today, and it's important that you understand the questions so you can answer them truthfully. If you don't understand a question, please let me know and I'm happy to clarify. If you do answer a question, I'm going to assume that you understood it. Is that fair?

**A.** Yes.

**Q.** Okay. This deposition is being transcribed in addition to being videotaped. That means a court reporter is literally taking down every single word that is being spoken. So, I know in normal conversation we might sometimes shake or

nod our head or grunt uh-huh or uh-uh, but that

doesn't transcribe very well. So, for purposes

of this deposition, if you intend to say yes or

no, please use those words and respond verbally

to all my questions. Does that make sense?

**A.** Yes.

**Q.** Okay. If you need a break at any time, let

me know. I'm happy to accommodate. I would just

ask that we not break while a question is

pending. Is that fair?

**A.** Yes.

**Q.** Okay. Have you ever been a plaintiff or a

defendant in a lawsuit?

**A.** No.

**Q.** Okay. Has The Medic Rig ever been a party to

any lawsuit other than this one?

**A.** No.

**Q.** Okay. I'm going to ask you some questions

about what you did to prepare today. I don't

want to know anything you talked about with

your attorney, but did you happen to review any

documents in preparing to testify today?

**A.** Yes.

**Q.** And what did you review?

**MR. DOYLE:** Here. I have a list I can hand them

if you just want to read those things.

**MR. CARSON:** The interrogatories. I reviewed

those.

**MR. DOYLE:** Yeah. Everything on the list.

**BY MR. SCHWEIKERT:**

**A.** Okay. The Medic Rig answer and affirmative

defenses, medical emergency action plan, Alpine

stars Mobile Medical Unit, disaster action

plan, track emergency protocol, Master Services

Agreement, medical unit sponsorship, The Medic

Rig subcontract agreement for Bodnar,

subcontract agreement for Dr. Kennedy,

subcontract agreement for Amy Metiva,

subcontract volunteer agreement, Tampa

Supercross meeting.

**Q.** Did you review any deposition transcripts?

**A.** No.

**Q.** Did you meet with any attorneys other than

Mr. Doyle or his partners or colleagues?

**A.** No.

**Q.** Did you have any conversations with Dr.

Bodnar, Dr. Kennedy, Amy Metiva, or Scott

Combs?

**A.** No.

**Q.** I will show you, well, before I do that,

where are you physically located today? I know

we're doing this via Zoom, but where are you

located?

**A.** Pittsburgh, Pennsylvania.

**Q.** Is that where you live?

**A.** No.

**Q.** Are you in an office building?

**A.** Yes.

**Q.** Are you at a law firm office?

**A.** No.

**Q.** I know Mr. Doyle is there. Is there anybody else present in that room with you?

**A.** No.

**Q.** Okay. Did you meet or speak with any lawyers of Feld Motorsports before the deposition today?

**A.** No.

**Q.** Okay. Are you from Pittsburgh?

**A.** No.

**Q.** What brings you to Pittsburgh?

**A.** This deposition.

**Q.** Do you live in Pittsburgh?

**A.** No.

**Q.** Where do you live?

**A.** Ohio.

**Q.** Why did you go to Pittsburgh for this deposition?

**A.** I was requested to be here.

**Q.** Was that a request from your attorney?

**A.** Yes.

**MR. DOYLE:** Mark, if it'll save you some time.

Pittsburgh was the closest airport to Tom, so

he agreed to come to me rather than make me

come to him.

**MR. SCHWEIKERT:** Understood. Okay. Thank you.

Excuse me.

**BY MR. SCHWEIKERT:**

**Q.** All right, I'm going to show you a document

which I will mark as Exhibit 135. Just give me

a moment. It's going to be a little bit

trickier because we're doing this over Zoom, so

I appreciate your patience. And I will

represent to you that this is an amended notice

of Rule 30(b)(6), videotape deposition of The

Medic Rig. I'm happy to show you the whole

thing. Let me know if you have seen this

before.

**A.** Yes.

**Q.** Okay.

**MR. DOYLE:** Yeah, I just put a copy of it in

front of him, so he has it. He's asking me if

he's allowed to hold it and I told him yes.

**MR. SCHWEIKERT:** Perfect. Thank you.

**BY MR. SCHWEIKERT:**

**Q.** I've had some communications with your

attorney offline, but it's my understanding

that you have been designated by The Medic Rig,

LLC, to testify on behalf of the topics listed

in this notice. Is that correct?

**A.** Yes.

**Q.** Okay. Are you prepared to do that today?

**A.** Yes.

**Q.** Great. Did you graduate from high school,

sir?

**A.** Yes.

**Q.** Was that in Ohio?

**A.** Yes.

**Q.** Did you go to college?

**A.** No.

**Q.** Do you ride motorcycles?

**A.** Yes.

**Q.** When did you start riding?

**A.** About 10 years old.

**Q.** Dirt bikes, I take it?

**A.** Yes.

**Q.** Have you ever raced motocross?

**A.** Yes.

**Q.** When did you start? Or strike that. When was your first motocross race as best as you can remember?

**A.** 1973.

**Q.** Okay. How old were you at that time?

**A.** 12, 11.

**Q.** So, your first motocross race was when you were approximately 11 to 12 years old?

**A.** Correct.

**Q.** Did you ever race professionally?

**A.** Yes.

**Q.** When did you start racing professionally?

**A.** 1982.

19

**Q.** That was around the age of approximately 20 years old?

**A.** Correct.

**Q.** Okay. What professional races were you involved in over the course of your career?

**A.** Can you be more specific?

**Q.** Sure. What do you mean when you tell me that you have raced professionally before?

**A.** That's what I did to earn money.

**Q.** Was it for a particular racing series?

**A.** Yes.

**Q.** Do you recall the name?

**A.** I raced Supercross and Motocross.

**Q.** Did you start racing Supercross and Motocross around the age of 20 at the same time or did you [crosstalk]?

**A.** 1982.

**Q.** Okay. So, beginning in 1982, you started racing professionally in Supercross and Motocross races?

**A.** Yes.

**Q.** For those of us unfamiliar with the sport, could you please explain the difference between Supercross and Motocross?

**A.** Normally Supercross is in a stadium, Motocross is an outdoor terrain.

**Q.** When did you stop racing professionally?

**A.** 1991.

**Q.** So, your professional racing career spanned approximately 9 years?

**A.** Correct.

**Q.** What is your best ballpark estimate of the number of Supercross and Motocross races that you participated in?

**A.** Are you asking for Supercross or Motocross or my total number of races?

**Q.** I was asking for total, but we can break it down into both too.

**A.** If you're asking for total, it's hundreds.

**Q.** Okay. How many Supercross races have you

participated in?

**A.** 50.

**Q.** And Motocross?

**A.** 100.

**Q.** Sorry, have you ever been injured? Strike

that. Were you ever injured while participating

in any of these professional Motocross or

Supercross races?

**A.** Yes.

**Q.** Did you ever have any injury that required a

visit to a hospital?

**A.** Yes.

**Q.** Tell me about that, please.

**A.** I broke my tib and fib and was taken to the

hospital.

**Q.** By tib and fib, you mean tibia and fibula?

**A.** Correct.

**Q.** Those are bones in your leg?

**A.** Correct.

**Q.** Did those broken bones happen at the same

time in one crash, or are these separate

crashes?

**A.** The same crash.

**Q.** Do you recall approximately when it was that

you suffered that injury?

**A.** 1983.

**Q.** Was that during a Motocross or Supercross

race?

**A.** Motocross.

**Q.** Do you recall if the racetrack was red-

flagged after you had crashed?

**A.** No, it was not.

**Q.** Was there a medical team on site at that

time to provide medical care to an injured

rider such as yourself?

**A.** I do not remember.

**Q.** Okay. I understand there's been an evolution

in the sport. I was just curious. All right,

any other injuries that required you to visit a

hospital other than the broken leg in 1983?

23

**A.** Yes.

**Q.** What other injuries?

**A.** Broken femur.

**Q.** When did you break your femur?

**A.** 1986.

**Q.** During a Motocross or Supercross race?

**A.** Motocross.

**Q.** Was the racetrack red-flagged when you broke your leg?

**A.** No.

**Q.** Was there any medical team there that assisted you at the racetrack?

**A.** Can you be more specific on medical team?

**Q.** Sure. Did you break your leg crashing your motorcycle during a Motocross race?

**A.** Yes.

**Q.** Okay. Was there a medical team that was on site to give care to riders that got hurt on the racetrack like yourself?

**A.** Can you define medical team for me?

24

**Q.** Well, what does it mean to you?

**A.** It means a dedicated team that is at the track.

**Q.** Was there a dedicated team at the track to provide medical care to injured riders such as yourself?

**A.** No.

**Q.** Was there local ambulance paramedics?

**A.** Yes.

**Q.** Okay. Were you taken to hospital in an ambulance?

**A.** Yes.

**Q.** Do you recall how you got off of the track after you broke your leg?

**A.** No.

**Q.** Did you walk off?

**A.** No.

**Q.** Did somebody assist you?

**A.** Yes.

**Q.** Was that person a medical professional or

someone that happened to be there?

**A.** The local ambulance service.

**Q.** Okay. Did they put you on a stretcher?

**A.** Yes.

**Q.** Did they put you on a stretcher while you were on the racetrack?

**A.** I do not recall.

**Q.** Any other injuries that required you to go to a hospital over the course of your professional racing career?

**A.** Yes.

**Q.** What was the next injury?

**A.** Separated shoulder.

**Q.** Ouch. Was that during a Motocross or Supercross event?

**A.** Motocross.

**Q.** Do you recall what year?

**A.** 1989.

**Q.** Do you recall if the racetrack was red-flagged?

**A.** No, it was not.

**Q.** At that particular event, was there a medical team on site?

**A.** I'm not aware.

**Q.** Were there local ambulance people there?

**A.** I'm not aware. I took myself to the hospital.

**Q.** Ouch. Okay. I'm sorry to hear about your injuries. Any others over the course of your career?

**A.** Yes.

**Q.** What other injury?

**A.** My knee.

**Q.** What happened to your knee?

**A.** I tore my PCL.

**Q.** What is a PCL?

**A.** The posterior cruciate ligament.

**Q.** Did you tear your PCL during a Motocross or Supercross race?

**A.** An event in Germany.

27

**Q.** Was it a Motocross-type event?

**A.** It was called Holland Cross.

**Q.** Do you recall approximately what year?

**A.** 1985 or '86.

**Q.** Do you know if there was a sanctioning body for that particular event?

**A.** Yes.

**Q.** Was it the FIM?

**A.** No.

**Q.** What sanctioning body was it?

**A.** The German sanctioning body.

**Q.** Were you assisted by any medical professional after you had crashed and tore your PCL at the racetrack?

**A.** No.

**Q.** Is that another instance where you took yourself to a hospital?

**A.** I did not go to the hospital in Germany for that.

**Q.** Why not?

**A.** I flew home to the US.

**Q.** When did you find out that you had torn your PCL?

**A.** When I got home.

**Q.** Did you continue racing after you had crashed your motorcycle and torn your PCL?

**A.** No.

**Q.** Is it fair to say that you were experiencing pain after you crashed and so you got off the track and stopped racing on that day?

**A.** Yes.

**Q.** Okay. Do you know if a red flag was thrown when you had that crash?

**A.** No, it was not.

**Q.** Any other injuries over the course of your career that required a visit to a hospital?

**A.** Professionally or as an amateur?

**Q.** Let's finish professionally first, please.

**A.** I do not believe so.

**Q.** Okay. What about as an amateur?

**A.** Yes.

**Q.** What injuries were those?

**A.** Broken foot.

**Q.** Any others?

**A.** I do not believe.

**Q.** When did you break your foot approximately?

**A.** I do not remember.

**Q.** When you distinguish between amateur and professional racing, what do you mean?

**A.** One series, you are a professional rider, which means you can earn money. As an amateur rider, you're not competing for money.

**Q.** The amateur racing that you're referring to, was it still an organized event or is it a bunch of friends getting together and just racing around a track?

**A.** Organized.

**Q.** Okay. During the amateur event where you broke your foot, was there any medical professional on site that assisted you at the

30

racetrack?

**A.** No.

**Q.** Okay. Do you recall the sanctioning bodies

for the professional Motocross and Supercross

events that you competed in over the course of

your career?

**A.** Yes.

**Q.** What sanctioning bodies were those?

**A.** AMA.

**Q.** Any others?

**A.** I do not believe so.

**Q.** Do you recall if there were promoters for

the Motocross and Supercross events that you

competed in professionally?

**A.** Can you be more clear on that question?

**Q.** Sure. What AMA-sanctioned professional

Motocross or Supercross series did you compete

in?

**A.** The Supercross series and the Motocross

series.

**Q.** Do you know, if at the time that you were competing in those series, whether the AMA was the owner of the series?

**A.** No, I do not.

**Q.** Do you know who owned the series?

**A.** No.

**Q.** Well, as you sit here today, do you understand the difference between a promoter or organizer of a Supercross event and a sanctioning body for a Supercross event?

**A.** Yes.

**Q.** And can you explain to me your understanding, please?

**A.** The AMA, it provides the rules, a promoter puts on the event.

**Q.** And as far as you're aware, who is responsible for safety measures to protect riders from injuries similar to the ones that you unfortunately experienced over the course of your career?

**MR. DOYLE:** Object to form.

**MS. SPRADLIN:** Join. And for the record, can we go ahead and say one objection counts for all as we have been doing?

**MR. SCHWEIKERT:** Yes.

**MS. SPRADLIN:** Thank you.

**BY MR. SCHWEIKERT:**

**Q.** You can answer, sir.

**A.** Can you repeat the question?

**Q.** Do you believe that rider safety is something that is important in the sport of professional Motocross or Supercross racing?

**A.** Yes.

**Q.** Okay. What is your understanding of who is responsible for promoting rider safety during Supercross events during the 2020 season?

**MR. DOYLE:** Object to form. Go ahead. You can answer. You can answer if you [inaudible], yeah, I'm going to be making objections from time to time. Don't let that bother you at all.

If you understand his question, answer it. Just ignore me.

**BY MR. SCHWEIKERT:**

**A.** I'm sorry, can you repeat that question?

**Q.** We're going to talk more about it specifically, but I'm just trying to understand generally if you are aware of anyone that has any sort of responsibility for trying to keep riders safe while they are on a racetrack during a professional Motocross or Supercross event.

**MR. DOYLE:** Object to form, if that's the question.

**BY MR. SCHWEIKERT:**

**A.** I'm sorry, I don't understand your question.

**Q.** Well, you agree that keeping riders safe is important, right?

**A.** Yes.

**Q.** So what is your understanding of how that is done during a professional Motocross or

Supercross race?

**A.** I defer that to Dr. Bodnar.

**Q.** Is it your understanding that the AMA has no involvement in promoting rider safety during professional races, its sanctions similar to the ones you participated in?

**MS. SPRADLIN:** Object to form.

**MR. GORDON:** Form.

**BY MR. SCHWEIKERT:**

**A.** Can you be more clear, please?

**Q.** We'll come back to that. Is The Medic Rig, LLC a limited liability company in California?

**A.** Yes.

**Q.** Okay. And you're the sole owner?

**A.** Yes.

**Q.** Are you the only person with managerial authority over the company?

**A.** Yes.

**Q.** Does the company currently have any employees?

35

**A.** One.

**Q.** And who is that?

**A.** Myself.

**Q.** Does the company pay you a salary?

**A.** Yes.

**Q.** Okay. What about, with respect to February
of 2020, were you an employee of The Medic Rig,
LLC at that time?

**A.** Yes.

**Q.** Were there any other employees at that time?

**A.** No.

**Q.** Okay. Do you know who Joanne Pryor is?

**A.** Yes.

**Q.** And who is she?

**A.** Accounting. Accountant.

**Q.** Is the accountant for the Medic Rig, LLC?

**A.** Yes.

**Q.** Does the company pay her for her accounting
services?

**A.** Yes.

36

**Q.** But she's not an employee, it's more of a

contractual arrangement?

**A.** Correct.

**Q.** When did you form The Medic Rig, LLC, if you

can recall?

**A.** 2011 or '12.

**Q.** And why did you form the company?

**A.** To manage the money, to provide the service.

**Q.** And what service was the company intended to

provide shortly after it was formed in 2011,

2012?

**A.** The program started in 2000.

**Q.** What do you mean by the program?

**A.** It was the first time that a doctor was

official. It was the first time that our

company provided a doctor at the event. At an

event.

**Q.** Was in the year 2000?

**A.** Correct.

**Q.** But The Medic Rig, LLC entity didn't exist

at that time. So what company are you referring

to?

**A.** Innovation Sports was the company in 2000.

**Q.** After you retired from professional racing,

did you start getting involved in working at

professional Motocross and Supercross events?

**A.** I went to work for Innovation Sports.

**Q.** When did you go to work for Innovation

Sports?

**A.** Part-time in 1998.

**Q.** And what was Innovation Sports?

**A.** A medical company.

**Q.** Do you recall who was the owner of that

medical company?

**A.** Jim Castillo.

**Q.** Castillo, C-A-S-T-I-L-L-O?

**A.** Correct.

**Q.** Was he a medical doctor?

**A.** No.

**Q.** And what were you hired to do for that

38

company in 1998?

**A.** The company made custom knee braces.

**Q.** For motorcycle racing?

**A.** All sports.

**Q.** Okay. Well, what were you doing for them?

**A.** Looking after the professional motorcycle athletes.

**Q.** What does that mean?

**A.** Can you be more specific?

**Q.** You said you were looking after professional motorcycling athletes, correct?

**A.** We made knee braces. That some of those athletes wore knee braces.

**Q.** Did that company at some point become a medical care service provider for professional racing?

**A.** Can you repeat that?

**Q.** I understood that your company today is sort of a successor or took over from Innovation Solutions.

**A.** Innovation Sports.

**Q.** Sports, excuse me. Right. But what I
understand is as of 2000, Innovation Sports was
making protective equipment. So was there a
point in time where it started providing
medical care during professional races similar
to what The Medic Rig does today?

**A.** We paid a doctor to attend the events.

**Q.** What events?

**A.** The professional Supercross.

**Q.** And who engaged Innovation Solution, Sports?

**A.** Sports.

**Q.** Excuse me. Who engaged Innovation Sports to
provide services at professional races, if you
know?

**A.** Can you explain engaged?

**Q.** What services was Innovation Sports
providing for these races that you're referring
to?

**A.** We paid a doctor's expenses to go attend

those races.

**Q.** And did somebody ask you to pay those

doctor's expenses?

**A.** I offered to pay that doctor to go to those

races.

**Q.** Who did you offer that to?

**A.** Dr. Bodnar.

**Q.** Do you know who asked Dr. Bodnar to go to

those races?

**A.** No.

**Q.** Are the races you're referring to

professional Supercross races?

**A.** Yes.

**Q.** Help me understand how Innovation Sports got

involved in paying for Dr. Bodnar to go to the

professional races?

**A.** I was at Innovation Sports, I wanted to

continue to be involved in the racing.

**Q.** Did Innovation Sports have any sort of

arrangement with any doctor that was providing

services to the Supercross before you started

working for Innovation Sports?

**A.** Not that I'm aware.

**Q.** That was sort of something that you were the

innovator for?

**A.** Correct.

**Q.** All right. And who is Dr. Bodnar?

**A.** He is an ER doctor from San Diego,

California.

**Q.** And how did you first meet him or come to

know of him?

**A.** I met him at Anaheim in 2000.

**Q.** Anaheim Supercross race in 2000?

**A.** Correct.

**Q.** Was he, as far as you know, providing

medical services at that Anaheim event in 2000?

**A.** In 2000, he did provide, he was present at

the event.

**Q.** And were you there as a spectator or were

you there performing some service yourself?

**A.** I was there on behalf of Innovation Sports.

**Q.** Okay. And what was Innovation Sports doing at that particular event?

**A.** Providing knee braces.

**Q.** Providing the knee braces to the riders so they could wear them during the races?

**A.** Those that chose to, yes.

**Q.** Was Innovative Sports doing anything other than providing knee braces to riders that wanted them?

**A.** Can you define other?

**Q.** Was Innovative Sports...

**A.** Innovation Sports.

**Q.** Excuse me. Well, I have an understanding of what The Medic Rig does today. Was Innovation Sports doing something similar back in 2000 for the Supercross?

**A.** 2000 was the start of the program of having a dedicated doctor at the events.

**Q.** Okay. And you were involved in getting that

43

program started?

**A.** Yes.

**Q.** Okay. And did Innovative Sports...

**A.** Innovation Sports.

**Q.** Right, Innovate. Let me write that down.
Innovation Sports. Did you ever acquire any
ownership interest in Innovation Sports?

**A.** No.

**Q.** Okay. Did your current company, The Medic
Rig, LLC, eventually succeed Innovation Sports
in providing medical services during
professional Supercross races?

**A.** Can you repeat that, please?

**Q.** Sure. Innovation Sports, as far as I'm
understanding, was beginning in around 2000
providing some medical services during
professional Supercross races, right?

**A.** In the year 2000. Correct.

**Q.** Is it still doing that today?

**A.** No.

44

**Q.** Do you know who is providing medical

services during professional Supercross races

today?

**A.** Yes.

**Q.** And who is that?

**A.** The Medic Rig.

**Q.** Your company?

**A.** Correct.

**Q.** Just trying to understand the transition

from Innovation Sports in the past to your

company in the present. Is that something you

can explain to me?

**A.** Yes.

**Q.** Please do so.

**A.** Innovation Sports was the first company, the

very next year it went to Asterisk.

**Q.** In around 2001?

**A.** Correct.

**Q.** And who owned Asterisk?

**A.** Jim Castillo, Ed Castillo, Sherry Castillo,

45

Mike Byer, Dave Castillo, Danny Castillo, Mike

Byer, Tom Carson, Mark Wilson.

**Q.** You have a very good memory of names.

**A.** We were owners of the company.

**Q.** Okay. And what was Asterisk doing in

connection with Supercross at that time?

**A.** Making knee braces.

**Q.** Was it still paying for doctors to provide

care at Supercross races?

**A.** A doctor.

**Q.** Dr. Bodnar?

**A.** Correct.

**Q.** Was it paying for any other medical

professionals to assist Dr. Bodnar?

**A.** Not the first year.

**Q.** But the scope expanded over time?

**A.** Yes.

**Q.** Tell me about that, please.

**A.** The program got bigger.

**Q.** What does that mean?

**A.** More people became involved. I'd like to take a break please.

**Q.** Are you finished? Okay, that's fine. How long would you... We can go off the record.

**A.** Why don't we take [inaudible]?

**COURT REPORTER:** 11:06 a.m. All right, we're back on the record. The time is 11:12 a.m. Go ahead, Mark.

**BY MR. SCHWEIKERT:**

**Q.** I think before the break, I was asking you about how the scope expanded. Do you recall that?

**A.** Yes.

**Q.** Could you explain to me what you meant by that?

**A.** There was never a dedicated doctor at the series. We brought a doctor the first year in 2000. All the rider seemed to accept the fact that there was one particular doctor and then the program was growing, so we brought on

another person.

**Q.** Another doctor?

**A.** No.

**Q.** A medical professional?

**A.** Yes.

**Q.** Do you recall what type?

**A.** Athletic trainer.

**Q.** Was that Eddie Casillas?

**A.** Casillas, yes.

**Q.** C-A-S-I-L-L-A-S?

**A.** Correct.

**Q.** Okay. So first it was just Dr. Bodnar, then it expanded to Dr. Bodnar and Eddie Casillas, correct?

**A.** Yes.

**Q.** And that was under the Asterisk umbrella?

**A.** Yes.

**Q.** Did it expand further after that?

**A.** Yes.

**Q.** Please tell me about that.

**A.** Those 2 individuals were accepted. So then we added more individuals.

**Q.** You were adding more individuals to the team of medical professionals that were going to the Supercross races to be available to riders if needed?

**A.** Yes.

**Q.** Did at some point The Medic Rig take over from Asterisk?

**A.** Yes.

**Q.** And I'm just trying to understand, how did it go from Asterisk to The Medic Rig, LLC, which I understand you are the sole owner of.

**A.** Asterisk was going bankrupt.

**Q.** It did not have sufficient funding to provide medical care for the events?

**A.** They didn't have funding to stay in business.

**Q.** Do you know if [crosstalk]...

**A.** Go ahead.

**Q.** No, I'm sorry. What did you say?

**A.** I was waiting.

**Q.** Okay. Do you know if Asterisk was being paid by anyone for providing Dr. Bodnar and then Dr. Bodnar and Eddie Casillas for the Supercross events?

**A.** I do not recall.

**Q.** But Asterisk was paying Dr. Bodnar's expenses for those events, right?

**A.** Correct.

**Q.** Do you recall where Asterisk was getting that money?

**A.** We were a company selling knee braces.

**Q.** Asterisk was using the revenue it generated from selling knee braces to reimburse Dr. Bodnar for his expenses?

**A.** Yes.

**Q.** Did there come a point in time where Asterisk received funds from other sources that it used to pay the expenses associated with

providing medical services at the Supercross
events?

**A.** Yes.

**Q.** Tell me about that, please.

**A.** I do not recall all the companies. In the
beginning, there were several donations.

**Q.** Do you recall if there were any donations
from the sanctioning bodies or the promoters of
the Supercross at that time?

**A.** I do not recall.

**Q.** When did Asterisk go bankrupt?

**A.** I believe 2015. I'd like to rephrase that.
The company did not go bankrupt, the company
went out of business.

**Q.** In 2015, approximately?

**A.** '15 or '16, correct.

**Q.** Okay.

**MR. RAMOS:** Doctor, do you mind giving us a
spelling on the company, because I've seen it a
couple different ways?

**MR. CARSON:** On the company, Asterisk?

**MR. DOYLE:** Yes. Yeah, he's asking you to spell it.

**MR. CARSON:** Okay. A-S-T-E-R-I-S-K.

**MR. RAMOS:** Thank you.

**BY MR. SCHWEIKERT:**

**Q.** Was that a limited liability company as well?

**A.** Yes.

**Q.** Okay.

**Q.** And I'm really just trying to understand a little bit of the background before we get to more of the present day. I understand the Medic Rig company was formed around 2011, 2012, right?

**A.** Correct.

**Q.** And when did The Medic Rig company begin getting involved in providing medical care for the Supercross races?

**A.** Approximately 2016.

**Q.** So you formed the company in 2011, 2012 but it wasn't until Asterisk went out of business that The Medic Rig company took over the role of providing medical care/ Am I understanding correctly?

**A.** Correct.

**Q.** All right. And do you recall who was the owner of the Supercross in 2015?

**A.** No.

**Q.** Do you know who's the owner of the Supercross today?

**A.** Yes.

**Q.** And who is that?

**A.** Feld Motorsports. I'm sorry, let me clarify that. Feld Motorsports is the promoter. I believe AMA or AMA Pro Racing is the owner of Supercross.

**Q.** Today?

**A.** Today.

**Q.** Okay. And why do you believe that?

**A.** Feld Motorsport is the promoter.

**Q.** It promotes an event that it does not own, according to your understanding?

**A.** I do not [crosstalk].

**Q.** As of the time that The Medic Rig company took over from Asterisk, what was the scope of the team that was being provided for the Supercross races?

**A.** Can you define scope?

**Q.** Yeah, I mean, we were talking about it earlier. First it was Dr. Bodnar, then Dr. Bodnar and Eddie Casillas, then you said there were some others added.

What was the team, approximately, if you can remember, around the time that the Medic Rig company took over?

**A.** We also had an RN and we had some volunteer medical staff.

**Q.** As of today, there is a Medic Rig semi-trailer that serves as a emergency department

54

on wheels. Is that fair?

**A.** Yes.

**Q.** Did you have that trailer back in the 2015 era?

**A.** There was a semi-trailer before the current semi-trailer.

**Q.** When was the first trailer?

**A.** I do not recall.

**Q.** Have you been the sole owner of the Medic Rig company throughout the entire history of its existence?

**A.** No.

**Q.** Who else has had an ownership interest?

**A.** Joanne Pryor.

**Q.** And when did she have an ownership interest?

**A.** The very first year.

**Q.** The very first year after it was formed or the very first year after it began providing medical services for the events?

**A.** I do not recall.

**Q.** And she no longer has an ownership interest?

**A.** Correct.

**Q.** Why not?

**A.** She didn't want to be an owner.

**Q.** With respect to the 2020 Supercross season, can you describe for me what services, if any, the Medic Rig provided during Supercross races?

**A.** I defer that to Dr. Bodnar.

**Q.** Do you have any understanding as the owner of the company?

**A.** Understanding of what?

**Q.** You just show up and sit there? I mean, I'm just trying to find out, sir, a little bit about the business, from the businessman that owns the business.

I'm not asking for you to tell me about how to provide medical care. I understand you're not a doctor, right? You're not a doctor?

**A.** I am not a doctor.

**Q.** Okay. And I'm not asking about that. But I'm

56

just trying to understand your perspective and

what is the role of the Medic Rig company at

the Supercross events during the 2020 season?

**A.** To provide on-track medical care.

**Q.** Anything else?

**A.** Anything else?

**Q.** Does it sell knee braces?

**A.** No.

**Q.** Okay. Does it provide care to riders even

off the track?

**A.** Yes.

**Q.** Does it provide preventative treatments like

taping up ankles or things like that if a rider

wants it?

**A.** Yes.

**Q.** Does it provide care to anyone other than

riders?

**A.** Yes.

**Q.** Could you explain that to me, please?

**A.** Anyone who is a credentialed individual at

the event can come to the trailer.

**Q.** And what do you mean by credentialed?

**A.** Every individual is required to apply for a credential to be at the event.

**Q.** Did you yourself have a credential for the 2020 Supercross season?

**A.** Yes.

**Q.** Who did you apply to, to obtain that credential?

**A.** Feld Motorsports.

**Q.** And by credential, are you referring to a hard card that can be worn on a lanyard?

**A.** Yes.

**Q.** And just so we're talking apples to apples, I'm going to show you a document previously marked as Exhibit 42, which I will represent to you is pictures of Dr. Kennedy's hard card for the 2020 Supercross season. Do you see Exhibit 42 on the screen, sir?

**A.** Yes.

**Q.** Did you have a credential like this one?

**A.** No.

**Q.** What did your credential look like?

**A.** I do not recall.

**Q.** Do you still have a copy of it?

**A.** I'm sure that I do.

**Q.** Did you look for it at all in connection with this case?

**A.** No.

**Q.** Give me a second. All right, I'm going to show you a document previously marked as Exhibit 3, which I will represent is something called a credential board given to me by Feld Motorsports. Can you see that document on your screen, sir?

**A.** Yes.

**Q.** Okay. It's my understanding these are sort of different types of credentials, VIP, media pass credential, industry credentials. Do you see that?

**A.** I see the different types, yes.

**Q.** All access type up here, do you see that?

**A.** Yes.

**Q.** Do any of these look like the credential that you had for the 2020 season?

**A.** I do not recall.

**Q.** What about on the second page?

**A.** Are you asking if I had a vest?

**Q.** Did you have a vest?

**A.** No, I did not.

**Q.** Okay. Did your credential look like the track walk credential?

**A.** No.

**Q.** Do you recall if you had a credential that had the SX logo on it?

**A.** I do not recall.

**Q.** But you do recall that it did not look like Dr. Kennedy's?

**A.** I do not recall.

**Q.** Okay. Second. All right, I'm going to show

60

you another document previously marked as

Exhibit 75. I'll represent this as a picture of

Tim Kennedy's hard card for the 2020 Supercross

season. Do you see that on your screen, sir?

**A.** Yes.

**Q.** Did your credential look anything like this

one?

**A.** I do not recall.

**Q.** Okay, do you know who Tim Kennedy is?

**A.** Yes.

**Q.** And who is he?

**A.** He helps at the races.

**Q.** Here's the back of his credential, do you

see that?

**A.** Yes.

**Q.** Does that refresh your recollection at all

about what yours looked like?

**A.** No.

**Q.** But you do believe you have a copy of it, is

that correct?

**A.** Yes.

**Q.** You wouldn't mind seeing if you could find it, I would appreciate that.

**MR. DOYLE:** And Mark, just so I'm clear, you're talking about specific to the 2020 season?

**MR. SCHWEIKERT:** Yeah, if he has it, sure.

**MR. DOYLE:** Yeah, if he's going to go look, I want to make sure he's looking for what you're asking him to look for.

**MR. SCHWEIKERT:** Yes. All right. Second. Do you have a copy of the Master Services Agreement in front of you, perchance?

**MR. DOYLE:** He will in a moment. [silence] He's got it.

**MR. SCHWEIKERT:** I want to talk to you about a document previously marked as Exhibit 7, Bates labeled FMS Inc. 576 through 586, which is a copy of the Master Services Agreement between the Medic Rig, LLC and Feld Motorsports Inc. Do you have a copy of that agreement in front of

you, sir?

**MR. DOYLE:** So the numbers she's talking about
are these numbers down here at the bottom are
the base numbers, just to [crosstalk].

**MR. CARSON:** 576.

**MR. DOYLE:** Just go ahead and flip through and
confirm that you've got them.

**BY MR. SCHWEIKERT:**

**A.** 576 and 577, yes.

**Q.** Okay, do you recognize this agreement?

**A.** Yes.

**Q.** What is it?

**A.** Master services agreement.

**Q.** Is it a Master Services Agreement between
the Medic Rig, LLC and Feld Motorsports?

**A.** Yes.

**Q.** And if we look at the first page, at the
top, it says this Master Services Agreement is
made and entered into on December 6th, 2016. Do
you see that?

**A.** Yes.

**Q.** Is this the first contract that your company had with Feld Motorsports related to providing medical services at Supercross events?

**A.** Yes.

**Q.** But prior to December 2016, your company had been providing medical services to Feld Motorsports, right?

**A.** I believe it was Asterisk. The [inaudible] was only managing the money.

**Q.** What do you mean by that?

**A.** It was still promoted as Asterisk. The semi-set Asterisk.

**Q.** But the name of the company that was providing medical services before the Medic Rig was Asterisk?

**A.** Asterisk, yes.

**Q.** Okay. And I understand Asterisk is also a brand that includes motorcycle safety apparel, right?

**A.** Let's be more clear on apparel.

**Q.** Sure, well, you tell me, what is Asterisk?

**A.** Knee braces.

**Q.** Knee braces, okay. So when we're talking about the company that was providing medical services before your company today, are you referring to Asterisk, the company that manufactures and sells knee braces, or a different entity that also happened to be called Asterisk?

**A.** I don't understand your question.

**Q.** Was Asterisk the sponsor of a company or was it the actual company that was providing services?

**A.** Both. Asterisk owned the original Semi. Asterisk manufactured knee braces. Asterisk was the name on the side of the Semi.

**Q.** And at what point did the Medic Rig start managing the money?

**A.** I believe 2011 or 2012.

**Q.** You formed the company to manage the money

that was used to pay the expenses of the

medical team that was going to these events?

**A.** The team was still paid. 2011, 2012. I

believe Asterisk still paid those individuals

from their checking account.

**Q.** And the source was from revenue generated

from selling knee braces and donations?

**A.** Yes.

**Q.** All right. If we go back to Exhibit 7, the

Master Services Agreement,

is this contract, strike that, was this

contract in effect during the 2020 Supercross

season?

**A.** I believe there was a revision from this

original 2016 contract.

**Q.** There is a Statement of Work attached as

Exhibit A, which is page 9 of the contract. Let

me know when you're there.

**MR. DOYLE:** Should we keep going? It should be

after that yellow divider. It kind of keeps

those separate.

**BY MR. SCHWEIKERT:**

**A.** Okay.

**Q.** Section 1 reads, "The term of this Statement

of Work shall be from the effective date of the

Master Services Agreement through the Monster

Energy Cup event held in October 2021." You see

that?

**A.** Yes, sir.

**Q.** Okay. Does that refresh your recollection as

to whether the term of this Master Services

Agreement first entered into in December 2016,

was still in effect as of 2020 Supercross

season?

**A.** This was in effect, yes.

**Q.** Okay. Is this agreement still in effect

today in 2025?

**A.** I believe it is with updates.

**Q.** What type of updates?

**A.** Financial increases.

**Q.** Anything other than financial increases?

**A.** I do not know. I have a corporate attorney

for reuse this document.

**Q.** Do you recall the last time there was a

negotiation of different terms?

**A.** I do not recall.

**Q.** Okay. Let's go back to the Master Services

Agreement. Do you see a heading 1.0 entitled

Services and Deliverables?

**A.** Yes.

**Q.** Okay. And there's a Section 1.1, do you see

that?

**A.** Yes.

**Q.** And it reads in part, "Service provider will

supply to FMS professional services, including,

but not limited to providing licensed

physicians at FMS produced Supercross races."

Do you see that?

**A.** Yes.

**Q.** Okay. The reference to service provider is to your company, the Medic Rig, LLC, right?

**A.** Yes.

**Q.** And FMS refers to Feld Motorsports?

**A.** Yes.

**Q.** Okay. And what is your understanding of the professional services that were provided to Feld Motorsports under this contract during the 2020 Supercross season?

**A.** Can you be more specific?

**Q.** Yeah, with respect to what we just read.

**A.** The Medic Rig was to provide medical services for the events.

**Q.** And if we go back to Section 1, the second half of that sentence also states, "And to provide equipment, including, but not limited to a basic mobile medical facility." Do you see that?

**A.** Yes.

**Q.** Okay. And is that something that your

company also did during the 2020 Supercross
season?

**A.** Yes.

**Q.** And then it refers to the Statement of Work.
Do you see that?

**MR. DOYLE:** Are you asking him to go to the
Statement of Work? [Inaudible] Are you asking
him to go to the Statement of Work or are you
just asking him, does he see where it
references the Statement of Work?

**MR. SCHWEIKERT:** Just trying to get on the same
page.

**MR. DOYLE:** That's why I'm asking because
they're on 2 different pages. One reference is
a Statement of Work and then the Statement of
Work is a separate page. So, where do you want
[crosstalk]?

**MR. SCHWEIKERT:** I'll redo it.

**MR. GORDON:** Okay.

**BY MR. SCHWEIKERT:**

**Q.** Okay. With respect to 1.1, your company was agreeing to supply 2 FMS, professional services, including licensed physicians and equipment, including a basic mobile medical facility at FMS produced Supercross races, right?

**A.** Yes.

**Q.** And you were required to do so as mutually agreed upon from time to time and as set forth in a written Statement of Work signed by all parties, right?

**A.** Yes.

**Q.** Okay. Now, let's go to page 9, Exhibit A, the Statement of Work. Do you see that?

**A.** Yes.

**Q.** And if we look at Section 2 entitled Duties and Responsibilities, there is a subsection entitled Monster Energy Supercross. Do you see that?

**A.** Yes.

**Q.** Okay. And it reads in part, "Service provider shall provide all necessary staffing and equipment to operate a basic mobile medical facility at each event during the 2017 to 2021 seasons of the Monster Energy Supercross, organized and operated by FMS in order to provide medical care to riders, crew and staff as needed." Do you see that?

**A.** Yes.

**Q.** And is that something that the Medicare did for Feld Motorsports?

**A.** Yes.

**Q.** And the last sentence reads, "Service providers shall be present and ready to provide professional services for all on-track activities at each event during the Supercross season, including practice." Do you see that?

**A.** Yes.

**Q.** And is that something that the Medic Rig did for Feld Motorsports during the 2020 Supercross

season?

**A.** Yes.

**Q.** Okay. And under Section 3, well, let's talk about the compensation while we're here. I understand there has been an amendment to this Statement of Work, which increases the compensation. Are you familiar with that?

**A.** Yes.

**Q.** And I'm happy to show it to you. It was previously marked as Exhibit 128,

Bates labeled FMS Inc. 574 through 575 entitled First Amendment to Statement of Work.

**MR. DOYLE:** Okay. We've got it.

**MR. SCHWEIKERT:** You've got that?

**MR. DOYLE:** Yes.

**BY MR. SCHWEIKERT:**

**Q.** Okay. And does this First Amendment to the Statement of Work set the amount of compensation that your company was paid for the Supercross season of 2020 at $378,069?

**A.** Yes.

**Q.** Okay. And then if you provided services at the Monster Energy Cup, you would be paid an additional fee as set forth in this First Amendment to Statement of Work, right?

**A.** Yes.

**Q.** Okay. And if we go to the second page of the First Amendment, is that your signature under the Medic Rig, LLC?

**A.** Yes.

**Q.** Okay. You signed this on September 20th, 2019?

**A.** Yes.

**Q.** Okay. And it looks like Mike Muir also signed on that day. Do you see that?

**A.** Yes.

**Q.** Did you guys sign it together at the same place?

**A.** No.

**Q.** Did you negotiate the amount of compensation

with Mr. Muir?

**A.** I do not recall.

**Q.** Do you recall who was your point of contact with respect to the terms of this agreement at Feld Motorsports?

**A.** Dave Prater and Mike Muir, I believe.

**Q.** Okay. And if we go back to the Master Services Agreement itself, Exhibit 7. You go to page 8. Do you see your signature on behalf of the Medic Rig, LLC dated December 6, 2016?

**A.** Yes.

**Q.** Okay. And above that, there's the signature on behalf of Feld Motorsports by David Prater. See that?

**A.** Yes.

**Q.** And then on page 11, you and Mr. Prater signed Exhibit A, the Statement of Work as well, right?

**A.** Yes.

**Q.** Let's go to Section 3.0 of the Master

Service Agreement. It's on page 2. Let me know

when you're there.

**A.** I'm there.

**Q.** Okay. Do you see the heading is

responsibility for third-party services,

software and hardware?

**A.** Yes.

**Q.** Okay. And below the heading, it reads, "In

performing and providing the services, service

provider may engage third parties, including

but not limited to physicians, EMTs, or other

qualified medical personnel." Do you see that?

**A.** Yes.

**Q.** Okay. And who made the determination as to

whether medical personnel was qualified for the

2020 Supercross season?

**A.** Dr. Bodnar.

**Q.** And did Dr. Bodnar have a responsibility for

training the medical personnel that worked the

Supercross events during the 2020 Supercross

season on behalf of your company?

**A.** Yes.

**Q.** We go back to that paragraph. The second sentence reads, "Service provider shall ensure that all third-party vendors are duly licensed in the states where they will provide medical care. And that each third-party vendor carries appropriate medical malpractice insurance as required by any state or jurisdiction where such services are rendered by the service provider." Do you see that?

**A.** Yes.

**Q.** And is that something that The Medic Rig agreed to do during the 2020 Supercross season?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I don't understand your question.

**Q.** This is a document entitled the Master Services Agreement, right?

**A.** Yes.

**Q.** And what does agreement mean to you?

**A.** Something parties agree to do together.

**Q.** And are the terms written in this Master Services Agreement things that The Medic Rig, LLC and Feld Motorsports agreed to do?

**A.** Yes.

**Q.** Okay. So did The Medic Rig ensure that all third-party vendors were duly licensed in the states where they will provide medical care during the 2020 Supercross season?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I defer that to Dr. Bodnar.

**Q.** And why do you defer that to him?

**A.** I'm not a medical person.

**Q.** Do you need to be a medical person to verify someone's licensing status?

**MR. DOYLE:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I have Dr. Bodnar for those tasks.

**Q.** Do you know if he verified, we'll strike that. Do you know what state Dr. Bodnar is licensed to practice medicine in?

**A.** I do not know all the states.

**Q.** Was Dr. Bodnar licensed to practice medicine in Florida as of February, 2020?

**A.** I do not know.

**Q.** What are some of the states that you believe he was licensed to practice medicine in at that time?

**A.** California.

**Q.** Any others?

**A.** I do not recall.

**Q.** Aside from this Master Services Agreement with Feld Motorsports, did your company have any contract with any racing team during the 2020 Supercross season?

**A.** No.

**Q.** Did your company have any contract with any rider during 2020 Supercross season?

**A.** No.

**Q.** Did your company have any contract with the AMA during the 2020 Supercross season?

**A.** I do not recall.

**Q.** You don't know if your company had a contract with the AMA during the 2020 Supercross season?

**A.** That is correct. I do not recall.

**Q.** Why don't you recall?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I don't remember. I do not recall.

**Q.** Did your company have a contract with the AMA before the 2020 Supercross season?

**A.** I do not recall.

**Q.** Is there a contract that your company has with the AMA today?

**A.** I do not recall.

**Q.** Who would know, other than the AMA, if not you, the owner of the Medic Rig, LLC?

**A.** My corporate attorney.

**Q.** Are you aware that plaintiffs have asked for contracts related to any medical services that were provided during the 2020 Supercross season?

**A.** Are you asking if I'm aware that they are asking for those?

**Q.** Yes.

**MR. DOYLE:** I'm not trying to interrupt here, but I think I may know why Tom's struggling based on a conversation we had yesterday. Are you worried about, not worried, but thinking about the Daytona event? Is that what you're thinking?

**MR. CARSON:** Yes.

**MR. DOYLE:** Okay. He does have an agreement for the event at Daytona that's separate from this MSA. Is that with AMA?

**MR. CARSON:** Yes.

**MR. DOYLE:** Okay, so I think that's where he's

struggling. It's not really applicable here,

but he does have a contract with AMA.

**MR. SCHWEIKERT:** No, that's fine.

**MR. DOYLE:** Okay.

**MR. SCHWEIKERT:** Okay.

**BY MR. SCHWEIKERT:**

**Q.** Well, let me put it this way. Did your

company have an agreement with the AMA that

applied to the Tampa Supercross event in

February of 2020?

**A.** No.

**Q.** Okay. But your company does have an

agreement with the AMA that applied to Daytona

Supercross events?

**A.** Yes.

**Q.** Do you know why Daytona is treated

separately?

**A.** Separate promoter. Different promoter.

**Q.** Do you know who promotes the Daytona

Supercross?

**A.** DMG, Daytona Motorsports Group.

**Q.** And do you know who owns Daytona Motorsports Group?

**A.** No.

**Q.** Do you know if Feld has anything to do with the Daytona Supercross events?

**A.** I do not know.

**Q.** Have you been to Daytona Supercross events?

**A.** Yes.

**Q.** When was the last time?

**A.** 2025.

**Q.** Was it last month?

**A.** Yes.

**Q.** Did you see anybody from Feld there?

**A.** Yes.

**Q.** Who did you see?

**A.** Some of the track crew.

**Q.** Were they there as spectators or were they there working as track crew?

**A.** I do not know.

**Q.** Well, were they on the track at any point while you were there at the event?

**A.** I do not know.

**Q.** Did you see them sitting in the stands or in the pit area? Where did you encounter them?

**A.** I encountered them, I saw them on Friday at a get together.

**Q.** A social event?

**A.** Yes.

**Q.** Okay. I am really just trying to understand. I know it's not comfortable to be asked questions in a deposition. I appreciate that. But I am really just trying to understand. That's all. Okay. What about on Saturday, the day of the actual like race? Did you?

**A.** I do not know.

**MR. DOYLE:** Hang on, just let him ask you the question, if that's okay.

**BY MR. SCHWEIKERT:**

**Q.** Did you see any of those Feld people or

other Feld people on Saturday, the race day?

**A.** I do not recall.

**Q.** And your company provided medical services at Daytona, right?

**A.** Yes.

**Q.** Okay. And the AMA was officiating the event?

**A.** Yes.

**Q.** And Daytona Motorsports Group was promoting the event?

**A.** Yes.

**Q.** Do you know who had hired the flaggers and track runners that were working that day?

**A.** No.

**Q.** Does the AMA have any ownership interest in Daytona Motorsport Group?

**MS. SPRADLIN:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I do not know.

**Q.** In the last 10 years or so, just based on your experience, has Daytona always been a

85

separate event from the other Supercross

events?

**A.** Yes.

**Q.** Do you know why?

**A.** No.

**Q.** Let's talk a little bit about February 2020

Supercross, which we'll get into much more

later. But do you recall who was on the medical

team that day, February 15, 2020?

**A.** Yes.

**Q.** And who do you recall?

**A.** Dr. Bodnar, Dr. Kennedy, Amy Metiva, and we

had a couple of volunteers.

I'm not sure of the rest.

**Q.** Was one of those volunteers a gentleman by

the name of Scott Combs?

**A.** Yes.

**Q.** Okay. How long have you known Dr. Kennedy?

**A.** I'm not sure.

**Q.** When is the first time you remember him

86

providing services at a Supercross event?

**A.** I do not remember.

**Q.** Well, was 2020 the first year for him?

**A.** No.

**Q.** He had provided services the prior season, 2019?

**A.** I do not recall.

**Q.** Okay. Dr. Kennedy is a medical doctor, right?

**A.** Yes.

**Q.** Okay. Do you know if Dr. Kennedy was licensed to practice medicine in Florida in February of 2020?

**A.** I do not know.

**Q.** And you yourself didn't attempt to verify his license insurer status before the Tampa Supercross, right?

**A.** I defer that to Dr. Bodnar.

**Q.** And who is Amy Metiva?

**A.** Athletic trainer.

**Q.** Are you aware of whether she is also a former emergency medicine technician?

**A.** I do not know.

**Q.** Have you ever seen her resume?

**A.** No.

**Q.** Do you have any reason to believe that she was not formerly an EMT?

**A.** Can you repeat that, please?

**Q.** Sure. I've checked the public records. As far as I'm aware, she was licensed as an EMT in Michigan as of February of 2020. Do you have any reason to believe that is not the case?

**A.** I defer to Dr. Bodnar.

**Q.** Do you know if Amy Metiva was licensed in athletic training in Florida as of February of 2020?

**A.** I do not know.

**Q.** And when did you first meet Ms. Metiva?

**A.** I do not remember.

**Q.** Do you know if she had prior experience with

Supercross before the Tampa event in 2020?

**A.** I do not remember.

**Q.** Are you saying that as the owner of The

Medic Rig, you let anybody walk in off the

street and [crosstalk] Hold on. Hold on.

**MR. DOYLE:** Let him finish his question.

**BY MR. SCHWEIKERT:**

**Q.** Are you saying that as the owner of The

Medic Rig, you let anybody walk in off the

street without knowing whether they have prior

experience with Supercross or what medical

profession they're licensed in, or in what

state they're licensed in before your company

allows them to provide care

to elite professional athletes? Is that what

you're saying?

**MR. GORDON:** Form.

**MR. DOYLE:** The state's testimony argumentative

and nonsensical. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I defer that to Dr. Bodnar.

**Q.** Okay. Well, what function did you play for The Medic Rig company during the Tampa Supercross in 2020?

**A.** Can you be more specific?

**Q.** Were you there?

**A.** Yes.

**Q.** Why?

**A.** I own the company.

**Q.** Were you watching from the stands?

**A.** No.

**Q.** Where were you?

**A.** Off the property.

**Q.** By property, are you talking about Raymond James Stadium?

**A.** Correct.

**Q.** Were you at The Medic Rig trailer?

**A.** No.

**Q.** Okay. Where were you?

**A.** Home Depot or Lowe's.

**Q.** The entire day?

**A.** No.

**Q.** Are you referring to during the time when the accident that we're going to talk about later happened?

**A.** Yes.

**Q.** Okay. I'm going to go back to the Master Services Agreement. What sections did you highlight on your agreement, sir?

**MR. DOYLE:** Are you asking him what highlights he made? Because I highlighted for him the same that you designated in your notice so that we could reference them more easily.

**BY MR. SCHWEIKERT:**

**Q.** Okay. Is there any other markings or notations on the Master Services Agreement that you have in front of you aside from the highlighting?

**A.** No.

**Q.** All right. Let's go back to the Master

Services Agreement, Exhibit 7, page 2. There's a reference here to ensuring that third-party vendors carry appropriate medical malpractice insurance in Section 3.0. Do you see that?

**A.** Yes.

**Q.** And what does that mean?

**A.** What are you asking?

**Q.** In the agreement where it states in part that The Medic Rig will ensure each third-party vendor carries appropriate medical malpractice insurance, what does that mean to you?

**A.** That I have malpractice insurance.

**Q.** And were all of the members of the medical team at the Tampa Supercross in 2020 covered by that medical malpractice insurance?

**A.** I defer that to Dr. Bodnar.

**Q.** Did you do anything to determine whether Dr. Kennedy, Dr. Bodnar, Amy Metiva, or Scott Combs had medical malpractice insurance aside from the insurance that your company procured?

**A.** I defer that to Dr. Bodnar.

**Q.** Let's go to Section 4.2. Are you there?

**A.** Yes.

**Q.** All right. It's entitled FMS Responsibilities and Access. Do you see that?

**A.** Yes.

**Q.** And it reads, "On a commercially reasonable basis, FMS will provide or arrange for access to the locations where service provider is to deliver all contracted professional services or deliverables. You see that?

**A.** Yes.

**Q.** Okay. And is that a true statement with respect to the Supercross season of 2020?

**MS. SPRADLIN:** [inaudible].

**BY MR. SCHWEIKERT:**

**A.** Yes.

**Q.** Your company could not provide medical services at any Supercross event unless Feld Motorsports gave you access, right?

**A.** Yes, correct.

**Q.** Okay. And none of the members of your
medical team could provide services at a
Supercross event, including the one in Tampa in
2020, unless Feld Motorsports gave them access,
right?

**A.** Yes.

**Q.** Okay. And Feld Motorsports also provided
access for your medical rig trailer to be
parked near the stadium, right?

**A.** Yes.

**MR. GORDON:** Object to form.

**BY MR. SCHWEIKERT:**

**Q.** Okay. Where was the trailer parked during
the February 2020 Supercross, to the best of
your recollection?

**A.** Outside the stadium entrance.

**Q.** And did it need clearance or approval in
order to get into that area?

**A.** Can you be more specific?

94

**Q.** Was it like a general parking lot where anybody could just come in and park their car?

**A.** No.

**MR. GORDON:** Object to form.

**BY MR. SCHWEIKERT:**

**Q.** Was it an area reserved for the event and the participants?

**A.** Yes.

**Q.** And Feld Motorsports gave your company access for it to bring its medical rig into that area and park near the stadium, right?

**MR. GORDON:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** Yes.

**Q.** Let's go to Section 5.2. Are you there?

**MS. SPRADLIN:** I'm sorry, Mark, did you say 5.2?

**MR. SCHWEIKERT:** Yes.

**MS. SPRADLIN:** Okay, thank you.

**MR. DOYLE:** And when you find that spot, Tom, as we're going through this, just let him know

you're there so that we can move this along.

**MR. CARSON:** Okay.

**BY MR. SCHWEIKERT:**

**Q.** All right. Do you see Section 5.2 entitled
Performance of Services?

**A.** Yes.

**Q.** Okay. And it reads, "Service provider
warrants that its personnel and/or third party
vendors shall perform the professional services
in a reasonable, good and workman-like manner
in accordance with the applicable Statement of
Work and all applicable relevant law. And will
obtain necessary permits and licenses to
perform same and provide all deliverables if
applicable." Do you see that?

**A.** Yes.

**Q.** And is that something that your company
warranted for the 2020 Supercross season?

**A.** I defer that to Dr. Bodnar.

**Q.** But that's what it says in this agreement,

right?

**A.** What are you asking me?

**MR. DOYLE:** He's just asking if those words

appear in the agreement?

**MR. CARSON:** Yes, they do.

**MR. DOYLE:** Would you agree that what he read is

what it says?

**MR. CARSON:** Yes.

**MR. DOYLE:** Okay. That's all.

**BY MR. SCHWEIKERT:**

**Q.** Thank you. And if I understand it, any

interpretation of what those words mean, you

would defer to Dr. Bodnar?

**A.** Yes.

**Q.** You don't have any understanding of what

performing professional services in a

reasonable good and workman-like manner means?

**A.** I'm not a medical person.

**Q.** Were there any permits and licenses that The

Medic Rig needed to perform its services and

provide all deliverables for the 2020 Tampa

Supercross?

**A.** I defer to Dr. Bodnar.

**Q.** You know, it's funny because when I deposed

Dr. Bodnar, he deferred to you about this

agreement. So kind of a little ping pong, but

that's neither here nor there.

**MR. DOYLE:** Object to form or move to strike.

It's not exactly accurate, but I understand

what you're saying.

**BY MR. SCHWEIKERT:**

**A.** It's all right.

**Q.** If we take a look at section 5.3.

**A.** Okay.

**Q.** It's entitled Professional Services and

Deliverables Warranty. Do you see that?

**A.** Yes.

**Q.** Okay, and then there's a little Subsection

I, do you see that?

**A.** Yes.

98

**Q.** All right. And it reads, "Service provider

will be fully responsible for all its employees

or third party vendors, including without

limitation responsibility for all salaries and

other compensation insurance and other

statutory payments, fringe benefits, and other

benefits customarily provided by employers on

behalf of the employees." You see that?

**A.** Yes.

**Q.** Okay. And is that true with respect to the

2020 Supercross season?

**A.** Yes.

**Q.** Okay. Your company agreed to be fully

responsible for you as its employee and its

third party vendors?

**A.** Yes.

**Q.** And it's my understanding there are

subcontracts that The Medic Rig, LLC has with

individuals like Dr. Bodnar and Dr. Kennedy

that were in effect during the 2020 season,

right?

**A.** Yes.

**Q.** Okay. And the references in here to third party vendors, that's referring to the various medical personnel that your company contracted to provide services during the 2020 Tampa Supercross?

**A.** Can you repeat that?

**Q.** I think it's defined in here. Just give me a second. All right, if we go back So section 3.0, first sentence reads in part, "Service provider may engage third parties, including but not limited to physicians, EMTs, or other qualified medical personnel, [collectively the third party vendors]." Do you see that?

**A.** Yes.

**Q.** So this contract is defining third party vendors to mean third parties engaged by your company, including physicians, EMTs, or other qualified medical personnel, right?

**A.** I see that that is written there. Yes. I'm not sure who third party vendors are in this situation.

**Q.** According to the contract, it would include physicians, EMTs, or other qualified medical personnel. Do you see that?

**A.** Yes.

**Q.** And do you believe that Amy Metiva, Scott Combs, Dr. Kennedy, Dr. Bodnar, were qualified to provide medical services during the 2020 Supercross season?

**A.** I defer that to Dr. Bodnar.

**Q.** You defer it to him even though it's your company?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** He handles all the medical.

**Q.** But you yourself don't even believe that Dr. Bodnar is qualified.

**MR. DOYLE:** Object to the form. Misstates

testimony, argumentative. Go ahead, Tom.

**BY MR. SCHWEIKERT:**

**A.** I believe Dr. Bodnar is qualified.

**Q.** What about Dr. Kennedy?

**A.** I defer to Dr. Bodnar.

**Q.** What is the basis for your belief that Dr. Bodnar is qualified?

**A.** He was one of the founders founding of this whole program and an ER doctor in California.

**Q.** He's worked at Supercross races for decades, fair?

**A.** Fair.

**MR. SCHWEIKERT:** You want to take a little break? I could use one myself.

**MR. DOYLE:** Yes.

**MR. SCHWEIKERT:** Off the record.

**MR. CARSON:** Yeah.

**MR. GORDON:** Are we talking about lunch or are we talking about bathroom? What are we talking about?

**MR. SCHWEIKERT:** I would say [crosstalk].

**MR. GORDON:** Why don't we go off the record? These don't have to be on the video records. Go off the record.

**COURT REPORTER:** All righty. Off the record, 12:31.

**MR. SCHWEIKERT:** I'd say let's do like 30 minutes and I'm going to go grab something to eat unless people need more time.

**MS. SPRADLIN:** 30 minutes is fine for me.

**COURT REPORTER:** All right, we're back on the record. The time is 1:18 p.m. Go ahead, Mark.

**BY MR. SCHWEIKERT:**

**Q.** Where in Ohio do you live, Mr. Carson?

**A.** Hopedale.

**Q.** What's the closest big city?

**A.** Define big?

**Q.** Are you near Cleveland, Columbus?

**A.** No.

**Q.** Akron?

**A.** No.

**Q.** Toledo?

**A.** No.

**Q.** What's the closest airport?

**A.** Pittsburgh.

**Q.** Pittsburgh, okay. And what is the address of the office building that you are located in today?

**MR. DOYLE:** I can't help you. If you know, tell him. If you don't know.

**BY MR. SCHWEIKERT:**

**A.** I don't know.

**Q.** Okay. And did you meet with any attorney from Buchanan Ingersoll & Rooney such as Gretchen Jankowski, Matthew Pilsner, or Mr. David Gordon today or before today?

**A.** No.

**Q.** Let's go back. Well, before I get there, you understand that we're here today because Brian Moreau has filed a lawsuit, correct?

**A.** Yes.

**Q.** When did you first become aware that Brian

intended to file suit?

**A.** I do not recall.

**Q.** Are you aware that Dr. Bodnar was served

with pre-suit notice in May of 2022?

**A.** No.

**Q.** He never informed you that he had received

some paperwork from me around that time?

**A.** I cannot be sure of that date.

**Q.** Did there come a time where Dr. Bodnar made

you aware that he had received some paperwork

from me?

**A.** Yes.

**Q.** Tell me about that, please.

**A.** He informed me that there would be a lawsuit

because of Mr. Moreau's incident.

**Q.** And do you know if you or Dr. Bodnar did

anything to inform Feld Motorsports of that?

**A.** I would defer to Dr. Bodnar.

**Q.** Who submitted the claim for insurance
coverage in this case to The Medic Rig's
insurer, do you know?

**A.** I defer to Dr. Bodnar.

**Q.** Is that because Dr. Bodnar did that, you
believe?

**A.** Yes.

**Q.** And to the extent you have been deferring to
Dr. Bodnar throughout this deposition, is it
fair to say that with respect to those topics,
Dr. Bodnar has authority to speak on behalf of
The Medic Rig, LLC?

**A.** I am not a medical person. Any question you
ask me pertaining to a medical or medical
procedure, I'm going to defer to Dr. Bodnar.

**Q.** And Dr. Bodnar is authorized by you as the
owner of The Medic Rig, LLC, to answer those
questions on its behalf?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** On medical questions.

**Q.** Well, there were a number of questions I asked you about, the Master Services Agreement, to which deferred to Dr. Bodnar. Do you recall that?

**A.** Yes.

**Q.** Okay. But one of the topics of today that you've been designated to testify about was that Master Services Agreement. Do you recall that?

**A.** Yes.

**Q.** Did you do anything to speak with Dr. Bodnar in preparing to provide information about the agreement?

**A.** No.

**Q.** Okay. So if you can't answer certain questions to which you have deferred to Dr. Bodnar on behalf of your company, is it fair to say that Dr. Bodnar is authorized to answer those questions on behalf of your company?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** Pertaining to medical, yes.

**Q.** Let's go back to Exhibit 7, the Master
Services Agreement.

**A.** 7.0?

**Q.** I'm sorry?

**MR. DOYLE:** It's Exhibit 7. So it's been
previously marked as Exhibit 7. See that?
That's just my handwriting. On the first page,
it says number 7, that's because it's Exhibit
7. He'll tell you which part to look at. He
hasn't said yet.

**MR. CARSON:** Okay.

**BY MR. SCHWEIKERT:**

**Q.** I'm on page 3, Section 6.0.

**A.** Okay.

**Q.** Do you see, it is entitled Mutual Indemnity
for Certain Acts?

**A.** Yes.

108

**Q.** And the language within that section, is

that applicable with respect to the claims made

by Brian Moreau about what allegedly happened

in February of 2020 at the Tampa Supercross?

**MR. DOYLE:** Object to the form to the extent it

calls for a legal conclusion, but go ahead.

**BY MR. SCHWEIKERT:**

**A.** I would defer to my attorney for

interpretation of that paragraph.

**Q.** Your corporate lawyer?

**A.** Either.

**Q.** And who's the corporate gentleman you've

referenced?

**A.** Charles Kidder.

**Q.** How do you spell Kidder?

**A.** K-I-D-D-E-R.

**Q.** Is he in Ohio or California?

**A.** Ohio.

**Q.** Okay. And how long has he been the corporate

attorney for your company?

109

**A.** 2016 or '17.

**Q.** Since then?

**A.** Yes, sir.

**Q.** Through the present?

**A.** Yes, sir.

**Q.** Does Section 6.0 entitled, Mutual Indemnity for Certain Acts, set forth things that your company and Feld Motorsport agreed to do as written in that section?

**A.** I would like to read that first, please. I believe that paragraph is correct.

**Q.** All right. Let's go to page 5, Section 9.0, entitled Insurance.

**A.** Okay.

**Q.** And let me know. You're there? Okay.

**A.** Yes, sir.

**Q.** Do you see in the first sentence it reads in part, "For the duration of this agreement, service provider shall purchase and maintain at its own expense and in companies acceptable to

110

FMS the below listed insurance." Do you see

that portion?

**A.** Yes, sir.

**Q.** Okay. Why did you agree to buy insurance

that had to be acceptable to Feld Motorsport?

**A.** I can't answer that. I would defer that to

my attorney.

**Q.** Did you negotiate this agreement on behalf

of your company?

**A.** I have an attorney to negotiate this.

**Q.** Your company did agree to buy and maintain

insurance from companies that were acceptable

to FMS, right?

**A.** Yes.

**Q.** But you don't know one way or the other why

you agreed to only buy insurance from companies

that FMS deemed acceptable?

**A.** That is correct.

**Q.** Okay. If we go to page 6.

**A.** Okay.

**Q.** At the top of page 6, there is a Subsection C. Do you see that?

**A.** Yes.

**Q.** And it reads in part, "Coverage shall include an additional insured endorsement naming Feld Motorsports as an additional insurer except for workers' compensation." Do you see that?

**A.** Yes.

**Q.** Did your company do that?

**A.** Yes.

**Q.** And is that true with respect to the insurance coverage that your company had purchased for the 2020 Supercross season?

**A.** I can't answer that. I do not know.

**Q.** You don't know if your company bought coverage that named Feld Motorsports as an additional insured during the 2020 Supercross season?

**A.** I can't be sure.

**Q.** Did you review this Section 9 in preparing to testify today as the representative of your company?

**A.** No.

**Q.** Why not?

**A.** I can't answer that.

**Q.** Well, did you see in the notice of the deposition that Section 9 of the Master Service Agreement was one of the topics? That would be Exhibit 135 at paragraph 5.

**MR. DOYLE:** So, that's the notice.

**MR. CARSON:** This?

**MR. DOYLE:** Yep. [inaudible] Nope, just that one document stapled. See it? He's asking you about the notice that we got about 2 and a half days before your deposition. Right there, yeah. And he's asking if you saw that in reviewing or preparing for the deposition.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** The version of the Master Service Agreement
that you have in front of you, which you've
highlighted, did you highlight Section 9?

**MR. GORDON:** Objection. The record is that Mr.
Doyle highlighted it, not Mr. Carson.

**BY MR. SCHWEIKERT:**

**Q.** Is the version of the Master Service
Agreement that you have in front of you
highlighted at Section 9?

**MR. DOYLE:** [inaudible]. Okay. So there's 9 and
I think it continues on this page. So he's
asking whether Section 9 is highlighted? So,
technically, he's asking you if you highlighted
it?

**BY MR. SCHWEIKERT:**

**A.** I did not highlight it.

**Q.** Is Section 9 in the version of the agreement
you have in front of you highlighted?

**A.** Yes.

**Q.** Is that subsection referring to coverage

including FMS as an additional insured

highlighted?

**A.** Yes.

**Q.** Okay. Is it fair to say that the agreement,

at least according to its terms, required your

company to buy coverage that included Feld

Motorsports as an additional insured except for

workers' compensation?

**A.** I would defer all this to my corporate.

**MR. DOYLE:** He's just asking you if that's what

it says. He's just asking, does it say that you

agree to do that in the contract?

**MR. CARSON:** Yes.

**MR. DOYLE:** There you go. That's the answer.

**BY MR. SCHWEIKERT:**

**Q.** Okay. And by signing this contract on behalf

of your company, did your company agree to do

or not do the things written in this Master

Services Agreement?

**A.** Yes.

**Q.** Okay. In that Subsection C, it also states in part, "Service provider shall furnish Feld Motorsports with certificates of all required insurance for service provider. Do you see that?

**A.** Yes.

**Q.** Do you know if your company did that?

**A.** No.

**Q.** No, you don't know, or no, it did not do that?

**A.** No, I do not know.

**Q.** Okay. Are you aware of your company ever furnishing any certificates of insurance to Feld Motorsports?

**A.** I do not recall.

**Q.** I would like to go to the Statement of Work, which is Exhibit A to the Master Services Agreement. Page 10, Section 5, entitled Miscellaneous.

**A.** Okay.

**Q.** It reads, "Service providers personnel and third party vendors must abide by all reasonable safety rules and regulations put in place by Feld Motorsports, right?

**A.** That is what it reads, yes.

**Q.** Okay. And that's something your company agreed to do?

**A.** Yes.

**Q.** Are you aware of any safety rules or regulations put in place by Feld Motorsports that applied to the Tampa Supercross in February of 2020?

**A.** I would defer to Dr. Bodnar.

**Q.** Is it your understanding that the reference to reasonable safety rules and regulations is a reference to medical safety rules and regulations?

**A.** Can you repeat that?

**Q.** I understood you to tell me a little bit earlier that anything medical you would defer

to Dr. Bodnar, right?

**A.** Yes.

**Q.** Okay. And when I asked you about this particular section, you deferred to Dr. Bodnar, right?

**A.** Yes.

**Q.** And I'm asking, is that because your understanding is that the reasonable safety rules and regulations put in place by Feld Motorsport is a reference to medical safety rules and regulations?

**A.** I can't answer that.

**Q.** Why not?

**A.** I don't know how to answer that.

**Q.** Are you aware of any medical or non-medical safety rules or regulations put in place by Feld Motorsports that applied to the Tampa Supercross in 2020?

**A.** I would defer to Dr. Bodnar.

**Q.** Even with respect to non-medical safety

rules and regulations?

**A.** I'm not aware.

**Q.** Okay. The second portion of that subsection reads, "All employees and third party vendors must execute a waiver and release prior to accessing the track area. Do you see that?

**A.** Yes.

**Q.** And you're an employee of The Medic Rig, LLC, correct?

**A.** Yes.

**Q.** Did you execute a waiver and release for the Tampa Supercross in 2020?

**A.** I signed a release for all of Feld's events pertaining to Supercross.

**Q.** For like the entire 2020 season?

**A.** Last season.

**Q.** Did you sign a waiver and release with anyone other than Feld Motorsports?

**A.** Yes.

**Q.** Could you please explain?

**A.** I signed a release to be part of the outdoor motocross nationalists with MX Sports.

**Q.** Okay. Just focusing on the 2020 Supercross season, I understand you signed a waiver and release with Feld Motorsports, right?

**A.** Yes.

**Q.** Anybody else that you signed a waiver and release for in connection with that 2020 Supercross season?

**A.** No.

**Q.** Do you recall signing any paperwork for the AMA?

**A.** No.

**Q.** Okay. Do you happen to have a copy of the medical unit sponsorship agreement with you today? If not, I can show you.

**MR. DOYLE:** Yeah, we do. I just need to get it on.

**MR. SCHWEIKERT:** You do? [inaudible].

**MR. DOYLE:** Just a little bit. [inaudible].

120

**BY MR. SCHWEIKERT:**

**A.** Okay.

**Q.** I want to show you a document previously marked as Exhibit 129, Bates labeled FMS Inc. 587 through 596. Do you have a copy of that in front of you, sir?

**A.** I don't see where those numbers are.

**MR. DOYLE:** See these down here that say FMS?

**MR. CARSON:** Yeah.

**MR. DOYLE:** That's what he's talking about. What was the numbers, Mark?

**MR. SCHWEIKERT:** FMS Inc. 587 to 596. But it looks like the one you have might be redacted.

**MR. DOYLE:** Yeah, this is I asked my office if we had one that was not redacted. If you want to show him one that's unredacted.

**MR. SCHWEIKERT:** Yeah.

**MR. DOYLE:** At least nobody could put their hands on yesterday.

**MR. SCHWEIKERT:** No problem.

**MR. GORDON:** Which document are we referring to, Mark? Got it. I see it. Thank you.

**MR. SCHWEIKERT:** Yes.

**MS. SPRADLIN:** Would you possibly, just for convenience, be able to drop it in the chat and then Doyle will have a copy?

**MR. SCHWEIKERT:** Sure. Give me a second. Not too familiar with the chatting. Second. All right, it's 12 megabytes. It's on its way. Should be in the chat.

**MR. DOYLE:** Okay, thanks.

**MR. SCHWEIKERT:** Yeah.

**BY MR. SCHWEIKERT:**

**Q.** All right, I'm going to show you a document previously marked as Exhibit 129, Bates labeled FMS Inc. 587 through 596 entitled, Medical Unit Sponsorship Agreement. Do you see the first page of that document on the screen?

**A.** Yes.

**Q.** Okay. Do you recognize this document?

122

**A.** Yes.

**Q.** And what is it?

**A.** Medical Unit Sponsorship Agreement.

**Q.** Is it a medical unit sponsorship agreement between Feld Motorsports, the Medic Rig, LLC and Alpine stars SPA?

**A.** Yes.

**Q.** And was this agreement effective as of March 27, 2018?

**A.** I don't see the executed. I see. Yes.

**Q.** Okay. And I'll go down to the signature page. Bates labeled FMS Inc. 595. Do you see the signature page in front of you, sir?

**A.** Yes.

**Q.** Okay. And there's a heading for the Medic Rig, LLC, do you see that?

**A.** Yes.

**Q.** And then a signature of Thomas R. Carson dated April 3, 2018. Do you see that?

**A.** Yes.

**Q.** Is that your signature?

**A.** Yes, it is.

**Q.** Okay. And you were signing on behalf of your company, right?

**A.** Yes.

**Q.** Okay. What is your general understanding of this agreement?

**A.** Can you be more specific?

**Q.** It's a medical unit sponsorship agreement. What is being sponsored? By who? Do you have any idea?

**A.** Alpine stars is sponsoring the Medical Unit. The Medical Unit is to provide medical at the Feld Supercross events.

**Q.** And that was true during the 2020 season, right?

**A.** Yes.

**Q.** Okay. Is it fair to say that your company's medical personnel, sometimes referred to as the Alpine stars Medical Team?

124

**A.** Are you asking if they're referred to what
you just said?

**Q.** Occasionally, yes.

**A.** Yes.

**Q.** Okay. And is it fair to say that the medical
unit is sometimes referred to as the Alpine
stars Mobile Medical Unit?

**A.** Yes.

**Q.** Okay. Or it's sometimes referred to as the
Alpine stars Mobile Medical Center, right?

**A.** Yes.

**Q.** Okay. If we look down at the section for
compensation, do you see it says the
sponsorship fee for all sponsorship benefits
for the events to be provided to sponsor by FMS
and the Medic Rig under this agreement will be
paid directly by sponsor to FMS as follows?

**A.** I see that.

**Q.** Okay. And the sponsor was Alpine stars SPA,
right?

**A.** Yes.

**Q.** And they make motocross apparel, is that
fair?

**A.** They make several protective apparel, but
yes, they make specifically for motorcycles.

**Q.** Okay. Okay. And if we go down a little bit
further, it says sponsor, meaning Alpine stars,
agrees to pay Feld Motorsports a sponsorship
fee in the amount 993,822 and 0 US dollars for
the first sponsorship year. Do you see that?

**A.** That's not correct.

**MR. DOYLE:** I think you misread that. You said
983.

**MR. SCHWEIKERT:** Okay.

**MR. DOYLE:** He wishes.

**MR. CARSON:** Yes, I do.

**BY MR. SCHWEIKERT:**

**Q.** All right. Well, do you see that it says
sponsor agrees to pay FMS a sponsorship fee? Do
you see that part?

126

**A.** Yes, sir.

**Q.** Okay. And then the payments increase over time, do you see that?

**A.** Yes.

**Q.** Okay. And sponsor agreed to pay all sponsorship fee amounts in accordance with the following payment scheduled. Do you see that?

**A.** Yes.

**Q.** And for 2020, the sponsorship fee was $405,636.66, right?

**A.** Yes.

**Q.** Okay. And that was for Alpine stars to sponsor your medical unit, right?

**A.** Yes.

**Q.** Why did you not receive any sponsorship fee from the sponsor?

**A.** I'm not able to answer that.

**Q.** Your company entered into an agreement to allow this third party Motocross Protective Apparel company to sponsor its Medical Unit,

but you didn't actually receive any monetary

compensation from the sponsor for that, did

you?

**A.** No, I did not.

**Q.** That money went to Feld Motorsports, right?

**A.** Yes.

**Q.** Why did you agree to that?

**MR. GORDON:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I would defer that to my company lawyer.

**Q.** You don't have any understanding as a

businessman as to why you would give another

company the right to sponsor your Medical Unit

but not receive any monetary compensation from

the sponsor for that, right?

**MR. GORDON:** Object to the form.

**MR. DOYLE:** Go ahead. You can answer.

**BY MR. SCHWEIKERT:**

**A.** I'm not able to answer that.

**Q.** Okay. Do you know if Alpine stars was the

128

official and exclusive sponsor of the Medical

Unit?

**A.** I do not know that.

**Q.** All right. I'm going to show you the

agreement again. Whoops. Do you see Section 3

of that agreement on your screen, sir?

**A.** Yes.

**Q.** And it says, "Subject to Section 4A1,

sponsor will be an official and exclusive

sponsor of the Medical Unit for the term of

this agreement," right?

**A.** Yes.

**Q.** Okay. And Section 4 is entitled Sponsorship

Benefits provided to Sponsor. Do you see that?

**A.** Yes.

**Q.** Okay. And in part, sponsor received the

following benefits in connection with each of

the events that were produced by Feld

Motorsports during the term of this agreement,

including naming and branding the Medical Unit

as the Alpine stars Mobile Medical Center,

right?

**A.** Yes.

**Q.** Okay. And these naming branding rights were

exclusive to sponsor during 2019 through 2021,

right?

**A.** Yes.

**Q.** And no other company would be appointed as a

sponsor of the Medical Unit, and no other third

party logos would be featured on the Medical

Unit except for, and then it lists some logos.

You see that?

**A.** Yes.

**Q.** Okay. And one of the exceptions is the logos

of Feld Motorsports and Feld Entertainment,

right?

**A.** Yes.

**Q.** Do you know if during the 2020 season, the

Medical Rig, the truck itself had any Feld

Motorsports or Feld Entertainment logos on it?

**A.** Yes.

**Q.** It did?

**A.** Yes.

**Q.** Where were they?

**A.** On the side.

**Q.** Going down to Subsection 2, your company agreed to revise its website to reflect the branding of the Medical Unit as the Alpine stars Mobile Medical Center, right?

**A.** Yes.

**Q.** And did you do that?

**A.** No, we branded it the Alpine stars Mobile Medical Unit, I believe.

**Q.** Okay. So you didn't technically brand it Alpine stars Mobile Medical Center. You branded Alpine stars Mobile Medical Unit, right?

**A.** Yes.

**Q.** Okay. Your staff agreed to wear the following sponsor branded apparel, and then it lists some items, right?

**A.** Yes.

**Q.** And that included 60 pit shirts?

**A.** Yes.

**Q.** Are the pit shirts, the red uniforms that the medics were wearing during the Tampa Supercross?

**A.** Yes.

**Q.** Okay. And according to this agreement, the pit shirts will also display Feld Motorsports' logos, subject to Feld Motorsports approval as to design and location, right?

**A.** That is what it says, yes.

**Q.** And did that happen?

**A.** I do not recall.

**Q.** I'll come back to that in a second.

**A.** Sure.

**Q.** Next section. Feld Motorsports will use commercially reasonable efforts to ensure that all mentions of the medical unit team on the event PA system and in FMS controlled

television broadcasts of the event will refer

to the Alpine stars' Medical Team, right?

**A.** Yes.

**Q.** Okay. Did that happen during the 2020

Supercross season?

**A.** Yes.

**Q.** And it also happened in fact during the 2020

Tampa Supercross, right?

**MR. GORDON:** [inaudible]. You can answer.

**BY MR. SCHWEIKERT:**

**A.** I believe so. I do not remember.

**Q.** I want to show you a new document, which I

will mark as Exhibit 136, and if you'd like, I

will drop it in the chat really briefly. I'm

showing you on my screen a document I will mark

as Exhibit 136, Bates labeled FMS, Inc. 771

through 772.004. You see that?

**A.** Yes.

**Q.** Okay. And on the first page, there is an

email chain between you and Mike Muir of Feld

Motorsports, right?

**A.** Yes.

**Q.** Have you seen these emails before?

**A.** 2019.

**MR. GORDON:** Can you make it a little larger,

Mark? Thank you.

**BY MR. SCHWEIKERT:**

**Q.** And just here. It starts at the bottom, an

email from Tom Carson, that's you, right?

**A.** Yes.

**Q.** On July 25, 2019 to Feld Motorsports, M.

Muir, right?

**A.** Yes.

**Q.** And you know who Mike Muir is?

**A.** Yes.

**Q.** Okay. And the subject of your email is logo,

right?

**A.** Yes.

**Q.** And you write, "Mike, can you send me the

vector file for the black logo with dots,

134

please? Thanks, Tom." Do you see that?

**A.** Yes.

**Q.** Was this you asking Feld Motorsports to

provide logos that your company was going to

use in some way?

**A.** That's what it says.

**Q.** Okay. Right. And if we go up towards the top

of the exhibit, it's an email from Mike Muir

that same day back to you with a couple

attachments. Do you see that?

**A.** Yes.

**Q.** Okay. And I'll show you those attachments.

The first one is Bates labeled FMS, Inc.

772.001. Do you see that?

**A.** Yes.

**Q.** And that's a Feld Entertainment Inc. logo,

right?

**A.** Yes.

**Q.** Okay. And another attachment is Bates

labeled 772.003, and that is a Feld

135

Entertainment logo as well, right?

**A.** Yes.

**Q.** Okay. And is it your understanding that these logos were Feld Motorsports logos as well?

**A.** Yes.

**Q.** Okay. And do you have any recollection of where else, aside from on the trailer, Feld Motorsports logos were displayed in connection with your medical team?

**A.** Yes.

**Q.** Tell me about that, please.

**A.** On the sleeve of the picture.

**Q.** And that would include Dr. Bodnar's, Dr. Kennedy's, Amy Metiva, and Scott Combs' shirts at the Tampa Supercross?

**A.** Yes.

**Q.** And you've seen pictures of that, right?

**A.** Pictures of what?

**Q.** The logo on the sleeve?

136

**A.** I'm aware of the logo on the sleeve, yes.

**Q.** Okay. Are you aware that there is also a SX
logo on the collar of those pit shirts?

**A.** I'm aware of that logo. It wasn't always on
the collar. I'm not sure what year it was put
on the collar.

**Q.** Okay. And the SX logo means what?

**A.** Does it say SX or SMX? I do not recall.

**Q.** Let me show you. I'm going to show you
document previously marked as Exhibit 9. Excuse
me. I'm going to show you a document previously
marked as Exhibit 29, which I will represent is
pictures of Amy Metiva's medical team uniform
from that season. Do you see the uniform on
your screen?

**A.** Yes.

**Q.** And is this a pit shirt?

**A.** Yes.

**Q.** Okay. And you can partially see the Feld
Entertainment logo there on the sleeve, right?

**A.** Yes.

**Q.** Okay. And if we go to the picture of the

back of the shirt, try to make this big for

you. Just give me a second. Do you see there on

the back of the collar the SX logo?

**A.** Yes.

**Q.** Is that a logo for the Supercross?

**A.** Yes.

**Q.** Okay.

**MR. SCHWEIKERT:** All right. Guys, I'm really

sorry. I need a quick little restroom. So,

could we go off the record briefly?

**MR. GORDON:** Yeah.

**COURT REPORTER:** Mark, we're back on the record

at 2:11.

**BY MR. SCHWEIKERT:**

**Q.** Thank you for accommodating me. I want to

show you a document, I will mark as Exhibit

137. And it's I believe your biography from the

Alpine stars Mobile Medical Unit website, which

138

I pulled off the internet over lunch. Do you

see the document I marked as Exhibit 137?

**A.** Yes.

**Q.** Okay. And is this a snapshot of a portion of

your company's website?

**A.** Yes.

**Q.** Okay. That's a picture of you, right?

**A.** Correct.

**Q.** And then there's a little biography about

you?

**A.** Yes.

**Q.** Okay. The last sentence of your bio reads,

"Tom knows racing and safety and has a passion

to keep them aligned." Do you see that?

**A.** Yes.

**Q.** What does that mean?

**A.** That I'm very familiar with motorcycle

racing and I know it's important to be as safe

as possible.

**Q.** Important by who to be as safe as possible?

**A.** By everyone.

**Q.** And that would include who?

**A.** I don't understand what you're asking me.

**Q.** Everyone involved in putting on a

professional motorcycle racing event?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** Everybody wants to be safe in whatever they

do. If you drive down the street, you want to

be safe.

**Q.** And when you're racing motorcycles around

temporary motocross track inside a professional

sports stadium and jumping through the air, you

want to be safe as possible as well, right?

**A.** Yes.

**Q.** And those riders would want the officials

controlling the track to be acting as safe as

possible, right?

**MS. SPRADLIN:** Object to the form.

**MR. DOYLE:** Go ahead.

**BY MR. SCHWEIKERT:**

**A.** Yes.

**Q.** Do you believe that Supercross is an inherently dangerous sport?

**A.** Matter of interpretation.

**Q.** What's your interpretation?

**A.** As a rider, no.

**Q.** And that's despite your personal experience of breaking multiple bones in your body, competing in Motocross and Supercross events as a rider?

**MR. GORDON:** Form.

**MR. CARSON:** Am I to answer that?

**MR. DOYLE:** Yeah, he's asking you, is that why that it's your opinion?

**BY MR. SCHWEIKERT:**

**A.** As a rider, yes. I felt comfortable what I was doing.

**Q.** When you were a rider, did you consider that there was a possibility that you could crash

your motorcycle and get hurt?

**A.** Every time I threw my leg over that

motorcycle, something could have happened.

**Q.** Right.

**A.** And obviously it did.

**Q.** Are you familiar with any written medical

protocols that applied to the 2020 Supercross

season?

**A.** Can you repeat that?

**Q.** Sure. Are you aware that I have deposed Dr.

Bodnar before?

**A.** Yes.

**Q.** Okay. Are you aware of whether there were

written protocols that applied to providing

emergency medical care on a racetrack during a

Supercross event in 2020?

**A.** I would defer to Dr. Bodnar.

**Q.** I'm just asking if you know whether they

exist or not.

**A.** Exist from who?

142

**Q.** I'm asking you, sir.

**A.** I don't know how to answer that.

**Q.** So your company entered into a Master Services Agreement to provide medical care at Supercross events, and you as the sole owner of that company, don't know whether there was any written medical protocol that applied to the care being provided on the racetrack?

**A.** I do not recall.

**Q.** Isn't that essentially the primary function of the Medic Rig, LLC?

**A.** Primary function?

**Q.** To provide medical care to riders during Supercross events if they need it.

**A.** Yes.

**Q.** And that was what your company agreed to do during the 2020 Supercross season, right?

**A.** Yes.

**Q.** But you don't know if there were any written protocols that applied to that medical care

143

that your company was agreeing to provide

during that season?

**A.** I would defer anything medical to Dr.

Bodnar.

**Q.** I just want to know if you are aware of the

existence in writing. Is that a no?

**A.** I'm sorry, I can't answer that question. I

do not recall.

**Q.** I'm going to show you a document. It's

previously been marked as Exhibit 9, Bates

labeled Bodnar 223 through 227. I'm happy to

give you time if you want to read through the

entire document before I ask you questions

about it. Just let me know. Do you see a

document on your screen, sir?

**A.** Yes.

**Q.** Okay. The top part of the document is an

email from Dr. John Bodnar on August 16, 2019

to Joanne Pryor, yourself, Tom Carson, Paul

Ryman and Chris Alexander. You see that?

**A.** Yes.

**Q.** Okay. Do you recall this email at all?

**A.** No.

**Q.** Do you see the subject of the email is track emergency protocol?

**A.** Yes.

**Q.** Okay. Would you like the opportunity to review this email that was sent to you before I ask you questions about it?

**A.** No.

**Q.** Have you reviewed this email recently?

**A.** No.

**Q.** Okay.

**MR. GORDON:** Mark, I'm sorry for interrupting. Was this previously marked as an exhibit? I missed that part.

**MR. SCHWEIKERT:** 9, yeah.

**MR. GORDON:** Thank you.

**BY MR. SCHWEIKERT:**

**Q.** Okay. Excuse me, sorry. All right, I am on

145

the third page of the exhibit, Bates labeled

Bodnar 225. Do you see that there is an email

beginning August 16, 2019?

**A.** Yes.

**Q.** And if we go to the bottom, we can see it's

from Joanne. Do you see that?

**A.** Yes.

**Q.** Okay. And she was the accountant for your

company?

**A.** She did the accounting. Yes.

**Q.** Was she an owner as of August, 2019?

**A.** I do not believe.

**Q.** Okay. Ms. Pryor writes, in part, "Dearest

Chief Medical Officers, we have been tasked by

Feld to prepare our disaster and emergency

protocol." Do you see that?

**A.** Yes.

**Q.** Do you have any recollection of being tasked

by Feld to prepare a disaster and emergency

protocol?

**A.** No.

**Q.** Why not?

**MR. DOYLE:** You're asking him why he doesn't remember something? Is that the question Mark? Because if he knew why he'd remember it, maybe he remember it. So it's a ridiculous question, and it's the second time you've asked it.

**MR. SCHWEIKERT:** Yeah. I'm entitled to ask my questions, and the jury can infer whatever they want to infer from his answers. But this is the core issue in dispute. And if they want to say they don't remember, if they don't remember, that's fine.

**MR. DOYLE:** I don't have a problem with him saying he doesn't remember. What I have a problem with, or you asking the question, but I have a problem with you asking a witness why they don't remember something.

**MR. SCHWEIKERT:** I understand.

**MR. DOYLE:** Or they don't know something.

**MR. SCHWEIKERT:** And you can make that argument. But I'm certainly entitled to make arguments as to why I believe they should.

**MR. DOYLE:** And this is why the deposition takes 7 hours. I'm sorry, Tom, go ahead and tell him why you don't remember.

**MR. CARSON:** I don't remember.

**MR. DOYLE:** There you go.

**MR. GORDON:** I also object to the reference that this is a core issue in this case. I'm not sure this protocol has anything to do with this case, but let's keep going.

**MR. SCHWEIKERT:** Okay. I don't want this to become a lawyer [crosstalk].

**MR. GORDON:** No, I get it. It's getting late.

**MR. SCHWEIKERT:** I got you.

**BY MR. SCHWEIKERT:**

**Q.** All right. Did Feld ever ask you or any of the medical personnel that work with your company to prepare emergency protocols for the

Supercross?

**MR. DOYLE:** Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** Okay. Do you have any reason to believe that Ms. Joanne Pryor would make up something like that if it didn't happen?

**MR. DOYLE:** Form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I do not know.

**Q.** Okay. But you are copied here on this email, right?

**A.** Yes.

**Q.** Okay. Do you know if prior to August 16, 2019, your company had any sort of written protocol regarding providing medical care to riders injured on a racetrack during a Supercross event?

**A.** I do not recall.

**Q.** Okay. I'm going to show you a document. I

will mark as a new exhibit. Did you review Dr.

Bodnar's deposition, sir?

**A.** No.

**Q.** All right. I'm going to show you a document

I will mark as Exhibit 138. It's an excerpt

from Dr. Bodnar's August 5, 2024 deposition,

pages 114 to 117. Do you see this document on

your screen, sir?

**A.** Yes.

**Q.** Okay. I had discussions with Dr. Bodnar's

about this very topic, and he told me, as you

can see here, this is when...

**MR. DOYLE:** Can you make that a little larger,

Mark? Thank you.

**BY MR. SCHWEIKERT:**

**Q.** This is when Feld wanted to have some kind

of emergency action plan, would be if somebody,

there was some kind of incident on the scene.

Do you see that?

**A.** I see that.

**Q.** Okay. And that was page 114, line 16 to 19.
And then on page 116, he was asked if this
medical emergency action plan was in effect? He
said to the best of his knowledge, I asked,
"Did Feld have any input on this action?" He
responded, "Not that I'm aware of, no." Are you
with me?

**A.** Yes.

**Q.** Okay. And then I asked him, "Do you recall
if you ever sent this medical emergency action
plan to Feld?" And Dr. Bodnar responded, "I
don't remember if I sent it to Feld or to Tom
who would afford it onto Feld." Do you see
that?

**A.** I see that.

**Q.** Do you have any recollection of receiving
any written medical emergency action plan from
Dr. Bodnar?

**A.** I do not recall.

**Q.** But you're not saying no, you just don't

151

remember, right?

**A.** I'm telling you, I don't know if I recall seeing that. I don't know that I received that.

**Q.** Well, do you recall having any communications with Mike Muir about preparing any sort of protocols for the Supercross?

**A.** I do not recall.

**Q.** Have you ever had any conversations with anyone at Feld before the Tampa Supercross in 2020 about protocols for your medical team in providing care on the racetrack during a Supercross event?

**A.** I would defer that to Dr. Bodnar. It's pertaining to medical.

**Q.** But did you have any conversation of that nature?

**A.** I do not recall.

**Q.** On behalf of your company, you signed an agreement agreeing to provide a medical team, but you have no recollection of ever having any

conversation afterwards about any protocols for providing medical care on the track during the Supercross season with Feld?

**A.** I do not recall. [crosstalk]

**Q.** I'm sorry?

**MR. DOYLE:** He didn't hear your answer, Tom. There was an objection. Go ahead and answer again.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** All right, hold on for a second. I am going to show you document previously marked as Exhibit 11, Bates labeled Bodnar 210 through 216. Do you see the first page of Exhibit 11 on the screen, sir?

**A.** Yes.

**Q.** It's a 7-page document. I'm happy to go through it and you can read it. Let me know when you're ready for my questions.

**A.** Is this just page 1?

**Q.** Yeah.

**A.** Is this page 1?

**Q.** Yes. Do you need a copy over there? I can

drop it in the email.

**MR. DOYLE:** No, I'm getting it for him. So it's

this document.

**BY MR. SCHWEIKERT:**

**A.** Okay? Have you seen the document marked as

Exhibit 11 before?

**A.** Yes.

**Q.** And what is it?

**A.** It says it's a medical emergency action

plan.

**Q.** For who?

**A.** Are you asking who it's from?

**Q.** Yes, sir.

**A.** It's from the Medic Rig.

**Q.** Your company, right?

**A.** Yes, sir.

**Q.** Okay. You have seen this written medical

emergency action plan before, is that right?

**A.** Yes.

**Q.** When do you recall seeing it?

**A.** I do not recall.

**Q.** Okay. Did you ever have any discussions with Feld Motorsports about this medical emergency action plan or any similar type of protocol?

**A.** I do not recall.

**Q.** But this is your company's medical emergency action plan, right?

**MR. DOYLE:** Form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** This is referring to medical. I defer to Dr. Bodnar.

**Q.** All right, let's see. It says right here, sir, "The Medic Rig, LLC operator of the Alpine stars Mobile Medical Unit, AMMU, has established a comprehensive plan for handling significant and unexpected situations on the track and in pit areas," right?

**A.** That is what it says, yes.

**Q.** Okay. And you are the owner of the Medic Rig, LLC, right?

**MR. DOYLE:** Object to form. Ask and answered. Go ahead, Tom.

**BY MR. SCHWEIKERT:**

**A.** Yes.

**MR. DOYLE:** Eighth time.

**BY MR. SCHWEIKERT:**

**Q.** And you were contracted by Feld to provide medical services during the Supercross events, right?

**A.** Yes.

**Q.** I think when we started this deposition, I had asked you what was sort of the role and you told me it was providing care to riders on the track, remember that?

**A.** I believe that's correct.

**Q.** And then I asked if there were other things you did like taping ankles, stuff like that,

156

right?

**A.** That I do personally? No.

**Q.** Your company?

**A.** Yes.

**Q.** Okay. If providing emergency medical care is one of the purposes of your company's agreement with Feld Motorsports, why do you, as the owner of that company, not have any information about the development of this written protocol?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** This is referring to medical. I'm not a medical person. I will defer this to the doctor.

**Q.** So you have no recollection of how this particular medical emergency action plan for your company came into existence?

**A.** I would defer to Dr. Bodnar.

**Q.** Did you ask Joanne Pryor what she remembered about being tasked or her email saying, "Feld

tasked your company with preparing some protocols?"

**A.** I do not recall.

**Q.** Is that a no?

**MR. DOYLE:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** Okay. Do you recall doing anything after signing the Medical Services Agreement on behalf of your company to prepare to provide medical services at the Supercross events?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** Can you be more specific?

**Q.** I'll take whatever you can remember, sir.

**A.** Yes, I have a mobile medical unit that was at or goes to the events. The door is open before the event and there is a medical team present.

**Q.** Do you recall doing anything to get that

medical team present and prepared to provide

services during the Tampa Supercross in 2020?

**A.** Can you define prepared?

**Q.** How would you define it?

**A.** It's not up to me to define it. I'm not sure

what you are asking me.

**Q.** Was your medical team prepared to provide

medical services to injured riders at the 2020

Tampa Supercross?

**A.** Yes.

**Q.** What do you mean by that?

**A.** They were there on time and they were on the

track.

**Q.** Did they know what they were supposed to be

doing?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** I would defer to Dr. Bodnar.

**Q.** Are you aware of any other written protocol

prepared by or for your company about providing

159

emergency care to riders on a racetrack? Other
than this one we're looking at in Exhibit 11.

**A.** You're asking if there's any more documents?

**Q.** Have you seen any other written protocols by
or for your company about providing emergency
medical services to riders injured on a
racetrack aside from Exhibit 11?

**A.** I do not recall. The doctor handles the
medical.

**Q.** And that doctor is Bodnar?

**A.** Dr. Bodnar.

**Q.** Is there any other doctor that you would
defer to in answering these or answering
questions about medical related issues?

**A.** I would defer all medical questions to Dr.
Bodnar.

**Q.** What is your understanding of the role that
the medical team plays during a Supercross
event?

**A.** I would defer that to Dr. Bodnar.

160

**Q.** Even as a businessman, you have no understanding of what services your company and the people at contracts are doing at these events?

**MR. DOYLE:** Object to the form. Misstates testimony, argumentative, asked and answer. Repetitive harassing. Go ahead.

**MR. SCHWEIKERT:** It's non-responsive. Go ahead.

**MR. DOYLE:** Move to strike.

**MR. SCHWEIKERT:** Denied. Go ahead.

**MR. CARSON:** Am I to answer?

**MR. DOYLE:** No. Do you even remember what the question is?

**MR. CARSON:** No.

**MR. DOYLE:** Then don't answer it.

**BY MR. SCHWEIKERT:**

**Q.** Let's do this first. Are you aware that your company contracted Dr. Bodnar to provide services in connection with Supercross events?

**A.** Yes.

**Q.** All right. Give me a second. All right. I'm going to show you a document previously marked as Exhibit 6. It's a subcontract services agreement between the Medic Rig, LLC and Dr. John Bodnar. Do you see that?

**A.** Yes.

**Q.** Okay. And on the second page, it's signed by Dr. John Bodnar and by you, Tom Carson, on January 5, 2019, right?

**A.** Yes.

**Q.** Okay. Was this subcontract agreement in effect during the 2020 Tampa Supercross?

**A.** Yes.

**Q.** Okay. And one of the things Dr. John Bodnar was the subcontractor, right?

**A.** Yes.

**Q.** And one of the things Dr. Bodnar was agreeing to do was exercise his independent medical judgment consistent with the Medic Rig's program, procedures, and policies for

providing medical care in the competitive

racing environment. Do you see that?

**A.** Yes, sir.

**Q.** What are The Medic Rig's program,

procedures, and policies for providing medical

care in the competitive racing environment?

**A.** I would defer to Dr. Bodnar. It's medical.

**Q.** But he was agreeing to exercise his medical

judgment consistent with your company's

procedures and policies, right?

**MR. DOYLE:** Go ahead.

**BY MR. SCHWEIKERT:**

**A.** He's the doctor. I have no medical

background.

**Q.** Did he develop the policies and procedures

for your company?

**A.** Yes.

**Q.** Okay. And are those reflected in the medical

emergency action plan that we were looking at,

which was Exhibit 11?

163

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** Yes.

**Q.** It was Dr. Kennedy. I'm going to show you a document previously marked as Exhibit 39. I will represent, it's a subcontract services agreement between the Medic Rig, LLC and Dr. James R. Kennedy. Do you see that?

**A.** Yes, sir.

**Q.** And do you agree that's what this is?

**A.** It says it's a subcontract services agreement.

**Q.** Between the Medic Rig, LLC and James R. Kennedy, right?

**A.** Yes.

**Q.** Then on the second page, under The Medic Rig, LLC, there is a signature. Do you see that?

**A.** Yes.

**Q.** Is that your signature?

164

**A.** Yes.

**Q.** All right. You signed this subcontract with Dr. Kennedy on behalf of your company on January 11, 2020, right?

**A.** That is what it says, yes. January 11, 2020.

**Q.** Okay. If we go back to that really quickly, do you see in the middle of the subcontract services agreement, it states in all capital bold letters, motorsports are dangerous?

**A.** I see that.

**Q.** Okay. So, your company believed that motorsports are dangerous as reflected in this subcontract, right?

**A.** That is what it says.

**Q.** And your company is asking the subcontractor, in this instance, Dr. Kennedy, to recognize the caution required to operate safely in the motorsports pit and trackside areas and accept personal responsibility for accidental injury, right?

**A.** Yes.

**Q.** Okay. Do you believe it was dangerous for your medical team to provide medical care to a rider on an active racetrack during the 2020 Supercross season?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** It could be.

**Q.** Why?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** Motorcycles are moving.

**Q.** And that's it?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**Q.** Motorcycles are jumping, right?

**A.** Yeah, motorcycles are moving, are circulating around the track. Yes.

**Q.** And a person such as a medical team member that's on a track around which motorcycles are

moving, there's a risk of getting hit by a

motorcycle, right?

**A.** There could be.

**Q.** Are you aware of anyone on your medical team

ever being struck by a motorcycle during a

Supercross event?

**A.** I do not recall.

**Q.** Okay. I want to show you a document

previously marked as Exhibit 25. I'll represent

this as a subcontract services agreement

between your company, The Medic Rig, LLC, and

Amy Metiva.

**A.** Okay.

**Q.** If we go to the second page, do you see your

signature on behalf of The Medic Rig dated

February 9, 2019?

**A.** Yes.

**Q.** Below that, the subcontractor's name is Amy

Metiva, right?

**A.** Yes.

**Q.** Is that Amy Metiva's signature on this page?

**A.** Yes.

**Q.** Her signature is dated February 9, 2019, right?

**A.** That is what it reads.

**Q.** Okay. Do you agree then that this is a subcontract services agreement between The Medic Rig, LLC and Amy Metiva?

**A.** Yes.

**Q.** Was this agreement in effect during the 2020 Supercross season?

**A.** Yes.

**Q.** Is that true with respect to Dr. Kennedy's subcontract services agreement as well?

**A.** Yes.

**Q.** Okay. I'm going to show you another document. This was previously marked as Exhibit 31. Do you see Exhibit 31 on your screen, sir?

**A.** Yes.

**Q.** Okay. Have you seen this before?

**A.** Yes.

**Q.** What is it?

**A.** It's an Alpine stars Mobile Medical Unit volunteer agreement.

**Q.** Is it an agreement with any person in particular?

**A.** It's with Scott Combs.

**Q.** Remind me who he was, if you know?

**A.** He was a volunteer at the event.

**Q.** At the bottom, the right-hand corner for The Medic Rig representative, there's initials, TRC. Do you see that?

**A.** Yes, I see that.

**Q.** Are those your initials?

**A.** Yes, they are.

**Q.** Okay. Do you recall initialing this volunteer agreement with Mr. Scott Combs?

**A.** I do not recall.

**Q.** It's dated February 15, 2020, right?

**A.** Yes, sir.

**Q.** Okay. Is it your understanding that was the day of the Tampa Supercross?

**A.** That is correct.

**Q.** Do you know when Mr. Combs signed this?

**A.** He signed it. Are you asking for a time or the day?

**Q.** Whatever you remember, sir.

**A.** He signed it on February 15th.

**Q.** Did he sign it in your presence?

**A.** Yes, he did.

**Q.** What do you remember about that?

**A.** What do you want me to answer, do I remember?

**MR. DOYLE:** He's asking, do you remember Scott signing it in your presence? If you do, tell him what you remember about that?

**BY MR. SCHWEIKERT:**

**A.** He signed it in my presence. If not, it wouldn't have... He signed it in my presence. Any volunteer would sign before anything

happens at the start of the day.

**Q.** Do you remember meeting Mr. Combs?

**A.** I do not recall.

**Q.** Okay. Was when he signed this document the first time you had encountered him?

**A.** Yes.

**MR. SCHWEIKERT:** Okay. We'll take a little bathroom break. Off the record, please.

**COURT REPORTER:** Off the record at 2:55.

**MR. SCHWEIKERT:** 5 minutes is good for me. I want to get a little organized. Be right back.

**MR. DOYLE:** Okay. Nice change.

**MR. SCHWEIKERT:** Ready?

**MR. DOYLE:** Ready on our end.

**COURT REPORTER:** Mark, we're back on the record. It's 3:05 p.m.

**BY MR. SCHWEIKERT:**

**Q.** All right, I'm going to show you a document, I will mark as Exhibit 139, and I'm putting it in the chat. All right. Do you see on the

screen the first page of the document I have

marked as Exhibit 139?

**A.** Yes.

**Q.** Okay. There's a second page. Do you see

that?

**A.** Yes.

**Q.** Okay. Do you know what this exhibit is?

**A.** Yes.

**Q.** What is it?

**A.** It's a record of our bank transactions.

**Q.** The company's bank transactions?

**A.** Correct.

**Q.** Okay. I went through expense reimbursements

and payments with the medics. I just wanted to

cross-reference with you some things. Is this

your handwriting on this document, sir?

**A.** Yes.

**Q.** Okay. You've highlighted in yellow payments

made to Amy Metiva, is that right?

**A.** Yes.

172

**Q.** Are these payments for services she provided during the Tampa Supercross?

**A.** Can we make that a little bit bigger?

**MR. DOYLE:** Yeah, it's tough to see on our end.

**BY MR. SCHWEIKERT:**

**Q.** Right. Whoops. Can you receive it at this size?

**A.** I can see it.

**Q.** Okay. There is a February 18th payment of $398 that's highlighted in yellow. Do you see that?

**A.** Yes, sir.

**Q.** Is that money that was paid to Amy for her services or to reimburse her for expenses she incurred at the Tampa Supercross?

**A.** I believe that was for reimbursement.

**Q.** Okay. Then there's another payment dated February 28th, also highlighted in yellow for $341.22. Do you see that?

**A.** Yes.

**Q.** Is this a payment to Ms. Metiva in connection with the 2020 Tampa Supercross?

**A.** Yes.

**Q.** Do you know what this one was for? Was it also in reimbursement or compensation for her time?

**A.** I do not recall.

**Q.** Okay. We look at the description of that particular payment appears to reference Tampa Hotel. Do you see that?

**A.** Yes, I do.

**Q.** Do you believe that that payment was a reimbursement for her hotel expense?

**A.** That is what that line says. Yes.

**Q.** What you've highlighted in green is for Jim Kennedy?

**A.** Yes.

**Q.** Jim Kennedy is also Dr. James Kennedy, right?

**A.** Yes.

174

**Q.** Okay. There's a payment from your company on

February 20th of $884.95 highlighted in green.

Do you see that?

**A.** Yes.

**Q.** Was that a payment to Dr. Kennedy for

services or reimbursement of expenses he

incurred in connection with the Tampa

Supercross?

**A.** I do not recall.

**Q.** Okay. But this is a payment that went to Dr.

Kennedy on February 20th referencing Tampa,

right?

**A.** Yes.

**Q.** Okay. Then on the second page, is this your

handwriting where it says John Bodnar?

**A.** Yes.

**Q.** Okay. Next to his name is an orange

highlight? I'm colorblind, so forgive me.

**A.** Yes.

**Q.** Okay. Highlighted in orange is a payment on

175

March 5th of $4,895.59. Do you see that?

**A.** Yes.

**Q.** Is that a payment made by your company to Dr. Bodnar for services or expenses he incurred in connection with the Supercross?

**A.** It looks like that is for a couple of events.

**Q.** Okay. What is this reference in your handwriting at the bottom where it says $2,252.12 for Tampa SX?

**A.** I would say of the March 5th payment of 4,895.59, 2,252.12 was for the Tampa Supercross.

**Q.** Okay. So, payments were made by your company to Dr. Kennedy, Dr. Bodnar, and Amy Metiva in connection with services they provided at the Tampa Supercross. Is that right?

**A.** Yes.

**Q.** Did Mr. Scott Combs receive any sort of compensation or reimbursement?

**A.** No.

**Q.** Were you involved in any sort of planning for providing medical personnel at the Tampa Supercross?

**A.** No.

**Q.** I'm going to show you a document I will mark as Exhibit 140. I'm going to put a copy in the chat. All right, I'm going to show you a document I have marked as Exhibit 140, Bates labeled The Medic Rig 5 through 6. Take a minute, review it, let me know if you've seen it before.

**A.** Okay.

**Q.** Have you seen it before?

**A.** I believe so, yes.

**Q.** What is this document, sir?

**A.** It says that it's from the doctor. He doesn't get there till 5:00. And he has a brief description of the track and how he plans to get around.

**Q.** Is this an email from Dr. Bodnar to you on
February 13, 2020?

**A.** I mean, that's what it says. Yes.

**Q.** Okay. He's sending you the Tampa map for
tomorrow, which is the second page, right?

**A.** Yes.

**Q.** Okay. And he writes, "The outside lanes
should be fine and the only areas to really
worry about is around the start line and
podium. We can go in front of the start gate,
but need to get to the tunnels on each side and
not be hindered by the stage." Do you see that?

**A.** Yes.

**Q.** Do you have an understanding of what he
meant when he sent an email to you stating
that?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I'm only reading the same as you're reading.
He gave me a description.

178

**Q.** Why would he be sending you an email with the Tampa track map 2 days before the event?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** One, he told me that I will not be there until after 5:00.

**Q.** Were you doing something to relay information about how the track had been designed and how the medical team intended to be stationed around the track?

**A.** I do not recall.

**Q.** What about generally? Does Dr. Bodnar typically provide you with information related to the design of a particular Supercross track and where he wants to station medical team members?

**A.** Most of the time, he informs me.

**Q.** Do you provide that information to anyone else?

**A.** No.

**Q.** Let's go back to his email. He writes also, in part, it would be nice if we had the area behind the first turn, sand turn, open to the mules as shown in red line. Also, the area to the left of stage will hopefully have enough room to get between the sand and rhythm sections. Let me know if you have any questions. Do you see that?

**A.** Yes.

**Q.** Okay. What did you do, if anything, in response to the information he's providing you in this email?

**A.** I do not recall.

**Q.** What did you understand him to mean when he said it would be nice if we had the area behind the first sand turn open to the mules as shown in red line?

**A.** I read that is like, he would like to have some area behind the first turn open so the mule can get through.

180

**Q.** Did you do anything to attempt to accommodate his desire for that space?

**A.** I do not recall.

**Q.** Do you typically have any input with regard to how the track is designed for a Supercross event to accommodate your company's medical team?

**A.** I defer to Dr. Bodnar.

**Q.** Have you ever communicated with... We'll strike that. Do you know who's responsible for the design of the Supercross racetracks during the 2020 season?

**A.** I do not know.

**Q.** Does the AMA design them?

**A.** I do not know.

**Q.** Do you know if Feld Motorsports is involved in the design or the construction of the track for a particular event?

**A.** I do not know.

**Q.** Well, Dr. Bodnar's email seems to suggest

that you might be able to assist him in

accommodating his desire for some additional

space on the map that he marked up, right?

**MR. GORDON:** Object to the form.

**MR. DOYLE:** Join. You can answer, if you can.

**MR. CARSON:** Oh, I can't answer that.

**BY MR. SCHWEIKERT:**

**Q.** Well, so you don't have any idea, even

reviewing this email now with me here today,

why he would be providing this information to

you together with the Tampa track map that has

red lines on it a couple of days before the

event?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** He was telling me he would not be there till

after five o'clock.

**Q.** He was telling you he would not be there

until after 5:00, but then he also provided

more information about space for the mules,

right?

**A.** That's what it reads.

**Q.** Okay. Were you able to do anything to accommodate his desire for some more space for the mules behind that first sand turn?

**A.** I do not recall.

**Q.** If you had wanted to do something, would you have sent off and forwarded this information to someone?

**A.** Are you asking if I forwarded that information to anyone?

**Q.** You told me you don't remember.

**A.** That is correct. I do not recall.

**Q.** Based on your experience having done this for a long time, would you have provided as a typical course of business, this information to someone else so they could address or respond to Dr. Bodnar's request for more space for the mules behind the first sand turn?

**A.** Are you asking if I requested more space

183

behind whatever it says?

**MR. DOYLE:** No, what he's asking you, Tom, is

knowing how you do your job, is that something

that you would typically do? We know you don't

remember it in this case, but if you get that

kind of email, is there anything you typically

do with it? I think that's what he asking.

**BY MR. SCHWEIKERT:**

**A.** I can't answer that. I don't know how you

want me to answer that.

**Q.** I just want the truth. Based on your

experience, would you possibly call someone and

say, "The Chief Medical Officer, Dr. Bodnar,

has some concerns about where the mule's going

to be stationed? Can you make sure there's some

extra space in a certain corner of the stadium

so we've got our mules there?" Is that

something you've done?

**A.** He probably already called the person from

Feld. I don't know that for sure.

**MR. DOYLE:** Tom, he's not asking you to guess about what Dr. Bodnar may or may not have done. He's asking if that's something that, in your role, that you would do from time to time, pass that information along.

**MR. CARSON:** From time to time, that is something I would do.

**MR. DOYLE:** There you go.

**BY MR. SCHWEIKERT:**

**Q.** You would pass that on to somebody at Feld?

**A.** Yes.

**Q.** During the 2020 Supercross season, do you know who in particular you might have reached out to for something like this?

**A.** I do not recall.

**Q.** Would it have been somebody on the operations team for Feld Motorsport?

**A.** I do not recall.

**Q.** Why do you think in this type of scenario, Dr. Bodnar would've reached out to somebody at

Feld if he had concerns about accommodating the mules or the medical team around a particular Supercross track?

**MR. DOYLE:** Object to form, calls for speculation. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** Can you rephrase that, please?

**Q.** I'm just trying to understand. I mean, you run this company that provides medical services. Dr. Bodnar was the Chief Medical Officer. If the medical team had concerns about how a particular track was laid out or designed, who would they go to address those concerns?

**A.** I would go to Feld.

**Q.** Anyone in particular?

**A.** I do not recall in 2020.

**Q.** What about during this season? Who would you contact?

**A.** Mike Muir.

186

**Q.** All right. Is there anything else? Strike

that. Do you yourself coordinate with anyone

from the AMA or Feld about accommodating The

Medic Rig trailer for a particular event?

**A.** I do not coordinate the parking of the rig

with the AMA.

**Q.** How do you know where to put the truck?

**A.** The driver is in contact with the proper

Feld personnel.

**Q.** Do you recall who was the driver in 2020?

**A.** Rodney Duncan.

**Q.** Is he an employee of the Medic Rig?

**A.** There are only one employee of the Medic

Rig.

**Q.** Forgive me. Is Mr. Rodney, correct that, was

Mr. Rodney Duncan a contractor of the Medic Rig

at that time?

**A.** Yes.

**Q.** Okay. And he was engaged to drive the truck

from stadium to stadium throughout the season?

**A.** Yes.

**Q.** Okay. Do you recall anyone else that was part of the larger Medical Rig crew at the 2020 Supercross in Tampa?

**A.** What are you referring to as larger medical crew?

**Q.** I understand there's medical personnel and we've talked about many of those, right? Right?

**A.** Yes.

**Q.** Okay. And now you mentioned there was a truck driver for the semi, right?

**A.** Yes.

**Q.** Was there anybody else that was part of the crew, whether it's medical or non-medical, that were assisting in providing services during the Tampa event?

**A.** I do not recall.

**Q.** Do you know a gentleman by the name of Dana Raible, R-A-I-B-L-E?

**A.** I know a Dan Raible. I do not know a Dana

Raible.

**Q.** My apologies to Mr. Raible. Okay. Who is Dan Raible?

**A.** He is an RN.

**Q.** A registered nurse?

**A.** That is correct.

**Q.** And was he working the Tampa Supercross?

**A.** I do not recall.

**Q.** So there's a medical team that's on the track when the riders are on it, right?

**A.** Yes.

**Q.** In the normal course of business, is there anybody back at the Medic Rig that's still available or doing things?

**A.** Yes.

**Q.** Tell me about that, please.

**A.** There is an RN at the rig throughout the day.

**Q.** Anyone else?

**A.** Medical or non-medical?

**Q.** I'm just trying to get a complete picture.

**A.** And I'm just trying to give you the correct answer.

**Q.** Okay. Well, both then.

**A.** Okay. Sometimes I'm there. Sometimes the driver's there.

**Q.** Anyone else?

**A.** It depends on the event. Sometimes there may be a visitor. Sometimes maybe somebody's coming for a tour.

**Q.** Okay. Do you remember when you traveled to Tampa for the Supercross event in February of 2020?

**A.** Do I remember what?

**Q.** When you traveled there?

**A.** Yes. Yes, February of 2020.

**Q.** Do you recall if you were there the Wednesday before the event, Thursday, Friday?

**A.** No, I do not recall.

**Q.** Did you attend press day on Friday, February

14th?

**A.** I do not recall.

**Q.** Do you know if anyone from the medical team was present during press day when riders were on the racetrack?

**A.** I do not know that.

**Q.** Is that something that the medical team typically did during the 2020 season?

**A.** Did what?

**Q.** Provide standby emergency medical services when the riders were on the track on press day?

**A.** No, we did not provide service on that day.

**Q.** Do you know who, if anyone, provided that type of service typically?

**A.** I do not know.

**MR. DOYLE:** I know you want this to be done, but you got to let him finish.

**MR. CARSON:** I know.

**MR. DOYLE:** Yeah.

**BY MR. SCHWEIKERT:**

**Q.** Let's talk about the day of the event,
Saturday, February 15, 2020. Do you recall
arriving at the stadium?

**A.** If you're asking what time I arrived there,
I do not recall.

**Q.** Did you go to the stadium in the morning?

**A.** Yes.

**Q.** What did you do, or what do you typically do
when you first arrive at an event?

**A.** Unlock the door on the semi.

**Q.** And then what?

**A.** Make sure the lights are on. Make sure all
the equipment is out. Make sure everything is
ready to go when the team arrives.

**Q.** By team, you're referring to the medical
personnel?

**A.** The medical team.

**Q.** Do you recall doing that on that particular
day, or is that just generally your routine?

**A.** That's generally my routine.

**Q.** Okay. Bless you. It's my understanding there's a number of meetings among different people throughout the morning. Did you yourself attend or participate in any meetings that morning?

**A.** No.

**Q.** Did you go to the medical meeting?

**A.** No.

**Q.** Did you have any meetings with AMA personnel or Feld people?

**A.** Are you asking in the morning?

**Q.** Yes, sir.

**A.** No.

**Q.** So once the medical team arrives, and you'd already set everything up, what do you typically do before the practices start?

**A.** Whatever needs done.

**Q.** Okay. And I understood from what you told me earlier, you were at Home Depot or Lowe's at the time that Brian crashed. Is that correct?

**A.** Yes.

**Q.** Do you remember why you'd gone to Home Depot

or Lowe's?

**A.** I was, obviously, was doing some type of

repair and needed a part.

**Q.** Do you recall when you left the stadium to

go shopping?

**A.** I do not recall.

**Q.** When did you first become aware that Brian

had crashed?

**A.** Later in the day.

**Q.** Tell me about that.

**A.** I'm not sure what you want me to tell you.

**MR. DOYLE:** Tell him how you found out.

**A.** When I returned to the stadium, the

ambulance was, I believe, leaving.

Sometime after that, I heard the name Brian

Moreau.

**BY MR. SCHWEIKERT:**

**Q.** Who did you hear that name from?

194

**A.** I do not recall.

**Q.** Was Brian already in the back of the ambulance with the doors closed and it was driving away? Or was he still outside the ambulance at the time that you returned from Home Depot or Lowe's?

**A.** I believe he was in the ambulance.

**Q.** And did you have any conversations with anyone about what was going on at that time?

**A.** No.

**Q.** You didn't ask anybody what the ambulance had been for?

**A.** No.

**Q.** Why not?

**A.** Why? Why would I ask?

**Q.** You own the company that's there to provide emergency medical services to rider and you see an ambulance departing the stadium. That wasn't something that you wanted to inquire about?

**A.** No.

195

**Q.** Okay. Not even what happened? Was it a

rider? Was it a spectator? Was it one of the

officials?

**A.** No.

**Q.** Why not?

**MR. DOYLE:** Object to form. Asked and answered.

Go ahead.

**BY MR. SCHWEIKERT:**

**A.** You just asked me that.

**Q.** But I'm asking why you did not have an

interest in finding out more about an ambulance

leaving a stadium where your company had been

contracted to provide emergency medical

services.

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I don't know how you want me to answer that.

I did not ask who was in the ambulance.

**Q.** Your bio we looked at earlier says that you

have a passion for racing and safety and

keeping them aligned. There was nothing about seeing an ambulance at the stadium that made you interested in figuring out more?

**A.** No.

**Q.** Did you have any discussions with any members of the medical team that day about Brian Moreau?

**A.** What kind of discussions are you asking about?

**Q.** Any that may have happened regarding Brian.

**A.** Before the accident or after?

**Q.** Were there discussions? Sir, I thought you told me the first time you heard his name was after the accident, right?

**A.** That is correct.

**Q.** So then there wouldn't have been discussions about him before, right?

**A.** Okay, then no.

**Q.** Okay. What about after the accident on that day, did you have any discussions about him or

his accident?

**A.** I knew that he went to the hospital.

**Q.** How did you find that out?

**MR. DOYLE:** Object to the form, asked and

answered. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** Was it Dr. Bodnar that had informed you that

Brian had gone to the hospital?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** Did you ever become aware of the type of

injury that Brian had potentially sustained

that required him to be taken from the stadium

where your company was providing medical

services to Tampa General Hospital?

**A.** Yes, I heard later in the day.

**Q.** What did you hear and when?

**A.** I do not recall the time.

**Q.** What did you recall hearing?

**A.** Possible spinal injury.

**Q.** Who did you hear that from?

**A.** I do not recall.

**Q.** Was that a discussion that you would have had with his racing team, with Feld, with the AMA, or just amongst the medical team?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** Would you like to rephrase that, please?

**Q.** In the normal course of business, as someone who owns a company that has been providing emergency medical services to riders at Supercross events for many years, would you typically have a conversation about the injury sustained by a rider that was treated by your medical team with folks from the rider's team, from the AMA, from Feld, only within your medical team, all of the above, none of the above?

**A.** You're asking for a lot of answers.

**Q.** Yes, my client is seriously hurt and I

[crosstalk].

**A.** I understand that, but it's not a simple yes

or no.

**Q.** I'll take a complex answer. That's fine.

**A.** Okay. What's your first question?

**MR. DOYLE:** Why don't we break it up? Would you

typically speak to anyone with Feld? How about

that?

**MR. CARSON:** No.

**MR. DOYLE:** Would you typically speak with

somebody at AMA?

**MR. CARSON:** No.

**MR. DOYLE:** Brian's racing team?

**MR. CARSON:** No.

**MR. SCHWEIKERT:** All right, [crosstalk] you'll

get your chance. You'll get your chance.

**MR. DOYLE:** I'm trying to help you out here,

Mark, because there's no way you're going to

finish in 7 hours if I don't.

**MR. SCHWEIKERT:** Well...

**MR. DOYLE:** You're welcome. I think you just answered your question.

**MR. SCHWEIKERT:** Okay.

**BY MR. SCHWEIKERT:**

**Q.** Would you typically have that type of conversation with medical team members?

**A.** I would only know if they went to the hospital or not.

**Q.** Would you typically have that type of conversation only with the medical team members?

**A.** What type of conversation?

**Q.** A rider went to the hospital in an ambulance with a potential spinal cord injury.

**A.** I would only have that with my medical team.

**Q.** Okay. Do you recall having a meeting in the semi-trailer with Amy Metiva and other folks later that day?

**A.** Yes.

**Q.** What do you remember about that meeting?

**A.** I do not recall anything about the meeting.

**Q.** But you remember it happening?

**A.** Yes.

**Q.** Do you remember who was there?

**A.** I do not recall.

**Q.** Well, you remember Amy Metiva was there, right?

**A.** Correct.

**Q.** Was it just you and Ms. Metiva?

**A.** No.

**Q.** So you do remember other people, right?

**A.** I don't remember all the other people, and that's what you asked me. Dr. Bodnar was there. Amy was there. I don't know other people.

**Q.** Okay. What was that meeting about?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

202

**Q.** It was not about Brian?

**A.** I did not say that.

**Q.** So it was about Brian, at least partially?

**A.** I do not [crosstalk].

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** Do you know what led to the 3 of you
convening in the trailer?

**MR. DOYLE:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** Do you recall who was doing most of the
talking, if anyone?

**A.** I do not recall.

**Q.** But you recall Lowe's or Home Depot, but not
a meeting in a trailer with the Chief Medical
Officer and one of the medics that had been
involved in treating a rider who you had
learned sustained a spinal cord injury at the

event. Is that fair?

**MR. DOYLE:** Object to form.

**A.** That is correct.

**BY MR. SCHWEIKERT:**

**Q.** Well, if you obviously were shopping for

some part at Lowe's or Home Depot, isn't it

equally obvious that you were talking about

Brian with Dr. Bodnar and Metiva in that semi-

trailer?

**MR. GORDON:** Object to the form.

**MR. DOYLE:** Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I've told you multiple times, I'm not

medical. Would you like to know how to fix the

sink in the semi? I can tell you.

**Q.** Were you having a medical conversation in

that semi with Dr. Bodnar and Amy Metiva?

**MR. DOYLE:** Object to the form. Mark, he's told

you 4 times he doesn't remember what the

conversation was about. There's only so many

more times he can tell you. I mean, how much more are you going to harass this guy? Let's cut [crosstalk].

**MR. SCHWEIKERT:** It's not harassment. A jury can determine what they want to determine based on the demeanor, response.

**MR. DOYLE:** For your sake [crosstalk].

**MR. SCHWEIKERT:** I got to ask my questions [crosstalk] as I remember, but I can ask them, and that's all I'm doing.

**MR. DOYLE:** But you can't ask them 4 or 5 or 6 times and continue to harass a witness. At some point, and I think we're there, it does become harassment. You can't just ask the same question 10 times, 20 times and say, "Well, I can ask my questions and let the jury decide."

**MR. SCHWEIKERT:** That's fine.

**MR. DOYLE:** That's not how it works.

**MR. SCHWEIKERT:** You can have a dialogue if you want off the record. I don't want to keep

eating up time.

**MR. DOYLE:** Well, that's pretty much what you've

been doing for about 5 hours, but go ahead.

**MR. SCHWEIKERT:** The record will reflect what it

reflects. You have one perspective. I have

another perspective, but that has nothing to do

with the deposition. I just want to take the

testimony and that's what I'm going to continue

doing.

**BY MR. SCHWEIKERT:**

**Q.** Do you recall doing anything after that

meeting?

**A.** No, I do not recall.

**Q.** Is Amy Metiva still a part of your company's

medical team today?

**A.** No.

**Q.** Why not?

**A.** After COVID, because COVID was the next week

or 2, we didn't ask her to come for work.

**Q.** I'm sorry. What was that?

**A.** I said after COVID, which was a week or 2 later, the events were suspended for, I don't know, it's 3 months. No one worked. When we came back to work, she was not one of the people to come back to work at the events that resumed after COVID.

**Q.** Did you, or anyone that you're aware of, inform Ms. Metiva on Sunday, February 16th, the day after the event, that her services were no longer needed?

**A.** I do not recall.

**Q.** Did you review Ms. Metiva's deposition transcript?

**A.** No, I did not.

**MR. DOYLE:** Object to form, asked and answered. I was just reminding me that he asked you people to deposition testimony. The one he had one time.

**MR. SCHWEIKERT:** Maybe you saw it over lunch. I don't know.

**MR. DOYLE:** No, because that would really be improper, wouldn't it, since he's under oath. But thank you for raising the possibility that I'm entirely unethical. I appreciate that.

**MR. SCHWEIKERT:** That was not my insinuation.

**MR. DOYLE:** Well, exactly what it would be, in fact.

**MR. SCHWEIKERT:** Look, I don't need the interruptions. That is improper. Let's just keep going.

**BY MR. SCHWEIKERT:**

**Q.** Did you inform Ms. Metiva at some time after COVID that her services would not be needed?

**A.** I do not recall.

**Q.** What about Scott Combs? Did he ever provide medical services for your company after the Tampa Supercross?

**A.** Not that I'm aware.

**Q.** I understand you were not at the stadium when the accident happened. But, typically,

when you are at the stadium during practices,
are you on a headset or listening to the
medical team's communications?

**A.** No.

**Q.** Okay. In the days after the event, did you
have any meetings with anyone to discuss Brian?

**A.** Not that I recall.

**Q.** In all your years of running a company
that's providing services for the Supercross,
have you had any other riders that were
paralyzed during an event other than rider,
Brian?

**A.** Yes.

**Q.** Who are you thinking of?

**A.** Jimmy Button, but he somewhat recovered.

**Q.** When did that happen?

**A.** I do not recall.

**Q.** Was it more than a decade before Brian's
accident or less than a decade?

**A.** I do not recall.

**Q.** Any others that you...

**A.** I do not. Go ahead.

**Q.** ... that you can recall? Any others that you

can recall?

**A.** I do not recall. I do not remember.

**Q.** So that would be no, there are no others

that you don't recall?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**Q.** Give me a second. Let me show you a document

previously marked as Exhibit 17. It's labeled

Medic Rig 1 through 4. And I'm happy to scroll

through it. Let me know if you've seen it

before.

**A.** I have not seen it.

**Q.** This isn't a document that you compiled to

be produced in this case under a Bates labeled

for your company?

**A.** I've told you multiple times, I'm not a

doctor. That's a doctor's file. I'm not

medical.

**Q.** Just asking if you had seen it.

**A.** I have not.

**Q.** Is any of this handwriting yours?

**A.** No.

**Q.** Do you have any understanding why there is a circle on the lower part of this silhouette of the back of a person?

**A.** No.

**Q.** I'm going to show you, this is a document previously marked Exhibit 654. Strike that. I'll show you a document previously marked as Exhibit 23, Bates labeled FMS Inc. 654. Have you seen this before? Do you have a copy in front of you?

**A.** Yes.

**Q.** Okay.

**A.** I do not remember this.

**MR. DOYLE:** The only question is have you seen this before? That's the only thing pending

right now. Hang on [inaudible]. Have you seen

it before?

**BY MR. SCHWEIKERT:**

**A.** I do not recall.

**Q.** Do you see that this is an email from Mike

Muir on February 18, 2020 to Michael Pelletier,

you, Tom Carson, Dr. John Bodnar, and Dave

Prater?

**A.** I see that's what it says, yes.

**Q.** And the subject is Tampa Supercross meeting.

Do you see that?

**A.** Yes.

**Q.** But you don't recall having any meeting with

any of these people on February 18, 2020?

**A.** That is correct. I do not recall.

**Q.** Do you know who Michael Pelletier is?

**A.** Yes.

**Q.** Who is he?

**A.** He works for the AMA.

**Q.** Do you know Dave Prater?

**A.** Yes.

**Q.** Who's he?

**A.** He works for Feld Motorsports.

**Q.** Do you typically have meetings with Mr.
Pelletier or Dave Prater following a Supercross
event?

**A.** What is your definition of typically?

**Q.** Normal course of business.

**A.** Does that mean every week?

**Q.** I don't know how you conduct your business,
sir. I'm trying to get a sense.

**A.** I'm just asking you, do I have meetings
every week after the event?

**Q.** Do you have meetings every week after the
event?

**A.** No.

**Q.** Do you occasionally have meetings with folks
from the AMA, Feld, Dr. Bodnar after an event?

**A.** Sometimes.

**Q.** And what is the purpose of sometimes having

those meetings?

**A.** Parking.

**Q.** To address parking from the weekend prior?

**A.** Maybe we needed to address the parking for the next year's event.

**Q.** Okay. Any other general purpose?

**A.** I do not remember from week to week.

**Q.** Have you ever had any meetings at any time to discuss an injury to a particular rider or riders at a past Supercross event?

**A.** I defer the medical to Dr. Bodnar.

**Q.** I just want to know if you've had that type of meeting.

**A.** I do not remember.

**Q.** But you remember meetings about parking, sometimes?

**A.** You asked for an example.

**Q.** And that's the only example you can give?

**A.** Would it be possible to get ice on site?

**Q.** That's a reason why there would be a meeting

a couple days after event to see if it was

possible to have gotten ice for an event?

**A.** Or next year.

**Q.** For the following year. Okay. And Mr.

Prater, he's pretty high up at Feld

Motorsports, isn't he?

**A.** I believe that.

**MR. GORDON:** Object to form.

**BY MR. SCHWEIKERT:**

**Q.** Do you know his title?

**A.** In 2020?

**Q.** Sure.

**A.** No, I do not.

**Q.** Do you know his title today?

**A.** No, I do not.

**Q.** What about Mr. Pelletier? You mentioned he's

with the AMA. Do you know what role he was in

during the 2020 season?

**A.** I do not know his official position.

**Q.** What about today?

**A.** I do not know.

**Q.** Do you know anybody above Mr. Pelletier at

the AMA?

**MS. SPRADLIN:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** Yes.

**Q.** Who are you thinking of?

**A.** The man at the top.

**Q.** Does he have a name?

**A.** I can't remember his name.

**Q.** So as far as you're aware, at least as of

today, Mr. Pelletier is below the man at the

top?

**MS. SPRADLIN:** Object to the form.

**BY MR. SCHWEIKERT:**

**Q.** Is that a yes?

**A.** I would say that's correct.

**Q.** Would you typically have a meeting with

somebody at that level to address the need for

ice at future Supercross events?

**MS. SPRADLIN:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I did not say I met with the AMA about getting ice for a future event. You asked if I had a meeting with Feld about next year's event.

**Q.** The ice example is a reason you might have a meeting with Feld a couple days after an event to request sufficient ice for the following season?

**A.** It could be. You asked for an example.

**Q.** And under no circumstances would you have meetings with Feld or the AMA to address anything related to the provision of medical services at a Supercross event that had previously occurred?

**MS. SPRADLIN:** Object to the form.

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I can't answer that.

**Q.** Why not?

**A.** I don't recall this meeting.

**Q.** I get that. But I'm trying to understand if,
in the normal course of things, did you ever
review an injured rider or like a medical team
response with anyone from the AMA or the Feld,
that had occurred in the past?

**MS. SPRADLIN:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** Did you ask me a question?

**Q.** I did. Did you answer my question?

**A.** Can you repeat the question, please?

**MR. DOYLE:** I think he was confused because you
said what I'm trying to find out [crosstalk].

**MR. SCHWEIKERT:** I'll rephrase it.

**MR. DOYLE:** Yeah.

**BY MR. SCHWEIKERT:**

**Q.** Could you please explain to the jury why the
owner of the company that is contracted to
provide medical services at a Supercross event

would not, in the normal course of business, have a meeting after an event to discuss any issues related to a rider's injury or a response to a particular incident at the event?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I would defer to Dr. Bodnar. I am not medical.

**Q.** I'm going to show you another document. Jorge, how long have we been going? [silence] Mr. Gordon?

**MS. SPRADLIN:** I'm hoping he's still on.

**MR. SCHWEIKERT:** You're muted if you said anything.

**MR. DOYLE:** Both of his windows are still there.

**MR. SCHWEIKERT:** Mr. Garcia, are you present? I cannot hear you if you're saying anything.

**COURT REPORTER:** Sorry, I was muted.

**MR. SCHWEIKERT:** It happens. I was just trying to get a sense of how long we've been going.

**COURT REPORTER:** Yes, I can tell you right that right now. We've been going for 4 hours and 46 minutes with 33 seconds.

**MR. SCHWEIKERT:** Okay. That's cute.

**MR. DOYLE:** Mark, although I don't know that I need to reserve for this witness, I do want to reserve some time to question this witness when you're done.

**MR. SCHWEIKERT:** Yeah, no, for sure. For sure.

**BY MR. SCHWEIKERT:**

**Q.** All right, I'm going to show you a document previously marked, one moment, as Exhibit 19. I'm not sure if you happen to have that with you. It's not Bates labeled, but do you see that document on your screen, sir?

**A.** Yes.

**Q.** Okay. At the top, there is an email from Sean Brennan to Olivier Deval, Dr. Bodnar, and you, Tom Carson, on February 17, 2020.

**A.** I see that.

220

**Q.** Do you know who Sean Brennan is?

**A.** Yes.

**Q.** Who's he?

**A.** He works for Feld.

**Q.** Do you know what he was doing for Feld around this time?

**A.** I do not.

**Q.** Do you know Olivier Deval?

**A.** Not that I recall.

**Q.** The first email in this chain is from Olivier Deval on that same day to Dr. Bodnar, to you and Sean Brennan, and the subject is French Media's questions regarding Brian Moreau. Do you see that?

**A.** Yes, sir.

**Q.** Do you know if Mr. Deval is a member of the French Media?

**A.** Only because it says it on that letter.

**Q.** Have you seen this email before?

**A.** I do not recall.

221

**Q.** You see, at the beginning he writes, "Hi, John. Hi, Tom. Hi, Sean!" right?

**A.** Correct.

**Q.** Seems like a friendly, familiar type of greeting, but you don't know who this person is?

**A.** I do not recall.

**Q.** And then in the email, in part, he writes, "I have a few questions for you regarding Brian Moreau's accident." Do you see that?

**A.** Yes, sir.

**Q.** Okay. And he writes, "Our goal is to publish the most accurate information possible regarding the circumstances of the accident in order to cut short to all the rumors that will arise this week." Do you see that?

**A.** I see that.

**Q.** Were you aware of any rumors that arose following Brian's accident?

**A.** I do not recall.

222

**Q.** Then he writes, "All the questions below are not accusatory, so please don't be on a defensive mode." Do you see that?

**A.** Yes, sir.

**Q.** Okay. "We just try to ask you everything our readers are already asking us." Do you see that?

**A.** Yes, sir.

**Q.** He writes, "We'd like to be able to publish answers to the following questions." And the first bullet point, "Red flag. Why no red flag? Was it seen as unnecessary on the moment? And why?" Do you see that?

**A.** I see that.

**Q.** Did you ever respond to this inquiry?

**A.** No.

**Q.** Did you ever discuss how to respond to this inquiry with anyone?

**A.** No.

**Q.** Did you ever exchange emails about this

inquiry with anyone other than Sean Brennan?

**A.** I don't believe I ever responded to anyone.

So, no.

**Q.** Did you get emails from other folks about

Brian's accident?

**A.** Not that I'm aware.

**Q.** But if you had, you believe you would not

have responded?

**A.** That is correct. This is a medical question.

**Q.** Well, the first question, why no red flag?

Do you consider that medical?

**A.** Yes, sir.

**Q.** Why?

**A.** It stops the race.

**Q.** Why is that a medical question?

**A.** They don't normally stop the race if there's

no reason.

**Q.** In all your experience, is the only reason

for stopping a race or practice a medical

reason?

**MS. SPRADLIN:** Object to the form.

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** Can you repeat that, please?

**Q.** In your experience, is the only possible reason for stopping a race or practice during a Supercross event a medical reason?

**A.** No.

**Q.** So this question then wouldn't necessarily be medical, would it?

**MR. DOYLE:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I don't have an answer for that.

**Q.** Did you ever have any discussions with anyone about whether a red flag should have been thrown following Brian's crash?

**A.** No.

**Q.** We go back to the journalist's email. This next question concerns evacuation from the track. Do you see that?

**A.** Yes.

**Q.** He writes, "Looks like Brian was quickly put on his feet, which will raise questions, but I'm sure there's a perfectly reasonable answer to that decision." Do you see that?

**A.** Yes.

**Q.** Are you aware of any answer to that? Strike that. Are you aware of why Brian was lifted off the track in the manner that he was?

**A.** I defer that to Dr. Bodnar.

**Q.** And you never acquired any information about that at any time?

**A.** Correct.

**Q.** Did you ever ask Dr. Bodnar or Amy Metiva or Scott Combs or Dr. Kennedy why Brian had been removed from the track and transported to The Medic Rig without spinal immobilization?

**A.** No.

**Q.** Why not?

**A.** Why would I? I'm not medical.

226

**Q.** All right. I'm going to show you another document. This will be a new one. I'll put it in the chat. 141. I'm going to also share it with you. Oops, sorry. Can you see the document I've marked as Exhibit 141 on the screen, sir?

**A.** Yes.

**Q.** Okay. I want to scroll. It's 2 pages. It's going to scroll through it. Do you see it begins with that same email from the journalist, Olivier Deval?

**A.** I see that, yes.

**Q.** Okay. And then Mike Muir of Feld forwards to you, Tom Carson, the journalist's email, right?

**A.** That's what it reads. Yes.

**Q.** Okay, and then you send it to Dr. Bodnar's cell phone, right?

**A.** That's what it reads.

**Q.** You sent it approximately 3 minutes after receiving Mike Muir's email?

**A.** That looks like what it reads. Yes.

**Q.** Okay. Do you have any understanding of why Mr. Muir was forwarding this to you?

**A.** No, I do not.

**Q.** Did you ever have any conversations with Mike Muir about Brian after his accident?

**A.** I do not recall.

**Q.** And the reason you forwarded it to Mr. Bodnar is because it was, from your view, a medical inquiry?

**A.** Yes, sir. Dr. Bodnar is the doctor.

**Q.** Are you aware of any changes that were made to how things are done by The Medic Rig or your medical team as a result of the incident with Brian?

**A.** I defer to Dr. Bodnar.

**Q.** Any non-medical changes?

**A.** I don't recall.

**Q.** Do you still continue to work with first-time volunteers?

**A.** I defer to Dr. Bodnar.

228

**Q.** You don't know, one way or another, whether your company still contracts volunteer paramedics or EMTs to assist with providing emergency medical services to the Supercross at present?

**A.** I defer to Dr. Bodnar.

**Q.** But we looked earlier at Mr. Combs' volunteer subcontract agreement, and it had your initials on it, right?

**A.** Correct.

**Q.** And you told me he'd signed it with you that morning, right?

**A.** Correct.

**Q.** Can you recall having an experience with any other sort of volunteer, paramedic, or EMT at a Supercross event in the past year or so?

**A.** I do not recall.

**Q.** Do you know if any changes have been made to the written medical protocol that was in effect for the Tampa Supercross?

**A.** I do not know.

**Q.** It's not important to you to know what protocol the medical team is going to be following when they are working under your company in providing emergency medical services to riders at Supercross events?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** I defer to Dr. Bodnar. You're asking a medical question.

**Q.** Well, do you think that things could have been done better, particularly with responding to Brian's crash during the practice at the Tampa event?

**MR. DOYLE:** Object to form.

**MS. SPRADLIN:** Join.

**BY MR. SCHWEIKERT:**

**A.** I was not on the property. I did not see the incident.

**Q.** I'm going to show you a video then. Well,

230

before we do that, you want to take a little

bathroom break?

**A.** Yes.

**MR. SCHWEIKERT:** Jorge, please.

**COURT REPORTER:** All right. We're off the

record. The time is 4:26.

**MR. SCHWEIKERT:** I just wanted. They promised

not to turn the lights off on us.

**COURT REPORTER:** All right, we're back on the

record. It's 4:34 p.m. Go ahead, Mark.

**BY MR. SCHWEIKERT:**

**Q.** Thank you. Have you ever seen any videos of

what happened on the track that day?

**A.** No.

**Q.** At no point in time?

**A.** No.

**Q.** Did you ever try to seek out any footage

about what had happened?

**A.** No videos, no.

**Q.** Did you try to seek out information

231

otherwise?

**A.** I saw pictures.

**Q.** All right. I'm going to show you a video

previously marked as Exhibit 59. For the

lawyer's sake, it's the jumbotron. Can you see

this video player on your screen, sir?

**A.** Yes.

**Q.** Okay. Just fast forward. I think it's 250,

240. I'm going to start playing it around the

240 mark.

**MAN 1:** Another rider having trouble in the

rhythm section, the far rhythm section by the

big screen. We got Alpine stars on it.

**BY MR. SCHWEIKERT:**

**Q.** Did you hear the announcement over the PA

about having Alpine stars on it?

**A.** I just heard that, yes.

**Q.** Do you know who controls the public address

announcements at Supercross events?

**A.** No.

**MAN 1:** Riders paying attention to those yellow flags, making sure they protect the rider and themselves. And if you're not familiar with Alpine stars medical crew, they are doctors, nurses, and first responders on site to make sure if a rider does fall, that they're able to help that rider up, and offer medical services with a state-of-the-art Alpine stars Medical Rig. Not far away here at the stick...

**BY MR. SCHWEIKERT:**

**Q.** Okay. Did you see 2 members of your company's medical team lifting Brian?

**A.** I just saw that on this video. Yes.

**Q.** Okay.

**MAN 1:** State-of-the-art Alpine stars Medical Rig.

**BY MR. SCHWEIKERT:**

**Q.** Okay. So that's some footage of him coming up off the ground. I'm going to show you another video. This one was previously marked

233

Exhibit 64, FMS Inc. 1147. Strike that. I'm
going to show you a video previously marked
Exhibit 62, FMS Inc. 1148. Can you see the
video on your screen, sir?

**A.** I believe this is a video, yes. There's a
picture of a racetrack.

**Q.** Right. And I'm going to start playing it
from the 11-second mark. And I'll pause it at
the 19-second mark. Does this footage look
familiar to you at all?

**A.** I have never seen this footage.

**Q.** Okay. Were you aware that there were cameras
recording the practices at the Tampa
Supercross?

**A.** I'm not aware.

**Q.** And I'll represent to you, this is Brian in
the middle. You see that?

**A.** Yes, sir.

**Q.** And then there's Scott on the right and Amy
on the left. And do you see them removing him

234

from the track?

**A.** I see what's on this video, yes.

**Q.** Okay. I'm going to pause it at 49-second mark. Do you see a third gentleman in a red shirt?

**A.** Yes, sir.

**Q.** He just lowered the tailgate of the mule?

**A.** Okay.

**Q.** Did you see that?

**A.** I see the third person.

**Q.** And that's Dr. Kennedy, correct?

**A.** I believe.

**Q.** Okay. And this medical mule is part of the equipment that your company brings to the Supercross events at that time?

**A.** Yes.

**Q.** Okay. Do you know if there's a backboard on the mule?

**A.** Yes.

**Q.** Do you know if there's a cervical collar on

235

the mule?

**A.** I do not. I defer to Dr. Bodnar.

**Q.** Okay. But you do believe there is a

backboard on this mule?

**A.** Yes, sir.

**Q.** Okay. Do you recall doing a YouTube video

where you demonstrate the backboard that can be

pulled out on the back of these mules?

**A.** I don't recall any video that I did, but I

can see the backboard from this video.

**Q.** Okay.

**Q.** I was referring to a YouTube video like the

Science of Supercross. But if you don't

remember, that's fine.

**A.** Okay.

**Q.** All right, let's keep going. And you'd never

seen a video of the removal of Brian from the

track at all? Just pictures?

**MR. DOYLE:** Object to form. Asked and answered.

Go ahead.

236

**BY MR. SCHWEIKERT:**

**A.** I have never seen this video.

**Q.** Okay. And I was asking a little bit earlier if you had any thoughts about whether things could have been done better with the benefit of hindsight? Do you remember that?

**A.** I remember you asking me.

**Q.** Do you have an answer for that question, having had the chance to review some footage?

**MR. DOYLE:** Object to the form. Foundation predicate. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** I defer to Dr. Bodnar. I trust Dr. Bodnar. I'm not medical.

**Q.** But you are a former rider, right?

**A.** Correct.

**Q.** And you don't have any perspective on whether someone who has experienced a spinal cord injury on a racetrack should be moved with or without immobilization?

237

**MR. DOYLE:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I defer to Dr. Bodnar.

**Q.** Do you know why there was a backboard on the mule?

**A.** Defer to Dr. Bodnar.

**Q.** I'm going to show you a YouTube video. Let me know when you see that on your screen.

**A.** I see it.

**Q.** It's called the Science of Supercross, Episode 37, posted by Kawasaki USA. Do you see that?

**A.** Yes, sir.

**Q.** All right. And I'm going to start playing around the 1 minute and 36-second mark. Do you know who this is, the person depicted here?

**A.** Yes, I do.

**Q.** And who's that?

**A.** Dr. Alexander.

**Q.** Okay.

**MR. CARSON:** One of the vital members of the Alpine stars Medical Team are the Kawasaki Mules. One of the unique features on this mule is this specialty designed drawer. It allows the doctor to have all his supplies, whether it be a splint, a neck collar, maybe an ACE bandage, anything the doctor may need out on the floor is in this drawer. This allows the doctor to load the patient on the board and put it inside of a mule in one smooth motion to ensure that the rider is transported with the least amount of movement. In the case that maybe a rider only has an extremity injury, he's able to step onto the step, be fastened in with the seatbelt and transported back to the Alpine stars Medical Unit.

**BY MR. SCHWEIKERT:**

**Q.** Was that you in that video, sir?

**A.** Yes.

**Q.** And were you describing that there's a

backboard and a cervical collar on the Kawasaki

Medical Mules?

**A.** I was describing some of the features on the

Kawasaki Mules.

**Q.** And that included a backboard, right?

**A.** There was a backboard in that photo,

picture.

**Q.** And did you hear yourself explaining that

the backboard can be used to transport a rider

with the least amount of movement in the case

of a suspected spinal cord injury?

**MR. DOYLE:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I heard the conversation.

**Q.** Go back again. Start from the 150-second

mark.

**MR. CARSON:** Caller may be an ACE bandage.

Anything the doctor may need out on the floor

is in this drawer. This allows the doctor to

load the patient on the board and put it inside

240

of the mule in one smooth motion.

**BY MR. SCHWEIKERT:**

**Q.** Did you hear yourself just describing the
backboard as allowing the doctors to put the
patient and load them on the mule in one smooth
motion?

**A.** That is what I said right there. Yes, sir.

**Q.** Okay.

**MR. CARSON:** To ensure that the rider is
transported with the least amount of movement.

**BY MR. SCHWEIKERT:**

**Q.** And you then said, "And that is to ensure
you can transport the rider with the least
amount of movement." Right?

**A.** That is what I said.

**Q.** Okay. And why is transporting the rider with
the least amount of movement important as
you're explaining in this video?

**A.** I don't know what you want me to say. I said
to the least amount of movement.

**Q.** Why is that a feature that you were explaining about these backboards on this YouTube video?

**MR. DOYLE:** Object to form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** That's why we have those Kawasaki Mules, is to transport someone off the track if need be.

**Q.** And with the least amount of movement if need be, right?

**A.** That's correct.

**Q.** Okay. Knowing what you know today, do you believe Brian should have been transported off the track with the least amount of movement?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** Sir, I'm not a medical person. I cannot make that call. I was not on the track. I did not see the incident. I defer that medical call to the doctor.

**Q.** Do you condone the way that Brian was

242

removed from the track on that day?

**MR. DOYLE:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I am not making any consensus. I was not

there. I was not on the track. I am not a

medical person.

**Q.** You didn't give that disclaimer in the

YouTube video when you were explaining all of

the medical equipment on the mule and the

ability of the backboard to transport a rider

with the least amount of movement. Did you?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** Did I what?

**Q.** You didn't disclaim that, "I'm not a medical

doctor, so I should not be explaining to you

what equipment we have and how we use the

backboard." Did you?

**A.** Anybody can describe an item.

**Q.** But you were describing the purpose of the

243

backboard in the video, right?

**A.** I was describing several features.

**Q.** How many mules were at the Tampa event in 2020?

**A.** Can you be more specific? On the track or in total?

**Q.** In total, how many medical mules did your company bring to the Tampa Supercross?

**A.** Three.

**Q.** Do you know how many mules were on the track during the practice session in which Brian had his accident?

**A.** I do not.

**Q.** It's my understanding there were 2, 1 with Dr. Kennedy and 1 with Dr. Bodnar. Do you happen to know where the third mule may have been?

**A.** I do not.

**Q.** Did you go to Lowe's or Home Depot to get a part to fix the mule?

244

**A.** I do not recall if I was fixing the mule or the semi.

**Q.** And as of today, does your company typically take 3 medical mules to Supercross events?

**A.** We take 3 Kawasaki mules.

**Q.** And when the racetrack is active as of today, do you typically have 3 mules on the track ready to go in case they're needed?

**A.** No.

**Q.** What is the typical setup with the mules when riders are on the track?

**A.** Two mules.

**Q.** And a third one is kept back at the track?

**A.** There is a third Kawasaki mule at the semi.

**Q.** And why typically is it kept back at the track?

**A.** It's not a medical mule.

**Q.** What kind of mule is it?

**A.** A Kawasaki mule.

**Q.** And what purpose does it serve? Just moving

around the premises or?

**A.** Correct.

**Q.** All right. I'm going to show you, it's a
document previously marked as Exhibit 16 at Dr.
Bodnar's deposition, Bates labeled KTM 145. Do
you see the document marked as Exhibit 16 on
your screen?

**A.** Yes.

**Q.** Okay. And this is an email dated October
2022 with a number of folks on here, including
Dr. Bodnar. You see that?

**A.** Yes, sir.

**Q.** And John Hinz and Roger De Coster, right?

**A.** Yes.

**Q.** And they are with KTM, is that right?

**A.** Yes.

**Q.** Okay. And Tyler Keefe, do you know him?

**A.** Yes.

**Q.** What about Mathilde Musquin? Do you know
her?

246

**A.** I know who she is.

**Q.** And Mike Pelletier, Dave Prater.

**A.** Yes, I know them.

**Q.** Okay. Did you ever have any conversations with anyone from KTM about Brian's accident?

**A.** No.

**Q.** What about from his racing team?

**A.** No.

**Q.** Do you recall attending a spinal cord safety and health meeting in Redbud, Michigan?

**A.** Yes.

**Q.** Okay. I might not be seeing it. I thought you were on this email. Do you see your email anywhere?

**A.** No, sir.

**Q.** Okay. But if we go to the third page of the exhibit, you see it says at the top, "Summary meeting, Athlete Safety and Preparedness/spinal cord injury."

**A.** Yes.

**Q.** And it's referencing Redbud, Michigan, September 23, 2022?

**A.** Yes.

**Q.** And then there's a list of attendees. And below that is your name, Tom Carson. Do you see that?

**A.** Yes, sir.

**Q.** Okay. Did you attend this meeting?

**A.** Yes.

**Q.** Okay. What do you remember about that?

**A.** Several of those people were in attendance to talk about spinal injuries.

**Q.** And if you're not a medical doctor and you defer all of that to Dr. Bodnar, why did you attend to this meeting.

**A.** For information.

**Q.** And what information, if any, did you acquire related to services that your company provides at the Supercross events?

**A.** I do not recall.

248

**Q.** Do you recall any discussion of Brian Moreau?

**A.** I do not recall.

**Q.** I'm going to go to the 10th page of the exhibit, which I'll show you in a second. Okay. All right. This is page 10 of Exhibit 16. Let me know if you can see it.

**A.** I can see it.

**Q.** Do you recall a PowerPoint presentation at the meeting concerning Jesse Nelson or Brian Moreau?

**A.** No, I do not recall.

**Q.** Why did you attend this meeting?

**MR. DOYLE:** Object to the form. Asked and answered.

**BY MR. SCHWEIKERT:**

**A.** I was invited.

**Q.** Who invited you?

**A.** I do not recall.

**Q.** Was one of the purposes of the meeting to

improve safety for riders at Supercross events?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** I believe that was their intention.

**Q.** Did you have any such intention in attending

that meeting?

**A.** Can you be more clear?

**Q.** You traveled from your home in Ohio to

Redbud, Michigan for this meeting, right?

**A.** I didn't go just for the meeting.

**Q.** Okay, there we go. Help me understand.

**A.** What do you want to know?

**Q.** What did you go for?

**A.** There was an event, a race, the same

weekend.

**Q.** This meeting was held the weekend of a

Supercross or Motocross race or something else?

**A.** Can you put the document back up so I can

see the date, please?

**Q.** Yeah, sure.

250

**A.** It was at a Motocross race. I don't know

which one exactly.

**Q.** Okay. So September 23, 2022. So this is more

than 2 years after Brian's accident at the

Tampa event in February of 2020, right?

**A.** That's what the document reads.

**Q.** And there are still discussions with KTM and

Feld and the AMA and you and others about

spinal cord injuries using, according to one of

these presentations, Brian Moreau, as an

example, right?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** That's what this document reads.

**Q.** But when I asked you earlier if you had had

any other conversations about Brian, you didn't

remember this meeting, did you?

**A.** As I told you, I remember attending.

**Q.** We're getting close, I promise. All right, I

want to show you a new document. I can figure

out my exhibit number.

**MR. DOYLE:** 42.

**BY MR. SCHWEIKERT:**

**Q.** Thank you. Put it in the chat. I'm going to

show you a document marked as Exhibit 142,

which is a copy of the verified interrogatories

your attorney provided me with this morning. Do

you happen to have a copy with you?

**A.** Yes, sir.

**MR. GORDON:** Just to clarify, because we've been

here all day. I don't see 141 in my notes.

Maybe I'm missing it. What was 141?

**MR. SCHWEIKERT:** It's in the chat. It was

[crosstalk].

**MR. DOYLE:** [inaudible] email.

**MR. SCHWEIKERT:** About the [inaudible]

questions.

**MR. GORDON:** Got it. Now I got it. My bad. Go

ahead.

**BY MR. SCHWEIKERT:**

**Q.** All right. Is document 142 answers to

interrogatories served on your company, The

Medic Rig, LLC?

**MR. DOYLE:** Yeah, that's what you have?

**MR. CARSON:** Yes.

**MR. DOYLE:** Okay.

**BY MR. SCHWEIKERT:**

**A.** Plaintiff's interrogatories.

**A.** Okay.

**Q.** And you have verified the answers. Hold on.

I sent the wrong one in the chat, guys. Hold

on.

**A.** Okay.

**Q.** I sent the unverified. Is document 142

verified interrogatory answers to questions

served by plaintiff in this case?

**A.** Are you asking if I have a copy?

**Q.** Just identify it for what it is. I know what

it is, but to create a record, I'm asking if

you can help me identify it.

253

**A.** I have a copy of it says interrogatories.

**Q.** Okay. And if you go to the last page, is
there a verification page?

**A.** The notary? Yes, there is a verification
page.

**Q.** Okay. And that's your signature as the
president and managing member of the Medic Rig,
LLC?

**A.** Yes.

**Q.** Okay. Let me have that one back just so they
stay together. I want to direct your attention
to, it would be page 6, it'd be the
interrogatory number 2.

**MR. DOYLE:** So hang on a sec, because I took all
the certificate of service stuff out of his, so
he's right here. Interrogatory number 2.

**A.** Oh, I see. Okay. Yes, I have that in front
of me.

**Q.** In your company's answer to number 2, in the
last sentence it reads, "Defendant took no

254

action, nor could it have taken any action to prevent Brian Moreau's crash, which was the sole cause of his paralysis and claimed damages in this action." Right?

**A.** That is what it reads.

**Q.** Okay. And that's what you verified as being true, right?

**A.** There's only one person responsible, Brian Moreau.

**Q.** Tell me about that.

**A.** He's the rider of the motorcycle.

**Q.** Okay. So I understand he crashed the motorcycle himself. Can we agree on that?

**A.** Absolutely.

**Q.** Does your company believe any other person or entity did anything after Brian crashed that may have contributed in any way to the injuries?

**A.** No. I believe Brian Moreau was responsible for his own injury.

255

**Q.** Okay. Your company doesn't assign any

portion of fault to his racing team. True?

**A.** True.

**Q.** Your company doesn't assign any portion of

fault to GoPro. True?

**A.** Yes.

**Q.** Your company doesn't assign any portion of

fault to the AMA. True?

**A.** True.

**Q.** And your company doesn't assign any portion

of fault to Feld Motorsports. True?

**A.** True.

**Q.** And that is based on all of the information

that's available to your company as of today.

Is that true?

**A.** That is true.

**Q.** Is there anything that you know of that

would change your opinion on any of those

assertions?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** No.

**Q.** I want to go to the answer to number 6.

**A.** Number 6. [inaudible].

**MR. DOYLE:** Yeah, right here.

**BY MR. SCHWEIKERT:**

**A.** Okay.

**Q.** And it is just a list of people that have
been identified as possibly having some
information related to the case.

**A.** Okay.

**Q.** And in the answer, you identify Edgar
Perrin, P-E-R-R-I-N.

**MR. DOYLE:** Do you see it?

**MR. CARSON:** No.

**MR. DOYLE:** That's on the same answer with
[inaudible]. There.

**MR. CARSON:** Okay.

**BY MR. SCHWEIKERT:**

**Q.** Who is Edgar Perrin?

257

**A.** I would defer this to my attorney.

**Q.** Well, do you know him at all?

**A.** No.

**Q.** Do you know if he's or was part of Brian's racing team?

**A.** I do not know.

**Q.** Okay. So fair to say then you do not know what information he may have related to this lawsuit?

**A.** I defer this to my attorney.

**Q.** I mean, if you do have information about anything they know, now would be the time to inform me of that.

**A.** I do not know.

**Q.** What about the next gentleman? Mike Brown. Do you know him?

**A.** Yes, I do.

**Q.** And who is he?

**A.** He was a former racer.

**Q.** And what information does your company

believe that Mr. Brown may have concerning any
issues in this lawsuit?

**A.** I would defer this to my attorney.

**Q.** Have you spoken to Mike Brown about Brian or
this case?

**A.** No.

**Q.** You were designated to testify about these
interrogatories on behalf of your company,
correct?

**A.** Yes.

**Q.** But you don't know why these 2 individuals
were identified as potentially having
information concerning issues in this lawsuit?

**A.** I defer to my attorney.

**Q.** Do you have any experience with the race
control function during Supercross events in
2020?

**A.** No, sir.

**Q.** Are you aware of how or if there's
communication between your medical team and

anyone else when responding to an injured rider

at that time?

**A.** I'm not aware.

**Q.** You are not aware of how they do the job on

the track that your company has contracted them

to do?

**A.** I defer that to the medical director, to Dr.

Bodnar.

**Q.** Even as a lay person, you don't even have a

semblance of an understanding of what the

medics do or how they're communicating when

stationed next to an active racetrack?

**A.** I know that all the medical personnel wear

headsets and they are in communication with

each other.

**Q.** Do you know where they get those headsets?

**A.** Yes.

**Q.** Where?

**A.** In my semi.

**Q.** You don't know if they are in communication

or had the ability to communicate with other persons such as the race officials or Feld personnel during the event. Am I understanding correctly?

**A.** I do not know.

**Q.** Have you ever heard of a track safety supervisor?

**A.** Are you asking me if I know is there one or am I aware of that title?

**Q.** Let's start with the title.

**A.** Can you repeat the question, please?

**Q.** I'm going to show you Medical Emergency Action Plan previously marked as Exhibit 11. Whoops. Specifically the page Bates labeled Bodnar 212. Do you see that on your screen?

**A.** I do not see the number that you're referring to. What is the title that you're asking?

**Q.** Do you see the heading?

**A.** Yes, sir.

261

**Q.** Medical crew and rider security.

**A.** Yes.

**Q.** Okay. And it reads, "Designated Feld crew members are assigned to the track to manage track equipment including tough blocks, track markers, and signage. They're also assigned to provide a safe area for the medical staff to work on an injured rider. Communication is maintained and monitored through radio with track safety supervisor who has overview of the entire track." Did I read that correctly?

**A.** I believe you did.

**Q.** And did you see the reference to maintaining communication with track safety supervisor?

**A.** I see that, that is what the document says.

**Q.** What is your understanding of a track safety supervisor as of the time of the Supercross event in Tampa in 2020?

**A.** I defer to Dr. Bodnar. It says right there, medical crew.

262

**Q.** Well, it refers to designated Feld crew members, right?

**A.** That's what it says, yes, sir.

**Q.** Okay. Do you know who was the track safety supervisor at the Tampa Supercross?

**A.** No, sir.

**Q.** Do you know Jim Perry?

**A.** Yes.

**Q.** Who is he?

**A.** I do not know his current title. He was team manager at Yamaha.

**Q.** When was he team manager at Yamaha?

**A.** I do not know.

**Q.** But he's not in that role as of today as far as you know?

**A.** Correct.

**Q.** Right. Would you agree that responding to an injured rider involves a collaboration between the officials and your medical team and the track safety supervisor to ensure that the

medics are given a safe area to respond to a rider?

**MR. DOYLE:** Object to the form.

**BY MR. SCHWEIKERT:**

**A.** I'm going to defer that to Dr. Bodnar. I'm not a medical person.

**Q.** I am aware of that. You've told me that many times. But you are the sole owner of a company named the Medical Rig, LLC that provides emergency medical services to riders at Supercross events, including the Tampa event in 2020, right?

**A.** Yes.

**Q.** Okay. And I've seen you also referred to as the President, right?

**A.** Yes.

**Q.** And you don't have any more specific information about whether there is any sort of communication outside of your medical team with the AMA or Feld in coordinating a response to a

rider who's crashed on a racetrack, is that right?

**A.** I trust what Dr. Bodnar does.

**Q.** And you don't have any more specific information like I just asked, do you?

**A.** I trust what Dr. Bodnar does and how he runs the program.

**Q.** It was a simple yes or no.

**A.** Please repeat the question, sir.

**Q.** Beyond trusting Dr. Bodnar, do you have any more specific information about whether your medical team communicates with the AMA or Feld in coordinating a response to an incident involving a crashed rider on the racetrack?

**A.** No.

**Q.** Do you know somebody named Harv Whipple?

**A.** Yes.

**Q.** Who's that gentleman?

**A.** I do not know his title.

**Q.** What do you know about him?

**A.** He's at the events.

**Q.** Was he at the Tampa event in 2020?

**A.** I do not know.

**Q.** When was the last time you saw him at an event?

**A.** Last week.

**Q.** And do you know what role, if any he would [crosstalk]...

**A.** I'm sorry, we had a weekend off the week before.

**Q.** Okay. At the event where you saw him relatively recently, do you have any idea what role, if any, he was serving at the Supercross event?

**A.** I do not know his title.

**Q.** Do you know anything about what he was doing there?

**A.** No, sir.

**Q.** Do you know if he was involved in overseeing the racetrack from an elevated position?

266

**A.** I do not know.

**Q.** Have you ever been in an elevated position within a stadium where a Supercross event is being conducted?

**A.** Are you asking if I was a spectator, or in a working position?

**Q.** It's my understanding there are some booths, a race control booth, a show booth, television booth, some of which may have Feld or AMA folks in them overlooking the racetrack. Have you ever been in any sort of booth like that?

**A.** I've been in the press box.

**Q.** What is the press box? Does that serve any sort of monitoring function?

**A.** No.

**Q.** Is the press box just for the press to watch?

**A.** That would be a Feld question.

**Q.** In all your years of experience in all the races you've done, you never acquired any more

information about how the track that your crew
is contracted to provide emergency medical
services on is monitored or supervised, if at
all, by who or from where?

**MR. GORDON:** Objection to form.

**MR. DOYLE:** Join.

**BY MR. SCHWEIKERT:**

**A.** I defer to Dr. Bodnar.

**Q.** That wasn't my question. Either you have
more information or you don't. That's all I'm
trying to understand.

**A.** What more information do you want?

**Q.** Whatever you know about any sort of
coordination or collaboration in responding to
riders on the track.

**A.** I have no information.

**Q.** I'm going to show you again the Medical
Emergency Action Plan, Exhibit 11. Do you see
where it says Trackside Interdependence?

**A.** I see that.

**Q.** What does Trackside Interdependence mean?

**MR. DOYLE:** Object to form.

**BY MR. SCHWEIKERT:**

**A.** I do not know.

**Q.** Does it mean that there is some depending going on between the medical team and the AMA race director or other track marshals and AMA officials as referenced in this paragraph?

**A.** I do not know.

**MR. CARSON:** Oh, I'm sorry.

**MR. DOYLE:** That's okay.

**BY MR. SCHWEIKERT:**

**Q.** Have you ever served in any sort of officiating capacity for any Supercross event?

**A.** No.

**Q.** Have you ever served in any capacity other than as the Chief of Staff of the Medic Rig, LLC at a Supercross event?

**A.** No.

**Q.** Let's take a brief recess. I will review,

and I may be close. Off the record, Mr. Garcia,

please.

**COURT REPORTER:** Mark, you ready? All right,

back on the record. The time is 5:39 p.m. Go

ahead, Mark.

**BY MR. SCHWEIKERT:**

**Q.** Just a couple more questions, sir. Have you

told me everything that you can remember about

Brian Moreau's accident and the response to it

by the officials and your medical team?

**A.** Yes.

**Q.** Is there anything that you could do between

now and trial to refresh your recollection as

to other information that you haven't been able

to tell me today?

**MR. DOYLE:** Object to the form. Go ahead.

**BY MR. SCHWEIKERT:**

**A.** No.

**Q.** Do you consider the Supercross community to

be one big family?

270

**A.** I consider them to be the Supercross group.

**Q.** Do you still consider Brian to be part of

that Supercross group?

**A.** I consider Brian to be a racer or former

racer.

**Q.** Subject to following up with additional

questions, I will tender the witness.

**MR. GORDON:** Mr. Carson, my name's David Gordon.

I represent Feld Motorsports. I know it's been

a long day and I promise I'm going to be very

short. Are we okay, Mr. Doyle? I see you over

there.

**MR. DOYLE:** Yeah, I had Mark pinned. So, now I'm

pinning you.

**MR. GORDON:** Got you. All right.

**MR. CARSON:** Yes, sir.

**CROSS-EXAMINATION BY MR. GORDON:**

**Q.** Mr. Carson, can you hear me okay?

**A.** Yes.

**Q.** All right. So Dr. Bodnar provided testimony

in this case that Feld Motorsports did not direct supervise or control any of the medical care which was provided at Tampa on February 15, 2020. Do you have any reason to disagree with that testimony from Dr. Bodnar?

**MR. SCHWEIKERT:** Form.

**BY MR. GORDON:**

**A.** No.

**Q.** Okay. And I will tell you Dr. Kennedy, Amy Metiva, and Scott Combs, all provided similar testimony, which is that Feld Motorsports did not control, supervise, or direct any of the medical care which they provided at Tampa in February of 2020. Do you have any reason to disagree with any of that testimony?

**MR. SCHWEIKERT:** Form.

**BY MR. GORDON:**

**A.** No.

**Q.** I'm sorry, I didn't get your answer.

**A.** No.

272

**Q.** No, thank you.

**MR. DOYLE:** Same objection.

**BY MR. GORDON:**

**Q.** Thank you. You provided testimony today, and
I just want to confirm that, that all of the
medical personnel on the track that were
affiliated with Medic Rig, and obviously, we're
including Dr. Bodnar, Dr. Kennedy, Amy Metiva,
and Scott Combs, all of those folks were in
fact hired and trained by the Medic Rig?

**MR. SCHWEIKERT:** Form.

**BY MR. GORDON:**

**A.** I defer that to Dr. Bodnar.

**Q.** But to your knowledge, you've signed
contracts. So I'm not asking you details about
the actual training, etc. and so forth. I'm
just asking you, to your knowledge, did the
Medic Rig, LLC, in fact, hire for purposes of
working at the Tampa 2020 event? Dr. Bodnar,
Dr. Kennedy, Amy Metiva, and Scott Combs?

**MR. SCHWEIKERT:** Form.

**BY MR. GORDON:**

**A.** 3 of the 4 are correct.

**Q.** Okay. And who was the one who was not?

**A.** Scott Combs. He was a volunteer.

**Q.** Got it. And Scott Combs volunteering, was his agreement to volunteer at this race, was that arranged through Medic Rig?

**MR. SCHWEIKERT:** Form.

**BY MR. GORDON:**

**A.** Through Dr. Bodnar, yes.

**Q.** Okay. All right. And any training or instruction that he would've received that day that would've been through Dr. Bodnar and Medic Rig folks?

**A.** Through Dr. Bodnar.

**Q.** Thank you. Okay, and all of the medical equipment that we've talked about today, the mule that was shown in the video and photographs that you've seen, and the Medical

274

Rig, which we've not looked at photographs of,

but we've talked about where it was parked,

etc., and so forth, all of that medical

equipment was owned and provided at this Tampa

event by the Medic Rig, LLC?

**A.** Yes.

**Q.** Thank you. I will keep to my word. No

further questions.

**A.** Thank you.

**MR. GORDON:** Anything else? Go ahead, Caroline.

**MS. SPRADLIN:** Mr. Carson, I just have a few

questions. I suspect that Mr. Doyle will be

pinning me now, so.

**MR. DOYLE:** Yes.

**MS. SPRADLIN:** Let me know when I'm pinned.

**MR. DOYLE:** You're there.

**CROSS-EXAMINATION BY MS. SPRADLIN:**

**Q.** Excellent. Mr. Carson, I introduced myself

earlier, but it's been a long day. My name is

Caroline Spradlin. I'm an attorney here on

behalf of the American Motorcycle Association.

We've been referring to them all day as AMA. So

if I refer to them as AMA, will you know who

I'm talking about?

**A.** Yes.

**Q.** Great. I just have a few short questions for

you, which is similar to as Mr. Gordon asked

you. Dr. Bodnar testified that AMA also did not

direct, supervise, or control any of the

medical personnel, the medical care that was

provided during the February 15, 2020 Tampa

Supercross. Is that your understanding?

**MR. SCHWEIKERT:** Form.

**BY MS. SPRADLIN:**

**A.** Yes.

**Q.** And likewise, Dr. Kennedy, Amy Metiva, and

Scott Combs provided similar testimony that AMA

did not control, direct, or supervise the

medical care or medical personnel for the Tampa

2020 Supercross. Is that your understanding?

**MR. SCHWEIKERT:** Form.

**BY MS. SPRADLIN:**

**A.** Yes.

**Q.** And it is generally your understanding that

AMA does not direct, supervise, or control the

medical care provided by Medic Rig personnel.

Is that correct?

**MR. SCHWEIKERT:** Form.

**BY MS. SPRADLIN:**

**A.** Yes.

**Q.** That is all that I have for you today, Mr.

Carson. I greatly appreciate your patience, and

subject to any further questions that Mr.

Schweikert may have for you. Thank you for

being with us today.

**A.** Thank you.

**MR. GORDON:** Anything else, anybody?

**MR. SCHWEIKERT:** No. But thank you, Mr. Carson.

I know it's not pleasant. It's not always

pleasant to be the lawyer having to ask the

hard questions, but thank you for your time today.

**MR. DOYLE:** Okay, I have no questions, and he'll read if it's ordered.

**COURT REPORTER:** Anybody ordering this? Gordon, Doyle, Caroline?

**MR. GORDON:** Gordon will take a copy. Electronic is fine with exhibits, if you don't mind.

**MS. SPRADLIN:** I will not be ordering a copy at this time. Thank you.

**COURT REPORTER:** Gordon, you're going to give me at least 10 days, please?

**MR. GORDON:** That's fine.

**COURT REPORTER:** Thank you. I appreciate it. All right, thank you so much. Have a great day, guys. We're concluding at 5:46 p.m. Thank you.


[END]

                    CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MIAMI-DADE


     I, Jorge Garcia, do hereby certify that I was
authorized to and did transcribe the electronic notes
of the deposition of Tom Carson, that a review of the
transcript was requested; and that the foregoing
transcript, pages 05 through 275 is a true record of
the electronic notes.

     I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am
I financially interested in the action.

     Dated this 20th day of March 2025


                    *Jorge Garcia*


                    Jorge Garcia

                    Court Reporter

                    Notary Public, State of Florida

                    Commission: HH358644


DATE: March 20th, 2025
TO: Tom Carson

279

BRIAN MOREAU,
Plaintiff
vs.
FELD MOTOR SPORTS, INC. ET AL,
Defendants

CASE NO. 8:22-CV-01295-TPB-CPT

Dear Tom Carson,

 Please take notice that on March 20, 2025, you gave  your
 deposition in the above-referenced matter. At that  time,
 you did not waive signature. It is now necessary that  you
sign your deposition. You may do so by contacting your  own
attorney or the attorney who took your deposition and  make
       an appointment to do so at their office. You may
    also  contact our office at the below number, Monday -
    Friday,  9:00 AM - 5:00 PM, for further information and
                          assistance.
       If you do not read and sign your deposition
within  thirty (30) days, the original, which has already
been  forwarded to the ordering attorney, may be filed
with the  Clerk of the Court. If you wish to waive your
signature,  sign your name in the blank at the bottom of
this letter  and promptly return it to us.


Very truly yours,

---------------
JORGE GARCIA,
JG SEARCHING
JGSearching@outlook.com

I do hereby waive my signature.

--------------------
Tom Carson




                         ERRATA SHEET

280

PAGE NO.  LINE NO.

_____  _____  _____

_____  _____  _____

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-  \-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-  SIGNATURE DATE