# EXHIBIT 3



UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

BRIAN MOREAU,

    Plaintiff,

vs.                 Case No.  8:22-CV-01295-TPB-CPT

FELD MOTOR SPORTS, INC., et al,

    Defendants.

DEPOSITION OF

AMY KAYE METIVA

TAKEN ON

FRIDAY, AUGUST 9, 2024

9:13 A.M.

RAMADA WYNDHAM CONFERENCE CENTER

3325 DAVENPORT AVENUE

SAGINAW, MICHIGAN 48602



Page 6

1             TAKEN ON
2        FRIDAY, AUGUST 9, 2024
3             9:13 A.M.
4
5        THE VIDEOGRAPHER: We are on the record.
6  The time is 9:13. The date is August 9th, 2024.
7  This is the beginning of the deposition of Amy
8  Metiva. The case caption is Moreau versus Feld
9  Motor Sports.
10       Will counsel introduce yourself and state
11 whom you represent.
12       MR. SCHWEIKERT: Mark Schweikert for the
13 plaintiff, Brian Moreau.
14       MR. DOYLE: David Doyle on behalf of
15 defendants, Amy Metiva, Dr. John Bodnar, Dr. James
16 Kennedye, Scott Combs, and The Medic Rig.
17       MR. GORDON: David Gordon, Buchanan
18 Ingersoll and Rooney on behalf of the Feld
19 defendants.
20       MS. SPRADLIN: Caroline Spradlin on behalf
21 of the American Motorcyclist Association.
22       THE VIDEOGRAPHER: The court reporter will
23 now swear in the witness.
24       THE REPORTER: Ms. Amy Metiva, can you
25 please raise your right hand?

Page 7

1        Do you affirm under penalty of perjury
2  that the testimony you're about to give will be the
3  truth, the whole truth, and nothing but the truth?
4        THE DEPONENT: I will.
5        THE REPORTER: Thank you. Counsel, you may
6  proceed.
7        MR. SCHWEIKERT: Thank you.
8  AMY KAYE METIVA, having been first duly affirmed to
9  tell the truth, was examined and testified as
10 follows:
11 EXAMINATION
12 BY MR. SCHWEIKERT:
13    Q.   Good morning.
14    A.   Good morning.
15    Q.   Could you please state your full legal
16 name for the record?
17    A.   Amy Kaye Metiva.
18    Q.   What does the K stand for?
19    A.   K-A-Y-E is my middle name.
20    Q.   Oh, okay. Have you ever had your
21 deposition taken before?
22    A.   Never.
23    Q.   Have you ever been a party to a lawsuit?
24    A.   No.
25    Q.   Did you do anything to prepare for today's

Page 8

1  deposition?
2     A.   Yes. Just with my counsel.
3     Q.   Did you have any communications with
4  anyone other than your counsel?
5     A.   No, I did not.
6     Q.   Did you review any documents in preparing
7  for the deposition?
8     A.   With my counsel yesterday.
9     Q.   Do you have any email addresses?
10    A.   I do.
11    Q.   And what are those?
12    A.   The only one I have right now is Amy
13 Metiva at Yahoo dot com.
14    Q.   And how long have you had that email?
15    A.   Probably 15 years.
16    Q.   Do you have a cell phone?
17    A.   I do.
18    Q.   And what is that number?
19    A.   989-324-8784.
20    Q.   Do you have any other telephone numbers?
21    A.   No, I do not.
22    Q.   Do you know who Brian Moreau is?
23    A.   I do.
24    Q.   And you understand we're here today to
25 talk about the events on February 15th, 2020, right?

Page 9

1     A.   Correct.
2     Q.   Okay. Aside from that day, have you had
3  any communications with anyone since then about
4  Brian Moreau?
5     A.   No.
6     Q.   Never exchanged any text messages with
7  anyone about Brian?
8     A.   No.
9     Q.   Emails?
10    A.   No.
11    Q.   Could you describe to me, please, your
12 educational background?
13    A.   So I have a Bachelor's of Science degree
14 in exercise science with a concentration in athletic
15 training from Lake Superior State University, and
16 I'm board certified by the National Athletic
17 Trainers Association and licensed in the state of
18 Michigan as an athletic trainer.
19    Q.   Are you also currently licensed as an
20 emergency --
21    A.   No, I'm not.
22    Q.   -- medicine technician?
23    A.   I let that go.
24    Q.   Okay.
25         MR. DOYLE: Hey Amy, just make sure you let

Page 86

1   Q.   But if Code 3 was used, that would be a
2   situation where the racetrack should be stopped?
3        MR. DOYLE: Object to form.  Go ahead.
4        THE DEPONENT: Possibly.  It depends.
5   BY MR. SCHWEIKERT:
6   Q.   Depends on what?
7   A.   It depends on what safety scene and the
8   event of what happened to the rider.
9   Q.   Have you -- well, during your experience
10  working with the Supercross, had you heard Code 3's
11  called on the radio before?
12  A.   Only once.
13  Q.   When was that?
14  A.   That was in a Motocross race in RedBud in
15  Michigan.
16  Q.   Were you aware of any prior Supercross
17  events where a red flag had been thrown due to an
18  injured rider?
19  A.   Yes.
20  Q.   What prior instances are you thinking of?
21  A.   There was many.  The one in Nashville when
22  two riders collided midair.
23  Q.   Were you involved in that rescue?
24  A.   I was.
25  Q.   Did you ask for a red flag?

Page 87

1   A.   I did not.
2   Q.   Do you know how a red flag came about?
3   A.   Yes.  Dr. Bodnar asked for a red flag from
4   the AMA.
5   Q.   Did you communicate something to Dr.
6   Bodnar in that instance to indicate that it was --
7   A.   No.  I was on the other side of the track.
8   Q.   So -- I thought I understood that you,
9   like, responded to that crash in Nashville?
10  A.   I did.
11  Q.   Were you one of the first responders?
12  A.   No.
13  Q.   You responded after traffic was stopped?
14  A.   That is correct.
15  Q.   Do you know why they stopped the racetrack
16  in that instance?
17  A.   Because one was unconscious and the other
18  one had a broken pelvis.
19  Q.   Fair to say they stopped the track to
20  allow for the riders to receive the care they
21  needed?
22  A.   That is correct.
23  Q.   How does not stopping the racetrack impact
24  your ability to respond to an injured rider?
25       MR. DOYLE: Object to the form.  Go ahead.

Page 88

1        THE DEPONENT: You have to have your head
2   on a swivel and you have to make sure that you're
3   looking everywhere while you're going to the rider
4   to make sure that the scene is safe for you to go
5   out there, and then make sure that that rider is
6   safe as well.
7   BY MR. SCHWEIKERT:
8   Q.   Anything else?
9   A.   And then treat the athlete with whatever
10  that athlete has said, and then you're moving them
11  if they -- if you can.
12  Q.   Do you recall any other instances aside
13  from Nashville that were prior to the Tampa event
14  where a red flag was called due to an injured rider?
15  A.   No.
16  Q.   During the medical meeting at the Tampa
17  event, what did Dr. Bodnar explain about flagging?
18  A.   He asked all of us if we knew what the
19  flags were, so we went over the flag colors.  We
20  also went over making sure that, like, on a medical
21  flag, you didn't jump; but on a yellow, you could
22  jump, the blue, the black.
23  Q.   How did those flags relate to medical
24  services?
25  A.   Well, if it's a yellow flag, they can

Page 89

1   still jump.  So you have to have your head on a
2   swivel to get out to the injured rider.  If it's a
3   medical flag, then they can't jump, they have to
4   roll through the section.
5   Q.   Any other flags discussed?
6   A.   I hadn't seen a black flag.  Black flag
7   means the rider's black flag and they have to get
8   off the track immediately.  Blue flag is a -- they
9   don't really use them too much in Supercross, no.
10  Q.   Did he -- was there any discussion during
11  that meeting about a red flag?
12  A.   Yes.  And he said that if you need a red
13  flag, please let me know and I will call the AMA.
14  Q.   Was there any discussion during that
15  meeting about the protocol for removing an injured
16  rider's helmet?
17  A.   Yes.  Because we'd have the injects, and
18  the injects were in our fanny packs.  So the ones
19  that had them knew how to take the helmet off.
20  Q.   What about responding to -- strike that.
21       Was there any discussion about how
22  Supercross is dangerous and falling off a motorcycle
23  can present a risk of neck or head injuries and that
24  you needed to be careful about potential spine
25  injuries?

Page 114

1 move -- stand up on his leg to move him off the
2 track.
3   Q.   And what did he say?
4   A.   He nodded yes.
5   Q.   Did he verbally respond to that question?
6   A.   Not that I'm aware of.
7   Q.   But you believe he nodded his head yes in
8 response to your question?
9   A.   Yes.
10  Q.   Did you do anything personally to assess
11 whether the injury was sufficiently minor that you
12 could lift him to his feet?
13  A.   I kept asking if it -- if his leg was --
14 he kept saying that his leg was injured, so that's
15 why I thought I could -- that it was a left leg
16 injury and that I could move him safely off the
17 track.
18  Q.   A leg can be injured in a multitude of
19 different ways, right?
20  A.   Correct.
21  Q.   Some can be very, very serious, right?
22  A.   Right.
23  Q.   Some can be very, very minor, right?
24  A.   Correct.
25  Q.   Where on the spectrum did Brian's injury

Page 115

1 fall and how do you know that?
2   A.   Probably in the middle.
3   Q.   In the middle? Meaning what?
4   A.   Not severe enough to need -- not severe
5 enough to warrant a red flag, but enough -- severe
6 enough to warrant a mule to get him off the track to
7 go to the medical unit.
8   Q.   What was the severity of the injury that
9 you had assessed?
10  A.   He said he had a left leg injury.
11  Q.   But you're the medical professional,
12 right?
13  A.   I --, yes.
14  Q.   It's your job to determine the extent of
15 that injury?
16       MR. DOYLE: Object to the form.  Go ahead.
17       THE DEPONENT: Yes.  But when the athlete
18 says his leg -- his left leg hurts, I'm going to
19 take that as that we need to assess it, but we need
20 to assess it in a controlled, safe environment.
21 BY MR. SCHWEIKERT:
22  Q.   A controlled, safe environment could
23 include a racetrack where there's no activity
24 because it's been red flagged, right?
25       MR. DOYLE: Object to the form.  Go ahead.

Page 116

1       THE DEPONENT: No.  Because it was a left
2 leg injury, and left leg injuries go to the mule and
3 to the medical center.
4 BY MR. SCHWEIKERT:
5   Q.   So you would -- there's no circumstance
6 under which you would call for a red flag due to a
7 left leg injury; is that right?
8   A.   No, I would not.
9   Q.   Even if the left leg is broken and the
10 bone's popping out of his pants and there's blood
11 spurting everywhere, that would not be sufficiently
12 serious for a red flag?
13       MR. DOYLE: Object to the form --
14       THE DEPONENT: That would.
15       MR. DOYLE: -- go ahead.
16       THE DEPONENT: Sorry.  That would be, yes.
17 BY MR. SCHWEIKERT:
18  Q.   So there --
19  A.   But --
20  Q.   -- are circumstances?
21  A.   There are circumstances.
22  Q.   What about a paralyzed leg? Would that be
23 a circumstance sufficiently serious to warrant a red
24 flag?
25  A.   Yes.  But this was a left leg injury.

Page 117

1   Q.   How did you assess his left leg?
2   A.   Asking him, seeing if he could move it.
3   Q.   Could he move it?
4   A.   He was crawling to his bike.  To me, that
5 shows that you're moving your -- all your
6 extremities.
7   Q.   How was he crawling?
8   A.   He was crawling.
9   Q.   With his arms; is that right?
10  A.   Right.
11  Q.   Not with his legs, right?
12  A.   I did not notice.
13  Q.   Did you palpitate the leg to see if he
14 could feel it, feel your touching?
15  A.   I didn't have time on the track to do
16 that.  That was going to be happening in the
17 training -- in the medical rig where it was safe.
18  Q.   Do you know if Scott Combs did anything to
19 assess the extent of the injury?
20  A.   I do not.
21  Q.   And you're not communicating with him
22 during the on-scene rescue?
23  A.   We may be communicating.  I'm not sure
24 what I was saying.
25  Q.   Is it important for first responders to

Page 126

1  Q.  Isn't that an important part of assessing
2  an injury to know the extent of the pain that the
3  rider has?
4       MR. DOYLE: Object to the form. Go ahead.
5       THE DEPONENT: Correct.
6  BY MR. SCHWEIKERT:
7  Q.  But you didn't ask him?
8       MR. DOYLE: Object to the form.
9       THE DEPONENT: Time frame was very short.
10 BY MR. SCHWEIKERT:
11 Q.  You could have created a larger window of
12 time to assess and respond to his injury by asking
13 for a red flag, right?
14 A.  No. Because it was a left leg injury. So
15 I'm not going to ask for a red flag for a left leg
16 injury.
17 Q.  But we said earlier a left leg injury
18 could include bone popping out of the pants, right?
19 And you said that would be an instance to red flag,
20 right?
21 A.  True. But in this case, it was not.
22 Q.  But you can't tell me specifically the
23 extent of the injury, just that it was a left leg
24 injury; is that right?
25 A.  Right. That is correct.

Page 127

1  Q.  It looks like -- I'm looking at Picture
2  1195. Mr. Combs has his arms under Brian's armpits,
3  right?
4  A.  Correct.
5  Q.  Your hands are on his torso?
6  A.  Correct.
7  Q.  And why are you holding him in that way?
8  A.  To keep him stable as he's getting off the
9  track.
10 Q.  Is that because he couldn't stand on his
11 own?
12 A.  No. It was just a way to get him off the
13 track so that we could have him evaluated in the
14 trailer.
15 Q.  Were you carrying him?
16 A.  No.
17 Q.  Were you struggling to move him?
18 A.  No.
19 Q.  If you look at Picture 1196, that's you in
20 the picture, right?
21 A.  That is correct.
22 Q.  Looks like you're straining, or at least
23 that's your expression, no?
24      MR. DOYLE: Object to the form.
25      THE DEPONENT: I look like I have my mouth

Page 128

1  open.
2  BY MR. SCHWEIKERT:
3  Q.  Well, what are you doing in this photo?
4  Are you saying something?
5  A.  I might have been.
6  Q.  Do you know who that gentleman is in the
7  white --
8  A.  I do not.
9  Q.  -- shirt?
10 A.  I do not.
11 Q.  Did you say anything to this gentleman
12 when he approached you and Scott moving Brian?
13 A.  That he had a left leg injury and we were
14 moving him to the mule.
15 Q.  And what did -- did the gentleman respond?
16 A.  I'm not sure if he did.
17 Q.  Let's go to the next picture, 1197. What
18 do we see in this picture?
19 A.  Are you asking me?
20 Q.  Yeah.
21 A.  Okay. I see myself, Scott, the rider, and
22 the paramedic lifting up the left leg.
23 Q.  How do you know the gentleman in the white
24 shirt's a paramedic?
25 A.  Because anybody in a white shirt is a

Page 129

1  paramedic in Tampa.
2  Q.  So you knew he was a paramedic, but you --
3  A.  I did.
4  Q.  -- just didn't know him --
5  A.  Right.
6  Q.  -- personally?
7  A.  Correct.
8  Q.  In Picture 1197, it appears that Brian's
9  legs are dragging behind him. Do you see that?
10 A.  I do.
11      MR. DOYLE: Object to the form.
12      THE DEPONENT: I see that.
13 BY MR. SCHWEIKERT:
14 Q.  They're not underneath him, are they?
15 A.  No.
16 Q.  Did it occur to you, at this point in
17 time, that he might have a more serious injury than
18 the left leg injury that you had assessed him with?
19 A.  No. Not at this time, no.
20 Q.  It didn't concern you that his legs were
21 dragging from his torso?
22      MR. DOYLE: Object to the form. Go ahead.
23      THE DEPONENT: I was looking up and trying
24 to get him to the mule, so I did not see that.
25 BY MR. SCHWEIKERT:

Page 194

1  AMA direct you or direct Medic Rig what equipment
2  you needed to have or were required to have for the
3  2020 Tampa Supercross?
4      A.   No.
5           MR. SCHWEIKERT: Form.
6  BY MS. SPRADLIN:
7      Q.   Following the event, did you communicate
8  with anyone at -- following the event, being the
9  2020 Tampa Supercross, did you communicate with
10 anyone from AMA regarding the events of that day?
11     A.   No.
12     Q.   And in terms of the decisions that you
13 made in rendering medical care to Brian Moreau, did
14 you receive any direction or any instruction from
15 anyone at the AMA regarding those decisions?
16     A.   No.
17          MR. SCHWEIKERT: Form.
18 BY MS. SPRADLIN:
19     Q.   And no one at the AMA told you where to be
20 positioned on the track during the Tampa Supercross
21 event?
22     A.   Correct.
23     Q.   We spoke about -- we spoke in detail about
24 the medical minute that was conducted at each event
25 and the medical minute that was conducted the day of

Page 195

1  the event.  I have the name of that correct, it was
2  --
3      A.   That is correct.
4      Q.   -- called the medical minute? Was anyone,
5  as far as you recall, anyone from the AMA in
6  attendance at that medical minute meeting?
7      A.   No.
8      Q.   Okay.  And as far as you're aware, no one
9  from the AMA directed what was to be discussed or
10 instructed during that medical minute meeting?
11     A.   That is correct.
12          MR. SCHWEIKERT: Form.
13 BY MS. SPRADLIN:
14     Q.   And in terms of reimbursements for your
15 participation, as far as you're aware, you were not
16 reimbursed for anything relating to your
17 participation in the 2020 Tampa Supercross by AMA?
18     A.   Correct.
19     Q.   And you have no employment agreement
20 between yourself and AMA at this time?
21     A.   No, I do not.
22     Q.   Have you ever had any employment agreement
23 between yourself and AMA?
24     A.   No.
25     Q.   Have you ever had any kind of contractual

Page 196

1  agreement between yourself and AMA that you're aware
2  of?
3      A.   No.
4           MR. SCHWEIKERT: Form.
5  BY MS. SPRADLIN:
6      Q.   And you don't consider AMA to be your
7  employer as of February 15th, 2020?
8      A.   Correct.
9           MR. SCHWEIKERT: Form.
10 BY MS. SPRADLIN:
11     Q.   And you never have considered AMA to be
12 your employer as of any time relating to Supercross?
13          MR. SCHWEIKERT: Form.
14          THE DEPONENT: Correct.
15 BY MS. SPRADLIN:
16     Q.   Okay.  Give me just one moment, and I
17 think we can wrap you up and get you out of here.
18          With respect to red flagging, we discussed
19 the red flagging in detail, have you ever, in your
20 experience working as -- with the medical team for
21 the Supercross events, did you ever ask for a red
22 flag and be denied the red flag, be refused that red
23 flag being thrown?
24     A.   No.
25     Q.   And on the day of the event in question,

Page 197

1  February 15th, 2020, relating to Brian Moreau's
2  injuries, did you ask for a red flag to be thrown?
3      A.   No, I did not.
4      Q.   And as far as you're aware, no one else
5  asked for a red flag to be thrown during the 2020
6  Tampa Supercross relating to Brian Moreau's
7  injuries?
8      A.   Correct.
9           MS. SPRADLIN: Okay.  I don't have any more
10 questions, so I will tender the witness.  Thank you
11 very much, Ms. Metiva, for your time.
12          MR. DOYLE: I've got a few.
13 EXAMINATION
14 BY MR. DOYLE:
15     Q.   Oh, yeah.  Sorry Amy.  I didn't think of
16 anything further but just to introduce myself on
17 video, my name is David Doyle.  I know you know that
18 and I -- because I have the privilege of
19 representing you and some of the other folks on the
20 Alpinestars team.  So I want to ask you a couple of
21 follow-up questions.  It has been, I guess,
22 insinuated, suggested that you may have acted
23 quickly in assessing a rider like Brian because of
24 some concern or pressure to get -- well, in this
25 instance, the practice resumed quickly.  Do you