# EXHIBIT 4




UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

BRIAN MOREAU,

    Plaintiff,

vs.              CASE NO. 8:22-CV-01295-TPB-CPT

FELD MOTOR SPORTS, INC., et al.,

    Defendants.

VIDEOTAPED DEPOSITION OF

SCOTT COMBS

TAKEN ON

THURSDAY, AUGUST 15, 2024

10:07 A.M.

BUCHANAN INGERSOLL & ROONEY, PC

401 EAST JACKSON STREET, SUITE 2400

TAMPA, FLORIDA 33602



Page 6

```
 1              EXHIBIT INDEX
 2                                          PAGE
 3   31 - Volunteer Agreement                 82
 4   032 - Map of Raymond James Stadium       92
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1            VIDEOTAPED DEPOSITION OF
 2                  SCOTT COMBS
 3                   TAKEN ON
 4            THURSDAY, AUGUST 15, 2024
 5                   10:07 A.M.
 6
 7         THE VIDEOGRAPHER:  Okay.  We are on the
 8   record.  The time is 10:07 a.m.  The date is August
 9   15th, 2024.
10         Court Reporter, would you swear in the
11   witness.
12         THE REPORTER:  Yes.  All right.
13         Mr. Combs, please raise your right hand.
14         Do you affirm under penalty of perjury
15   that the testimony you're about to give will be the
16   truth, the whole truth, and nothing but the truth?
17         THE DEPONENT:  Yes, ma'am.
18         THE REPORTER:  Thank you so much.
19         THE VIDEOGRAPHER:  This is the beginning
20   of the deposition of Scott Combs in the case name of
21   Moreau versus Feld Motor Sports.  Naegeli job number
22   is 76223, but case Number 8:22-CV-01295-TPB-CIT
23   (sic).
24         Will counsel introduce yourselves and
25   state whom you represent.
```

Page 8

```
 1         MR. SCHWEIKERT:  Good morning.  My name is
 2   Mark Schweikert.  I represent Plaintiff, Brian
 3   Moreau.
 4         MR. DOYLE:  David Doyle, on behalf of
 5   Defendants Scott Combs, Dr. John Bodnar, Dr. James
 6   Kennedye, Amy Metiva, and The Medic Rig, LLC.
 7         MR. GORDON:  David Gordon, on behalf of
 8   the Feld defendants.
 9         MS. SPRANDLIN:  Caroline Spradlin, on
10   behalf of the American Motorcyclist Association.
11         THE VIDEOGRAPHER:  And you may proceed.
12         MR. SCHWEIKERT:  Did you swear the witness
13   already?
14         THE REPORTER:  Yes.
15         MR. SCHWEIKERT:  Okay.
16   SCOTT COMBS, having been first duly affirmed to tell
17   the truth, was examined, and testified as follows:
18   EXAMINATION
19   BY MR. SCHWEIKERT:
20        Q.   Good morning, sir.
21        A.   Good morning, sir.
22        Q.   A little bit of brain fog for myself so
23   you have -- I have to apologize in advance.
24        A.   Me too.
25        Q.   Could you please tell me your full legal
```

Page 9

```
 1   name?
 2        A.   Scott Frisco Combs.
 3        Q.   And where are you from?
 4        A.   Hudson, Florida.
 5        Q.   Where's that?
 6        A.   Just north of New Port Richey.  Just north
 7   of Tampa.  About an hour.
 8        Q.   Have you ever lived anywhere else?
 9        A.   No, sir.
10        Q.   Have you ever had the pleasure of your
11   deposition being taken before?
12        A.   Just through work, but that was all based
13   off of, like they needed my report for like a hit
14   and run or something like that.  But, yes, I have
15   done a deposition before.
16        Q.   Approximately how many times?
17        A.   Approximately?  Maybe two or three.
18        Q.   When was the most recent deposition that
19   you can remember?
20        A.   I -- I don't really remember, to be honest
21   with you.
22        Q.   And in those cases, to the best of your
23   recollection you were a witness to an accident?
24        A.   Yeah.  They just needed me to read off
25   some of my report or whatnot.
```

Page 102

1  the assessment and said it was his leg then why
2  would I -- why would I question it?  It would kind
3  of be -- it would kind of be counterproductive if I
4  -- she went in and assessed him and then I had to go
5  and do the same exact assessment.  Then we're -- you
6  know what I mean?
7      Q.  You don't think second opinions can be
8  useful in a medical setting?
9          MR. DOYLE:  Object --
10         MR. GORDON:  Object.
11         MS. SPRANDLIN:  Object.
12         MR. DOYLE:  -- to the form.
13         Go ahead.
14         THE DEPONENT:  Yeah.  But circumstances
15 are different.
16 BY MR. SCHWEIKERT:
17     Q.  What do you --
18     A.  We can -- we can get that second opinion
19 or not next to bikes landing next to us.  If you can
20 do a quick assessment and understand that it's --
21 it's a leg injury.  Then let's get him off the track
22 where we can then do a proper care of him.
23     Q.  Did it occur to you to possibly see if the
24 racetrack could be stopped so you could complete
25 your assessment on the track?

Page 103

1      A.  That wasn't my call.
2      Q.  Whose call was it?
3      A.  Amy's.
4      Q.  How do you know that?
5      A.  I would assume because she was the first
6  one there and she had worked for them.
7      Q.  Do you know if Amy is a paramedic?
8      A.  I don't know what she is.
9      Q.  Do you know her professional background at
10 all?
11     A.  Other than she was there.  Pretty sure I
12 was told that -- what she's done, but I still don't
13 even know.
14     Q.  You were essentially deferring to Amy
15 while you were on the scene.  Is that what you're
16 saying?
17     A.  Yeah.  Because she got there first.  She
18 did the assessment.  She said it was his leg.  Get
19 him off the track.  I went, okay.  Picked him up.
20 Got him off the track.
21     Q.  I think we had talked earlier about how if
22 there's like a broken leg you might want to splint
23 it, right?
24     A.  Mm-hmm.  Yes.  We also talked about the
25 difference between life-threatening situations.  So

Page 104

1  in this case a rapid extraction would be fine,
2  right, while there's bikes landing next to us.
3  Let's get him away from the situation.  We thought
4  it was a leg.  You know, and let's get away from the
5  danger.
6          If I have a house fire -- if I have a
7  house fire and have somebody break his leg inside of
8  a house fire, am I going to stay inside and splint
9  it, or am I going drag him out.  Get him out of the
10 danger and then -- you know what I mean?  It's not
11 -- it's not the same exact thing, obviously, but it
12 kind of correlates.
13         She did the assessment.  She said that it
14 was his leg.  She said, get him out of -- off the
15 track.  I went, okay.  Nothing jumped out at me that
16 said otherwise.  If he was unresponsive,
17 unconscious, right?  How would I know at that point
18 it was his leg?  We'd probably need to re-evaluate
19 that section.  He was limp, you know.
20     Q.  He -- was he limp?
21     A.  I don't think so.  Not that I recall.
22     Q.  It's my understanding you felt the scene
23 was unsafe and that you were in danger because it
24 was an active racetrack.
25         MR. GORDON:  Objection to form.

Page 105

1  BY MR. SCHWEIKERT:
2      Q.  Is that right?
3          MS. SPRANDLIN:  Join.
4          MR. DOYLE:  Join.
5          THE DEPONENT:  It was an active racetrack,
6  yeah.
7  BY MR. SCHWEIKERT:
8      Q.  And you just compared it to having a house
9  on fire, right?
10     A.  Mm-hmm.
11     Q.  Is that yes?
12     A.  Yes, sir.
13     Q.  It's an emergency situation that needs to
14 be addressed, right?
15     A.  Yes, sir.
16     Q.  Were you aware that it was possible to
17 stop the activity on the racetrack to allow for a
18 more prolonged medical intervention?
19     A.  I guess, we could have if we -- if she
20 thought it was necessary.  She did the assessment.
21 And nothing jumped out at me stating that she was
22 wrong.
23     Q.  Did you hear her ask Brian if he was in
24 pain?
25     A.  I don't remember.